**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FILED**

JAN – 8 2010

**Clerk, U.S. District and
Bankruptcy Courts**

MORRIS D. DAVIS,

Plaintiff,

v.

JAMES H. BILLINGTON, in his official
capacity as the Librarian of Congress, and
DANIEL P. MULHOLLAN, in his individual
capacity,

Defendants.

Case No. **10  0036**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER
OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION**

Aden J. Fine (D.C. Bar No. 485703)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2693

Arthur B. Spitzer (D.C. Bar No. 235960)
Frederick V. Mulhauser (D.C. Bar. No. 455377)
American Civil Liberties Union
  of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, D.C. 20036
(202) 457-0800

Jameel Jaffer
Alexander A. Abdo
National Security Project
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-7814

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. i

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

    A. Plaintiff Colonel Morris Davis ........................................................................... 2

    B. Col. Davis' Employment at CRS. ....................................................................... 3

    C. The *Wall Street Journal* Op-Ed and the *Washington Post* Letter to
       the Editor, and Subsequent Termination. .......................................................... 6

    D. Nature of the Claims and Irreparable Injury to Col. Davis. .............................. 9

ARGUMENT ................................................................................................................. 10

I.     COL. DAVIS IS LIKELY TO SUCCEED ON THE MERITS OF
        HIS CLAIM THAT HIS TERMINATION VIOLATED THE FIRST
        AND FIFTH AMENDMENTS. ................................................................. 10

        A. The Library Unconstitutionally Terminated Col. Davis for
           Writing Opinion Pieces as a Citizen on a Matter of Immense
           Public Concern. ............................................................................................. 11

           1. Col. Davis Spoke as a Citizen on a Matter of Immense
              Public Concern When He Wrote His Opinion Pieces. ........................ 11

           2. Col. Davis's Interest in Participating in Public Affairs
              and the Public's Interest in His Contribution to the
              Military-Commissions Debate Outweigh Any Speculative
              Threat to the Library's Interest in Nonpartisanship and
              Objectivity. ........................................................................................ 14

           3. Col. Davis's Termination Was Motivated in Substantial
              Part—in Fact Entirely—by His Protected Speech. .............................. 26

           4. The Library Cannot Show by a Preponderance of the
              Evidence That Col. Davis's Termination Would Have
              Occurred Otherwise. ......................................................................... 27

        B. If Col. Davis's Opinion Pieces Were Prohibited by CRS Policy,
           the Policy Violates the First Amendment. ...................................................... 29

        C.  The Library's and CRS's Policies Governing Outside Speech Are
            Unconstitutionally Vague Under the First and Fifth Amendments. ...............31

            1.  Col. Davis Had No Fair Warning That His Outside Speech
                Might Violate CRS's or the Library's Policies....................................32

            2.  CRS's Policy on Outside Speech Is Facially Vague............................35

II.     COL. DAVIS WILL SUFFER IRREPARABLE INJURY WITHOUT
        IMMEDIATE INJUNCTIVE RELIEF.......................................................................38

III.    THE BALANCE OF HARDSHIPS TIPS IN FAVOR OF COL. DAVIS
        AS IMMEDIATE RELIEF WOULD NOT SUBSTANTIALLY INJURE
        THE LIBRARY OF CONGRESS. ...........................................................................42

IV.    THE PUBLIC INTEREST WOULD BE FURTHERED BY AWARDING
        IMMEDIATE RELIEF TO COL. DAVIS...................................................................44

CONCLUSION.............................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Autauga County Bd. of Educ.,*
    685 F.2d 1302 (11th Cir. 1982) ........................................................................44

*Am. Fed'n of Gov't Employees v. Dist. of Columbia,*
    No. Civ.A. 05-0472, 2005 WL 1017877 (D.D.C. May 2, 2005) ......................30

*Am. Fed'n of Gov't Employees v. United States,*
    104 F. Supp. 2d 58 (D.D.C. 2000) ...................................................................40

*Am. Postal Workers Union v. U.S. Postal Serv.,*
    830 F.2d 294 (D.C. Cir. 1987) .........................................................................15

*Arnett v. Kennedy,*
    416 U.S. 134 (1974) ....................................................................................35, 36

*Cal. Pharmacists Ass'n v. Maxwell-Jolly,*
    563 F.3d 847 (9th Cir. 2009) ............................................................................40

*Callicotte v. Carlucci,*
    698 F. Supp. 944 (D.D.C. 1988) ......................................................................39

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995) ...........................................................................10

*Clark v. Library of Cong.,*
    750 F.2d 89 (D.C. Cir. 1984) ...........................................................................40

*Coates v. City of Cincinnati,*
    402 U.S. 611 (1971) ....................................................................................37, 38

*\*Connick v. Myers,*
    461 U.S. 138 (1983) ....................................................................................12, 30

*Davis v. Pension Benefit Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) .......................................................................10

*DeNovellis v. Shalala,*
    135 F.3d 58 (1st Cir. 1998) ..............................................................................41

*Eberhardt v. O'Malley,*
    17 F.3d 1023 (7th Cir. 1994) ...........................................................................14

*Elrod v. Burns,*
   427 U.S. 347 (1976)...................................................................................41, 42

*Faulkner v. N.C. Dep't of Corr.,*
   428 F. Supp. 100 (W.D.N.C. 1977) ...............................................................40

*Feinerman v. Bernardi,*
   558 F. Supp. 2d 36 (D.D.C. 2008) .................................................................40

*Fire Fighters Ass'n v. Barry,*
   742 F. Supp. 1182 (D.D.C. 1990)...................................................................31

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006)..........................................................................12, 13, 14

*Garrison v. Louisiana,*
   379 U.S. 64 (1965)..........................................................................................12

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972)..........................................................................31, 37, 38

*Hall v. Ford,*
   856 F.2d 255 (D.C. Cir. 1988) .......................................................................15

*Hall v. Johnson,*
   599 F. Supp. 2d 1 (D.D.C. 2009).....................................................................10

*Hubbard v. Adm'r, Envtl. Prot. Agency,*
   982 F.2d 531 (D.C. Cir. 1992) (en banc) ................................................39, 40

*Jessen v. Vill. of Lyndon Station,*
   519 F. Supp. 1183 (W.D. Wis. 1981) .............................................................40

*Johnson v. Bergland,*
   586 F.2d 993 (4th Cir. 1978) .........................................................................39

*Kan. Health Care Ass'n v. Kan. Dep't of Social & Rehab. Servs.,*
   31 F.3d 1536 (10th Cir. 1994) .......................................................................40

*Keeffe v. Library of Cong.,*
   777 F.2d 1573 (D.C. Cir. 1985) ............................................................. *passim*

*Little v. Fenty,*
   Civil No. 09-2308, 2009 WL 4981535 (D.D.C. Dec. 15, 2009).......................10

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
    429 U.S. 274 (1977)....................................................................................................11, 26, 27

*Nat'l Treas. Employees Union v. U.S. Dep't of Treasury,*
    838 F. Supp. 631 (D.D.C. 1993) .................................................................................44

*\*Navab-Safavi v. Broad. Bd. of Governors,*
    650 F. Supp. 2d 40 (D.D.C. 2009) ................................................................14, 15, 16, 25

*O'Donnell v. Barry,*
    148 F.3d 1126 (D.C. Cir. 1998) ..................................................................................15

*Pearson v. Shalala,*
    130 F. Supp. 2d 105 (D.D.C. 2001) ............................................................................44

*People for the Ethical Treatment of Animals, Inc. v. Gittens,*
    215 F. Supp. 2d 120 (D.D.C. 2002), *reversed on other grounds*, 414 F.3d 23 (D.C. Cir.
    2005) ........................................................................................................................44

*\*Pickering v. Bd. of Educ. of Township High Sch. Dist. 205,*
    391 U.S. 563 (1968)................................................................................................ *passim*

*Rankin v. McPherson,*
    483 U.S. 378 (1987)..........................................................................................10, 11, 18

*Republican Party of Minn. v. White,*
    536 U.S. 765 (2002)..........................................................................................23, 24, 25

*Robinson v. Dist. of Columbia,*
    No. Civ. A.97-787, 1997 WL 607450 (D.D.C. July 17, 1997)............................27, 39, 44

*S. Pac. Comm'ns Co. v. Am. Tel. & Tel. Co.,*
    740 F.2d 980 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1005 (1985) .................................25

*Sampson v. Murray,*
    415 U.S. 61 (1974)....................................................................................................41

*Sanjour v. EPA,*
    56 F.3d 85 (D.C. Cir. 1995) ........................................................................12, 16, 30, 31

*Spagnola v. Mathis,*
    859 F.2d 223 (D.C. Cir. 1988) (en banc) ....................................................................40

*Stolte v. Laird,*
    353 F. Supp. (D.D.C. 1972) .......................................................................................35

*Thomas v. Carpenter*,
  881 F.2d 828 (9th Cir. 1989) .........................................................................................14

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*,
  413 U.S. 548 (1973)...........................................................................................22, 36, 37

*United Public Workers of America v. Mitchell*,
  330 U.S. 75 (1947)........................................................................................................22

*United States v. Fausto*,
  484 U.S. 439 (1988)......................................................................................................40

*\*United States v. Nat'l Treasury Employees Union* (*NTEU*),
  513 U.S. 454 (1995)..........................................................................13, 14, 15, 29

*United States v. New York*,
  708 F.2d 92 (2d Cir. 1983)............................................................................................40

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976)......................................................................................................42

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982)......................................................................................................31

*Waters v. Churchill*,
  511 U.S. 661 (1994)................................................................................................12, 15

*Watts v. Alfred*,
  794 F. Supp. 431 (D.D.C. 1992) ...............................................................................43, 44

*Westbrook v. Teton County Sch. Dist. No. 1*,
  918 F. Supp. 1475 (D. Wyo. 1996)...........................................................................35, 36

*Westfield High Sch. L.I.F.E. Club v. City of Westfield*,
  249 F. Supp. 2d 98 (D. Mass. 2003) ..........................................................................36, 37

*Winter v. Natural Res. Def. Council, Inc.*,
  129 S. Ct. 365 (2008)....................................................................................................10

*Wright v. FBI*,
  Nos. 02-915, 03-226, 2006 WL 2587630 (D.D.C. July 31, 2006) ....................................13

**Statutes and Regulations**

2 U.S.C. § 166.....................................................................................................22, 37

5 C.F.R. § 734.101 ........................................................................................................................22

LCR 2023-3, § 2 ............................................................................................................................37

LCR 2023-3, § 3 ............................................................................................................................37

## INTRODUCTION

Plaintiff Colonel Morris D. Davis, a former Chief Prosecutor for the military commissions, brings this motion for immediate relief to prevent the Library of Congress (the "Library"), his current employer, from causing him to suffer further irreparable injury through its violation of his constitutional rights.  Col. Davis was unconstitutionally removed from his position as the Assistant Director of the Foreign Affairs, Defense, and Trade Division of the Congressional Research Service ("CRS") and reassigned to a temporary position starting December 22, 2009, for writing an Op-Ed in the *Wall Street Journal* and a Letter to the Editor in the *Washington Post* expressing his personal views on the recent decision of the Obama administration to use a dual system of federal courts and military commissions to try Guantánamo detainees.  These paradigmatic examples of speech on a matter of immense public concern by a public employee as a private citizen are protected by the First Amendment, and Defendants' actions in terminating him for engaging in this speech, based on an unconstitutionally vague policy, violated Col. Davis's First and Fifth Amendment rights.

Col. Davis's temporary reassignment within CRS will expire on January 20, 2010, after which Col. Davis will no longer be employed by the Library.  Col. Davis now seeks a temporary restraining order and/or a preliminary injunction ordering the Library to reinstate him to his prior position or, in the alternative, prohibiting the Library from terminating his period of reassignment and from permanently filling his Assistant Director position, pending a final decision on the merits of his First and Fifth Amendment claims against the Librarian.[1]  Because Col. Davis is not entitled to the protections of the Civil Service Reform Act or other agency procedures, this lawsuit is the only recourse he has for the Library's unconstitutional actions.

---

[1] Col. Davis filed this lawsuit against the Library and against the Director of CRS, Daniel P. Mulhollan, in his personal capacity.  This motion is premised solely on the claims against the Library.

