**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FILED**

JAN - 8 10

Clerk, U.S. ...
Bankrupt

MORRIS D. DAVIS,

Plaintiff,

v.

JAMES H. BILLINGTON, in his official
capacity as the Librarian of Congress, and
DANIEL P. MULHOLLAN, in his individual
capacity,

Defendants.

Case No. _____  **10 0036**

## DECLARATION OF MORRIS D. DAVIS

I, Morris D. Davis, hereby declare and state as follows:

1.      I submit this declaration based on my personal knowledge in support of the

plaintiff's motion for a temporary restraining order or, in the alternative, preliminary injunction

in the above-captioned case.

2.      I am the plaintiff in this case.  I was the Assistant Director of the Foreign Affairs,

Defense, and Trade ("FDT") Division of the Congressional Research Service ("CRS"), until I

was dismissed from my job because I wrote an op-ed piece in the *Wall Street Journal* and a letter

to the editor in the *Washington Post*.

3.      Attached as Exhibit A is a true and correct copy of an Op-Ed piece entitled

"Justice and Guantánamo Bay," which I wrote for the *Wall Street Journal*, and which is available

at http://online.wsj.com/article/SB10001424052748704402404574525581723576284.html. The

article was published in the print edition of the *Wall Street Journal* on November 11, 2009.

4.     Attached as Exhibit B is a true and correct copy of a Letter to the Editor which I wrote for the *Washington Post*, and which is available at http://www.washingtonpost.com/wp-dyn/content/article/2009/11/10/AR2009111017461.html.  The article was published in the print edition of the *Washington Post* on November 11, 2009.

5.     I am a twenty-five-year veteran of the United States Air Force.  Following my graduation from law school in 1983, I was commissioned as an officer in the Judge Advocate General's Corps of the United States Air Force, becoming Chief of Military Justice at Patrick Air Force Base in Cocoa Beach, Florida.  Over the next twenty-five years of military service, I served in a variety of important leadership and staff positions, including as a Staff Judge Advocate at various levels of command, an Appellate Government Counsel, the Deputy Commandant and Interim Commandant at the Air Force Judge Advocate General's School at Maxwell Air Force Base in Montgomery, Alabama, the Director of Air Force Legal Information Services at Maxwell Air Force Base, and the Director of United States Air Force Judiciary at Bolling Air Force Base in Washington, D.C.  I retired from military service in October 2008, with the rank of Colonel.

6.     I was promoted to the rank of Colonel in April 2001.  Over the years, I have received numerous awards and honors, including: the Legion of Merit; the Meritorious Service Medal (6 awards); the Air Force Commendation Medal (2 awards); the Air Force Achievement Medal (2 awards); the Air Force Outstanding Unit Award (2 awards); the Air Force Organizational Excellence Award (2 awards); the National Defense Service Medal (with service star); the Southwest Asia Service Medal; the Global War on Terrorism Expeditionary Medal; the Global War on Terrorism Service Medal; the Air Force Longevity Service Medal (6 awards); the

Air Force Training Ribbon; and recognition as the 1990 Headquarters Air Force Outstanding Judge Advocate of the Year.

7.      I hold Masters Degrees in Law from both the George Washington University School of Law and the U.S. Army Judge Advocate General School.

8.      Because of my extensive and successful experience and expertise in the military, I was selected to serve as the Chief Prosecutor for the Department of Defense's Office of Military Commissions in September 2005.  In that role, I was responsible for the prosecution of the suspected terrorists being held at Guantánamo Bay, Cuba, a position which carried enormous responsibilities and which was the subject of intense public scrutiny and attention.  Nevertheless, I received praise for my performance from both the Air Force and the critics of the military commissions.

9.      Although I initially was a firm supporter of the military commissions system, I resigned from my position as Chief Prosecutor for the military commissions in October 2007 because of my belief that the military-commissions process had become politically tainted and fundamentally flawed because of a lack of procedural protections.

