# EXHIBIT A

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Court.

10 0036



Dow Jones Reprints  This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format          Order a reprint of this article now

# THE WALL STREET JOURNAL.
WSJ.com

OPINION  |  NOVEMBER 10, 2009, 8:51 P.M. ET

# Justice and Guantanamo Bay

*It is a mistake to try some detainees in federal courts and others by military commissions.*

By MORRIS DAVIS

This past Sunday, Attorney General Eric Holder announced that the administration will decide by Nov. 16 which Guantanamo detainees will be tried in military commissions trials, and which of them will stand trial in federal courts. But a decision to use both legal settings is a mistake. It will establish a dangerous legal double standard that gives some detainees superior rights and protections, and relegates others to the inferior rights and protections of military commissions. This will only perpetuate the perception that Guantanamo and justice are mutually exclusive.

President George W. Bush authorized military commissions in November 2001, and President Barack Obama ordered them stopped in January 2009. In the intervening seven years—which included a period from September 2005 until October 2007 when I served as chief prosecutor at Guantanamo—only three military commissions trials were completed.

Two of the three detainees convicted of war crimes have served their sentences and today they are free men back in their home countries. But the more than 200 that remain inside the detention center have never been convicted, or in most cases even faced charges.

The day after his inauguration, Mr. Obama ordered an evaluation of all the detainees to determine who should face criminal prosecution. Administration officials estimate that roughly a quarter of the remaining detainees will be recommended for trial in criminal courts.

In a preliminary report submitted to Mr. Obama in July, the Detention Policy Task Force recommended the approval of evaluation criteria developed by the Department of Defense and the Department of Justice. The task force stated its preference for trials in the federal courts, but added the decision would be based in part on "evidentiary issues" and "the extent to which the forum would permit a full presentation of the accused's wrongful conduct." A Washington Post editorial endorsed the proposal, arguing that there should be an alternative forum when a trial in federal court is "not an option because the evidence against the accused is strong but not admissible."

Stop and think about that for a moment. In effect, it means that the standard of justice for each detainee will depend in large part upon the government's assessment of how high the prosecution's evidence can jump and which evidentiary bar it can clear.

The evidence likely to clear the high bar gets gold medal justice: a traditional trial in our federal courts. The evidence unable to clear the federal court standard is forced to settle for a military commission trial, a specially created forum that has faltered repeatedly for more than seven years. That is a double standard I suspect we would condemn if it was applied to us.

Military commissions satisfy the requirements of the Geneva Conventions, which are the source of the detainees' rights. The rights in federal courts surpass the Geneva Conventions requirements and give detainees more than their status and the law demand.

The Obama administration could legitimately choose to prosecute detainees in either forum—federal courts or military

commissions—and satisfy its legal obligations. The problem is trying to have it both ways: the credibility that comes from using federal courts with admissible evidence under the very strict rules of civilian tribunals, and military commissions for cases that are often comparable except for the fact that they depend on evidence (such as hearsay testimony) that is not normally admissible in civilian courts. What if Iran proposed the same for the three American hikers it is currently holding? We would surely condemn what we now stand ready to condone.

It is not as if double-standard justice is required to keep suspected terrorists off our streets. Those detainees who cannot be prosecuted can still be detained under rules the administration approves—likely in the next several months—for the indefinite detention of those who pose a threat to us during this ongoing armed conflict.

The administration must choose. Either federal courts or military commissions, but not both, for the detainees that deserve to be prosecuted and punished for their past conduct.

Double standards don't play well in Peoria. They won't play well in Peshawar or Palembang either. We need to work to change the negative perceptions that exist about Guantanamo and our commitment to the law. Formally establishing a legal double standard will only reinforce them.

**Mr. Davis is the former chief prosecutor for the military commissions. He retired from the military in 2008.**

Copyright 2009 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law
For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

# EXHIBIT B

10 0036

FILED

JAN - 8 20..

Clerk, U.S. District an..
Bankruptcy Courts

# The Washington Post

## Justice indeed worth showcasing

Wednesday, November 11, 2009

In his Oct. 6 op-ed, "The right place to try terrorists," former attorney general Michael B. Mukasey asked whether the main purpose of prosecuting suspected terrorists in federal courts "is to protect the citizens of this country or to showcase the country's criminal justice system, which has been done before and which failed to impress Khalid Sheik Mohammed, [Ali Saleh Kahlah al-Marri] or any of their associates."

Prosecutions are not about impressing the Khalid Sheik Mohammeds of the world. S howcasing our criminal justice system can, however, undermine the twisted propaganda of those terrorists and reduce their ability to attract recruits. Upholding the rule of law also makes it easier for other governments to cooperate in efforts to defeat this global threat.

*Suzanne E. Spaulding, McLean*

*The writer was executive director of the National Commission on Terrorism from January to June 2000. Her law firm, Bingham McCutchen, represents Uighur detainees at Guantanamo Bay.*

--

Michael B. Mukasey had his premise wrong when he contended that the decision to try Guantanamo detainees in federal courts comes down to a choice between protecting the American people and showcasing American justice.

First, his belief that a military commission would have given Ali Saleh Kahlah al-Marri a longer sentence than the eight years-plus that a federal judge gave him is suspect. Two of the three military commissions completed at Guantanamo resulted in effective sentences of nine months or less, and today David Hicks and Salim Ahmed Hamdan are free.

Second, his "serious security concerns for any person or place" near where detainees are to be held or tried are fear-mongering worthy of former vice president Dick Cheney. In many terrorism trials in recent years -- Omar Abdel-Rahman, Richard Reid and Ramzi Yousef, among others -- we

Advertisement


# The Washington Post

## Justice indeed worth showcasing

managed to do justice in significant cases
in the United States without compromising
our security.

Finally, military commissions are not, as Mr.
Mukasey implied, essential to keep
detainees from returning to terrorism. The
Geneva Conventions permit detaining the
enemy during armed conflicts to prevent
them from causing future harm. Criminal
trials punish past misconduct. Suggesting
that the choice is either criminal
prosecution or freedom is false.

*Morris Davis, Gainesville*

*The writer was chief prosecutor for the
military commissions from 2005 to 2007.*

View all comments that have been posted
about this article.

Advertisement



**DON'T DELAY**

**Get Proven, Proactive
IDENTITY THEFT PROTECTION**

**LifeLock.**
#1 In Identity Theft Protection™

*Call Now* **1-877-670-1746**

# EXHIBIT C

10 0036

**FILED**

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

ISSUES IN FOCUS  ▾    PROGRAMS & EVENTS  ▾    REPORTS & ANALYSIS  ▾    RESOURCES  ▾    ABOUT CRS  ▾

Congressional Research Service > Search

## Search Results

Search Within Results

[GO]

1-18 of 18

18 CRS reports ( 9 active and 9 archived ) were found for your search:
• "military commissions"

Sort by Relevance ⟳

Your search was limited. Searches using Boolean operators or quotation marks are not stemmed to match plural/singular forms. Searches using Boolean operators, quotation marks, or asterisks are not expanded to match acronyms, synonyms, etc. As such, you may wish to repeat your search without using these features. Searches using Boolean operators display in Date sort order. Search Help »

Active and archived
reports defined

### 9 Active CRS Reports

1. [x] PDF version of this Report   The Military Commissions Act of 2006 (MCA): Background and Proposed Amendments
   Jennifer K. Elsea • September 8, 2009 • R40752
   Legislative Issue:  Detainee Treatment

2. [x] PDF version of this Report   Guantanamo Detention Center: Legislative Activity in the 111th Congress
   Anna C. Henning • December 30, 2009 • R40754
   Legislative Issue:  Detainee Treatment

3. [x] PDF version of this Report   Comparison of Rights in Military Commission Trials and Trials in Federal Criminal Court
   Jennifer K. Elsea • November 19, 2009 • R40932
   Legislative Issue:  Detainee Treatment

4. [x] PDF version of this Report   Closing the Guantanamo Detention Center: Legal Issues
   Michael John Garcia, Elizabeth B. Bazan, R. Chuck Mason, Edward C. Liu, Anna C. Henning • November 17, 2009 • R40139
   Legislative Issue:  Civil Liberties and National Security,  Detainee Treatment,  Intelligence Policy

5. [x] PDF version of this Report   Enemy Combatant Detainees: Habeas Corpus Challenges in Federal Court
   Jennifer K. Elsea, Kenneth R. Thomas, Michael John Garcia • September 15, 2009 • RL33180
   Legislative Issue:  Detainee Treatment

6. [x] PDF version of this Report   Renditions: Constraints Imposed by Laws on Torture
   Michael John Garcia • September 8, 2009 • RL32890
   Legislative Issue:  Detainee Treatment,  Intelligence Policy

7. [x] PDF version of this Report   Interrogation of Detainees: Requirements of the Detainee Treatment Act
   Michael John Garcia • August 26, 2009 • RL33655
   Legislative Issue:  Detainee Treatment

8. [x] PDF version of this Report   U.N. Convention Against Torture (CAT): Overview and Application to Interrogation Techniques
   Michael John Garcia • January 26, 2009 • RL32438
   Legislative Issue:  Detainee Treatment,  United Nations

9. [x] PDF version of this Report   The War Crimes Act: Current Issues
   Michael John Garcia • January 22, 2009 • RL33662
   Legislative Issue:  Detainee Treatment

Search Results

^ Back to top

## 9 Archived CRS Reports

10.  [Archived] The Military Commissions Act of 2006: Analysis of Procedural Rules and Comparison with Previous DOD Rules and the Uniform Code of Military Justice
Jennifer K. Elsea • September 27, 2007 • RL33688

11. [PDF version of this Report] [Archived] The Department of Defense Rules for Military Commissions: Analysis of Procedural Rules and Comparison with Proposed Legislation and the Uniform Code of Military Justice
Jennifer K. Elsea • September 25, 2006 • RL31600

12. [PDF version of this Report] [Archived] Hamdan v. Rumsfeld: Military Commissions in the "Global War on Terrorism"
Jennifer K. Elsea • July 6, 2006 • RS22486

13. [PDF version of this Report] [Archived] Terrorism and the Law of War: Trying Terrorists as War Criminals before Military Commissions
Jennifer K. Elsea • December 11, 2001 • RL31191

14. [PDF version of this Report] [Archived] Boumediene v. Bush: Guantanamo Detainees' Right to Habeas Corpus
Michael John Garcia • September 8, 2008 • RL34536

15. [PDF version of this Report] [Archived] Treatment of "Battlefield Detainees" in the War on Terrorism
Jennifer K. Elsea • January 23, 2007 • RL31367

16. [PDF version of this Report] [Archived] Selected Procedural Safeguards in Federal, Military, and International Courts
Jennifer K. Elsea • September 18, 2006 • RL31262

17. [PDF version of this Report] [Archived] Detainees at Guantanamo Bay
Jennifer K. Elsea • July 20, 2005 • RS22173

18. [PDF version of this Report] [Archived] Terrorist Surveillance Act of 2006: S. 3931 and Title II of S. 3929, the Terrorist Tracking, Identification, and Prosecution Act of 2006
Elizabeth B. Bazan • January 16, 2007 • RL33689

^ Back to top

1-18 of 18

SITEMAP  CONTACT US  PRIVACY  LEGAL

**External Resources**
Congressional Liaison Offices
Legislative Information System (LIS)
Library of Congress Book Loan

**Tools for Staffers**
Grants and Federal Assistance
Speeches for Holidays & Commemorative Events

**Constituent Services**
Current Concerns

# EXHIBIT D

10 0036

FI____

JAN - 8 ___

Clerk, U. S. District and
Ban___ ___tcy Courts


MERCURY

New Activity ▾  New Record ▾   Go To ▾  Tools ▾    Global Search      Advanced Find

**Workplace**

Queues
  Personal Queue                                               View:   Search Results

Request/Project Views

CRS Clients

Utilities

| | Req # | Subject | Status | Received Date | Assigned To | Resolved By |
|---|---|---|---|---|---|---|
| | CRS-34910 | airline terrorist as enemy combatant | Resolved | 1/5/2010 9:45 AM | Elsea, Jennifer | Elsea, Jennifer |
| | CRS-33056 | Military Commissions Act; Boumediene and Hamdan | Resolved | 12/15/2009 4:03 PM | ALD/CO | Liu, Edward |
| | CRS-32897 | discovery in military commissions | Closed | 12/15/2009 11:22 AM | Elsea, Jennifer | Elsea, Jennifer |
| | CRS-32852 | Military Commissions | Closed | 12/15/2009 9:59 AM | Elsea, Jennifer | Elsea, Jennifer |
| | CRS-28030 | Legal definition: unprivileged combatant | Closed | 11/20/2009 1:10 PM | Mason, Robert | Mason, Robert |
| | CRS-26923 | Transfer of Guantanamo Bay prisoners | Closed | 11/17/2009 1:00 PM | Elsea, Jennifer | Elsea, Jennifer |
| | CRS-26487 | 9/11 trials | Closed | 11/16/2009 11:52 AM | Elsea, Jennifer | Elsea, Jennifer |
| | CRS-26280 | Rules of Evidence: Civilan Courts | Closed | 11/13/2009 2:58 PM | Mason, Robert | Mason, Robert |
| | CRS-18914 | terrorist prosecutions | Closed | 10/13/2009 3:25 PM | Elsea, Jennifer | Elsea, Jennifer |
| | CRS-16180 | Law: military commissions | Closed | 9/30/2009 4:09 PM | Elsea, Jennifer | Elsea, Jennifer |
| | CRS-11187 | military commissions | Closed | 9/10/2009 1:44 PM | Elsea, Jennifer | Elsea, Jennifer |
| | CRS-8723 | military commissions | Closed | 8/26/2009 5:18 PM | Elsea, Jennifer | Elsea, Jennifer |

Requests

military commissions

New

1 of 12 selected.

All    #   A   B   C   D   E   F   G   H   I   J   K   L   M   N   O   P   Q   R   S   T   U   V   W   X   Y   Z

Personalize Workplace ...

  Workplace

  Outreach

  Settings

Help

# EXHIBIT E

10 0036

**FILED**

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts


**CRS**  *Subject Directory*

Browse Divisions
A B C D E F G H I J K L M
N O P Q R S T U V W X Y Z

Search Subjects:
[GO]
Use *, e.g. "Librar*" for "Library/ies"
Search Tips

Subjects          Divisions          Staff          Recent Changes          Contact Us

American Law Division
   Courts and International Section

Phone Numbers Redacted

| | |
|---|---|
| 200 Mile Fishing Limit | Elsea, Jennifer K |
| 200 Mile Fishing Limit | Mason, R Chuck |
| ADA | Smith, Alison M |
| AID | Grimmett, Jeanne J |
| Administrative Office of the U.S. Courts | Bazan, Elizabeth B |
| Admiralty Law | Thomas, Kenneth R |
| Advance Directives | Thomas, Kenneth R |
| Agency for International Development | Grimmett, Jeanne J |
| Air Force, U.S. | Elsea, Jennifer K |
| Air Force, U.S. | Mason, R Chuck |
| Aliens (Foreigners in the U.S.) | Smith, Alison M |
| American Investments Abroad | Grimmett, Jeanne J |
| Americans with Disabilities Act | Smith, Alison M |
| Antidumping (Trade) | Grimmett, Jeanne J |
| Appellate Procedure | Bazan, Elizabeth B |
| Arms Control | Elsea, Jennifer K |
| Arms Sales & Transfers | Grimmett, Jeanne J |
| Army, U.S. | Elsea, Jennifer K |
| Army, U.S. | Mason, R Chuck |
| Assassinations Ban | Bazan, Elizabeth B |
| BRAC | Elsea, Jennifer K |
| BRAC | Mason, R Chuck |
| Bail | Smith, Alison M |
| Bail | Bazan, Elizabeth B |
| Base Closures (Military) | Elsea, Jennifer K |
| Base Closures (Military) | Mason, R Chuck |
| Basel Convention (Waste Trade) | Grimmett, Jeanne J |
| Basel Convention (Waste Trade) | Garcia, Michael John |
| Blind | Smith, Alison M |
| Border Control | Garcia, Michael John |
| CAFTA | Grimmett, Jeanne J |
| CSRS | Smith, Alison M |
| Capital Punishment | Bazan, Elizabeth B |
| Capital Punishment | Smith, Alison M |
| Capital Punishment | Henning, Anna C |
| Central American Free Trade Agreement | Grimmett, Jeanne J |
| Change of Venue (Courts) | Bazan, Elizabeth B |

Phone Numbers Redacted

| | |
|---|---|
| Change of Venue (Courts) | Thomas, Kenneth R |
| Child Abuse and Neglect | Smith, Alison M |
| Child Support | Smith, Alison M |
| Children | Smith, Alison M |
| Church & State | Thomas, Kenneth R |
| Citizenship | Smith, Alison M |
| Civil Liberties | Elsea, Jennifer K |
| Civil Penalties | Thomas, Kenneth R |
| Civil Procedure | Bazan, Elizabeth B |
| Civil Procedure | Thomas, Kenneth R |
| Civil Procedure | Henning, Anna C |
| Civil Service Retirement System | Smith, Alison M |
| Civil/Military Relations | Bazan, Elizabeth B |
| Civil/Military Relations | Elsea, Jennifer K |
| Class Actions (Civil Procedure) | Bazan, Elizabeth B |
| Classified Information | Bazan, Elizabeth B |
| Classified Information | Elsea, Jennifer K |
| Classified Information | Mason, R Chuck |
| Commerce Clause | Bazan, Elizabeth B |
| Commerce Clause | Thomas, Kenneth R |
| Compulsory Military Service | Elsea, Jennifer K |
| Confessions (Law) | Bazan, Elizabeth B |
| Congress & Foreign Policy | Elsea, Jennifer K |
| Constitution (U.S.) | Thomas, Kenneth R |
| Constitution (U.S.) | Bazan, Elizabeth B |
| Constitutional Amendments | Thomas, Kenneth R |
| Constitutional Conventions (Federal) | Thomas, Kenneth R |
| Consular Service (U.S.) | Garcia, Michael John |
| Contempt of Court | Bazan, Elizabeth B |
| Controlled Substances Act | Bazan, Elizabeth B |
| Countervailing Duties | Grimmett, Jeanne J |
| Courts | Bazan, Elizabeth B |
| Courts | Thomas, Kenneth R |
| Courts | Henning, Anna C |
| Courts-Martial and Courts of Inquiry | Elsea, Jennifer K |
| Courts-Martial and Courts of Inquiry | Mason, R Chuck |
| Courts-Martial and Courts of Inquiry | Garcia, Michael John |
| Criminal Justice Act of 1964 | Henning, Anna C |
| Currency & Foreign Transaction Reporting Act | Grimmett, Jeanne J |
| Customs and Immigration Service (CIS) | Smith, Alison M |
| Cybercrime | Bazan, Elizabeth B |
| Cybercrime | Henning, Anna C |
| Cybersecurity (Critical Infrastructure) | Henning, Anna C |
| DOD | Elsea, Jennifer K |
| DOD | Mason, R Chuck |
| Death Penalty | Bazan, Elizabeth B |
| Death Penalty | Smith, Alison M |

| | |
|---|---|
| Death Penalty | Henning, Anna C |
| Defense Intelligence | Bazan, Elizabeth B |
| Defense Intelligence | Elsea, Jennifer K |
| Defense Intelligence | Mason, R Chuck |
| Department of Defense | Elsea, Jennifer K |
| Department of Defense | Mason, R Chuck |
| Deportation | Garcia, Michael John |
| Desertion (Military) | Elsea, Jennifer K |
| Desertion (Military) | Mason, R Chuck |
| Diplomatic Immunity | Elsea, Jennifer K |
| Diplomatic Immunity | Garcia, Michael John |
| Disabled | Smith, Alison M |
| Disaster Relief | Bazan, Elizabeth B |
| Discrimination in Criminal Justice | Henning, Anna C |
| Domestic Content | Grimmett, Jeanne J |
| Domestic Relations | Smith, Alison M |
| Droughts (Including Financial Assistance) | Bazan, Elizabeth B |
| Dumping (Foreign Trade) | Grimmett, Jeanne J |
| EPA | Garcia, Michael John |
| EX-IM Bank | Grimmett, Jeanne J |
| Eavesdropping | Bazan, Elizabeth B |
| Employer Sanctions | Smith, Alison M |
| Enemy Combatants | Elsea, Jennifer K |
| Enemy Combatants | Garcia, Michael John |
| Enemy Combatants | Mason, R Chuck |
| Enemy Combatants | Henning, Anna C |
| Entrapment | Bazan, Elizabeth B |
| Environment | Garcia, Michael John |
| Environmental Protection Agency | Garcia, Michael John |
| Evidence | Bazan, Elizabeth B |
| Exclusionary Rule | Bazan, Elizabeth B |
| Export Import Bank | Grimmett, Jeanne J |
| Extradition | Elsea, Jennifer K |
| Extradition | Garcia, Michael John |
| Extraterritoriality | Grimmett, Jeanne J |
| Extraterritoriality | Elsea, Jennifer K |
| Extraterritoriality | Garcia, Michael John |
| FERS | Smith, Alison M |
| FISA | Bazan, Elizabeth B |
| FISA | Elsea, Jennifer K |
| FOIA | Smith, Alison M |
| FSC | Grimmett, Jeanne J |
| Family Law | Smith, Alison M |
| Federal Circuit Court | Bazan, Elizabeth B |
| Federal Circuit Court | Thomas, Kenneth R |
| Federal Circuit Court | Henning, Anna C |
| Federal Courts | Bazan, Elizabeth B |

Phone Numbers Redacted

| | |
|---|---|
| Federal Courts | Thomas, Kenneth R |
| Federal Courts | Henning, Anna C |
| Federal Employees | Smith, Alison M |
| Federal Employees' Retirement System | Smith, Alison M |
| Federal Flood Insurance | Bazan, Elizabeth B |
| Federal Rules of Procedure | Bazan, Elizabeth B |
| Federal Rules of Procedure | Henning, Anna C |
| Fisheries | Bazan, Elizabeth B |
| Foreign Debts (to the U.S.) | Grimmett, Jeanne J |
| Foreign Intelligence Surveillance Act | Bazan, Elizabeth B |
| Foreign Intelligence Surveillance Act | Elsea, Jennifer K |
| Foreign Investments (in the U.S.) | Grimmett, Jeanne J |
| Foreign Relations-U.S. | Grimmett, Jeanne J |
| Foreign Relations-U.S. | Elsea, Jennifer K |
| Foreign Sales Corporation | Grimmett, Jeanne J |
| Foreign Trade | Grimmett, Jeanne J |
| Foreign Workers in the U.S. | Smith, Alison M |
| Foster Care (Children) | Smith, Alison M |
| Fraud | Bazan, Elizabeth B |
| Fraud | Henning, Anna C |
| Free Trade Agreements (FTA) | Grimmett, Jeanne J |
| Free Trade/Protectionism | Grimmett, Jeanne J |
| Freedom of Association | Thomas, Kenneth R |
| Freedom of Information | Smith, Alison M |
| Freedom of Information Act | Smith, Alison M |
| GSP | Grimmett, Jeanne J |
| Generalized System of Preferences | Grimmett, Jeanne J |
| Genetics | Smith, Alison M |
| Geneva Conventions | Elsea, Jennifer K |
| Geneva Conventions | Garcia, Michael John |
| Geneva Conventions | Mason, R Chuck |
| Government Employees | Smith, Alison M |
| Grand Juries | Bazan, Elizabeth B |
| Habeas Corpus | Bazan, Elizabeth B |
| Handicapped | Smith, Alison M |
| Hate Crimes | Smith, Alison M |
| Hate Speech | Thomas, Kenneth R |
| Hearsay (Law) | Bazan, Elizabeth B |
| ICE | Garcia, Michael John |
| IDBS | Grimmett, Jeanne J |
| INS | Smith, Alison M |
| ITC | Grimmett, Jeanne J |
| Immigration | Garcia, Michael John |
| Immigration | Smith, Alison M |
| Immigration and Customs Enforcement | Garcia, Michael John |
| Impeachment of Presidents | Bazan, Elizabeth B |
| Import Labeling | Grimmett, Jeanne J |

Phone Numbers Redacted

| | |
|---|---|
| Imports | Grimmett, Jeanne J |
| Injunctions | Bazan, Elizabeth B |
| Insanity Defense | Bazan, Elizabeth B |
| Insanity Defense | Smith, Alison M |
| Intelligence Services | Bazan, Elizabeth B |
| Intelligence Services | Elsea, Jennifer K |
| Internal Security | Bazan, Elizabeth B |
| International Court of Justice | Elsea, Jennifer K |
| International Court of Justice | Garcia, Michael John |
| International Criminal Courts | Elsea, Jennifer K |
| International Criminal Courts | Garcia, Michael John |
| International Development | Grimmett, Jeanne J |
| International Development Banks | Grimmett, Jeanne J |
| International Economic Relations | Grimmett, Jeanne J |
| International Investments | Grimmett, Jeanne J |
| International Law | Elsea, Jennifer K |
| International Law | Grimmett, Jeanne J |
| International Law | Garcia, Michael John |
| International Military Tribunals-post WWII | Elsea, Jennifer K |
| International Military Tribunals-post WWII | Mason, R Chuck |
| International Military Tribunals-post WWII | Garcia, Michael John |
| International Trade | Grimmett, Jeanne J |
| International Trade Commission | Grimmett, Jeanne J |
| Jackson-Vanik Amendment (Trade) | Grimmett, Jeanne J |
| Jones Act (Shipping) | Thomas, Kenneth R |
| Judicial Procedure | Bazan, Elizabeth B |
| Judicial Procedure | Thomas, Kenneth R |
| Judicial Procedure | Henning, Anna C |
| Judicial Reform | Bazan, Elizabeth B |
| Juries | Bazan, Elizabeth B |
| Juries | Smith, Alison M |
| Juries | Henning, Anna C |
| Jury Selection | Bazan, Elizabeth B |
| Jury Selection | Smith, Alison M |
| Jury Selection | Henning, Anna C |
| Law of War | Elsea, Jennifer K |
| Law of War | Mason, R Chuck |
| Life Imprisonment | Smith, Alison M |
| Life Imprisonment | Bazan, Elizabeth B |
| Living Wills | Thomas, Kenneth R |
| MFN | Grimmett, Jeanne J |
| MTN | Grimmett, Jeanne J |
| Magistrates | Bazan, Elizabeth B |
| Magistrates | Henning, Anna C |
| Mail Fraud | Bazan, Elizabeth B |
| Mail Fraud | Henning, Anna C |
| Marine Corps | Mason, R Chuck |

Phone Numbers Redacted

| | |
|---|---|
| Maritime Law | Thomas, Kenneth R |
| Maritime Transportation | Thomas, Kenneth R |
| Marshal Service, U.S. | Bazan, Elizabeth B |
| Martial Law | Elsea, Jennifer K |
| Martial Law | Mason, R Chuck |
| Military Benefits-Forfeiture for Commission of Crimes | Elsea, Jennifer K |
| Military Benefits-Forfeiture for Commission of Crimes | Mason, R Chuck |
| Military Desertion | Elsea, Jennifer K |
| Military Desertion | Mason, R Chuck |
| Military Intelligence | Bazan, Elizabeth B |
| Military Intelligence | Elsea, Jennifer K |
| Military Intelligence | Mason, R Chuck |
| Military Law | Elsea, Jennifer K |
| Military Law | Mason, R Chuck |
| Military Personnel | Elsea, Jennifer K |
| Military Personnel | Mason, R Chuck |
| Most Favored Nation Principle (Trade) | Grimmett, Jeanne J |
| Multilateral Trade Negotiations | Grimmett, Jeanne J |
| Municipal Corporations-Insolvency | Jeweler, Robin |
| Municipal Labor Relations | Smith, Alison M |
| NAFTA | Grimmett, Jeanne J |
| NATO | Elsea, Jennifer K |
| NATO | Mason, R Chuck |
| NATO | Garcia, Michael John |
| NFIP | Bazan, Elizabeth B |
| NLRA | Smith, Alison M |
| NLRB | Smith, Alison M |
| NSC | Bazan, Elizabeth B |
| NSC | Elsea, Jennifer K |
| National Capital Planning Commission | Thomas, Kenneth R |
| National Emergency Powers | Elsea, Jennifer K |
| National Emergency Powers | Bazan, Elizabeth B |
| National Guard (U.S.) | Mason, R Chuck |
| National Identity Cards | Smith, Alison M |
| National Labor Relations Act | Smith, Alison M |
| National Labor Relations Board | Smith, Alison M |
| National Security | Elsea, Jennifer K |
| National Security | Bazan, Elizabeth B |
| National Security | Henning, Anna C |
| National Security Council | Bazan, Elizabeth B |
| National Security Council | Elsea, Jennifer K |
| Navy (U.S.) | Mason, R Chuck |
| Nonvoting Delegates | Thomas, Kenneth R |
| North American Free Trade Agreement | Grimmett, Jeanne J |
| North Atlantic Treaty Organization | Elsea, Jennifer K |
| North Atlantic Treaty Organization | Mason, R Chuck |
| North Atlantic Treaty Organization | Garcia, Michael John |