Without interim relief, the Library may be able to eviscerate the very relief that Col. Davis would otherwise be entitled to obtain from this Court by quickly hiring a replacement for his position and by claiming immunity to other forms of relief.  In fact, the Library posted a vacancy for Col. Davis's former position the day of this filing.  Immediate relief is also necessary to prevent the ongoing loss of Col. Davis's and other CRS employees' First Amendment rights because of CRS's unconstitutionally vague policy and CRS's interpretation of this policy, which are chilling the speech of Col. Davis and other CRS employees.

Col. Davis more than satisfies the requirements to obtain immediate relief.  The subject matter of the speech engaged in by Col. Davis—Guantánamo and the military commissions—is of immense public interest, and Col. Davis's speech cannot be said to have caused any significant disruption to CRS's ability to function.  The public has an especially significant interest in hearing Col. Davis's views—and protecting his right to express those views—on this subject because of Col. Davis's unique experience and perspective.  The Library, on the other hand, has no real need to avoid the immediate relief sought by Col. Davis.  Because Col. Davis will otherwise suffer irreparable injury if immediate relief is not granted, the Court should grant his request for a temporary restraining order and/or a preliminary injunction.

## STATEMENT OF FACTS

### A.    Plaintiff Colonel Morris Davis.

Plaintiff Colonel Morris Davis is a twenty-five-year veteran of the U.S. Air Force who has served in important leadership and staff positions, including as the Director of the U.S. Air Force Judiciary at Bolling Air Force Base in Washington, D.C., and has received numerous awards and recognition, including the Legion of Merit.  Davis Decl. ¶¶ 5-6.  Because of his successful career, Col. Davis was appointed as the Chief Prosecutor for the Department of

2

Defense's Office of Military Commissions in September 2005. *Id.* ¶ 8. In that role, he was responsible for overseeing the military commissions created to prosecute suspected terrorists being held at Guantánamo Bay, Cuba, a position which carried enormous responsibilities and which was the subject of intense public scrutiny and attention. *Id.* Although he initially was a firm supporter of the military commissions, he resigned from his position in October 2007 because he came to believe that they had become fundamentally flawed and politically tainted. *Id.* ¶ 9.

After his resignation, Col. Davis became a vocal critic of the Bush administration's military commissions system. He wrote opinion pieces for major newspapers like the *New York Times* and the *Los Angeles Times*, published a law review article in the Northwestern University Law Review Colloquy, and spoke about his experiences and his personal views concerning Guantánamo and the military commissions at various law schools and before legal organizations. *Id.* ¶ 10. Because of his unique experience and his ongoing participation in the public debate over the military commissions, Col. Davis was asked to testify before Congress in July 2008. *Id.* ¶ 11.

### B.      Col. Davis's Employment at CRS.

On December 22, 2008, after retiring from military service, Col. Davis began work at the Congressional Research Service ("CRS"), a service unit of the Library of Congress (the "Library"), as the Assistant Director of its Foreign Affairs, Defense, and Trade ("FDT") Division. Davis Decl. ¶ 16. Although in his interviews and in his application Col. Davis emphasized his experience with the military commissions and his subsequent public speaking activities on that issue, neither Defendant CRS Director Daniel P. Mulhollan nor any other individual in CRS management told him that similar public speaking or writing in the future

would imperil his ability to serve as an Assistant Director or compromise the work of CRS or the Library, and Col. Davis's employment was not conditioned in any way on his willingness to forego such activities. *Id.* ¶¶ 13-15.

Col. Davis's primary responsibility as the Assistant Director was to supervise the research and analytical work of the approximately 95 employees within the FDT Division. *Id.* ¶16. Like other Assistant Directors, Col. Davis was not expected to and did not author any written reports or analyses on behalf of CRS. *Id.* ¶ 17. In addition, although he participated in internal policy discussions about how to run the office, he did not have any authority to establish CRS-wide policy. *Id.* ¶ 18.

The FDT Division, which Col. Davis supervised, has official responsibilities and duties over subject matters relating to foreign affairs, the Defense Department, and international trade and finance, but not for issues related to military commissions. *Id.* ¶¶ 16, 19. Legislative attorneys within a separate division of CRS, the American Law Division ("ALD"), have sole responsibility for military commissions issues. *Id.* ¶ 19. Every congressional inquiry and all reports and analyses on the military commissions have been handled by ALD, not by FDT. *Id.* ¶¶ 21-23, Ex. C (Search for CRS Reports, "military commissions") (showing that all current and archived CRS reports on military commissions since 2001 have been handled by ALD attorneys), Ex. D (Requests, military commissions) (showing that all requests for research regarding military commissions since the implementation of the electronic system have been assigned to ALD attorneys). The CRS subject directory, which indicates which CRS employees are responsible for responding to congressional inquiries about specific subjects, lists issues like "military law," "war detainees," and "international military tribunals" as topics within the expertise of the ALD attorneys. *Id.* ¶ 20, Ex. E (CRS Subject Directory: American Law

Division).  In addition, the several CRS seminars and workshops that have been held for

congressional staff on military commission related issues since 2001 have been conducted by

legislative attorneys from ALD.  *Id.* ¶ 24.  Although Col. Davis informally peer reviewed several

ALD products, assisted that division's staff in making contact with relevant outside parties, and

conducted a briefing for ALD staff on his experiences as chief prosecutor, he undertook those

activities not pursuant to his official duties but as another resource for the ALD attorneys, similar

to outside contacts or experts who may not be neutral on the issues researched by ALD.  *Id.* ¶ 25.

     Col. Davis continued to speak publicly on the prosecution and treatment of Guantánamo

detainees during his employment at CRS, with explicit approval from CRS management.  *Id.* ¶

26.  For example, Mr. Mulhollan approved his participation in a conference at Case Western

Reserve Law School concerning the military commissions, and the submission of an article in

connection with it.  *Id.* ¶¶ 29-31, Ex. F (Morris D. Davis, *Historical Perspective on Guantánamo

Bay: The Arrival of the High value Detainees*, 42 Case W. Res. J. Int'l L. 115 (2009)).  CRS's

attorneys also approved his participation without an explicit disclaimer disassociating himself

from CRS.  *Id.* Ex. G (Email from Kent Ronhovde to Morris Davis (Sept. 10, 2009, 07:34 EST)).

Mr. Mulhollan also approved his acceptance of the Charles E. Whittaker Award from the

Lawyers Association of Kansas City honoring him for speaking out against torture and the

politicization of the military commissions.  *Id.* ¶ 32, Ex. H (Email from Dan Mulhollan to Morris

Davis, et al. (Aug. 24, 2009, 16:58 EST)).  Col. Davis also spoke on several other occasions at

events, on the web, and in an interview for the BBC on issues related to treatment and

prosecution of detainees without always providing an express disclaimer.  *Id.* ¶¶ 26-33.  On each

of those occasions, CRS management was satisfied that the topic of discussion did not relate to

his official responsibilities or duties and that he could engage in such speech on his personal time

without harming the interests of CRS or the Library. *Id.* Although Col. Davis was hesitant to speak at the beginning of his employment, these approvals gave him confidence that his speech activities did not violate any provisions of the Library of Congress regulations or CRS policy on outside speaking, which specifically regulate only speech related to the topic area for which an employee has responsibility at CRS, and which provides that employees shall not be required to submit personal writings for prior review. *Id.* ¶¶ 35, 53, 54. Although CRS tracks media coverage of its employees, nobody at CRS questioned Col. Davis's ability to serve as an effective and valuable Assistant Director as a result of the opinions he expressed in the course of his outside speaking activities. *Id.* ¶ 36.

To the contrary, throughout his time at CRS until November 2009, Mr. Mulhollan and others consistently told Col. Davis that he was doing a very good job, that he was well-liked and respected by his CRS colleagues, and that he was a good fit for CRS. *Id.* ¶ 37. Col. Davis's six-month review reflected this positive feedback. *Id.* Ex. I (Six Months Qualifying Period Performance and Conduct Evaluation). Moreover, during their regular meetings, Mr. Mulhollan consistently made clear to Col. Davis that he was more than satisfied with Col. Davis's performance; he also told Col. Davis that he should rest assured that he was satisfactorily completing his mandatory one-year probationary period. *Id.* ¶ 37. Indeed, on November 10, 2009, the day before the publication of the opinion pieces for which Col. Davis was terminated, Mr. Mulhollan reaffirmed his satisfaction with Col. Davis's performance and stated that others at CRS liked Col. Davis and thought that he was doing a very good job. *Id.* ¶ 38.

## C.    The *Wall Street Journal* Op-Ed and the *Washington Post* Letter to the Editor, and Subsequent Termination.

In November 2009, U.S. Attorney General Eric Holder announced that some of the detainees at Guantánamo would be tried in federal court in the United States, and that others

would continue to be prosecuted in military commissions.  Because of his prior personal

experience and expertise, Col. Davis felt compelled to express his personal views on this matter

of immense public interest and concern.  Davis Decl. ¶ 40.  Over the weekend of November 7-8,

at home, in his personal capacity, from his personal computer, he wrote and submitted two

opinion pieces, *id.* ¶ 39:  (1) an op-ed to the *Wall Street Journal* about Attorney General Holder's

decision (the "Op-Ed"), *id.* Ex. A (Morris Davis, Op-Ed., *Justice and Guantánamo Bay*, Wall St.

J., Nov. 10, 2009); and (2) a letter to the editor of the *Washington Post* on the use of federal

courts to try some of the individuals being held at Guantánamo (the "Letter to the Editor"), *id.*

Ex. B (Morris Davis, Letter to the Editor, Wash. Post, Nov. 11, 2009) (collectively, the "opinion

pieces").

Col. Davis's principal point in these pieces was that, in his view, there should only be one

judicial system for all of the Guantánamo detainees, rather than two separate systems, because

having two separate systems will inevitably lead many to believe that one system is fair (the

federal courts) and one is less fair (the military commissions).  *Id.* ¶ 41.  He had criticized both

the Bush and the Obama administrations' military commissions policies in the past, and had

expressed this exact view on other occasions, including at the Case Western event.  *Id.* ¶ 42.  He

arrived at this conclusion based on a thorough analysis of policy and legal issues that he had

undertaken as the former Chief Prosecutor for the military commissions, not based on any

information or knowledge that he gained as a result of his employment with CRS.  *Id.*  Neither of

the opinion pieces  referenced CRS or the Library, and the bylines made clear that Col. Davis

was writing in his personal capacity.  *Id.* ¶ 43.

Because of Col. Davis's unique experience and the valuable perspective he could offer

the public on these issues of public concern, both the *Wall Street Journal* and the *Washington*

*Post* decided to publish his opinion pieces. The two newspapers informed Col. Davis of their decision on November 10, 2009. *Id.* ¶ 39. Col. Davis did not insist on an express disclaimer disassociating himself from CRS because he believed, on the basis of prior approval of his speech, that he could comply with the spirit of the express disclaimer policy by ensuring that neither CRS nor the Library was mentioned in the pieces and that it was clear that he was speaking in his personal capacity. *Id.* ¶ 43. He also believed, based on a conversation with an editor from the *Washington Post*, that including such a disclaimer would be counterproductive to the disclaimer policy by highlighting his association with CRS. *Id.* Col. Davis promptly informed Mr. Mulhollan that the two pieces would be printed on November 11, 2009. *Id.* ¶ 44. Mr. Mulhollan then asked Col. Davis to send him a copy of the articles. *Id.* ¶ 45, Ex. J (Email from Dan Mulhollan to Morris Davis (Nov. 10, 2009, 19:56 EST)). Col. Davis did so immediately, forwarding the versions he had submitted. *Id.* ¶ 45.