10.      After my resignation, I became a vocal and highly public critic of the Bush administration's implementation of the military commissions, although I continued to generally support the notion of military commissions.  I wrote op-eds for the *New York Times*, the *Los Angeles Times*, and the *Toronto Star*, and a law review article in the Northwestern University Law Review Colloquy.  I presented my views at, among other places, Yale Law School, the Thomas M. Cooley Law School, the Fordham University School of Law, George Mason University School of Law, Duke University School of Law, American University School of Law, Syracuse University School of Law, the annual meeting of the American Society of International

Law, the Pennsylvania Bar Association's Law Policy Forum, and to a variety of military audiences. In my writings and public speeches I criticized the military commissions system as it then existed, relying on my personal experience as the former Chief Prosecutor. I believed that such flaws would render the military commissions suspect in the eyes of the world.

11. On July 30, 2008, I testified to Congress about my experience and personal views of the military commissions system. Specifically, I objected to the lack of procedural protections and the excessive interference in the criminal process by political appointees.

12. I also testified at a hearing at the Organization of American States' Inter-American Commission on Human Rights in October 2008, again presenting my view that the military-commissions process as it was then being implemented lacked procedural protections and was excessively politicized.

13. I first began thinking of working for the Congressional Research Service ("CRS"), a service unit of the Library of Congress (the "Library"), when I applied for a position as Assistant Director of the American Law Division ("ALD") in early 2008. I was interviewed by a panel that included Mr. Daniel P. Mulhollan, the Director of CRS. During the interview, I discussed my experience as Chief Prosecutor for the military commissions and my decision to resign and to speak out against the process. Although I was ultimately not hired for the position, I received a call from Mr. Mulhollan saying that he was impressed by my professionalism, courage, and integrity, and that I would be a good fit at CRS for any future vacancies.

14. The opportunity to reapply for employment at CRS occurred when the position of Assistant Director of the Foreign Affairs, Defense and Trade ("FDT") Division became available in the fall of 2008. I applied on September 8, 2008, citing examples of my public writing and speaking on military commissions and Guantánamo issues in my application and as my writing

sample. I was interviewed by a panel that again included Mr. Mulhollan, and I again discussed my experience as a Chief Prosecutor for the military commissions and my decision to resign and to speak out against the process. Neither Mr. Mulhollan nor any other Library or CRS person told me during the interview that I could not continue engaging in outside speaking activities on military commissions and Guantánamo or that such activities would endanger the mission of CRS or my ability to serve as an effective CRS employee.

15.     On December 12, 2008, I received an offer of employment to become the Assistant Director of the FDT division, and I accepted it the same day, turning down another position with the government. Neither Mr. Mulhollan nor any other Library or CRS personnel told me at this time that I could not continue engaging in my outside speaking activities on military commissions and Guantánamo or that such activities would endanger the mission of CRS. Similarly, at no time did anyone tell me that my employment was conditioned, either explicitly or implicitly, on my willingness to forego engaging in any further outside speaking or writing about military commissions issues or other issues of immense personal interest and public concern. Had I been so told, I likely would not have accepted the position.

16.     I began work at CRS as the Assistant Director of the FDT division on December 22, 2008. My main day-to-day duty as an Assistant Director was to lead, plan, direct, and evaluate the research and analytical activities in the policy areas assigned to the FDT division: foreign affairs, Defense Department, and international trade and finance. There were about 95 employees in the FDT division, divided among seven official research sections: Foreign Policy Management and Global Issues; International Trade and Finance; Defense Policy and Arms Control; Defense Budget, Manpower, and Management; Asia; Europe and the Americas; and the Middle East and Africa.

17.     Like other Assistant Directors, I was not expected to and did not author any written reports or analyses on behalf of CRS.  I also had no inquiries from Congress directed to me.  Although I served as a liaison to Congress, I did not have a significant public contact role in part because my name did not appear as an author on any reports that were disseminated to Congress.