Phone Numbers Redacted

| | |
|---|---|
| Occupational Safety & Health | Smith, Alison M |
| Ocean Management and Organizations | Elsea, Jennifer K |
| Ocean Transportation | Thomas, Kenneth R |
| Ocean Treaties | Elsea, Jennifer K |
| PATRIOT Act | Bazan, Elizabeth B |
| PATRIOT Act | Elsea, Jennifer K |
| POWs | Elsea, Jennifer K |
| POWs | Garcia, Michael John |
| POWs | Mason, R Chuck |
| Pardons | Bazan, Elizabeth B |
| Parole | Bazan, Elizabeth B |
| Patriot II | Bazan, Elizabeth B |
| Perjury | Bazan, Elizabeth B |
| Plea Bargaining | Bazan, Elizabeth B |
| Plea Bargaining | Smith, Alison M |
| Political Violence | Bazan, Elizabeth B |
| Posse Comitatus | Elsea, Jennifer K |
| Posse Comitatus | Bazan, Elizabeth B |
| Posse Comitatus | Mason, R Chuck |
| Presidential Powers | Elsea, Jennifer K |
| Preventive Detention | Bazan, Elizabeth B |
| Prisoners of War | Elsea, Jennifer K |
| Prisoners of War | Garcia, Michael John |
| Prisoners of War | Mason, R Chuck |
| RICO | Thomas, Kenneth R |
| RICO | Henning, Anna C |
| Racketeer Influenced & Corrupt Organizations | Thomas, Kenneth R |
| Racketeer Influenced & Corrupt Organizations | Henning, Anna C |
| Recidivism | Bazan, Elizabeth B |
| Rehabilitation Act | Smith, Alison M |
| Right to Counsel | Bazan, Elizabeth B |
| Right to Speedy Trial | Bazan, Elizabeth B |
| Right to Speedy Trial | Smith, Alison M |
| Right to Trial by Jury | Bazan, Elizabeth B |
| Right to Trial by Jury | Smith, Alison M |
| Schools | Smith, Alison M |
| Searches & Seizures | Bazan, Elizabeth B |
| Searches & Seizures | Henning, Anna C |
| Selective Service | Elsea, Jennifer K |
| Selective Service | Mason, R Chuck |
| Self-Incrimination | Bazan, Elizabeth B |
| Self-Incrimination | Henning, Anna C |
| Sentencing Guidelines | Smith, Alison M |
| Separation of Church & State | Thomas, Kenneth R |
| Separation of Powers | Elsea, Jennifer K |
| Servicemembers Civil Relief Act | Elsea, Jennifer K |
| Servicemembers Civil Relief Act | Mason, R Chuck |

Phone Numbers Redacted

| | |
|---|---|
| Sex Crimes | Thomas, Kenneth R |
| Sex Crimes | Bazan, Elizabeth B |
| Sex Crimes | Smith, Alison M |
| Sex Offenders Notification Laws | Thomas, Kenneth R |
| Sexual Offenders | Bazan, Elizabeth B |
| Sexual Offenders | Thomas, Kenneth R |
| Shipping | Thomas, Kenneth R |
| Soldiers and Sailors Civil Relief Act | Elsea, Jennifer K |
| Soldiers and Sailors Civil Relief Act | Mason, R Chuck |
| Solicitation | Bazan, Elizabeth B |
| Solicitation | Thomas, Kenneth R |
| Son of Sam Law (Criminal Profiteering) | Smith, Alison M |
| Sovereign Immunity | Elsea, Jennifer K |
| Sovereign Immunity | Grimmett, Jeanne J |
| Sovereign Immunity | Mason, R Chuck |
| Standing To Sue | Bazan, Elizabeth B |
| Standing To Sue | Henning, Anna C |
| Status of Forces Agreements | Mason, R Chuck |
| Statute of Limitations | Bazan, Elizabeth B |
| Subsidies (Foreign Trade) | Grimmett, Jeanne J |
| Subversive Activities | Bazan, Elizabeth B |
| Supreme Court | Thomas, Kenneth R |
| Supreme Court | Henning, Anna C |
| TEAM | Smith, Alison M |
| Taft-Hartley Act (Labor) | Smith, Alison M |
| Tariffs | Grimmett, Jeanne J |
| Teamwork for Employees & Managers Act | Smith, Alison M |
| Territorial Delegates | Thomas, Kenneth R |
| Territorial Waters | Elsea, Jennifer K |
| Territorial Waters | Thomas, Kenneth R |
| Territorial Waters | Mason, R Chuck |
| Trade | Grimmett, Jeanne J |
| Trade Blocs | Grimmett, Jeanne J |
| Trade Preferences | Grimmett, Jeanne J |
| Trafficking in Humans | Garcia, Michael John |
| Treason | Elsea, Jennifer K |
| Treason | Bazan, Elizabeth B |
| Treaties & Executive Agreements | Elsea, Jennifer K |
| Treaties & Executive Agreements | Grimmett, Jeanne J |
| Treaties & Executive Agreements | Garcia, Michael John |
| Treaties & Executive Agreements | Mason, R Chuck |
| Two Hundred Mile Limit (Fisheries Zone, Economic Zone) | Elsea, Jennifer K |
| Two Hundred Mile Limit (Fisheries Zone, Economic Zone) | Mason, R Chuck |
| U.N. | Elsea, Jennifer K |
| U.N. | Mason, R Chuck |
| U.N. | Garcia, Michael John |
| U.S. Immigration and Naturalization Service | Smith, Alison M |

Phone Numbers Redacted

| | |
|---|---|
| U.S. National Security Council | Bazan, Elizabeth B |
| U.S. National Security Council | Elsea, Jennifer K |
| U.S. Trade Representative | Grimmett, Jeanne J |
| UN | Elsea, Jennifer K |
| UN | Mason, R Chuck |
| UN | Garcia, Michael John |
| USA PATRIOT ACT | Bazan, Elizabeth B |
| USA PATRIOT ACT | Elsea, Jennifer K |
| USAID | Grimmett, Jeanne J |
| USTR | Grimmett, Jeanne J |
| Unfair Trade Practices | Grimmett, Jeanne J |
| United Nations | Elsea, Jennifer K |
| United Nations | Mason, R Chuck |
| United Nations | Garcia, Michael John |
| VOA | Smith, Alison M |
| Violence against Women | Thomas, Kenneth R |
| Visas | Garcia, Michael John |
| Visually Impaired | Smith, Alison M |
| Voice of America | Smith, Alison M |
| WTO | Grimmett, Jeanne J |
| War Crimes | Elsea, Jennifer K |
| War Crimes | Garcia, Michael John |
| War Crimes | Mason, R Chuck |
| War Detainees | Elsea, Jennifer K |
| War Detainees | Garcia, Michael John |
| War Detainees | Mason, R Chuck |
| War Detainees | Henning, Anna C |
| War Powers | Elsea, Jennifer K |
| War Powers | Mason, R Chuck |
| White Collar Crime | Bazan, Elizabeth B |
| White Collar Crime | Henning, Anna C |
| Wiretapping | Bazan, Elizabeth B |
| World Court | Elsea, Jennifer K |
| World Court | Garcia, Michael John |
| World Trade Organization | Grimmett, Jeanne J |

# EXHIBIT F

10 0036

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

HISTORICAL PERSPECTIVE ON GUANTÁNAMO BAY: THE ARRIVAL OF
THE HIGH VALUE DETAINEES

*Morris D. Davis*[*]

*Detainees were sent to Guantánamo Bay to be exploited for intelligence purposes, not to perfect criminal cases against them. The effort to construct credible criminal cases based upon intelligence was going to be problematic, and it became even more so when President George W. Bush decided in the summer of 2006 to transfer high value detainees from secret Central Intelligence Agency sites, where some were subjected to torture, to military detention at Guantánamo Bay. The former chief prosecutor for the military commissions describes the decision to create "clean teams" of Federal Bureau of Investigation agents and military law enforcement personnel to interview the high value detainees anew at Guantánamo Bay in hopes of separating the criminal prosecution effort from the earlier intelligence gathering phase. The merits of that decision will be tested as President Barack Obama's administration moves forward with the prosecution of Khalid Sheikh Mohammed and the other high value detainees.*

> "A nation that forgets its past is doomed to repeat it"
> —Winston Churchill

## I. INTRODUCTION

Two things happened on Monday, August 29, 2005, that were unrelated, except perhaps in a symbolic sense: Hurricane Katrina devastated New Orleans and the moving company packed my household goods to take me and my family to Washington so I could become the Chief Prosecutor for the Military Commissions at Guantánamo Bay, Cuba.

I had agreed to accept the job as Chief Prosecutor a few weeks earlier following an interview with former Defense Department General Counsel Jim Haynes at his Pentagon office. At the time, I was excited about this historic opportunity and optimistic that I could play an important role in holding terrorists accountable in a system of justice that reflected American values and our commitment to the rule of law. For an attorney, the chance to lead a talented multi-agency prosecution team assembled to conduct the first

---

[*] Morris D. Davis retired from the Air Force in October 2008. These are his personal views and they do not reflect the opinions of any government agency or any other organization.

military commissions since World War II was more than a once-in-a-lifetime opportunity; most lawyers never got a chance like this.

Thanks to Hurricane Katrina, the cross-country drive from Cheyenne, Wyoming, to the Virginia suburbs of Washington took on a sense of foreboding that presaged the twenty-five months I served as Chief Prosecutor. The long drive was my first experience buying gasoline that cost more than three dollars a gallon, well over the military's travel reimbursement rate, which meant the new job came at a personal cost right from the start. The radio news coverage as my family and I passed from town to town was ominous as the impact of Katrina became more apparent, and the mood at every stop was subdued, similar to the mood that enveloped the country after 9/11. Just as the nation had done four years earlier when terrorists struck, it looked to the Bush Administration for leadership in the wake of a disaster.

My involvement in the military commissions began in early September 2005, nearly four years after President Bush authorized them in a military order issued on November 13, 2001.[1] I became the third Chief Prosecutor following Colonel Fred Borch, who left amid controversy within the prosecution team in early 2004 and retired from the Army shortly thereafter, and Colonel Bob Swann, who retired from the Army in September 2005 and remained on the prosecution team as a civilian attorney to work full-time on the high value detainee cases.

A little more than two years later, my initial excitement and optimism was gone. I agreed to serve as Chief Prosecutor for as long as I believed we were committed to providing full, fair, and open trials. At a presentation at Case Western Reserve University School of Law in March 2006, someone asked what I would do if I ever concluded we would not have full, fair, and open trials, and I responded that I would call it a day and walk away. Well, that day came on October 4, 2007, when I learned that Deputy Secretary of Defense Gordon England had signed orders placing me under the command of Brigadier General Tom Hartmann and Department of Defense General Counsel Jim Haynes, men who believed waterboarding was an acceptable way to extract confessions for use in criminal proceedings conducted by the U.S., including cases that could potentially result in the death penalty. I had instructed the prosecutors as early as October 2005 that we would not use any evidence obtained by waterboarding or other unduly coercive interrogation techniques, so a few hours after being placed under the command of Hartmann and Haynes I submitted a request to resign as Chief Prosecutor. My request was granted.[2]

---

[1]   Mil. Order of Nov. 13, 2001, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,831 (Nov. 16, 2001).

[2]   *See* House Armed Services Comm., *Hearing on the Implications of the Supreme Court's Boumediene Decision for Detainees at Guantanamo Bay, Cuba Before the House Armed*

Some of what occurred in the period between 2005 and 2007 remains classified, but many of the details are now in the public domain and available for examination and discussion. I had a role in shaping some of the decisions that remain the subject of debate today, so, lest we forget, I offer a personal perspective on a significant chapter in the Guantánamo Bay legacy.

## II. THE TRANSFER OF THE HIGH VALUE DETAINEES TO DEPARTMENT OF DEFENSE CUSTODY AT THE U.S. NAVAL STATION GUANTÁNAMO BAY, CUBA

More than three years had elapsed between the time the U.S. captured and detained some of its high value detainees and the time I became the Chief Prosecutor in September 2005.[3] The circumstances surrounding how the detainees were captured, detained, and interrogated at secret CIA facilities have been and continue to be vigorously debated and are not discussed in detail here.[4] Suffice it to say, the methods employed to elicit in-

---

*Services Comm.*, 110th Cong. (Jul. 30, 2008) (prepared statement of Morris D. Davis, former Chief Prosecutor, Office of Military Commissions), *available at* http://armedservices. house.gov/pdfs/FC073008/Davis_Testimiony073008.pdf (last visited Oct. 16, 2009). Lieutenant Colonel Will Britt (U.S. Army Reserve) served as Interim Chief Prosecutor from the time I resigned in October 2007 until a replacement, Colonel Larry Morris, arrived in December 2007 to become the fourth Chief Prosecutor. Colonel Morris retired from the Army in 2009 and was replaced by Captain John Murphy (U.S. Navy Reserve). John Murphy is a Department of Justice attorney assigned to the military commissions since 2006 as a civilian member of the high value detainee prosecution team. He switched to military status in May 2009 and became the fifth military judge advocate appointed Chief Prosecutor in less than eight years. The four Chief Prosecutors that preceded him all retired from the military before reaching their mandatory retirement dates.

[3]   Abu Zubaydah was the first of the group known as the high value detainees captured by the U.S. He was captured in Pakistan in March 2002. The most well-known of the high value detainees, Khalid Sheikh Mohammed, was captured in Pakistan in March 2003. *See* Office of the Dir. of Nat'l Intelligence, *Summary of the High Value Detainee Program, available at* http://www.defenselink.mil/pdf/thehighvaluedetaineeprogram2.pdf (last visited Oct. 16, 2009). *See also Profile: Key US terror suspects,* BBC, Feb. 11, 2008, http://news.bbc.co.uk/2/hi/americas/5322694.stm (last visited Oct. 16, 2009).

[4]   In conjunction with the release of Department of Justice Office of Legal Counsel interrogation memos, President Obama referred to the secret prisons and enhanced interrogation era as "a dark and painful chapter in our history." Press Release, President Barack Obama, Statement of President Barack Obama on Release of OLC Memos (Apr. 16, 2009), http://www.whitehouse.gov/the_press_office/Statement-of-President-Barack-Obama-on-Release-of-OLC-Memos/ (last visited Oct. 16, 2009). A May 7, 2004, report by the CIA Inspector General, released in redacted form in August 2009 in response to a Freedom of Information Act (FOIA) lawsuit by the American Civil Liberties Union, describes waterboarding, mock executions, threats to kill or sexually assault family members of detainees, and other interrogation methods the CIA Inspector General labeled "inhumane." *See* CENTRAL INTELLIGENCE AGENCY, OFFICE OF INSPECTOR GEN., COUNTERTERRORISM DETENTION AND INTERROGATION ACTIVITIES (SEPTEMBER 2001–OCTOBER 2003)

CASE W. RES. J. INT'L L.     [Vol. 42:115

formation from the high value detainees prior to their transfer to Department of Defense (DOD) custody caused the prosecution team to doubt that any of their post-capture statements would be admissible at trial, even though the evidentiary rules in military commissions are more lenient than the rules in federal courts and courts-martial.[5] Given those doubts, when President Bush made the decision in 2006 to transfer the high value detainees to Guantánamo Bay, the prosecution team faced a pivotal question: Do we question the detainees again using a "clean team" of law enforcement personnel in an effort to obtain admissions independent of what they said in CIA custody, or do we preserve the status quo in hopes the military judges might admit some of their earlier admissions? At the same time, and unbeknownst to the prosecution team, the DOD intelligence community at Guantánamo Bay had other ideas, and a tug-of-war began.

In a speech on the afternoon of September 6, 2006, in the East Room of the White House to an audience that included family members of some of the 9/11 victims, President Bush said:

> We're now approaching the five-year anniversary of the 9/11 attacks—and the families of those murdered that day have waited patiently for justice. Some of the families are with us today—they should have to wait no longer. So I'm announcing today that Khalid Sheikh Mohammed, Abu Zubaydah, Ramzi bin al-Shibh, and 11 other terrorists in CIA custody have been

---

(May 7, 2004), *available at* http://www.aclu.org/torturefoia/released/052708/052708_Special_Review.pdf (last visited Oct. 16, 2009).

[5]   In a written statement that accompanied his testimony at a House Armed Services Committee hearing on Sep. 7, 2006, on proposed rules for military commissions in the wake of the Supreme Court's decision in *Hamdan v. Rumsfeld*, Acting Assistant Attorney General Stephen G. Bradbury said:

> Because military commissions must try crimes based on evidence collected everywhere from the battlefields in Afghanistan to foreign terrorist safe houses, we believe that the Code of Military Commissions should provide for the introduction of all probative evidence, including hearsay evidence, where such evidence is reliable. . . . Court-martial rules of evidence track those in civilian courts, reflecting the fact that the overwhelming majority of court-martial prosecutions arise from everyday violations of the military code of conduct, far from the battlefield. By contrast, military commissions must permit the introduction of a broader range of evidence, including hearsay statements, because many witnesses are likely to be foreign nationals who are not amenable to process, and other witnesses may be unavailable because of military necessity, incarceration, injury, or death. In this respect, the Code of Military Commissions follows the practice of international war crimes tribunals, which similarly recognize the need for broad evidentiary rules when dealing with evidence obtained under conditions of war.

Dep't of Justice, *Statement of Stephen J. Bradbury, Acting Assistant Attorney General Office of Legal Counsel Department of Justice, Before the Committee on Armed Services Concerning the Supreme Court's Decision in Hamdan v. Rumsfeld*, 5–6 (Sept. 7, 2006), *available at* http://armedservices.house.gov/comdocs/schedules/9-7-06BradburyStatement.pdf (last visited Oct. 16, 2009)

> transferred to the United States Naval Base at Guantanamo Bay. They are
> being held in the custody of the Department of Defense. As soon as Con-
> gress acts to authorize the military commissions I have proposed, the men
> our intelligence officials believe orchestrated the deaths of nearly 3,000
> Americans on September the 11th, 2001, can face justice.[6]

As President Bush said in his speech, the transfer of the high value
detainees from the CIA to the DOD marked a change in focus from a CIA-
controlled phase focused on intelligence collection to a DOD-controlled
phase focused on prosecution and criminal accountability. The transition
was neither smooth nor easy. Years earlier, the decision was made to send
some detainees captured in the Global War on Terrorism to Guantánamo
Bay so they could be exploited for intelligence purposes in a controlled en-
vironment away from the battlefield and at a place some senior administra-
tion officials mistakenly believed was outside the reach of the federal
courts.[7] Accordingly, in 2002 the U.S. Naval Station Guantánamo Bay took
on two new missions: (1) creating and operating a detention facility for
enemy combatants selected for transfer from other detention locations; and
(2) creating and operating an intelligence collection program to exploit
those detainees. As proved to be the case at Abu Ghraib, mixing two sepa-
rate and distinct missions at one detention facility can blur the lines of
command and control and generate tensions and adverse consequences. Law
enforcement's retrospective focus—what has the person already done in the
past?—with its well-defined and rigid rules is often at cross purposes with
the intelligence community's prospective focus—what is the person plan-
ning to do in the future?—and its vaguely defined, situation-driven practic-
es. Trying to merge these two focuses presents the classic square peg and
round hole challenge.

By the time the high value detainees arrived in September 2006, the
intelligence group at Guantánamo Bay had been in operation for more than

---

[6]   Press Release, President George W. Bush, President Discusses Creation of Military
Commissions to Try Suspected Terrorists (Sept. 6, 2006), *available at* http://georgewbush-
whitehouse.archives.gov/news/releases/2006/09/20060906-3.html (last visited Oct. 16,
2009). Prior to President Bush's announcement, we had divided the prosecution team into
two parts operating out of separate facilities, with one part of individually selected members
with high level security clearances dedicated solely to preparing cases against the high value
detainees. This prosecution task force (PTF), as it was called, included prosecutors from the
military services, the DOD, and the Department of Justice. The PTF was supported by law
enforcement agents from the Federal Bureau of Investigation (FBI) and DOD's Criminal
Investigation Task Force (CITF), as well as analysts, agents, administrative support person-
nel and others from various federal agencies. When I resigned in October 2007 there were
more than one hundred people assigned to the PTF on a full-time or part-time basis.

[7]   Those believed to be major figures in the global terrorist network with significant intel-
ligence value went into the CIA program. Some of them were eventually transferred to
Guantánamo Bay.

four years, and, predictably, some in the DOD intelligence community were excited to have Khalid Sheikh Mohammed and thirteen other alleged major terrorist figures right in their backyard. A few in the DOD intelligence community seemed to believe that if they had a few minutes alone with Mohammed he would give up information that the CIA had been unable to extract through months of enhanced efforts. The senior leadership of the Prosecution Task Force (PTF) that I led was unanimous in its belief that whatever remote possibility there was of eliciting actionable intelligence at that point was outweighed by the realistic prospect of compounding the problems of already very difficult cases with significant evidentiary and legal challenges. Together we were able to persuade decision-makers at higher levels to order a brief hands-off period where neither the PTF nor the intelligence group had access to the detainees, ostensibly to allow the detainees to adapt to their new environment. During that period we convinced the decision-makers to prevent the intelligence group from interrogating the high value detainees while we prepared criminal charges so the detainees could face justice as President Bush had vowed.[8] Some members of the DOD intelligence community at Guantánamo Bay were not happy with the hands-off decision.

In an interview with the New York Times in February 2008, former Assistant Attorney General for National Security, Kenneth Wainstein, said that "seasoned prosecutors who [were] very adept at building cases and anticipating the challenges down the road" were involved in developing the high value detainee cases.[9] I was the Chief Prosecutor for the majority of that period and I agree that both the DOD and the Department of Justice provided their best legal talents to the PTF. I would note, too, that the FBI and CITF detailed exceptional law enforcement agents and analysts to the team as well. It was reported after Khalid Sheikh Mohammed and five other high value detainees associated with 9/11 were charged with capital murder that a "clean team" of FBI and military law enforcement agents had obtained admissions from some of the high value detainees when they were interviewed at Guantánamo Bay "without the use of coercive interrogation tactics."[10] The decision to create the "clean teams" and initiate fresh interviews was made after much discussion and debate, but it was our collective belief that we did not have much to lose by trying.

---

[8]    There were several layers of decision-making authority between the PTF and the White House, including a working group and a senior oversight group within the Pentagon, as well as the National Security Council. I never learned who approved our request to block the intelligence group from interrogating the high value detainees.

[9]    Scott Shane & David Johnston, *U.S. Acts to Avert Tactic Expected in Qaeda Trial*, N.Y. TIMES, Feb. 13, 2008, at A16.

[10]   Josh White et al., *U.S. to Try 6 on Capital Charges over 9/11 Attacks; New Evidence Gained Without Coercive Tactics*, WASH. POST, Feb. 12, 2008, at A1.

We anticipated three potential outcomes to the clean team effort. In the best case, the detainee would agree to talk and voluntarily provide the same or similar information as that provided while in CIA custody. We hoped "clean" admissions would allows us to introduce the statements made to law enforcement personnel, using them as witnesses at trial, and eliminate or at least minimize CIA involvement in courtroom proceedings. The status quo outcome was the detainee would refuse to talk and we would proceed with what we already had in hand. The worst-case scenario was the detainee would agree to meet with the clean team, but would only talk about alleged mistreatment while in the CIA program. Rather than bolstering the prosecution's case, allegations of abuse required further investigation and might leave the prosecution in a weaker position.[11] We believed a well-prepared interview team with a well-structured script could mitigate the risks by focusing the discussion on the detainee's own conduct and away from his treatment while in CIA custody.

The most significant task remaining before executing the clean team effort was to craft an introductory advisement—something similar to a traditional law enforcement cleansing statement—that would ensure that the detainee understood his choices sufficiently to demonstrate reliability of the statement at trial if he chose to talk.[12] Since the fate of the high value detainees is unresolved and some form of criminal proceeding is almost certain, I will not go into detail about the introductory advisement in any particular case, but I will make two general observations.

First, I did not watch the clean team sessions with all of the high value detainees, but in the sessions I did observe the law enforcement agents, particularly those from the FBI, went to extraordinary lengths to explain to each detainee that his decision to talk or not talk was a purely voluntary choice and there would be no punishment or reward tied to the decision. In one session I thought the law enforcement agents were going to such great lengths that they risked persuading the detainee to change his mind and switch his yes to a no. I had no doubt that the sessions I observed

---

[11]  *See* Dep't of Def., Directive 2310.E, The Department of Defense Detainee Program 3 (Sep. 5, 2006), *available at* http://www.dtic.mil/whs/directives/corres/pdf/231001p.pdf (last visited Oct. 16, 2009) (requiring that allegations of detainee abuse be reported and investigated).

[12]  *See* Mil. Comm. R. Evid 304(c)(2), *available at* http://www.defenselink.mil/pubs/pdfs/Part%20III%20-%20MCREs%20(FINAL).pdf (requiring that the military judge may only admit an incriminating statement in which the degree of coercion is in question if he or she finds, based on the totality of the circumstances, that it is reliable and has sufficient probative value, its admission is in the interest of justice, and the methods used to obtain it did not amount to cruel, inhuman, or degrading treatment). *See also* DEP'T OF DEF., THE MANUAL FOR MILITARY COMMISSIONS III-9 (2007), *available at* http://www.defenselink.mil/pubs/pdfs/The%20Manual%20for%20Military%20Commissions.pdf; Military Commissions Act of 2006, 10 U.S.C. § 948r(d) (2006).

resulted from knowing, voluntary consent and it appeared to me that the detainees were relaxed and eager participants in the discussions.[13]

Second, there was debate over whether to include Miranda rights in the introductory advisement.[14] In my view, Miranda rights did not apply and were unnecessary, and they were excluded.[15] In addition to believing them unnecessary, I was concerned that acknowledging that Miranda rights existed in 2007 for the high value detainees would also acknowledge that the thousands of statements obtained earlier from hundreds of other detainees interrogated at Guantánamo Bay without Miranda rights advisements violated those rights, or at least it would provide the fodder for defense counsel's argument on a motion to suppress. The overwhelming majority of the evidence in the cases that were already in development when the high value detainees arrived at Guantánamo Bay—cases we referred to as the "non-high value detainee" cases—consisted of admissions made during custodial interrogations without Miranda rights advisements. If Miranda rights had indeed applied, and if the failure to provide Miranda rights warnings rendered the statements inadmissible, it would be impossible to successfully prosecute the vast majority of the non-high value detainee cases.[16]

---

[13]    Clearly an argument can and will be made that the long period of confinement and harsh treatment that preceded transfer to Guantánamo Bay negated the ability to later give voluntary consent, but my personal observations at the time were that the detainees who participated did so willingly.