After reading the opinion pieces, Mr. Mulhollan sent a highly threatening and hostile email to Col. Davis, questioning Col. Davis's judgment and ability to continue serving as an Assistant Director. *Id.* ¶ 45, Ex. K (Email from Dan Mulhollan to Morris Davis (Nov. 10, 2009, 22:17 EST)). On November 12, the day after the pieces appeared in the papers, Mr. Mulhollan called Col. Davis into a meeting with Richard Ehlke, the acting Deputy Director of CRS. *Id.* ¶ 47. During this meeting, Mr. Mulhollan told Col. Davis that he could not believe that Col. Davis had written these pieces and that Col. Davis's actions had caused him to doubt Col. Davis's judgment and suitability to serve as an Assistant Director. *Id.* Mr. Mulhollan informed Col. Davis that he would not be converted to permanent status, despite his previous assurances, and that, instead, Col. Davis's mandatory one-year probationary period would be extended for 90 additional days. *Id.*

The next day, on November 13, Mr. Mulhollan again called Col. Davis into a meeting with Mr. Ehlke. When Col. Davis refused to acknowledge that it was impermissible for him to have written the opinion pieces, Mr. Mulhollan handed him a pre-written formal letter of admonishment. *Id.* ¶ 48, Ex. L (Memorandum from Daniel P. Mulhollan to Morris Davis (Nov. 13, 2009) ("Admonishment letter")). As Col. Davis stood to leave the room, Mr. Mulhollan told Col. Davis that he was a likeable person and that he had done a good job, but that Mr. Mulhollan could not accept his bad judgment. *Id.* ¶ 48.

One week later, on November 20, Mr. Mulhollan called Col. Davis on the telephone. *Id.* ¶ 49. Mr. Mulhollan informed Col. Davis that he would be terminated as of December 21, 2009, and that Col. Davis would thereafter be given a thirty-day temporary position as Mr. Mulhollan's Special Advisor. *Id.* Mr. Mulhollan had his assistant deliver a formal written notice of termination to Col. Davis immediately after that call. *Id.* Ex. M (Letter from Daniel P. Mulhollan to Morris Davis (Nov. 20, 2009) ("Termination letter")).

Shortly thereafter, on November 24, 2009, Mr. Mulhollan sent an email to every CRS employee informing them that Col. Davis was being removed from his position as the Assistant Director of the FDT Division as of December 21, 2009. *Id.* ¶ 50.

**D.      Nature of the Claims and Irreparable Injury to Col. Davis.**

Col. Davis now brings this lawsuit against Dr. Billington, in his official capacity, and Mr. Mulhollan, in his individual capacity, for violating his First and Fifth Amendment rights. Immediate injunctive relief is necessary to prevent Col. Davis from suffering irreparable injury. Col. Davis was removed from his position as Assistant Director on December 21, 2009, and has been temporarily reassigned to serve as Mr. Mulhollan's Special Advisor for thirty days. Davis Decl. ¶ 51. Unless extended, that position will expire on January 20, 2010. *Id.* After that date,

Col. Davis will no longer be employed by the Library. Because Col. Davis does not have any administrative remedies under the Civil Service Reform Act ("CSRA") or the Library regulations, his only recourse for being reinstated to his Assistant Director position and retaining his salary is to bring this lawsuit and to seek interim relief from the Court.

## ARGUMENT

Col. Davis is entitled to a temporary restraining order and a preliminary injunction because: (1) he is likely to succeed on the merits of his claims against the Library, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) an injunction would not substantially injure the Library and the balance of equities tips in his favor, and (4) the injunction would further the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008); *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). Although a showing of likelihood of irreparable harm is necessary, *Winter*, 129 S. Ct. at 375, this Court may employ a sliding scale as to the other factors so that a particularly strong showing of one factor compensates for another factor's weakness, *CityFed Fin. Corp.*, 58 F.3d at 747.[2] The same standard applies to both temporary restraining orders and preliminary injunctions. *See Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009).

## I.  COL. DAVIS IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM THAT HIS TERMINATION VIOLATED THE FIRST AND FIFTH AMENDMENTS.

The government may not terminate employees, even those on probationary status, for constitutionally impermissible purposes. *See Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987). Col. Davis is likely to succeed on the merits of his unconstitutional-termination claim on

---

[2]  *Winter* only addressed the irreparable harm prong of the four-part inquiry and did not otherwise overrule the applicability of this Circuit's sliding scale standard. *See Little v. Fenty*, Civil No. 09-2308, 2009 WL 4981535, at *1 (D.D.C. Dec. 15, 2009). *But see Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) (leaving open the question whether the sliding scale survives *Winter*).

three theories, any one of which would be sufficient:  (1) the Library terminated him for

expressing his personal views in public on a matter of immense public interest in violation of the

First Amendment; (2) to the extent the Library's regulation or CRS's policy on outside speaking

and writing prohibited Col. Davis's opinion pieces, those rules violate the First Amendment; and

(3) CRS's policy regarding outside speaking and writing is impermissibly vague and did not give

Col. Davis fair warning of its scope as required by the First and Fifth Amendments.

A. **The Library Unconstitutionally Terminated Col. Davis for Writing Opinion Pieces as a Citizen on a Matter of Immense Public Concern.**

In *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563

(1968), the Supreme Court affirmed the right of public employees to exercise "the First

Amendment rights they would otherwise enjoy as citizens to comment on matters of public

interest." *Id.* at 568.  Where, as here, a public employee establishes that he spoke as a citizen

upon matters of public concern, *Rankin*, 483 U.S. at 384, and that this constitutionally protected

speech was a "substantial" or "motivating factor" in the decision to terminate him, *Mt. Healthy*

*City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), the burden shifts to the

government to justify the discharge by showing harm to its interest "in promoting the efficiency

of the public services it performs" that outweighs the employee's First Amendment rights,

*Rankin*, 483 U.S. at 388 (internal quotation marks omitted), or by demonstrating, by a

preponderance of the evidence, that "it would have reached the same decision . . . even in the

absence of the protected conduct," *Mt. Healthy*, 429 U.S. at 287.  The Library cannot meet its

burden.

1. **Col. Davis Spoke as a Citizen on a Matter of Immense Public Concern When He Wrote His Opinion Pieces.**

By writing his opinion pieces criticizing the government's decision to use both civilian courts and military commissions, Col. Davis sought to contribute as a citizen to one of the most important public debates of our time:  the debate about the appropriate response of our constitutional democracy to the threat posed by international terrorism.  "[C]urrent government policies" are "the paradigmatic 'matter[] of public concern.'"  *Sanjour v. EPA*, 56 F.3d 85, 91 (D.C. Cir. 1995) (en banc).  There can be no dispute that the subject of his opinion pieces—the government's decision about how to prosecute suspected terrorists—is of immense public interest.  Davis Decl. ¶ 65, Ex. N (Letter from Lindsey O. Graham, U.S. Senator, to Dr. James Billington, Librarian of Congress (Dec. 15, 2009)); Wittes Decl. ¶¶ 6, 10.  "The public interest in having free and unhindered debate on matters of public importance" is a "core value of the Free Speech Clause of the First Amendment."  *Pickering*, 391 U.S. at 573.  For that reason, "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."  *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted); *see also Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1965) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.").

The public has an especially strong interest in hearing Col. Davis's views on this policy matter of immense public concern.  *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006) (recognizing a particularly strong public interest in hearing the "well-informed views of government employees engaging in civic discussion").  That is because public employees are often "the members of a community most likely to have informed and definite opinions" on issues that require "informed decision-making by the electorate."  *Pickering*, 391 U.S. at 572; *Waters v. Churchill*, 511 U.S. 661, 674 (1994) ("Government employees are often in the best positions to know what ails the agencies for which they work; public debate may gain much from their

informed opinions."). Col. Davis, a former Chief Prosecutor for the military commissions at Guantánamo, is uniquely situated to provide valuable views to the public on the system of justice for Guantánamo detainees. *See Wright v. FBI*, Nos. 02-915, 03-226, 2006 WL 2587630, at *7 (D.D.C. July 31, 2006) (holding that the views of "knowledgeable, informed, experienced insiders" of the FBI are "of particular utility"). That is why both the *Wall Street Journal* and the *Washington Post* ran the opinion pieces, and it is why Members of Congress and outside experts on military commissions value Col. Davis's speech on these issues, regardless of whether they agree or disagree with him. *See* Davis Decl. Ex. N (Graham letter); Wittes Decl. ¶¶ 8-10.

Col. Davis engaged in his high-value speech as a retired military prosecutor and a private citizen—not as an employee of the Library. The Library cannot contend otherwise given that the speech was "addressed to a public audience . . . made outside the workplace, and involved content largely unrelated to . . . government employment." *United States v. Nat'l Treasury Employees Union* (*NTEU*), 513 U.S. 454, 466 (1995). Op-ed pieces and letters to the editor are classic examples of speech addressed to a public audience. *See, e.g.*, *Garcetti*, 547 U.S. at 423; *Pickering*, 391 U.S. at 569-70. Col. Davis wrote these pieces at home, over the weekend, on his own time, without using any government resources. *See* Davis Decl. ¶ 39. The pieces were not directed at or related to his employment with CRS and did not rely on any information obtained there; they were exclusively based on knowledge and experience he acquired well before coming to work for CRS. *See* Davis Decl. ¶ 42. Indeed, the FDT Division of CRS, which Col. Davis supervises, has no responsibility for military commissions issues and does not handle congressional inquiries or otherwise research issues related to military commissions. *See supra*; Davis Decl. ¶¶ 19-23. A separate CRS division, the ALD, has sole responsibility for those issues. *Id.*

This is not a case in which a public employee seeks constitutional protection for internal, work-related grievances or for speech made pursuant to his official duties, *Garcetti*, 547 U.S. at 420, 421; it is a case in which an employee engaged in the highest echelon of protected speech—on a policy matter of immense public concern on which he has knowledge acquired prior to his current employment. The significant interest of the public and of Col. Davis in his speech tips the *Pickering* balance decisively in favor of Col. Davis's speech.

> ### 2. Col. Davis's Interest in Participating in Public Affairs and the Public's Interest in His Contribution to the Military Commissions Debate Outweigh Any Speculative Threat to the Library's Interest in Nonpartisanship and Objectivity.

"As the magnitude of intrusion on employees' interests rises, so does the Government's burden of justification." *NTEU*, 513 U.S. at 483 (O'Connor, J., concurring in the judgment in part, and dissenting in part). Where, as here, the challenged speech "more substantially involved matters of public concern," the Supreme Court has cautioned, and lower courts have held, that the government must make "a stronger showing" of disruption to its interests as an employer. *Connick*, 461 U.S. at 152; *see, e.g., Eberhardt v. O'Malley*, 17 F.3d 1023, 1026-27 (7th Cir. 1994) (Posner, J.); *Thomas v. Carpenter*, 881 F.2d 828, 830-31 (9th Cir. 1989), *cert. denied*, 494 U.S. 1028 (1990); *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 55-57 (D.D.C. 2009).

The Library cannot meet this heightened burden. In fact, the Library can show no actual harm to its ability to operate. "The less [a public employee's] speech has to do with the office, the less justification the office is likely to have to regulate it." *Eberhardt*, 17 F.3d at 1027; *Navab-Safavi*, 650 F. Supp. 2d at 57-58. Col. Davis's opinion pieces do not even mention the Library, CRS, or any of its employees or policies, let alone criticize any of them. Davis Decl. Exs. A, B. The Library cannot, therefore, argue that this is a case where "public criticism" of the

employer "seriously undermine[s] the effectiveness of the working relationship between [the superior and the subordinate]," *Pickering*, 391 U.S. at 570 n.3, or that it is a case where a high-level employee disrupted the organizational objectives of the employer by expressing "public disagreement with the agency's policies," *O'Donnell v. Barry*, 148 F.3d 1126, 1135-36 (D.C. Cir. 1998).[3] Likewise, because Col. Davis spent his own time and resources to prepare the opinion pieces and because the speech occurred outside the workplace on a matter unrelated to his CRS employment, the Library cannot justify its actions "on the grounds of immediate workplace disruption asserted in *Pickering* and the cases that followed it." *NTEU*, 513 U.S. at 470; *Navab-Safavi*, 650 F. Supp. 2d at 57-58.

The Library is therefore left with the hollow assertion that Col. Davis's speech "could cause real harm to CRS by impairing, in fact or in perception, the high professional standards for objectivity which are essential to CRS." Davis Decl. Ex. L at 4 (Admonishment letter); *id.* at 3 (asserting that Members of Congress might doubt Col. Davis's "ability to lead the provision of objective, non-partisan analysis for the Congress"). "[U]nadorned speculation as to the impact of speech," however, is not enough to justify suppressing Col. Davis's speech. *Hall v. Ford*, 856 F.2d 255, 261 (D.C. Cir. 1988); *Waters*, 511 U.S. at 674 (stating that where an employee has "a strong, legitimate interest in speaking out on public matters . . . the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished"). The D.C. Circuit and this Court have rejected conjectural claims of harm to interests like "public confidence" in the government, *see, e.g.*, *Am. Postal Workers Union v. U.S. Postal Serv.*, 830 F.2d 294, 303 (D.C. Cir. 1987), avoiding the "appearance of impropriety," *see, e.g.*,

---

[3] For this reason, the policymaker exception, which grew out of the political patronage cases, does not apply here. *See Hall v. Ford*, 856 F.2d 255, 263 (D.C. Cir. 1988).