18.     Although I participated in internal policy discussions about how to run the office, I did not have authority to make CRS-wide policy.

19.     My position as the Assistant Director of the FDT division did not include any official responsibilities or duties related to military commissions.  The FDT division does not have official responsibility for issues related to the military commissions system or the judicial options and alternatives for handling the prosecution of the individuals detained at Guantánamo.  A separate division within CRS, the American Law Division ("ALD"), specializes in such topic areas and has sole responsibility for research and analysis on those subjects.

20.     Attached as Exhibit E is a true and correct copy of CRS's subject directory for ALD, Courts and International Law Section, that I accessed from an internal CRS website on January 6, 2010.  This is a true and correct copy, except that the column of telephone numbers by each analyst's name has been redacted.  When Members of Congress and their staffs request assistance from CRS by telephone or through the website, the CRS Inquiry Section uses the subject directory to assign the request to the appropriate CRS subject matter expert.  The subject directory shows that ALD is responsible for military-commissions-related issues like "military law," "war detainees," and "international military tribunals."

21.     CRS has an electronic system which its employees or Members of Congress and their staffs can use to search for past reports.  I used this system to search for CRS reports

containing the phrase "military commissions."  Exhibit C is a true and correct copy of the web

page showing search results obtained from the system on January 6, 2010.  The results show that

eighteen CRS reports have been written on the subject of military commissions since 2001.

Comparing the authors with the CRS subject directory for ALD confirms that all the authors,

except for Edward C. Liu, work for the Courts and International Law Section of the ALD.  Mr.

Liu works for the Congress Section of the ALD.

  22. Each CRS report has the name and contact information of the authors so that

Members of Congress and their staffs can contact the authors for further inquiry.  Because every

CRS report on military commissions has been written by legislative attorneys in ALD, they

would receive direct inquiry from Congress about their reports.  My name is not associated with

any CRS products.

  23. In July 2009, CRS implemented an electronic system, Mercury, through which

Members of Congress and their staffs could submit requests for research assistance from CRS.  I

used this system to search for requests from Members of Congress and their staffs relating to

military commissions since the time Mercury was implemented.  Exhibit D is a true and correct

copy of the printable portion of my computer screen showing the search result obtained from

Mercury on January 6, 2010 when I put in the term "military commission."  The screen does not

show the column for the Member of Congress requesting assistance, as I selected the option to

hide that column before printing it.  The search results show that there have been twelve requests

for assistance regarding military commissions between August 26, 2009, and January 5, 2010, all

of which have been resolved by Ms. Jennifer Elsea, Mr. Edward Liu, or Mr. Robert Mason.  All

three work for ALD.  Eight of these twelve requests were made between November 11, 2009,

after my opinion pieces were published, and January 5, 2010.  Five of these requests came from Republican Members, and three came from Democrats.

24.     CRS has conducted several seminars and workshops for congressional staff on military-commission-related issues since 2001.  All were conducted by legislative attorneys from ALD, not by me or by members of the FDT division.

25.     Although I have informally peer reviewed several ALD products, assisted that division's staff in making contact with relevant outside parties, and conducted a 90-minute briefing for ALD staff on my experiences as Chief Prosecutor for the military commissions, I undertook those activities not pursuant to my official duties, but so that ALD staff could take advantage of my prior experience and knowledge of the military commissions.  In that sense, I was another resource for ALD, similar to outside contacts and experts who may also review CRS products for completeness.

26.     Since my employment at CRS, I continued to speak publicly on the prosecution and treatment of Guantánamo detainees with explicit approval from and knowledge of CRS management.  In February 2009, I gave an extemporaneous speech at a Human Rights Watch dinner that reflected my oft-stated criticism of the Bush administration's policies relating to military commissions.  The CRS Deputy Director had given me approval to attend the dinner and I reported what happened to her the next day.  I was not notified by anyone that this speech had threatened CRS or the Library's work.