[14]    See Miranda v. Arizona, 384 U.S. 436, 444–46 (1966) (holding that the Fifth and Sixth Amendments require law enforcement agents to advise a suspect in a custodial interrogation of the right to remain silent, that anything said can be used in court, and of the right to consult an attorney and to have the attorney present during questioning).

[15]    I believed that alien unlawful enemy combatants held outside the U.S. did not have constitutional rights. I believed then, as I do now, that the rights to which they are entitled are those in Common Article 3 of the Geneva Conventions as further defined in Article 75 of Additional Protocol I. See Convention (III) Relative to the Treatment of Prisoners of War art. 3, Aug. 12, 1949, 6 U.S.T. 3316, 3318, 75 U.N.T.S. 135; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II) art 75, June 8, 1977, 1125 U.N.T.S. 609.

[16]    As late as October 2007, I estimated that we would prosecute about seventy-five detainees. At a press conference in July 2009, current Chief Prosecutor Captain John Murphy said he is prepared to prosecute about sixty-six detainees. See Viola Gienger, Al-Qaeda Suspects at Guantanamo Face Delays in Review, BLOOMBERG, July 15, 2009, available at http://www.bloomberg.com/apps/news?pid=20601103&sid=a13CMSW33nlc (last visited Oct. 16, 2009). That number likely includes the original fourteen high value detainees plus an additional high value detainee, Abd al-Hadi al-Iraqi, who was transferred to Guantánamo Bay in April 2007, leaving about fifty non-high value detainees facing prosecution. See Press Release, Dep't of Def., Defense Department Takes Custody of a High-Value Detainee (Apr. 27, 2007), available at http://www.defenselink.mil/Releases/Release.aspx?ReleaseID=10792 (last visited Oct. 16, 2009) (providing information on the transfer of Abd Hadi al-Iraqi). The Obama administration is reportedly considering transferring as many as thirty cases to several U.S. Attorneys for prosecution in the federal courts. See Peter Finn, Jerry Markon & Del Quentin Wilber, Va., N.Y. Districts Vie for 9/11 Case; U.S. Attorneys Seek Trial of Alleged

### III. CONCLUSION

The Washington Post reported in February 2008 that most of the high value detainees chose to cooperate with the clean teams and only one or two of them declined.[17] The article said the teams of FBI and military law enforcement agents used a non-confrontational, rapport-building approach to facilitate dialogue with those that decided to talk and the discussions continued for days or, in some cases, months.[18] The newspaper's description of the clean team initiative is consistent with my personal observations. In the sessions that I watched, it appeared that the detainees enjoyed talking with the members of their clean teams; in fact, it was not uncommon for there to be some occasional laughter. I never saw any indication of intimidation or fear; to the contrary, in some instances I observed a sense of pride that at times bordered on arrogance. In other cases the dynamic was one of mutual respect, like soldiers from opposite sides sitting down over coffee after the war is over to reflect on their past battles. The question of whether the high value detainees would be willing to talk was soon answered and I began to wonder if they would ever stop.

I believe the decision to create the clean teams and attempt to separate the law enforcement effort from the earlier intelligence collection phase was sound. Will it prove to be a positive factor in eventually bringing these alleged terrorists to justice? That remains to be seen. Admittedly, there is some logic to the argument that you cannot un-ring the torture and maltreatment bell after it chimes, but perhaps with enough time and distance, and a good faith effort to treat the detainees humanely, you can demonstrate that the ill effects were overcome and the subsequent admissions were voluntary and reliable.

The decision I would reconsider if given a chance to do it all over is the one regarding Miranda rights. The detainees with the greatest degree of culpability, the ones that definitely should be held accountable for their conduct, are the high value detainees. If the failure to include Miranda rights proves fatal, then my concern about the impact of rights advisements on the ability to prosecute the non-high value detainee cases was for naught. I believe that the overwhelming majority of the high value detainees would have agreed quite willingly to talk with their clean teams—just as many of them talked at length at their administrative hearings and at their military commissions—with or without Miranda rights warnings. A person who is proud of his accomplishments and believes he has earned glory and honor

---

*Leader Mohammed*, WASH. POST, Aug 4, 2009, at A1. Since there are fifteen high value detainees, about half of the thirty cases under review for prosecution in the federal courts are non-high value detainee cases.

[17]   *See* White et al., *supra* note 10.

[18]   *Id*

will generally not decline a chance to brag, even when he is warned of the potential consequences. To paraphrase one of comedian Ron White's more famous lines, "even if they had the right to remain silent, they didn't have the desire."[19]

---

[19] RON WHITE, I HAD THE RIGHT TO REMAIN SILENT . . . BUT I DIDN'T HAVE THE ABILITY (2007).

# EXHIBIT G

10 0036

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

## Morris Davis - Re: CIA Memo

| | |
|---|---|
| **From:** | Kent Ronhovde |
| **To:** | Davis, Morris |
| **Date:** | 9/10/2009 7:34 AM |
| **Subject:** | Re: CIA Memo |
| **CC:** | Kelley, Lizanne |

Moe:  Sounds like you're "good to go."  Hope it goes well.

>>> Morris Davis 9/9/2009 7:31 PM >>>
Here is the URL for the website that shows the conference agenda:
http://law.case.edu/centers/cox/content.asp?content_id=158  I am one of several current or former military or federal government employees participating in the conference and we were all invited because of our involvement in the military commissions in one capacity or another.  Note that I am listed as the former chief prosecutor with no mention of CRS.  I've also attached a copy of the paper I wrote that the CIA approved.  I intend to do a general "these are my personal views" disclaimer since I don't expect CRS to be mentioned.  I'm traveling in the morning and I'll have my blackberry with me if you need to contact me.

- Moe

# EXHIBIT H

10 0036

**FILED**

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

**From:**      Dan Mulhollan
**To:**        Davis, Morris, Ronhovde, Kent, Ehlke, Richard
**Date:**      8/24/2009 4:58 PM
**Subject:**   Re: Whittaker Award

Dear Morris,
First of all, congratulations. As we know, your choice of principle was not without cost. It is my sense that your pursuit of a position in CRS was premised on that same shared set of principles.
That said, the award is based on your actions prior to coming to CRS and I forsee no issue in your acceptance of this recognition. It would likely be prudent for you to travel on your personal time when you go to receive the award - to underscore that this is a personal recognition and honor. That does not say that we are not proud of you and that such recognition underscores that CRS is an institution that values integrity highly.
Be sure to have steak in Kansas City.
Dan

-----Original Message-----
From: Morris Davis
To: Mulhollan, Dan <DMULHOLLAN@crs.loc.gov>
To: Ronhovde, Kent <KRONHOVDE@crs.loc.gov>
To: Ehlke, Richard <REHLKE@crs.loc.gov>

Sent: 8/24/2009 3:54:53 PM
Subject: Whittaker Award

I received a letter today from the Lawyers Association of Kansas City saying I was selected as the recipient of the 2009 Whittaker Award based on my response to the politicization of the military commissions at Guantanamo Bay. The award is named in honor of the founder of the Association and former Supreme Court Justice Charles E. Whittaker. I was not familiar with the award, but prior recipients include Rep. Dan Glickman, Sen. Nancy Kassebaum Baker, and Sen. John Danforth, among others.

Is it okay for me to accept the award? If so, they'd like for me to come to Kansas City (at their expense) at some point in November for a luncheon.

- Morris

# EXHIBIT I

10 0036

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

**Library of Congress**
**SIX MONTHS QUALIFYING PERIOD**
**PERFORMANCE AND CONDUCT EVALUATION**

| Name<br>Morris Davis | Position Title<br>Assistant Director | Division<br>Foreign Affairs, Defense & Trade |
|---|---|---|

Briefly describe the employee's performance, conduct and general character traits which affect the performance of duties. Indicate strong and/or weak points that would support retention or separation from the service of the Library of Congress.

Since joining CRS as the Assistant Director, Foreign Affairs, Defense and Trade Division (FDT), Mr. Davis has demonstrated solid leadership skills and abilities. And so far it appears that he is a good fit for CRS. In group sessions, meetings with individuals, and in written communications, he has worked (as he himself has noted) to "develop an environment centered on selfless service rather than selfish personal entitlement." In addition, he has:

- Participated in new Member briefings for 8-10 Members, either at Williamsburg, VA or in their offices; and also met with senior staff members from the HASC, SASC, and HFAC, and communicated with senior members of the SFRC, to explore likely areas of legislative interest where CRS can be of service.

- Addressed pockets of unacceptable behavior within the division that were allowed to fester for too long.

- Peer reviewed several American Law Division (ALD) products, assisted that division's staff in making contact with relevant outside parties, and conducted a 90-minute briefing for ALD staff on his experiences as chief prosecutor for the military commissions.

- Effectively communicated the Service's emphasis on collaboration, and mandated that issue teams meet at least once a quarter (more often on rapidly evolving issues) to ensure issue statements and related products remain current.

- Encouraged minority applicants for the Section Research Manager (SRM) position in international trade as well as hold the previous holder of that position accountable for their performance.

The work of CRS requires ongoing support in the context of evolving policy and legislative settings, and as such CRS standards must be demonstrated across the full set of areas for which FDT has lead responsibility. In that light, the following are some examples of expectations for the remainder of the conditional period:

- Ensure that SRMs, issue coordinators, and analysts (in their respective roles and areas of responsibility) are monitoring needs, are developing and maintaining supporting coverage across all areas, and are identifying and responding adequately to areas requiring special emphasis.

- Ensure that he is personally conversant with the subject areas and attendant issues within FDT's purview and with the quality of written work products.

- Ensure that CRS supports work that may be characterized by administrative frameworks (e.g. CODELS, nominations) with efficiency but with primary attention to current policymaking needs.

| Employee's Signature | Date 8/14/09 |
|---|---|
| Supervisor's Signature | Date 8/14/09 |

Distribution   White - Employee, Yellow - Division

# EXHIBIT J

10  0036


FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

**From:** Morris Davis [MDAVIS@crs.loc.gov]
**Sent:** Wednesday, January 06, 2010 9:04 AM
**To:**
**Subject:** Fwd: Re: Articles

**Follow Up Flag:** Follow up
**Flag Status:** Red

>>> Dan Mulhollan 11/10/2009 7:56 PM >>>

The problem is that military commissions are on the congressional agenda and any opinion
on this issue relects on the Service - to say your observations on this issue has no
connection to CRS is, at best, naïve. Please forward the text of both asap so that we can
be prepared for any congressional reaction. We will talk about this further on Thursday.

-----Original Message-----

From: Morris Davis
To: Mulhollan, Dan <DMULHOLLAN@crs.loc.gov>
To: D'Addario, Janine <JDADDARIO@crs.loc.gov>

Sent: 11/10/2009 7:34:16 PM
Subject: Articles

Last Sunday I submitted two articles related to military commissions
One was an op-ed I sent the Wall Street Journal and the other was a letter to the editor
to the Washington Post.  Both have been accepted for publication and could run as early as
tomorrow.  Neither has any connection to CRS.

- Moe

# EXHIBIT K

10 0036

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts



| | |
|---|---|
| **From:** | Morris Davis [MDAVIS@crs.loc.gov] |
| **Sent:** | Wednesday, January 06, 2010 9:05 AM |
| **To:** | |
| **Subject:** | Fwd: Re: Articles |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

>>> Dan Mulhollan 11/10/2009 10:17 PM >>>

Dear Morris,

What kind of role model are you setting for CRS analysts? How can you tell a colleague that they cannot write a critical editorial of a policy direction set by Secretary Clinton - even when well documented from their personal experience? But a Member is still to have confidence that they can rely on our colleague's analysis of Clinton's policy when they say they disagree? And if they, and you, have the green light in publically criticizing a Cabinet member - why not a committee chairman?
How do you begin to explain to a Member of Congress that you can objectively help them to defend Eric Holder - if that is what they choose to do - even though you have publically criticized his policy direction? And that they can rely on your leadership in helping them on this issue - even though you are publically opposed? This editorial sets a very damaging precedent. I, for the life of me, cannot understand that you think such writing would not damage the Service's reputation for objectivity and nonpartisanship If you thought that the Service's analysis on this issue was not providing the insights you had to offer, why did you not work with American Law to get out examination of this question with your contribution? I am deeply troubled by this and I am worried by what our CRS colleagues will now feel they can model after you in asserting their personal policy preferences to the world.

-----Original Message-----

From: Morris Davis
To: Mulhollan, Dan <DMULHOLLAN@crs.loc.gov>
Cc: D'Addario, Janine <JDADDARIO@crs.loc.gov>
Cc: Kelley, Lizanne <LKELLEY@crs.loc.gov>
Cc: Ehlke, Richard <REHLKE@crs.loc.gov>

Sent: 11/10/2009 8:59:51 PM
Subject: Re: Articles

As per your message.

---

This past Sunday, Attorney General Eric Holder announced that the administration will decide by Nov. 16 which Guantanamo detainees will be tried in military commissions trials, and which of them will stand trial in federal courts. But a decision to use both legal settings is a mistake. It will establish a dangerous legal double standard that gives some detainees superior rights and protections, and relegates others to the inferior rights and protections of military commissions. This will only perpetuate the perception that Guantanamo and justice are mutually exclusive.

President George W. Bush authorized military commissions in November 2001, and President Barack Obama ordered them stopped in January 2009.
In the intervening seven years—which included a period from September
2005 until October 2007 when I served as chief prosecutor at Guantanamo—only three military commissions trials were completed.

Two of the three detainees convicted of war crimes have served their sentences and today they are free men back in their home countries. But the more than 200 that remain inside

1

the detention center have never been convicted, or in most cases even faced charges.

The day after his inauguration, Mr. Obama ordered an evaluation of all the detainees to determine who should face criminal prosecution.
Administration officials estimate that roughly a quarter of the remaining detainees will be recommended for trial in criminal courts.

In a preliminary report submitted to Mr. Obama in July, the Detention Policy Task Force recommended the approval of evaluation criteria developed by the Department of Defense and the Department of Justice.
The task force stated its preference for trials in the federal courts, but added the decision would be based in part on "evidentiary issues"
and "the extent to which the forum would permit a full presentation of the accused's wrongful conduct." A Washington Post editorial endorsed the proposal, arguing that there should be an alternative forum when a trial in federal court is "not an option because the evidence against the accused is strong but not admissible."

Stop and think about that for a moment. In effect, it means that the standard of justice for each detainee will depend in large part upon the government's assessment of how high the prosecution's evidence can jump and which evidentiary bar it can clear. The evidence likely to clear the high bar gets gold medal justice: a traditional trial in our federal courts. The evidence unable to clear the federal court standard is forced to settle for a military commission trial, a specially created forum that has faltered repeatedly for more than seven years. That is a double standard I suspect we would condemn if it was applied to us.
Military commissions satisfy the requirements of the Geneva Conventions, which are the source of the detainees' rights. The rights in federal courts surpass the Geneva Conventions requirements and give detainees more than their status and the law demand.

The Obama administration could legitimately choose to prosecute detainees in either forum—federal courts or military commissions—and satisfy its legal obligations. The problem is trying to have it both
ways: the credibility that comes from using federal courts with admissible evidence under the very strict rules of civilian tribunals, and military commissions for cases that are often comparable except for the fact that they depend on evidence (such as hearsay testimony) that is not normally admissible in civilian courts. What if Iran proposed the same for the three American hikers it is currently holding? We would surely condemn what we now stand ready to condone.

It is not as if double-standard justice is required to keep suspected terrorists off our streets. Those detainees who cannot be prosecuted can still be detained under rules the administration approves—likely in the next several months—for the indefinite detention of those who pose a threat to us during this ongoing armed conflict.

The administration must choose. Either federal courts or military commissions, but not both, for the detainees that deserve to be prosecuted and punished for their past conduct.

Double standards don't play well in Peoria. They won't play well in Peshawar or Palembang either. We need to work to change the negative perceptions that exist about Guantanamo and our commitment to the law.
Formally establishing a legal double standard will only reinforce them.

Mr. Davis is the former chief prosecutor for the military commissions.
He retired from the military in 2008.

---

Former attorney general Michael B. Mukasey has his premise wrong when he contends that the decision to try Guantanamo detainees in federal courts comes down to a choice between protecting the American people and showcasing American justice.

First, his belief that Ali Saleh Kahlah al-Marri's eight-plus-year sentence by a federal judge would have been greater if a military commission had tried the case is suspect. Two of three military commissions completed at Guantanamo resulted in effective sentences of nine months or less, and today David Hicks and Salim Ahmed Hamdan are free.

Second, his "serious security concerns for any person or place"
near where detainees are to be held or tried is fear-mongering worthy of former vice
president Richard B. Cheney. From the Boston Massacre trial in 1770 to countless terrorism
trials in recent years — Omar Abdel-Rahman, Richard Reid, and Ramzi Yousef, among others
— we managed to do justice in significant cases in the United States without compromising
our security.

Finally, military commissions are not, as Mr. Mukasey implied, essential to keep detainees
from returning to terrorism. The Geneva Conventions permit detaining the enemy during
armed conflicts to prevent them from causing harm in the future. Criminal trials, on the
other hand, punish past misconduct. Suggesting that the choice is either criminal
prosecution or freedom is false.

Morris Davis
Gainesville
The writer was chief prosecutor for the military commissions from 2005 to 2007

# EXHIBIT L

10 0036

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts



**Congressional Research Service**

**MEMORANDUM**                                                              November 13, 2009

**To:**        Morris Davis
               Assistant Director
               Foreign Affairs, Defense and Trade Division

**From:**      Daniel P. Mulhollan
               Director

**Subject:**   **Memorandum of Admonishment:  Failure of Judgment and Discretion**

On November 10, 2009, at 7:34 p.m., you informed me via electronic mail (email) that you had
submitted two articles related to military commissions to national newspapers. One was an
opinion piece for the Wall Street Journal, and the second was a letter to the editor of the
Washington Post. You added that the two pieces were accepted for publication, and could "run
as early as tomorrow" (November 11). You closed by saying that "neither has any connection to
CRS."

Before I received your communication, the CRS Office of Communications was notified through
an alert at 7:12 p.m. on November 10, 2009, that your piece for the Wall Street Journal was
posted on WSJ.com. (The November 11, 2009, written edition of the Journal published your
submission on page A21.) Your opinion piece criticized Attorney General Eric Holder and the
Obama Administration for its decision to use both military commission trials and trials in U.S.
federal courts for the Guantanamo detainees.

The Washington Post on November 11, 2009, carried your letter to the editor criticizing former
Attorney General Michael Mukasey on the same issue of trials for the Guantanamo detainees. In
the course of that letter, you refer to Mr. Mukasey's arguments as "fear-mongering worthy of
former vice president Dick Cheney."

I find your assertion that neither of your written works "has any connection to CRS" to be
troubling, as well as a serious indication of a lack of judgment and discretion on your part. Your
statement and your actions appear to be a rejection of CRS core values. As an Assistant Director
and a senior leader in this organization, I rely upon you to uphold and maintain the Service's core
mission of providing objective and non-partisan analysis to the Congress. As I said to you in my
email response on November 10, 2009, how do you begin to explain to a Member of Congress
that you can objectively help them analyze Attorney General Holder's policy after you have
publicly criticized his policy direction? How can our clients rely on your leadership on this key
policy issue facing Congress even though you are publicly opposed to the option being pursued

at present? How will members of the minority party in Congress view your objectivity after your thinly-veiled criticism of the former vice president?

In your position as Assistant Director and Senior Specialist in Foreign Affairs, the Foreign Affairs, Defense and Trade Division, you lead, plan, direct and evaluate the research and analytical activities of the division and ensure that the research and analysis produced is of the highest quality and consistently meets the Service's standards of objectivity, nonpartisanship, balance, timeliness, legislative relevance, authoritativeness, and accessibility. You are expected to demonstrate personal intellectual leadership in monitoring congressional needs in the policy areas of Foreign Affairs, Defense and Trade, and assure the availability of the intellectual capacity needed to meet the current and changing needs of the Congress at a sustained level. As an Assistant Director, you serve as a chief advisor to the Director, counseling him on all aspects of the research and management and operations of CRS. You are a member of CRS' senior management team. As such, "exercising the highest level of judgment and discretion, the [Assistant Director] demonstrates awareness of the likely consequences or implications of his/her actions, responds appropriately to situations that require discretion and confidentiality and consistently advances CRS values." Keeping the Director informed on a timely basis of matters "with implications for the successful conduct of CRS functions and activities and its service to the Congress" is also an important element of the position description and the performance standards governing Assistant Directors.

I seriously question the model you are setting for the analysts and managers in your division (and throughout the Service) by your conduct. You have directly counseled analysts in your division for failure to adhere to CRS standards on interacting with the media, and on outside activities. Ironically, in a memorandum to a subordinate in June of this year, you helped craft language that told this individual that while he "did not forfeit [his] First Amendment rights as a CRS employee" that he could not conduct himself in "a manner that impairs, in fact or in perception, the high professional standards for objectivity which are essential to CRS." Foreign Affairs, Defense and Trade Division analysts have frequent opportunity to engage with the media, or take part in outside speaking and writing activities. I fear that you have seriously eroded your position of authority and leadership within your division on these issues as a result of your recent conduct.

Furthermore, you failed to adhere to CRS policy on Outside Speaking and Writing. The disclaimer provision of the policy calls for staff members to explicitly disassociate themselves from the Library and from their official positions. You appear to believe that by identifying yourself simply as "Morris Davis, Gainesville," or "chief prosecutor for the military commissions from 2005 to 2007" that you are disassociating yourself from CRS. However, it would take very little effort for readers of your opinion pieces, including congressional clients, to identify the current position you hold in the Service, and to consequently doubt your ability to lead the provision of objective, non-partisan analysis for the Congress as a result of your outside writing. In fact, one quick search of Wikipedia using your name clearly shows, under the heading of "post military career," the fact that you were named as head of the Foreign Affairs, Defense and Trade Division of CRS, along with the November 10 opinion piece for the Wall Street Journal which it characterizes as critical of the review team President Obama authorized.

You also appear to believe, based on comments made in your emails to me, that LCR 2023-3 (Outside Employment and Activities) which speaks of the obligation to avoid "the appearance of conflict of interest," especially when speaking or writing on controversial matters, does not apply to you because prosecution of the Guantanamo detainees does not fall strictly within the purview of your division. You stated (in your email of November 11) that the "fact of the matter is that for as long as where to prosecute terrorism suspects has been an issue it has been an issue within the purview of ALD." However, I seriously question whether Congress understands that the Assistant Director for Foreign Affairs, Defense and Trade has little to do with military commissions. Furthermore, you have been regularly consulted by the American Law Division on this issue  and have been a collegial resource for the lawyers who have prepared legal analyses of these issues.

The CRS policy on Outside Speaking and Writing states that when employees contemplate engaging in outside activities that involve any type of advocacy, "they should strive to avoid even the appearance of a conflict of interest or engaging in an activity that would compromise one's ability to perform their responsibilities for CRS." It goes on to strongly urge individuals to make an inquiry before embarking on conduct that may present these issues. Although you and I met for an hour in-person on November 10, 2009, you said nothing to me about your advocacy. You waited until 7:34 p.m. to inform me by email that these writings were to appear. You had a responsibility to inform me, as well as ample opportunity, and you failed to do so in a timely and responsible manner. This further reflects poorly on your judgment and candor.

As stated in the CRS policy on Outside Speaking and Writing:

> The CRS mission of providing balanced, objective, and non-partisan support to the Congress places a challenging responsibility on all CRS staff that is of critical importance to this agency. It is incumbent on everyone to ensure that the ability of CRS to serve the Congress is not compromised by even the appearance that the Service has its own agenda; that one or more analysts might be seen as so set in their personal views that they are no longer to be trusted to provide objective research and analysis; or that some have developed a reputation for supporting a position on an issue to the extent that CRS is rendered "suspect" to those of a different viewpoint.

Let me remind you of the Library of Congress regulations and CRS policies that you have the responsibility to be familiar with as a senior manager in the organization. LCR 2023-3 (Outside Employment and Activities) speaks to the obligation to avoid "the appearance of a conflict of interest," especially when speaking or writing on controversial matters. CRS policy on Outside Speaking and Writing advises that it is important to err on the side of caution so as to avoid the potential for controversy and to adhere to the standard set for the review of CRS written products. LCR 2023-1 (Personal Conduct and Personal Activities of the Staff of the Library of Congress) goes on to counsel that staff members shall avoid any action which might result in or create the appearance of compromising independence or impartiality. And, finally, CRS Policy on Interacting with the Media states that the standards for CRS writing — objectivity, nonpartisanship and non-advocacy of policies or arguments — must guide all media interactions.

Additionally, LCR 2023-1 (Personal Conduct and Personal Activities of the Staff of the Library of Congress: Purpose, Policy, and General) states that:

> The maintenance of high standards of honesty, integrity, impartiality, and conduct by staff members is essential to assure the proper performance of the Library's business and the maintenance of confidence by citizens in their Government. The avoidance of misconduct and conflicts of interest on the part of staff members through **informed judgment** is indispensable to the maintenance of these standards. (Emphasis added.)

Your conduct and judgment were also called into question by the unprofessional manner in which you responded to my email on November 11, 2009. After stating that you "have no desire to get into a back and forth email debate," you went on to state that you believe you knew what I would like the policy on outside writing to be, "no one from CRS expresses an opinion in public." Again, in our meeting on Thursday, November 12, 2009, you expressed no remorse for your actions, nor awareness that your poor judgment could do serious harm to the trust and confidence Congress reposes in CRS. Your concern was focused on your rights. This is not about the content of your writings, nor about your ability to exercise your rights. Rather, this is about your judgment and discretion in pursuing activities that could cause real harm to CRS by impairing, in fact or in perception, the high professional standards for objectivity which are essential to CRS. I will not tolerate unprofessional conduct by the senior managers I have entrusted to lead this organization.

When you were interviewed for your current position as Assistant Director, we discussed the mission of CRS and the need for its senior leaders to be able to make reasonable and necessary compromises to fulfill our obligations to the United States Congress to provide them with our best work in an objective and non-partisan manner. You expressed to me at that time that you would be able to do so. These recent events have caused me to lose confidence in your judgment and discretion. Nothing you said in our meeting on November 12 caused me to reconsider my loss of faith. Let me remind you that as a probationary employee judgment and discretion are critical components of the position description for an Assistant Director and key performance indicators on which you are being judged. You are hereby admonished for failing to exercise judgment and discretion in accordance with the professional standards expected of Senior Level executives in CRS.

# EXHIBIT M

10 0036

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts



**Congressional
Research
Service**

November 20, 2009

Mr. Morris Davis
Assistant Director
Foreign Affairs, Defense and Trade Division
Congressional Research Service

Dear Mr. Davis,

Pursuant to LCR 2017-2.1, *Senior Level Executive System,* and applicable provisions of
LCR 2010-11, *Personnel Appointments, Assignments, Qualifying/Probationary Periods, and
Terminations,* I am hereby notifying you that your separation (disqualification) from your
position as Assistant Director, Foreign Affairs, Defense and Trade Division (FDT),
Congressional Research Service (CRS), will be effective at the close of business on
December 21, 2009. You are being separated during your qualifying period based on the
conclusion that you have not adequately demonstrated the requisite general fitness
characteristics relating to judgment and discretion as a Senior Level Executive,
characteristics that are necessary for conversion to permanent status.

Based on an overall assessment of your general fitness, which includes your actions and
conduct during your qualifying period, I have concluded that you have not adequately
demonstrated the Senior Level Executive qualities and characteristics necessary to serve
effectively as Assistant Director in the Foreign Affairs, Defense and Trade Division of the
Congressional Research Service.