*Sanjour*, 56 F.3d at 94, and maintaining "neutrality" and "objectivity," *see, e.g.*, *Nabav-Safavi*, 650 F. Supp. 2d at 59.

This is the case here as well. Any assertion of harm by the Library to its interests is, at best, speculative. The Library's own policies, its past practice, its prior approvals of Col. Davis's speech regarding military commissions, and logic all demonstrate that there can be no legitimate claim that Col. Davis's opinion pieces caused any actual harm to the Library.

First, the Library's own policies make clear that outside writing like the opinion pieces is to be "encouraged," not discouraged. Davis Decl. Ex. O at § 3(A) (Library of Congress Regulation 2023-3 ("LCR 2023-3")) (staff members are "encouraged to engage in teaching, lecturing, or writing that is not prohibited by law"). Although it requires employees to take certain precautions if (1) "the subject matter of such writing relates to . . . a field of a staff member's official specialization" and (2) "some association may be made with a staff member's official status," LCR 2023-3, § 3(B), the regulation does not express concern with speech—like Col. Davis's—that is outside the official subject matter of the employee's work or speech that is not associated with the Library. Similarly, the CRS policy on outside speaking and writing, which purports to clarify the Library regulations, is explicitly focused on "preserving the appearance of objectivity when addressing *the very issues for which [the employees] have responsibility at CRS.*" Davis Decl. Ex. P at 1, 2 (Outside Speaking and Writing, Jan. 23, 2004) (emphasis added).[4] CRS considers outside activity to be related to the job at CRS if "circumstances suggest that the staff member was invited [to speak] primarily because of their

---

[4] *See also, e.g.*, Davis Decl. Ex. P at 1 ("It is . . . advisable, when writing or speaking on the subject for which the individual has responsibility at the Service, that the standard set for review of CRS written products be observed."); *id.* at 2 ("Employees must exercise the greatest level of care for preserving the appearance of objectivity when addressing the very issues for which they have responsibility at CRS."); *id.* at 3 ("When considering engaging in outside activities, employees should think carefully before taking a public position on subject matters for which they are responsible at CRS.").

work on the job rather than their independent expertise on a particular subject," or if "the subject

of the outside activity deals in significant part with anything which the staff member is presently

working on, or has worked on during the previous one-year period." *Id.* Ex. Q at 2

(Memorandum from Lizanne D. Kelley, Office of the Counselor, to Jeffrey H. Goode, Section

Research Manager (Dec. 17, 2008)). Col. Davis's opinion pieces relied on his independent

expertise, acquired before he came to CRS, and dealt with a subject outside of the areas for

which he has official responsibilities at CRS. Neither the Library regulation nor the CRS policy

on outside speaking explicitly regulates this type of speech. That evidences the Library's own

view that such writing does not threaten its reputation.

Second, past practice confirms that outside speaking, whether related to one's official

duties at CRS or not, does not harm CRS's reputation for objectivity and non-partisanship or

one's ability to serve as an effective employee—in fact, it enhances it. Scores of CRS

employees, including those with supervisory authority, have publicly taken policy positions on

controversial, high profile issues over the years. *See, e.g.*, Roth Decl. ¶¶ 4, 8; Rosenberg Decl.

¶¶ 10, 13; Fisher Decl. ¶¶ 3, 12, 30; Relyea Decl. ¶¶ 21-22; Dumbaugh Decl. ¶¶ 4-5. These

opinions, like many official CRS reports, have even drawn criticism and disagreement from

individual Congress members, but that speech has not undermined Congress's perception of CRS

as a highly respectable, nonpartisan, and objective entity.[5] *See* Roth Decl. ¶ 16; Rosenberg Decl.

¶ 13; Fisher Decl. ¶ 36. As expected, this speech has sometimes included colorful language or

---

[5] That Members of Congress may complain about CRS employees' policy positions in their outside speech or their CRS reports does not undermine CRS's principles of nonpartisanship and objectivity. *See* Fisher Decl. ¶ 34, ¶ 3 (stating that "it is not uncommon for Members to complain when they disapprove [] policy opinions made by CRS employees," but explaining that "[l]awmakers and staff are accustomed to hearing a variety of viewpoints" and that in his four decades at CRS, his expression of his views on high profile, contentious issues never caused any "lawmaker or legislative staffer to decline my analytical assistance"); Roth Decl. ¶ 16; Rosenberg Decl. ¶ 13.

explicit criticism of officials. *See* Rosenberg Decl. ¶¶ 10, 15.[6] Nevertheless, despite the

inevitable policy differences, even these CRS employees who have expressed their strong views

on controversial topics have successfully been able to work with Members on both sides of the

political divide. *See, e.g.,* Fisher Decl. ¶¶ 28-30. In fact, not only do Members of Congress

benefit from hearing the opinions of CRS employees, regardless of whether they agree with

them, *see id.* ¶¶ 3, 12, 30, outside speaking opportunities benefit "the quality of service

employees are able to provide to Congress, thereby increasing, rather than decreasing, CRS's

ability to serve Congress," Roth Decl. ¶ 8; Dumbaugh Decl. ¶ 5; Rosenberg Decl. ¶ 11. That is

why past directors of CRS have encouraged outside speaking: it advances CRS's mission and the

employee's career and reputation, rather than detracts from it. *See* Fisher Decl. ¶¶ 13, 17-18;

Relyea Decl. ¶¶ 13-14.

This point is equally true whether the employees are researchers or supervisors like Col.

Davis. Col. Davis's primary supervisory function was, in Mr. Mulhollan's words, to "lead, plan,

direct, and evaluate the research and analytical activities of the division . . . ." Davis Decl. Ex. L

at 2 (Admonishment letter). Thus, Col. Davis did not have a significant "confidential,

policymaking, or public contact role," *Rankin*, 483 U.S. at 390-91; Davis Decl. ¶¶ 17-18, and in

fact, the researchers under his supervision have more prominent public contact roles because

their names appear on the reports given to Congress, and they are the ones interacting with

---

[6] *See also, e.g.,* Henry Cohen, Letter to the Editor, *Truth, Confessions and Torture,* N.Y. Times, Mar. 16, 2007 ("The widespread knowledge that the United States engages in torture constitutes an implicit threat against all detainees, and it is impossible to know if their confessions or any information they provide is true. Thank you, President Bush."); Henry Cohen, Letter to the Editor, *Silent Justice Screams for Thomas to Step Down,* Legal Times, Oct. 15, 2001 ("If this biography presents strong evidence of [Justice Clarence] Thomas' lying under oath (even once), then the executive branch should prosecute (if the statute of limitations has not run) and the legislative branch should impeach. These two venerable institutions, of course, will not, because they put politics ahead of law and ethics."); Pamela A. Hairston, Letter to the Editor, *'D' for the District,* Wash. Times, Dec. 13, 2003 (criticizing Laura Bush's educational policy in the District of Columbia: "Did she forget that she also lives in this great city? Doesn't she care about the children who live in her own back yard?"). True and correct copies of these periodical pieces are attached as Exhibits A, C, and AJ to the Declaration of Frederick Mulhauser.

Congress on a day-to-day basis. *See id.* ¶ 22. The Library, accordingly, does not have a greater interest in suppressing Col. Davis's speech outside of the work of his division than in suppressing the speech of the subordinate researchers on their areas of specialty.

Third, the Library cannot now claim that Col. Davis's opinion pieces were harmful to it or to Col. Davis's ability to serve as an effective CRS employee given that Mr. Mulhollan, a CRS attorney, and other management figures had previously expressly approved Col. Davis's requests to speak on the very same topics throughout the year, including at the Case Western conference and the Kansas City Lawyer's Association event. *See, e.g.*, *id.* ¶¶ 29-33, Ex. G-H. Col. Davis criticized the military-commissions policies at these events and expressed views similar to those expressed in the opinion pieces, without receiving any reprimand or cautioning. *See id.* Ex. R (Scott Lauck, *Whittaker Award from the Lawyers Association of Kansas City Honors*, Mo. Lawyers Media, Nov. 9, 2009) (noting that Col. Davis criticized the decisions of both the Bush and Obama administrations). In fact, at the Case Western conference, he expressed the exact same view against the use of a dual system of justice as in the opinion pieces. *See id.* ¶ 42. Although the CRS Office of Communications tracks all media coverage of CRS employees, and thus the CRS leadership must have had knowledge of Col. Davis's comments at these events, nobody ever told Col. Davis that CRS's reputation or interests, or Col. Davis's own reputation, had been harmed by his expressing his personal views in these other instances. *See id.* ¶ 36.[7]

In any event, common sense and logic undermine the argument that Col. Davis's opinion pieces somehow harmed or were likely to harm the Library's interests in nonpartisanship and

---

[7] These prior approvals suggest that Col. Davis was admonished and terminated for the opinion pieces not because of the harm arising from his speech, but from his failure to seek prior approval. As explained below, however, if that were a requirement, Col. Davis had no notice of it, and, in any event, it would be unconstitutional. *See infra* at Part I.C.

objectivity by associating CRS with him and his views.  His opinion pieces were clearly written in his personal capacity.  The opinion pieces did not mention the Library or CRS, and there is no indication whatsoever that Col. Davis worked for CRS or that he was writing on behalf of CRS or regarding subject matters for which he had responsibility at CRS.  It would have been readily apparent to any reader, whether from the bylines and content of the articles or from familiarity with Col. Davis's career, that the pieces were written by Col. Davis in his capacity as "the former chief prosecutor for the military commissions," not in his capacity in whatever his present unstated job was.  Davis Decl. Exs. A-B; Rosenberg Decl. ¶ 14.  Indeed, the *Washington Post* editor specifically advised Col. Davis that it was customary not to include an express disclaimer, and Col. Davis agreed that expressly associating and then disassociating himself from CRS in the byline would unnecessarily highlight his affiliation with CRS.  *See* Davis Decl. ¶ 43.  CRS itself appeared to agree with this reasoning just months before when it approved Col. Davis's request to speak without an express disclaimer where the subject of Col. Davis's speech—again, the military commissions—had nothing to do with CRS or his work for CRS.  *See id.* ¶ 29, Ex. G (email from CRS attorney approving Col. Davis's request to speak the Case Western conference without using an express disclaimer).[8]

Col. Davis's reasonable understanding from the Case Western approval was that CRS required an express disclaimer in his writings only when there was an overt association drawn between CRS and himself and when it was not otherwise clear from context that he was speaking as a private citizen.  *See id.* ¶ 43.  That understanding is, in fact, consistent with the established

---

[8]  In another similar instance, a CRS attorney asked Col. Davis to confirm that he was speaking in his personal capacity in a series of web posts protesting the use of CRS facilities to host an event for Lynddie England.  *See* Davis Decl. ¶ 28.  Col. Davis confirmed that he was, because he used his personal resources to generate the materials for the posts.  *See id.* Ex. S (Email from Morris Davis to Kent Ronhovde and Lizanne Kelley (Aug. 17, 2009, 12:58 EST)).  Despite the lack of express disclaimer in a comment post, CRS agreed with him that the comment was made in his personal capacity because of the use of personal resources.  *See id.* ¶ 28.

practice at CRS, which is that disclaimers are only necessary when employees are writing or

speaking about matters related to their official CRS area of expertise and an association is made

between the speaker and their role at CRS.  *See* Roth Decl. ¶ 17.  Indeed, many Library

employees—both at high and low levels, including Dr. Billington himself—have engaged in

public speaking and writing without using express disclaimers.  *See* Fisher Decl. ¶¶ 18, 24;

Relyea Decl. ¶ 19; Roth Decl. ¶ 17; Dumbaugh Decl. ¶ 7.  Plaintiff has uncovered dozens of

examples from a few employees alone, simply by looking on the Internet.[9]  Plaintiff is confident