27.     In early August 2009, I did an interview with former British Defence Secretary Michael Portillo for a BBC documentary on Guantánamo.  I obtained permission from Mr. Mulhollan and the CRS Office of Communications to be interviewed.

28.     In August 2009, an e-mail that I had sent to friends criticizing a scheduled appearance by former Army Private Lynndie England before a private group at the Library gained much publicity and became an article on Small Wars Journal. I also posted a comment to a related article on Small Wars Journal. My comment did not include a formal express disclaimer saying that the views were my own personal views and not those of CRS or any other entity. When CRS General Counsel Kent Ronhovde asked me whether the e-mail had been written in my official or personal capacity, I assured him by e-mail that my original e-mail and the comment were composed and sent on my personal computer during my own time. A true and correct copy of the e-mail from me to Mr. Ronhovde and Lizanne Kelley, sent on August 17, 2009 at 12:58pm, which I retrieved from my e-mail archive and saved as a word document, is attached as Exhibit S. Mr. Ronhovde subsequently told me that the information I provided satisfied the Library General Counsel that I had acted in my personal capacity. Mr. Mulhollan supported my view and my speech during that incident.

29.     On September 11, 2009, I participated in a conference at Case Western Reserve University School of Law, entitled "After Guantánamo: The Way Forward," and submitted a written paper in connection. Mr. Mulhollan approved my participation in the conference in April, as long as I took vacation time to do so in my personal capacity. I also e-mailed a copy of the paper to Mr. Ronhovde and told him that I was not planning to use an express disclaimer disassociating myself from CRS, as I did not expect my affiliation with CRS to be mentioned. Attached as Exhibit G is a true and correct copy of an e-mail response from Mr. Ronhovde, received on September 10, 2009, at 7:34am, approving my paper and my intention not to use an express disclaimer.

30.     At the conference, I expressed my opinion that there should only be one judicial system for all of the Guantánamo detainees.  The webcast of the event is available at: http://law.case.edu/centers/cox/webcast.asp?dt=20090911&type=flv&a=1.  I know from my interactions with the CRS Office of Communications that the staff there tracks all media coverage of CRS employees, and therefore I believe that the office reviewed my comments at the event.  Nobody ever informed me that my comments had harmed the interests of CRS or the Library or compromised my ability to serve as an effective CRS employee.

31.     The paper that I submitted in connection with the conference was subsequently published in the Case Western Journal of International Law.  Attached as Exhibit F is a true and correct copy of the article, Morris D. Davis, *Historical Perspective on Guantánamo Bay: The Arrival of the High value Detainees*, 42 Case W. Res. J. Int'l L. 115 (2009), that is available from the website of the law journal at http://www.case.edu/orgs/jil/hist_pers.html.  Although I expressed my views in the paper on which decisions regarding the treatment of detainees in Guantánamo were correct and which I would reconsider were I to have the chance to do it again, and although I sent a copy of the paper in advance to Mr. Ronhovde, nobody from CRS or the Library told me that my comments would harm the interests of CRS or the Library, or that it would compromise my ability to serve as an effective CRS employee.

32.     On November 4-5, 2009, I received the Charles E. Whittaker Award from the Lawyers Association of Kansas City for speaking out against torture and the politicization of the military commissions.  Mr. Mulhollan once again approved my participation on the only condition that I do so on my personal time, by using a vacation day.  Attached as Exhibit H is a true and correct copy of the e-mail from Mr. Mulhollan, received on August 24, 2009, 4:58 pm,

which I retrieved from e-mail archives and saved as a word document, approving my

participation and recognizing that the award is based on my actions prior to coming to CRS.