On November 13, 2009, you were admonished in writing for your poor judgment and lack
of discretion with respect to a letter to the editor and an opinion piece you authored for
publication that appeared separately in The Wall Street Journal and The Washington Post.
During a meeting on November 12, 2009, in which your conduct leading to the
admonishment was discussed, you neither expressed remorse for your actions nor awareness
that your poor judgment could do serious harm to the trust and confidence Congress reposes
in CRS. In addition, you failed to adhere to the CRS policy on Outside Speaking and
Writing. Among other things, the policy calls for staff members to explicitly disassociate
themselves from the Library and from their official positions when speaking or writing on
controversial matters. You failed to effectively do so. Furthermore, you have impaired your
ability to lead the analysts and managers in FDT (and throughout the Service) as a result of
your conduct. Part of that leadership includes the responsibility to ensure that staff adheres

to the core principles of objectivity, nonpartisanship and balance in CRS' service to the Congress.

You have also been verbally counseled in recent months on your judgment and discretion in matters involving (1) the attribution of authorship on an FDT report (*DOD Contractors in Iraq and Afghanistan*) and (2) an inappropriate email to another senior manager in CRS. In the attribution of authorship case, FDT had a CRS report published with an intern listed as the co-author contrary to the CRS policy at the time. Then, in an email on October 20, 2009, you used inappropriate and disrespectful language toward an Associate Director of long tenure on a substantive policy matter and disseminated it to the Research Policy Council.

Pursuant to LCR 2017-2.1, and applicable provisions of LCR 2010-11, it is apparent that your actions and conduct have shown poor judgment and discretion and are not consistent with "acceptable service" and therefore serve as the basis for the determination to separate you during your probationary period.

Under the provisions of LCR 2017-2.1, Section 10, and LCR 2010-11, Section 5, you do not have the right to a formal appeal of this decision. However, as provided for in LCR 2010-11, Section 5.A., you do have the right to request an informal hearing with an appropriate supervisory or management official in CRS for the purpose of discussing the basis for the Library's action. I have designated Ms. Lynne McCay, Senior Advisor to the Director, for this purpose. You can reach Ms. McCay at 202-707-1415. I am enclosing a copy of LCR 2017-2.1 and a copy of LCR 2010-11 for your information.

Sincerely,

Daniel P. Mulhollan
Director
Congressional Research Service


Enclosures:
      LCR 2017-2.1 and LCR 2010-11

cc:
      Richard Ehlke, Acting Deputy Director, CRS
      Ms. Bessie Alkisswani, Associate Director, WRK, CRS
      HRS/WLSC/TSG (w/PAR)
      HRS/WFM/ERT

# EXHIBIT N

10 0036

**FILED**

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts



LINDSEY O. GRAHAM
SOUTH CAROLINA

290 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-5972

# UNITED STATES SENATE

December 15, 2009

Dr. James Billington
Librarian of Congress
101 Independence Ave, SE
Washington, DC 20540-0001

Dear Dr. Billington:

I write to express serious concern over your announced dismissal of Morris Davis, Colonel (ret.). I have known Col. Davis for more than twenty years as a man of the highest ability and integrity. Multiple press accounts of this situation have stated that you will dismiss Col. Davis at the end of his probationary status this year as a result of his authoring an op-ed and letter to the editor regarding the trial forum for Guantanamo detainees. As one of the chief authors of the Military Commissions Act of 2006 and 2009, I have a profound interest in the public discourse of the issues surrounding military commissions.

Col. Davis has an experienced and valuable perspective on military commissions. As part of his long and honorable military service to our nation, Col. Davis served as chief prosecutor of the military commissions, a unique position from which to participate in the proceedings. For that reason, his editorial comments were worthy of publication in the *Wall Street Journal* and the *Washington Post*. To the extent possible, please explain Col. Davis's employment situation and why Director Mulhollan determined that Col. Davis violated internal CRS regulations regarding employees expressing their personal views. A balance exists between the rights of CRS as an employer and the rights of Col. Davis to express his views as a private citizen. I want to ensure that Col. Davis was treated appropriately in this matter.

I trust you will give this matter full and fair consideration before taking any final action on Col. Davis's dismissal.

Sincerely,

Lindsey O. Graham
United States Senator

508 HAMPTON STREET
SUITE 202
COLUMBIA, SC 29201
(803) 933-0112

401 WEST EVANS STREET
SUITE 111
FLORENCE, SC 29501
(843) 669-1505

130 SOUTH MAIN STREET
SUITE 700
GREENVILLE, SC 29601
(864) 250-1417

530 JOHNNIE DODDS BOULEVARD
SUITE 202
MOUNT PLEASANT, SC 29464
(843) 849-3887

140 EAST MAIN STREET
SUITE 110
ROCK HILL, SC 29730
(803) 366-2828

124 EXCHANGE STREET
SUITE A
PENDLETON, SC 29670
(864) 646-4090

# EXHIBIT O

10 0036

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

*Important Notice:* To ensure that you are viewing the most
recent version of a Library regulation or other material on
the OGC Web site, Internet Explorer users should click
the "Refresh" button. Netscape, Firefox, and Safari users
should click the "Reload" button.

*LIBRARY OF CONGRESS REGULATIONS*



# LCR 2023-3

**SUBJECT: Outside Employment and Activities**

| SERIES: 2023<br>Personal Conduct and Personal<br>Activities of Staff | STATUTORY AUTHORITY:<br>2 U.S.C. §136 | RESPONSIBLE OFFICE:<br>Office of the Librarian |
| --- | --- | --- |
| ISSUE DATE:<br>March 23, 1998 | REVIEW DATE: | SUPERSEDES:<br>April 3, 1991, issuance of LCR<br>2023-3 |

**Contents:**

Section 1. Purpose
Section 2. Outside Employment
Section 3. Teaching, Writing, and Lecturing
Section 4. Copyright Claims
Section 5. Book Endorsements
Section 6. Evaluations of Library Materials
Section 7. Intermediaries and Product Recommendations
Section 8. Memberships in Organizations
Section 9. Service as Officers or on Boards or Committees of Professional Associations
Section 10. Post-Employment Restrictions

**Section 1. Purpose**

This policy concerns the outside employment and other outside activities of staff members, including
outside activities that draw upon staff members' skills that reflect Library training or experience, that
make use of knowledge or information gained on the job, or that are the result of work performed in
whole or in part during official duty hours.

**Section 2. Outside Employment**

A. Generally, staff members shall not engage in outside employment or other outside activities not
   compatible with the full and proper discharge of the duties and responsibilities of their Library
   employment. Incompatible activities of staff members include, but are not limited to,

   1. acceptance of a fee, compensation, gift, payment of expense, or any other thing of
      substantial monetary value in circumstances in which acceptance may result in or create the
      appearance of conflict of interest;

2.  outside employment of such a nature as to impair their mental or physical capacity to perform their Library duties and responsibilities in an acceptable manner;

3.  activities that may reasonably be construed by the public to be official acts of the Library of Congress;

4.  activities that establish relationships or property interests that may result in a conflict between their private interests and their official duties;

5.  employment that may involve the use of information, secured as a result of employment by the Library, to the detriment of the Library or the public interest or to the preferential advantage of any person, corporation, public agency, or group; or

6.  employment with any person, firm, or other private organization having business either directly or indirectly with the Library, when such employment might result in or give the appearance of a conflict of interest or otherwise be incompatible with law.

B.  Except as provided by 2 U.S.C. §162 and 162a, staff members shall not receive any salary or anything of monetary value from a private source as compensation for their services to the Library. See also 18 U.S.C. §§201(c), 209.

C.  Staff members may

1.  engage in outside employment or other outside activities that are unrelated to their specific Library functions and that do not affect their ability to discharge the duties and responsibilities of their Library employment, but shall not carry on such outside activities during their official duty hours;

2.  participate in the activities of national or state political parties not proscribed by law; and

3.  participate in the affairs of or accept an award for a meritorious public contribution or achievement from a charitable, religious, professional, social, fraternal, nonprofit educational or recreational, public service, or civic organization.

D.  Staff attorneys are encouraged, in off-duty hours and consistent with local court rules and official responsibilities, to participate in programs that provide legal assistance and representation to indigent persons. Such participation, however, shall not include representation precluded by the provisions of 18 U.S.C. §205.

E.  The provisions of 18 U.S.C. §205 do not, nor shall this policy preclude staff attorneys, if consistent with the faithful performance of their Library duties, from acting without compensation as representatives or attorneys for staff members who are subjects of disciplinary, personnel security, or other personnel administrative proceedings within the Library. Staff attorneys who do perform in this capacity are subject to the limitations on the use of official time set out in LCR 2020-1, *Grievances, Adverse Actions, Appeals: Policy and General Provisions*; LCR 2010-3.1, *Resolution of Problems, Complaints, and Charges of Discrimination in Library Employment and Staff Relations under the Equal Employment Opportunity Program*; and the various collective bargaining agreements. Staff attorneys who are managers or supervisors or who are on the staff of the Office of the General Counsel, the Office of Counsel for Personnel, the Office of the Director of Personnel, or the Equal Employment Opportunity Complaints Office are excluded from

performing in this capacity.

**Section 3. Teaching, Writing, and Lecturing**

A. Staff members are encouraged to engage in teaching, lecturing, or writing that is not prohibited by law. Generally, personal writings and prepared or extemporaneous speeches that are on subjects unrelated to the Library and to staff members' official duties are not subject to review.

B. In speaking and writing on controversial matters, staff members are expected to disassociate themselves explicitly from the Library and from their official positions. Personal writings as well as prepared or extemporaneous speeches by staff members shall not be subject to prior review. Where, however, the subject matter of such writing relates to library science or the history, organization, administration, practices, policies, collections, buildings, or staff of the Library as well as matters relating to a field of a staff member's official specialization or the special clientele which a staff member serves, and where some association may be made with a staff member's official status, staff members shall: (1) assure accurate presentation of facts about the Library and Library-related matters; (2) avoid the misrepresentation of Library policies; (3) avoid sources of potential damage to their ability to perform official Library duties in an objective and nonpartisan manner; and (4) assure, when appropriate, that staff members' opinions clearly differentiate from Library policy.

**Section 4. Copyright Claims**

Staff members are advised that no copyright subsists in any work prepared by Federal employees pursuant to their employment. Accordingly, it is improper for staff members to claim copyright in any material prepared by them within the requirements of their duties or to authorize a publisher to do so.

**Section 5. Book Endorsements**

A. Staff members shall not endorse books. In rare instances in which staff members' opinions are requested for a special purpose because of their unusual competence in a particular field, an exception to this general policy may be requested. Such exceptions shall be made solely in the interest of the Library and shall be approved by the Librarian or his or her designee for this purpose.

B. Endorsement, as used herein, is defined as a statement prepared for use in the promotion of a publication. The term is not to be confused with book review, which is a statement prepared for publication in a recognized medium for the evaluation of publications.

**Section 6. Evaluations of Library Materials**

Requests for private evaluations of library material may be accepted by staff members as outside employment provided staff members do not undertake any part of this work during their duty hours and provided further that the results of their work are not associated directly or indirectly with their official duties or with the Library of Congress.

**Section 7. Intermediaries and Product Recommendations**

Except as required by their official duties, staff members shall not recommend or suggest the use of any particular or identified nongovernmental intermediary to deal with the Library nor shall they recommend

any device or product tested by or for or used by the Library.

**Section 8. Memberships in Organizations**

    A.  Staff members shall not, **in their official Library capacity**, serve as members of a business organization except where express statutory authority exists, where statutory language necessarily implies such authority, or where the Librarian of Congress has determined that such service would be beneficial to the Library and consistent with such staff members' service as Library employees. However, staff members may serve **in an individual capacity** as members of such an organization, provided that (1) such membership does not violate restrictions set out in this policy; and (2) their official titles or organizational connections are not shown on any listing or presented in any activity of the organization in such a manner as to imply that they are acting in their official Library capacity.

    B.  Staff members may be designated to serve as liaison representatives of the Library to a business organization provided that (1) the activity relates to the work of the Library; (2) the staff members do not participate in the policy determinations of the organization; and (3) the Library is in no way bound by any vote or action taken by the organization.

**Section 9. Service as Officers or on Boards or Committees of Professional Associations**

    A.  It is the policy of the Library to encourage staff members to participate actively in the work of professional groups when such activities will contribute to staff members' professional interests or to Library programs and when such participation will not materially interfere with staff members' official duties or involve extensive travel expense to the Library (see also LCR 2022-3, Attendance at Professional Meetings).

    B.  Staff members, invited or nominated to serve as officers or on boards or committees of professional groups, shall notify their immediate supervisor before accepting such nominations or making commitments to serve. Where circumstances do not permit an advance notification, the staff member shall report the matter to his or her supervisor as soon as possible.

**Section 10. Post-Employment Restrictions**

    A.  These restrictions only apply to acts by a former staff member who, for at least 60 days, in the aggregate, during the one-year period before that former staff member's service as such staff member terminated, was in a position for which the rate of basic pay, exclusive of any locality base pay adjustment, is equal to or greater than the basic rate of pay payable for Level 5 of the Senior Executive Service. 18 U.S.C. §207(e)(6).

    B.  For one year following termination of Library employment (retirement, resignation, or otherwise), affected staff members shall not (1) knowingly make, on behalf of any other person (except the United States) a communication or appearance before any Library staff member with the intent to influence him or her on any official matter; or (2) knowingly represent, aid, or advise any foreign entity (foreign government) on any U.S. Government matter before any U.S. Government department or agency. 18 U.S.C. §207(e)(5), (f).

    C.  The Director of Personnel shall take such steps as may be necessary to assure that affected staff members leaving Library employment are reminded of these restrictions.

     Next ➤         ◀ Prev         ⬆

*Comments: lcweb@loc.gov*

# EXHIBIT P

10 0036

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

Policy

# Outside Speaking and Writing

Effective date: Jan. 23, 2004. This policy, originally issued on Jan. 23, 2004, as Director's Statement, Outside Activities: Preserving Objectivity and Non-Partisanship, *has been edited and reformatted for the staff site.*

## Statement

This statement outlines the policy for writing and speaking outside of work, including teaching or lecturing. For situations relating to the media, see the policy statement on Interacting with the Media.

### Disclaimer

The obligation, set out in Library regulation, is to present a formal disclaimer regarding any personal views. Employees must make it clear that the views expressed are theirs and do not represent the views of the Service. Specifically, LCR 2023-3, Outside Employment and Activities, provides that when speaking and writing on "controversial" matters, "staff members are expected to disassociate themselves explicitly from the Library and from their official positions." In outside writings this is most commonly done by ensuring that a footnote appears at the outset making that clear. When speaking, the staff member may make the point on introduction to the audience, or before commencing substantive remarks. The obligation falls on the employee, whether as a presenter, as an author, or as a contributor in whatever form, to ensure that such a disclaimer is actually presented. A sample disclaimer for writings might read: "The views expressed herein are those of the author and are not presented as those of the Congressional Research Service or the Library of Congress." For in-person remarks, it is advisable to add "the speaker [I] am not here representing the Congressional Research Service, and the views expressed..."

### Conflict of Interest

Library regulation 2023-3 also speaks to the obligation to avoid "the appearance of conflict of interest," especially when speaking or writing on controversial matters. For CRS, almost everything that staff say or write has the potential to be "controversial." It is therefore important to err on the side of caution, especially when addressing issues for which the individual has responsibility for the Service. It is therefore advisable, when writing or speaking on the subject for which the individual has responsibility at the Service, that the standard set for review of CRS written products be observed. While it is not a formal requirement, the Service strongly encourages all staff to submit draft outside writings to the Review Office, which welcomes the opportunity to provide input and advice.

### Advocacy v. Research

When employees contemplate engaging in outside activities that involve any type of advocacy (e.g., associational affiliations and organization membership, political activities, and endorsements) or activities potentially compromising the appearance of independence or impartiality, they should strive to avoid even the appearance of a conflict of interest or engaging in an activity that would compromise one's ability to perform their responsibilities for CRS. See LCR 2023-1 and 2023-3. CRS examines such activities on a case-by-case basis to determine whether the conduct is problematic, and strongly urges individuals to make an inquiry before embarking on conduct that may present these issues.

## Background

The CRS mission of providing balanced, objective, and non-partisan support to the Congress places a challenging responsibility on all CRS staff that is of critical importance to this agency. It is incumbent on everyone to ensure that the ability of CRS to serve the Congress is not compromised by even the appearance that the Service has its own agenda; that one or more analysts might be seen as so set in their personal views that they are no longer to be trusted to provide objective research and analysis; or that some have developed a reputation for supporting a position on an issue to the extent that CRS is rendered "suspect" to those of a different viewpoint.

When staff speak or write for the Congress within the scope of their duties here, the lines are very clear. CRS has designed all layers of review in the divisions, the Review Office, and elsewhere so that the work adheres to CRS obligations and congressional expectations. While CRS staff, like all citizens, are entitled to hold their own views on all matters of public policy, when staff speak or write in their private capacities they continue to carry with them related responsibilities.

Employees must exercise the greatest level of care for preserving the appearance of objectivity when addressing the very issues for which they have responsibility at CRS. LCR 2023-3 also provides that "[w]here...the subject matter of [personal writings as well as prepared or extemporaneous speeches by staff members] relates to... a field of a staff member's official specialization or the special clientele which a staff member serves, staff members shall ...avoid sources of potential damage to their ability to perform official Library duties in an objective and non-partisan manner..." Staff will likely have acquired much of their knowledge of this subject matter in the course of performing their duties as a public servant for the Congress and it may be seen as inappropriate for them to profit from that knowledge elsewhere. In addition, this is also the subject area that the individual will continue to be writing about for CRS and is the subject most likely to be the basis of a suspicion of failure to meet the obligatory standards of objectivity and balance.

Congress created CRS to provide an objective resource for the National Legislature, and it is frequently touted as the only agency in town that holds to that charge. And, failure to

do so carries the severe consequence of rendering the Service ineffective at best, and useless at worst. More importantly, to do so violates the trust that has been placed in CRS by the Congress to meet its statutory mission. Preserving that trust is the responsibility of all CRS staff.

## Expectations

When considering engaging in outside activities, employees should think carefully before taking a public position on subject matters for which they are responsible at CRS. They are responsible at a minimum for providing a formal disclaimer, and for using sound judgment in deciding when engagement in an outside activity may place the reputation of CRS at risk. CRS has painstakingly built a reputation for excellence over the years, much of it tied to its unique role in the provision of objective, non-partisan, and confidential research and analysis to the Congress. CRS staff, both individually and collectively, must avoid engaging in activities that have a high risk of tarnishing that reputation. Everyone must make every effort to avoid presenting even the appearance that the Service is not true to the mandates given it to be objective, non-partisan, and confidential.

Contact:

Address questions regarding application of this policy to division or office management. Division and office heads should direct their questions to the Office of Congressional Affairs and Counselor to the Director.

Last reviewed July 2008

# EXHIBIT Q

10 0036

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts



**Congressional
Research
Service**

## *Memorandum* December 17, 2008

**TO:** Jeffrey H. Goode
Section Research Manager, International Trade and Finance Section
FDT

**FROM:** Lizanne D. Kelley *LDK*
Office of the Counselor
CAC

**SUBJECT:** Request for opinion on book publication

---

This is in response to your request for an opinion on a book that Shayerah Ilias, Analyst in International Trade and Finance of your section, was asked to write on Islamic finance by Prager Security International. We understand that Prager is a publishing company that focuses on security issues. Ms. Ilias has said the book would focus on the main principles of Islamic finance, and the opportunities and challenges this system poses for the U.S. Government. Ms. Ilias is a Presidential Management Fellow who has been employed by CRS for approximately one and one-half years.

The opinion of the Office of the Counselor is that writing a book on Islamic finance for compensation by Ms. Ilias would violate CRS policy and Library of Congress regulation (LCR) 2023-3 on *Outside Employment and Activities*. The Office of the Counselor lauds both you and Ms. Ilias for coming forward to request advice and consent prior to her entering into a contractual agreement to write such a book. It is important to note that every outside activity question that comes before the Office of the Counselor is dealt with on a case-by-case basis. The opinions rendered are highly dependent upon the specific and unique facts presented.

The facts presented in this case are that Ms. Ilias covers international trade and intellectual property rights issues, with a focus on Middle Eastern economic financing issues, for your section in FDT. It is further our understanding that Ms. Ilias wrote the 6-page report on *Islamic Finance: Overview and Policy Concerns* on July 29, 2008, as a result of a request received by CRS from a congressional office. It appears that Prager Security International contacted Ms. Ilias about the possibility of writing a book only after reading the report she had prepared for the Congress. From our understanding, Ms. Ilias had a general interest in the topic of Islamic financing stemming from her time in graduate school and other professional experience (her rotation to the State Department), but that she has no particular

---

or long-standing expertise on this issue distinct from the work she has done for the Congress. Ms. Ilias has said that she would like in the next Congress to explore additional topics related to Islamic financing for the Congress since this policy issue is growing in importance.

Internal policy states that generally, CRS staff may not be paid by any source other than the government for teaching, writing, or lecturing in relation to their job. One of the tests used for determining if a staff member's outside activity, such as writing a book, "relates to a job" is if the circumstances suggest that the staff member was invited primarily because of their work on the job rather than their independent expertise on a particular subject. A second test used is whether the subject of the outside activity deals in significant part with anything which the staff member is presently working on, or has worked on during the previous one-year period.

The Office of the Counselor believes there is a direct relationship between the book proposed to be written by Ms. Ilias on the topic of Islamic financing and the work she does for the Congress. This opinion is supported by the Library's Office of the General Counsel. The facts of this case suggest that Ms. Ilias was asked primarily because of her job as an analyst for CRS. Furthermore, a book on Islamic finance, a relatively narrow subset of Mideast economic/finance issues, does relate in significant part to the work she performed for the Congress as part of her official duties in the last year (the report, in fact, provided an overview of the main principles of Islamic finance, the very same issue she is being asked to cover for a publisher for compensation). Thus, the Office of the Counselor opines that it would be impermissible for Ms. Ilias to accept compensation for a book with such a direct nexus to work she has done for the Congress in the last year. The fact that Ms. Ilias would draw on additional sources and new information for the book does not ameliorate the fact that, but for her authoring of this report for the Congress, Ms. Ilias would likely never have been asked to write a book on this topic.

Section 2 of LCR 2023-3 states that "staff members shall not engage in outside employment or other outside activities not compatible with the full and proper discharge of the duties and responsibilities of their Library employment." It goes on to state that incompatible activities may include, but are not limited to, "acceptance of a fee, compensation, gift, payment of expense, or any other thing of substantial monetary value in circumstances in which acceptance may result in or create the appearance of conflict of interest."

CRS objectivity and nonpartisanship have been hallmarks of the Service since its founding. It is essential that staff members engage in no activity, either at work or in their outside activities, that jeopardizes their ability to be seen as objective, fair, and without bias. Although Ms. Ilias has said that Prager is not looking to "sensationalize" the issue as it deals primarily with policy issues from an objective and balanced perspective, and we appreciate that Ms. Ilias has said that she would not have even considered writing this book if it would require her to take a particular stand on one side or the other, the Office of the Counselor has determined that Ms. Ilias' authoring of such a book would create the appearance of a conflict of interest for the client CRS serves, the Congress.

1 - Acting Assistant Director Ed Bruner
1 - Shayerah Ilias

# EXHIBIT R

10  0036

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

- Find Articles in:
- All
- Business
- Reference
- Technology
- Lifestyle
- Newspaper Collection

## Business Publications

o Comments

# Whittaker Award from the Lawyers Association of Kansas City honors

## Missouri Lawyers Media, Nov 9, 2009 by Scott Lauck

A prominent critic of evidentiary practices at Guantanamo Bay and an advocate for new federal civil rights legislation were the recipients Thursday of the 33rd annual Whittaker Award from the Lawyers Association of Kansas City.

At a lunch at the World War I Museum in Kansas City, the association honored Morris Davis, the former chief prosecutor at the extraterritorial prison for terrorists in Cuba who resigned in protest over the use of evidence obtained through "enhanced interrogation techniques."

The group also honored Alvin Sykes, whose lobbying led to the signing of the Emmett Till Unsolved Civil Rights Crime Act, which provides money for federal authorities to reopen cold civil rights- era criminal cases. Sykes is only the second nonlawyer to win the award since its inception in 1976.

Davis headed prosecutions at Guantanamo from September 2005 to October 2007. Before his resignation, he was a strong supporter of the military commission system. In his acceptance remarks on Thursday, Davis said he doesn't think the system served its purposed; there have been only three prosecutions in eight years. However, he said that is because "prosecution was a distant thought at best" during many of the interrogation sessions.

Although Davis defended the use of techniques such as waterboarding for gathering intelligence, he said the evidence gathered from such sessions was inadmissible in court. He drew fire from his superiors for refusing to use interrogation evidence in his prosecutions. On Thursday, Davis remained critical of the Bush administration, although he said he was also "extraordinarily disappointed" with the Obama administration's subsequent policies.

"If there's any good that has come out of this, it's a greater respect for military law and military lawyers," he said.

Sykes used his remarks to reflect on the state of the legal profession. His own quasi-legal career began in the 1980s, when he persuaded the Justice Department to pursue a civil rights charge against a white man who beat a black musician to death. The murder occurred not far from the Liberty Memorial that was host to Thursday's lunch. Sykes said the juxtaposition "means we are making progress in America."

Sykes worked with the mother of Emmett Till, whose brutal 1955 murder in Mississippi was a catalyst of the civil rights movement, to help pass legislation to pursue other crimes from that era that had languished. The bill was signed into law last year.

Sykes said he was honored to receive the Whittaker Award.

"The plaques and accolades show you're on the right track," he said. "But we have a lot more to do."

The Whittaker award, given out since 1976, is named for Charles E. Whittaker, the only Missourian to serve on the U.S. Supreme Court.

Copyright 2009 Dolan Media Newswires
Provided by ProQuest Information and Learning Company. All rights Reserved.

Advanced Search  whittaker award chief prc in  free and premium articles    Search

# EXHIBIT S

10  0036

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

| | |
|---|---|
| **From:** | Morris Davis |
| **To:** | Kent Ronhovde;  Lizanne Kelley |
| **Date:** | 8/17/2009 12:58 PM |
| **Subject:** | Lynndie England |

The email that later became an article on Small Wars Journal was composed and sent on my personal Gmail account at 8:43 pm last Tuesday evening.  It was composed on my personal laptop computer while I was sitting in my La-z-boy recliner in my living room and sent using my Comcast internet service.

Pasted below is an item I posted as a comment to a related article on Small Wars Journal.  Note that it was sent on Sunday afternoon at 1:56 pm from my personal laptop computer from my house.

Let me know if you need any additional information.

- Moe

---

Let me exercise the right of free speech and offer a couple of personal observations.

1. I support the First Amendment and I'm a firm believer in free speech, even that with which I happen to disagree. I believe Ms England (1) paid her debt and deserves to get on with her life and (2) has the right to express herself. The reason I spoke out earlier this week was because (1) I do not believe people should be honored or rewarded for criminal conduct and dishonorable behavior and (2) the right to free speech does not mean anyone can say anything anywhere and at anytime. I'm sure there are a lot of people who would like to have the honor of speaking at the LOC and they'll never get it. Have their First Amendment rights been violated? I hope Ms England gets a job and is able to support her son, but I don't believe she deserves a dime or a pat on the back for what she did. It doesn't take book learning to know that somewhere along the spectrum of strip them naked, make them masturbate, stack them in piles, and insert glow sticks in their as#es you've moved beyond the code of conduct. If you watch the BBC interview she did Thursday night you'll see that she just fell in love with the wrong guy (Grainer) and didn't want to risk losing his affection by saying no to his sadistic behavior. I don't know what else anyone needs to learn from Ms England, but if you want to learn more go see her at a book signing at some of the book stores where she's appearing in coming weeks; be my guest, but don't save me a seat.

2. I, nor anyone I know, advocated any form of violence to try and stop the event. If it occurred it is regrettable and I certainly do not condone it. The phones at the LOC have caller ID and obviously you can tell who sent an email, so we should learn soon who threatened Mr. Moore. I hope the name or names are well-

publicized and they are held accountable. I, along with others I communicated with, intended to indicate our displeasure by giving Ms England's appearance the attention it deserved: none. I would have been thrilled if they had the event and no one showed up. That would have been an appropriate statement.