---

[9] *See, e.g.*, James H. Billington, Russia in Search of Itself (2004); James H. Billington, The Face of Russia: Anguish, Aspiration, and Achievement in Russian Culture (1999); James H. Billington, Fire in the Minds of Men: Origins of the Revolutionary Faith (Transaction Pubs. 1999); Henry Cohen, Letter to the Editor, *Truth, Confessions and Torture*, N.Y. Times, Mar. 16, 2007; Henry Cohen, Letter to the Editor, *Justices Raise Overlooked Point in Virtual Porn Case*, Legal Times, Apr. 29, 2002; Henry Cohen, Letter to the Editor, *Silent Justice Screams for Thomas to Step Down*, Legal Times, Oct. 15, 2001; Henry Cohen, Letter to the Editor, *Bill Silent on Labeling Authority*, Legal Times, Aug. 21, 2000; Henry Cohen, Op-Ed., *When Smut Hurts*, Legal Times, Aug. 14, 2000; Henry Cohen, Letter to the Editor, *A Restatement of Torts*, Legal Times, Mar. 13, 2000; Henry Cohen, Letter to the Editor, *It's Time to End the Drug Prohibition*, Legal Times, July 26, 1999; Henry Cohen, Letter to the Editor, *Should McVeigh Receive the Death Penalty?*, N.Y. Times, June 5, 1997; Henry Cohen, Op-Ed., *'Reefer Madness' Theory Won't Die*, Baltimore Sun, Feb. 27, 1997; Pamela A. Hairston, Letter to the Editor, *Divided and Unruled*, Wash. Times, Nov. 30, 2009; Pamela A. Hairston, Letter to the Editor, *Pardon Me for Begging Your Pardon*, Wash. Times, Oct. 20, 2009; Pamela A. Hairston, Letter to the Editor, *What's Really Behind the Vick Controversy*, Pa. Daily News, Sept. 1, 2009; Pamela A. Hairston, Letter to the Editor, *Remember History Before It's Forgotten*, Wash. Times, May 31, 2009; Pamela A. Hairston, Letter to the Editor, *Study Black History*, Wichita Eagle, Oct. 8, 2008; Pamela A. Hairston, Letter to the Editor, *Race Always Matters*, USA Today, Sept. 24, 2008; Pamela A. Hairston, Op-Ed., *Black or White, Will He Care?*, Wash. Post, Aug. 3, 2008; Pamela A. Hairston, Letter to the Editor, *The Popularity of Kwanzaa*, Wash. Post, Jan. 7, 2008; Pamela A. Hairston, Letter to the Editor, *The Need to March*, L.A. Times, Nov. 21, 2007; Pamela A. Hairston, Letter to the Editor, *Don't Call Me Al*, N.Y. Daily News, Nov. 1, 2007; Pamela A. Hairston, Letter to the Editor, *The Martinsville Seven*, Revolution, Aug. 19, 2007; Pamela A. Hairston, Letter to the Editor, *Other Issues Matter More*, Detroit News, July 19, 2007; Pamela A. Hairston, Letter to the Editor, *Reparations for Slavery Would Trigger America's 2nd Civil War*, The Hill, Mar. 14, 2007; Pamela A. Hairston, Letter to the Editor, *Slavery in Virginia Isn't Only Injustice*, L.A. Times, Mar. 2, 2007; Pamela A. Hairston, Letter to the Editor, *Winfrey Told Truth on Scorn for Schools*, Baltimore Sun, Jan. 16, 2007; Pamela A. Hairston, Letter to the Editor, BusinessWeek, Sept. 11, 2006; Pamela A. Hairston, Letter to the Editor, *Inequity at LOC*, Roll Call, Oct. 26, 2006; Pamela A. Hairston, Letter to the Editor, *Thanks, Cos*, Wash. Times, Aug. 31, 2006; Pamela A. Hairston, Letter to the Editor, *Direct Assistance Where It's Really Needed*, Atlanta J. & Const., May 17, 2006; Pamela A. Hairston, *Some Good Has to Come From Tragedy*, Toronto Star, Sept. 9, 2005; Pamela A. Hairston, Letter to the Editor, *Slavery Reparations*, Daily Press, July 31, 2005; Pamela A. Hairston, Letter to the Editor, *Even Score with Acre and Chicken*, The Herald, July 25, 2005; Pamela A. Hairston, Letter to the Editor, *History Rules All-White Juries*, Baltimore Sun, May 25, 2005; Pamela A. Hairston, Letter to the Editor, *What Were They Thinking?*, Wash. Times, Nov. 5, 2004; Pamela A. Hairston, Letter to the Editor, *Complainants Can't All Be Wrong*, Roll Call, Oct. 12, 2004; Pamela A. Hairston, Letter to the Editor, *American Monuments*, Independent, Sept. 23, 2004; Pamela A. Hairston, Letter to the Editor, *'D' for the District*, Wash. Times, Dec. 13, 2003; Kenneth Katzman, Panel Discussion, *Iran Capturing Iraq*, Arab-U.S. Policymakers Conference of the National Council on U.S.-Arab Relations, Oct. 2008; Kenneth Katzman, Interview, *Al-Maliki Demands Timetable for Iraq Withdrawal*, NPR, July 12, 2008; Kenneth Katzman, *Iraq and the U.S. Election*, Emirates Center for Strategic Studies and Research, June 12, 2008; Kerry Dumbaugh, *The U.S. Role During and After Hong Kong's Transition*, 18 U. Pa. J. Int'l Econ. L. 333

that if discovery on this issue were conducted, there would be hundreds and hundreds of such examples. Despite this widespread outside speaking and writing without disclaimers, the Library and CRS have continued to maintain their nonpartisan and objective status. Their claimed harm from Col. Davis's lack of an express disclaimer is, accordingly, nothing more than baseless speculation.

The Library's claim that Col. Davis's speech has undermined its interest in non-partisanship is similarly without foundation. Although CRS's statutory authorization requires the agency to perform its work "without partisan bias," 2 U.S.C. § 166(d), the term "partisan" has a limited meaning: "related to a political party." 5 C.F.R. § 734.101; *Keeffe v. Library of Cong.*, 777 F.2d 1573, 1580-81 (D.C. Cir. 1985) (holding that a rule prohibiting *political party activities*, such as attendance at political conventions, implements the congressional mandate that the CRS render advice "without partisan bias"). Indeed, the Supreme Court has affirmed congressional power to bar "partisan political activity" by federal employees through the Hatch Act upon the understanding that the Act proscribed only "active participation in political management and campaigns," but that "[e]xpressions, public or private, on public affairs, personalities and matters of public interest, not an objective of party action, are unrestricted by law so long as the Government employee does not direct his activities toward party success." *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 556 (1973) (quoting *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 100 (1947)). Col. Davis's speech had nothing to do with political parties, political management, or campaigns. His views in the opinion pieces, in fact, are critical of decisions and positions taken by officials from both major

---

(1997); Ted Dagne, *Somalia: Prospects for a Lasting Peace*, 20:2 Mediterranean Quarterly 95 (Spring 2009); Ted Dagne, *Humanitarian Crisis in Ethiopia and Eritrea*, 15:2 Mediterranean Quarterly 38 (Spring 2004). True and correct copies of the periodical pieces cited above are attached as Exhibits A-AP to the Declaration of Fritz Mulhauser.

parties. *See* Davis Decl. Ex. A (criticizing the Obama administration's decision); *id.* Ex. B

(criticizing former Attorney General Mukasey's opinions).  An expression of an opinion on a

matter of public policy does not violate the principle of non-partisanship, and in any event, CRS

cannot demonstrate that one individual employee's expression of his personal opinion somehow

has disrupted CRS's institutional nonpartisanship.[10]  *See* Rosenberg Decl. ¶ 12; Roth Decl. ¶ 8;

Dumbaugh Decl. ¶ 6.

As to objectivity, and the related principle of neutrality and avoidance of appearance of

conflict, Col. Davis's opinion pieces in no way threatened CRS's reputation for objectivity if that

term is understood as representing integrity of scholarship.  Col. Davis arrived at his opinion on

the dual use of civilian trials and military commission through an impartial analysis of the

benefits and disadvantages of each of the systems of justice.  *See* Davis Decl. ¶ 42.  He was not

influenced by desire for private gain, party politics, or other improper biases.  *See id.* ¶ 42.  His

opinions and critical analyses about military commissions are well-respected by Members of

Congress and experts in the field, even those who disagree with his views.  *See id.* Ex. N

(Graham letter); Wittes Decl. ¶ 12; Dumbaugh Decl. ¶ 6.

Moreover, it cannot be that every time a CRS employee expresses a position on a policy

issue the speech threatens CRS's institutional reputation for "objectivity" and "balance"—to the

extent these terms mean absence of advocacy or preconception.  It is improbable and undesirable

that the experts CRS hires have not expressed any opinion on any policy issue: "[o]ne cannot

gain [the stature of 'nationally recognized expert'] by being neutral and descriptive."  Fisher

Decl. ¶ 10; Roth Decl. ¶ 5; Relyea Decl. ¶¶ 13-14; *cf. Republican Party of Minn. v. White*, 536

U.S. 765, 777-78 (2002) ("A judge's lack of predisposition regarding the relevant legal issues in

---

[10] Col. Davis's criticism of former Vice President Cheney in the Letter to the Editor is not partisan—it was directed at the former Vice President's policy positions, not at Republicans.  The letter from Senator Graham, a prominent Republican, makes that clear.  Davis Decl. Ex. N (Graham letter).

a case has never been thought a necessary component of equal justice, . . . . [because] it is virtually impossible to find a judge who does not have preconceptions about the law. . . . Indeed, even if it were possible to [do so], it would hardly be desirable to do so."); *see Keeffe*, 777 F.2d at 1580 (referencing judicial ethics in analyzing restriction on CRS employees' participation at a political convention).  CRS and Mr. Mulhollan knew when they hired Col. Davis not only that he held views critical of the use of military commissions to try Guantánamo detainees, but that he had been extremely outspoken about his views in congressional testimony, media interviews, and op-ed pieces.  *See* Davis Decl. ¶¶ 10-14.  Mr. Mulhollan and CRS must have believed that Col. Davis's well-established policy position on the use of military commissions, which was the basis for his opinion pieces, would not interfere with his ability to lead the FDT Division, or he would not have been hired in the first place.

Given that CRS employees have personal views, it cannot advance CRS's mission to conceal them.  *See Republican Party of Minn.*, 536 U.S. at 778 ("[S]ince avoiding judicial preconceptions on legal issues is neither possible nor desirable, pretending otherwise by attempting to preserve the 'appearance' of that type of impartiality can hardly be a compelling state interest . . . .").  To the contrary, as discussed above, Members of Congress have historically "appreciate[d] the expression of expert opinions by CRS staff on controversial matters," even when they disagree with the conclusions.  *See, e.g.*, Fisher Decl. ¶ 12.  In any event, silencing Col. Davis cannot achieve anything because Congress surely already knows—and knew before the opinion pieces were published—that he has policy opinions on issues related to military commissions.  Even if there were evidence that some Members of Congress incorrectly believed that Col. Davis handles the issue for CRS, Col. Davis's views were well-known before he wrote the opinion pieces at issue—he testified before Congress on that subject—and stifling his views

would not further the appearance of objectivity.  If that truly presented a concern, CRS could simply assure Congress that Col. Davis is not responsible for analyzing or supervising research related to military commissions.  This honesty would advance CRS's interest in objectivity and the appearance of objectivity, not detract from it, as the Library speculatively claims.

"[J]udges often state their views on disputed legal issues . . . in classes that they conduct, and in books and speeches," *Republican Party of Minn.*, 536 U.S. at 779, without compromising perceptions of fairness, even-handedness, and objectivity.  *See S. Pac. Comm'ns Co. v. Am. Tel. & Tel. Co.*, 740 F.2d 980, 990 (D.C. Cir. 1984) ("It is well established that the mere fact that a judge holds views on law or policy relevant to the decision of a case does not disqualify him from hearing the case."), *cert. denied*, 470 U.S. 1005 (1985).  There is no reason to hold CRS employees to a higher standard of "objectivity" than judges, especially with respect to policy issues that would not even be presented to them in the course of their work.