33.     Upon accepting the Whittaker Award, I gave a speech criticizing both the Bush

administration and the Obama administration's handling of the military commissions issue.  My

speech was covered in the local media.  Attached as Exhibit R is a true and correct copy of Scott

Lauck, *Whittaker Award from the Lawyers Association of Kansas City Honors*, Mo. Lawyers

Media, Nov. 9, 2009, which is accessible online at

http://findarticles.com/p/articles/mi_7992/is_20091109/ai_n42066557/.  The article reports that I

"remained critical of the Bush administration" in my acceptance speech, but that I was also

"'extraordinarily disappointed' with the Obama administration's subsequent policies."  Again,

although I believe the Communications Office reviewed this media coverage, nobody informed

me that my comments had harmed the interests of CRS or the Library, or compromised my

ability to serve as an effective CRS employee.

34.     There were also a few other occasions prior to November 11, 2009, where I

attended events, for example at the Center for Strategic and International Studies and at the New

America Foundation, and was asked questions related to Guantánamo.

35.     Although I was hesitant to speak towards the beginning of my employment at

CRS because I was focusing on the requirements of my new job, I began to speak publicly more

often as I became more comfortable with the parameters of what I thought I could and could not

say and with my responsibilities as the Assistant Director for FDT.  Mr. Mulhollan's approval of

my speech activities on Guantánamo and the military commissions convinced me that they did

not violate CRS policy and that CRS had little interest in suppressing my speaking and writing

on Guantánamo and the military commissions, especially because those issues relate to my

previous employment as a Chief Prosecutor and not to my official duties as an Assistant Director of the FDT Division.

36.     Prior to November 10, 2009, nobody at CRS questioned my ability to serve as an effective and valuable Assistant Director as a result of the opinions I expressed in the course of my outside speaking activities, despite the fact that CRS tracks media coverage of its employees, including me.

37.     Throughout my time at CRS up to November 11, 2009, Mr. Mulhollan and others had told me on numerous occasions that I was doing a good job, that I was well-liked and respected by my colleagues, and that I was a good fit for CRS.  No one at CRS or the Library questioned or criticized my job performance or indicated that I was doing anything other than highly satisfactory work.  Indeed, Mr. Mulhollan consistently made clear to me that he was more than satisfied with my performance.  He assured me that I would have no problem successfully completing my probationary period.  Attached as Exhibit I is a true and correct copy of the Six Months Qualifying Period Performance and Conduct Evaluation signed by me and Mr. Mulhollan, which reflects these positive reviews of my work.

38.     On November 10, 2009, during a regularly scheduled meeting with Mr. Mulhollan, he reaffirmed his previous views concerning my work performance, telling me that I was doing a good job and that I was well-respected by my colleagues.

39.     On November 10, 2009, I received notice from the *Wall Street Journal* and the *Washington Post* that an op-ed piece and a letter to the editor, respectively, that I had written had been selected for publication.  I had written and submitted these pieces in my personal capacity, on my home computer, during non-work hours, over the previous weekend of November 7-8, 2009.

40.     I was motivated to write these opinion pieces after the United States Attorney General Eric Holder announced in early November that some of the detainees at Guantánamo would be tried in federal court in the United States, and that others would continue to be prosecuted in military commissions, and after former Attorney General Michael Mukasey published an op-ed predicting dire consequences if detainees were brought to the United States to stand trial.  Because of my personal experience and expertise on the issue of military commissions, I felt compelled to contribute in my personal capacity to the discussion of this matter of immense public interest and concern.   I was not solicited to write the pieces and I did not receive any payment in return for writing them.

41.     My principal point in these pieces was that, in my view, there should only be one judicial system for all of the Guantánamo detainees that will face criminal prosecution, rather than two separate systems, because having two separate systems will inevitably lead many to believe that one system is fair—the federal courts—and one is less fair—the military commissions.