3. To those who think the behavior of England and her cohorts is acceptable because it's no worse than what the enemy does to us, I hope to God you're not in the military. If you are, you don't get it and you clearly aren't representative of the overwhelming majority who do.

4. As for David Moore, he is a fellow veteran. I respect all who served (and who currently serve) honorably. I have very little patience for the chicken hawks who had other priorities and found deferments so they didn't have to serve, but they don't mind sending other peoples' sons and daughters off to do what they didn't have the guts to do themselves (nor their own sons and daughters). I respect Mr. Moore as a veteran, but that doesn't mean I have to agree with all of his views.

5. I hope this recent publicity does not tarnish the LOC or the LOC Professional Association. The LOC is a great institution and the LOCPA is a fine organization. I think they got caught in the frag pattern unaware of what was about to erupt.

6. Finally, I am still disappointed that those who deserve attention and a pat on the back are not getting the recognition they deserve. I've had surgery twice - once last month and before in July 2007 - at the Walter Reed Army Medical Center and I've spent a good bit of time there. First, the medical care at Walter Reed is outstanding despite what some may perceive from the negative articles from a few years ago. Second, I got to see and talk with a lot of young men and women who lost arms and legs and eyes serving honorably. I have never once heard any of them complain or say, as Lynndie England does, that they are victims who deserve pity. Their attitudes are amazing. They deserve to be heard and to be honored.

- Moe Davis (Colonel, U.S. Air Force retired)

Posted by Moe Davis | August 15, 2009 1:56 PM

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MORRIS D. DAVIS, | |
| Plaintiff, | |
| v. | Case No. _____ |
| JAMES H. BILLINGTON, in his official capacity as the Librarian of Congress, and DANIEL P. MULHOLLAN, in his individual capacity, | **DECLARATION OF DENNIS ROTH** |
| Defendants. | |

I, Dennis Roth, hereby declare and state as follows:

1.     I am a Specialist in Labor Economics at the Congressional Research Service ("CRS") of the Library of Congress (the "Library").  I am also the President of the Congressional Research Employees Association ("CREA"), International Federation of Professional and Technical Engineers ("IFPTE"), Local 75, the Union representing CRS employees.

2.     I submit this declaration based on my personal knowledge in support of the plaintiff in the above-captioned case, Colonel Morris Davis.

3.     From 1976 to the present I have held the position of a labor economist at CRS. Since October 1987 I have been president of CREA, the exclusive representative for all bargaining-unit CRS employees.  I have been elected to this position on an annual basis.  The Library is one of only two legislative branch agencies covered by Title VII of the Civil Service Reform Act of 1978 (P.L. 95-454).  In 1990 I was elected as Eastern Federal Area Vice President of IFPTE, a position in which I served until July 1997.  In 1994 I was also elected as Executive Vice President of IFPTE, a position in which I served until July 1997.  During the same period I served as labor co-chair of the Department of Defense Partnership Council.

4.     Colonel Davis is not eligible to be a member of CREA because of his position as an Assistant Director.  CREA is nevertheless very interested in this case because of its broader impact and critical importance for all CRS employees.  CRS employees regularly engage in outside speaking and writing activities, including on controversial and high-profile policy matters, and CRS employees have a substantial desire and interest in being able to continue speaking and writing outside of CRS.  For these reasons, CREA has always been, and remains,

1

extremely concerned about attempts by management to restrict employees' rights to engage in such speaking and writing.

5.      Outside speaking and writing can actually be a necessary and obligatory part of CRS employees' duties: Under CRS guidelines, "recognition of the analyst's professional expertise" by "high ranking officials in State governments, public interest groups, the courts, and subject matter experts and policy analysts in the Federal and other professional communities," among others, is a specific "ranking factor" in evaluation for promotion to higher-level grades in CRS. (*See* Position Description and Ranking Factors, Social Science Analyst, GS-15, Factor 1-9.) In other words, employees need to get recognized, and a primary way to get recognized in one's field is to participate in the outside world by speaking and writing, attending conferences, making presentations, and the like.

6.      Outside speaking and writing are compatible with a CRS employee's duties and responsibilities. The expression of personal views in outside venues does not compromise one's ability to serve as an effective CRS employee in the performance of "comprehensive and reliable legislative research, analysis, and information services that are timely, objective, non-partisan, and confidential...." (*See* CRS Mission Statement.) To the contrary, it increases an employee's ability to serve as an effective and knowledgeable expert for Congress. Outside speaking, writing, lecturing, and teaching activities by CRS staff create important opportunities for professional, career, and personal growth and advancement. Such occasions generate interactions and contacts with academic or professional colleagues in one's field; advance research and speaking skills; provide opportunities for feedback on analysis and innovative

2

theories and hypotheses; and may contribute to a certain public recognition and standing of the employee as an expert in the subject, reflecting positively on the reputation of CRS.

7.      If a CRS staffer, in outside writing or speaking, reaches a conclusion or expresses an opinion on a public policy matter that is based upon nonpartisan, independent, and generally accepted methodologies of analysis and scholarship, it does not indicate that he or she is no longer objective or unbiased on that subject.  When one's outside writings, and the opinions and conclusions contained therein, are drawn from and based upon a fair consideration, analysis, and application of the known facts and appropriate, competing theories and hypotheses, such writings and conclusions are objective by definition, regardless of whether an opinion is expressed.  The fruits of the objective research that inform this writing and speaking directly facilitate, rather than damage, one's ability to perform official CRS functions in an objective manner.

8.      Outside speaking and writing by CRS employees, even on controversial public policy matters, do not compromise CRS's ability to serve Congress or its ability to maintain its reputation and status as a nonpartisan, objective entity.  Restricting CRS employees' rights to engage in outside speaking and writing is, by contrast, detrimental not only to the individual employee, but to the professionalism, reputation, and mission of CRS as a whole.  Ultimately, the knowledge and skills gained in outside research and scholarship benefit directly the quality of services employees are able to provide to Congress, thereby increasing, rather than decreasing, CRS's ability to serve Congress.

9.      Director Mulhollan issued a Director's Statement on Outside Activities, dated January 23, 2004, in an apparent attempt to cut back on employees' free speech rights.  The

3

Director's Statement has been reformatted into a document that is now labeled as a policy. Because of its tenor and emphasis, the Director's Statement raised rather than answered more questions for conscientious CRS staff, as it made it unclear what speech was permissible and what was not permissible. Based on comments and inquiries CREA received after the Statement's issuance, CREA concluded that it was having an unfortunate chilling effect, intended or not, on staff who wanted to or had planned to engage in professionally related writing or lecturing activities outside of their CRS employment.

10.    As a result of the issuance of the Director's Statement, CREA had an attorney draft a memorandum to CREA members explaining their legal rights, pointing out the troubling aspects of the Statement and emphasizing that employees do have a right to engage in outside speaking and writing despite the apparent attempt of the Director to limit their First Amendment rights. A true and correct copy of this May 12, 2004, CREAgram, entitled "Outside Writing, Lecturing Activities by CRS Staff: Objectivity," is attached to this Declaration as Exhibit A. The points made in that memorandum are still valid today, and many of them are repeated in this Declaration. The termination of Colonel Davis has made these issues all the more important for CRS employees.

11.    The Director's Statement spoke to the inclusion in Library Regulations of an "appearance of conflict of interest" standard in the provisions on outside activities, at LCR 2023-3. The specific "appearance of conflict of interest" standard cited by the Director in LCR 2023-3 is set out in Section 2A(1) and Section 2A(6) of the cited regulation ("Outside Employment"), and applies only to the "acceptance of a fee, compensation, gift, payment of expense, or any other thing of substantial monetary value" (Section 2A(1)); or when one engages in outside

4

"employment with any person, firm or other private organization having business either directly or indirectly with the Library ..." (Section 2A(6)).  It does not apply simply to expressing one's personal views in public.

12.     The termination of Colonel Davis because of his outside speech has already had a concrete and significant impact on CRS employees.  As with the issuance of the Director's Statement in 2004, the termination of Colonel Davis is intimidating and chilling staff who either want to or had planned to engage in outside writing or speaking activities.  People are now wondering whether they will be disciplined if they engage in further outside speech or writing, and CREA has been contacted by several CRS employees who are confused, uncertain, or worried about what outside speaking and writing is permissible and is not permissible.  CRS employees want to be able to continue participating in their fields of expertise outside CRS, but as a result of Colonel Davis's termination, they fear what the consequences may be.  CREA is very concerned that this incident will cause many employees to refrain from engaging in lawful speech activities and outside scholarly pursuits.  CREA has already been informed that some employees will either be refraining from certain speaking and writing, or that, at a minimum, they will be careful about what they say and they may change their words out of an abundance of caution.

13.     CRS employees are now more confused than ever about what speech is permitted and not permitted by CRS.  That is especially the case because management has taken action against Colonel Davis based on outside writing on subject matter that was not within his official CRS responsibilities or duties, which has always been the focus of management's concern over staff's outside speaking and writing.

14.     It is my understanding that CRS is taking the position that Colonel Davis demonstrated bad judgment by writing the op-ed and letter to the editor at issue.  I am not certain what management's definition is of good judgment.  I know what it means to me, but the term is inherently subjective and CRS has not, to my knowledge, provided any definition or standard to define good judgment.

15.     Because of CRS's decision to terminate Colonel Davis and the impact that it has already had on CRS employees, CREA is updating its 2004 memorandum and will soon be reissuing the updated memorandum to its members.  The contents of this Declaration will likely be reflected in that document.

16.     It is not uncommon for Members of Congress to take issue with analyses, reports, or other materials prepared by CRS employees, especially when a Member disagrees with the conclusions.  That is the nature of the expert analysis that CRS employees provide.  Just because a Member makes a complaint does not mean that the CRS employee involved has performed unsatisfactorily or should be disciplined.  Our official writing for CRS is nonpartisan and objective, and those who are partisans and advocates on an issue might often criticize our findings.

17.     CRS employees do not always include formal, express disclaimers in their outside writings.  An express formal disclaimer is only necessary if employees are writing or speaking about matters directly related to their official CRS area of expertise and an association is made in the writing or speech with CRS and their role at CRS.  In practice, employees who do not include express disclaimers are not always reprimanded or disciplined simply because a formal

6

disclaimer is not used. I am not aware of any CRS employee who has been terminated merely because a formal express disclaimer was not used in an outside writing or speech.

18.     I am also not aware of any CRS employee other than Colonel Davis ever having been terminated for engaging in outside writing or speaking. CREA is now very concerned that CRS may take even more severe measures against employees who work to become recognized in their subject areas as part of their effort to become true experts, which is what they are required to be. Judicial intervention is necessary to stop this from occurring and to assure CRS employees that management cannot overrun employees' First Amendment rights.

Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January _6_, 2010

Dennis Roth

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MORRIS D. DAVIS,

      Plaintiff,

            v.

JAMES H. BILLINGTON, in his official
capacity as the Librarian of Congress, and
DANIEL P. MULHOLLAN, in his individual
capacity,

      Defendants.

Case No. _____

**DECLARATION OF
KERRY DUMBAUGH**

## DECLARATION OF KERRY DUMBAUGH

I, Kerry Dumbaugh, hereby declare and state as follows:

1.     I was a Specialist in Asian Affairs within the Foreign Affairs, Defense, and Trade Division of the Congressional Research Service ("CRS") of the Library of Congress since 1985. I retired from CRS on December 31, 2009 to take a position as a Research Analyst with CAN China Studies. I received my B.A. with a double major in East Asian Studies and music from Wittenberg University in 1974; an M.A. in Asian Studies from the University of Pennsylvania in 1977; and an M.A. in National Security Studies from the U.S. National War College in 1995.

2.     This declaration is based on my personal knowledge.

3.     In my twenty-five years of experience at CRS, employees and analysts routinely engaged in outside speaking and writing both on matters within their jurisdiction for CRS and on matters unrelated to their official obligations.  Outside exposure allowed CRS analysts to enhance their expertise and reputation and to be recognized as national and international experts in their fields of study.  Such speaking and writing was considered to be crucial not only to professional development within CRS but to continuing education through the engagement of other experts in the field.

4.     I was among the many analysts and employees of CRS who took part in outside speaking, and my career at CRS undoubtedly benefitted from it.  I spoke and wrote outside of CRS all the time, including several recent trips around the country and the world to lecture and speak on matters related to China, Asia, U.S. policy, and congressional actions.  I was never admonished or disciplined for my outside speaking and writing.

5.     Far from impairing my work within CRS or my ability to serve Congress, my outside speaking and writing only refined my expertise, allowed me to connect with other

experts, and broadened my perspective on the issues for which I was responsible at CRS. Based on my observation, other analysts at CRS also benefitted from similar public exposure. CRS never to my knowledge terminated an employee for speaking or writing on issues relating to his or her CRS obligations or otherwise, except for Col. Morris Davis.

6.      Col. Davis was my supervisor at CRS. Although a new hire, he was respected and liked within the FDT Division of CRS and, to the best of my knowledge, by all who interacted with him at CRS. I am familiar with the two articles cited by CRS as justification for his termination, and I am familiar with his views on the military commissions as expressed prior to his publication of the two articles, both during his time at CRS and previously. The views Col. Davis expressed in the articles are similar to the views he has consistently expressed on the subject of the military commissions. He is, in fact, well known nationally and internationally for these views, as he expressed them publicly on various occasions, even testifying before Congress, before CRS hired him. He has criticized both the Bush and Obama administrations even-handedly and on the basis of the personal expertise he acquired, as the chief prosecutor of the military commissions, prior to joining CRS. In my opinion, given the even-handedness of his criticism and his outspokenness prior to joining CRS, it is difficult to understand how the expression of his views in the two November 2009 articles could have been of special significance in his ability to faithfully and objectively perform his duties at CRS. In addition, Col. Davis and the FDT Division had no official CRS responsibilities for the subject of military commissions; matters related to the military commissions have consistently and uniformly been handled by the American Law Division of CRS.

7.      Although CRS has a policy on express disclaimers for outside writing, that policy is applied inconsistently at best and, except as cited by CRS in the case of Col. Davis, with few if

any actual repercussions. I frequently spoke outside of CRS without disassociating myself from CRS; in fact, I often associated myself with CRS to make clear to the audience that the source of my expertise stemmed, in part, from a decades-long career advising Congress on the subject matters of my speeches. I also wrote numerous articles outside of CRS. While these often had express disclaimers, at times they did not. *See, e.g.,* Kerry Dumbaugh, *The U.S. Role During and After Hong Kong's Transition,* 18 U. Pa. J. Int'l Econ. L. 333 (1997); Kerry Dumbaugh, *Rough Waters: Navigating the U.S.-China Security Agenda, A Handbook for Journalists,* Global Reporting Network, Center for War, Peace, and the News Media, Department of Journalism and Mass Communication, New York University; and articles in several issues of the *Washington Journal of Modern China,* published by the U.S.-China Policy Foundation in Washington DC. In the latter case, one single issue of the *Washington Journal of Modern China,* Fall-Winter 1997, Vol. 4, No. 1, included the names of three CRS specialists: my name as author of "Religious Practices and U.S.-China Relations," without a disclaimer (p. 31); Dick Nanto's name as author of "The Hong Kong Handover: Political Discussions and Economic Issues," with a disclaimer (p. 62); and Robert G. Sutter's name, identified as being with the Congressional Research Service and listed as a member of the *Journal*'s Advisory Committee (inside title page). No one, to my knowledge, was ever terminated for failure to use an express disclaimer in outside speaking or writing. Although CRS employees were occasionally reminded to use such disclaimers when they failed to do so, CRS had never imposed any sanction for such a failure until Col. Davis's case.

8.      In my twenty-six years at FDT in CRS, it was also a common practice to include interns' names on official CRS reports when appropriate. The intention of interns in joining CRS for temporary periods often was specifically to assist in the writing of a report and to

receive attribution that would further their graduate studies.  On CRS reports, these interns most

often were listed as "Research Associates."  From my own files, I have several reports with

intern's names listed on the front cover.  One example, dated August 24, 1999, is RL30289,

*China and the Reversion of Macau: Background and Implications* (August 24, 1999), which

included the name of Alexander van Praag, from Hong Kong, as a "Research Associate" co-

author.  A second example, dated August 17, 2000, is RS20655, *China: The National People's*

*Congress*, for which the sole author on the cover was "Research Associate" Samuel Wolfe.  (In

the latter case, a caveat on the front cover directed clients with questions to Kerry Dumbaugh.)

The two reports I have cited, along with numerous others, were all reviewed and approved by the

CRS Review Office under the tenure of Director Dan Mulhollan.  I have attached true and

correct PDF copies of two such reports as Exhibits A and B.  During the last few months of my

tenure at CRS, new software with an automatic author designation feature (the "Authoring and

Publishing Tool" developed by CRS) appeared to complicate the attribution of work to non-CRS

employees.  I considered this difficulty to be an unforeseen consequence of this new software. I

did not interpret the new software to have precluded the long-standing practice of giving

legitimate attribution to interns who had contributed to CRS products.

Privileged and Confidential; Attorney Work Product

10.     I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 7, 2010

KERRY DUMBAUGH

# EXHIBIT A

Order Code RL30289

# CRS Report for Congress

### Received through the CRS Web

# China and the Reversion of Macau: Background and Implications

August 24, 1999

Alexander van Praag
Research Associate
Kerry Dumbaugh
Specialist in Asian Affairs
Foreign Affairs, Defense, and Trade Division

**ABSTRACT**

This report examines factors which might be relevant for US policy towards Macau after it reverts to Chinese administration on December 20, 1999. It includes a brief background to the reunification, followed by the discussion of economic and social factors which make the case of Macau different for China than the case of Hong Kong, as well as Macau's economic relevance to the United States. It includes a brief examination of the political status of Macau as a Special Administrative Region of China and of possible areas where controversy might arise concerning Chinese administration. This CRS report also discusses some implications for U.S.-Macau relations. Information on Hong Kong's reversion can be found in CRS Issue Brief 95119, *Hong Kong after the Return to China: Implications for U.S. Interests*, by Kerry Dumbaugh. This report may be updated in the light of changed circumstances.

# China and the Reversion of Macau:
# Background and Implications

## Summary

On December 20, 1999, the Portuguese territory of Macau will revert to Chinese administration after four hundred and fifty years of colonial rule, to become a Special Administrative Region (SAR) of the People's Republic of China (PRC).  Macau has technically been Chinese sovereign territory since 1979, when China and Portugal established formal diplomatic relations and the two countries decided that Macau was a Chinese territory under Portuguese administration.  On December 20, the PRC takes over administration of the territory.

At present, policy-makers are examining the U.S. stance towards the future SAR.  On the basis of the PRC's promise of autonomy for the SAR in all respects except foreign relations and defense granted by the Basic Law of the Macau SAR, Representative Bereuter and Senator Thomas have proposed the United States-Macau Policy Act of 1999 (**H.R. 825/S. 1430**) patterned after the model of the United States-Hong Kong Policy Act of 1992 (**S. 1731/P.L. 102-383**).

The two Basic Laws governing Hong Kong and Macau after their reversion to China are effectively very similar, granting largely the same degree of autonomy to the two SARs.  Significant differences exist, however, particularly in the commercial and economic foundations of the two territories.  The economy of Macau is based mainly on a large gambling industry, and other leisure sectors.  A general weakness of this economy, as well as a significant crime problem in Macau, will present the Chinese government with problems very different from those which it faced with Hong Kong in 1997.  In the reversion of Macau, China may well face economic and social problems.

The potential exists that China may act in such a way towards Macau that it could be judged as infringing on the autonomy of the SAR or as denying consular protection to foreign nationals, especially in the case of Macanese residents who have chosen Portuguese citizenship.  Furthermore, the way the United States forms its policy towards Macau and Hong Kong as SARs may be judged by some observers as reflecting how it would relate to Taiwan if Taiwan were to reunify with China under a similar "one country-two systems" model.

**Contents**

Congressional Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Background to Reunification  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Future . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Macau's Economy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        The Scale and Basis of the Economy  . . . . . . . . . . . . . . . . . . . . . . . 3
        Gambling and Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    The Political Future of Macau  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        "One country, two systems" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Implications for U.S.-Macau Relations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

# China and the Reversion of Macau:
# Background and Implications

## Congressional Interest

The territory of Macau reverts—after 450 years of Portuguese rule—to Chinese control on December 20, 1999.  In order to set forth U.S. policy with respect to Macau, provide statutory authority for Macau's treatment under U.S. law, and provide a framework for U.S.-Macau relations once Macau becomes a Special Administrative Region (SAR) of the People's Republic of China (PRC), the United States-Macau Policy Act of 1999 (**H.R. 825** [rep. Bereuter et al.] / **S. 1430** [Sen. Thomas et al.]) has been introduced in Congress.  The act effectively proposes to continue to treat the Macau SAR as an entity in most respects independent of China.  It is similar to the United States-Hong Kong Policy Act of 1992 (**P.L. 102-383**), which provided statutory authority for Hong Kong's treatment under U.S. law after its reversion to China.

This issue acquires additional, potentially greater, significance in the relation between the reversions of Hong Kong and Macau to Chinese administration, and the possibility of Taiwan's eventual reunification with China itself as an SAR.  U.S. relations with both SARs are likely to be scrutinized as forecasting the United States' likely relationship with Taiwan if Taiwan were ever to reunite with China under the same "one country-two systems" model.  The purpose of this report is, therefore, to outline the circumstances of Macau's reunification with China, raise issues with which the PRC must deal when it assumes control over Macau, and draw implications for U.S. policy towards Macau as an SAR and as a potential model for a similar situation involving China and Taiwan.  This report provides background on Macau, an overview of its economy, the political situation there, some problems that may occur there, and some implications for the United States.

## The Background to Reunification

When Macau becomes an SAR of mainland China on December 20, 1999, it will do so under circumstances similar to the reversion of Hong Kong to Chinese sovereignty in 1997.  The same "one country, two systems" formula is being followed; the Joint Declarations under which they revert are in many respects similar; and the Basic Laws under which they are to be governed are also similar in many key aspects.[1]  Significant differences exist, however, both in terms of the history of Western

---

[1] See David W. Chang and Richard Y. Chuang, *The Politics of Hong Kong's Reversion to China*, Macmillan, 1998, ch. 2.

CRS-2

sovereignty over the two territories and also in terms of their economic bases, such that the example of Hong Kong cannot simply be assumed to hold for the case of Macau as well.

Hong Kong came under foreign rule much later than Macau: The post-Opium War treaty of Nanking[2] in 1840 was followed shortly by the addition to Hong Kong of Kowloon and the New Territories, in 1860 and 1898, respectively; Macau, on the other hand, was first settled by Portuguese merchants, who began official trade with China in 1553. In 1557, the Portuguese acquired permission for permanent residency and then acquired the de facto rights to govern Macau beginning in 1573. In 1887, with China weakened by the Opium Wars, Portugal concluded a treaty granting it the right to perpetual jurisdiction over Macau.[3] For much of its history, until the British colony of Hong Kong gained significance in the mid 19th century and came to dominate trade in the area, Macau served as the principal entrepôt for trade between the West and China and Japan.

Thus, Macau's association with Portuguese government and culture significantly antedates Hong Kong's with Great Britain. Moreover, the prospect of the return of Macau to Chinese government was raised much earlier than was the case with Hong Kong. Twice Portugal offered to return Macau to China: In 1966-67, after the pro-China riots in Hong Kong and Macau, and subsequently in 1974, following the coup d'état in Portugal, during the period when Portugal relinquished its other colonies—such as Timor, Mozambique and Angola.[4] In 1974, China, in the midst of the Cultural Revolution, declined to undertake the administration of Macau. Technically, Macau became a Chinese sovereign territory in 1979, when Portugal established formal diplomatic relationships with the PRC. At that time, the two countries agreed that Macau was a Chinese territory, although the agreement provided for it to remain under Portuguese administration.[5]

In June 1986, after discussions concerning the return of Hong Kong had begun, China and Portugal began negotiations for the return of Macau to Chinese administration. This resulted in the Sino-Portuguese Joint Declaration of 1987. In many respects, the Sino-Portuguese Joint Declaration resembles the Sino-British Joint Declaration over the return of Hong Kong.[6] The most significant difference in the context under which the two Joint Declarations were conceived is that, while there was no question of which country ought to have sovereignty over Macau, Portugal having been willing to relinquish sovereignty in 1974, Sino-British negotiations had temporarily stalled over the possibility of Great Britain's retaining sovereignty over

---

[2]See *Consolidated Treaty Series*, vol. 93.

[3]See John K. Fairbank, et al., *East Asia: The Modern Transformation*, Boston, Houghton Mifflin, 1965, p. 343.

[4]See CRS issue brief 98018, *China-U.S. Relations*, by Kerry Dumbaugh.

[5]For an excellent overview of this, as well as a general disussion of the issues involved in the reversion, see article by Beatrice Leung, in *Asian Affairs an American Review*, Washington, Spring 1999.

[6]For a detailed breakdown of differences between the two treaties, see Chang and Chuang, *The Politics of Hong Kong's Reversion to China*, ch. 2.

CRS-3

Hong Kong after it returned to Chinese administration, which was subsequently rejected.

# The Future

## Macau's Economy

**The Scale and Basis of the Economy.** Compared to the economy of Hong Kong, that of Macau is relatively tiny. Moreover, where Hong Kong is established internationally both as a trading center of East Asia, and also as a financial center, Macau has become increasingly marginal in these respects since the mid 19th century. It is only in a very limited field, viz., gambling and leisure, that it is of major significance throughout the region. This small scale may be seen both from the Gross Domestic Product (GDP) of Macau, and also its volume of trade with the outside world, shown in **Table 1**. Its GDP of $7.3 billion is roughly the same size as that of Angola, Jordan or Bolivia. Although on a per capita basis Macau's volume of trade and GDP are relatively high, this is tempered by the small population of the territory, which has approximately 450,000 inhabitants.

### Table 1. GDP and Volume of Trade for Macau
(Millions of U.S. Dollars)

| Year | Imports | Exports | GDP |
|------|---------|---------|-----|
| 1995 | 2,033.4 | 1,989.2 | 7,410.2 |
| 1996 | 1,991.3 | 1,987.3 | 7,282.0 |
| 1997 | 2,075.4 | 2,141.2 | 7,309.0 |
| 1998 | 1,949.6 | 2,135.5 | N.A.. |

**Source:**  Direccao dos Serviços de Estatística e Censos de Macau (DSEC); converted from Macanese Patacas at the fixed rate of 8 MOP per U.S. dollar.

Macau's economy depends largely on gambling. A monopoly held by the *Sociedade de Turismo e Diversoes de Macau* (STDM), the society for tourism and amusements in Macau, a company run by Hong Kong businessman Stanley Ho, controls the gambling industry of Macau. The relative importance of STDM within the context of Macau's economy is evidenced by the significant proportion of Macau's total public revenue which comes from the approximately 30% tax levied on gambling. In 1996, for example, Macau collected US$ 630 million from STDM, more than 40% of government revenues.[7] In the same year, STDM had revenues of more than US$ 2.1 billion, out of a reported GDP of US$ 7.3 billion.[8] Furthermore, STDM

---

[7]*ASIA, INC.*, August 1997. Statistics for other years available from the Autoridade Monetária e Cambial de Macau (AMCM).

[8]For comparison, the State of Nevada collected approximately 497 million dollars in percentage taxes on gambling for the fiscal year of 1998-1999, according to a press release

(continued...)

CRS-4

employed about 10,000 workers, roughly 5% of Macau's total workforce.[9]  In dealing with Macau after December 20, 1999, China will face the dilemma of how to preserve the profitability of the gambling industry, in order to retain this significant source of revenue.