This case involves Col. Davis's speech on a matter of immense public concern which is unrelated to his work.  Accordingly, the Library has a high burden of justifying its interest in suppressing the speech.  *See Navab-Safavi*, 650 F. Supp. 2d at 57.  The Library's punishment of Col. Davis's speech is based on hypothetical harm that the opinion pieces might have on CRS's reputation.  This hypothetical claimed harm is contrary to the Library and CRS rules, past practice, prior approvals of similar speech, and reason.  As one Congress Member's staffer told Mr. Louis Fisher when the latter was admonished by Mr. Mulhollan for his outside writing several years ago, CRS management should not "try to 'read the minds' of Members of Congress as to who they will and will not call for assistance. . . . Members will decide by themselves who to call, and why."  Fisher Decl. ¶ 36.  The significant number of requests regarding military commissions that CRS has received from Congress—eight, including five from Republican

Members and three from Democratic Members—since Col. Davis's opinion pieces were published bears out this observation. Davis Decl. ¶ 23. Despite the Library's claimed fears, Congress has not stopped calling CRS on this very issue.

In summary, the Library cannot show any harm to its interests arising from Col. Davis's opinion pieces, much less harm that outweighs Col. Davis's and the public's significant interest in his contribution to the historic debate on the prosecution of Guantánamo detainees.

### 3. Col. Davis's Termination Was Motivated in Substantial Part—in Fact Entirely—by His Protected Speech.

The events surrounding Col. Davis's termination unequivocally establish that the publication of the opinion pieces—the protected speech—was a "substantial factor" or a "motivating factor" in his dismissal. *Mt. Healthy*, 429 U.S. at 287. In fact, it is clear that they were the only factor.

On the afternoon of November 10, 2009—the day before the opinion pieces were published—Mr. Mulhollan praised Col. Davis for his job performance and his reputation among his colleagues. Davis Decl. ¶ 38. Those comments were consistent with Mr. Mulhollan's previous statements and his six-month formal written review of Col. Davis's work. *Id.* ¶ 37, Ex. I. Mr. Mulhollan's attitude towards Col. Davis changed abruptly that evening, however, after Col. Davis informed Mr. Mulhollan that his opinion pieces would be appearing in the *Washington Post* and the *Wall Street Journal*. After reading the pieces, Mr. Mulhollan immediately sent Col. Davis a highly threatening email questioning Col. Davis's decision to express his views in the opinion pieces and his suitability as a CRS employee. *Id.* Ex. K. Two days later, on November 12, Mr. Mulhollan expressly told Col. Davis that he would not be converted to permanent status as he had previously assured Col. Davis because the opinion pieces caused him to doubt Col. Davis's judgment and suitability to serve as Assistant Director.

*Id.* ¶ 47.  The next day, Mr. Mulhollan gave Col. Davis a formal letter of admonishment, which stated that "[t]hese recent events"—i.e., publication of the opinion pieces—have caused him to lose confidence in Col. Davis's judgment and discretion.  *Id.* Ex. L at 4.  One week later, on November 20, Col. Davis received a letter of termination which reiterated the substance of the admonishment letter, focusing on the opinion pieces.  *Id.* ¶ 49, Ex. M.

The letters of admonishment and termination, as well as other statements made by Mr. Mulhollan, establish that the opinion pieces—i.e., the protected speech—are what motivated Col. Davis's termination.  Indeed, the sequence of events during the ten days from November 10, 2009 to November 20, 2009—the favorable review followed by the publication of the opinion pieces and the subsequent termination—raise "the obvious inference" that "there was some causal nexus between Plaintiff's protected speech and [the adverse employment action]." *Robinson v. Dist. of Columbia*, No. Civ. A.97-787, 1997 WL 607450, at *6 (D.D.C. July 17, 1997) (finding causal connection for retaliatory discharge where plaintiff was told to cut off his dreadlocks from December 1996 to March 1997, but he was not fired until after he filed an internal discrimination complaint and was quoted in a newspaper).  The Library's termination of Col. Davis occurred in substantial part and, in fact, entirely because of Col. Davis's protected speech.

### 4.   The Library Cannot Show by a Preponderance of the Evidence That Col. Davis's Termination Would Have Occurred Otherwise.

Given the above sequence of events and the focus of the letters of admonishment and termination on the opinion pieces, the Library cannot show by a preponderance of the evidence that Col. Davis's termination was for a reason other than his protected speech.  *Mt. Healthy*, 429 U.S. at 287 (burden on government to so demonstrate).  The letter of admonishment focuses exclusively on Col. Davis's writing of the opinion pieces.  *See* Davis Decl. Ex. L.  Perhaps

recognizing the constitutional deficiencies with such an approach, the notice of termination refers to two additional incidents, although even Mr. Mulhollan does not purport to set them forth as independent reasons for dismissal. *See id.* Ex. M at 2.

The first involved Col. Davis approving an intern to be listed as a co-author on a CRS report pursuant to long-established practice, because he did not believe there was a formal policy—only a proposed change to the policy—against such attribution. Davis Decl. ¶ 59; Dumbaugh Decl. ¶ 8. When CRS asked that the intern's name be removed pursuant to a "CRS business rule" for the new computer system, Col. Davis did not object and the matter was laid to rest. Davis Decl. ¶ 59.

The second involved an e-mail that Col. Davis sent in October during a discussion on finalizing the intern policy, in which he expressed disagreement with a proposal by Mr. Roger White, which was contrary to the consensus that the assistant directors had appeared to reach, that would allow one person to exercise sole "dictatorial" control over who can be listed as an author on a report. *Id.* ¶ 60. Mr. Mulhollan sided with Col. Davis that the consensus approach was necessary, and a few days later CRS adopted a rule that rejected the proposed elimination of interns as authors. *Id.* ¶¶ 60-61. Mr. Mulhollan subsequently explained in a brief, fifteen-second, friendly conversation to Col. Davis that he needed to be especially sensitive to Mr. White, *id.* ¶ 62, but that was that. Col. Davis did not receive any further admonishment or any indication that the email had caused anything other than a trivial problem. *Id.*

Those incidents are so minor that they could not conceivably have resulted in dismissal on their own. Suffice it to say that Col. Davis did not receive a letter of admonishment or a notice of termination after those incidents, if one can even call them "incidents." Indeed, well after they occurred, Mr. Mulhollan told Col. Davis that he was doing a very good job and that he

28

was respected and well-liked by his colleagues. *Id.* ¶¶ 37-38.  Even after he told Col. Davis that

he would not be converted into a permanent employee because of his opinion pieces, Mr.

Mulhollan still told Col. Davis that he liked him and that he had been doing a good job. *Id.* ¶ 48.

The only problem for Mr. Mulhollan, apparently, was his belief that Col. Davis had exhibited

poor judgment in writing the opinion pieces.  As the factual discussion detailed earlier makes

clear, Col. Davis was fired immediately after publication of his opinion pieces.  The Library

cannot now claim that he is being terminated for reasons unrelated to his speech.

### B.    If Col. Davis's Opinion Pieces Were Prohibited by CRS Policy, the Policy Violates the First Amendment.

As explained above, Col. Davis's opinion pieces did not violate the Library regulations or

the CRS policy on outside speaking and writing.  In the letter of admonishment and in other

correspondence, however, Mr. Mulhollan appears to contend that expressing "any opinion" on an

issue "on the congressional agenda" is prohibited, Davis Decl. Ex. J, and that employees have a

"responsibility to inform" Mr. Mulhollan about the speech before it happened, *id.* Ex. L at 3.

This interpretation of the rules, or this new rule that CRS has apparently attempted to create and

impose, would prohibit every CRS employee from commenting on any current public policy

matter unless the CRS leadership previously approved it.  Such a policy would amount to a prior

restraint on speech and would be unconstitutional under *Pickering* and *NTEU.*

In *NTEU*, the Supreme Court held that the *Pickering* balancing test applies to a challenge

to regulations that suppress the prospective speech of a broad category of public employees, 513

U.S. at 467, and that in such challenges, the "Government's burden is greater . . . than with

respect to an isolated disciplinary action," *id.* at 468.  Given that CRS's "isolated disciplinary

action" with respect to Col. Davis cannot withstand the normal *Pickering* balancing, the Library

*a fortiorari* cannot meet its heavier burden of justifying a policy that prohibits all CRS

employees from engaging in future outside speaking or writing on certain subject matters, such as controversial, politically charged policy matters. Such a policy would be a prior restraint and would significantly burden CRS employees' expressive activity on "paradigmatic 'matter[s] of public concern,'" *Sanjour*, 56 F.3d at 91, without a sufficient justification.

The political speech that Mr. Mulhollan apparently seeks to prohibit—i.e., speech on any issue "on the congressional agenda"—is at the core of the First Amendment. *See, e.g., Connick*, 461 U.S. at 145. It deserves more, not less, protection. CRS's position, apparently, is that the more important the speech, and the more visible it is, the less it is permissible. That cannot and should not be the law. All lawful speech, including speech about matters important to only a very few, is protected by the First Amendment. Speech concerning matters that are of critical import to the public, such as issues on the congressional agenda, "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection," *id.*, not no protection, which is what CRS appears to be arguing.

To the extent that CRS also insists that there is a policy requiring prior approval of all speech, or of certain speech, such as speech on high profile or controversial matters, that policy would be unconstitutional. "[T]he detriments of [such] prior restraints"—including chilling of speech, the specter of viewpoint discrimination, and the danger of self-censorship—weigh in the *Pickering* balancing test against the employer. *Am. Fed'n of Gov't Employees v. Dist. of Columbia*, No. Civ.A. 05-0472, 2005 WL 1017877, at *8 (D.D.C. May 2, 2005). Here, because neither the Library regulations nor the CRS policies anywhere establish a standard for what type of writing would be considered appropriate for publication, if prior approval is required, the CRS leadership would have unfettered discretion over which speech is permitted and which is not. That is constitutionally impermissible. *See Sanjour*, 56 F.3d at 96-97 (holding that regulation

permitting official approval only for speech "within the mission of the agency" gives the agency

unbridled discretion); *Fire Fighters Ass'n v. Barry*, 742 F. Supp. 1182, 1194 (D.D.C. 1990)

(holding that where a policy requires employees to receive pre-approval for interviews, but does

not contain standards to guide the decision to grant or deny the request, the vesting of the

unbridled discretion constitutes an unconstitutional prior restraint).  Such unbridled discretion

raises the "specter of viewpoint discrimination" and "pose[s] a real and substantial threat of . . .

censorship," which, "in the context of *Pickering* balancing . . . justifies an additional thumb on

the employees' side of our scales."  *Sanjour*, 56 F.3d at 97 (internal quotation marks omitted).

> C.    **The Library's and CRS's Policies Governing Outside Speech Are**
>        **Unconstitutionally Vague Under the First and Fifth Amendments.**

Even assuming that CRS's termination of Col. Davis did not violate Col. Davis's free

speech rights, it violated Col. Davis's entitlement to due process under the First and Fifth

Amendments.  "It is a basic principle of due process that an enactment is void for vagueness if its

prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

The requirement of clarity is especially stringent where the law interferes with the right of free

speech or of association.  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S.

489, 499 (1982).  Here, the application of the Library and CRS rules to Col. Davis was

unconstitutionally vague for two reasons:  first, because none of the relevant policies or past

practices gave Col. Davis "fair warning" that he could not express a public opinion on a

controversial or political matter, *Grayned*, 408 U.S. at 108, and second, because CRS's policy

requiring "caution" and "judgment" to avoid "an appearance of conflict" even when speaking on

matters outside of one's area of official responsibility is impermissibly vague and lacks any

discernible standard.

1.    **Col. Davis Had No Fair Warning That His Outside Speech Might
Violate CRS's or the Library's Policies.**

CRS's termination of Col. Davis violated his right to fair notice under the First and Fifth

Amendments because nothing in the applicable Library and CRS policies or their past

enforcement warned Col. Davis that CRS might newly interpret them to apply to his outside

writing or speaking on Guantánamo and the military commissions, matters on which he had

previously been permitted to speak.

First, as set out above, the Library's and CRS's policies do not prohibit Col. Davis's

speech here. *See supra* Part I.A.2.   Rather, they generally leave speech unregulated, particularly

speech on matters unrelated to CRS obligations, requiring only that employees exercise "sound

judgment" to avoid "the appearance of a conflict of interest."   Davis Decl. Ex. P at 1-3.