42.     The views expressed in the opinion pieces—criticizing the dual system of civilian trials and military commissions for eroding public confidence in justice—were similar to or an outgrowth of what I had publicly said and written both before and after my employment with CRS.  I had criticized both the Bush and the Obama administrations' military-commissions policies in the past.  In fact, I had expressed the exact same views in response to a question from the audience at the Case Western Reserve University School of Law event.  My views are based on a thorough analysis of policy and legal issues that I had undertaken as the former Chief Prosecutor for the military commissions, and on an impartial weighing of the benefits and disadvantages of each policy position.  They are not influenced by desire for private gain, party

politics, or other improper biases.  They are not based on any information or knowledge that I gained as a result of my employment with CRS.  They are based in large part on concern as a career military officer for the potential precedents that may be set, which could be detrimental to U.S. service members who fall into the hands of current or future adversaries.

43.     The opinion pieces did not reference CRS or the Library and were not directed to them in any way.  The byline stated my name and that I was the former Chief Prosecutor for the military commissions.  This was appropriate because that was the capacity in which I was speaking and the basis for my expertise on the topic.  The editor of the *Washington Post* told me that it was customary not to include an express disclaimer, and I agreed based on that conversation that including such a disclaimer would be counterproductive to the disclaimer policy because it would highlight my association with CRS.  I also believed that any reasonable person would understand that I was speaking in my capacity as a former Chief Prosecutor, and not as a representative of CRS, and that this understanding was consistent with Mr. Ronhovde's approval of my participation in the Case Western Reserve University conference without an express disclaimer because neither CRS nor the Library was mentioned.

44.     On the evening of November 10, 2009, I notified Mr. Mulhollan that my opinion pieces would be published the next day.  I did not believe I was required to notify him and did so as a courtesy since I thought the Communications Office, in the course of their routine media monitoring, would flag the articles the next day.  I did not notify him sooner about the pieces because I learned over the years that most submissions never make it into print and you cannot assume anything until the publisher gives a firm commitment.

45.     The same night, Mr. Mulhollan sent me a highly threatening and hostile email about my opinion pieces, questioning my judgment in publishing the pieces and my ability to

continue serving as an Assistant Director.  Attached as Exhibit J is a true and correct copy of an

e-mail from Mr. Mulhollan that I received on November 10, 2009, at 7:56pm, in response to my

e-mail alerting him of the publication of the opinion pieces.  Attached as Exhibit K is a true and

correct copy of an e-mail from Mr. Mulhollan that I received later that night at 10:17pm, after I

sent him the text of my opinion pieces pursuant to his request.

46.    I was scheduled to speak on November 12 at a monthly meeting of the Capitol

Hill Chapter of the Federal Bar Association.  They had invited me to speak on my perspectives

as the former Chief Prosecutor for the military commissions.  Because of the threatening and

hostile nature of Mr. Mulhollan's emails, I notified the Chapter President that I could not speak

at the event.

47.    On November 12, the day after the pieces appeared in the papers, Mr. Mulhollan

called me into a meeting with Mr. Richard Ehlke, the acting Deputy Director.  During this

meeting, Mr. Mulhollan told me that he could not believe that I had written these pieces and that

my actions had caused him to doubt my judgment and suitability to serve as an Assistant

Director.  Mr. Mulhollan informed me that I would not be converted to permanent status from

my probationary status and that, instead, the mandatory one-year probationary period would be

extended for 90 additional days.

48.    The next day, on November 13, 2009, Mr. Mulhollan again called me into a

meeting with Mr. Ehlke.  When I refused to acknowledge that it was impermissible for me to

have written the Op-Ed and Letter to the Editor, Mr. Mulhollan handed me a pre-written formal

letter of admonishment for writing the Op-Ed and Letter to the Editor.  As I stood to leave the

room, Mr. Mulhollan told me that I was a likeable person and that I had done a good job, but that

he could not accept my bad judgment. Attached as Exhibit L is a true and correct copy of the letter of admonishment.

49.     One week later, on November 20, 2009, Mr. Mulhollan called me on the telephone and informed me that I would be terminated as of December 21, 2009, and that I would thereafter be given a 30-day temporary position as his Special Advisor, during which time I could find a different job. Mr. Mulhollan had his assistant deliver a written notice of termination to me immediately after that call. Attached as Exhibit M is a true and correct copy of the letter of termination.