**Gambling and Crime.** There exist three potential complications for China's handling of the economy, and of the gambling industry, in Macau after December 1999.  First, the monopoly held by STDM over Macau's casinos expires in 2001.  Second, extensive organized crime exists in Macau, both in various Macanese criminal organizations and also involving mainland Chinese gangs from Guangzhou province.  These gangs are currently fighting largely to control the VIP rooms of Macau's casinos.  Thirdly, there is the weakness of an economy based on tourism and gambling in the face of a volatile Asian economic environment, where fewer people currently have the disposable income to expend on gambling.

Concerning the issue of the expiration in 2001 of STDM's monopoly dating back to 1962, China has the basic options of renewing the monopoly, either under STDM (although the chairman, Stanley Ho is already 78 years old) or under another company, or of dispersing control of Macau's nine casinos among several companies.  In 1997, when previously renewing STDM's monopoly, Stanley Ho argued to the Sino-Portuguese Joint Liaison Group that to preserve gambling as a monopoly would be in the government's best interest, on the grounds that, given Macau's relatively small population, overall casino profits and, hence, gaming tax revenues for the government, would be maximized.[10]  This is likely to be relevant when the question of renewal comes up in 2001.  It cannot be overstated how much gambling, under the auspices of STDM, contributes to the Macau economy.  According to government statistics,[11] in 1996, tourism and gambling contributed 43% of the territory's GDP and, according to STDM officials, over three quarters of that year's 8.1 million visitors came primarily for gambling.[12]  If China were to take measures to reduce gambling, Macau's economy would be severely weakened.

The second question concerns the rise of organized crime in Macau, both as it relates to the economy, and also as a problem in its own right.  Crime levels in Macau have been extremely high since 1997,[13] with gang warfare between two rival Macau triad organizations, the "14K" and the "Sui Fong" escalating over control over VIP rooms in Macau's top casinos.  These VIP rooms, according to STDM officials,

---

[8](...continued)
by the Tax and Licence Division of the Nevada Gaming Control Board

[9]*South China Morning Post*, March 3, 1999

[10]*South China Morning Post*, June 26, 1997.

[11]Cited, for example, in *South China Morning Post*, July 11, 1997.

[12]This is consistent with AMCM and DSEC tourism statistics, which indicate an extremely short (1.3 — 1.5 days) average stay for visitors in the territory.

[13]According to the *South China Morning Post*, August 19, 1999, there occurred 27 murders in Macau in 1998, and, at the time when the article was written, 28 murders had already taken place that year in the territory.

CRS-5

generate more than half of all gambling revenues.[14]   Recently, criminal elements from Mainland China, particularly the so-called "Dai Huen" or "Big Circle" gangs from Guangzhou province, have also begun activities in Macau.  The high level that organized crime has reached in Macau is evidenced not only by the recent period of violence, but also by the high profile of some of this violence.  On November 26, 1996, the deputy head of the Gambling Inspectorate, Lieutenant-Colonel Manuel Antonio Apolinario, survived being shot twice in the head, while on March 24, 1998, the third in command of the Gambling Inspectorate, Francisco Xavier Pinto do Admiral, was shot dead near the Lisboa Hotel.[15]  There are indications that this level of violence in Macau has had a very negative effect on tourism in the territory, including on casino attendance, which in turn impacts GDP and government revenue.[16]   Since the upsurge of crime in 1996/7, in a city of some 430,000 inhabitants, nearly 100 murders have occurred, the majority Triad-related.  At the same time, tourist arrivals fell to 6.9 million in 1998, down 16% from 1996.[17]

The PRC may therefore choose to take a tougher stance on crime.  It has been widely anticipated within Macau that a return to Chinese authority will bring a greater level of law and order.[18]  What remains to be seen is whether this can be done without a major negative effect on casino revenues, which could cripple Macau's economy as it is currently structured.  This might be the result of, for example, an all-out ban on gambling as an anti-crime measure.  It must also be seen whether China can reduce Triad crime without incurring criticism for the use of improper measures.  Some[19] have expressed the concern, for example, that PLA troops scheduled to be garrisoned in Macau after December 20 might be used in an improper law-enforcement role, infringing on the judicial autonomy granted Macau by the Basic Law.

The third problem is the effect of regional financial problems on an economy that depends so heavily on the leisure industry.  The PRC may well encourage the diversification of Macau's economy into industries less reliant on the disposable, leisure income of the region's inhabitants.[20]

Although tourism and gaming comprise the major proportion of Macau's GDP, nonetheless, foreign trade remains a second area in which Macau receives revenue. This income is currently waning in Macau's economy: revenue from tourism has exceeded the value of exported goods since 1992, the average rate of growth of which dropped from 10%, between 1982 and 1987, to -2% in the following years. Furthermore, employment in the industrial sector has decreased as well.  While half

---

[14]See Cathy Hilborn, "Making a Killing", in *Far Eastern Economic Review,* March 12, 1998.

[15]*South China Morning Post*, March 25, 1998

[16]*Far Eastern Economic Review,* Mar 12, 1998

[17]*Dow Jones* newswire, July 11, 1999

[18]For example, Stanley Ho, cited in the *South China Morning Post*, February 1, 1997

[19]For example Macau legislator Antonio Ng, cited in a Dow Jones newswire, July 11, 1999.

[20]E.g., Stanley Ho, in *Far Eastern Economic Review*, September 26, 1996

CRS-6

the working population was employed in the industrial sector at the beginning of the 1980's, only a third was registered as in the industrial sector as of 1998.[21]

In order to provide some boost to the economy, major infrastructure projects have been undertaken in recent years in which STDM has also played a major role. These include the new Ka-Ho container port, the "Lotus Flower" bridge being built to link Taipa and Coloane, two of Macau's outlying island's, with Mountain Island in China (scheduled to be finished in November 1999), and the new Macau International Airport. This is of course significant as an aid to increasing tourism in Macau (including tourism not strictly relating to gambling), especially given the rise in visitors from mainland China.[22] Projects like the Ka-Ho container port, however, can only be explained in the context of a desire to boost an export-based economic sector, which is clearly consistent with the desire to reduce dependency on gambling as a source of revenue.

It is unclear, however, whether Macau's location at the mouth of the Pearl River delta, and its proximity to the PRC's Zhuhai Special Economic Zone will ultimately prove to be beneficial to Macau's export sector. For example, garment manufacturing, once a major industry in Macau, has shifted to China and other regions of Asia where labor costs are lower.[23] What seems evident, however, is that the current situation is not ideal: government revenues from gambling fell 15.4%, to five billion patacas (630 million dollars) in 1998, from their 1997 level of 5.97 billion patacas (750 million dollars).[24] After December 1999 the PRC may well take steps to increase revenues from gambling, probably by attempting to reduce crime in the colony and thus make Macau a safer place for tourist-gamblers to visit, and also to diversify the economy of Macau, perhaps by increasing the emphasis on the manufacturing and export sector.

## The Political Future of Macau

**"One country, two systems".** The principle of "one country, two systems" is to be applied to Macau after reversion. This will allow Macau to retain its current lifestyle and legal, social and economic systems for at least fifty years. It was also the basis for the reversion of Hong Kong. This is presumably the approach through which PRC leaders would contemplate reunification with Taiwan. The political future of Macau depends on how this principle is in fact implemented. Moreover, Taiwan's willingness to unify with China may depend in part on the successful implementation of unification in Hong Kong and Macau. Were either of these two reunifications to prove unsuccessful, Taiwan may be less willing to unite with China, both under the "one country two systems" model in effect in the cases of Hong Kong and Macau, or

---

[21]From DSEC statistics

[22]Macau's visitors come primarily from Hong Kong and China; DSEC tourism statistics indicate a decrease in visitors to Macau by sea (mainly from Hong Kong) and an increase in visitors to Macau by land (clearly from the PRC).

[23]*Far Eastern Economic Review*, March 12, 1998.

[24]AMCM statistics, cited by the *South China Morning Post*, March 3, 1999.

CRS-7

under other systems as well. The following discussion examines how this principle might be implemented in Macau and some difficulties that might arise.

The principle of "one country, two systems" which determines the government of SARs in China is provided for by Article 31 of the PRC constitution, which states that:

> The state may establish special administrative regions where necessary. The systems to be instituted in special administrative regions shall be prescribed by law enacted by the National People's Congress in the light of specific conditions.[25]

On the face of it, and given the Basic Law of 1993 established for Macau on the basis of the Sino-Portuguese Joint Declaration of 1987, this allows for the Macau SAR to remain largely unchanged for fifty years after its reversion to China.[26] Some China watchers have, however, expressed reservations as to whether the Basic Law, in conjunction with Article 31, would be likely to provide any protection for the status quo, and the autonomy of Macau, were China not to wish it as a matter of policy.

First, contradictions have been noted between the Basic Law, especially articles 2[27] and 5[28] and Article 31 of the PRC constitution, and other articles of the PRC's 1982 constitution, especially article 5[29], establishing the uniformity of the socialist legal system, and article 6[30], establishing the uniformity of the socialist economic system. Thus, it is not clear whether the autonomy granted the SARs under Article 31 would be legally defensible were the PRC to wish, for any reason, to revoke the judicial or economic autonomy of the Macau SAR. Moreover, Article 18 of the Basic Law of Macau, while allowing the SAR to be largely exempted from Chinese national laws, also provides for the Central People's Government to apply national laws to Macau in case of the declaration of a state of war, or if turmoil should arise within the

---

[25]*The Laws if the People's Republic of China 1979-1982*, Beijing, Foreign Languages Press, 1987.

[26]See Articles 2 and 5 of the Basic Law of the Macau SAR.

[27]Article 2 of Macau Basic Law:
"The National People's Congress authorizes the Macau Special Administrative Region to exercise a high degree of autonomy and enjoy executive, legislative and independent judicial power, including that of final adjudication."

[28]Article 5 of Macau Basic Law:
"The socialist system and policies shall not be practised in the Macau Special Administrative Region, and the previous capitalist system and way of life shall remain unchanged for 50 years."

[29]Article 5 of PRC constitution:
"The state upholds the uniformity and dignity of the socialist legal system. No law or administrative or local rules and regulations shall contravene the constitution..."

[30]Article 6 of PRC constitution:
"The basis of the socialist economic system of the People's Republic of China is socialist public ownership of the means of production, namely, ownership by the whole people and collective ownership y the whole people..."

CRS-8

SAR "which endangers national unity or security and is beyond the control of the government of the region".[31]

The case of how the Basic Law has been followed in Hong Kong since 1997 may be enlightening, especially in the role played by China in Hong Kong judicial matters. According to Article 19 of the Hong Kong basic law, the supreme judicial authority in Hong Kong is to be held by the Hong Kong judiciary, and China is not to intervene. In fact, several cases have arisen which some observers have noted as instances where China has intervened in Hong Kong autonomy. These include the trial and execution of the kidnapper Cheung Tze-keung in mainland courts,[32] and the trial of Li Yuhai on the mainland for crimes committed in the Hong Kong SAR. More controversial was the recent reinterpretation of an immigration ruling made by Hong Kong's highest court by China's parliament.[33] Since theoretical judicial autonomy is granted to the Macau SAR, were China similarly to intervene in Macau's judicial matters, as might be the case in dealing with Triad crime in Macau, similar controversy might arise after December 20.[34]

A further possible source of contention lies in the issue of citizenship and consular protection for Macanese residents. Unlike the British, who only conferred on Hong Kong residents the status of British National (Overseas) or British Dependent Territories Citizen (BTDC), which passport serves only as a travel document and does not confer the right of abode in the United Kingdom on its bearer, Portuguese authorities have offered full Portuguese citizenship to residents of Macau. China does not however recognize Portugal's right to grant consular protection to what it perceives as "Chinese" residents of Macau. Thus, to Chinese authorities, a Portuguese passport held by an ethnic Chinese resident of the Macau SAR constitutes only a travel document held by someone who is in fact a Chinese national, and does not grant its bearer the consular rights of a genuine Portuguese citizen.[35] After Macau's reversion, Chinese authorities could attempt to try a resident holding a Portuguese passport and deny him or her access to consular protection.

Refusal by the PRC to recognize foreign citizenship has already been seen in several cases not directly related to a resident of an SAR. Harry Honda Wu, a naturalized American citizen who entered China from Kazakhstan with a valid visa on

---

[31]For a much more detailed account of the issues discussed in this paragraph, see Chang and Chuang, 1998.

[32]Martin Lee, *Washington Post,* January 13, 1999.

[33]Cited for example in a Reuters newswire, July 4, 1999. There is evidence of resentment of the role played by China in the Hong Kong Judiciary amongst Hong Kong legal professionals. See *South China Morning Post*, August 16, 1999. Additionally, on June 30, 1999, 600 Hong Kong lawyers marched in opposition to Beijing's reinterpretation of the Basic Law in the Right of Abode case. See *South China Morning Post*, July 1, 1999.

[34]Addendum: The recent refusal by China to admit the Pope into Hong Kong, on the grounds that the Vatican has relations with Taiwan, announced on August 9, 1999, might similarly be classed as a case of China making decisions which might be considered in some respects to violate Hong Kong's statutory autonomy.

[35]See *Economist*, March 27, 1999, pp. 43-44.

CRS-9

June 19, 1995, was arrested by Chinese authorities and denied American consular protection.[36]  Similarly, James Jiandong Peng, an Australian national, was taken on October 13, 1993 from his hotel room in Macau and delivered without extradition proceedings across the border to China, where he was tried and sentenced to 17 years in a mainland prison.[37]  It is clear then that Chinese authorities take very seriously their claim that ethnic Chinese holding foreign passports are subject to Chinese law without foreign consular protection, and we may speculate that similar cases might arise in the case of Macanese residents who hold Portuguese passports.

Another potential issue is the role of the PLA troops to be stationed in Macau after the handover.  The last Portuguese military garrison was removed from Macau in late 1975.  In September 1998, Chinese Vice-Premier Qian Qichen announced that a small PLA garrison would be stationed in Macau after the handover, a unilateral decision made without the consent of Lisbon.[38]  This seems largely to have been welcomed by residents, on the grounds that it would lead to decreased crime in the territory.[39]  Worries have, however, been raised on two counts.  Firstly, by passing a law to accommodate the garrison in Macau, something not discussed in the Basic Law, Beijing is seen as setting a precedent for future constitutional amendments.  Second, since the new law states that the PLA troops will "exercise the same powers as relevant law-enforcement officials when requested by the governor", it has been argued that the military garrison might become a de facto auxiliary police force.[40]

Such objections notwithstanding, the structure of the Basic Law and of the post-1999 government of the Macau SAR allows for the theoretical autonomy of the SAR in a great number of respects.  Section II of Annex II of the Sino-Portuguese Joint Declaration states that the Chief Executive of the SAR is to be selected by "elections or consultations to be held in Macau," and appointed by the Central People's Government.  The candidate selected in this case, Edmund Ho, is a man with significant business experience, who has held positions of authority under the present administration of Macau.  Edmund Ho was selected in preference over rival Stanley Au, in a ballot held by a China-selected committee.

According to Section III of Annex I, the majority of the members of the legislature of the Macau SAR are to be elected.[41]  According to Section IV of the same annex, the power of final adjudication is to be exercised by the court of final appeal of the Macau SAR.  Thus, if the framework established by the basic law is followed, as has largely been the case with Hong Kong, then the Macau SAR may

---

[36]See *The Economist*, London, July 8, 1995

[37]*South China Morning Post*, Hong Kong, July 27, 1996.  See also Martin Lee in the *Washingto Post*, January 13, 1999.

[38]Dow Jones newswire, July 11, 1999

[39]Ibid.; see also *South China Morning Post,* February 1, 1997

[40]Ibid.

[41]According to Annex II of the Macau SAR Basic Law, the legislative body is to be selected on the basis of a combination of direct election, indirect election, and appointment by the PRC.

CRS-10

have significant autonomy. If, however, some of the circumstances discussed above come to be realized in the Macau SAR, then it is possible that the autonomy of the Macau SAR may be viewed as curtailed by Chinese influence in key respects.[42]

# Implications for U.S.-Macau Relations

Macau is less likely to be an issue for U.S. policy than Hong Kong was in 1997. First, Macau's reversion to China, and its associated legislation, the United States-Macau Policy Act of 1999 has a precedent in the case of Hong Kong and the United States-Hong Kong Policy Act of 1992. Secondly, Macau is of less commercial relevance to the United States than Hong Kong, given the latter economy's greater emphasis on trade and international finance. Although the United States receives a large proportion of Macau's exports, the total volume of U.S. trade with Macau remains low, as **Table 3** indicates, and Macau is not among the United States' major export markets.[43]

**Table 2. Trade Relations between the United States and Macau**
(US$ million)

| Year | U.S. percentage of Macau export markets | U.S. Imports from Macau | U.S. Exports to Macau |
|------|------|------|------|
| 1996 | 40.3 | 801.4 | 29.8 |
| 1997 | 45.2 | 968.4 | 67.4 |
| 1998 | 47.7 | 1017.6 | 40.8 |

**Sources:**   Macau DSEC; U.S. Census Bureau

The cases in which Macau has been considered of trade significance to the United States has been with respect to trade regulations. Representative Cox has alleged[44] that Hong Kong has been used as a transshipment point for strategic goods by the PRC. Given the easier (overland) access to Macau from the PRC, this may become of greater significance in the case of the Macau SAR. Furthermore, there are

---

[42]Leung, in *Asian Affairs, An American Review*, Spring 1999 also mentions possible difficulties for China over the relationship between Macau and its islands of Taipa and Colonne, as well as the establishment of an anticorruption organization as suggested in Article 60 of the Macau Basic Law. Additionally, she anticipates potential difficulties stemming from the failure until now to strengthen the independence of the Macau civil service and judiciary, which had grown reliant on Portuguese expertise and guidance.

[43]By comparison, in 1998 U.S. exports to Hong Kong were valued at 12,923.5 million dollars, while imports from Hong Kong came to 10,538.4 million dollars. The major export of Macau is textiles; according to statistics from the Macau AMCM, between 1991 and 1996 approximately 75 percent of Macau's exports were textiles.

[44]Cited, for example, in the *South China Morning Post*, July 28, 1999.

CRS-11

also allegations that textile transshipments have been made by the PRC through Macau, evading U.S. import quotas. According to a Reuters newswire of July 29, 1999, the U.S. Commerce Department has determined to deny imports of textiles and clothes from 77 firms in Macau, on the grounds that they are being used to transship textiles manufactured within the PRC.[45]

Even if the nature of U.S. relations with Macau is unlikely to have significant implications for the U.S. economy, it may still be relevant to consider how the policy on which Congress decides will be viewed in the context of the case of Taiwan. As has already been discussed, it seems likely that, if Taiwan were ever to consider uniting with China under article 31, its assessment of U.S. relations with other SARs within China would be a factor in its decision.

Finally, given the commitment made by the United States-Macau Policy act of 1999 to the preservation of the autonomy of, and of civil rights within, Macau[46], such potential breaches of civil liberties and autonomy as have been discussed, were they to occur in Macau, would become directly relevant to U.S. foreign policy. This might be particularly pertinent if China were to use the PLA to crack down on crime in such a way as might be viewed as a breach of human rights. Additionally, were the PRC to deny consular protection to an ethnic Chinese Portuguese national in Macau, this might be seen as a breach of human rights relevant to the United States-Macau Policy act of 1999

---

[45]For more information, consult McGraw-Hill Companies' "Tower Group" bulletin for July 40, 1999, on www.towergroupintl.com. See also: *Inside US Trade*, March 26, 1999.

[46]Sections 2 and 101 of H.R. 825.

# EXHIBIT B

Order Code RS20655
August 17, 2000

# CRS Report for Congress

## Received through the CRS Web

# China: The National People's Congress

Samuel Wolfe
Research Associate
Foreign Affairs, Defense, and Trade Division

## Summary

The National People's Congress (NPC) is The People's Republic of China (PRC)'s less-powerful counterpart to the U.S. Congress. Although China's constitution establishes the NPC as the "highest organ of state power," the Chinese Communist Party (CCP) continues to dominate the congress, as it has throughout the NPC's history. During the most recent NPC meeting in March 2000, the congress focused on economic reform, corruption, Falun Gong, and entry into the World Trade Organization. Exchanges between the U.S. Congress and the NPC are expanding.

[For questions about this report, refer to Kerry Dumbaugh, Specialist in Asian Affairs of the Foreign Affairs, Defense, and Trade Division.]

The National People's Congress, a unicameral legislature, is the PRC's counterpart to the U.S. Congress.[1] In recent years, there has been increasing interaction between the two legislatures. This report briefly considers recent developments in the NPC, describes how the NPC works, and discusses exchanges between the two congresses.

## Background

Historically, the NPC has been a mostly symbolic organization.[2] The State Council, whose key seats are filled with Chinese Communist Party politburo members, monopolizes Chinese government power. (The State Council is the PRC's supreme executive organ, which consists of the prime minister, deputy prime ministers and state councillors.) However, under

---

[1] The NPC differs from the U.S. Congress in that it is not powerful, is not democratically elected, meets infrequently, and has no effective autonomy.

[2] George E. Delury and Deborah A. Kaple ed., *World Encyclopedia of Political Systems and Parties, 3rd Edition.* (New York: Facts on File, 1999) 207.

CRS-2

the leadership of Qiao Shi (former NPC chairman), the NPC showed some signs of asserting itself beyond its traditional role as a rubber-stamp legislature.[3]   Qiao was the chairman of the Eighth NPC Standing Committee from 1993 to 1997; but he failed to retain his position with the commencement of the Ninth Congress in 1998. During his tenure, Qiao – who was also a high-ranking member of the CCP – became known as an advocate of reforms, which included: greater autonomy for the legislature, more power for lower-level people's congresses, rapid economic liberalization, and establishment of the rule of law.[4]

While Qiao's objectives were not clear, he did lead an increasingly assertive congress. He was successful in enacting a variety of economic legislation on "corporate law, labor, urban real estate, contract law, and ethical competition in the market place."[5]  Through his national and international tours he also worked to add legitimacy  to the NPC.   In March 1995, an unprecedented 36.5% of NPC deputies voted against appointing a CCP politburo member to a deputy premiership because they considered him to be poorly suited for the position.[6] The same session was marked by up to a third of deputies voting against or abstaining from key government-sponsored legislation involving State Council control over the Central Bank, education law, and reports of the Supreme Court and the Supreme Procurator's office.[7]  Also under Qiao's leadership of the congress, several senior CCP leaders, including Li Peng, were "humiliated" when they received numerous negative votes during confirmation hearings.[8]   Such incidents were almost unheard of in previous congresses.[9]

The Ninth Congress (the Tenth Congress begins in 2003), held its first session in March of 1998.  As Chairman of the NPC's Standing Committee, Li Peng (who is also the second-ranking CCP politburo member), is the leader of the Ninth Congress. Under Li Peng, who is considered a conservative leader, the NPC reportedly has not been as assertive as it was under Qiao.   During the most recent session, which lasted eleven days and ended on March 15,

---

[3] Ibid.

[4] U.S. Congress, testimony by James R. Lilley, U.S. Ambassador to China (1989-1991), *Qiao Shi - China's Real Reformer,* Federal Document Clearing House, Inc. (1995). Also see Willey Wo-Lap Lam, "Party Leads, Congress Follows," *South China Morning Post* (Hong Kong), March 10, 2000.

[5] U.S. Congress, testimony by James R. Lilley.

[6] Minxin Pei, "'Creeping Democratization' in China," *Journal of Democracy* 6:4 (1995): 65-79.

[7] Ibid.

[8] Willy Wo-Lap Lam, "The Prospects of Political Liberalization in China" (Washington D.C.: paper presented at a seminar for Project for the New American Century, Oct. 8, 1999), 9.

[9] One important exception to this was a vote over the Three Gorges project.  In 1992, 177 NPC delegates voted against the project, 644 abstained, and 1,764 voted in favor of it.  Ironically, this project began as a pet project of Li Peng, who now heads the NPC. See Joanna Gail Salazar, "Damming the Child of the Ocean: The Three Gorges Project," *Journal of Environment & Development* (June 2000), 160-174.

CRS-3

2000, the NPC approved all of the resolutions that were backed by the Communist Party.[10] Recent NPC actions appear to confirm the remark Li Peng made during the session that "all items of legislation and supervisory work undertaken by the NPC completely and thoroughly follow the line and policies of the [Chinese Communist] party."[11]

Economic reform was a focus of this year's congress. For example, the legislature addressed adjusting agriculture laws in preparation for entry to the World Trade Organization; it also addressed the issue of restructuring state-owned enterprises.[12] The sensitive topic of political reform did not receive any mention.[13] Other prominent topics that the Ninth Congress addressed included corruption, Falun Gong (the congress passed a law banning and criminalizing so-called cults), and entry into the World Trade Organization.

One of the largest issues facing the NPC is corruption. On July 31, 2000, the former Vice Chairman of the NPC's Standing Committee, Cheng Kejie (who served as vice-chairman until April 2000), was sentenced to death for accepting about $5 million in bribes.[14] Cheng is the most senior PRC official to receive this sentence since 1949, when the Communists came into power. PRC president Jiang Zemin has used the high-level sentencing as a basis for reinforcing party loyalty through an ideological campaign of self-criticism and study of his speeches on corruption.[15] This insecurity within the congress over corruption, firm leadership by CCP leader Li Peng and other top CCP leaders who continually stress party loyalty, together with a long history of the NPC acting in relative unity with party leadership, work to keep the NPC in its role as a rubber-stamp congress.

## A Description of the NPC

The PRC's constitution names the NPC as China's "highest organ of state power."[16] In reality, however, the congress mostly acts as a reflection of CCP policies and decisions. Li Peng, the current NPC Chairman, is the second highest-ranking official in the Chinese Communist Party. The highest-ranking CCP official, Jiang Zemin, is also President of the PRC, General Secretary of the CCP, and Chairman of the Central Military Commission. In the PRC's one-party system, the CCP exercises control over the NPC as it does all other organs

---

[10] William Kazer, "Party Resolutions Given Swift Stamp of Approval," *South China Morning Post* (Hong Kong), March 16, 2000.

[11] Lam, "Party Leads, Congress Follows," *South China Morning Post* (Hong Kong), March 10, 2000.

[12] For an in-depth discussion of economic reform in China see CRS Report RL30519, *The Growth of the Private Sector in China and Implications for China's Accession to the World Trade Organization* and CRS Report IB98014, *China's Economic Conditions: Issue Brief,* both by Wayne Morrison.

[13] Lam, "Political Reform Not on the Agenda," South China Morning Post, March 7, 2000.

[14] New York Times, Aug. 1, 2000.

[15] Lam, *South China Morning Post,* Aug. 3, 2000.

[16] The Constitution of the People's Republic of China is available at [http://www.china-embassy.org/cgi-bin/china.pl?E1]. Articles 57-78 detail the NPC.

CRS-4

of state power. Keeping the prominent role of the CCP in mind, this section details the powers legally granted to, although not fully exercised by, the NPC.

According to the PRC's constitution, the NPC is to conduct the legislative functions of the state. Legislative powers of the NPC include the authority to do the following:

- amend the constitution;
- oversee the enforcement of the constitution;
- administer both the state budget and the plan for national economic and social development;
- make declarations of war; and
- enact, amend, and repeal statutes and resolutions.

The constitution also grants the NPC power to both elect and remove from office the president of the PRC, the vice-president, the chairman of the State's Central Military Commission, the president of the Supreme Court, and the procurator-general of the Supreme People's Procuratorate. The PRC's constitution likewise grants the NPC power to confirm presidential nominations to the positions of premier of the State Council, vice-premiers, state councillors, ministers, auditor-general, and secretary-general of the State Council. Likewise, the NPC is charged to confirm the chairman of the Central Military Commission's nominations for the Central Military Commission.

The NPC is composed of just under 3,000 deputies who are elected for a period of five years by people's congresses at the provincial and municipal levels and by units of the armed forces.[17] PRC electoral law allows for direct elections of deputies to the lowest-level people's congresses.[18] (Low-level people's congresses are at the level of counties, cities not divided into districts, municipal districts, townships and towns.) Low-level people's congresses in turn elect delegates to provincial and municipal people's congresses. These congresses elect NPC deputies from CCP-approved lists of candidates. CCP election committees oversee this process to ensure party loyalty, consider candidates' political and social backgrounds, and provide representation of various ethnic and socio-economic groups.[19] More than eighty percent of NPC delegates are CCP party members.[20] About twenty percent of NPC delegates are women.