Second, CRS's past practice with respect to Col. Davis himself confirms that CRS has

never applied or interpreted these vague references to actually prohibit speech on matters

unrelated to an employee's obligations.   For example, Col. Davis spoke and wrote publicly about

Guantánamo Bay, the treatment of detainees in the so-called "war on terror," and the use of

military commissions on at least six occasions while employed at CRS and prior to the two

publications at issue here. *See id.* ¶¶ 26-34.   The opinions he expressed on these occasions were

similar to and consistent with the views he articulated in the opinion pieces, and in his vast pre-

CRS speaking and writing. *See id.* ¶ 42.   In the two most recent and highest-profile instances,

CRS and Mr. Mulhollan specifically approved of this outside speaking and writing in advance.

*See id.* ¶¶ 29, 32.   In the others, CRS implicitly or explicitly gave its assent afterwards. *See, e.g.,*

*id.* ¶¶ 26, 28.   Although Col. Davis was somewhat hesitant to speak towards the beginning of his

employment at CRS, he became more confident with each approval that CRS had little interest in

suppressing his speech on the issue of military commissions, which had nothing to do with his

official responsibilities at CRS and the knowledge of which he had acquired prior to coming to

work for CRS.  *See id.* ¶¶ 35, 55, Ex. Q (discussing Lizanne Kelly memo which makes clear that

CRS's outside speaking rules cover only situations where the information discussed is acquired

while at CRS, not instances where the subject of the speaking or writing is based on an

employee's prior life experiences).  Nothing in CRS's policies or in its past application of them

gave fair warning to Col. Davis that CRS would treat his final two publications on the military

commissions differently.[11]

Finally, the history of CRS's application of the policies on outside speaking and writing

to other employees confirms this conclusion.  CRS does not appear to have previously

terminated an employee for outside speaking, much less for outside speaking on matters

unrelated to the employee's official obligations, despite the vast amount of outside publication

and speaking undertaken by CRS employees.  That is true even where the outside speaking and

writing is on controversial, high-profile policy matters.  *See* Fisher Decl. ¶¶ 18-23, 27, 33-40, 44;

Rosenberg Decl. ¶¶ 10-11, 14-15; Relyea Decl. ¶¶ 17-18, 23; Roth Decl. ¶ 4 ("CRS employees

regularly engage in outside speaking and writing activities, including on controversial and high-

profile policy matters . . . ."); *id.* ¶¶ 5-9, 18; Dumbaugh Decl. ¶¶ 3-6.; *see also supra* note 8

(Mulhauser Decl. Exs. A-AP).  For example, in a 2007 letter to the *New York Times*, one CRS

employee in the ALD thanked President Bush for the damage to our legal system caused by the

"widespread knowledge that the United States engages in torture."  Mulhauser Decl. Ex. B.  The

same employee called upon Supreme Court Justice Thomas to resign or, alternatively, for the

executive branch to prosecute or Congress to impeach him.  *Id.* Ex. C.  The employee concluded

---

[11] As explained above, Col. Davis's opinion pieces did not violate the Library regulations or the CRS policy on outside speaking and writing.  CRS appears to be attempting to newly interpret its policy, however, to prohibit certain forms of outside speech, including speech that expresses "any opinion" on an issue "on the congressional agenda," or speech on controversial or political matters.  In doing so, CRS has unconstitutionally denied Col. Davis fair warning of these new interpretations.

that, "These two venerable institutions, of course, will not, because they put politics ahead of law and ethics." *Id.*; *see also id.* Exs. A-I. Another employee who currently works for CRS also routinely discusses controversial matters in opinion pieces, *id.* Exs. J-AJ, including two pieces in *Roll Call*—the newspaper devoted to Capitol Hill issues—accusing the Library and its management of racially discriminatory workplace practices, *id.* Exs. Z, AH. That neither of these employees was terminated for their speech confirms the lack of any practice at CRS of punishing outside speech, and the lack of any fair warning to Col. Davis of the possibility that he would be terminated for his speech in this case.

In its failure to provide fair warning that Col. Davis's writings on the military commissions would result in sanction, CRS's actions here resemble its own previous actions which were found similarly lacking by the D.C. Circuit in *Keeffe v. Library of Cong.*, 777 F.2d 1573 (D.C. Cir. 1985). In *Keeffe*, a CRS employee sought to become a delegate-at-large to the 1980 Democratic National Convention, an activity that had not previously been expressly prohibited by CRS's or the Library's regulations. *Id.* at 1575-76. When the Library learned of the employee's intentions, it advised her that the conduct would violate the Library's regulations by presenting "a potential conflict of interest with her official duty to render non-partisan advice." *Id.* at 1576. The employee challenged that advice, and, in the days leading up to her departure to attend the convention, the Library's General Counsel's office upheld the advice— but that decision was not timely relayed to the employee prior to her departure to attend the convention. *Id.* at 1576, 1582. In the suit over her subsequent discipline, the D.C. Circuit concluded that the Library's prior general policy about conflicts of interest had not given the employee fair warning of the new interpretation embodied in the General Counsel's advice. *Id.* at 1582. Focusing on past practice, the D.C. Circuit held that the Library's "course of dealing

34

with [the employee] . . . was insufficient to place [her] on notice that the prior interpretation [of its conflict-of-interest policy] had changed." *Id.* [12]

The same is true here. CRS seeks to apply a novel reinterpretation of its policy on outside speaking on matters unrelated to employees' official duties, notwithstanding its prior approval of virtually identical writing and speaking by Col. Davis on several occasions. CRS's actions failed to give Col. Davis fair warning and, as in *Keeffe*, "[s]urprise, in this instance, was unpleasant, unfair, and unconstitutional." *Id.* at 1583.

### 2.      CRS's Policy on Outside Speech Is Facially Vague.

The arbitrary pattern of enforcement of CRS's policy on outside speaking failed to put Col. Davis on notice of the conduct it allegedly proscribes. More fundamentally, however, the arbitrary pattern evidences the inherent vagueness of the policy and the unfettered nature of the discretion it affords. CRS's policy rests on inherently vague terms—like "sound judgment," "discretion," and "objectivity"—and lacks any clarifying guidance to narrow its reach. For these reasons, it is facially vague under the First and Fifth Amendments.

Although the government enjoys certain leeway in crafting codes of conduct for its employees, *see, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 159-61 (1974) (plurality opinion), prohibitions, especially those directed at protected speech, must still be clear. *See, e.g.*, *Westbrook v. Teton County Sch. Dist. No. 1*, 918 F. Supp. 1475, 1490-91 (D. Wyo. 1996) (invalidating prohibition against "criticism" of other governmental staff); *Stolte v. Laird*, 353 F. Supp. 1392, 1396-99 (D.D.C. 1972) (invalidating prohibition of "disloyal" conduct by members of the Army). In *Keeffe*, for example, the Library's general policy against creating potential conflicts of interest with the duty to render non-partisan advice failed to put the CRS employee

---

[12] The D.C. Circuit held that *prospective* application of the General Counsel's advice, which was subsequently incorporated into CRS policy, was constitutional, because employees would thereafter have the requisite fair warning. *See id.* at 1581.

on notice that she could not become a delegate-at-large to the Democratic National Convention, and was thus held to be unconstitutionally vague. *Keeffe*, 777 F.2d at 1576, 1582. Rather, the D.C. Circuit relied on the new and clarifying interpretation of the general policy in allowing only prospective application of it. *Id.* at 1581 (holding that the Library's new interpretation of its general policy was clear enough for prospective application, but not for retroactive application). Similarly, in *Westbrook*, a school's policy against "criticism" was held to be unconstitutionally vague because "the term 'criticism' is indefinite, fluid, and contingent," and because no interpretive guidance clarified or narrowed its application. *Westbrook*, 918 F. Supp. at 1490-91.

By contrast, limitations on governmental speech that have been upheld have either been sufficiently precise or have been informed by (1) statutory or regulatory clarification, (2) past practice and interpretive guidance, and (3) the availability of administrative clarification. *See, e.g.*, *Letter Carriers*, 413 U.S. at 550, 575-76, 580; *Arnett*, 416 U.S. at 160 & n.24 (plurality opinion). CRS's policy lacks these characteristics. First, all of the criteria used in the policy and in its application in the admonishment and termination letters are inherently vague. The policy, for example, states that "sound judgment" should be used. Davis Decl. Ex. P at 3. The admonishment letter focuses on Col. Davis's exercise of allegedly poor "judgment and discretion," stating that his "objectivity" has been called into question by his writings on the military commissions. *Id.* Ex. L at 4. And the termination letter likewise summarizes Col. Davis's admonishment as being for his alleged "poor judgment and lack of discretion." Davis Decl. Ex. M at 2. Like the word "criticism," "sound judgment, "discretion, and "objectivity" are "complex and variable word[s]. [They] can mean many things to many people. In fact, [they] can mean so many things to so many people that [they are] too vague for use in an enactment that regulates speech." *Westbrook*, 918 F. Supp. at 1490; *see also Westfield High Sch. L.I.F.E.*

36

*Club v. City of Westfield*, 249 F. Supp. 2d 98, 127 (D. Mass. 2003) (holding that "responsible" and "good judgment" are inherently vague terms). This is confirmed by many of the employees subject, or formerly subject, to CRS's policy. Roth Decl. ¶¶ 9-14 ("I know what [good judgment] means to me, but the term is inherently subjective and CRS has not, to my knowledge, provided any definition or standard to define good judgment."); Rosenberg Decl. ¶ 16 ("If there is fault here, it is in the essential vagueness and uncertainties of the CRS outside writing rules, which I never understood."); Relyea Decl. ¶ 23; Fisher Decl. ¶ 44. Davis Decl. ¶¶ 54. Fundamentally, the terms fail to provide any fair warning of what they prohibit or to provide standards that would guide their application by CRS's management. *See Grayned*, 408 U.S. at 108-09; *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) ("Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.").

Moreover, far from being clarified by regulation or interpretive guidance, CRS's restriction on outside speaking and writing lacks any interpretive guidance or clarification and has been applied here in a manner that directly contradicts past practice. *See supra* Part I.C.1.

Finally, although CRS allows employees to submit proposed writing for review prior to publication, there are no discernible standards or criteria that would allow consistent and non-arbitrary application, even if the requirement were mandatory.[13] Unlike in the Act in *Letter Carriers*, where a significant statutory, regulatory, and interpretive framework informed the process of administrative pre-clearance, here, administrative pre-clearance would be an exercise

---

[13] To the extent that CRS is now interpreting its policy to require prior approval of outside speech, or certain outside speech, such as speech on controversial issues or "on the congressional agenda," such a rule would be invalid because the CRS Director has no authority to contravene the Library's regulation, which expressly prohibits such a requirement, LCR 2023-3, § 3(B); 2 U.S.C. § 166, and unconstitutionally vague because Col. Davis could therefore have had no fair warning of it.

in arbitrary and subjective enforcement, a primary vice of vague and standardless laws.

*See Grayned*, 408 U.S. at 108-09 ("A vague law impermissibly delegates basic policy matters to"

the executive "for resolution on an ad hoc and subjective basis, with the attendant dangers of

arbitrary and discriminatory application."); *Coates*, 402 U.S. at 614.  That danger is particularly

acute here, as Col. Davis was terminated on the basis of speech substantially similar to his own

and other speech that was previously approved by CRS.  CRS's policy does not provide any

criteria that would allow meaningful differentiation between its past approval of Col. Davis's

speech and its reversal of course here.  Accordingly, CRS's policy on outside speech is

unconstitutionally vague on its face.

## II.     COL. DAVIS WILL SUFFER IRREPARABLE INJURY WITHOUT IMMEDIATE INJUNCTIVE RELIEF.

Col. Davis will suffer irreparable injury absent immediate relief for two principal

reasons: (1) without immediate relief he may be left without a real remedy to recover for the

violation of his constitutional rights; and (2) he and other CRS employees are presently being

chilled from engaging in protected speech because of the unconstitutionally vague and

impermissible policies regarding outside speaking and writing.