50.     On November 24, 2009, Mr. Mulhollan sent an email to every CRS employee informing them that as of December 21, 2009, I would no longer serve as the Assistant Director of the FDT Division.

51.     I was terminated at the end of the day on December 21, 2009, and I am currently serving as Mr. Mulhollan's Special Advisor for thirty days. I have a few set assignments to complete in that capacity. Unless extended, that position is set to expire on January 20, 2010. An Acting Assistant Director has taken over my prior position.

52.     As of January 6, 2010, there have been 21 online comments posted in response to my op-ed in the *Wall Street Journal* and two in response to the letter to the editor in the *Washington Post*. None of them refer to CRS or the Library. Portions of what I wrote in the op-ed were later quoted in other articles, but all identified me as the former Chief Prosecutor for the military commissions and made no reference to CRS or the Library. There was no connection made publicly between what I wrote and CRS or the Library until December 3, 2009, when a reporter learned that I had been terminated and posted an online article saying I had been fired.

53.     The admonishment and termination that followed the publication of my opinion pieces have taken me by surprise.  This is in part because the Library of Congress's Regulation on Outside Speaking and Writing encourages outside speaking and writing and does not contain any substantive limitations on speech unrelated to the topic areas for which the employee has official responsibility.  It also does not require advance approval for outside speaking.  Attached as Exhibit O is a true and correct copy of the Library of Congress Regulation 2023-3, which is available from the Library's internal website.

54.     CRS's Outside Speaking and Writing policy established by Mr. Mulhollan in 2004, also does not prohibit outside speech unrelated to an employee's area of official responsibility.  Attached as Exhibit P is a true and correct copy of the Outside Speaking and Writing policy.  The policy states that employees are responsible "for using sound judgment in deciding when engagement in an outside activity may place the reputation of CRS at risk."  I know what good judgment means to me, but I don't know what good "judgment" means to CRS or to Dan Mulhollan.

55.     Attached as Exhibit Q is a true and correct copy of a Memorandum from Lizanne D. Kelley, Office of the Counselor, to Jeffrey H. Goode, Section Research Manager, dated December 17, 2008.  I received this memorandum when I started as Assistant Director, and its definition of what constitutes speech related to a job informed my understanding that my speech on Guantánamo and military commissions is unrelated to my job at CRS and acceptable under CRS policy.

56.     Although I was instructed to discipline one of my researchers regarding outside speech during the year, that instance involved speech relating to the individual's area of specialty within CRS.  I never disciplined anyone for engaging in speech unrelated to the individual's area

of official responsibility at CRS.  In part because of Mr. Mulhollan and CRS management's

receptivity to my outside speaking engagements on military-commissions issues throughout the

year, the treatment of outside speech by others, and the express wording of the regulations, I

believed that CRS had little to no interest in regulating speech unrelated to employees' official

duties at CRS.

57.    I know that that the express disclaimer policy is not enforced consistently in

practice and that violation of it does not lead to major disciplinary action.  My understanding,

based in part on e-mail interaction with CRS's General Counsel, Mr. Ronhovde, and the explicit

approval I received from him to refrain from using a formal disclaimer, was that whether an

express disclaimer is required in practice depended on whether one's affiliation with CRS or the

Library was connected to the speech.  I am not aware of any CRS employee who has been

terminated or even formally admonished for failing to include an express disclaimer.

58.    I am also aware that many Library and CRS employees at low and high levels,

including Dr. Billington, have engaged in public speaking and have taken positions on policy

issues over the years, with or without disclaimers, without harming CRS's well-respected

reputation for objectivity and nonpartisanship in Congress.

59.    I was also surprised that the letter of termination cited two undocumented minor

events that occurred earlier in the year, both before the positive reviews that I received from Mr.