---

[17] Delury and Kaple ed., 207. See also The Economist Intelligence Unit, *Country Report: China, Mongolia* (May 2000), 5.

[18] Laws of the People's Republic of China, 1995: Electoral Law (Amended). *Electoral Law of the National People's Congress and Local People's Congresses of the People's Republic of China.*

[19] Thomas Lum, Foreign Affairs Analyst, Congressional Research Service, unpublished memo, September 1, 1999.

[20] Ibid.

CRS-5

Congressional delegates meet one time each year (usually in March) for a duration of two or three weeks.[21] The Constitution says that all NPC deputies may submit bills and proposals to the Congress and address questions to the State Council or the ministries and commissions under the Council. Statutes and resolutions are adopted by a majority vote of more than one-half of all the delegates to the NPC.[22]

The NPC elects the Standing Committee of the NPC (from a CCP-approved list) for a five-year term. The current Standing Committee leadership is composed of Chairman Li Peng, twenty vice-chairmen (including two women), Secretary General He Chunlin, and nine deputy secretaries general.[23] The Standing Committee is supposed to supervise the PRC's State Council. It also conducts the NPC's business while the whole NPC is not in session.[24]

The NPC maintains a system of special committees including the Nationalities Committee, the Law Committee, the Finance and Economic Committee, the Education, Science, Culture and Public Health Committee, the Foreign Affairs Committee, and the "Overseas Chinese" Committee. The Standing Committee directs these special committees except when the NPC is in session. According to the constitution, special committees "examine, discuss and draw up relevant bills and draft resolutions under the direction of the National People's Congress and its Standing Committee."[25] However, the State Council, which consists primarily of CCP politburo officials, drafts the most important legislation for the NPC.[26]

NPC deputies also act as intermediaries between the CCP and Chinese citizens. They do this by monitoring the application of national laws, inspecting government offices and activities, receiving and registering complaints by the people, collecting views of constituents, and promoting the CCP's party line.[27]

## U.S.-PRC Congressional Exchanges

There is growing exchange between members of the U.S. Congress and the NPC. In 1996, at the invitation of the Foreign Affairs Committee of the NPC, a delegation from the U.S. Association of Former Members of Congress spent about nine days visiting China. In return,

[21] Barry Turner ed., *The Statesman's Yearbook* (New York: St. Martin's Press, 2000), 445.

[22] PRC Constitution, articles 57-78.

[23] The Europa World Year Book 1999 (London: Europa Publications Limited), 947. Also see China Economic Information Network, *9th National People's Congress Standing Committee,* March 16, 1998. Available at [http://www.cei.gov.cn/sicnet/siccew/echn/a2/a2_ld2.htm].

[24] PRC Constitution, articles 57-78.

[25] Ibid., art. 70.

[26] Minxin Pei, "'Creeping Democratization' in China," *Journal of Democracy* 6:4 (1995): 65-79. See also Orville Schell and David Shambaugh ed., *The China Reader: The Reform Era* (New York: Vintage Books 1999), 58-61.

[27] Thomas Lum, Foreign Affairs Analyst, Congressional Research Service, unpublished memo, September 1999.

CRS-6

a delegation from the NPC's Standing Committee visited Washington, D.C. in October 1999.[28]
The NPC delegation's October 1999 visit marked the beginning of the U.S.- China
Interparliamentary Exchange Group. This group is currently chaired by Representative Donald
Manzullo of Illinois.[29]

During the NPC delegation's October 1999 visit, NPC leaders met with U.S.
congressional and other government leaders. The focus of their visit was four seminars with
representatives from the U.S. Congress. These sessions focused on the following four
categories: (1) China's domestic political situation, including the construction of a legal system,
rural elections, and Tibetan issues; (2) the systems of the NPC and U.S. Congress; (3) U.S. –
China Relations and security issues; and, (4) economic and trade exchange, with sustainable
development. The two congresses are planning for another NPC delegation visit in spring of
2001.[30]

During these early exchanges between the two congresses, NPC Standing Committee
leaders have expressed a great deal of interest in the workings of the U.S. Congress and in the
U.S. legal system. This interest parallels the Chinese government's current focus on economic
reform and establishing the rule of law – which is necessary for China to join the World Trade
Organization and successfully integrate itself into the world economy. Constructive exchange
between the NPC and U.S. Congress may contribute to the development of the NPC into a
more powerful legislative body as the PRC grapples with sensitive political changes that may
follow the massive economic changes taking place in their country.

---

[28] *Congressional Record.* "Reception of Former Members of Congress," May 17, 2000.
Available
at [http://www.congress.gov/crtext/106query.html].

[29] Congress, House, *Conference Report on H.R. 4328, Making Omnibus Supplemental
Appropriations for Fiscal Year 1999,* 105th Congress., *Congressional Record,* daily ed.
(October 19, 1998): H11329. This report recommended $150,000 for interparliamentary
exchanges with Korea and China, under Title IV, "State Department and Related Agencies."

[30] Congressman Manzullo's office, interview by author, August 8, 2000, Washington, D.C.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MORRIS D. DAVIS,

       Plaintiff,

             v.

JAMES H. BILLINGTON, in his official
capacity as the Librarian of Congress, and
DANIEL P. MULHOLLAN, in his individual
capacity,

       Defendants.

Case No. _____

**DECLARATION OF
HAROLD C. RELYEA**

I, Harold C. Relyea, of Falls Church, VA, hereby declare and state as follows:

1.      I was on the staff of the Congressional Research Service (CRS) of the Library of Congress from November 1971 until January 2009.

2.      I submit this declaration based on my personal knowledge in support of the plaintiff in the above-captioned case.

### Background

3.      I joined the staff of the Congressional Research Service (CRS) of the Library of Congress as a GS-12 Analyst in American National Government on November 8, 1971. I was subsequently promoted on the basis of merit and achievement, becoming a GS-15 Specialist in American National Government during the latter half of 1976. I remained at that grade level, the highest in my position series, until my retirement from CRS on January 30, 2009.

4.      CRS was established by provisions of the Legislative Reorganization Act of 1970. It is the successor to the Legislative Reference Service (LRS), which was functionally mandated by statute in 1914 and formally organized by provisions of the Legislative Reorganization Act of 1946.

5.      During my tenure with CRS, while continuing to fulfill the research responsibilities of my position, I served on two occasions as a supervisor of a staff section in my CRS division and on one occasion served as Acting Assistant Chief of my division. I also served as the editor of the now defunct CRS Review in 1987, and, during the latter half of my career, I mentored at various times several new hires to the CRS staff.

6.      In recognition of my performance during my career with CRS, I received 27 CRS Incentive and Achievement Awards for accomplishment as an individual or member of a group and two Library of Congress Meritorious Service Awards. In 2008, I received the CRS

1

Director's Award, the citation for which read: "For your outstanding contributions in support of the United States Congress and to the mission of the Congressional Research Service."

7.      I received a Bachelor of Arts degree from Drew University in 1966 and Doctor of Philosophy degree in government from The American University in 1971.  I have lived in the Falls Church, Virginia, area for the past 25 years.

### Research and Publication

8.      As a result of my graduate education and association with faculty members who were social science practitioners, I was instilled with a strong respect for the value of social science research and the public dissemination of the findings and results of such research.  As a graduate student, I produced research products which were either accepted for publication or presented at professional conferences.

9.      As an indication of my interest in, and support of, research production and publication, I came to serve on the editorial boards of several journals where I functioned as a peer reviewer of submissions and an editor of accepted manuscripts.  These journals, with years of service indicated, included: Presidential Studies Quarterly (1979-1999), Government Publications Review (1981-1983), Transnational Data Report (1982-1989), Journal of Media Law and Practice ((1982-1995), Government Information Quarterly (1984-    ), International Journal of E-Government Research (2004-2008), Journal of E-Government ((2004-2008), and Journal of Information Technology and Policy (2007-2009).

10.      Of related pertinence, I served two terms (1983-1988) on the Committee on Scientific Freedom and Responsibility of the American Association for the Advancement of Science (AAAS).  My invited participation came at a time when security restrictions on scientific communication were very much an issue.  In addition to assisting with, and participating in,

2

discussion forums organized and sponsored by the committee regarding this issue, I developed

and edited a monograph, which included an essay of my own, published by AAAS, on the issue:

Striking A Balance: National Security and Scientific Freedom — First Discussions (1985).

Subsequently, I wrote a book on the matter:  Silencing Science: National Security Controls and

Scientific Communication (1994).

**Publication and CRS**

11.     When I joined the CRS staff in late 1971, the CRS Director was Lester Jayson, an

attorney who had risen to the leadership position after having been head of the LRS American

Law Division.  During his tenure as the head of CRS, there was an expectation that draft

manuscripts prepared for publication outside of CRS would be submitted to his office for

prepublication review.   The standard for such a review was to determine if a manuscript,

designed for external publication, might impair or otherwise jeopardize the author's value to

CRS.  Authors were offered a judgment on the negative career effects of their written product,

and left to determine for themselves what adjustments were to be made, including the possibility

of abandoning publication.

12.     I met with Mr. Jayson in the early months of 1972 regarding a piece of outside

writing, to which he had no objections.  He was, however, curious as to why I wanted to publish,

and inquired as to whether or not I thought other new hires, like myself, would be inclined to

pursue outside publication.  I apprised him that such publication was a normal, if not to be

expected, professional activity by young social scientists; reminded him that he, himself, had

published in the area of torts law; and indicated that other new hires might likely pursue such

outside publication.  He accepted my response without dispute or counter-argument.

3

13.     Mr. Jayson was succeeded as CRS Director by Gilbert Gude (1977-1985), who had served as the elected Representative from the Eighth Congressional District of Maryland for ten years prior to his retirement in 1977.  While Mr. Gude left the outside writing review expectation of his predecessor intact, he encouraged CRS staff contact with policy persona — interest group representatives, journalists, and private think tank research personnel — and was otherwise supportive of CRS staff participation in a wide variety of panel discussions and publication regimes.  It was not uncommon, in my experience, for him to drop into one's office, casually and unannounced, to inquire about what one was working on, in terms of both CRS efforts and external activities.

14.     Upon his retirement, Mr. Gude was succeeded by Joseph Ross (1986-1993), a former government attorney who had risen to the leadership position after having been head of the CRS American Law Division.  During his tenure, Mr. Ross terminated the expectation that manuscripts prepared by CRS staff for publication outside of CRS would be reviewed by his office.  He appeared to otherwise support the position of his immediate predecessor, encouraging CRS staff contact with a variety of policy persona and supporting CRS staff participation in a wide variety of professional group discussions and publication regimes.

15.     Upon his retirement, Mr. Ross was succeeded by Daniel Mulhollan (1994-   ), a career CRS employee who had served temporarily as Deputy Librarian of Congress immediately prior to his appointment to the CRS leadership position.  He offered that CRS staff might voluntarily submit drafts of manuscripts intended for outside publication to the CRS Review Office, but did not reinstitute the previous expectation of prepublication review.  Such voluntary submission, however, was problematic for CRS employees:  failure to do so could potentially have unpleasant consequences if controversy resulted, and if a submission were made, that could

4

also have similarly unpleasant consequences if the suggested modifications were not accepted by

the employee.  More perplexing was a January 2004 Director's statement emphasizing neutrality

in the public dissemination of research results  — publications and other presentations — outside

of CRS.  The Legislative Reorganization Act of 1970 directs that the assistance provided by CRS

to Congress shall be "without partisan bias," but makes no reference to the otherwise nebulous

concept of neutrality.  I never understood what "neutrality" meant in the context of my role as an

expert, and still do not understand what that means.  I am also not certain about the origins of

this standard or if its prescription was in accordance with court declarations regarding

constitutionally established procedures for the congressional enunciation of such policy *(INS* v.

*Chadha*, 462 U.S. 919 (1983)) or the authority of Library of Congress officials to

administratively prescribe same.

### Experience with CRS Review of Outside Publications

16.     During my tenure as a CRS employee subject to the expectation of review of

outside writing during the tenure of Directors Jayson, Gude, and Ross (until the last of these

terminated this expectation), I did not experience a situation when a draft manuscript authored by

myself encountered any objections or criticism from CRS leadership.  After Director Ross

abandoned the expectation of prepublication review position, I did not submit any manuscript I

had prepared for outside publication for review by CRS officials.

17.     During my 37 year tenure, I published numerous materials on policy and other

issues in sources outside of CRS.  Specifically, I wrote in excess of 300 books, articles, book

chapters, encyclopedia entries, book reviews, and speech, explication, and non-congressional

testimony texts.  Among these last materials were presentations to officials of the municipal

government of Shanghai and invited testimony on two occasions before a committee of the

European Parliament. There were, as well, various oral presentations during this period. Reflective of this experience is a citation from a 1983 Executive Board Award for Superior Public Service from the American Society of Access Professionals, an organization largely composed of federal employees responsible for administering open records laws such as the Freedom of Information Act and the Privacy Act of 1974. The award citation reads: "For exemplary service as an author and speaker in significantly enhancing public knowledge and understanding of fair information practice laws and policies."

18.     Despite this large volume of outside writing and speaking materials, during my entire 37 years of employment with CRS, I did not encounter any criticism by CRS officials or from any quarter of Congress regarding any published writing by myself, or any comment that I had compromised my ability to serve as an objective CRS employee by expressing my opinions publicly.

19.     Although I attempted to express a disclaimer in my published writings that the expressed views were personal and not institutional, I find, upon a review of the record, that I was not always consistent in this regard. I was never admonished or disciplined in any manner for not including such a disclaimer. I am not aware of any CRS employee who was terminated simply because he or she did not include such a disclaimer.

20.     My publication and speaking outside of CRS were compatible with my duties and responsibilities as a CRS employee. They provided me with a basis for engaging with other scholars examining the same issues and with practitioners involved in those issues, which is critical to becoming an expert in an intellectual field.

21.     My writing and speaking outside of CRS did not compromise my ability to serve as an effective and objective CRS employee, and did not result, to my knowledge, in any

6

Member of Congress or congressional staff person questioning my objectivity or nonpartisanship due to my having expressed opinions on controversial policy issues in my publications or speaking outside of CRS.

22.     My writing and speaking outside of CRS in which I expressed opinions on policy issues also did not, to my knowledge, harm the reputation of CRS with Congress or impair CRS's ability to work with Congress.

23.     During my tenure with CRS, it was my understanding that it was permissible to engage in writing and speaking outside of CRS, so long as the views expressed were not partisan. During the past few years, however, with the introduction of, and emphasis upon, "neutrality" in published writing and speaking outside of CRS, I have not understood that vague standard and have not been certain as to what expression was not permissible.

24.     My experience as a CRS employee was most challenging and rewarding.  As a consequence of my experience with CRS, I continue to have a high regard for the institution and the mission it serves, and to urge talented and resourceful social scientists to join its ranks.

Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 6, 2010

HAROLD C. RELYEA

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MORRIS D. DAVIS,<br><br>              Plaintiff,<br><br>                        v.<br><br>JAMES H. BILLINGTON, in his official capacity as the Librarian of Congress, and DANIEL P. MULHOLLAN, in his individual capacity,<br><br>              Defendants. | Case No. _____<br><br>**DECLARATION OF<br>MORTON ROSENBERG** |

I, Morton Rosenberg, of Rockville, Maryland, hereby declare and state as follows:

1.      From December 1972 until my retirement in August 2008, I was an attorney in the American Law Division of the Congressional Research Service ("CRS"), a non-partisan think tank for the Congress.  The Law Division is a law firm for the Congress, and I was a senior attorney assisting individual Members of Congress and congressional committees regarding legal issues of major importance by means of consultations, briefings, and the preparation of comprehensive confidential memos and reports, and by attendance at hearings, mark-up sessions, and meetings as an advisor in the areas of constitutional law (and, in particular, matters involving separation of powers questions), congressional practice and procedure, administrative law, appropriations law, labor law, and sports law.  I graduated from New York University (BA 1957) and Harvard Law School (LL.B. 1960).

2.      I submit this declaration based on my personal knowledge in support of the plaintiff in the above-captioned case, Colonel Morris Davis.

3.      Among the more significant topical issues of my concern were the scope of congressional oversight and investigatory prerogatives vis-à-vis the Executive Branch and private sector subjects, including questions involving citations for contempt of Congress and the validity of claims of executive, attorney-client and work product privileges before committees; congressional review of agency rulemaking; presidential temporary and recess appointments and removal powers; executive reorganization; legislative veto; the line item veto; appropriations law, including lapsed appropriations and breaches of the debt ceiling; government information processing, management and dissemination; government oversight institutions (e.g., inspectors general and the Government Accountability Office); negotiability in federal sector labor relations; and  anti-trust and franchise relocation issues related to professional sports activities.

4.      With respect to my specialization in congressional investigations, I assisted in the formulation of information access strategies in almost every domestic investigation from Watergate, ABSCAM, Whitewater, and the Clinton impeachment to the recent confrontation over the forced resignations of United States Attorneys and the successful House litigation overcoming presidential claims of absolute immunity for close advisors. My assistance over the years in these was sought by Members and staff of both political parties.

5.      In 1980 I was promoted to the position of Specialist in American Public Law, a GS-16 position (then called a "supergrade"). In that position I reported directly solely to my Division head, and my written work product, including formal congressional testimony, was subject to limited review by him and the review office of the Director's office. My position, together with Senior Specialist positions (then GS-17's) were created by the Legislative Reorganization Act of 1970 and were to be filled by the Director with analysts with national reputations in 25 or more expressly designated areas of congressional legislative concern. Implicit in that statutory direction was the understanding that occupants of those Senior Specialist and Specialist positions would be required to maintain such national recognition by public writings and lectures in their areas of their expertise, and in fact I was encouraged by my Division head to actively engage in such activities.

6.      Until 2004, there was no requirement that I had to have any prior CRS review of articles I submitted for outside publication or that such written products or oral presentations had to be qualified by a disclaimer that they represented my personal views and not those of CRS. In 2004 I was made aware of a new policy that outside written products and oral presentations had to be accompanied by such a disclaimer. There was still no requirement of prior review.

2

7.      In 1975, I was one of the founding organizers of the Congressional Research

Employees Association ("CREA") and became its first general counsel.  We sought and received

recognition from the Library as the exclusive representative of CRS employees, including GS-16

Specialists, for collective bargaining purposes.  In 1978, CREA successfully persuaded Congress

to include the Library within its newly created labor relations system for Executive Branch

employees, making it subject to the regulation of the Federal Labor Relations Authority.  The

congressional determination was made in the face of adamant opposition of the Librarian of

Congress and the CRS Director on the ground that membership in a labor organization that had

negotiability rights and the right to raise adverse action challenges created an inherent conflict of

interest with CRS employees' responsibilities to serve Congress in a non-partisan , objective

manner.  After the passage of the Congressional Accountability Act in 1995 and the creation of

the Office of Compliance (a legislative office) as the administrative and enforcement body for

the Act, the Library and CRS have at least three times sought a ruling from that Office that it

should exercise its authority to bring the Library's labor relations program under its exclusive

purview, arguing again the perceived conflict of interest problem.  Each time, the Office has

refused the request, noting the historic efficacy of the program under the present system and

rejecting the Library's position that having a union compromised CRS employees' abilities to be

non-partisan and objective.

8.      In 1991, Congress passed the Federal Employees Pay Comparability Act which,

among other things, abolished the "supergrades" and established a senior level pay system.  The

effect of the Act was to allow CREA to bargain over the creation of a senior level pay system for

the then 23 Specialists in the bargaining unit.  Those negotiations commenced in 1991 and were

concluded in 1995.  The agreement established a "pay for performance" scheme that required all

Specialists to demonstrate each year that they had satisfactorily accomplished three performance factors: (1) the quality and quantity of written products for members and committees, (2) the quality of the work done for committees, and (3) the demonstration of "intellectual leadership" during the year. Each factor is graded from unsatisfactory to outstanding which would determine the amount of the Specialist's bonus award. Unsatisfactory would mean no award and a possible demotion out of the senior level; outstanding entitles the Specialist to the maximum yearly award (the amount differed over time and in 2008 was $10,000). In each such annual narrative for this purpose, I would include, usually in the intellectual leadership description, a detailed account of any outside publications or speeches or lectures I had given during the year. In addition, during the narrative on work I had done for committees, I described the nature of the work I did for the committees that had not been reviewed by my Division head or the review office; that is, the non-written advice and suggestions that I communicated, and how they were received. Thus, in one way or another, I made CRS aware of everything I was doing and saying over the years.

9.      I received an outstanding rating for every year from 1991 to 2008. In addition, in most of the years I received one or more special commendation awards for particular things I had done, such as teaching a course on legislative process for analysts from all CRS divisions. In 2005 I was the recipient of the 2004-2005 Mary C. Lawton Award for Outstanding Public Service by the American Bar Association Section of Administrative Law and Regulatory Practice, the only time, before or since, the Award has been given to a Legislative Branch attorney.

10.      As I have indicated, throughout my tenure, I dealt with issues of significant constitutional, legal, and/or political sensitivity. My style, in writing or in personal contacts was usually blunt and direct where my research and analysis lead me to a firm conclusion. I often

told Members, chairs, and key staffers what they did not want hear: that the House was a

majoritarian institution and that individual House members had virtually no rights with respect to

investigative oversight unless they were chairs of committees or subcommittees; that provisions

that had been proposed were unconstitutional legislative vetoes or line item vetoes or violated the

Appointments Clause or were bills of attainder.  I criticized legislation such as the Congressional

Review Act as inoperable and ineffective and suggested remedial changes that could be effected

with new legislation and even by internal rule changes.  I criticized the failure of congressional

committees for over a decade to conduct aggressive and consistent oversight of the Executive as

an abdication of their constitutional obligation to maintain and vindicate the Congress's co-equal

role in our scheme of separated powers.  I criticized the Executive as usurping congressional

powers with its ever broadening claims of executive privilege and the notion of a unitary

executive which deprived the Congress of information essential to performing its legislative

duties, and specifically criticized those public officials who were responsible for these decisions.

I did all this, and more, through confidential memos, CRS reports, informal briefings, articles in

major law reviews, and in speeches for groups as varied as the Heritage Foundation, the Project

on Government Oversight (POGO), and the American Bar Association, with the full awareness

and support of the Congressional Research Service.

      11.    I always believed that by providing these candid, but often critical, opinions, I

was reflecting the professionalism, reputation, and mission of CRS as a whole and that outside

speaking, writing, lecturing and teaching activities provided important opportunities for me and

my CRS colleagues for professional, career and personal growth.  I found that those occasions

generated interactions and contacts with academic or professional colleagues in my fields and

helped advance my research and speaking skills.  They also provided invaluable opportunities for

feedback on my analyses and often offered me innovative theories and hypotheses that tested and honed my assumptions.  Perhaps most importantly, outside activities contributed to my public recognition and standing as a CRS analyst who was expert in his subjects which I believe reflected positively on the reputation and esteem of CRS with Congress as a support agency that could be relied on.  In sum, my outside speaking and writing, including my pointed critiques, did not compromise my ability to serve as an effective CRS analyst for over 35 years.

12.     In no instance did a Member ever question my objectivity or non-partisanship due to opinions expressed by me on controversial policy issues in any outside speaking or writing activities.  Nor did a Member ever question CRS's ability to serve Congress as an objective, non-partisan entity because of any opinions I voiced in my outside activities.

13.     On occasion a Member would complain about analyses and reports prepared by CRS analysts, including myself.  In my experience such complaints dealt with disagreements about conclusions and not about the propriety or conduct of the analyst.  In one instance a Ranking Minority Member who had been frustrated with his inability to get information from an agency filed a law suit seeking a court order compelling the agency head to turn over certain documents based on a provision of law that stated that if seven members of his committee demanded documents, the agency head had to oblige.  During a semi-annual law update session the Law Division gave for Members and staff, I discussed the case.  I noted that more than 25 years before I had opined that there was no express enforcement provision in that statute and that it was unlikely that a court would imply one since it would effectively give subpoena power to a group of Members, something no House had ever done, a view I had expressed many times over the years. The Member complained that my oft-stated view showed I was not objective.  I suggested that another attorney in the Law Division take a fresh look at the issue.  That attorney

agreed with my analysis, as did a district court that dismissed the suit.  Before the Member could

file an appeal, a mid-term election made that Member a majority party member who soon would

be the chair of that committee.  No appeal from the lower court ruling was taken.

14.     I have read the Wall Street Journal and Washington Post writings that led to Col.

Davis's termination.  From a scholarly perspective, based on my 35 years engaged in scholarly

research and writing, Col. Davis's background as a Guantanamo special prosecutor provides him

a special expertise and knowledge of the prosecutorial facts and issues that were the subject of

his writings, which makes him uniquely situated to express his opinions on these important

policy matters.  The Journal article reflects an effort to encourage a reassessment of a policy

decision of the Executive based on his actual hands-on experience; the Post letter essentially

corrects factual misunderstandings with respect to outcomes of three prosecutions that had taken

place.  Neither writing is associated with CRS, and it is made clear that he is talking with

reference to his prior experience as a prosecutor in Guantanamo, not with respect to anything

based on his current unstated employment status.

15.     Comments I made in my outside writings and presentations, and even in many of

my reports, memos and official presentations to Members and staff, were far more critical and

pointed with respect to perceived executive and congressional failings than those in Col. Davis's

writings, including his criticism of the decisions and opinions of Attorney General Holder,

former Attorney General Mukasey and former Vice President Cheney.  I often criticized public

officials by name in the context of expressing my opinions on policy matters, such as when I

objected to then-Attorney General Mukasey's action stopping the United States Attorney for the

District of Columbia from presenting to a grand jury contempt of Congress citations to Harriet

Miers, Karl Rove and other Bush administration officials for failing to appear in response to

subpoenas issued by Congress, and when I criticized the 2004 opinion of the Assistant Attorney

General Jack Goldsmith of the Office of Legal Counsel for expanding the scope of presidential

executive privilege and the notion of a unitary executive without a scintilla of case law authority.

I was never disciplined or reprimanded in any manner for any of these comments, including the

time when a Member specifically complained that my public opinions had rendered me biased.  I

am not aware of any other CRS employee who has been terminated for engaging in outside

speaking or writing.

16.     If there is fault here, it is in the essential vagueness and uncertainties of the CRS

outside writing rules, which I never understood.  The Director's dismissal letter, which I have

read, does not assert concrete evidence of damage to CRS's reputation.  There has been a lot of

turnover at CRS recently, as people like myself have recently retired and many others are nearing

the end of their careers, and there are a lot of young, new analysts at CRS now, making this a

critical time for CRS.  As someone who deeply cares for and values CRS and its legacy, I am

concerned that the real damage of this incident is to the morale and professionalism of CRS

analysts in the future.  If an Assistant Director can be terminated for publicly expressing his

personal views, I worry what this means for younger employees, and I am troubled that the likely

result will be that they refrain from engaging in the very activities which will enable them to

become the effective experts that Congress needs.

Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on the ___6th___ day of January 2010.

Morton Rosenberg

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MORRIS D. DAVIS,

　　　　　Plaintiff,

　　　　　　　　v.

JAMES H. BILLINGTON, in his official
capacity as the Librarian of Congress, and
DANIEL P. MULHOLLAN, in his individual
capacity,

　　　　　Defendants.

Case No. _____

## DECLARATION OF FREDERICK V. MULHAUSER

I, Frederick V. Mulhauser, hereby declare and state as follows:

1.　　　I am a member of the Bar of the District of Columbia (No. 455377) and am co-counsel for the plaintiff in the above-captioned case.  I am a staff attorney at the American Civil Liberties Union of the Nation's Capital.

2.　　　I submit this declaration on behalf of the plaintiff's motion for a temporary restraining order or, in the alternative, a preliminary injunction against the defendants.