First, the Library could easily take steps in an attempt to strip Col. Davis of the remedy of

reinstatement—the very relief to which he is entitled for the constitutional violations—by

permanently filling Col. Davis's position.  In addition, because of sovereign immunity, back pay

is likely unavailable in this case.  Thus, unlike in typical employment cases, interim relief is

necessary here to preserve plaintiff's remedies for the Library's unconstitutional conduct and to

uphold the First Amendment and Fifth Amendment rights of Col. Davis and other CRS

employees.

A number of courts, including this one, have held that irreparable harm exists when reinstatement may not be available as a remedy. *See, e.g., Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) (granting preliminary reinstatement in part because without it, "the government would be free to name a successor to Johnson as State Director for North Carolina, and Johnson would have no means of being reinstated if he should prevail at trial"); *Callicotte v. Carlucci*, 698 F. Supp. 944, 950 (D.D.C. 1988) (holding that plaintiff has shown irreparable harm in part because "reinstatement is unlikely"). Here, reinstatement to Col. Davis's prior position may not be an option absent preliminary relief, as he was in a supervisory position that the Library may try to fill more quickly than other positions. In addition, the Library may claim that the impairment of Col. Davis's knowledge about CRS's current work and the work of his division while he is in exile creates further difficulty in implementing a reinstatement remedy. *See Robinson v. District of Columbia*, No. Civ. A. 97-787, 1997 WL 607450, at *8 (D.D.C. July 17, 1997) ("[W]ith each day that plaintiff [a police officer] is out of the station house or off the streets, he loses the opportunity to gain valuable experience and training to help him achieve his career goal of becoming a police detective"); *Collicotte*, 698 F. Supp. at 950 (basing grant of preliminary injunction against termination on, *inter alia*, potential impairment of skills).

The availability of the remedy of reinstatement is particularly important in this case, as the Library will likely argue that sovereign immunity bars Col. Davis's right to obtain back pay and other monetary relief from the Library for lost pay during the period of the lawsuit. Although Col. Davis has asked for back pay and monetary relief against the Library, he recognizes that precedent might frustrate his efforts to obtain such relief in this suit absent a waiver of sovereign immunity. *See, e.g., Hubbard v. Adm'r, Envtl. Prot. Agency*, 982 F.2d 531, 538 (D.C. Cir. 1992) (en banc) (holding that the Administrative Procedure Act does not waive

sovereign immunity for back pay award, which is treated as monetary damages); *Clark v. Library of Cong.*, 750 F.2d 89, 102-04 (D.C. Cir. 1984) (holding that sovereign immunity bars monetary relief from the Library of Congress).[14]   Similarly, precedent might also frustrate his *Bivens* claim for damages.   *See, e.g.*, *Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C. Cir. 1988) (en banc) (holding that CSRA precludes a *Bivens* claim for the employees in those cases).   The result might therefore be that Col. Davis is left without the ability to recover monetary damages, even if it is determined that his constitutional rights were violated.

This Court has found irreparable injury to exist when there is a possibility that monetary relief will be precluded.   *See, e.g.*, *Am. Fed'n of Gov't Employees v. United States*, 104 F. Supp. 2d 58, 76 (D.D.C. 2000) (finding irreparable harm where plaintiffs might be precluded from recovering pay and benefits lost during the lawsuit); *see also Jessen v. Vill. of Lyndon Station*, 519 F. Supp. 1183, 1189 (W.D. Wis. 1981) (concluding that irreparable injury is shown where sovereign immunity made it questionable whether plaintiff could collect back pay and damages); *Faulkner v. N.C. Dep't of Corr.*, 428 F. Supp. 100, 103-04 (W.D.N.C. 1977) (same).   That is because any loss of income that is ultimately not recoverable is irreparable harm.   *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009); *Kan. Health Care Ass'n v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994); *United States v. New York*, 708 F.2d 92, 93-94 (2d Cir. 1983); *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008).

Col. Davis's case is not a typical employment case like *Sampson v. Murray*, 415 U.S. 61 (1974), in which the Supreme Court denied a public employee's request for an interim injunction

---

[14] In addition, it is likely that the Back Pay Act does not apply where, as here, CSRA does not afford an employee review of the agency's decision. *See United States v. Fausto*, 484 U.S. 439, 450 (1988).

while he was exhausting administrative remedies.  The employee in that case had the usual set of

remedies available at the end of his administrative process:  reinstatement to his non-unique job

and back pay.  Here, Col. Davis has no administrative remedies, and thus an injunction would

not have any disruptive effect on an administrative scheme.  *See, e.g., DeNovellis v. Shalala*, 135

F.3d 58, 63 (1st Cir. 1998) (requiring a lower standard than *Sampson* in discrimination cases

where "no interests in protecting the processes of the civil service system are involved").

Moreover, that Col. Davis may never be able to recover money damages makes *Sampson*

inapplicable in this case.  The principal factor underlying *Sampson* is the concept that the harm

from loss of employment can ultimately be compensated monetarily.  *Sampson*, 415 U.S. at 90.

Here, because of sovereign immunity, that is not the case at all.

     Second, irreparable injury is also separately present because of the unconstitutionally

vague and impermissible nature of CRS's existing policy and the new interpretations of existing

rules or new rules now being implemented by CRS.  "The loss of First Amendment freedoms, for

even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*,

427 U.S. 347, 373 (1976) (plurality).  To the extent that CRS has a policy that prohibits Col.

Davis's speech, that policy is vague and unconstitutional, *see supra* at Part I.B-C, and is chilling

the First Amendment rights of Col. Davis and of other CRS employees.  *See* Davis Decl. ¶¶ 46,

64; Roth Decl. ¶¶ 9, 12; Relyea Decl. ¶¶ 15, 23.  The vagueness and breadth of the speech policy

as newly interpreted or created by Mr. Mulhollan has already stopped Col. Davis from taking

advantage of numerous opportunities to publicly express his views on this administration's

military commissions policy.  *See* Davis Decl. ¶¶ 46, 60.  He has been chilled and intimidated

into near silence, and will remain so until relief is granted.

Moreover, CRS's termination of Col. Davis has already had the "concrete and significant impact on CRS employees" of "intimidating and chilling staff who either want to or had planned to engage in further outside writing or speaking activities." Roth Decl. ¶ 12. These employees were already confused by the vagueness of the CRS policy, Relyea Decl. ¶ 23; Roth Decl. ¶ 9, 13, but they are "now more confused than ever," Roth Decl. at ¶ 13. The Congressional Research Employees Association ("CREA"), the union for CRS employees, has been contacted by "several CRS employees who are confused, uncertain, or worried about what outside speaking and writing is permissible and is not permissible," *id.* ¶ 12; and it has already been informed that "some employees will either be refraining from certain speaking and writing, or that, at a minimum, they will be careful about what they say and they may change their words out of an abundance of caution," *id.* For this reason as well, immediate relief is necessary. *Elrod*, 427 U.S. at 373.[15]

For these reasons, Col. Davis has established that irreparable harm—loss of remedies for constitutional violations and the continuing chilling effects of an unconstitutional policy– may result if immediate relief is not issued.

**III.  THE BALANCE OF HARDSHIPS TIPS IN FAVOR OF COL. DAVIS AS IMMEDIATE RELIEF WOULD NOT SUBSTANTIALLY INJURE THE LIBRARY OF CONGRESS.**

Immediate relief reinstating Col. Davis to his position would not substantially injure the Library. With the exception of the opinion pieces at issue here, Col. Davis consistently received positive reviews from Mr. Mulhollan regarding his work, *see* Davis Decl. ¶¶ 37-38, Ex. I, and was well-liked within his division, Dumbaugh Decl. ¶ 6. As discussed earlier, the Library cannot

---

[15] Col. Davis has standing to raise the First Amendment rights of those not before the Court. *See, e.g., Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976).

establish that the opinion pieces have injured CRS's reputation for nonpartisanship or objectivity, *see supra*, so reinstating Col. Davis is unlikely to cause any similar harm either. Indeed, Col. Davis had expressed his opinion on the military commissions issue throughout his probationary year, with prior approval from CRS leadership, without causing any harm to CRS. *See supra*. CRS's claim that they are worried that its ability to serve Congress would be jeopardized now that Col. Davis has publicly voiced his views makes no sense given that Col. Davis's views were well known—and oft-expressed—prior to being hired at CRS. If CRS were truly worried that his opinions would cause Members to lose confidence in the CRS institution, one wonders why he was hired in the first place. To the extent that the Library is concerned about the perception that military commissions fall within the sphere of Col. Davis's influence at CRS, it could easily avoid that harm simply by refuting the perception.[16]

The inconvenience to the government in having to retain an employee that it tried to discharge in violation of the First Amendment is significantly outweighed by the irreparable injury that Col. Davis would suffer absent preliminary relief. *See Watts v. Alfred*, 794 F. Supp. 431, 434 (D.D.C. 1992) (holding that the balance of hardship tips in favor of reinstating employee, as "it is more onerous to [plaintiff] to keep him indefinitely in penal exile for his expressive audacity than it is to the Department to allow him to resume his duties . . . ."). Likewise, any friction between the individual who tried to unconstitutionally remove the employee and the employee—which is minimal in this case in any event as Col. Davis continues to work for Mr. Mulhollan as his Special Advisor—cannot justify denying reinstatement. *See*

---

[16] Col. Davis's alternative prayer for relief—an injunction enjoining the Library from discharging Col. Davis from his temporary reassignment and enjoining it from filling his Assistant Director position—also would not injure the Library. The Acting Assistant Director could continue in Col. Davis's role while this litigation is pending, and Col. Davis could continue to take part in projects that are helpful to the Library.

*Allen v. Autauga County Bd. of Educ.*, 685 F.2d 1302, 1305-06 (11th Cir. 1982) (holding that lack of mutual trust is not a sufficient reason to deny reinstatement for a First Amendment violation).   Col. Davis thus satisfies this factor.

## IV.   THE PUBLIC INTEREST WOULD BE FURTHERED BY AWARDING IMMEDIATE RELIEF TO COL. DAVIS.

Immediate relief would greatly advance the public interest by upholding the First Amendment. *See People for the Ethical Treatment of Animals, Inc. v. Gittens*, 215 F. Supp. 2d 120, 134 (D.D.C. 2002) (the "public interest favors a preliminary injunction whenever First Amendment rights have been violated."), *reversed on other grounds*, 414 F.3d 23 (D.C. Cir. 2005); *Pearson v. Shalala*, 130 F. Supp. 2d 105, 119 (D.D.C. 2001) ("[I]t is clearly in the public interest to ensure that governmental agencies . . . fully comply with the law, especially when that law concerns the parameters of a party's First Amendment rights . . . ."); *Robinson,* 1997 WL 607450, at *9 (granting reinstatement to further public interest where there are serious allegations of retaliation for the exercise of First Amendment rights).   Immediate relief would not only restore First Amendment values, but preserve remedies for the violation.

Although the Library may contend that there is a competing public interest in its ability to manage its employees, "the public may be deemed to have an overriding interest in assuring that the government remains within the limit of its constitutional authority." *Nat'l Treas. Employees Union v. U.S. Dep't of Treas.*, 838 F. Supp. 631, 640 (D.D.C. 1993).   The more immediate concern lies in enforcing the constitutional guarantee of freedom of expression, *Watts*, 794 F. Supp. at 433-34.   This factor, thus, favors granting immediate relief to Col. Davis.

## CONCLUSION

Col. Davis satisfies the four prerequisites to preliminary relief: he is likely to succeed on the merits, there is a likelihood of irreparable harm, the balance of hardships tips in his favor, and the public interest favors relief. Because of the strength of the four factors here, he is entitled to a temporary restraining order or preliminary injunctive relief in the form of reinstatement to his position as the Assistant Director of CRS's FTD Division. In the alternative, he is entitled to preliminary relief that preserves the status quo by prohibiting the Library from discharging him after his 30-day temporary employment period and from filling the Assistant Director position.

For the reasons stated above, Col. Davis's motion for immediate relief should be granted. A proposed order is filed herewith.

Respectfully submitted,

Arthur B. Spitzer  (D.C. Bar No. 235960)
Frederick V. Mulhauser (D.C. Bar. No. 455377)
American Civil Liberties Union
  of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, D.C. 20036
(202) 457-0800

Aden J. Fine   (D.C. Bar No. 485703)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2693

Jameel Jaffer
Alexander A. Abdo
National Security Project
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-7814

January 8, 2010                    ATTORNEYS FOR PLAINTIFF

45