Mulhollan in November.  One involved when I allowed a specialist to leave an intern's name as a

co-author on a CRS report submitted for publication in August 2009.  Although I knew the new

CRS computer system had made it technologically difficult to credit unpaid interns because they

are not in the Library's personnel database, I was only aware of a draft policy on this issue at that

point, and not a formal policy against such attribution.  Moreover, I knew that the interns had

been attributed as co-authors routinely for many years in the past.  When the specialist said he wanted to list the intern as co-author on his report, I told him he could submit it and see what happened.  When Associate Director Roger White asked that the intern's name be removed pursuant to a "CRS business rule" that governed the new computer system, I did not object.  I was not admonished for this incident or told of any negative consequences arising from it.

60.     The second involved a subsequent discussion of the CRS authorship policy, which includes the crediting of interns.  By October, the assistant directors of the research divisions were all in agreement that they preferred a policy that allows them to list interns as co-authors in the CRS reports.  The matter had been discussed in Research Policy Council sessions with Mr. Mulhollan, and it appeared that we had reached a consensus that required only a minor edit before it was final.  On October 20, 2009, however, Mr. White sent an e-mail saying that Mr. Mulhollan had designated him to establish the authorship policy, and presenting a proposal that gave Mr. White sole authority to decide who could or could not be listed as an author.  I responded that Mr. White's proposal was not what we had agreed upon and that I objected to Mr. White having "dictatorial" control over authorship decisions.

61.     Mr. Mulhollan later confirmed that Mr. White was mistaken in his approach in his e-mail.  Some days later, on October 23, 2009, the Research Policy Council finalized an authorship policy that allows interns to be credited – exactly as I had done in August.

62.     At the end of this Research Policy Council meeting, as we were leaving the room, Mr. Mulhollan put his hand on my back and explained conversationally that I should be nice to Mr. White because he has been at CRS for a long time and he can be especially sensitive.  I understood this to be in reference to the e-mail in which I had called Mr. White's proposal

"dictatorial." This fifteen-second friendly conversation as we walked out of the meeting was the only time this e-mail was ever mentioned.

63.     The prosecution of Guantánamo detainees continues to be a matter of enormous public concern, and will continue to be for the foreseeable future as President Obama and Attorney General Holder will undoubtedly announce additional decisions with respect to the military-commission or federal-court trial of other Guantánamo detainees.

64.     Although I have received requests for media interviews to publicly express my views on the military commissions issue since receiving my notice of termination, I have declined these opportunities to be interviewed.   I believe that the public would benefit from hearing my views on this matter of great importance, but I fear that the Library and Mr. Mulhollan would further retaliate against me—terminating my reassignment, for example—if I take advantage of these opportunities.  The vagueness of the rules and their arbitrary application make it difficult for me and my colleagues to understand which speech is allowed and which is not, thus resulting in significant chilling of our expression.

65.     Upon hearing of my situation, Senator Lindsey Graham sent a letter to Dr. James Billington, the Librarian of Congress, explaining that, as one of the primary authors of the Military Commissions Act, he values my perspective on the debate over how to prosecute the Guantánamo detainees, including my two opinion pieces.  Attached as Exhibit N is a true and accurate copy of the letter from Senator Graham to Dr. Billington that was sent to me by Senator Graham's chief of staff.

66.     I am most interested in being reinstated to my job as the Assistant Director of the FDT division.  I have great respect for the work of CRS and have maintained a positive relationship with my colleagues and former subordinates who have been extremely supportive of

me throughout this process.  If the position is filled permanently, I expect it will be difficult for me to be reinstated into that position.

67.     Ms. Pamela A. Hairston, Mr. Ted Dagne, and Mr. Kenneth Katzman are current employees of CRS.  Mr. Henry Cohen is an attorney who is or was in ALD.  I am informed and believe that he has recently retired.

68.     Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed on January 8, 2010

_____
MORRIS D. DAVIS