3.　　　Accompanying this declaration are true and correct copies of the following documents, which are referenced in the memorandum of points and authorities in support of the plaintiff's motion for a temporary restraining order or, in the alternative, a preliminary injunction.

4.     Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury

that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed on January 8, 2010

FREDERICK V. MULHAUSER

<u>Document</u>                                                                           <u>Exhibit</u>

Henry Cohen, Letter to the Editor, *Truth, Confessions and Torture*,
N.Y. Times, Mar. 16, 2007 ........................................................................ A

Henry Cohen, Letter to the Editor, *Justices Raise Overlooked Point
in Virtual Porn Case*, Legal Times, Apr. 29, 2002 ...................................... B

Henry Cohen, Letter to the Editor, *Silent Justice Screams for
Thomas to Step Down*, Legal Times, Oct. 15, 2001 .................................... C

Henry Cohen, Letter to the Editor, *Bill Silent on Labeling
Authority*, Legal Times, Aug. 21, 2000 ....................................................... D

Henry Cohen, Op-Ed., *When Smut Hurts*, Legal Times, Aug. 14,
2000 .............................................................................................................. E

Henry Cohen, Letter to the Editor, *A Restatement of Torts*, Legal
Times, Mar. 13, 2000 ................................................................................... F

Henry Cohen, Letter to the Editor, *It's Time to End the Drug
Prohibition*, Legal Times, July 26, 1999 .................................................... G

Henry Cohen, Letter to the Editor, *Should McVeigh Receive the
Death Penalty?*, N.Y. Times, June 5, 1997 ................................................. H

Henry Cohen, Op-Ed., *'Reefer Madness' Theory Won't Die*,
Baltimore Sun, Feb. 27, 1997 ...................................................................... I

Pamela A. Hairston, Letter to the Editor, *Divided and Unruled*,
Wash. Times, Nov. 30, 2009 ......................................................................... J

Pamela A. Hairston, Letter to the Editor, *Pardon Me for Begging
Your Pardon*, Wash. Times, Oct. 20, 2009 .................................................. K

Pamela A. Hairston, Letter to the Editor, *What's Really Behind the
Vick Controversy*, Pa. Daily News, Sept. 1, 2009 ........................................ L

Pamela A. Hairston, Letter to the Editor, *Remember History Before
It's Forgotten*, Wash. Times, May 31, 2009 ................................................ M

Pamela A. Hairston, Letter to the Editor, *Study Black History*,
Wichita Eagle, Oct. 8, 2008 ......................................................................... N

Pamela A. Hairston, Letter to the Editor, *Race Always Matters*,
USA Today, Sept. 24, 2008 ........................................................................... O

Pamela A. Hairston, Op-Ed., *Black or White, Will He Care?*,
Wash. Post, Aug. 3, 2008...............................................................................P

Pamela A. Hairston, Letter to the Editor, *The Popularity of
Kwanzaa*, Wash. Post, Jan. 7, 2008 .............................................................Q

Pamela A. Hairston, Letter to the Editor, *The Need to March*, L.A.
Times, Nov. 21, 2007....................................................................................R

Pamela A. Hairston, Letter to the Editor, *Don't Call Me Al*, N.Y.
Daily News, Nov. 1, 2007..............................................................................S

Pamela A. Hairston, Letter to the Editor, *The Martinsville Seven*,
Revolution, Aug. 19, 2007.............................................................................T

Pamela A. Hairston, Letter to the Editor, *Other Issues Matter
More*, Detroit News, July 19, 2007...............................................................U

Pamela A. Hairston, Letter to the Editor, *Reparations for Slavery
Would Trigger America's 2nd Civil War*, The Hill, Mar. 14, 2007.............V

Pamela A. Hairston, Letter to the Editor, *Slavery in Virginia Isn't
Only Injustice*, L.A. Times, Mar. 2, 2007....................................................W

Pamela A. Hairston, Letter to the Editor, *Winfrey Told Truth on
Scorn for Schools*, Baltimore Sun, Jan. 16, 2007........................................X

Pamela A. Hairston, Letter to the Editor, BusinessWeek, Sept. 11,
2006...............................................................................................................Y

Pamela A. Hairston, Letter to the Editor, *Inequity at LOC*, Roll
Call, Oct. 26, 2006 .......................................................................................Z

Pamela A. Hairston, Letter to the Editor, *Thanks, Cos*, Wash.
Times, Aug. 31, 2006...................................................................................AA

Pamela A. Hairston, Letter to the Editor, *Direct Assistance Where
It's Really Needed*, Atlanta J. & Const., May 17, 2006..............................AB

Pamela A. Hairston, *Some Good Has to Come From Tragedy*,
Toronto Star, Sept. 9, 2005 .........................................................................AC

Pamela A. Hairston, Letter to the Editor, *Slavery Reparations*,
Daily Press, July 31, 2005...........................................................................AD

Pamela A. Hairston, Letter to the Editor, *Even Score with Acre and
Chicken*, The Herald, July 25, 2005............................................................AE

Pamela A. Hairston, Letter to the Editor, *History Rules All-White Juries*, Baltimore Sun, May 25, 2005 ........................................................ AF

Pamela A. Hairston, Letter to the Editor, *What Were They Thinking?*, Wash. Times, Nov. 5, 2004 ...................................................... AG

Pamela A. Hairston, Letter to the Editor, *Complainants Can't All Be Wrong*, Roll Call, Oct. 12, 2004 ........................................................... AH

Pamela A. Hairston, Letter to the Editor, *American Monuments*, Independent, Sept. 23, 2004 ....................................................................... AI

Pamela A. Hairston, Letter to the Editor, *'D' for the District*, Wash. Times, Dec. 13, 2003 ........................................................................ AJ

Kenneth Katzman, Panel Discussion, *Iran Capturing Iraq*, Arab-U.S. Policymakers Conference of the National Council on U.S.-Arab Relations, Oct. 2008 ........................................................................... AK

Kenneth Katzman, Interview, *Al-Maliki Demands Timetable for Iraq Withdrawal*, NPR, July 12, 2008 ........................................................ AL

Kenneth Katzman, *Iraq and the U.S. Election*, Emirates Center for Strategic Studies and Research, June 12, 2008 ......................................... AM

Kerry Dumbaugh, *The U.S. Role During and After Hong Kong's Transition*, 18 U. Pa. J. Int'l Econ. L. 333 (1997) ...................................... AN

Ted Dagne, *Somalia: Prospects for a Lasting Peace*, 20:2 Mediterranean Quarterly 95 (Spring 2009) ................................................. AO

Ted Dagne, *Humanitarian Crisis in Ethiopia and Eritrea*, 15:2 Mediterranean Quarterly 38 (Spring 2004) ................................................. AP

# Exhibit A

3/16/07 N.Y. Times A22
2007 WLNR 4963585

New York Times (NY)
Copyright 2007 The New York Times Company

March 16, 2007

Section: A

### Truth, Confessions And Torture

To the Editor:

Re "Suspected Leader of Attacks on 9/11 Is Said to Confess" (front page, March 15):

You report that "Khalid Shaikh Mohammed, long said to be the mastermind of the Sept. 11 attacks. confessed to them at a military hearing held in Guantanamo Bay, Cuba, on Saturday, according to a transcript released by the Pentagon yesterday."

You also report: "Mr. Mohammed indicated in the transcript that some of his earlier statements to C.I.A. interrogators were the result of torture. But he said that his statements at the tribunal on Saturday were not made under duress or pressure."

How do we know that his statements at the tribunal were not made under torture? His statements could have resulted from torture, even if not directly. His having been tortured once was bound to constitute an implicit threat to him that he might be tortured again.

The widespread knowledge that the United States engages in torture constitutes an implicit threat against all detainees, and it is impossible to know if their confessions or any information they provide is true.

Thank you, President Bush.
Henry Cohen
Baltimore, March 15, 2007
To the Editor:

It is unfortunate that we will never know if Khalid Shaikh Mohammed is fully or partly responsible for the 9/11 attacks as he has reportedly confessed.

   Confessions extracted from torture are known to be unreliable. And since he was not afforded constitutional protections (like the right to counsel), this administration's policies have effectively ensured that the confession will never be admissible in a United States criminal court or in any international judicial tribunals.
Laura Beth Nielsen
Evanston, Ill., March 15, 2007
The writer, an assistant professor of sociology at Northwestern University, is a research fellow at the American Bar Foundation.
To the Editor:

   During my years as an interrogator for the United States Army (1986-97), I also provided training in resistance to interrogation for elite NATO troops.

   While teaching those troops how to resist abuse and torture, I learned an important lesson -- a lesson that should be kept in mind when reading the testimony of Khalid Shaikh Mohammed: The confession of a man being tortured is limited only by the imagination of the torturer.
Peter Bauer
South Bend, Ind., March 15, 2007

---- INDEX REFERENCES ---

COMPANY: PENTAGON LTD; AMERICAN BAR FOUNDATION; NORTHWESTERN UNIVERSITY

NEWS SUBJECT: (International Terrorism (1IN37); Sept 11th Aftermath (1SE05))

REGION: (Cuba (1CU43); USA (1US73); Americas (1AM92); North America (1NO39); Caribbean (1CA06); Latin America (1LA15))

Language: EN

OTHER INDEXING: (AMERICAN BAR FOUNDATION; LAURA BETH NIELSEN EVANSTON; NATO; NORTHWESTERN UNIVERSITY; PENTAGON) (Confessions; Henry Cohen Baltimore; Khalid; Khalid Shaikh Mohammed; Mohammed; Peter Bauer; Shaikh Mohammed; Torture)

EDITION: Late Edition - Final

Word Count: 461
3/16/07 NYT A22
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit B

4/29/02 Legal Times 53
2002 WLNR 15055982

Legal Times
Copyright 2002 American Lawyer Media, ALM LLC

April 29, 2002

Section: Points of View; Letters

Volume 25; Issue 17

JUSTICES RAISE OVERLOOKED POINT IN VIRTUAL PORN CASE

Henry Cohen

The majority opinion in Ashcroft v. Free Speech Coalition, which struck down the Child Pornography Protection Act's prohibition on child pornography produced without actual children, included some dicta noted neither by Tony Mauro ["Court: Congress Wen Too Far on Port," April 22, 2002, Page 8] nor any other commentator I've read. "Under the CPPA," the Court wrote, "images are prohibited so long as the persons appear to be under 18 years of age. 18 U.S.C. Section2256(1). This is higher than the legal age for marriage in many States, as well as the age at which persons may consent to sexual relations."

The point of this remark is obscure; the remark seems more relevant to traditional child pornography. It is ironic that a married couple under 18 can legally have sex but legally be photographed having sex consider also that a photograph of a minor engaging in masturbation constitutes child pornography. Masturbation, as far as I know, is illegal in no state, even if done by a minor, why should photographing it be illegal?

Is the answer that, though a married couple under 18 can consent to have sex, and a minor can legally masturbate, they cannot consent to be photographed? Minors are legally incompetent to consent to a contract to be photographed, and, even if a minor receives no payment for being photographed, the photographer's producing the photograph could constitute consideration for the minor's cooperation. But minors can't consent to being photographed for nonpornographic purposes either. Should long prison sentences be attached to photographs of minors engaged in legal activities?

The basis for the ruling in Ashcroft v. Free Speech Coalition was that child pornography may be banned only when the production of the work creates a victim. Whether there is a victim may be a relevant question even in some cases where actual minors are used to produce child pornography.

---- INDEX REFERENCES ----

NEWS SUBJECT: (Health & Family (1HE30); Human Sexuality (1HU27))

Language: EN

OTHER INDEXING: (CHILD PORNOGRAPHY PROTECTION: CONGRESS WEN: COURT; PORN; STATES; TONY MAURO ["COURT) (Coalition; Free: Free Speech Coalition; JUSTICES RAISE OVER-

# Exhibit C

Westlaw

10/15/01 LEGALTIMES 45

10/15/01 Legal Times 45
2001 WLNR 12950876

Legal Times
Copyright 2001 American Lawyer Media, ALM LLC

October 15, 2001

Section: Points of View; Letters

Volume 24; Issue 41

## SILENT JUSTICE SCREAMS FOR THOMAS TO STEP DOWN

Henry Cohen

A book review ["An Enigma Inside a Mystery," Page 23] in the October 8 issue of Legal Times of a new biography of Clarence Thomas [Silent Justice by John Greenya] views the book as taking a "middle ground" on Thomas. The reviewer writes:
"Did Thomas lie in his Senate confirmation hearings? Almost certainly about a few matters, but not across the board." The reviewer did not appear to intend any irony.

A mere lawyer, of course, could face disbarment and imprisonment for lying under oath, but a Supreme Court nominee apparently may do so as long as he confines it to a few matters. Is no one shocked that it has become acceptable to commit perjury at, of all places, one's hearings to be confirmed as a justice of the United States Supreme Court?

If this biography presents strong evidence of Thomas' lying under oath (even once), then the executive branch should prosecute (if the statute of limitations has not run) and the legislative branch should impeach. These two venerable institutions, of course, will not, because they put politics ahead of law and ethics. But the press, including Legal Times, and the bar ought to call for Thomas to resign. And they ought to do so with sufficient outrage to shame him into it.

Please forgive the naivete of this letter.

---- INDEX REFERENCES ---

COMPANY: THOMAS GMBH + CO HANDELS KG

NEWS SUBJECT: (Legal (1LE33))

Language: EN

OTHER INDEXING: (CLARENCE THOMAS; SENATE; SUPREME COURT; THOMAS) (John Greenya; Legal Times; SILENT JUSTICE SCREAMS)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit D

8/21/00 Legal Times 51
2000 WLNR 10520971

Legal Times
Copyright 2000 American Lawyer Media, ALM LLC

August 21, 2000

Section: Points of View; Letters

Volume 23; Issue 34

## BILL SILENT ON LABELING AUTHORITY

Henry Cohen

Ronald D. Rotunda, in "Rated V for Violence" [Aug. 14, 2000. Page 68], fundamentally misreads S. 2497. the Media Violence Labeling Act of 2000. This bill would require motion pictures, videos, video games, and sound recordings to be labeled as to "the nature, context, and intensity of the depictions of violence" they contain and to specify a minimum age for the purchase or use of the product.

Professor Rotunda says that the bill would impose unconstitutional prior restraint on speech because it would require the "literally tens of thousands of video games, songs, and other musical works published each year" to be submitted, before publication, to "whatever licensing board the FTC would create to implement the terms of the bill. If the government bureaucrats are slow to approve, then the delay could last a long time."

The bill, however, says nothing about a licensing board. It says that ""[m]anufacturers and producers of audio and visual media products and services may submit to the Federal Trade Commission a joint proposal for a system for labeling the violent content." If they submit such a proposal, the FTC would review it, modify it as it saw fit, and issue a labeling system. If they do not submit a proposal, then the FTC would develop a system itself. In either event, products could not be sold without a label or sold in violation of the age restriction on the label.

The bill does not say who would decide what label was appropriate for each product. Presumably, therefore, it would be the responsibility of the manufacturers and producers of the products. This conclusion is strengthened by the bill's provision that state attorneys general would have the authority to investigate allegations that a product does not bear a label "that is appropriate." Congress would not likely authorize state attorneys general to investigate the work of an FTC-established licensing board.

The bill does not say that the FTC could not create a licensing board and impose prior restraint. But, as doing so would, as Professor Rotunda notes, be unconstitutional, we must presume that the FTC would not do so.

This letter should not be taken as an endorsement of S. 2497, or of its constitutionality, but only as a disagreement with Professor Rotunda's reading of it.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit E

Westlaw

8/14/00 LEGALTIMES 70

8/14/00 Legal Times 70
2000 WLNR 10524217

Legal Times

Copyright 2000 American Lawyer Media, ALM LLC

August 14, 2000

Section: Points of View

Volume 23; Issue 33

WHEN SMUT HURTS
"COMMUNITY STANDARDS" CAN'T BE USED TO FIND SPEECH HARMFUL TO KIDS FOR REASONS
THAT REACH WELL BEYOND THE INTERNET

Henry Cohen

Can speech be harmful to minors because a community says it is? More precisely, can words or pictures or sounds portraying sex or nudity hurt children solely because a community believes that those words or pictures or sounds appeal to prurient interests? Will the same picture harm a child in Tennessee, but not one in California, just because a Tennessee jury, but not a California jury, concludes that the picture is sexually arousing? Absurd as it may seem, Congress apparently thought that this was the case when it enacted the Child Online Protection Act in 1998. And the U.S. Court of Appeals for the 3rd Circuit did not even notice the absurdity when it upheld a preliminary injunction against enforcement of COPA on June 22. Yet this absurdity is the most fundamental reason why the act is unconstitutional.

Simply put, "community standards" cannot be used to determine whether or not speech is harmful to minors. At least, not if the statute is to survive First Amendment scrutiny.

COPA is the son of the CDA, enacted after the Supreme Court struck down the Communications Decency Act three years ago. The CDA banned "indecency" on the Internet, whereas COPA merely bans the Child material that is "harmful to minors" and does so only on Web sites that seek to earn a profit. Under COPA, material that is harmful to minors must (1) be found, by "applying contemporary community standards . . . with respect to minors . . . [to be] designed to appeal to . . . the prurient interest," (2) be "patently offensive with respect to minors," and (3) "lack[] serious literary, artistic, political, or scientific value for minors."

This three-pronged test, of course, parallels the Supreme Court's test for obscenity. In Miller v. California (1973), the Court defined "obscenity" as material that, pursuant to community standards, appeals to the prurient interest, is patently offensive, and lacks serious literary, artistic, political, or scientific value.

Later, in Pope v. Illinois (1987), the Court indicated that community standards are to determine only the first two prongs. (Under COPA, they apply only to the prurience prong.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

And in Brockett v. Spokane Arcades Inc. (1984), the Court held that prurience does not include provoking "normal, healthy sexual desires," but refers to "a shameful or morbid interest in nudity, sex, or excretion." (COPA does not contain this limitation.) The Court did not provide guidance on the difference between normal, healthy desires and shameful or morbid ones.

Congress also patterned its harmful-to-minors definition in COPA on state statutes that bar the public display or sale to minors of material that is ""harmful to minors." The Supreme Court has upheld one of these statutes, in Ginsberg v. New York (1968).

But in Ginsberg, the Court applied a rational-basis test. Ginsberg did not find that harmful-to-minors material was actually harmful to minors. It found that the existence of harm, though not proved in the case, "has not been disproved either." (What censorship would that standard not permit?) The justices would not follow such reasoning today.

In United States v. Playboy Entertainment Group Inc., decided this May, the Court applied strict scrutiny-not rational basis-to determine the constitutionality of cable TV restrictions designed to protect children. Strict scrutiny means that a statute must advance a compelling governmental interest and do so by the least restrictive means. And it was strict scrutiny that the 3rd Circuit applied in American Civil Liberties Union v. Reno in June when it upheld a federal district court's preliminary injunction against enforcement of COPA. So the Ginsberg decision cannot save the statute from its community standards problem.

COMMUNITY CARES

The 3rd Circuit recognized that "community standards" was the key to COPA. But the court focused on community standards solely as they related to material on the Internet.

The 3rd Circuit reasoned that when one posts something on a Web site, it automatically becomes available to everyone with a computer in any community. Applying community standards to determine what may or may not be put online would inevitably mean that the standards of the most puritanical community would govern the entire nation.

While "the government has a compelling interest in protecting children from material that is harmful to them, even if not obscene by adult standards," the 3rd Circuit concluded, the government "may not regulate at all if it turns out that even the least restrictive means of regulation is still unreasonable when its limitations on freedom of speech are balanced against the benefits gained from those limitations."

All well and good. But the 3rd Circuit overlooked a more fundamental problem with using community standards to define "harmful to minors": The two have no connection.

For there to be a compelling governmental interest in protecting minors from material that is assertedly harmful

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

to minors, the material must actually be harmful to minors. But whether material is harmful to minors cannot depend upon what a particular community thinks. One cannot seriously say that a child is more likely to be hurt by speech if he lives in a community that finds the speech objectionable than if he lives elsewhere. To read COPA more literally, one cannot seriously assert that a child is more likely to be harmed by speech if he lives in a community that finds the speech appealing to prurient interests.

This difficulty in using community standards to define "harmful to minors" does not exist in using community standards to define "obscenity." Why? Because whether speech is harmful to minors is a question of fact, whereas whether it is obscene is a question of taste.

There is no pretense that obscenity hurts individuals. The Supreme Court justifies the denial of First Amendment protection to obscenity as furthering ""the social interest in order and morality." Roth v. United States (1957). Obscenity, in other words, is the one exception to the First Amendment that allows the majority to censor speech simply because it dislikes it.

Using community standards to define obscenity actually makes sense to the extent that a community with less-restrictive standards already has, in the Court's eyes, an inferior level of "order and morality." To apply that community's standards to allow pornography that would be deemed obscene elsewhere would not cause the community additional harm.

Of course, there are other problems with using community standards to define obscenity. For one, it eliminates any possibility of due process, as there can be no notice of community standards until a jury determines them. For another, it does not seem psychologically possible for a single community to find the same material both sexually arousing and patently offensive-in other words, to be simultaneously turned on and grossed out by the same speech. But these matters have never troubled the Court.

Note that, if "harmful to minors" cannot be defined by community standards, then any harmful-to-minors law that uses community standards-not merely those that apply to the Internet-is unconstitutional. The traditional state statutes, such as the one upheld in Ginsberg, must be overruled.

It boils down to this: Speech that is asserted to be harmful to children may not be restricted unless the government can demonstrate that it actually is harmful to children. This might be difficult to do empirically in any case, but it cannot even logically be done if "harmful to minors" is defined in terms of community standards. And this is true for material on the Internet, as well as for material in traditional media. Saying that something is harmful does not make it so.

Henry Cohen is a lawyer with the federal government who is not involved in this litigation.

---- INDEX REFERENCES ---

COMPANY: COPA: AMERICAN CIVIL LIBERTIES UNION; CDA; PLAYBOY ENTERPRISES INC; US COURT OF APPEALS; PLAYBOY ENTERTAINMENT GROUP INC

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit F

Westlaw

**News**Room

3/13/00 LEGALTIMES 61

Page 1

3/13/00 Legal Times 61
2000 WLNR 10520924

Legal Times
Copyright 2000 American Lawyer Media, ALM LLC

March 13, 2000

Section: Points of View; Letters

Volume 23; Issue 11

A RESTATEMENT OF TORTS

Henry Cohen

Walter Olson writes that President Clinton has a "willingness to veto almost any tort reform measure that reaches his desk" ["Pulling for the Plaintiffs Bar," March 6, 2000]. Clinton has vetoed one tort reform bill: H.R. 956, 104th Congress, the "Common Sense Product Liability Legal Reform Act of 1996."

He has signed 14 bills with tort reform provisions: the General Aviation Revitalization Act, Public Law 103-298 (1994) (created 18-year statute of repose in suits against small plane manufacturers); the Coast Guard Authorization Act of 1996, Public Law 104-324 (1996) (limited vicarious medical malpractice liability of cruise ship operators and owners); the Bill Emerson Good Samaritan Food Donation Act, Public Law 104-210 (1996) (limited liability of food donors and non-profit donees who distribute food); the Volunteer Protection Act of 1997, Public Law 105-19 (1997) (limited liability of volunteers with non-profit organizations and governmental entities); the Amtrak Reform and Accountability Act of 1997, Public Law 105-134 (1997) (limited damages in rail accidents); the Biomaterials Access Assurance Act of 1998, Public Law 105-230 (1998) (limited product liability of suppliers of biomaterials such as breast implants); the Y2K Act, Public Law 106-37 (1999) (limited liability for injuries related to Y2K failures).

In addition to the seven statutes just named, Clinton has signed seven that provide that volunteers under various federal programs shall be considered federal employees for purposes of the Federal Tort Claims Act. This means that they are immune from suit under state tort law, and the United States may be liable under the Federal Tort Claims Act (though not for punitive damages). I'll give just the public law numbers for these seven: 105-261, 105-255, 105-233, 105-85, 105-83, 104-191, 104-169.

---- INDEX REFERENCES ---

NEWS SUBJECT: (Legal (1LE33); Products Liability (1PR53); Liability (1LI55))

INDUSTRY: (Biopharmaceuticals (1BI13); Industrial Biotechnology (1IN87); Pharmaceuticals & Biotechnology (1PH13))

Language: EN

OTHER INDEXING: (AMTRAK REFORM; BILL EMERSON GOOD SAMARITAN; BIOMATERIALS AC-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit G

Westlaw

**News**Room

7/26/99 LEGALTIMES 19

Page 1

7/26/99 Legal Times 19
1999 WLNR 8543121

Legal Times
Copyright 1999 American Lawyer Media, ALM LLC

July 26, 1999

Section: Letters; To the Editor

Volume 22; Issue 11

## IT'S TIME TO END DRUG PROHIBITION

Henry Cohen

Stuart Taylor Jr.'s "Casualties of the Drug War" ["Points of View," July 19, 1999, Page 18], makes an eloquent case for eliminating mandatory minimum sentences for drug offenders. He fails to notice, however, that his excellent arguments also make the case for ending drug prohibition. If it is wrong to impose on someone a mandatory 10-year sentence for a nonviolent, victimless crime, then it is proportionately wrong to impose a lesser nonmandatory sentence.

The vast majority of murders and other felonies in the United States are caused by the drug laws, not by drugs. Ending drug prohibition would cause the price of drugs to plummet, eliminating the need for addicts to commit crimes to pay for them, and eliminating the black market that leads to innocent bystanders getting shot in the inner city, not to mention impure drugs and needles being shared.

As it seems that people who want drugs can get them, and will continue to be able to get them no matter how much money we waste on the drug war, it seems unlikely that making drugs freely available would significantly increase the number of addicts. If we truly wanted to reduce the number of drug addicts, we would use the money we waste on the drug war to reduce class sizes in the public schools.

If ending drug prohibition did increase the number of addicts, at least the people who choose to use drugs would be hurting only themselves, and would not, in order to support their habits, have to make the rest of us crime victims. And it would be preferable for addicts to hurt themselves than to have the government ruin their lives--usually more thoroughly than drugs do--through drug prohibtion. Many addicts, with a regular supply of drugs, regulated by the government for purity, and with clean needles, could function in society, holding down jobs and paying taxes, and not spreading AIDS. With drug prohibition, however, we spend about $30, 000 per year to keep an addict in prison, where addicts learn to become real criminals. We burden them with criminal records, which helps make them unemployable when they are released, which, in turn, gives them an incentive to put their new criminal skills to use until we lock them up again.

There is another reason to end drug prohibition. If we have a constitutional right to use condoms and to have abortions, then surely we have a constitutional right to ingest whatever plants we wish. There is no intellectually honest way not to apply Griswold v. Connecticut and its progeny to encompass the right to use drugs. If the government has the power to lock us up for using drugs of which it disapproves, then it has the power to lock us up

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

for any bad habit or dangerous activity. It would have the power to regiment virtually every moment of our personal lives, directing us, upon threat of imprisonment, not to smoke or drink, not to skip breakfast (and what to eat), when to carry an umbrella or wear a scarf, not to ski or fly small planes, or anything else it deemed bad for us (except matters protected by the First Amendment).

Why do we tolerate such an intrusion in the area of drugs that we would not tolerate with respect to other bad habits? The answer is simply that the victims of drug prohibition are predominantly black. It is not conscious racism at work, but rather a failure to recognize that inner-city drug addicts are human beings and deserve respect as such, and that many of us who did not grow up in the inner city would have become addicts if we had. In the end, drug prohibition is the product of arrogance.

---- INDEX REFERENCES ---

NEWS SUBJECT: (Health & Family (1HE30); Drug Addiction (1DR84))

REGION: (North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

OTHER INDEXING: (Connecticut; Griswold; Stuart Taylor Jr.)

Word Count: 537
7/26/99 LEGALTIMES 19
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.