# Exhibit H

Westlaw

6/5/97 NYT A26

NewsRoom

Page 1

6/5/97 N.Y. Times A26
1997 WLNR 4876408

New York Times (NY)
Copyright (c) 1997 The New York Times. All rights reserved.

June 5, 1997

Section: A

## Should McVeigh Receive the Death Penalty?

Henry **Cohen** reply to May 29 letters on capital punishment (S)

To the Editor:

Neither side of the controversy over increased use of the death penalty (letters, May 29) focuses on the most important issue. This is that the death penalty causes the execution of innocent people. Anthony Lewis said (column, Dec. 8, 1995) that "in the last 20 years, 54 Americans under sentence of death have been released from prison because of evidence of their innocence."

If 54 have been released, then surely far more than 54 have been executed notwithstanding their possible innocence. Advocates of the death penalty must take this into account when making their arguments.

HENRY **COHEN**
Baltimore, May 29, 1997

---- INDEX REFERENCES ---

Language: EN

OTHER INDEXING: ( **Cohen**. Henry) (Anthony Lewis: Henry Cohen) (Capital Punishment) (Letter)

EDITION: Late Edition - Final

Word Count: 138
6/5/97 NYT A26
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit I

Westlaw

2/27/97 BALTSUN 14A

2/27/97 Balt. Sun 14A
1997 WLNR 1103385

Baltimore Sun (MD)
Copyright The Baltimore Sun 1997

February 27, 1997

Section: Editorial (Morning)

'REEFER MADNESS' THEORY WON'T DIE

Henry Cohen

THE FEB. 14 editorial, "Legislating from the hip," opposes an increase in the penalties for marijuana possession but seems to favor continuing to imprison users, reassuring us that "even the most liberal politicians recognize that drug use, including marijuana use, is not a victimless crime but contributes significantly to domestic violence, street violence, property crime, child abuse and traffic deaths."

In fact, no politicians "recognize" this. One cannot recognize something that is false. One can only, in one's ignorance or willful blindness, imagine it. Marijuana does not make one violent and is not sufficiently addictive or expensive to cause users to commit crimes to buy it. Is "reefer madness" ever going to end?

Those drugs that are sufficiently addictive and costly to contribute to street crime and property crime are expensive, and lead to such crime only because they are illegal. Anyone who cares about crime must favor repeal of the drug laws.

Henry Cohen

Baltimore

Pub Date: 2/27/97

SERIES: SERIES -- Rejoinder   TYPE OF MATERIAL: OP-ED, COMMENTARY

---- INDEX REFERENCES ---

NEWS SUBJECT: (Social Issues (1SO05); Property Crime (1PR85); Health & Family (1HE30); Crime (1CR87); Drug Addiction (1DR84))

INDUSTRY: (Water Transportation (1WA23); Engineering (1EN73); Shipbuilding (1SH40))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit J

Westlaw

11/30/09 WATIMES A20

**News**Room

Page 1

11/30/09 Wash. Times (D.C.) A20
2009 WLNR 24173800

Washington Times (DC)
Copyright 2009 The Washington Times LLC

November 30, 2009

Section: LETTERS

Divided and unruled

THE WASHINGTON TIMES

After reading David C. Lipscomb's piece ("Fenty's approval in D.C. divides by race," Page 1, Friday), I was compelled to write and comment. As a black 55-year-old Democrat and 30-year resident of this great city, I am not at all surprised by the outcome of this survey, which shows the majority of black D.C. residents do not approve of Mayor Adrian M. Fenty's job performance.

Mr. Lipscomb shares with us a comment made by Greg Carr, an associate professor of Afro-American studies at Howard University, who said, "I think black people look at government as the entity that intervenes on behalf of those who have frequently been disadvantaged." I agree wholeheartedly with this statement, but I also believe that many black D.C. residents often make bad choices that put them at an even greater disadvantage.

Many young, single, unemployed black women in the District, as well as across the country, are choosing to have three, four or even five babies by as many single, unemployed black men. These children are virtually guaranteed to grow up poor and disadvantaged, unless someone intervenes. Add to that the fact that the District leads the nation in HIV/AIDS cases among young, black females. And add to that the steep high-school dropout rate in our nation's capital.

Sure, it's still a disadvantage to be black in America, but it's an even greater disadvantage not to use common sense when making major decisions such as childbearing, educating our children and preventing AIDS. We can't forever blame other people for the choices we make in life.

PAM HAIRSTON

Washington

---- INDEX REFERENCES ---

Language: EN

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit K

Westlaw

**News**Room

10/20/09 WATIMES A20

Page 1

10/20/09 Wash. Times (D.C.) A20
2009 WLNR 20740054

Washington Times (DC)
Copyright 2009 The Washington Times LLC

October 20, 2009

Section: LETTERS

Pardon me for begging your pardon

THE WASHINGTON TIMES

It is good to see that justice was served after 94 years ("Radio host wins pardon for great-uncles," Nation, Thursday). Tom Joyner's campaign to absolve two great-uncles who were executed for the murder of a Confederate Army veteran was not in vain.

Please allow me to share another story of American injustice. It is the story of the Martinsville Seven, the largest mass execution for rape in U.S. history. This year marks the 60th anniversary of the Martinsville Seven. In 1949, seven black men from Martinsville, Va., were sentenced to death for the rape of a 32-year-old married white woman. By 1951, all had been executed in Richmond. At the time of their arrests, five of these men were teenagers, and one was a World War II veteran with a wife and five young children.

Never in the history of Virginia has a white man been put to death for the rape of any woman. I believe with all my heart that these men were innocent. They killed no one, and they did not have to die. For the record, three of these men were Hairstons, relatives of mine, and I was born and raised in Martinsville.

PAM HAIRSTON

Washington

---- INDEX REFERENCES ----

REGION: (North America (1NO39); Virginia (1VI57); Americas (1AM92); USA (1US73))

Language: EN

OTHER INDEXING: (CONFEDERATE ARMY; PARDON) (Tom Joyner)

Word Count: 222
10/20/09 WATIMES A20
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit L

9/1/09 Phila. Daily News 16
2009 WLNR 17051970

Philadelphia Daily News (PA)
Copyright 2009 Philadelphia Daily News (PA)

September 1, 2009

Section: EDITORIAL OPINION

Letters: What's really behind the Vick controversy

PLEASE allow this 55-year-old black American female, who's never been a professional sports fan, to comment on Michael Vick.

I don't mean to play the race card, but the Vick situation shows, again, how vividly America is divided by race. It seems that white Americans are more adamant about him not returning to the NFL than most black Americans.

Can I go one step further? It seems that many white Americans tend to love their pets more than their fellow countrymen, especially black ones. As a God-fearing Christian, I ain't never read in the Bible where Jesus instructed his disciples or his followers to love their pets more than their neighbors or themselves!

NEVER! For Christ's sake, forgive the man! Peace.

Pam Hairston, Washington, D.C.

There seems to be many cursed with "poor judgment" these days.

Now it's the Humane Society! I am seething with ire at this latest insult!

After many years of heartfelt contributions, I've let them know I won't give them one more red cent. Michael Vick? A "credible" spokesman? Give me a break! What's next? A convicted pedophile speaking on behalf of child welfare groups?

Patricia O'Brien, Huntingdon Valley

Only in America can you take the life of another human being (ex-Eagle Donte Stallworth), and it's "Oh, well, life goes on." But god forbid you take the life of a dog, and it's headline news, outrage, jail time. Only in Amer-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit M

5/31/09 Wash. Times (D.C.) B02
2009 WLNR 10374752

Washington Times (DC)
Copyright 2009 The Washington Times LLC

May 31, 2009

Section: LETTERS

## Remember history before it's forgotten

### THE WASHINGTON TIMES

A good friend of mine sent me a sad but wonderful story she had read in your fine newspaper. After reading it, I was compelled to write and comment.

In this excellent and well-written piece, "From a pauper's grave to Arlington honors" (Plugged in, Thursday), Martha M. Boltz writes about Cpl. Isaiah Mays, a Buffalo Soldier who received the Medal of Honor after being wounded in 1889 while defending a government payroll train against robbers. He will be reburied soon in Arlington National Cemetery after being transferred from a pauper's grave in Phoenix.

I read in tears how Mays, after being shot in both of his legs, "walked and crawled" for more than two miles to the nearest help and how the robbers were acquitted soon thereafter. The robbers were "white, probably connected to local Mormons," which was not a minor detail at the time. According to a man quoted in the article, convicting Mormons was not conducive to Arizona's statehood efforts, "especially on the testimony of blacks."

Little-known stories like this abound in America. Often white Americans tell us black Americans to "stop whining" and "get over it." If they are talking about history such as this, let me know my history first before I have to forget it.

PAMELA A. HAIRSTON

Washington

---- INDEX REFERENCES ----

COMPANY: ARIZONA AND CALIFORNIA RAILROAD CO

REGION: (North America (1NO39); Americas (1AM92); USA (1US73))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit N

10/8/08 Wichita Eagle (Kan.) a2
2008 WLNR 19095928

Wichita Eagle (KS)
Copyright 2008 The Wichita Eagle

October 8, 2008

Section: a

READER VIEWS ON IRAQ WAR ENDGAME, ARKANSAS CITY SKIT, BOND ISSUE, SCHOOL SAFE
ROOMS, DRIVING FATALITIES

Iraqi chances are greater with McCain

The article "Candidates differ sharply on Iraq" (Oct. 6 Eagle) said that Barack Obama wants to pull the troops out in 16 months while John McCain wants to let the circumstances on the ground, not the calendar, determine the pace of troop reductions. Sarah Palin has said that for Obama to set a specific withdrawal date would be waving the white flag of surrender. I agree with her, because all the terrorists would have to do is stockpile their weapons and prepare their troops for the time when all the U.S. soldiers are gone, and then attack.

However, if the troop levels are adjusted by Gen. David Petraeus as the Iraqis become stronger, as McCain wants, then the chances for success are much greater.

WILLIAM L. PURCELL

Wichita

We need out now

I have always had a lot of respect for John McCain. I could vote for him no matter his political affiliation. But that will not be the case for me next month.

I have been against the Iraq war from the start. It was claimed that the purpose for it was the need to eliminate weapons of mass destruction. This turned out to be false, so the stated purpose was changed to fighting terrorists. But before the war started, there were no terrorists in Iraq. Now, more than five years later, Iraq is full of terrorists. We need to get out of there now. For what this war is costing, everyone in the country could have free health care.

McCain and running mate Sarah Palin have made it clear that they intend to carry on with this war. For this reas-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

on, I cannot understand why anyone would vote for them.

C.A. ALSTATT

Valley Center

Study black history

Regarding "Blackface act galls NAACP" (Oct. 3 Local & State): As a 54-year-old black American voter, I was compelled to comment about Arkansas City Mayor Mell Kuhn's recent performance in blackface, which made him the winner at a fundraiser for the Court Appointed Special Advocate program of Cowley County. It seems that Kuhn did not understand that his actions would be offensive to many black Americans. He didn't have any historical context whatsoever about blackface.

Perhaps if Kuhn and other white Americans picked up a real history book and read about all the injustices that black Americans have faced in America, they would understand why this is offensive to us. Although many white Americans often tell us black Americans to stop whining, to "get over" our history, many don't even know the history that they speak of and are often deliberately dismissive of it.

I wonder if Kuhn has ever read or heard about "Bloody Kansas."

PAMELA A. HAIRSTON

Washington, D.C.

Don't punish kids

Anti-bond groups have waged a campaign of misdirection, misinformation and appeals to self-interest over the needs of children. A primary complaint has been that the Wichita school district and state generally are not efficient in their use of financial resources. But should we sacrifice our children's education in protest of perceived mismanagement of state and local resources? If bond opponents Helen Cochran and Bob Weeks have concerns about the management of the district or the state, they should run for office and effect changes. They should not be in the business of throwing irresponsible accusations from the peanut gallery.

A second complaint is that new schools and additional classroom space are not needed. This is misinformation. The district has documented that classroom spaces are bursting, with many schools exceeding intended student populations. Anyone skeptical need only visit schools such as Seltzer Elementary or Heights High.

Finally, school bond opponents have suggested that taxpayers cannot accept an additional tax burden at this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

time. This is merely an appeal to selfish personal interest over the needs of children and the future of Wichita. The proposed tax increase is minimal -- about one cup of coffee per day for most property owners. More important, how do we measure the quality of a community? To what should we look to garner pride and approval in our community? Any such assessment must include the quality of our schools. If you have problems with how the district is managed, don't take it out on the students.

ANGELA SADER

Wichita

Shelters not a need

The appeal for school storm shelters is a clear example of the inability of politicians and civic leaders to differentiate between real needs and irrational, emotionally driven ones ("Protect: Safe rooms save lives," Sept. 29 editorial).

To my knowledge, no schoolchildren have been killed by storms hitting Kansas schools in the past 50 years. The appeal for storm shelters, therefore, is predominantly an emotional one. But that's not the point, now is it? The point is to coerce the taxpayers into voting for the whole bond issue -- $370 million -- so they don't feel guilty about voting down the $60 million shelters.

Obviously, no one wants to see schoolchildren get hurt, even if the magnitude of the perceived threat is statistically small. So what's the solution? Start school two days earlier, and on the rare days that severe storms are a realistic threat, cancel school. Additionally, parents can use their own discretion and keep their kids home whenever they deem it necessary. There -- I just saved $60 million.

STEVE W. CARTWRIGHT

Derby

#### ---- INDEX REFERENCES ---

NEWS SUBJECT: (Corporate Bonds (1XO30); Bond Issues (1BO94); Funding Instruments (1FU41); Corporate Funding (1XO17))

INDUSTRY: (Investment Management (1IN34); Securities Investment (1SE57); Financial Services (1FI37))

REGION: (Kansas (1KA13); North America (1NO39); USA (1US73); Americas (1AM92); Middle East (1MI23); Arab States (1AR46); Gulf States (1GU47); Iraq (1IR87); Arkansas (1AR83))

Language: EN

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit O

9/24/08 USA TODAY 10A
2008 WLNR 18151718

USA Today (USA)
Copyright 2008 USA TODAY

September 24, 2008

Section: NEWS

Students learn how to protect voting rights

It's a sad sign for our democracy when officials sworn to uphold our system try to prevent those newest to polit-
ics from getting involved, adding confusion to an already confusing process. ("Ballot box blues," Editorial, Sept.
12).

Unfortunately, a registrar's memo discouraging Virginia Tech students from voting locally is just the latest in a
long history of attempts to disenfranchise student voters. This year, in an election when record numbers of
young people are registering and hitting the polls, Rock the Vote is taking on voting rights as a core fight.

Recently, our first Rock Your Rights event, at Virginia Tech, brought students out to educate their peers about
students' rights to vote in Virginia. Students registered to vote and found out how they could volunteer to protect
their voting rights at Virginia Tech.

Rock the Vote is determined to ensure that every eligible young person be able to cast a ballot on Election Day.
But we can't do it alone. In the weeks leading up to Nov. 4, we hope that elections officials will work with us,
our volunteers and our partners so that all who want to are registered and can vote on Election Day.

Heather Smith

Executive director

Rock the Vote

Washington

**Race always matters**

When has race not been an issue in America ("Poll: Race may be issue for Obama in election," USAT-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ODAY.com, Saturday)?

As a freelance writer who is also a black American, I know that writing about race is probably the most difficult and touchiest subject one can tackle. I've been called racist by white colleagues simply because I write about race.

If Barack Obama does not win this election, the next chance a black American will have to win the White House will probably be in 400 years.

And as for race, when will the color of one's skin not matter in America? When our real enemies succeed in dropping that nuclear bomb on this great country, then and only then will the color of one's skin not matter because we won't have any.

Pamela A. **Hairston**

Washington

McCain's many faces

USA TODAY's editorial on bipartisanship missed the forest for the trees ("Who's the better uniter?," Our view, Bipartisanship debate, Thursday).

Of course John McCain can cite more examples of working across the aisle. He has been in Washington longer. The piece failed to put enough emphasis on the fact that the McCain of 2008 is a far cry from previous incarnations. The McCain of today has taken extreme right positions on everything from Iraq to abortion to tax giveaways for corporations.

This Republican once favored comprehensive immigration reform but now says he wouldn't even vote for his own bill. Worse, the McCain of today has run one of the most dishonorable campaigns in recent memory.

Do you really believe that the McCain of 2008 could unite the country after the smear job he has run on Barack Obama? No, the new McCain sold out the old one a long time ago and with it any hope of uniting the country.

Garth Lewis

Sunnyvale, Calif.

Obama doesn't get it

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Barack Obama's response "'Unite the American people'" doesn't address the issues in USA TODAY's editorial. Rather, his response is political discourse at its best and is inflammatory (Opposing view, Bipartisanship debate, Thursday).

What senator has not fought to keep nuclear weapons out of terrorist hands? Also, doubling fuel-efficiency standards will not end our dependence on oil. McCain voted 85% of the time with Republicans and 90% of the time with President Bush, but Obama voted with his party 97% of the time. Where's the reaching out?

The examples Obama uses to show that he has reached across to Republicans are non-issues compared with Social Security reform, health reform, energy independence, financial integrity and anti-terrorism measures. (It isn't just about Iraq.)

I want straightforward truth. I've watched all the candidates. I see and feel truth with John McCain and Sarah Palin.

D. Kent McCraney

Kansas City, Kan.

---- INDEX REFERENCES ---

COMPANY: WHITE HOUSE; WIHLBORGS FASTIGHETER AB PPTY

REGION: (North America (1NO39); Kansas (1KA13); Americas (1AM92); USA (1US73))

Language: EN

OTHER INDEXING: (BARACK; BARACK OBAMA; OBAMA; USA; VIRGINIA TECH; VOTE; WHITE HOUSE) (Ballot; Bipartisanship; Bush; D. Kent McCraney; Editorial; Executive; Garth Lewis; Heather Smith; John McCain; McCain; Pamela A. Hairston; Rock; Sarah Palin; Sunnyvale; Worse)

KEYWORDS: (Debate); (LETTERS); (OPINION)

Word Count: 781
9/24/08 USATD 10A
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit P

# The Washington Post

## Black or White, Will He Care?

Sunday, August 3, 2008

**If you died today,**
who would take care
of your family?

10-Yr Level Term
Life Insurance
$500,000 Policy
(Monthly Premiums)

| age | male |
| --- | --- |
| 40 | $20.56 |
| 45 | $31.06 |
| 50 | $45.06 |
| 55 | $87.00 |

Get A Free Quote!
**Click Here**

We're closer than ever before to electing the first black president of the United States, yet as a 54-year-old black woman, I don't feel the enthusiasm, the fire or the passion for this unprecedented election. Why? Because Alonzo Robinson, a 13-year-old black boy from Alabama in Washington to visit relatives, was killed recently [Metro, July 21] by random gunfire on the streets of this very city, the most important city in the world.

Perhaps the next president, black or white, will take a good, long look out of one of the White House windows and see the real Washington, D.C., once dubbed the "Murder Capital of the World." Perhaps he'll see what George W. Bush failed to see: beautiful, innocent Chelsea Cromartie, 8, killed by a stray bullet while playing with her dolls in her aunt's living room; grandmothers Dorine Fostion, 47, Grace Edwards, 76, and Helen Foster-El, 55, all killed by gunfire; a 21-year-old college student, Ivory Harrison, killed when a gunman fired multiple shots into a crowd; and my 25-year-old nephew, Michael Douglas Hairston, shot through the chest four years ago during an altercation, his murderer never brought to justice.

These are just a few of the hundreds of examples of black Americans being killed, young and old alike, in this city. Perhaps our next president will not be alarmed by the Third World murder statistics in our nation's capital because his young children, or his adult children, are unlikely to become the victims of this senseless violence. After all, anyone living in the White House will be protected 24-7.

No, I am not enthusiastic, not one bit. Presidential candidates are known to make promises they can't keep, and I've yet to hear any candidate address the problems that plague the black communities of this great city, where black Americans are the majority. To my knowledge, no one in the White House has ever commented on black-on-black crime in Washington. Perhaps they wish it would just disappear.

I really hope that the next president decides to take a good, long look out of that White House window and check out what's going on in his own back yard.

**-- Pamela A. Hairston**

*Washington*

View all comments that have been posted about this article.

# Exhibit Q

# The Washington Post

## The Popularity of Kwanzaa

Monday, January 7, 2008

Afi-Odelia E. Scruggs ["Kwanzaa's Lights Go Dim,"
Outlook, Dec. 30] thinks that Kwanzaa, an observance
created in the 1980s by and for African Americans, is
fading because young people aren't embracing it to
help keep it vibrant.

For several years, I've attended the Kennedy Center's
"The Spirit of Kwanzaa" celebration, and each year,
the crowd gets larger.

Matter of fact, when the first Kwanzaa celebration
was held there more than 12 years ago, it was
performed in the hallway of the center. Today, to
accommodate the larger crowd, it is performed in one of the largest concert halls. This year, my entourage of
about 10 children was not able to attend because I waited too late to purchase tickets and the shows sold out
in early December. Trust me, these kids were truly disappointed.

So let's not be discouraged. I'm going to purchase our tickets, which are inexpensive, earlier this year and take
as many children as I can.

It's a wonderful, diverse performance for all, and I'll guarantee that you'll want to come back for more.

PAMELA A. HAIRSTON

Washington

# Exhibit R



Westlaw

11/21/07 L.A. Times 24
2007 WLNR 23024432

Los Angeles Times
Copyright 2007 Los Angeles Times

November 21, 2007

Section: Main News

The need to march

Letters to the editor

Re "Sharpton leads call for federal investigation of hate crimes," Nov. 17

In this article, Joe R. Hicks, former head of the Southern Christian Leadership Conference's L.A. chapter, states that the District of Columbia demonstrators were broadcasting a "message of racial victimization" that he said ignored the progress made and opportunities available to African Americans today. I disagree. As long as the Ku Klux Klan, the oldest domestic terrorist organization, and all-white juries exist in America, we still have a need for such marches.

Pamela A. Hairston

Washington

---- INDEX REFERENCES ----

COMPANY: SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE

Language: EN

OTHER INDEXING: (KU KLUX KLAN; SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE) (Joe R. Hicks; Pamela A. Hairston)

EDITION: Home Edition

Word Count: 118
11/21/07 LATIMES 24
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit S

Voice of the people

http://www.nydailynews.com/opinions/2007/11/01/2007-11-01_voice_of...



**(1) WHITE Teeth Trick**
The dentists don't want you knowing about THIS teeth whitening   More info



**"25 Pounds in 2 Weeks"**
Lose 25 lbs in 2 Weeks - Guaranteed  Try This New Secret!  Get details



We Love New York

Tell us YOUR favorite place in NY  GO

**Autos**   **Real Estate**   **Jobs**   Classifieds   Shop   Contests   Place an Ad   Daily NewsPix

**More NYDN:**   NYDN Home   Feeds   Services   Delivery

Weather in NYC
36°F Forecast  Traffic
**Thursday, January 7, 2010**

Search

**News   Sports   Gossip   Entertainment   NY Events   Local   Opinion   Lifestyle   Travel   Money   Tech   Topics   Photos   Video   Blogs**

Opinion   **Voice of the people**

Login   Register

Article   Comments        Email   Print   RSS   Share

# Voice of the people

Thursday, November 1st 2007, 4:00 AM

**Don't call me Al**

Washington  Am I the only black American who's sick of Al Sharpton? Come on, Rev Sharpton, there are way, way more important things to put on your agenda than complaining about the Confederate flag. Black communities across America are facing crisis after crisis - high unemployment and high-school dropout rates, black-on-black crime, babies having babies, HIV/AIDS infections, diabetes, obesity, heart disease, drug addiction. I wish the white media would give me a microphone.

*Pamela A. Hairston*

## RELATED ARTICLES

Minaya remains patient for rest of offseason

Ex-Yank Randy Johnson picks perfect time to retire

Voice of the People for Jan. 6, 2010

Dawson elected to Hall; Blyleven & Alomar fall short

McGwire pinch-hitting could restart Hall clock

Mitre returns as Yanks avoid arbitration

# Exhibit T

FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

10 0036

Correspondence: The Martinsville Seven                                      http://revcom.us/a/098/martinsville7-en.html

Revolution #98, August 19, 2007

<u>Donate to the $500,000 Fund Drive</u>
<u>Fundraising Resources</u>

Correspondence:

# The Martinsville Seven

*Revolution* received this correspondence:

In light of the Jena Six, the group of black Louisiana students charged with second-degree murder after beating up a fellow white student, please allow me to share with your many readers another American story of injustice. It is a little known story about the Martinsville Seven, the largest mass execution for rape in U.S. history.

In 1949, in Martinsville, VA, seven black men were arrested for the rape of Ruby Stroud Floyd, a 32-year-old married white woman. Within 30 hours of this crime, all seven men had signed written confessions. Within 7 days, all seven were tried, convicted and sentenced to death by all-white, all-male juries. (Two were tried at the same time.) At the time of his arrest, the youngest was only 17 years old and the oldest, a 37-year-old WWII vet with a wife and five beautiful, young children, could have passed for white.

During appeals, Thurgood Marshall, later to become the first black Supreme Court judge and then head of the NAACP's Legal Defense Fund, helped represent them. (Three times the Supreme Court refused to hear their case.) Ossie Davis and Paul Robeson rallied Hollywood in their defense but to no avail. Communist Russia and China sent telegrams to the White House asking the U.S. to spare their lives but then President Truman, an alleged Klansman, refused to grant clemency. Around the world, they became known as the Martinsville Seven.

Just two years later in Richmond, VA, eight black men were executed, seven for the rape of one white woman. On Friday, February 2, 1951, at about 10:00 a.m., one man was taken to the electric chair. Ten minutes later, another died. 10 minutes after that, another died. It's been said that the chair was too hot to touch.

The following Monday, the remaining four black men were executed, or should I say boys because five of them were teenagers. Right before the youngest was executed, he said: "God knows I didn't touch that woman, and I'll see ya'll on the other side."

In the entire history of the United States, no white man has ever been executed for the rape of a black woman. During this time, no white man in Virginia had ever been executed for any rape of any woman. In 1977, over 25 years later, the Supreme Court ruled that rape could not be punishable by death. The Martinsville Seven case was instrumental in helping change the rape laws of this great nation. (The Seven case was the first time ever in a court of law where lawyers used statistics showing that black men were executed more than white men for similar crimes, especially rape.)

Every black person I have ever interviewed in Martinsville, young and old alike, said that the victim was having an affair with one of the Seven, the WWII vet, who could have passed for white. Elderly people who knew Rudy said she was a flirtatious lady, always "on the colored side of town." always "up in colored men's faces." Others said she was a devout Jehovah Witness, relentlessly passing out her religious pamphlets in Cherrytown, the colored side of town.

The true story of the Seven has never been told. There is one book published about the Seven and the author once told me that when he was researching his book, not one black person in Martinsville would be interviewed. For the record, I was born and raised in Martinsville, and three of the Seven executed were Hairstons.

If this is news to you, please share this American history with your readers and if not your readers, your friends and colleagues. Thanks for listening and KEEP HOPE ALIVE!

Pamela A. Hairston

Information Research Specialist and freelance writer

Washington, DC

<u>Send us your comments.</u>

This article is posted in English and Spanish at http://revcom.us

RCP Publications • Box 3486 Merchandise Mart • Chicago, IL 60654-3486
There are many websites that link to this site. Such links do not imply endorsement by Revolution newspaper of the content of these other websites (nor are those websites responsible for the content of revcom.us).

# Exhibit U



FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

10 0036

Westlaw

**News**Room

7/19/07 DETROITNWS A18

Page 1

7/19/07 Detroit News (Detroit, Mich.) A18
2007 WLNR 27542472

Detroit News, The (Detroit, MI)
Copyright 2007 Gannett

July 19, 2007

Section: Letters

Will N-word's burial make a difference?

July 19, 2007   Insult slaps ancestors

I am a 25-year-old, African-American woman who used the N-word frequently in casual conversation until I re-searched its true origin and meaning ("Banished: Thousands say 'good riddance' to N-word," July 10). It is not a "term of endearment." Every time the N-word is thrown around, it is like a slap in the face of our ancestors who lived through the oppression this word caused.

The Detroit News

As people in the article stated, we need to get rid of the watered-down version of our history to expose the reality of the true pain the word has caused.

LaKrisha Broadnax

Wayne

Avoid racial classification

I'm glad the N-word is buried. Now what needs to happen is to get rid of the B-word and also the A-A designa-tion. African Americans set themselves apart from the mainstream with that name. They should just try being or-dinary people for a change. That'll get them what they want.

Janet Russell

Troy

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Alas, N-word will continue

I'm an educator with the Detroit Public Schools, and I say it's past time for the N-word to be buried. But the reality is it's so engrained in the fabric and psyche of some blacks that I don't believe, in my lifetime, that I will not hear it spoken again. Now that there's been a symbolic burial of the dreaded N-word, what needs to be done next is to stop this genocide that's permeated our community and continues to spiral out of control.

Thomas A. Wilson Jr.

Detroit

Racism won't change

I am sorry to say a ceremony burying the N-word will not change racism in Detroit or America. Racism is taught by parents and is passed on from generation to generation. Until we act like a nation under God, words mean nothing and it is our actions for which we will be judged upon on earth and in heaven.

Andrew T. Linko

Brownstown Township

NAACP misses real problems

The NAACP has become irrelevant. As leaders like Bill Cosby and conservative blacks have pointed to the complete lack of parenting, a low high school graduation rate in Detroit and a terrible black-on-black crime rate, the NAACP concentrates on the N-word.

Could it be that maybe the 70 percent illegitimacy rate and the refusal of businesses to move into certain urban communities might be a little more important to focus on?

Tom Baker

Sterling Heights

Blacks must have self-respect

I recently went to the City Fest and heard blacks say the N-word at least 100 times. If some blacks can't show respect for themselves and heritage, don't expect anybody else to.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Linda Valerio

Detroit

Will insults to whites stop?

While the symbolic "funeral" for the N-word is intended to be a positive message for all people, and while I agree the N-word should never be used, does this "burial" mean that African-Americans with open malice toward whites will suddenly stop calling us derogatory words such as "cracker" or "honkey"? Does this mean they will finally stop assuming that hardworking Caucasians who live in the suburbs are somehow getting ahead only because we're white?

Janice M. Ryken

Livonia

Other issues matter more

While all this fanfare is good and fine, when will one of the oldest and most influential civil rights organizations in the nation take a real stand on the real issues that plague black America, like the staggering numbers of new HIV/AIDS cases, black-on-black crime, high school dropout rates, babies having babies, hypertension, heart disease, stroke, obesity and diabetes. As for the N-word, if I ever get my check in the mail for slavery reparations, white folks can call me that name for the debt will finally be paid.

Pamela A. Hairston

Washington, D.C.

Award erodes group's respect

How do African-Americans expect to gain that coveted "respect" when the supreme leader of the NAACP, Julian Bond, launches vicious, hysterical diatribes against President Bush and that organization bestows a special honor upon the planet's top demagogue, U.S. Rep. John Conyers, D-Detroit?

Ken Tippery

Royal Oak

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit V

FILED

10  0036      JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

Reparations for slavery would trigger America's 2nd civil war - TheHill.com   http://thehill.com/opinion/letters/6736-reparations-for-slavery-would-trig...

# THE⚖HILL

## Reparations for slavery would trigger America's 2nd civil war

By Pamela A. Hairston, information research specialist, Library of Congress - 03/14/07 12:49 PM ET

I read with caution Bob Cusack's article, "Patient Conyers hopes to move slavery bill during an Obama administration" (March 13). Whenever one speaks or writes about slavery, apologies and reparations in the same sentence, one should indeed proceed with caution.

In this piece, Mr. Cusack writes about Rep. John Conyers and how in 1989, he introduced H.R. 40, which calls for the president to appoint three members to a seven-member commission to analyze the effects of slavery and instructs the commission to review whether "any form of compensation to the descendants of African slaves is warranted."
As a researcher and freelance writer, I've followed and written about these controversial issues for years, and across America, most white Americans are vehemently against reparations of any sort. Just mention a mere apology for slavery and their shorts get all knotted. I truly believe it would be the beginning of the second civil war if our government doled out reparations to black Americans.

Last month, when the Virginia legislature apologized for slavery, it was indeed a noble gesture, long, long overdue. I'm 52 years old, born and raised in Virginia, and I feel that they need to apologize for much more. In 1951, seven black men from Martinsville, Va. were executed for the rape of one white woman. It was the largest mass execution for rape in U.S. history. Although in the whole history of the United States, no white man had ever been executed for the rape of a black woman, these boys (five were teenagers) were electrocuted. Around the world, they became known as the Martinsville Seven. (The true story of the Seven has yet to be told.)

In 1959, in Prince Edward County, Va., the public schools were closed for five years because white folks did not want to integrate. A private school was built for the white kids, and the black kids had to go elsewhere or forgo their education. Most were forced to choose the later.

I'm sure each state has little-known stories of racial injustice such as the above. White Americans constantly tell us black Americans to "get over" slavery. Tell me: How does one "get over" history one has never known? Let me know first before I have to forget. And as for 77-year-old John Conyers, I don't think he will live to see the day Congress apologizes for slavery, let alone grant reparations.

40 acres and a mule? Hell, right now, I'd take an acre and a chicken!

And for the record: Three of the Martinsville Seven were Hairstons, relatives of mine, and I was born and raised in Martinsville.

*Washington, D.C.*

---

**Sic 'em, Dick!**

*From Jim Koricki*

(Regarding Mark S. Mellman's column, "Cheney should resign," March 14.) So, Mellman thinks Cheney should resign. What a genius! Like if all the other vice presidents in the history of the nation were not attack dogs for the presidents. If anything, they should take some of the leash off.

*Rockville, Md.*

Source:
http://thehill.com/opinion/letters/6736-reparations-for-slavery-would-trigger-americas-2nd-civil-war

**The contents of this site are © 2010 Capitol Hill Publishing Corp., a subsisiary of News Communications, Inc.**

# Exhibit W



FILED

JAN

Clerk, U.S. District and
Bankruptcy Courts

10 0036

Westlaw

**News**Room

3/2/07 LATIMES 22

Page 1

3/2/07 L.A. Times 22
2007 WLNR 4021212

Los Angeles Times
Copyright 2007 Los Angeles Times

March 2, 2007

Section: Main News

Slavery in Virginia isn't only injustice

Letters to the editor

Correction Data

For The Record

Los Angeles Times  Tuesday March 06, 2007 Home Edition  Main News  Part A  Page 16  Editorial Pages Desk
0 inches;  28 words Type of Material: Correction

Misspelled name: The signatory of a March 2 letter about the Commonwealth of Virginia apologizing for
slavery was misspelled. The writer's name is Pamela A. Hairston, not Hariots.

Re "Va. lawmakers vote for slavery apology," Feb. 25

I was born and raised in Martinsville, Va., and it's good to see the Commonwealth of Virginia finally apologize
for slavery. Perhaps the Virginia Legislature can find it in its heart to apologize for other atrocities. In 1949 in
Martinsville, seven black men were arrested in the rape of a white woman. Although no white man had ever
been executed for rape in Virginia, by 1951 all seven had been executed.

In 1959, instead of integrating, Prince Edward County closed its entire public school system for five years. I'm
sure there are many other untold stories about injustices in Virginia, stories that helped mold and change America.

PAMELA A. HARIOTS

Washington

*

So the Virginia Legislature has issued an apology for slavery. That may be well and good. But what about
slavery going on right now? Black Sudanese in Darfur are suffering every day, shackled in bondage by Arab mi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit X

10 0036

**FILED**

JAN ~ 8 2010

Clerk, U.S. District and
Bankruptcy Courts

1/16/07 Balt. Sun 10A
2007 WLNR 865648

Baltimore Sun (MD)
Copyright 2007 The Baltimore Sun Company

January 16, 2007

Section: EDITORIAL

LETTERS TO THE EDITOR

NIH center meets design standards

1 want to clarify several points raised in The Sun's article about vibration issues at the National Institutes of Health's new Biomedical Research Center ("NIH may use labs at old building," Jan. 7).

First, the building meets the design standards for conducting biomedical research, and its structure is similar to other research buildings that have been recently constructed, such as those at Yale University, the University of Michigan and the Massachusetts Institute of Technology. To my knowledge, no vibration problems have been reported in these buildings.

Second, the most recent vibration measurements in the new building show it meets all the standard design criteria for state-of-the-art biomedical research. There is no evidence, as of yet, that any NIH experiments will be compromised in the new building. However, we are continuing to test equipment in the new facility this month.

Third, The Sun's article implied that NIH has decided to renovate an old laboratory building to house vibration-sensitive equipment. No such decision has been reached.

In summary, initial vibration concerns about the building were based on very preliminary estimates.

Recent readings tell us that the facility is capable of handling NIH's research needs.

Colleen Barros

Bethesda
The writer is deputy for management at the National Institutes of Health.
Winfrey told truth on scorn for schools

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

I usually don't agree with columnist Clarence Page. But he was right on target in "Daring to tell the truth about education" (Opinion * Commentary, Jan. 9).

In this column, Mr. Page writes that the queen of daytime talk, Oprah Winfrey, did poor folks a favor when she candidly explained in a Newsweek interview why she decided to build her lavish new school for impoverished teenagers in South Africa rather than in this country.

Ms. Winfrey said that Africans show a greater need and appreciation for education than U.S. inner-city students.

According to The Washington Post, Wilson High School, one of the best in our nation's capital, graduated only 53 percent of its seniors last year.

Such dismal and appalling statistics are matched in inner cities across the nation. But where is the outrage in the black community?

Mr. Page also suggests that old school buildings should be renovated. And indeed, if Americans can build state-of-the-art arenas for basketball, football and baseball, we can build state-of-the-art schools for our children.

Our children aren't the only ones with their priorities out of order.

Pamela A. Hairston

Washington
Ethics panel leaves issues unanswered

I received a "Breaking News" e-mail from The Sun informing me that Baltimore's Board of Ethics had cleared Sheila Dixon of any improprieties ("Ethics board clears Dixon," Jan. 12).

The Board of Ethics is made up of five unsalaried members. Four are appointed by the mayor, and three of these members are confirmed by the City Council. One member is chosen by the city solicitor.

How ethical is it that city officials thus police their own?

Had Ms. Dixon followed the city's crystal-clear ethics guidelines, she would have recused herself from any participation in discussions regarding a company her sister worked for.

The outcome of this inquiry suspiciously reeks of convenience, with justice and ethics pushed aside.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit Y



FILED

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

10 0036

 

► Close Window

SEPTEMBER 11, 2006

READERS REPORT

## Visceral Responses To The "Valley Boys"

A scant six years after the tech crash of 2000, *BusinessWeek* is once again falling into the same old trap ("Valley Boys," Cover Story, Aug 14). Instead of touting real examples of creative entrepreneurship on your cover, you hyped yet another Web startup with anemic revenues and no appreciable business model. Numerous Web 2 0 darlings have already crashed and burned. Your publication should have asked the question that continues to plague all Web 2.0 businesses: How can a Web site that is entirely predicated on user-submitted content ever hope to survive?

Mark Longo
Chicago


As much as I enjoyed the latest account of how the dynamics behind Silicon Valley entrepreneurship are changing, I was deeply alarmed by the role that women are consigned to play in the article. If there is a lack of female tech entrepreneurs, the writers and editors of the article are certainly not at fault But why should *BusinessWeek* validate the misguided perception that access to "pretty girls" is a benchmark on the ladder of success?

To emphasize the "rock star"-like status of so-called Valley Boys like Kevin Rose, readers are told that he was seen signing the cleavage of a "pretty brunette" at a party. This unnecessary detail, juxtaposed with other perks of his success, just reinforces the notion of women as prizes for successful entrepreneurs, rather than colleagues and competitors

Zoe Brooks
New York


Bubble 2.0 is nearing its bursting point  A puff piece like the glowing BW quasi-press release for Digg.com suggests that Webvan, Pets.com, and Boo.com will soon be on their summer revival tour.

Archie Senor Hall
New York


## The National Slavery Museum's Circuitous Route To Reality

Douglas Wilder's National Slavery Museum is very long overdue ("A cause that scares business," Philanthropy, Aug 14). I urged President Clinton during his first term to donate land and resources for such an institution memorializing this monstrous mega-crime, which took millions of lives during the passage across the Atlantic and in slaves' workplaces. To no avail.

Now Mr Wilder is having difficulty raising the necessary funds for this important educational project Here is a proposal  The same good people of all backgrounds who founded the United States Holocaust Memorial Museum in Washington, D.C., with private donations and the resources of the federal government can make the Slavery Museum a reality.

It would be an historic tribute to the unpaid labors and terrible suffering of African American slaves who harvested the food, took care of

others' children, and built much of America, including the U S Capitol itself, during those two and a half centuries

Ralph Nader
Washington

Why is the United States National Slavery Museum being built in Fredricksburg, Va , instead of Washington, on our National Mall? I can answer this question. Most white Americans in this great nation are in denial of the devastating impact slavery and racism continue to have on America Why put it in our own backyard?

Pamela A. Hairston
Washington

## A Little Wage Inflation Would Be Welcome

Regarding "Investors may be celebrating too soon" (Business Outlook, Aug. 14): Would a little wage inflation really be so bad? I understand labor's share of corporate profits are at relatively historic lows and the real wage has generally stagnated or fallen for some time now (with, I believe, a brief reprieve in the '90s) Maybe workers could finally have a chance to have their wages keep up with the nominal price increases we have all been experiencing lately

Andrew Harrison
Cambridge, Mass

## A Blade Too Far—For Some Shavers, At Least

I read Dan Beucke's commentary ("A blade too far," News & Insights, Aug. 14) on the Gillette Fusion razor with amusement. My wife and children tease me about my ever-increasing razor collection, as a new "cutting edge" marvel comes out, I'm one of the first to run out and buy it. Like Beucke, they seem to miss the point To some extent, the humble razor is a utility device, used for personal grooming It should be functional and, let's face it, there's a limit to the number of ways to trim whiskers But to many people, the razor goes beyond that, and that is the market Gillette has tapped.

A razor is also a toy. Shaving every morning can be dull work, and for those of us looking to vary our morning routine, a new toy is welcome. A shiny color, more blades, a vibrating handle -- why, the Fusion even has an indicator light to tell you the battery is running low! But the best thing about this new toy is that most of us can afford it Sure, $40 (with a bunch of blades) is more than cheap razors cost, but it's a lot less than just one ticket to a Major League Baseball game

Robert D Grossman
Egg Harbor Township, N.J.

Four blades, five blades, six blades.. .What's next, a lawnmower? Here's a novel idea: How about making one blade that actually works? One hundred years ago, Gillette advertised a razor that could get 100 uses. Revolutionary. In the meantime, I'll keep using the generics.

Paul Marino
New York

I'm an old man of 86, and I use a single-blade razor of pre-World War I vintage -- my father's safety razor I carried it as a combat infantryman during my World War II adventure in France and Germany. I was superstitious and had the idea it would be good luck Being a survivor of the Great Depression, when a penny had some value and you learned to get by with the bare essentials, I would be able to reuse the Gillette blades many times by simply resharpening the double-edged blade The only tool needed was an average-size water glass. With one finger pressing on the blade on the inside of the glass and seesawing back and forth on the rounded surface, it would be as good as new. So much for advanced science

Robert J. Straba
Albuquerque

# Exhibit Z

10 0036

**FILED**

JAN - 8 2010

Clerk, U.S. District and
Bankruptcy Courts

Westlaw

**News**Room

10/26/06 ROLLCALL (No Page)

Page 1

10/26/06 Roll Call (Pg. Unavail. Online)
2006 WLNR 18580611

Roll Call (USA)
Copyright 2006 Roll Call Inc. All rights reserved.

October 26, 2006

Inequity at LOC

After reading your informative Oct. 12 article "Black Employees' Foundation Sues LOC," I was compelled to write and comment.

In the article, Howard Cook, officer of this foundation and respected mentor to many, stated that he loved his career at the Library of Congress but also hated the environment and treatment afforded minority employees. My sentiments exactly! At any given time, you can ask 500 black LOC employees if they've experienced discrimination and/or double standards on the job, and you'll probably get 500 different stories. Funny thing, all of us can't be wrong.

Recently, I requested a transfer to another division and from the treatment I got from management, you'd think I'd asked to be president of the United States. A rabid dog would have been treated better. It took me 25 years of my 28-year career to become an LOC professional and after all these years of hard work and dedication, who needs this kind of stress? Yes indeed, we all can't be wrong.

Black Americans are frequently accused of playing the infamous race card. Answer me this: Who invented the race card? I fear no repercussions for writing this letter. After all, this is America.

Pamela A. Hairston

Information Research Specialist

Library of Congress

---- INDEX REFERENCES ---

Language: EN

OTHER INDEXING: (FOUNDATION SUES LOC; HAIRSTON INFORMATION RESEARCH SPECIALIST LIBRARY; LOC) (Answer; Funny; Howard Cook; Inequity; Pamela A.)

Word Count: 248
10/26/06 ROLLCALL (No Page)
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit AA

Westlaw

**News**Room

8/31/06 WATIMES A20

8/31/06 Wash. Times (D.C.) A20
2006 WLNR 15108683

Washington Times (DC)
Copyright 2006 Inc.

August 31, 2006

Section: LETTERS

Thanks, Cos

THE WASHINGTON TIMES

Thank God for Bill Cosby's relentless commitment to black American families ("Cosby exhorts students, parents," Metropolitan, Aug 23). Mr. Cosby recently visited three Baltimore elementary schools exhorting black children to value education and black adults to build stronger families.

It's going to take more than Mr. Cosby to turn this crisis around. Affluent, influential hip-hop artists and professional black athletes need to also step up to the plate in a national effort to change the course that many of our young, black Americans are taking.

PAMELA A. HAIRSTON

Washington

---- INDEX REFERENCES ---

Language: EN

OTHER INDEXING: (Affluent; Bill Cosby; Cos; Cosby; PAMELA A. HAIRSTON)

Word Count: 115
8/31/06 WATIMES A20
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit AB

5/17/06 Atlanta J. - Const. A12
2006 WLNR 8447584

Atlanta Journal and Constitution (GA)
Copyright 2006 The Atlanta Journal-Constitution

May 17, 2006

Section: Editorial

READERS WRITE

XAVIER HARRISON, BERT SILVERSTEIN, JO RUSIN, MELODY T. MCCLOUD, PAMELA A. HAIRSTON, TINA TRENT, LISA SICILIANO

Bill Cosby

Responses to "Cosby: Take charge," Metro, May 15

Direct assistance where it's really needed

Bill Cosby was right on target with his comments to the female black graduates: Become entrepreneurs. He also mentioned how young black boys are dropping out of school but they can memorize rap lyrics.

Cosby has been known for his generosity to Spelman, where most black students hail from upper-middle-class families. Perhaps he should think about spending his millions where they are more needed, like the many failing inner-city public schools across this great nation.

PAMELA A. HAIRSTON, Washington

EDITION: Main: The Atlanta Journal-Constitution

Word Count: 1024
5/17/06 ATLNTAJC A12
END OF DOCUMENT

# Exhibit AC

Westlaw

**News**Room

9/9/05 TRNTST A19

9/9/05 Toronto Star A19
2005 WLNR 14200451

Toronto Star

Copyright 2005 Toronto Star Newspapers Limited, All Rights Reserved.

September 9, 2005

Section: Letter

## Some good has to come from tragedy

Letter

Many 'underprivileged' better off, Barbara Bush says

Sept. 7.

Barbara Bush is getting much criticism about her recent comments concerning the Katrina evacuees at the Astrodome in Texas. She stated that many of the victims were "underprivileged anyway, so this is working very well for them." Why does the truth seem to hurt us so? Most of these people are poor, which means they are underprivileged. From Hollywood to China, even from the tsunami-stricken regions in Asia, money, supplies and sympathy are pouring in. Something good has got to come out of this tragedy or else this great country is doomed.

Let's hope when all is said and done, better mothers, single and married, will evolve and men will become better fathers to their many children. Babies will stop having babies because they will realize that no one will come and save them but themselves. Crack cocaine, alcohol and other mind-altering drugs will no longer be on their agendas. Homicides and crime will no longer plague our inner cities. The rising HIV/AIDS statistics in the black community, especially the inner cities, will fall like the stock market in 1929. Unemployment and high school dropout stats will soon follow suit.

Yes indeed, this is our time, a time of spiritual awakening. Something good indeed shall come to pass, slowly but surely. If not, may God have mercy on our souls. I am a black woman and I thank you for allowing me to share my opinion with your many readers.

Pamela A. Hairston,

Washington, D.C.

---- INDEX REFERENCES ---

# Exhibit AD

7/31/05 Daily Press (Newport News, VA) H2
2005 WLNR 23529794

Daily Press
Copyright 2005 The Daily Press Inc.

July 31, 2005

Section: Outlook

LETTERS TO THE EDITOR

Paul Goldman's tirade against power brokers and insider politicians ("Don't let the politicians choose," July 6) fell very short advocating primary selection as the only salvation for the people. It sounded very hollow coming from a former party chair who presided over state party conventions. But frankly that is not the weakest part of his argument.

The reality is party insiders continue to wield power and use the Virginia election laws, including the primary, to their benefit.

This year both the Democratic and Republican parties have nominated their statewide candidates by spending taxpayer monies. This fact is the greatest argument against primaries -- any party primary: Party politics is being conducted at taxpayer expense.

The major parties belly up to this gravy train often. When have you last heard of a third party using a primary for the nomination process? When conventions are used the political party must pay its own bills. When primaries are conducted, the taxpayer foots the bill -- 100 percent.

Elections are the heart and soul of our republic and commonwealth, but unfortunately both the heart and soul are owned by the very power brokers from whom Goldman wants to be free. Primary selections (and they certainly should never be characterized as elections) do nothing to free the common people from the tyranny of insider politicians and power brokers.

The honest way to build "a new Virginia" is to move away from election laws that promote nearly 70 percent of the incumbents being unchallenged. Virginia must have nonpartisan means of drawing legislative districts. Virginia must have laws that do not cater to the major parties and have laws that force the parties to pay 100 percent of the cost of any nominating process including the primary selection.

The people will return to the polls when they have an honest choice. The people will return to the polls when they know their vote counts.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Jamie Wampler

Newport News *

Stand together

I support President Bush and our armed forces in the fight against terrorism. I ask all Americans to stand with the president to make certain the extremists know we are not divided. The terrorists see our division as hope. Hope that our resolve will weaken. I want the world to know we are not divided and there is no hope for terrorism.

It would be so nice to hear these words from any leading Democrat. It would be wonderful if they could put politics aside and stand with our president and speak to the extremists in one loud voice. I am not counting on this because their hunger for power has overcome their common sense.

This war will be long and costly. The number of dead and the cost of this war can be reduced by standing together. Please do not wait for another attack here at home to realize this is a war like no other. As hard as it is for Bush haters to support Bush on any issue, I beg them to support him on this one.

Keith Derby

Yorktown

What if ...?

In response to recent letters concerning the existence of God I add this thought: What if God appeared in human form? What if God, the creator of the universe, took on flesh and blood and walked among us? Would that make it easier to believe in his existence?

I believe that our creator wants us to live our lives in relationship with him. He doesn't want there to be any confusion about who he is or about who we are. It's ironic that the riddle of human identity and significance is so intrinsically connected to the whole question of the existence of God. If there is no God and the universe is a cosmic accident, then what are we?

To remove confusion, to verify that we are made in God's image and likeness and to invite us to relationship with him, our creator entered human history by becoming a human being. His name was Jesus. Jesus is the answer to the question of God's existence as well as the answer to the question of human identity and significance.

Steve Gibbs

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Newport News

Slavery reparations

After reading "Shakedown lobby gearing up" by Walter E. Williams on July 20, please allow me, a descendant of slaves and survivor of Jim Crow, to comment.

Williams' advice about graduating from school, marrying and then having children, working any kind of job, all of this is excellent advice not only for black Americans but all Americans. But why does Williams have to refer to the NAACP and other black Americans who believe in slavery reparations as hustlers? I believe in reparations and I'm neither a hustler nor a member of the NAACP.

A good idea for reparations? Do away with the KKK and all-white juries. Considering the history of this great nation, both should have been outlawed decades ago. Some things never change.

Forty acres and a mule? Right now, I'd take an acre and a chicken.

Pamela A. Hairston

Washington, D.C.

Hampton leadership

The members of Hampton Watch claim that their actions in getting recall petitions against four white members of the Hampton City Council are not racial. Well, I have news, you can't call a duck anything but a duck.

They must think that the citizens of Hampton, including white citizens, are stupid. Hampton Watch will be satisfied only when the mayor is black and all of the members on the council are black.

It makes honest citizens, black and white, weary when we have to keep hearing the incessant whining of a few who are unhappy and won't be happy unless things are their way or no way. Get over it. Use your energy to help the police fight the ever-growing crime in Hampton and the teachers fight the ever-growing numbers in their classes. Quit dividing the city. It all boils down to leadership.

The former city manager had problems with any leadership but his own, and now he has been removed. It's what is good for the citizens of Hampton, not what is good for Hampton Watch.

Kevin D. Johnson

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit AE

7/25/05 Herald (Rock Hill, S.C.) 4A
2005 WLNR 11651719

Herald, The (Rock Hill, SC)
Copyright 2005 The Herald, a division of East Coast Newspapers, Inc.

July 25, 2005

Section: Letters

Voice of the people

Even score with acre and chicken

I truly enjoyed reading Vincent Blackwell's commentary, "Senate apology just a start," which appeared in The Herald July 16. In this excellent piece, Mr. Blackwell writes about some of the many injustices suffered by black Americans: how Anthony Crawford of Abbeville was lynched with more than 200 bullet holes in his body for disputing a business deal; how the U.S. Senate recently apologized for its failure to pass anti-lynching laws in the 1800s and 1900s; how the nation made reparations to Japanese-Americans for the internment camps they were made to occupy during World War II.

Please, allow me, a descendant of slaves and survivor of Jim-Crow, to share some more American history with your readers.

On Jan. 1, 1863, President Abraham Lincoln signed the Emancipation Proclamation, freeing the slaves. On the very same day, the Homestead Act of 1862 was enacted. Under this act, Congress literally gave away more than 270 million acres of land to more than two million white Americans, 160 acres per person, or family, free. The only stipulation was that they had to "homestead" the land for five years. Imagine that: 160 acres, free. And they didn't even have to be a U.S. citizen, only working on becoming one.

The U.S. government could give away 160 acres of land, free, to non-citizens but could not give 40 acres, as promised, to a people who provided them 200-plus years of hard, free labor. Instead, they gave us 100-plus additional years of hate, black codes, Jim Crow laws, the KKK, lynchings, burnings, rapes, chain gangs, segregation, degradation, oppression. stealing of property, redlining, profiling, discrimination, poverty and still more hate.

I ask you: Would black America, no, would America as a whole be a better nation if it had kept its promise? Forty acres and a mule? Hell, right now, I'd take an acre and a chicken.

Thanks for listening, and may God bless and protect children and soldiers everywhere.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Pamela A. Hairston

Washington, D.C.

New player needed on hospital scene

Many of our citizens in our county use one of the following health care systems: Pied- mont/Tenet, Carolina Medical Center or Presbyterian. Among them, they have eight or nine hospital centers in nearby cities or towns and many urgent care centers which provide adequate care to Carolinians on both sides of the border. But in a society that thrives on competition, do three corporations deserve to corner the market in health care?

Or, better yet, should town or county councils have the final say so on the health care of more than 175,000 people? Personally, I do not believe so; I believe the people of York County should be able to speak on this matter.

I believe that the people should be given the accurate information on each hospital vying to build in the Fort Mill area.

I firmly believe that none of the three hospitals listed above should win the rights to build here. If the people want competition, if they want something that is new and different and they want the best health care possible for the cost, none of the three above qualify.

It seems to me the proposal by Hospital Partners of America (HPA) is the only really new choice we have. We can already use the fine hospitals of CMC or Presbyterian in Charlotte. HPA's presence here would offer us a new option. HPA has committed to addressing western York's medical needs. And the facts that HPA would pay local property taxes and move their corporate headquarters to our county are attractive facets of their proposal.

My advice to our elected officials is to focus on new medical choices for the community - ones that will help pay their fair share and not sneak around and play games. At least, they should listen to the options that are placed on the table and not make deals without the public's knowledge.

Joseph St. John

Fort Mill

Editor's note: The decision to award a certificate of need to build a new hospital in York County will be made by the state Department of Health and Environmental Control - not by local government. Residents who wish to comment on the issue may write: Joel C. Grice, Bureau of Health Facilities and Services; DHEC; 2600 Bull St.; Columbia SC 29201.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit AF

5/25/05 Balt. Sun 18A
2005 WLNR 8267637

Baltimore Sun (MD)
Copyright © 2005 The Baltimore Sun. All rights reserved.

May 25, 2005

Section: EDITORIAL

LETTERS TO THE EDITOR

Dramatic finish reminds us of value of racing

   If my great-grandfather, Morris Schapiro, long-time owner of Laurel Race Course and advocate of international horse racing, were still alive today, he would have been at Pimlico watching the incredible drama unfold in the home stretch of the 2005 Preakness Stakes ("Afleet Alex powers to a win," May 22).

   Cutting through all controversy around whether to allow slot machines at Maryland tracks in an effort to save what could be a dying sport in Maryland, Afleet Alex and this year's Preakness field proved once again that America loves a good old-fashioned, come-from-behind horse race.

   Few other sports offer the unpredictability and drama we saw at Pimlico on Saturday and at Churchill Downs with Giacomo's come-from-behind win just weeks earlier.

   If we are lucky, we'll see another surprise at Belmont and have a Triple Crown of dramatic races that will be talked about for decades to come.

   Let's hope these stories will continue to be told in the stands at the Pimlico and Laurel tracks in the years to come.

   Jeffrey G. Katz

   Severna Park

Don't let Preakness go way of the Colts

   The more I read about the potential loss of racing in Maryland because of opposition to slot machines ("Tough odds for Pimlico," May 20), the more I am reminded of a similar state of affairs in Maryland in the late 1970s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and early 1980s.

One needs only remember two names that should resonate in the legislative chambers when considering this important legislation: Robert Irsay and the Baltimore Colts. Baltimore lost its storied football franchise despite last-minute, frenzied legislative and legal activities because of opposition to a new stadium.

Now it appears that history is about to repeat itself as we ponder the loss of yet another storied Maryland tradition, horse racing, because of legislative opposition to the slot machines needed to keep the sport in Maryland.

The legislators who have opposed slot machines in the past should reconsider before it's too late to save Maryland racing, just as it became too late to save the Colts.

Jerrold L. Brotman

Timonium

Slots wouldn't add to racing's fan base

The Sun's three-column, front-page photograph shows a yawning furlong of row after row of empty seats, right behind the rail at the top of Pimlico's long home stretch ("Tough odds for Pimlico," May 20). There were a mere seven railbirds in the photo exhorting the tight, six-horse field dueling to the wire.

That's not a favorable human-to-equine ratio for a thoroughbred racetrack.

If the slots parlors long sought by the De Francis family at Pimlico and Laurel racetracks are ever built, the revenues should result in larger fields in the races run there. And the money bet on the races should increase.

But slots parlors are not likely to put one single, additional, live racing fan into that sea of empty seats.

There may be the occasional slots junkie who stumbles out of his den into the sunlight, having lost his way en route to the ATM machine or the men's room. But he sure won't be there long.

Henry R. Lord

Baltimore

The costs of slots dwarf the benefits

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

I grew up near Charles Town, W.Va., and most of my family still lives there. I remember when the Charles Town racetrack threatened that 500 local jobs would be lost if slots were not approved. Slots finally were reluctantly accepted, since it was believed that unemployment was worse for the community than slots.

But that belief was wrong. The organized crime, rampant bankruptcy and families ruined by addiction to gambling have made slots a very bad bargain.

I am proud of the Democrats in the Maryland legislature who are taking the long view on what is beneficial for our state, communities and families, instead of embracing the quick fix of gambling.

Lisa Stahley

Baltimore

Bush's prayer for life comes much too late

In "Bush echoes the late pope at Catholic prayer event" (May 21), the president asked those attending to "pray that America uses the gift of freedom to build a culture of life."

This prayer comes a little late for the more than 1,600 Americans and tens of thousands of Iraqis who have lost their lives in the ill-advised war into which President Bush has gotten us.

Lester Cohen

Baltimore

Prosecutors sought integrated Jones jury

Writers to The Sun have questioned why the prosecutors allowed an all-white jury in the case of Noah Jamahl Jones ("Juries must be integrated to be fully respected," letters, May 19). Had they sat in on the process, they would have seen that the story is very different from what they might think.

When I saw the racial composition of the jury, I knew it would be an issue. However, the attorneys who handled this case had fought tooth and nail in attempts to seat a jury more racially diverse.

The list of potential jurors for any case is computer generated. When the list of potential jurors for this case was presented to the court, it was obvious that almost all of the African-Americans were in the bottom half of the list.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

We asked the judge to consider the jury list from the bottom up in an attempt to foster a more balanced pool of jurors. Our request was denied.

We challenged the defense attorneys' strikes of potential black jurors, but that challenge was denied as well.

We did all these things not because of pressure from special interest groups but because it was in the best interest of justice in this case.

Certainly, the questions regarding the verdict would not be present had the jury been racially mixed. And, indeed, we would have preferred a jury whose decisions would not be called into question.

However, in the end, we feel that the jury empanelled in this case rendered a verdict based upon evidence, not race.

While we may disagree with the jury's verdict, we must respect and accept its decisions.

Frank R. Weathersbee

Annapolis

The writer is Anne Arundel County state's attorney.

History rules out all-white juries

Fifty years ago in Mississippi, it took an all-white jury just over an hour to acquit two white men who had beaten 14-year-old, black Emmett Till to death.

On May 12, in Anne Arundel County, an all-white jury acquitted one of six white men accused in the fatal beating of a black high school student in July 2004.

Considering the history of this great country, all-white juries and the Ku Klux Klan should have been outlawed decades ago ("Juries must be integrated to be fully respected," letters, May 19).

Some things never change.

Pamela A. Hairston

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Washington

COLUMN: LETTERS TO THE EDITOR

---- INDEX REFERENCES ---

COMPANY: INDIANAPOLIS COLTS INC; SUN CORP; JU XING KE JI GU FEN YOU XIAN GONG SI; ATM

NEWS SUBJECT: (Social Issues (1SO05); Criminal Law (1CR79); Legal (1LE33); Racketeer Influenced & Corrupt Organizations (RICO) (1RI18); Legislation (1LE97); Judicial (1JU36); Crime (1CR87); Government (1GO80))

INDUSTRY: (Equestrian Events & Horse Racing (1EQ65); Travel & Tourism (1TR07); Casinos (1CA80); Gaming Industry (1GA25); Entertainment (1EN08); Sports (1SP75))

REGION: (North America (1NO39); USA (1US73); Americas (1AM92); Maryland (1MA47))

Language: EN

OTHER INDEXING: (ATM; BALTIMORE; BALTIMORE COLTS; CATHOLIC; COLTS; DE FRANCIS; EDITOR; GIACOMO; KU KLUX KLAN; LAUREL; LAUREL RACE; LETTERS; MARYLAND; NOAH JAMAHL JONES; PIMLICO; SUN) (Annapolis; Bush; Cutting; Emmett Till; Fifty; Frank R. Weathersbee; Henry R. Lord; Jeffrey G. Katz; Jerrold L. Brotman; Lester Cohen; Lisa Stahley; Morris Schapiro; Pamela A. Hairston; Robert Irsay; Severna Park) (COLUMN LETTER )

EDITION: FINAL

Word Count: 1313
5/25/05 BALTSUN 18A
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit AG

Westlaw

**News**Room

11/5/04 WATIMES A20

Page 1

11/5/04 Wash. Times (D.C.) A20
2004 WLNR 5187285

Washington Times (DC)

Copyright (c) 2004 Washington Times. All rights reserved.

November 5, 2004

Section: LETTERS

What were they thinking?

THE WASHINGTON TIMES

Alas, Marion Barry, once dubbed "mayor for life," has been elected, once again, to public office ("Barry back on council after Ward 8 landslide," Metropolitan, Wednesday).

Here we have a public figure, caught red-handed on national TV indulging in a drug that has almost single-handedly destroyed the structure of the black family and community, voted back into public office. What can my people, black Washington voters, be thinking? What miracles do they think Mr. Barry can perform, looking frail and fragile, to change one of the poorest neighborhoods in the District, a neighborhood plagued by drugs, unemployment, babies having babies, high school dropouts, new HIV cases and black-on-black crime?

What black D.C. voters need to do is concentrate on making better choices, voting and otherwise.

PAMELA A. HAIRSTON

Washington

20041105093407-110504

---- INDEX REFERENCES ---

REGION: (USA (1US73); Americas (1AM92); North America (1NO39))

Language: EN

OTHER INDEXING: (HIV; TV) (Alas, Marion Barry; Barry; PAMELA A. HAIRSTON)

Word Count: 173
11/5/04 WATIMES A20
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit AH

Westlaw

**News**Room

10/12/04 ROLLCALL (No Page)

10/12/04 Roll Call (Pg. Unavail. Online)
2004 WLNR 4025234

Roll Call (USA)
Copyright 2004 Roll Call Inc. All rights reserved.

October 12, 2004

Complainants Can't All Be Wrong

Like many black Library of Congress employees, I was saddened and discouraged to read in Roll Call about the dismissal of the allegations of racial discrimination by a group of 800 Library of Congress employees last week. ("LOC Discrimination Allegations Dismissed," Sept. 27). Two LOC employees filed a grievance and hundreds followed suit.

Right across the street from the LOC, a similar class-action suit was also dismissed, involving more than the 350 black Capitol Police, with more than 350 plaintiffs. ("Black Cops' Class-Action Suit Tossed," Oct 4.).

I've worked at the Library of Congress for more than 25 years and I can truly testify that 800 people can't all be wrong. When I retire from this great institution, I'm going to write my bestseller: "Capitol Hill: The Last Plantation."

God bless America.

Pamela A. Hairston

Washington, D.C.

---- INDEX REFERENCES ---

NEWS SUBJECT: (HR & Labor Management (1HR87); Workplace Discrimination & Equal Opportunity (1WO73); Business Management (1BU42); Occupational Safety (1WO89))

Language: EN

OTHER INDEXING: (CONGRESS; LOC) (Allegations Dismissed; Complainants; God; Pamela A. Hairston)

Word Count: 169
10/12/04 ROLLCALL (No Page)
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit AI

Westlaw

**News**Room

9/23/04 INDPNDT 40

Page 1

9/23/04 Independent (United Kingdom) 40
2004 WLNR 10520504

Independent (UK)
Copyright 2004 Independent Newspapers (UK) Ltd.

September 23, 2004

Section: Comment

Letter: American monuments

Pamela A Hairston

Sir: For me, reading the many articles written across the world about the opening of the new National Museum of the American Indian was bittersweet (report, 20 September). Sweet because of its magnitude, magnificence and importance. But, alas, bitter because it will be the last museum built on the Mall, which means there will never be a National Museum of the African American on our mall.

Let us take a moment and honour my mother and millions of other black female domestic workers. For 50 years of my mother's precious life she was a maid and nanny to rich, southern white families, helping to raise over 70 white children. (My fiance commented at her funeral: "I ain't seen so many white folks crying since Elvis died.") Multiply that by millions. A tribute is long overdue.

PAMELA A HAIRSTON

Washington DC

---- INDEX REFERENCES ---

Language: EN

OTHER INDEXING: (NATIONAL MUSEUM; NATIONAL MUSEUM OF THE) (Letter; Multiply; Sir; Sweet)

EDITION: First

Word Count: 161
9/23/04 INDPNDT 40
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit AJ

12/13/03 Wash. Times (D.C.) A12
2003 WLNR 759051

Washington Times (DC)
Copyright (c) 2003 Washington Times. All rights reserved.

December 13, 2003

Section: LETTERS

'D' for the District

THE WASHINGTON TIMES

 In regard to the article "Teaching jobs face ax in school budget deficit" (Metropolitan, Wednesday) by Jim McElhatton: Headlines such as this make me angry. Here we are in the nation's capital - the most important city in the world - and we're failing our children. I don't know all the ins and outs of how the District's school system managed to get a $38 million budget deficit, but I do know we can't continue to fail where the future of our children is concerned.

Didn't first lady Laura Bush recently begin an education initiative focusing on recruiting the best and brightest to the teaching profession and ensuring that all young children are ready to read and learn when they enter the classroom? What happened? Did she forget that she also lives in this great city? Doesn't she care about the children who live in her own back yard?

 PAMELA A. HAIRSTON

 Washington

 20031214210652-121303

---- INDEX REFERENCES ---

Language: EN

OTHER INDEXING: (Jim McElhatton; Laura Bush; PAMELA A. HAIRSTON)

Word Count: 180
12/13/03 WATIMES A12
END OF DOCUMENT

Exhibit AK



Click logo for www.SUSRIS.org home page

## Item of Interest
## December 27, 2008

✉



### Iran Capturing Iraq
**Dr. Kenneth Katzman**

**Editor's Note:**

Each fall the National Council on US-Arab Relations brings together a distinguished group of diplomats, government officials, business people, military officials, scholars and others to tackle the thorny issues surrounding US-Arab relations. SUSRIS has provided AUSPC speakers' remarks, which touch on the Saudi-US relationship, to you for over the last five years. In keeping with that practice we again provide for your consideration a collection of AUSPC presentations.

Today we present the remarks of Dr. Kenneth Katzman, Senior Middle East Analyst for the U.S. Congress. During 1996 and between July 2001-March 2002, he was assigned to the Majority Staff of the House International Relations Committee to work on Middle East issues. Between 1985-1989, he served as an analyst for the U.S. Central Intelligence Agency, where he was tasked with preparing written reports for U.S. Middle East policymakers on leadership dynamics in Iran, Iraq, and the Persian Gulf states, and with briefing senior U.S. officials. He has also written numerous articles in various outside publications, including "The Warriors of Islam: Iran's Revolutionary Guard," and papers on the

ballistic missile capabilities of Iran and Iraq for the Commission to Assess the Ballistic Missile Threat to the United States ("Rumsfeld Commission") in 1988. During 2004, Dr. Katzman was a consultant to CBS News on Al Qaeda and related Islamic extremist groups. He is quoted frequently on the Persian Gulf in the U.S. press and appears frequently on Middle Eastern news stations including Alam TV, Al Hurra, Al Arabiyya, LBC, and Al Akhbariya

Dr. Katzman was joined on the panel by Gen. Brent Scowcroft, Mr. Wayne White and Gen. Joseph P. Hoar. Their remarks will be provided separately. The panel was introduced by Dr. John Duke Anthony, President of the National Council on U.S.-Arab Relations.

Additional AUSPC sessions which address U.S. and Saudi issues will be provided by SUSRIS in the coming days.


**17th ANNUAL ARAB-U.S. POLICYMAKERS CONFERENCE**
**"Transitioning the White House: Challenges and Opportunities for Arab-U.S. Relations"**
**October 30-31, 2008 | Washington, DC**

**Iran Capturing Iraq**
**Dr. Kenneth Katzman**

[DR. JOHN DUKE ANTHONY] We now have Dr. Kenneth Katzman who's the senior specialist, writing reports and advising members of Congress on issues pertaining to Iran, Iraq, Arab-Israeli conflict, and other transnational issues. He's prolific in the voluminous reports that he prepares that are accessable to people engaged in foreign affairs, policy analysts, policy makers, and policy implementers. Dr. Katzman.

[KATZMAN] Thank you John, and thank you for having me again. I always enjoy speaking before these great conferences. And Happy Halloween everybody.

In regards to <u>Sheika Lubna's great speech at lunch</u>, Iran is a neighbor of the UAE. It's a neighbor that's sitting on three islands owned by the UAE, but it is a neighbor to the UAE, that's correct.

The title of my talk today, and I have a few extra copies, is called "Iran Capturing Iraq." "Iran capturing Iraq."



I've been asked to address Iran's influence in Iraq. With the conventional military and WMD threat from Saddam removed, Iran now seeks to insure that Iraq can never again become a threat to Iran, whether U.S. forces are in Iraq or not. I used to ask, with panels like this, two years ago, I would ask my peers on the panel does Iran want the United States in Iraq or do they want us out of Iraq? And the answer that would universally be given two years ago is both, or neither.

Well now I think the answer is becoming clear, clearer. Having secured Shia control over Iraq, Iran now -- they were ambivalent two years ago until Shia control was consolidated -- now that it is consolidated, Iran wants the United States out of Iraq. I think that's becoming clearer. By supporting Shia factions, Iran's influence in Iraq has at times hindered U.S. stabilization efforts and has heightened the threat of U.S. perception threat of Iran generally.

However, Iran is now itself facing difficult choices because its Shia protégés in Iraq are now at odds with each other. This even Iran did not expect. During 2003 to 2005, Iran calculated that it suited its interests to support the entry of Shiite Islamic factions into a U.S. led election process, because the overwhelming majority of Shia, numerical majority, would produce a Shia government, which is exactly what happened.

Iran in fact helped assemble the Shia Islamic block called the <u>United Iraqi Alliance</u>, which includes the Islamic Supreme Council of Iraq, the Dawa Party, and the faction of Muqtada al Sadr. A senior Dawa leader is Prime Minister, Nouri Maliki. Several leaders of the Supreme Council control other positions. The Sadr faction's ties to Iran were initially limited after the fall of Saddam because Sadr's family was not in exile in Iran or elsewhere. Sadr's family was still in Iraq, and his ties to the Iranian leadership were not formed really at all.

It's only later that Iran, when Iran started to really reach out to Muqtada al Sadr when they saw that Sadr had his Mahdi Army, which I'll call the J Shah Mahdi or JAM. It was becoming a powerful force and Iran said that this is a force that we cannot ignore. We need to place some bets also on this group. And Iran began supplying arms to the JAM through the Quds force, the export of the revolution force of the revolutionary guard, which it's the unit that goes abroad. It started really as the unit that helped form Hezbollah's militia. And it evolved to a sort of a force that goes abroad and helps Shia movements, not only Shia, but movements outside of Iran.

What happened though was Iran's strategy, which was going so well, actually tripped up Iran in 2007. Why is that? Because the United States, President Bush, decided on the troop surge. And he told Prime Minister Maliki we are going to help stabilize this deteriorating situation, but in exchange you must allow us to go after Sadr and the JAM. Maliki really had no viable choice other than to say okay. And what happened was the United States, the troop surge forces, started going after the JAM. And what happened, Sadr broke with Maliki, the alliance unraveled, Sadr pulled out of the United Iraqi Alliance, he pulled his five ministers out of the cabinet, and we began getting battling between the JAM and the government forces, Shia dominated government forces throughout southern Iraq.

It is primarily Iran's arming and training of the JAM that has added to U.S./Iran tensions over Iran's nuclear program and broader regional influence. And I, where I may differ with Wayne, is that the key threat from an Iranian nuclear program is not necessarily that Iran is going to attack Israel or use the nuclear weapon, the threat is that Iran will be emboldened because no one will be able to retaliate against Iran. It will be emboldened to further all the aggressive policies in the region that Iran has been pursuing. That's the key, I think, drawback to a nuclear Iran.



We have of course specific evidence that Iran is shipping numerous types of weapons to the JAM. General Petraeus has testified to this, and we now have some of these JAM elements consolidating it to what's called special companies or special groups. Some call them rogue breakaways of the JAM. I happen to consider them still JAM, who are still simply continuing radical activity.

And so I described this break between Maliki and Sadr. Now provincial elections are scheduled in Iraq for early 2009. And Maliki in advance of that wants to suppress the strength of the Sadr faction, and this I think explains why he launched his offensive on Basra against the JAM in 2008, and I totally concur with Wayne that part of the reason the government forces did gain the upper hand was not their own ability but really Petraeus and the U.S. military and the British military supporting them. I think had that not happened, the Iraqi, the ISF was very close to fracturing in Basra and would've had to retreat in humiliation.

So Sadr seeing what's going on has now tried to retrench and is bringing in the JAM and saying they will do political, social, and cultural work. Some U.S. commanders say they've gone to Iran; they're waiting to come back. Some are maybe coming back, trying to influence perhaps the elections, the provincial elections.

Now, how is Iran consolidating? You know, to head a lot of this off, the United States decided actually on direct talks with Iran. This was unprecedented. The United States since the revolution had not really had direct talks but we've had them in Baghdad with Iranian representatives. And those seem to be not making too much progress but at least they were on going. Now in May, Iran seeing that it is basically consolidated control of its protégés in Iraq has said we will not attend these talks anymore. And I think this reflects Iran's growing confidence in its position in Iraq that it no longer feels it has to talk to Ambassador Crocker.

Iran has also exploited its close ties to build broad political and economic influence. Iran has pumped lots of loans into Iraq. We've had at least two increments of one billion dollars each in credits extended. And not only is Iran doing development work in the south, it's also doing development work up in the north with the Kurds in the Kurdish area, building roads and doing construction. So Iran is not just pursuing a Shia only strategy, a Shia Arab only strategy, it is also pursuing to some extent a north-south strategy in expanding its tentacles inside Iraq.

Now the big test is the U.S./Iraq strategic pact and I think it is clear from this Iran wants us out of Iraq. Iran is working overtime to scotch the pact entirely. Iran is making a lot of progress to do that. They stiffened the resolve of Maliki and his allies to insist on a timetable for U.S. withdrawal on that pact. President Bush acceded to that  request, to that demand really. But now even that is not enough. Iran continues to try to pressure various parliamentarians. General Odierno said Iran is trying to bribe Iraqi parliamentarians to vote against the pact if it gets to the Parliament. And Iran is also continuing to help the Sadr faction, which is going against the pact on the street level, with regular demonstrations against the pact every week.

So Iran is really using all its leverage to try to scotch the U.S./Iraq Strategic Pact. And this is because Iran does not want Iraq to serve as a potential aircraft carrier for a U.S. potential strike, not that any strike is imminent or going to happen, but Iran wants to make sure that the United States does not capture

Iraq. Iran feels that it has captured Iraq, the title of my talk, and it is continuing to tighten that grip and the Arab-Persian differences that many said would cause the two to split apart have not materialized. Maliki has visited Iran three times. He has invited Ahmadinejad to visit, who visited in March. And all the signs are that Iran is increasingly tightening its grip over Iraq. Thank you.

<end>

Arab-US Policymakers Conference (AUSPC 2008)

Transcription Services by Ryan & Associates


**About Dr. Kenneth Katzman**

As a specialist with the Congressional Research Service, Dr. Katzman serves as Senior Middle East Analyst for the U.S. Congress, with special emphasis on Iran, Iraq, the Persian Gulf states, Afghanistan, and terrorist groups operating in the Middle East and South Asia. He provides reports and briefings to Members of Congress and their staffs on U.S. policy and legislation on these countries and issues. He has also written numerous articles in various outside publications, including The Warriors of Islam: Iran's Revolutionary Guard, and given numerous official presentations and briefings at conferences and in bilateral meetings throughout the Islamic world. During 1996 and July 2001-March 2002, he was assigned to the Majority Staff of the House International Relations Committee to work on Middle East issues, including hearings and legislation.

Among other major publications, Dr. Katzman wrote working papers on the ballistic missile capabilities of Iran and Iraq for the Commission to Assess the Ballistic Missile Threat to the United States ("Rumsfeld Commission") in 1988. In late 1999, the Atlantic Council published his study, U.S.-Iran Relations: An Analytic Compendium of U.S. Policies, Laws, and Regulations. Dr. Katzman is quoted frequently on the Persian Gulf in the U.S. press and he appears frequently on Middle Eastern news stations including Alam TV, Al Hurra, Al Arabiyya, LBC, and Al Akhbariya. During 2004, he was a consultant to CBS News on Al Qaeda and related Islamic extremist groups.

Dr. Katzman holds a PhD in Political Science from New York University, 1991. His dissertation was on "Iran's Islamic Revolutionary Guard Corps: Radical Ideology Despite Institutionalization in the Islamic Republic." From 1989 to 1991, he was an analyst for Defense Systems, Inc., in McLean, Virginia, where he wrote analyses for clients in the defense and policy analysis community. Among these projects

were those focused on military and security forces in Afghanistan, Saddam Husayn's intentions, and the combat effectiveness of several Middle Eastern military forces. During 1985-1989, he served as an analyst for the U.S. Central Intelligence Agency, where he was tasked with preparing written reports for U.S. Middle East policymakers on leadership dynamics in Iran, Iraq, and the Persian Gulf states, and with briefing senior U.S. officials.

For more information: www.loc.gov/crsinfo/

**Related Material:**

- A Very Critical Time: Examining Iran and Iraq (AUSPC 2008) - Lt. Gen. Brent Scowcroft - SUSRIS IOI - Dec 3, 2008
- SUSRIS EXCLUSIVE - Moving in the Right Direction - A Conversation with Ambassador Ford Fraker - Part 3 - Dec 1, 2008
- Security Cooperation in the Gulf: Actions -- Rather than Words and Good Intentions - Anthony Cordesman - SUSRIS IOI - Nov 22, 2008
- The US, Israel, the Arab States and a Nuclear Iran - Anthony Cordesman - SUSRIS IOI - Oct 10, 2008
- Conventional Armed Forces in the Gulf - Anthony H. Cordesman - SUSRIS IOI - Aug 23, 2008
- Iran on the Horizon: Iran and the Gulf - Middle East Institute Conference Series - Feb 18, 2008
- Saudis 'Very Anxious' to Hear Bush Views on Iran - Dr. Gregory Gause - Jan 12, 2008
- The Future of the Middle East: Strategic Implications for the United States - Part 4 - Afshin Molavi - Jul 30, 2007
- Maintaining the Regional Balance of Power: Confidence and Urgency - Toby Jones - Apr 27, 2007
- What Saudi Arabia Wants - Good Neighbors - Rachel Bronson - SUSRIS IOI - Apr 17, 2007
- Iran, Oil, and the Strait of Hormuz - Anthony H. Cordesman - SUSRIS IOI - Mar 27, 2007
- Saudi Arabia and Iranian Influence - Dr. Gregory Gause Talks with CFR - SUSRIS IOI - Mar 20, 2007
- SUSRIS EXCLUSIVE - National Security Issues and the Saudi-US Relationship: A Conversation with Jean-Francois Seznec - Mar 12, 2007
- King Abdullah Hosts Meeting with President Ahmadinejad - SUSRIS IOI - Mar 5, 2007
- SUSRIS EXCLUSIVE - Regional Crises in the Context of Saudi-US Relations: A Conversation with Flynt Leverett - SUSRIS Interview - Jan 24, 2007
- Support for Iraq, Middle East Peace Process: Ambassador Turki al Faisal

Exhibit AL

Al-Maliki Demands Timetable For Iraq Withdraw      NPR                     http://www    .org/templates/story/story.php?storyId=92489073

# Al-Maliki Demands Timetable For Iraq Withdrawal
by LINDA WERTHEIMER

*July 12, 2008*                                                text size A **A** **A**

Iraq Prime Minister Nouri al-Maliki demanded this week that the U S set a timetable for withdrawing military forces  Kenneth Katzman, a senior analyst on Iraq policy for the Congressional Research Service, talks with Linda Wertheimer about the possibility of such an agreement

*Copyright © 2009 National Public Radio®  For personal, noncommercial use only  See Terms of Use  For other uses, prior permission required*

LINDA WERTHEIMER, host.

This week, Iraq's prime minister, Nouri al-Maliki, demanded that the U S set a timetable for withdrawing military forces. Political pressures within Iraq are widely seen as the reason for al-Maliki's demand which comes as the U.S. and Iraq are negotiating what the future U.S. presence in Iraq will be. That's after the U.N. mandate runs out at the end of the year. Kenneth Katzman is senior analyst on Iraq policy for the Congressional Research Service  He joins us from his office  Mr. Katzman, welcome

Dr  KENNETH KATZMAN (Specialist in Middle East Affairs, Congressional Research Service). Thank you  Glad to be with you

WERTHEIMER  Is insisting on a timetable in any agreement an effort to strengthen Iraq's bargaining position in negotiations with the U S?

Dr  KATZMAN  Well, I think it's more an effort by the prime minister to solidify his own political base  Several blocs in the parliament do not want this agreement at all, or at the very least arguing that it's an infringement of Iraqi sovereignty. Although I suspect that's not the real reason why they oppose it  He's trying to show that he's not being just simply told what to do by the United States

WERTHEIMER  Does this have something to do, as well, with the election coming up?

Dr  KATZMAN  Definitely, because Maliki is with a Shiite bloc that is definitely threatened by the prospects of the Muqtada al-Sadr faction  The Sadr faction is highly popular with poor Shiites in the Shiite southern regions and in Baghdad as well  And Maliki, I think, is trying to show that he's listening to the Sadrists' concerns

WERTHEIMER  Now, he broached the idea before a group of regional ambassadors on a visit to the United Arab Emirates  Do you think he's feeling pressure from other Arab regimes, as well, to set an endpoint for U S  military presence?

Dr  KATZMAN  No, I don't get that sense. But I think he is getting pressure from the Iranians  Iran views this as a U S  attempt to basically complete or continue its encirclement of Iran. Iran views this as a U.S  attempt to secure bases from which the United States can easily conduct an attack on Iran's nuclear facilities  Iran views this as securing U S  interests to be able to send covert operatives and Special Forces into Iran for missions. Iran has a tremendous fear of this agreement, and it's trying to work mainly through the Sadr faction to undermine the agreement

WERTHEIMER  Well, with all of that in mind, how serious would you say that the timetable is that the Iraqi government is proposing?

Dr  KATZMAN  I don't think it's serious because I think Maliki knows the United States would never agree to a firm timetable

WERTHEIMER  So do you think in fact he does not want U S  forces to leave?

Dr  KATZMAN. Oh, no  He does not want U S  forces to leave  His faction, the Supreme Council - which is an allied Shiite faction - the Kurds, and a few other factions, they want the United States there because in their view, the United States is defending them. The United States is keeping them in power  And as long as the United States is there, these challenging factions such as Sadr, such as Sunni insurgents, etcetera, can't have any chance of toppling Maliki  So of course he wants us to stay there

WERTHEIMER  Kenneth Katzman is senior adviser on Iraq policy for the Congressional Research Service  Mr  Katzman, thank you very much

Dr  KATZMAN  Thank you

*Copyright ©2009 National Public Radio®  All rights reserved  No quotes from the materials contained herein may be used in any media without attribution to National Public Radio  This transcript is provided for personal, noncommercial use only*

pursuant to our Terms of Use  Any other use requires NPR's prior permission  Visit our permissions page for further information

NPR transcripts are created on a rush deadline by a contractor for NPR  and accuracy and availability may vary  This text may not be in its final form and may be updated or revised in the future  Please be aware that the authoritative record of NPR's programming is the audio

## Iraqis Call For U.S. Troop Withdrawal Timetable
by MICHELE KELEMEN

*July 9, 2008*

**Capt. Rawlings Takes Your Questions**

The stop-lossed soldier answers listeners' inquiries about U S policy in Iraq and being mocked for his Ivy League background

The Iraqi government is now calling for a timetable for the withdrawal of American troops, but the Bush administration is trying to downplay those calls despite a re-ignited debate on the presidential campaign trail

The Bush administration has been trying to negotiate a status-of-forces agreement with Iraq to make sure U.S. troops have the legal right to be there once a United Nations mandate ends late this year.

Iraqi Prime Minister Nouri al-Maliki has now made clear the invitation will not be open-ended  His national security adviser told reporters that Iraq cannot accept any agreement unless it has specific dates for a withdrawal of U S  troops. That would be hard to swallow for the Bush administration, according to Kenneth Katzman of the Congressional Research Service

"That would be a very big journey for the administration to sign on to any type of firm timetable for withdrawal," Katzman says. "That would be really repudiating the administration's entire strategy "

The Bush administration argues that the U.S  drawdown should be based on conditions on the ground and not on a timetable that could allow insurgents to simply wait it out and regroup

"We're looking at conditions, not calendars here," State Department spokesman Gonzalo Gallegos says  "We're making progress and are committed to departing, as evidenced by the fact that we have transferred over half of the country's provinces to provisional Iraqi control  And we're planning on removing the fifth and final surge brigade at the end of the month here, if things go according to plan "

The Bush administration and Republican presidential hopeful John McCain have argued that the surge has worked, but the progress is fragile and so the U S  cannot rush out.

McCain suggested in an interview with MSNBC that the Iraqi calls for a troop withdrawal date may be driven by politics in Baghdad, where Maliki is facing a lot of skepticism about the status-of-forces negotiations

"The Iraqis have made it clear to me, including meetings I had with the president and foreign minister in Iraq, that it is based on conditions on the ground," McCain says  "That's what I've always said. I've always said we will come home with honor and victory and not a timetable "

Presumptive Democratic presidential nominee Barack Obama, on the other hand, said it was encouraging to hear the Iraqis talk about the need to set out a time frame for the U S  to pull out

"I think that Prime Minister Maliki's statement is consistent with my view about how a withdrawal should proceed and how a status-of-force agreement should not be structured without congressional input and should not be rushed," Obama says

Obama and many in Congress are worried that the status-of-forces agreement could tie the hands of the next U S  president

Katzman of the Congressional Research Service says the agreement could be written in lots of different ways — with a fairly vague timetable or a nonbinding one  As for tying the hands of the next U S administration, he sees the Iraqis, at least, backing off from any long-term deal

"The Iraqis are now, for the past few days, talking about something very temporary, something interim, there may not be an agreement at all, which means the U.N  mandate might have to be rolled over for another year or six months," Katzman says  "There are a lot of different possibilities that are still out there."

But timetables are not the only thorny issue in the negotiations  Katzman says another dispute is over how much flexibility the U.S  would have to act on its own in Iraq, without coordinating military actions with the

Iraqi government

Related NPR Stories

Top Iraqis Seek Timetable For U S  Withdrawal
July 8, 2008

---

## comments

**Discussions for this story are now closed.** Please see the **Community FAQ** for more information

# Exhibit AM



صـركـز الإمـارات للدراسـات والـبـحـوث الإسـتراتيـجـيـة
The Emirates Center for Strategic Studies and Research

PRINT THIS PAGE 

## Iraq and the U.S. Election

Even though Iraq is no longer "front page news" in U.S. newspapers, Iraq will be a key issue in the U.S. presidential election. Even as Senator Barack Obama was emerging as the nominee of the Democratic Party, a debate was flaring between him and the Republican nominee, John McCain, over the fact that Senator Obama had made only one visit to Iraq, in January 2006. The two have articulated vastly different positions, giving the impression that an Obama presidency would result in a fairly rapid American troop pullout from Iraq, while a McCain presidency would differ little from the resolute insistence to maintain high American force levels that has been the hallmark of President Bush's past five years in office.

An analysis of American public opinion and of the battlefield situation in Iraq might show that the two would perhaps pursue not vastly different strategies in Iraq when in office. The underlying reality is that while the American public abhors the continued U.S. losses in Iraq and largely believes the decision to invade Iraq was mistaken, a majority of Americans do not want to face an outright defeat in Iraq that would resemble that suffered in Vietnam. It is this reality that will constrain both Obama and McCain when the election winner takes office in January 2009. This same dynamic caused the unexpected failure of the Democrats, who were given control of Congress in 2006 by voters weary of the war, to pass "veto-proof" legislation requiring a U.S. withdrawal from Iraq.

Senator Obama has, to a large extent, reflected the Democratic frustration at the party's own inability, despite seeming voter support, to force President Bush to wind down U.S. combat operations in the Iraq war.  Senator Obama has called for a U.S. force reduction, over a sixteen month period, to a level sufficient to perform such limited missions in Iraq as continue to combat Al-Qaeda in Iraq, protect U.S. diplomats, and train the Iraqi Security Forces.  Senator McCain, by contrast, has said that his primary goal is to "win" in Iraq, by which he means to stabilize a representative Iraqi government to the point where its security forces can defend that government and defend Iraq, without U.S. help.  He promises no force reductions unless security conditions permit such reduction, and he strongly opposes setting any timetable for a U.S. pullout.

The constraints of public opinion will likely prevent either candidate from implementing his campaign pledges after taking office.  If Senator Obama  is elected, and he begins to rapidly draw U.S. combat forces down from the level of about 140,000 that will likely be in Iraq when he takes office, violence in Iraq is likely to return to previously high levels.  Iraq's major communities have not reconciled, and Sunni insurgents remain in Iraq, awaiting a chance to challenge the Shiite-dominated government of Nuri al-Maliki.  Similarly, a Maliki government that is not heavily protected by U.S. forces will be vulnerable to armed challenge by fellow Shiites loyal to his main rival, Moqtada Al Sadr.  A return to high levels of violence is likely to cause a President Obama to slow any further U.S. withdrawal.

Were Obama to continue to withdraw U.S. forces and the government of Maliki to unravel, Obama would be vulnerable to charges that he "lost" Iraq by insisting on too hasty a withdrawal.

For Senator McCain, the choices are no less difficult. He might believe that, as President, he can "stay the course," and gradually draw down U.S. forces as conditions improve. However, security conditions are unlikely to improve to the point where U.S. commanders in Iraq would recommend force reductions below the 140,000 level they will reach in July 2008. U.S. casualty rates, although unlikely to return to the 100+ per month that they were in late

2007, will likely still be running at 20 – 40 or more per month, depending on whether or not Al Sadr renews his armed challenges to the United States. The continued casualties, the appearance of battlefield stagnation, and the likely continued inability of Iraq's communities to reconcile, will stimulate substantial public and congressional demands to wind down U.S. involvement in Iraq and will likely compel a President McCain to draw U.S. forces faster and more extensively than he or U.S. commanders might want. If pro-withdrawal Democrats win more seats in Congress in the 2008 elections, it is possible that the party will have enough votes to force a President McCain to set a timetable for withdrawal. The Democrats have thus far lacked the votes to force such a decision on President Bush, partly because many Democrats do not want to risk incurring public wrath over leading the United States to a Vietnam-style defeat.

The net effect of the political dynamics in the United States is that the Iraq policy of a President Obama will not differ dramatically from that of a President McCain. Under either administration, U.S. forces will likely be gradually reduced, perhaps to about 100,000 by the end of the first year of the new president's term. This force level will be insufficient to prevent a re-acceleration of insurgent and sectarian violence in Iraq, but most likely sufficient to prevent the outright collapse of an elected Iraqi government. It is possible that U.S. forces could remain at this level for several more subsequent years, in order to prevent a clear collapse. Yet, even a President McCain would be politically unable to add troops in yet one more try to fully stabilize Iraq, and either administration would be faced with – and ultimately accept -- a slow deterioration of the Iraq security situation. At this point, either administration would look for new methods to stabilize Iraq that do not involve more U.S. force – most likely an implementation of the long-suggested plan to facilitate the devolution of power in Iraq to individual, autonomous regions.

Copyright © ECSSR 2003 - 2007 All rights reserved.

Exhibit AN

Westlaw.

18 UPAJIEL 333                                                                                                    Page 1
18 U. Pa. J. Int'l Econ. L. 333

c

University of Pennsylvania Journal of International Economic Law
Spring, 1997

From British Colony to Chinese Special Administrative Region: Implications for Hong Kong's Economy and the
Rule of Law

Impact to and Role of the United States

**\*333** THE U.S ROLE DURING AND AFTER HONG KONG'S TRANSITION

Kerry Dumbaugh [FNa1]

Copyright (c) 1997 by the Trustees of the University of Pennsylvania; Kerry Dumbaugh

1. INTRODUCTION

In the months approaching China's resumption of sovereignty over Hong Kong on July 1, 1997, U.S. policy analysts are painstakingly reviewing how the territory will change under Chinese rule. The answer is important to U.S. interests for several reasons: first, because of the enormous U.S. economic presence in Hong Kong; second, because any adverse developments in Hong Kong are likely to affect U.S.-China relations; and third, because China's promise to give Hong Kong a high degree of autonomy under the "one country, two systems" policy has political implications for Taiwan.

A confident assessment of Hong Kong's future remains elusive. On one hand, Hong Kong's economy, increasingly tied to the expanding economy of mainland China, continues to grow. Annual growth in the past few years has been five to six percent. Over the last decade, Hong Kong has climbed from the fifteenth to the eighth largest trader in the world, and its per capita gross domestic product ("GDP") has risen from $6,000 to $23,800. With a population of only six million, Hong Kong's economy now equals one-fifth the GDP of mainland China and its 1.2 billion people. Along with its extraordinary economic track **\*334** record, Hong Kong plays an increasingly vital role as a conduit and financial center for U.S., Chinese, and international economic and business interests. Under these circumstances, some in the United States believe that the change from British to Chinese sovereignty will make little difference and that Hong Kong will continue to demonstrate strong economic growth, to foster a friendly and supportive business environment, and to provide an overall atmosphere that allows significant scope for individual freedom.

Despite positive signs, Hong Kong's political future and the individual rights of its citizens remain tenuous. In the past, Britain and China have argued acrimoniously over political reforms, new governmental institutions, and other arrangements surrounding the colony's transition to Chinese rule. China repeatedly has accused Britain of using its last years as Hong Kong's sovereign to establish new democratic institutions where none existed before and has said that these will hamper China's own ability to rule Hong Kong. As a result, China has threatened to undo many of the political reforms enacted during the past few years under Hong Kong's last British Governor, Christopher Patten. Additionally, during the course of Sino-British transition negotiations, political concerns occasionally caused Chinese leaders to hold up business contracts, stall in approving major construc-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333                                                                                    Page 2
18 U. Pa. J. Int'l Econ. L. 333

tion projects, and hamper other economic arrangements in Hong Kong. Such behavior has convinced some that China is likely to continue politicizing economic and other decisions in Hong Kong after 1997. These critics believe that Chinese leaders are willing to tolerate economic losses in Hong Kong when issues of sovereignty and Chinese governance are involved.

Throughout much of the decade since the ratification of the Sino-British Joint Declaration ("Joint Declaration") in 1985, [FN1] the United States has assumed a low profile on matters involving **335** Hong Kong. The U.S. policy is due, in part, to the fact that no country questions China's sovereign rights over Hong Kong beginning July 1, 1997. The low U.S. profile with respect to Hong Kong may also be accounted for by the closeness of U.S.-British relations and the reluctance of U.S. policymakers to second-guess British governance decisions. [FN2] As the July 1, 1997 transition date approaches and the British presence in the colony wanes, interested parties in both Hong Kong and China have increased pressure on U.S. policymakers to adopt favored policies. In this growing lobbying effort, the options that some in Hong Kong support directly conflict with options supported by Beijing. Moreover, there is divided opinion within Hong Kong itself.

Chinese leaders have objected to what one official called the "gradual insistence" by some U.S. policymakers on "inserting the United States" into the affairs of Hong Kong, [FN3] and signs indicate that they will continue to object. Liberal-minded activists in Hong Kong, however, wish for a broader and more visible U.S. presence, particularly in the form of support for democratic principles and institutions. The U.S. and international business communities in Hong Kong, while receptive to a more visible U.S. presence, nevertheless argue for involvement that respects Beijing's concerns and targets specific matters, often economic issues. All groups interested in U.S. involvement in Hong Kong are likely to become more vocal in making their cases to U.S. officials as the transition date approaches. The U.S. Congress has been receptive in the past to those groups that argue for more assertive U.S. involvement in Hong Kong's political life. Given U.S. interests in the territory, Congress is likely to remain active in 1997 and beyond.

## 2. U.S. INTERESTS IN HONG KONG

Hong Kong has long been a focal point of U.S. economic, political, and other interests in Asia. Each set of interests brings forth its own advocates, both domestic and international. These interests contribute to the U.S. policymaking process, particularly in the U.S. Congress. During the months preceding and following **336** Hong Kong's transition of sovereignty to Chinese rule, all parties are likely to increase pressure on U.S. policymakers to adopt favored policies. Complicating the U.S. policymaking process, U.S. interests in Hong Kong often compete with, rather than complement, one another.

### 2.1. U.S. Economic Interests in Hong Kong

Hong Kong is the largest base of U.S. economic operations in Asia. Today, about 31,000 Americans live and work in Hong Kong, and approximately 1,000 U.S. firms have corporate offices there. [FN4] By 1995, U.S. investments in Hong Kong totaled $10.5 billion. According to the U.S. Consul General in Hong Kong, U.S. exports to the territory in 1994 amounted to $11 billion, while U.S. imports were about $9 billion. [FN5] Hong Kong is the major transshipment point for Chinese products exported to the United States, which were valued at more than $30 billion in 1993. Because of the sizable U.S. economic interests in Hong Kong, the U.S. business community tends to press the U.S. government for a more calibrated and targeted approach toward matters involving Hong Kong and to downplay politically sensitive issues.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333                                                                                                           Page 3
18 U. Pa. J. Int'l Econ. L. 333

*2.2. The U.S. Perspective on Human Rights and Democracy in Hong Kong*

Since the 1989 military crackdown in Tiananmen Square, and mindful of massive demonstrations in Hong Kong that followed Tiananmen, U.S. officials have paid close attention to the prospects for human rights and political freedom in Hong Kong. Americans have been generally supportive of Governor Patten's modest measures to increase the level of democracy in Hong Kong prior to its reversion to China. Many U.S. officials have been critical of China's pressure tactics and opposition to Patten's political initiatives. U.S. officials and Members of Congress have been particularly outspoken against Chinese statements that **\*337** Beijing will dissolve Hong Kong's Legislative Council in 1997.

*2.3. Hong Kong as a Model for Chinese Reunification with Taiwan*

U.S. leaders sometimes view Beijing's handling of the Hong Kong transition as a method of forecasting the way Beijing could be expected to handle reunification with Taiwan. Chinese authorities have reinforced this view by frequent statements that the "one country, two systems" policy approach is what China will follow for both territories. A smooth transition in Hong Kong would buttress the arguments of those who assert that U.S. interests in Taiwan would not suffer from reunification. A rocky transition would support the arguments of those who press for strong U.S. support for Taiwan's status as separate from the mainland.

*2.4. Most Favored Nation Treatment of Chinese Exports*

Hong Kong has been an important element in the U.S. debate over China policy since the Tiananmen crackdown, especially in the annual debate over whether the United States should approve Most Favored Nation ("MFN") tariff treatment for Chinese exports to the United States. [FN6] Critics of China have argued in the past that MFN status should be withheld from China unless Beijing meets certain conditions, including a more accommodating Chinese stance on democracy and human rights in Hong Kong. An important counter-argument has held that cutting off MFN treatment would have a disastrous economic and perhaps negative political impact on Hong Kong, especially because the bulk of Chinese exports to the United States passes through the colony.

*2.5. Export Controls*

Non-proliferation of weapons is a top policy priority for the **\*338** United States, which considers China to be a significant proliferation risk. Under British rule, Hong Kong has adhered to non-proliferation principles. The colony has maintained export controls on high technology and strategic goods effective enough to qualify for U.S. export control exemptions under section 5(k) of the U.S. Export Administration Act. [FN7] Although the United States will continue to treat Hong Kong separately from China for export control purposes after the 1997 transition, many U.S. and Hong Kong officials are concerned that Chinese companies may take advantage of Hong Kong's more liberal export controls either to ship prohibited arms and materials clandestinely to rogue states or to import prohibited weapons for use by China's own military.

## 3. BACKGROUND TO DEVELOPMENTS IN HONG KONG

Much of the current U.S. interest and increasing involvement in Hong Kong results from two issues: developments surrounding Sino-British negotiations and disagreements over Hong Kong's future, and lingering U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

revulsion after China's brutal 1989 display in Tiananmen Square. Before examining the current U.S. policy toward Hong Kong and its prospects for the future, a brief review of the relevant aspects of the history of Hong Kong is useful.

Hong Kong's current situation stems from the terms under which the British originally acquired the territory, a combination of wartime concessions and a 99-year lease, the latter negotiated and signed with China in 1898. In 1982, as the end of the lease approached, the British government began a series of difficult bilateral negotiations with China about Hong Kong's future. These negotiations led to the Joint Declaration, which provided for the return of all of Hong Kong to China on July 1, 1997. [FN8]

Lacking power and basis for opposition, and faced with the strong Chinese insistence on regaining sovereignty over Hong Kong, Britain felt compelled to give ground repeatedly during the course of negotiations leading up to the Joint Declaration. China made compromises as well, most notably its pledge to leave Hong Kong's socioeconomic system virtually unchanged for fifty years **\*339** after 1997 and its promise to approach rule of Hong Kong under the general guidelines of "one country, two systems." [FN9] In its final form, the Joint Declaration set out the basic criteria for Hong Kong's future, as agreed upon by the British and Chinese governments. [FN10] Subsequently, British officials reportedly considered initiating political reforms that would grant the people of Hong Kong greater autonomy in the period leading to 1997. The British government moved cautiously, however, in part because of the Chinese government's staunch objections to granting the Hong Kong government a political status separate from the People's Republic of China ("P.R.C.") after 1997.

Between 1984 and 1989, the British and Chinese settled into a pattern of frank but generally cooperative interaction and negotiation over Hong Kong. [FN11] Britain, responsible for administering Hong Kong through June 1997, pushed for as much autonomy as possible for the territory. Among other proposals, the British negotiators suggested the institution of direct elections for Hong Kong's legislature, the Legislative Council ("Legco"). China opposed these efforts as attempts to interfere with its own ability to administer Hong Kong after 1997. These tensions prolonged the negotiations over plans for the Basic Law.

The Basic Law was finally adopted on April 4, 1990, but many of its provisions were vague, leaving room for controversy. [FN12] For example, the Basic Law prescribed few details for the election of Legco. The Basic Law provided only that the Hong Kong Legislative Council "shall be constituted by election" implemented "with gradual and orderly progress" and with "the ultimate aim the election of all the members of the Legislative Council by universal suffrage." [FN13]

In a second prescription for controversy, the conclusion of the **\*340** Basic Law negotiations coincided with China's June 1989 crackdown in Tiananmen Square. In the weeks after Tiananmen, over one million Hong Kong citizens demonstrated against the Chinese government's action. People in Hong Kong also were influential in supporting dissidents in China. They smuggled out political critics as well as information that proved damaging to the Beijing regime, both at home and abroad. Tiananmen and its aftermath stimulated the first genuine U.S. attempts to become more involved in Hong Kong's political future. Tiananmen also changed British and Chinese attitudes toward Hong Kong in several ways.

For the British--and, by extension, the Americans--the Chinese people in Hong Kong, long considered politically apathetic, suddenly were showing keen interest in politics. Many in Hong Kong pressed for more support from London to establish better safeguards against possibly capricious Chinese government action toward Hong Kong after the 1997 transition. A number of Hong Kong's increasingly important middle class of professionals

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333                                                                                      Page 5
18 U. Pa. J. Int'l Econ. L. 333

and business people advocated strengthening and expanding the colony's institutions of representative government. Additionally, these groups began to approach U.S. policymakers for assistance in helping to assure Hong Kong's future.

For China, Hong Kong's reaction to Tiananmen raised a major security concern. It heightened China's sensitivity to any action by the British, the Americans, or any other country that might encourage political conditions in Hong Kong that were inconsistent with Beijing's concepts of stability. Consequently, when China's National People's Congress promulgated the Basic Law in April of 1990, it strengthened wording concerning subversion.

British authorities, while trying to avoid unduly antagonizing the P.R.C., took several steps to reassure those living in Hong Kong. The British government passed a Bill of Rights for Hong Kong citizens in 1991, granted an additional 50,000 Hong Kong heads of families with close ties to Great Britain the option to emigrate there, and encouraged the United States, France, and other countries to grant more generous immigration options to Hong Kong employees of foreign-owned businesses and institutions.

The British also reaffirmed their support for Hong Kong in two other ways. First, they proceeded with plans to build a large, complicated, and expensive airport project. Second, they pushed *341 Chinese leaders to agree that Hong Kong legislators elected before 1997 would be allowed to complete their terms after China took over in July 1997--a concept known as the "through train." Almost from the outset, both the airport plan and the "through train" concept for certain Legco members met with serious Chinese objections. [FN14] Leaders of the P.R.C. effectively froze international financial support for the airport by asserting that they had not been adequately consulted on the project and that its financing might be subject to review after 1997.

In an effort to solve the problems surrounding the airport and the "through train," and to rejuvenate those programs, in September 1991 Prime Minister John Major became the first Western head of government since Tiananmen to travel to Beijing and meet with Chinese leaders. Although the Prime Minister signed a memorandum of understanding ("MOU") with Beijing over the airport, Chinese officials continued to voice reservations that ultimately made it difficult for the project to proceed.

Under the circumstances, Britain decided to shift the style, if not the substance, of its policy toward Hong Kong. The more cautious policy of the recent past--solicitous of P.R.C. concerns and fearful of antagonizing China-- was put aside in favor of a more direct approach. This approach was implemented under the leadership of a new Hong Kong Governor, Christopher Patten, who was also a close friend of Prime Minister Major. Shortly after assuming office in the Fall of 1992, Governor Patten precipitated a protracted political confrontation with Beijing when he proposed broadening the political representation of legislative institutions in Hong Kong. By Western standards, Patten's proposals seemed mild. The Governor did not propose increasing the number of directly elected seats in Legco, a figure upon which China and Britain had already agreed, but instead opted for a series of steps to institutionalize procedures on which he found the Joint Declaration and the Basic Law to be silent. [FN15]

*342 Beijing was suspicious of the new trends in British policy. Chinese leaders especially objected to the decision to go ahead with Hong Kong's New Airport and Port Construction Project. The huge project came with a price tag in excess of $20 billion, and involved numerous multinational contracts to construct terminals, runways, highways, railroad lines, bridges, and a tunnel crossing Hong Kong Harbor. The project's size and expense raised Chinese suspicions that Britain would attempt to drain Hong Kong's substantial treasury surplus prior to 1997. Furthermore, Beijing felt that Britain's handling of the airport proposal ignored China's insistence that it

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333

18 U. Pa. J. Int'l Econ. L. 333

be sufficiently consulted by Britain on all major issues affecting Hong Kong after 1997, since China would ultimately inherit the consequences of those decisions.

China's greatest objections to British actions were raised against Patten's political reforms. Beijing swiftly and vigorously denounced both the Governor and his reform platform, claiming that the reforms contravened the Joint Declaration and the Basic Law and were nothing short of an attempt to create new democratic institutions in Hong Kong where none had existed before. Chinese leaders maintained that Patten's changes would complicate Chinese reassertion of sovereignty in 1997 and, in the meantime, divide political opinion and reduce business confidence in the territory. In response to Patten's initiatives, Beijing announced in February 1994 that it would end the "through train" to which it had previously agreed, dismantle the current legislative structure of Hong Kong, and establish a provisional legislative body not provided for in the Basic Law. [FN16]

### 4. CURRENT U.S. HONG KONG POLICY

China's crackdown in Tiananmen Square on June 4, 1989, ended the consensus within the U.S. government that had characterized much of U.S. policy toward China for the previous decade. In the months following Tiananmen, the Bush Administration*343 reached a series of decisions to limit sanctions on China and protect U.S.-China relations. These decisions lacked popular support and increasingly antagonized Members of Congress. As a result, Congress began to hold hearings and to debate a wide range of measures related to every conceivable aspect of U.S. policy involving China. To some extent, this internal U.S. policy conflict continues today.

Hong Kong's return to Chinese sovereignty in 1997 has been one of the issues addressed in U.S. legislative efforts. Since 1992, Congress has enacted numerous measures designed to protect U.S. relations with Hong Kong, to pressure the White House to monitor closely developments there, and to persuade Chinese leaders to pursue more enlightened policies. In addition, the United States has negotiated and continues to negotiate a number of bilateral agreements with Hong Kong that will apply after the territory's reversion to Chinese rule. These agreements include: a civil aviation agreement; an extradition treaty; a mutual legal assistance agreement; a prison transfer agreement; a bilateral investment treaty; and agreements on future consular arrangements.

### 4.1. The United States-Hong Kong Policy Act of 1992 [FN17]

Most of the current U.S. policy toward Hong Kong is encapsulated in a single law, the United States-Hong Kong Policy Act of 1992. [FN18] Senator Mitch McConnell introduced the bill that eventually became law because he perceived a lack of coherent U.S. policy for dealing with the impending Chinese rule over Hong Kong. The law prescribes how the United States should conduct bilateral relations with Hong Kong when the territory becomes a non-sovereign entity. [FN19]

The United States-Hong Kong Policy Act is comprised of four main sections. [FN20] The first two sections constitute a series of findings and policy statements that are non-binding expressions of U.S. policy goals and objectives. [FN21] The Act states that support for democratization is a fundamental principle of the United *344 States that should apply to U.S. policy toward Hong Kong after 1997, [FN22] and that the United States should play an active role in maintaining Hong Kong's stability and prosperity. [FN23]

The substantive core of the United States-Hong Kong Policy Act states that the United States will continue

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333                                                                                                        Page 7
18 U. Pa. J. Int'l Econ. L. 333

to apply U.S. laws to an autonomous Hong Kong after the transition to Chinese rule in the same manner that they were applied before the transition. [FN24] It also extends congressional approval for all treaties and international agreements between the United States and Hong Kong so that the treaties and agreements continue in force after July 1, 1997, and it requires the President to report to Congress if he determines that Hong Kong is not competent to carry out its obligations or that it is not "appropriate" for Hong Kong to have rights or obligations under any such treaty or international agreement. [FN25]

The United States-Hong Kong Policy Act also gives the President authority to issue Executive Orders to suspend U.S. laws regarding Hong Kong, or portions thereof, if he determines that Hong Kong is not sufficiently autonomous. [FN26] In making such a decision, the President should consider the terms, obligations, and expectations contained in the Joint Declaration. [FN27] The Act provides that the President may terminate any such Executive Order if he determines that Hong Kong has regained sufficient autonomy. [FN28]

Additionally, the United States-Hong Kong Policy Act requires that the Secretary of State report to Congress by March 31 in each of six years--1993, 1995, 1997, 1998, 1999, and 2000--on eight specific factors regarding Hong Kong. [FN29] These factors include: (1) significant developments in U.S. relations with Hong Kong and in agreements that the United States has entered into *345 with Hong Kong; [FN30] (2) developments surrounding the transition to Chinese sovereignty; [FN31] (3) the nature and extent of official and unofficial U.S.-Hong Kong exchanges; [FN32] (4) any U.S. laws suspended or reinstituted under sections 201 and 202 of the Act; [FN33] (5) treaties and international agreements that the President has determined Hong Kong is incompetent to carry out under section 201(b) of the Act; [FN34] (6) significant problems in U.S.-Hong Kong cooperation on export controls; [FN35] (7) "the development of democratic institutions in Hong Kong;" [FN36] and (8) "the nature and extent of Hong Kong's participation in multilateral forums." [FN37]

The Act also requires, where applicable, a separate subreport on "China: Hong Kong" in U.S. reports that are compiled on a country-by-country basis. [FN38] This provision expressly affects: (1) reports compiled under sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961; [FN39] (2) trade barrier reports required by section 181 of the Trade Act of 1974; [FN40] and (3) economic policy and trade practices reports required by section 2202 of the Export Enhancement Act of 1988. [FN41]

*4.2. Congressional Amendment of the United States-Hong Kong Policy Act*

The 104th Congress battled over foreign policy issues in 1995 and 1996, both internally and with the White House. Debate was especially rancorous within Congress over attempts to reorganize *346 U.S. foreign policy programs and departments, levels of U.S. foreign assistance funding, and international population assistance programs. U.S. policy toward China figured prominently in some of these debates, particularly in the period of time surrounding China's military exercises and missile test firings in the Taiwan Straits. [FN42]

Some Members of Congress disagreed with the Clinton Administration's policy of "engagement" with China [FN43] and believed that a tougher approach would better influence Chinese behavior. As a result, the 104th Congress sought to strengthen the United States-Hong Kong Policy Act by adding a requirement for a 1996 report, expanding the information required to be included in the report, and making the reporting requirement a permanent one. Using three different legislative vehicles, the 104th Congress successfully amended the United States-Hong Kong Policy Act of 1992 in the first two of these ways, but was not able to make the Hong Kong report a permanent annual requirement.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*4.2.1. The Foreign Relations Authorization Act, Fiscal Years 1996 and 1997* [FN44]

The Conference Report to Senate Bill 908/House Bill 1561, the Foreign Relations Authorization Act, began as the 104th Congress' major vehicle for considering legislative provisions relating to China and Hong Kong. [FN45] Although the bill provoked heated debates between the Clinton Administration and Congress over a wide range of foreign policy, restructuring, and reorganization issues, it did not become law. On April 12, 1996, the bill *347 was vetoed by President Clinton for several reasons, none of which was related to the Hong Kong provisions. [FN46]

In the legislation, Congress attempted to amend section 301 of the United States-Hong Kong Policy Act of 1992, which relates to reporting requirements. [FN47] Congress proposed three changes: (1) requiring that an additional report be submitted by March 31, 1996, a year which had been skipped in the original public law; [FN48] (2) adding a permanent annual reporting requirement to extend beyond the year 2000; [FN49] and (3) requiring that the annual March reports include more detailed information on Hong Kong's situation. [FN50] In listing the last amendment to the United States-Hong Kong Policy Act, S. 908 specifically linked the amendment to past "deficiencies in reports submitted to the Congress" by the Clinton Administration under 22 U.S.C. § 5731. [FN51] The President's veto of the Foreign Relations Authorization Act ended this particular attempt to strengthen the Hong Kong provisions in U.S. law.

*348 *4.2.2. Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1996* [FN52]

With the Foreign Relations Authorization Act obviously in deep trouble, Members of Congress interested in amending the United States-Hong Kong Policy Act turned to the 1996 Foreign Operations Appropriations measure. [FN53] The annual foreign operations bill is the primary legislative vehicle for reviewing and funding the U.S. foreign assistance program and for influencing executive branch foreign policymaking. The Foreign Operations Appropriations bill was extraordinarily controversial, becoming at one point stalemated for three months because of international population assistance and family planning programs. [FN54] Ultimately, however, the bill passed, and the 104th Congress succeeded in enacting some of the provisions that it had attempted to enact in the doomed Foreign Relations Authorization Act.

Section 576 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act amended section 301 of the Hong Kong Policy Act of 1992 by requiring that an additional report be submitted by March 31, 1996 [FN55] and requiring that specific information be included in the 1996 report. [FN56] The information required in the 1996 report included information on:

*349 (1) the Basic Law and its consistency with the Joint Declaration;

(2) the openness and fairness of elections to [Hong Kong's] legislature;

(3) the openness and fairness of the election of [Hong Kong's] chief executive and the executive's accountability to the legislature;

(4) the treatment of political parties [in Hong Kong];

(5) the independence of [Hong Kong's] judiciary and its ability to exercise the power of final judgment over Hong Kong law; and

(6) [Hong Kong's] Bill of Rights. [FN57]

Although the Foreign Operations Appropriations bill was not passed until February 12, 1996, Clinton Administration officials had anticipated the new requirements imposed by the law. The Administration submitted the additional Hong Kong report by the March 31, 1996 deadline, complete with the additional information re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

quired by the new law.

### 4.2.3. Omnibus Appropriations Act for Fiscal Year 1997 [FN58]

The 104th Congress turned to the Hong Kong issue for a third time in the Omnibus Appropriations Act for Fiscal Year 1997. [FN59] Once again, Congress included a provision directing that additional information be included in the annual Hong Kong report. [FN60] Like the Foreign Operations Appropriations measure, the added requirements were imposed for one report only, in this case the *350 report due by March 31, 1997. [FN61] The additional requirements imposed by the Omnibus Appropriations Act were almost identical to those required under the Foreign Operations Appropriations Act and those in the vetoed Foreign Relations Authorization Act. [FN62]

### 4.2.4. Other Congressional Actions

The 104th Congress considered legislation to extend diplomatic privileges, exemptions, and immunities to Hong Kong's Economic and Trade Offices in the United States. Currently, representatives of Hong Kong stationed in the United States receive their diplomatic privileges because of their affiliation with the British government. In recognition of the impending transition to Chinese rule and mindful of U.S. promises to treat Hong Kong as an autonomous entity separate from the P.R.C., Senate Bill 2130 sought to give Hong Kong diplomatic privileges under the provisions of the International Organizations Immunities Act, [FN63] which applies to public international organizations. [FN64] The Senate considered the bill on September 28, 1996, and passed it by *351 unanimous consent without amendment. [FN65] Because the House did not act on the measure before adjournment, the issue has not been resolved.

In the past, concern for the future of Hong Kong residents has led Members of Congress to address issues outside the framework of the United States-Hong Kong Policy Act. Congress has acted several times, for example, on issues relating to visas for Hong Kong residents. The 101st Congress enacted the Immigration Act of 1990, [FN66] which establishes a separate immigrant visa quota for Hong Kong and offers a deferred visa to Hong Kong residents, thereby providing a possible future refuge without provoking an immediate exodus. [FN67] In the 103rd Congress, Senator Connie Mack and Representative John Porter were especially concerned about possible Chinese reprisals against Hong Kong journalists because of their reporting. [FN68] Each of the two Congressmen introduced legislation that would have provided a certain number of deferred visas to Hong Kong journalists and their families. [FN69]

### 5. CURRENT AND PENDING BILATERAL AND MULTILATERAL AGREEMENTS

Section 201(b) of the United States-Hong Kong Policy Act sets the broad policy parameters under which the U.S. President can continue, suspend, or judge to be inappropriate existing U.S. agreements with Hong Kong. [FN70] Hong Kong's impending change in sovereignty raises a number of unprecedented and complicated questions for the United States involving the continued validity of U.S. bilateral and multilateral agreements with Hong Kong that were negotiated, signed, and implemented while Great Britain was the sovereign. Because of the United States-Hong Kong Policy *352 Act, continuation of these agreements after the transition date depends partly on the President's future decisions. The continuing viability of U.S. agreements with Hong Kong is also contingent upon Hong Kong's future capacity either to continue or to enter into international agreements in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333                                                                                                    Page 10
18 U. Pa. J. Int'l Econ. L. 333

its own right, without interference from Beijing. [FN71] In some cases, application of agreements to Hong Kong may also depend on the acquiescence of China, as the new sovereign.

The United States currently maintains approximately nineteen bilateral agreements with Hong Kong, many of which actually are legal agreements with Great Britain that were "extended" to Hong Kong. The fact that bilateral U.S.-British agreements have been extended to Hong Kong in the past raises both policy and procedural questions. As of this writing, whether and how many of the approximately forty U.S. bilateral agreements with the P.R.C. may be extended to Hong Kong in the future remains unclear. [FN72]

Apart from bilateral agreements with both Hong Kong and China, the United States currently is also a party to approximately forty multilateral agreements with Hong Kong, and to approximately fifty-one multilateral agreements with the P.R.C., raising similar questions about whether and how to extend these agreements to the non-signatory party.

Twenty multilateral agreements bind all three parties. Problems should be minimal in continuing to apply these to Hong Kong after reversion to Chinese sovereignty. Their continued application, nevertheless, raises practical difficulties for the future. These difficulties include decisions on who the "central authority" is for the purposes of a particular agreement, what are the proper *353 channels of communication, and which party should be accountable for agreement breaches.

Given the status of the Sino-British Joint Declaration, an agreement between two sovereign nations, and the authority that the agreement gives to the Sino-British Joint Liaison Group ("JLG"), [FN73] the United States has had little influence over the course of legal affairs in Hong Kong during the transition process. Transition arrangements in Hong Kong were seen by the United States as delicate political matters to be handled by the British. British officials, in fact, encouraged this view. Additionally, the JLG alone had been given responsibility for reviewing and making determinations about each of Hong Kong's agreements with other countries. In each case, until that process was completed, countries with agreements with Hong Kong were unsure of what action might be needed.

By early 1996, Clinton Administration officials determined that U.S. interests would be better served if the United States became more involved in the transition process. U.S. policymakers began to hold discussions with Chinese and Hong Kong government officials about the continued application of U.S. agreements and treaties with Hong Kong after the transition. As of the writing of this article, these discussions are ongoing.

Ultimately, the United States and China will have to reach decisions on the following issues:

(1) Current U.S.-Hong Kong bilateral agreements that will remain in force in Hong Kong after 1997, but that will not be extended to the P.R.C.;

(2) Current U.S.-P.R.C. bilateral agreements that will be extended to Hong Kong after 1997;

(3) Current multilateral agreements in force for Hong *354 Kong, but not for the P.R.C., that the P.R.C. will agree to continue in force in Hong Kong after 1997;

(4) Current multilateral agreements in force for the P.R.C. and the United States, but not for Hong Kong, which the P.R.C. will agree to extend to Hong Kong after 1997; and

(5) Mechanisms for administering the various agreements after 1997.

As of early 1997, U.S. Administration officials had formed preliminary positions on a number of issues. For example, they had decided which bilateral agreements concerning Hong Kong should not survive the transition. These included the mutual defense assistance agreement and the consular convention. [FN74] U.S. officials had

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

also reached preliminary agreement about which bilateral agreements with the P.R.C. should not be extended to Hong Kong. These included agreements on matters that were either presumed or known to be within Hong Kong's sphere of autonomy after 1997, such as agreements on postal matters and intellectual property rights. [FN75] Other agreements unlikely to be extended after the transition are those that do not appear relevant to Hong Kong. [FN76] In addition, U.S. policymakers concluded that some agreements warranted further discussion as to their applicability*355 to Hong Kong. [FN77]

A number of new U.S. agreements are being discussed--either with Hong Kong, when the matter concerns areas where Hong Kong has been promised autonomy, or with the P.R.C. These discussions are in various stages of progress, but expectations are that they will be completed before the July 1 transition date. [FN78] According to U.S. State Department officials, the U.S. position in these discussions is not to create new situations for the United States in Hong Kong that did not exist before. Instead, the talks are to determine how best to continue the status quo arrangements that have existed in U.S.-Hong Kong relations and that Beijing in the Joint Declaration promised can continue after the reversion of sovereignty. [FN79] Three areas of discussion have particular implications for future U.S. policy: extradition, consular, and defense.

*5.1. Extradition Agreement*

The recently negotiated U.S.-Hong Kong extradition agreement is among the most important pending U.S. agreements with Hong Kong. In an example of what the future may hold, controversy has already arisen over the new agreement.

On January 7, 1997, a Massachusetts Federal District Court refused to approve the Hong Kong government's extradition request for Lui Kin-Hong on one charge of bribery conspiracy *356 and nine substantive bribery charges. [FN80] In denying the extradition request, Chief Judge Joseph L. Tauro reasoned that it was impossible for the Crown Colony of Hong Kong, as the requesting sovereign, to prosecute and punish Lui prior to Hong Kong's reversion to the sovereignty of the P.R.C., which currently has no extradition agreement with the United States. [FN81] The court's order held that the terms of the existing U.S.-Hong Kong Extradition Treaty establish "that Lui cannot be extradited to a sovereign that is not able to try and to punish him, any more than he could be extradited to a non-signatory nation." [FN82]

The District Court's memorandum also made two other statements about pending arrangements that could complicate future U.S. policy. First, the court referred to China's harsh, non-democratic judicial system as the judicial system that would likely exist in the Hong Kong Special Autonomous Region ("S.A.R.") after July 1, 1997. [FN83] The court's view on this matter runs directly counter to China's promises of autonomy enshrined in the Basic Law, an international agreement signed by both China and the United Kingdom. [FN84] The view also contradicts the stated policy of the United States to treat Hong Kong after July 1, 1997, as an entity separate and distinct from the P.R.C. [FN85] Second, the Court's memorandum inferred that the U.S. Congress, in enacting the United States-Hong Kong Policy Act, did not intend that the existing extradition treaty would extend beyond Hong Kong's reversion "absent any further action on [Congress'] part." [FN86] Congress, however, in section 201(b) of title II of the Act, specifically approved the continuation of all treaties and international agreements already in force with Hong Kong after the 1997 transition date. [FN87] Congress' intent was to bolster *357 public and international confidence by expressing what U.S. policy towards Hong Kong would be after the transition.

Moreover, section 201(b) of the United States-Hong Kong Policy Act gives specific congressional approval

for treaties and agreements that are in force between the United States and Hong Kong directly or, as in the case of the extradition treaty under which *Lui Kin-Hong v. United States* was brought, for those treaties and agreements that are actually between the United States and Great Britain, but that have been extended to Hong Kong. [FN88] Section 202 of the Act reserves to the President alone the power to determine, by Executive Order, which of these continuing treaties or agreements should be abrogated. [FN89]

*5.2. Consular Discussions*

Because the operative U.S. consular agreement in Hong Kong was negotiated and signed with the United Kingdom, U.S. Administration officials for months held discussions with Chinese officials on a matter that is within the P.R.C.'s sole jurisdiction--U.S. consular arrangements in Hong Kong. A new consular agreement was finally concluded and signed during the week of March 24, 1997. According to State Department officials, the U.S. goal was to reach an agreement that will permit the status quo in Hong Kong to continue. For instance, U.S. Administration officials wanted an agreement that allows the United States to continue to share information with Hong Kong authorities on law enforcement, intellectual property rights, and export control issues. All these are currently important functions of the U.S. consulate in Hong Kong, and they reportedly have been accommodated in the new consular agreement.

Sino-U.S. consular discussions were particularly sensitive in the areas of law enforcement and security. The U.S. position in these discussions was to emphasize China's Joint Declaration promises that the status quo can continue. China's position was to offer all consulates in Hong Kong the status and treatment conveyed by the Vienna Convention. Current U.S. consular arrangements in Hong Kong are both more specific and more beneficial than the Vienna Convention, as are the consular arrangements the United *358 States now has with China itself.

Some observers have suggested that the United States should simply have sought to extend to Hong Kong the current U.S. consular agreement with China. U.S. officials opposed this position, preferring to emphasize Hong Kong's separate status with a separate consular agreement. U.S. officials have faced some delicate political problems in their request for "special" treatment in Hong Kong, despite the assertion of State Department officials that the U.S. goal in these consular discussions was not to create new situations for the United States in Hong Kong that did not exist before, but instead to determine how best to continue the arrangements that have already existed.

For example, U.S. officials wanted to continue to work directly with Hong Kong government authorities to share sensitive information on export control violations, alien smuggling, drug trafficking, money laundering, and other enforcement issues. One concern is that Chinese officials may try to insert themselves into day-to-day law enforcement interactions between the United States and Hong Kong after July 1997. Another example involves questions about whether U.S. law enforcement efforts in Hong Kong can remain insulated from future bilateral tensions. This is particularly relevant since in the past China has sought to impose economic and other costs on U.S. business and government activities because of political problems in Sino-U.S. relations. Although some of these questions will not be answered until the new agreement has been in force, U.S. officials nevertheless appear quite pleased with the consular agreement as signed.

*5.3. Defense Issues*

On defense and security issues, another area outside of Hong Kong's promised autonomy, the U.S. Depart-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333                                                                Page 13
18 U. Pa. J. Int'l Econ. L. 333

ment of Defense continues to hold discussions with the P.R.C. to determine the extent to which current U.S.-Hong Kong defense cooperation can be continued. Currently, about seventy U.S. Navy ships a year make port visits to Hong Kong for rest and relaxation. Notification for such visits has been routinely handled through the British government in Hong Kong, and U.S. Administration officials would like these visits to continue after the transition. Although Chinese officials have reportedly agreed in principle to continue such port visits, details have yet to be finalized.

## *359 6. NEAR-TERM PROSPECTS FOR U.S. POLICY

Unless the U.S. government decides to confront the P.R.C. more directly concerning the Hong Kong issue, the ability of the United States to directly affect the course of events in Hong Kong during the 1997 transition and afterward seems marginal. The course of U.S.-China relations over 1995-1996 suggests that Clinton Administration officials might be hesitant to take a more confrontational approach. After several extraordinarily tense years in U.S.-China relations, Chinese and U.S. officials now appear cautiously optimistic about prospects for the near future.

U.S. and Chinese officials quietly have increased the number of talks and contacts at both the working and senior levels over the past year. U.S. policymakers seem encouraged by China's softer rhetoric and Chinese attempts to accommodate some U.S. concerns about weapons proliferation, human rights, and trade. Also encouraging are China's efforts to improve its knowledge of and relations with Congress, including the formation of a high-level working group on the U.S. Congress headed by a senior Chinese foreign policy official, Liu Huaqiu, and an increase in the size of the congressional liaison office at the Chinese Embassy in Washington.

Chinese officials appear equally encouraged at more muted rhetoric from the U.S. Congress and at the unprecedented number of Members of Congress interested in visiting China and talking with Chinese officials. Beijing may also be pleased at recent indications that some parts of the U.S. government are discussing the possibility of extending permanent MFN status to China.

### 6.1. The Role of Congress

Against the backdrop of current U.S.-China relations, Clinton Administration officials likely will spend at least the first half of 1997 concentrating on the pending agreements relating to the U.S. position in Hong Kong after the transition. U.S. officials appear confident that no major problems will arise in ongoing discussions, and that the parties will reach an equitable agreement on most, if not all, outstanding matters. Once an accord is reached, congressional approval likely will be required on at least some agreements.

The form of any new U.S.-Hong Kong agreement will determine the resulting congressional role. Because the United *360 States has a declared policy to treat an autonomous Hong Kong S.A.R. differently from the way that China is treated in U.S. policy, the transition poses unusual challenges for Clinton Administration officials in bringing matters before Congress. Agreements considered to be treaties will be referred to the Senate Foreign Relations Committee and ratified by the Senate only. Agreements not considered treaties may be reviewed by the whole Congress, or, conversely, may not need any congressional consideration. Furthermore, measures formulated as treaties will be subject to Senate "advice and consent" only; their terms cannot be altered while the Senate considers ratification. Measures formulated as legislation, on the other hand, are subject to the amendment process which allows Congress the opportunity to make legislative changes.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333                                                                                          Page 14
18 U. Pa. J. Int'l Econ. L. 333

Given the unique circumstances that will exist for Hong Kong after the 1997 transition, there appears to be little precedent to guide how the United States should configure agreements with Hong Kong. Lacking such guidance, Clinton Administration officials appear to have greater flexibility to decide whether a pending agreement with Hong Kong should be considered a treaty or some other form of agreement.

Regardless of its ultimate role in considering pending agreements with Hong Kong, Congress will maintain an ongoing interest in the specifics of future U.S.-Hong Kong agreements, as well as in general U.S.-Hong Kong relations. The House International Relations Committee and Senate Foreign Affairs Committee, in particular, are likely to hold hearings early in 1997 on various aspects of the transition process and on the U.S. policy position with respect to Hong Kong. Given Congress' efforts to amend the United States-Hong Kong Policy Act in 1995 and 1996, Congress is likely to revisit the issue in 1997. In particular, Members of Congress may try again to extend the annual March reporting requirement mandated by the Hong Kong Policy Act beyond its current cutoff date in the year 2000. [FN90] Alternatively, Congress may seek to make permanent the additional reporting requirements mandated for the 1996 and 1997 reports in the appropriations bills for those fiscal years. In addition, Members of Congress may consider adding new reporting requirements to reflect new issues that might arise in the coming months, such as *361 reports on extradition matters and the Hong Kong government's treatment of U.S. consular officials and U.S. businesses operating within the territory.

## 7. LONGER-TERM PROSPECTS FOR U.S. POLICY

The United States has based the separate treatment it is prepared to give to Hong Kong on the promise of Chinese leaders that they can pursue a "one country, two systems" policy toward Hong Kong, and that Hong Kong will have significant autonomy over its own affairs. This is the reason for the United States-Hong Kong Policy Act--to provide the statutory basis for the U.S. government to treat one part of a sovereign nation differently from another part. Thus, despite ongoing negotiations with China, and despite U.S. talks with the Hong Kong government, the overall direction of U.S. policy ultimately depends on American satisfaction with the implementation of the "one country, two systems" concept in Hong Kong.

Despite the apparent improvements in U.S.-China relations, a number of variables and other key indicators during the coming months could affect the course of U.S. policy toward Hong Kong. The U.S. Congress is particularly susceptible to the pressure of a wide range of interest groups about developments in Hong Kong. Democracy advocates, journalists, religious groups, businesses, and others in Hong Kong may seek to pursue their differences with China by appealing for intervention by Congress and other U.S. policymakers. Any number of groups--both within China and Hong Kong and within the United States--will be anxious to present their own policy alternatives to U.S. policymakers.

Some in Hong Kong and the United States are likely to argue for a U.S. policy that is more assertive and that focuses on preserving and expanding political rights in Hong Kong. They may urge the United States to use liberally the provisions in the United States-Hong Kong Policy Act that allow the United States to suspend legal and other benefits for Hong Kong after 1997 if the P.R.C. does not allow sufficient autonomy there. [FN91] These benefits range from textile quotas to immigration quotas and technology transfer restrictions. Their loss to Hong Kong would have a strong negative impact on China and presumably could be *362 used to dissuade P.R.C. authorities from infringing too much on Hong Kong autonomy. Those supporting a more assertive U.S. policy argue that the benefits of such an approach, followed vigorously, outweigh its potential disruptions to U.S.-China relations.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333

18 U. Pa. J. Int'l Econ. L. 333

Others, also generally positive about U.S. involvement in Hong Kong, argue for a more modulated and calibrated U.S. policy approach. Many, in Hong Kong in particular, say that U.S. congressional interest in the territory is beneficial for Hong Kong because it keeps Hong Kong's profile high. Many of these observers want the United States and others to show Beijing that the international community is keenly interested in the outcome in Hong Kong, and that other countries would take a negative view of any heavy-handed Chinese pressure in the territory. This group has pressed for U.S. congressional hearings on Hong Kong and increased activism by Members of Congress.

Other observers warn against greater U.S. involvement in Hong Kong. They aver that the P.R.C. is highly sensitive on the Hong Kong question and that U.S. "meddling" could cause unpredictable consequences. They have offered little critical comment on U.S. statements and policy up to this point, but they indicate that stronger statements of support or an outpouring of U.S. sympathy for democracy advocates could harden Chinese policy and seriously erode Hong Kong's autonomy.

Over the longer term, other factors may surface that could affect congressional attitudes and U.S. policy toward Hong Kong. A number of key indicators-- developments to watch over the coming months in gauging trends in Hong Kong-- can assist observers in analyzing prospects for the future and making decisions about the likely course of U.S. policy.

### 7.1. The Chief Executive. C.H. Tung

Certainly one crucial factor involves the leadership of Hong Kong's new Chief Executive, wealthy shipping magnate C.H. Tung, whose role after July 1, 1997, will be similar to that played by past British Governors. In accordance with the Basic Law, the new Chief Executive was chosen by the Beijing-appointed 400-member Selection Committee, which announced its selection on December 11, 1996. Some have expressed concerns about Mr. Tung's fitness for the job--wondering, for instance, whether the lucrative Chinese government shipping contracts that saved his *363 company from bankruptcy years ago may make him too beholden to Beijing. But Tung has moved carefully and swiftly in his early tenure in office. His decision to retain in office senior-level civil servants-- particularly Anson Chan, the highly-respected Chief Secretary and second-highest ranking official in Hong Kong--bolstered optimism that no drastic governmental changes would occur after July 1, 1997.

### 7.2. The Civil Service

Continuity in Hong Kong's civil service and China's approach to civil service issues are commonly viewed in Hong Kong to be crucial elements in Hong Kong's future. Although the Joint Declaration guarantees that Hong Kong's civil servants will be able to continue at their jobs with full pay and benefits--and Tung's decision to retain senior officials appears to reinforce this guarantee--concern remains about the attrition rate in the civil service. Concern is particularly high about civil service professionals, some of which continue to leave their jobs prematurely by either moving to the private sector or taking early retirement.

Currently, the vacancy rate within the civil service is reported to be below four percent, and any gaps have been filled by hiring consultants or contractors. However, of the estimated 1,400 civil servants who are considered "key" in running Hong Kong efficiently, approximately twenty percent are eligible for early retirement prior to China's takeover. If those eligible decide to elect for early retirement, government services could suffer, resulting in a sharp erosion of public confidence that, in turn, could have collateral effects. Of particular concern

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333                                                                                                                    Page 16
18 U. Pa. J. Int'l Econ. L. 333

is the retention rate within Hong Kong's police force and judiciary--institutions essential for maintaining stability and international confidence in Hong Kong.

### 7.3. Provisional Legislature

Beijing's decision to dissolve the elected Legislative Council on July 1, 1997, and to replace it with an appointed temporary body, the so-called "provisional legislature," is likely to be an acid test for U.S. confidence regarding the "one country, two systems" concept. A provisional legislative body is not provided for in either the Joint Declaration or the Basic Law, and Beijing's decision to appoint such a group is viewed by many U.S. policymakers as the beginning of heavy-handed Chinese interference*364 in Hong Kong's promised decision-making autonomy. The behavior of the provisional legislature, legislative actions taken by the provisional legislature during its tenure, the length of time before elections are held for the first Hong Kong S.A.R. Legislative Council (and whether Beijing honors its commitments about the first legislature), [FN92] and the reaction of democracy advocates in Hong Kong to the provisional body constitute factors that are likely to have continuing repercussions for U.S. policy.

### 7.4. Freedom of the Press

The extent to which China allows freedom of expression--including freedom of the press and freedom of assembly--is another key variable that can indicate likely U.S. policy towards Hong Kong. Under the Basic Law, China has accepted a number of provisions with regard to Hong Kong's political and economic future. Among these legal guarantees is one contained in Article 27 of the Basic Law, which declares:

> Hong Kong residents shall have freedom of speech, of the press and of publication; freedom of association, of assembly, of procession and of demonstration; and the right and freedom to form and join trade unions, and to strike. [FN93]

*365 Despite the apparent clarity of such language, Chinese officials routinely make statements suggesting that either a more restrictive approach to or total disregard of these provisions will prevail after the transition to Chinese rule. China's Foreign Minister, Qian Qichen, who is also chairman of the Preparatory Committee, has been quoted as saying that journalists would be able to publish criticism, "but not rumors or lies" or personal attacks on Chinese leaders. [FN94] Apart from the dissolution of Legco, Beijing's approach to issues of personal freedom in Hong Kong could be the most volatile issues surrounding the transition.

## 8. CONCLUSIONS

A widespread view in the international community is that better relations between the United States and China--the two largest economic players in Hong Kong--will be a key component in Hong Kong's future. Some fear that Hong Kong could easily become a collateral casualty of poor U.S.-China relations. Therefore, many observers with policy suggestions to offer the United States include among them that the United States should hold regular high-level dialogues with Chinese officials, have more economic exchanges with China, and seek to minimize actions that seem to challenge China's sovereignty or authority over Hong Kong. By the same token, better U.S.-China relations could facilitate a more visible U.S. presence in Hong Kong, even in the face of objections from Beijing. Such an enhanced presence could include expanded direct U.S. contacts with Hong Kong and a continued U.S. insistence that China honor the terms of the Sino-British Joint Declaration.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Ultimately, over the next few years, the Clinton Administration and Members of Congress are likely to be in the difficult position of having to balance a number of often competing U.S. policy goals. They will have to make difficult choices between U.S. economic, political, and security goals in China on the one hand, and U.S. economic and political imperatives in Hong Kong on the other. Additionally, bearing in mind the United States-Hong Kong Policy Act, they will certainly be monitoring China's *366 adherence to its commitments concerning Hong Kong's future.

[FNa1]. Kerry Dumbaugh is an Asian Affairs specialist at the Foreign Affairs and National Defense Division of the Congressional Research Service ("CRS"), a research arm of the U.S. Congress. She has been working in Washington, D.C., in various policy capacities since 1977 and has been with CRS since 1986. At CRS, she specializes in analyzing economic, political, and security developments in China, Hong Kong, and Taiwan and has written extensively on U.S. policy toward those countries. Ms. Dumbaugh spent eight years working as a Legislative Assistant and Legislative Director for various Members of Congress from both political parties and in both houses. She holds a Bachelor of Arts degree from Wittenberg University, a Master of Arts degree in East Asian Studies from the University of Pennsylvania, and a Master of Science degree in National Securities Studies from the United States National War College in Washington, D.C.

[FN1]. *See* Joint Declaration on the Question of Hong Kong, Dec. 19, 1984, U.K.-P.R.C., 1985 Gr. Brit. T.S. No. 26 (Cmnd. 9543), para. 1 [hereinafter Joint Declaration]. The Joint Declaration was the final result of several years of negotiations between China and Britain over Hong Kong's future. The agreement lays out China's basic policies and guarantees regarding Hong Kong, including policies on rights of Hong Kong citizens and foreign nationals, Hong Kong's legislative, judicial, and other governmental institutions, and financial and monetary arrangements. *See id.* para. 3. The agreement was initialed on September 26, 1984; signed on December 19, 1984; and ratified on May 27, 1985. *See id.*

[FN2]. Henry Kissinger once referred to the close U.S.-British relations as the "special relationship." HENRY KISSINGER, WHITE HOUSE YEARS 86 (1979).

[FN3]. Interview with a Chinese official who cannot be named in this Article, in Beijing, China (1985).

[FN4]. Most of the corporate offices in Hong Kong function as financial and marketing bases for manufacturing facilities in mainland China and as headquarters for business activities throughout Asia.

[FN5]. *See* Consul General Richard W. Mueller, America's Long-Term Interest in Hong Kong, Address to the Foreign Correspondents' Club, Hong Kong (May 22, 1995), *available in* LEXIS, Genfed Library, Dstate File.

[FN6]. MFN is the tariff treatment that the United States extends to almost all of its trading partners. China's eligibility for MFN status is subject to an annual renewal, which the President must request by June 3 each year and which automatically goes into effect if Congress does not enact a joint resolution of disapproval within 60 days. *See* 19 U.S.C §§ 2431-32 (1994). Renewal of China's MFN status became controversial the year following the Tiananmen Square crackdown of 1989, and has been the subject of sometimes rigorous debate in subsequent years. The collateral effect on Hong Kong of withdrawing China's MFN status has been one of the issues debated.

[FN7]. *See* 50 U.S.C. app. § 2404(k) (1994).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN8]. *See* Joint Declaration, *supra* note 1, para. 1. The U.S. government maintained a low profile throughout these negotiations.

[FN9]. *See id.*

[FN10]. *See id.* Further details of Hong Kong's future governance were provided in a second document enacted by the Chinese government. The Basic Law of the Hong Kong Special Administrative Region of the People's Republic of China, that will serve as Hong Kong's de facto constitution after 1997. *See* The Basic Law of the Hong Kong Special Administrative Region of the People's Republic of China (April 4, 1990), *translated in* 29 I.L.M. 1520 [hereinafter Basic Law].

[FN11]. The United States remained uninvolved during the course of the negotiations between the British and the Chinese.

[FN12]. *See* Basic Law, *supra* note 10.

[FN13]. *Id.* art. 68.

[FN14]. Beijing especially objected to the "through train" concept for certain Legco members who were vocal critics of the P.R.C., members such as Martin Lee and Szeto Wah.

[FN15]. In his reform proposal, Governor Patten expanded the number of functional constituency seats in Legco from 21 to 30, and broadened their franchises to include a wider range of workers within each profession. He expanded the District Board jurisdiction and abolished the tradition of appointing some Legco members to serve concurrently on the Executive Council, the Governor's advisory board. Additionally, Governor Patten lowered the voting age from 21 to 18.

[FN16]. China first announced that it would establish a separate legislative body in Hong Kong in November 1992, shortly after Governor Patten announced his political reform platform. Beijing repeated and confirmed these assertions periodically in the intervening years, until finally naming a provisional legislature on December 21, 1996.

[FN17]. 22 U.S.C. §§ 5701-32 (1994).

[FN18]. *See id.*

[FN19]. *See id.*

[FN20]. *See id.*

[FN21]. *See id* §§ 5701-15.

[FN22]. *See id.* § 5701(5).

[FN23]. *See id.* § 5701(4).

[FN24]. *See id.* § 5721(a).

[FN25]. *Id.* § 5721(b).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN26]. *See id.* § 5722(a). Any Executive Order issued under this provision must be published in the Federal Register. *See id.* § 5722(c).

[FN27]. *See id.* § 5722(b).

[FN28]. *See id.* § 5722(d).

[FN29]. *See id.* § 5731.

[FN30]. *See id.* § 5731(1).

[FN31]. *See id.* § 5731(2).

[FN32]. *See id.* § 5731(3).

[FN33]. *See id.* § 5731(4). Sections 201 and 202 of the United States-Hong Kong Policy Act are codified at 22 U.S.C. §§ 5721-22 (1994).

[FN34]. *See id.* § 5731(5). Section 201(b) of the United States-Hong Kong Policy Act is codified at 22 U.S.C. § 5721(b) (1994).

[FN35]. *See id.* § 5731(6).

[FN36]. *Id.* § 5731(7).

[FN37]. *Id.* § 5731(8).

[FN38]. *See id.* § 5732.

[FN39]. *See id.* § 5732(1). Sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961 are codified at 22 U.S.C. §§ 2151n(d), 2304(b) (1994).

[FN40]. *See id.* § 5732(2). Section 181 of the Trade Act of 1974 is codified at 19 U.S.C. § 2241 (1994).

[FN41]. *See id.* § 5732(3). Section 2202 of the Export Enhancement Act of 1988 is codified at 15 U.S.C. § 4711 (1994).

[FN42]. On March 8, 1996, amidst international tensions during Taiwan's first direct presidential elections, China began conducting ballistic missile exercises in the Taiwan Straits off two key Taiwanese ports. On March 10, 1996, the United States responded by sending two carrier battle groups into the Straits.

[FN43]. At a news conference in the White House briefing room on May 26, 1994, President Clinton defined the "engagement policy" as engaging China "in a growing web of political and economic cooperation and contacts." President William J. Clinton, Remarks at Press Conference on China Trade Status (May 26, 1994), *in* U.S. Newswire, *available in* Westlaw, File No. 3823616. The President further stated his view that "the best path for advancing freedom in China is for the United States to intensify and broaden its engagement with that nation." *Id.*

[FN44]. H.R. 1561, 104th Cong. (1995); S. 908, 104th Cong. (1995).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN45]. *See* S. 908, 104th Cong. (1995); H.R. 1561, 104th Cong. (1995).

[FN46]. The Foreign Relations Authorization Act would have authorized appropriations for the Departments of State, Justice, and Commerce for fiscal year 1996. The House Committee on International Relations reported on H.R. 1561 on May 19, 1995. *See* H.R. REP. NO. 104-128, pt. 1 (1995). The bill was passed by the House on June 8, 1995, by a vote of 222-192. On December 14, 1995, the Senate passed an amended version of the bill by a vote of 82-16, necessitating a conference. The final Conference Report was passed by the House on March 12, 1996, by a vote of 226-172, and by the Senate on March 28, 1996, by a vote of 52-44. *See* H.R. CONF. REP. NO. 104-478 (1996). President Clinton vetoed the bill on April 12, 1996. A veto override attempt in the House on April 30, 1996, failed to achieve the necessary two-thirds margin to pass, and the Foreign Relations Authorization Act died.

[FN47]. *See* S. 908.

[FN48]. The language contained in S. 908 would have amended 22 U.S.C. § 5731 "by inserting 'March 31, 1996,' after 'March 31, 1995.'" *Id.* § 605(a)(2).

[FN49]. S. 908 would have amended 22 U.S.C. § 5731 "by striking 'and March 31, 2000,' and inserting 'March 31, 2000, and every year thereafter.'" *Id.* § 605(a)(2).

[FN50]. S. 908 added six more requirements to the eight reporting requirements in 22 U.S.C. § 5731. These additional requirements included detailed information on: (1) the Basic Law and its consistency with the Joint Declaration; (2) the openness and fairness of elections to Hong Kong's legislature; (3) the openness and fairness of the election of Hong Kong's new chief executive, and the executive's accountability to the legislature; (4) the treatment of political parties in Hong Kong; (5) the independence of Hong Kong's judiciary and its power to exercise final judgment over Hong Kong law; and (6) Hong Kong's Bill of Rights. *See id.* § 605(b).

[FN51]. *Id.*

[FN52]. Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1996, Pub. L. No. 104-107, 110 Stat. 704 (1996).

[FN53]. *See* H.R. 1868, 104th Cong. (1995). The 1996 Foreign Operations Appropriations bill was reported by the House Appropriations Committee on June 15, 1995. It passed the House on July 11, 1995, and passed the Senate, amended, on September 21, 1995 by a vote of 91-9. A Conference Report was filed on October 26, 1995. The House agreed to the Conference Report on October 31, 1995, by a vote of 351-71, but with one amendment in disagreement on international family planning assistance. The Senate agreed to the Conference Report on November 1, 1995, by a vote of 90-6, with an amendment to the House amendment. After a three month stalemate, the bill was enacted by reference when conferees attached compromise language and H.R. 1868 to the Continuing Resolution on Appropriations, H.R. 3019, which the President then signed on January 26, 1996. H.R. 1868 was later enacted in its own right as Pub. L. No. 104-107 on February 12, 1996. *See* Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1996, Pub. L. No. 104-107, 110 Stat. 704 (1996).

[FN54]. *See supra* note 53.

[FN55]. *See* Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1996, Pub. L. No

18 UPAJIEL 333                                                                                        Page 21
18 U. Pa. J. Int'l Econ. L. 333

104-107, § 576(a), 110 Stat. 704, 750 (1996).

[FN56]. *See id.* § 576(b).

[FN57]. *Id.* Although Congress could have used this bill to amend the United States-Hong Kong Policy Act to permanently require the additional information in future reports, appropriators generally like to accommodate any necessary changes in the appropriation bill for that year without amending permanent law. Thus, the Foreign Operations Appropriations bill dealt only with the requirements of the March 1996 Hong Kong report and not with the requirements of future reports.

[FN58]. Omnibus Appropriations Act for Fiscal Year 1997, Pub. L. No. 104-208, § 571 (1996).

[FN59]. *See id.*

[FN60]. *See id.*

[FN61]. *See id.* The 1997 report was required by section 301 of the original United States-Hong Kong Policy Act of 1992. *See* 22 U.S.C. § 5731 (1994).

[FN62]. *Compare* Omnibus Appropriations Act for Fiscal Year 1997, § 571 *with* Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1996, Pub. L. No. 104-107, § 576, 110 Stat. 704, 750 (1996) *and* H.R. 1561, 104th Cong. (1995) *and* S. 908, 104th Cong. (1995). In the Omnibus Appropriations Act for Fiscal Year 1997, Congress reflected China's decisions on Hong Kong's legislature, changing the reporting requirement from one on the "fairness of elections for the legislature" to the new requirement of a report on China's plans to dissolve Hong Kong's elected legislature and replace it with a provisional appointed body. *See* Omnibus Appropriations Act for Fiscal Year 1997, § 571. The other five additional requirements are the same as those listed for the Foreign Operations Appropriations Act, and include reports on: the Basic Law and its consistency with the Joint Declaration; the openness and fairness of the election of Hong Kong's chief executive and the executive's accountability to the legislature; the treatment of political parties in Hong Kong; the independence of the judiciary and its ability to exercise the power of final judgment over Hong Kong law; and Hong Kong's Bill of Rights. *See id.*, Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1996, § 576.

[FN63]. *See* S. 2130, 104th Cong. (1996). Senate Bill 2130 was an original measure reported to the Senate by Senator Helms on September 25, 1996, without written report. *See* 142 CONG. REC. S11,291 (daily ed. Sept. 25, 1996).

[FN64]. *See* 22 U.S.C. § 288 (1994).

[FN65]. *See* 142 CONG. REC. S11,658-59 (daily ed. Sept. 28, 1996).

[FN66]. *See* Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990).

[FN67]. U.S. visas generally must be used within the fiscal year that they are issued. The Immigration Act of 1990 permitted extension of the period of validity until January 1, 2002, for immigrant visas issued to certain aliens before September 1, 2001. *See* Immigration Act of 1990, § 154(a)(1)-(2). Hong Kong residents are the only aliens to whom this extension applies. *See id.* § 154(b).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN68]. *See* 139 CONG. REC. S3867-68 (daily ed. Mar. 26, 1993) (statement of Sen. Mack); 139 CONG. REC. E587-88 (daily ed. Mar. 10, 1993) (statement of Rep. Porter).

[FN69]. *See* S. 665, 103rd Cong. (1993); H.R. 1265, 103rd Cong. (1993).

[FN70]. *See* 22 U.S.C. § 5721 (1994).

[FN71]. Paragraph 3(2) of the Joint Declaration promises Hong Kong a "high degree of autonomy, except in foreign and defense affairs, which are the responsibilities of" China. Joint Declaration, *supra* note 1, para. 3(2). Paragraph 3(10) of the Joint Declaration, however, provides that Hong Kong will have the authority on its own to "maintain and develop economic and cultural relations and conclude relevant agreements with states, regions, and relevant international organizations." *Id.* para. 3(10).

[FN72]. According to U.S. Treaties in Force, the United States and China have approximately 40 bilateral treaties and agreements. *See* U.S.T. 51-52 (1996). There may be other treaties or agreements in force, however, that deal with more specialized areas. Although additional treaties may not be accounted for in U.S. Treaties in Force, any agreement made by a branch of the U.S. government would have the effect of law.

[FN73]. The "JLG" was created under Annex II of the Joint Declaration. *See* Joint Declaration, *supra* note 1, Annex II, § 2. Sections 4 and 5 of Annex II specify matters for consideration by the JLG to include any actions the two governments need to take "to ensure the continued application of international rights and obligations affecting Hong Kong," and actions to help the Hong Kong government "conclude agreements [on economic and cultural matters] with states, regions, and relevant international organizations." *Id.* Annex II, §§ 4(b), 5(b). The JLG is currently in the process of reviewing all bilateral and multilateral agreements to determine which should lapse, which should remain in force, and which should be replaced with other agreements.

[FN74]. *See* Consular Convention, June 6, 1951, U.S.-U.K., 3 U.S.T. 3426; Mutual Defense Assistance Agreement, Jan. 27, 1950, U.S.-U.K., 1 U.S.T. 126. The consular convention and the mutual defense assistance agreement cover foreign affairs and defense, respectively. Those matters in Hong Kong will be under the authority of the P.R.C. Thus, the existing agreements, negotiated with Great Britain, will not apply after the transition.

[FN75]. Although postal matters are not specifically mentioned in the Joint Declaration, U.S. officials have judged them to be within Hong Kong's control after 1997. Therefore, the parcel post agreement with the P.R.C. would not apply to Hong Kong. *See* Parcel Post Agreement Between the Postal Service of the United States of America and the Ministry of Posts and Telecommunications of the People's Republic of China, Oct. 9, 1980, U.S.-P.R.C., 32 U.S.T. 2920. The U.S.-China Memorandum of Understanding on the protection of intellectual property, which entered into force on January 17, 1992, will not apply to Hong Kong after the transition because the Basic Law gives control over intellectual property rights specifically to the Hong Kong government after the transition. *See* Basic Law, *supra* note 10, art. 105; U.S.-China Memorandum of Understanding on Protection of Intellectual Property, Jan. 17, 1992, U.S.-P.R.C., T.I.A.S. No. 12036.

[FN76]. For example, agreements the United States now has with the People's Republic of China concerning embassy sites and satellite launches do not appear to affect Hong Kong.

[FN77]. Agreements of this type include agreements on atomic energy, fisheries, and property. *See* Agreement Concerning Fisheries Off the Coasts of the United States, July 23, 1985, U.S.-P.R.C., T.I.A.S. No. 12002; Protocol Between the Nuclear Regulatory Commission of the United States of America and the State Scientific and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333                                                                    Page 23
18 U. Pa. J. Int'l Econ. L. 333

Technological Commission of the People's Republic of China on Cooperation in Nuclear Safety Matters, Oct. 7, 1981, U.S.-P.R.C., 33 UST 4111; Convention Relating to the Tenure and Disposition of Real and Personal Property, Mar. 2, 1899, U.S.-U.K., T.S. No. 146.

[FN78]. These agreements include: a new extradition treaty, which has been approved by the JLG; a bilateral investment agreement; a new consular convention; a mutual legal assistance agreement; an air services agreement; and a prisoner exchange agreement, which is currently awaiting JLG approval. In addition, the U.S. Department of Defense is currently involved in discussions about continued U.S.-Hong Kong cooperation, including discussions on an agreement to allow U.S. Navy ships to continue to make Hong Kong a port-of-call after the transition date.

[FN79]. Interview with a U.S. State Department Official (Jan. 1997).

[FN80]. *See* Lui Kin-Hong v. United States, No. CIV. A. No. 96-104849-JLT, 1997 WL 37477, at *12 (D. Mass. Jan. 7, 1997) (memorandum and order denying extradition request).

[FN81]. *See id.* at *3.

[FN82]. *Id.* at *5.

[FN83]. *See id.* at *12.

[FN84]. Article 82 of the Basic Law gives power of final adjudication to Hong Kong's Court of Final Appeal, to be presided over by Hong Kong judges. *See* Basic Law, *supra* note 10, art. 82.

[FN85]. *See* 22 U.S.C. §§ 5711-15 (1994).

[FN86]. *See Lui Kin-Hong*, 1997 WL 37477, at *9.

[FN87]. *See* 22 U.S.C. § 5721(b) (1994).

[FN88]. *See id.*

[FN89]. *See id.* § 5722.

[FN90]. *See* 22 U.S.C. § 5731 (1994).

[FN91]. *See* 22 U.S.C. § 5722 (1994).

[FN92]. On April 4, 1990, China's Seventh National People's Congress adopted a document entitled the Decision of the National People's Congress on the Method for the Formation of the First Government and the First Legislative Council of the Hong Kong Special Administration Region. Paragraph 6 of this document states:

> The first Legislative Council of the Hong Kong S.A.R. shall be composed of 60 members, with 20 members returned by geographical constituencies through direct elections, 10 members returned by an election committee, and 30 members returned by functional constituencies. If the composition of the last Hong Kong Legislative Council before the establishment of the Hong Kong S.A.R. is in conformity with the relevant provisions of this Decision and the Basic Law of the Hong Kong S.A.R., those of its members who uphold the Basic Law of the Hong Kong S.A.R. of the People's Republic of China and pledge allegiance to the Hong Kong S.A.R. of the P.R.C., and who meet the requirements set forth in the Basic Law of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 UPAJIEL 333                                                                                    Page 24
18 U. Pa. J. Int'l Econ. L. 333

the Region may, upon confirmation by the Preparatory Committee, become members of the first Legislative Council of the Region.

[FN93]. Basic Law, *supra* note 10, art. 27.

[FN94]. Erik Guyot, *Free-Press Fears Spread to Financial News,* ASIAN WALL ST. J., Oct. 18, 1996, at 3, *available in* 1996 WL-WSJA 12476138.
18 U. Pa. J. Int'l Econ. L. 333

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit AO

# Somalia: Prospects for a Lasting Peace

## Ted Dagne

In 1991, General Mohamed Siad Barre, who came to power through a military coup in 1969, was ousted from power by several Somali armed groups. Following the collapse of central authority in Mogadishu, the capital, rival Somali groups engaged in armed struggle for personal political power and prevented food and medicine from reaching innocent civilians suffering from drought and famine. An estimated five hundred thousand people died from violence, starvation, and disease as Somalia was wracked by continued internal chaos. On 9 November 1992, then-president George H. W. Bush authorized Operation Restore Hope, using the US military to safeguard nongovernmental organizations (NGOs) and their efforts to provide humanitarian assistance to the suffering Somali civilian population.

The US-led United Task Force (UNITAF) successfully subdued the warlords and armed factions and enabled NGOs to provide humanitarian relief safely to Somalis. In May 1993, UNITAF handed the operation over to the United Nations. The UN effort was known as United Nations Operation in Somalia (UNOSOM) II. In May 1993, UNOSOM II coalition forces were attacked by one of the factions in Mogadishu. On 3 October 1993, after a seventeen-hour battle between US troops and Somali factions in Mogadishu, in which eighteen US Rangers were killed, President Clinton ordered the withdrawal of US troops from Somalia. In March 1994, the United States completely pulled out of Somalia, and one year later the UN pulled out the remaining peacekeepers. Since the withdrawal of UN forces in March 1995, Somalia has been without a central government and has been splintered into several regions controlled by clan-based factions.

Ted Dagne is associate editor of *Mediterranean Quarterly*.

*Mediterranean Quarterly* 20.2   DOI 10.1215/10474552-2009-007
Copyright 2009 by Mediterranean Affairs, Inc.

## Peace Processes

There have been fourteen Somali reconciliation or peace conferences to bring an end to the fighting in Somalia since the early 1990s. Some were held under the auspices of or were supported by the UN or governments in the Horn of Africa. These efforts have largely failed to bring about lasting peace. Moreover, competing efforts by international actors have contributed to the failure of peace efforts in Somalia. In 1996 the government of Ethiopia convened a peace process in the resort town of Sodere, Ethiopia. Many political actors and armed factions participated, although a few boycotted the peace process. The Sodere process collapsed when the government of Egypt convened another meeting of the Somali groups in Cairo in 1997. Subsequently, the Cairo initiative failed when yet another peace conference was convened, by Somali factions in Bosaso, Somalia, in 1998. In February 2000, the Inter-Governmental Authority on Development approved a peace plan proposed by the government of Djibouti. In May 2000, the Somali Reconciliation Conference opened in Arta, Djibouti, in which four hundred delegates took part for several months of deliberation. The Arta process was boycotted by several powerful warlords as well as the governments of Somaliland and Puntland.

On 13 August 2000, participants agreed to the creation of a Transitional National Government and a Transitional National Assembly. On 26 August 2000, participants nominated Abdulqassim Salad Hassan as president. In October 2002, the InterGovernmental Authority on Development launched another peace process, led by the government of Kenya. An estimated 350 delegates from different regions of Somalia participated in the opening session of the conference in the Kenyan town of Eldoret. The government of Somaliland boycotted the conference. In the first phase of the conference, the parties signed a temporary cease-fire and agreed to respect and honor the outcome of the conference. The parties further agreed to establish a federal system of government and committed themselves to fighting terrorism. In September 2003, the parties agreed on the Transitional National Charter, paving the way for a national unity government.

In August 2004, Somalia's Transitional Federal Parliament was inaugurated in Kenya. The 275-member parliament consists of the major political

factions and seems to represent all the major clans of Somalia. The Transitional National Charter allocated sixty-one seats for the four major clans and thirty-one seats for the small clans. The charter also allocated 12 percent of the seats to women, accepted Islam as the national religion, and agreed that *sharia* (Islamic) law would be the basis of national legislation. Previous Somali constitutions had similar provisions. In October 2004, the Transitional Federal Parliament elected Abdullahi Yusuf Ahmed as the new president of Somalia. The swearing-in ceremony was attended by eleven heads of government from African countries and representatives from regional organizations and the UN.

In November 2004, President Yusuf appointed Ali Mohamed Gedi as prime minister. The transitional government, however, was not able to function effectively or locate in Mogadishu, in large part due to opposition from the warlords in the city, even though some of these warlords signed the agreement and were ministers in the government. The inability of the transitional government to establish effective control allowed warlords and clan factions to dominate many parts of Somalia until late December 2006. Some observers contend that the defeat of the warlords by the Islamic Courts Union (ICU) paved the way for the establishment of central authority in Mogadishu.

## Background: 2006 to 2008

On 24 December 2006, Ethiopian and Transitional Federal Government (TFG) forces launched a military campaign against the forces of the ICU, a group that took power in Mogadishu, the capital, in June 2006. On 28 December 2006, Ethiopian troops captured Mogadishu with little resistance from the ICU. The ICU leadership decided a day before the Mogadishu attack to leave the city in order to avoid bloodshed and the destruction of Mogadishu, according to a senior official of the group.[1] On 1 January 2007, the ICU lost its last stronghold, Kismaayo, after its forces withdrew to an area near the Kenyan border, although most of its fighters and leaders either simply melted into society throughout Somalia or fled to neighboring countries. Some of the

1. Senior ICU official, interview with the author, Kenya, late December 2006.

top leaders of the ICU are in Yemen, Djibouti, Kenya, and Somalia.[2] In late January, Sharif Sheik Ahmed, the chairman of the executive committee of the Somali Council of Islamic Courts (SCIC), the successor to the ICU, traveled to Kenya. On 24 January 2007, the US ambassador to Kenya, Michael Ranneberger, reportedly met with Sheik Ahmed. Other leaders of the ICU have also been approached by US officials as part of a new strategy to reach out to them and others in an effort to have them participate in negotiations among Somali groups and the TFG.

The Ethiopian military intervention, while it has accomplished its military objective of ousting the ICU from Mogadishu and other areas it controlled, has been criticized by governments and regional organizations. The African Union, the European Commission, the Arab League, and others have called for the deployment of a UN peacekeeping force. Ethiopian officials argued that their military action is justified because the ICU posed a serious threat to Ethiopia and regional stability and because it is an extremist, jihadist group. Ethiopian and US officials also accused the ICU of being influenced or tied to well-known terrorist individuals and al Qaeda. ICU officials have repeatedly rejected these allegations and on a number of occasions have offered to work with US officials, according to one senior ICU official. Allegations about the presence in Somalia of the three suspects involved in the bombings of the US embassies in Tanzania and Kenya in 1998 have been made on many occasions over the years. However, the ICU did not exist as an organized group when these allegations were made. Those in charge of Mogadishu and other areas in southern Somalia at the time were the warlords who were ministers in the current TFG.

On 8 January 2007, the US Air Force, using AC-130 gunships, attacked several locations in southern Somalia, reportedly to kill the three terror suspects in the 1998 US embassy bombings in Kenya and Tanzania. Reportedly, the United States launched another attack the following day, although US officials deny any further attacks by its forces. The British humanitarian group, Oxfam, stated in a press release that an estimated seventy people were killed in the bombings and vital water resources were destroyed in Afmadow district. A number of parties criticized the US attacks, including officials

2. Senior ICU official and regional sources in the Horn of Africa, interviews with the author, 2006–8.

in Europe and the government of Djibouti, where US forces are currently stationed. Djiboutian foreign minister Mahmoud Ali Yusuf told the BBC that the raid was counterproductive to achieving peace. He also stated that his government had not been informed about the air strikes. According to a *New York Times* article, the United States actively coordinated with Ethiopian forces in targeting suspected terrorists and Islamic Union forces.[3] US Special Operations troops from Task Force 88 were reportedly deployed to Ethiopia and entered Somalia. Moreover, the United States reportedly shared intelligence with the Ethiopian military and used an airstrip in eastern Ethiopia to launch attacks inside Somalia. A senior Ethiopian government official denied that there was any coordination with US forces.

Ethiopian troops were attacked by armed Somali groups, and a number of Ethiopian soldiers were killed by snipers or in ambushes. Some Somalis and human rights advocates accused Ethiopian TFG security forces of a witch hunt. Ethiopian and TFG security forces reportedly were engaged in house-to-house searches for Oromos (an Ethiopian ethnic group), supporters of the ICU, and members of the TFG considered not supportive of the Somali government and the Ethiopian intervention. The government of Kenya turned over dozens of Somalis and other nationals to TFG officials and Ethiopian security forces, according to Kenyan sources. In one particular case, Kenyan officials reportedly blindfolded and handcuffed thirty individuals and returned them to Mogadishu, where these detainees were taken by Ethiopian and TFG security personnel to unknown locations, according to Somali sources and government officials in the region. A number of Kenyan Muslims that were in Ethiopian detention were released in 2008.

On 17 January 2007, the Transitional Federal Parliament ousted the speaker of parliament, Sharif Hassan Sheik Adan, from his position. The former speaker, who has been a vocal critic of the Ethiopian intervention and the US air strike, has a strong following in Mogadishu and had been active in reaching out and engaging ICU officials when they had control over Mogadishu. Then-US assistant secretary of state for Africa Jendayi Fraser stated in mid-January 2007 that "the no-confidence motion brought against

3. Michael Gordon and Mark Mazzetti, "US Used Base in Ethiopia to Hunt al Qaeda," *New York Times*, 23 February 2007.

the Parliament Speaker is likely to have a negative impact on this process of dialogue."[4] In late January, the TFG elected Sheikh Adan Mohamed Nur Madobe, a former warlord and an ally of President Yusuf, as speaker of parliament.

## Recent Political Developments

Humanitarian and security conditions continue to deteriorate in south-central Somalia, despite some political progress and a recent peace agreement between the TFG and the Alliance for the Re-Liberation of Somalia (ARS), a group formed by former members of the ICU and Somalis from different backgrounds. The ouster from power of the ICU by Ethiopian forces in December 2006 created a security vacuum that was soon occupied by the more radical elements of the ICU's military factions. The moderate leadership of the ICU became marginalized, splintered, and weakened. US, TFG, and Ethiopian officials labeled the entire leadership of the ICU as extremist and terrorist in 2006. Eighteen months later, however, the same officials supported the inclusion of some former ICU members in a UN-led peace process.

In May–June 2008, TFG and ARS officials met in Djibouti under the auspices of the UN. Officials from the United States, Europe, the African Union, the Arab League, the Organization of the Islamic Conference, and regional governments took part as observers during the talks in Djibouti. The parties agreed on a wide range of issues, including cessation of hostilities and a commitment to find a durable peace agreement.[5] The parties agreed to support the deployment of a UN peacekeeping force and the phased withdrawal of Ethiopian forces from Somalia. While the agreement links the withdrawal of Ethiopian forces with the deployment of a UN peacekeeping force, Ethiopian forces have already withdrawn from some areas. In addition, in November 2008 the Ethiopian government announced that its forces would pull out of Somalia by the end of 2008. The parties also agreed to provide unhindered humanitarian access to civilians in need and to establish a joint security

4. "US Slams Somali Speaker's Sacking," BBC News, 18 January 2007, news.bbc.co.uk/2/hi/africa/6273949.stm.
5. Senior TFG officials and members of the Somali opposition, interviews with the author, Kenya, May and August 2008.

committee to ensure the implementation of security arrangements and create an interim joint security force.[6] The parties established the High Level Committee, chaired by the UN, to deal with political, justice, and governance issues.

The Djibouti agreement is complicated and has repeatedly been undermined by infighting within the TFG, insecurity, growing influence of insurgent groups, and limited support by the international community. The TFG forces are weak, ineffective, and seriously debilitated by defections. Over the past year, an estimated 40 percent of the police force, trained by the UN, left the force due to lack of payment. Some donor governments have withheld funds pledged to the TFG due to a lack of transparency and human rights abuses. In-fighting within the TFG, especially between Prime Minister Nur Adde and President Yusuf, also has weakened the TFG. In November 2007, Nur replaced Prime Minister Ali Mohamed Gedi, a man seen by many Somalis as ineffective and highly partisan.

Prime Minister Nur, who is seen by many Somalis and Somali observers as a key actor in the effort to bridge the gap between the TFG and the opposition, often clashed with President Yusuf. In July 2008, the prime minister dismissed the mayor of Mogadishu and the governor of the Benadir region, Mohamed Dheere, because of mismanagement of funds. In protest, ten pro-Yusuf ministers resigned, triggering a crisis within the TFG. In August 2008, the prime minister and the president met in Ethiopia and later reached an agreement on a number of issues. In mid-December 2008, President Yusuf fired Prime Minister Nur and named Mohamed Mohamud Guled as the new prime minister. Nur has rejected his dismissal, arguing that President Yusuf lacked the legal authority to dismiss him and that only parliament has the power to dismiss the prime minister. On 15 December 2008, a majority of the Somali Parliament voted in support of Nur. The government of Kenya imposed a travel ban and asset freeze against President Yusuf. In late December 2008, President Yusuf resigned and left the government.

The ongoing Djibouti peace process aims to establish a new, inclusive government in Mogadishu.[7] The primary objective is to form a new national unity

---

6  United Nations Political Office for Somalia (UNPOS), August 2008.

7. UN Special Envoy Ould-Abdallah, interview with the author, Kenya, August 2008.

government made up of Somalis from different backgrounds, including former members of the ICU. The parties also reportedly plan to expand the current 275-member parliament. The Somali parliament has been inactive due to insecurity, defections, and infighting. The Djibouti peace process, however, faces serious challenges. The balance of military power on the ground has shifted in favor of the al-Shabaab, "the Youth," a group determined to expand its influence and control beyond Mogadishu. If successful in capturing Mogadishu, al-Shabaab is likely to seek control of Somaliland and Puntland by military means.

Some of the military commanders of the ICU/SCIC are likely to join forces with al-Shabaab. A negotiated settlement between the ICU/SCIC and al-Shabaab is possible, with the withdrawal of Ethiopian forces and intervention by clan elders. Some al-Shabaab leaders are currently engaged in talks with some members of the ICU/SCIC. But the leaders of al-Shabaab are not fully known, with the exception of some. Some of the key commanders and leaders come from Somaliland. Ahmed Abdi Godane, who is on the US terrorism list, is a key commander who trained and fought in Afghanistan and comes from Somaliland. Mukhtar Robow, who is also on the US terrorism list, is the spokesman of al-Shabaab. Another key leader is Ibrahim Haji Jama, who is on the US terrorism list and reportedly trained and fought in Afghanistan. In February 2008, Secretary of State Condoleezza Rice designated al-Shabaab as a Foreign Terrorist Organization and as a Specially Designated Global Terrorist.

## Security Conditions

In 2008, insurgent groups stepped up attacks against Ethiopian and TFG forces in south-central Somalia. In some cases, TFG forces simply withdrew from some areas. As of late November 2008, insurgent groups were in control of most of south-central Somalia, including the third largest town, Kismaayo. Ethiopian and TFG forces, as well as the African Union Mission to Somalia, do not have control or presence outside Baidoa and Mogadishu. The insurgents even control some parts of Mogadishu, and some of their forces are active outside the capital. The forces of the ARS are reportedly in control of

Beledweyne and Jowhar, with some support from Ethiopian and TFG forces.[8] Al-Shabaab forces also have expanded their military operations to other parts of Somalia and routinely assassinate opponents and government officials.

Security conditions are likely to deteriorate further in the coming months, despite the peace agreement between the TFG and the ARS. In late October 2008, simultaneous and well-coordinated suicide attacks in Puntland and Somaliland reportedly killed an estimated twenty people and injured many more. The targets of the attacks were the Ethiopian consulate, the office of the UN Development Program, and a security office close to the presidential palace. The suicide mission was reportedly carried out by members of al-Shabaab, although no organization claimed credit for the attacks. One of the suicide bombers is an American-Somali from Minneapolis, who, according to press reports, left the United States to take part in the suicide attacks. Reportedly, more than a dozen Somali youth from Minneapolis left their homes there, and some community leaders believe they went to Somalia to join the insurgency. There is no clear evidence of how many and for what purpose these Somalis left Minneapolis.[9] Over the past decade, many Somalis have returned to Somalia to work as journalists, humanitarian workers, and teachers. A number of these Somalis have been killed in the past two years by insurgents and security forces.

## Human Rights and Humanitarian Conditions

In 2008, humanitarian and human rights conditions became worse than in previous years, according to UN officials and Somali humanitarian workers. An estimated 1.1 million people have been displaced and more than 475,000 have fled to neighboring countries in the past two years. Human rights groups and Somali observers estimate more than ten thousand people have been killed since mid-2007. Civilians, humanitarian workers, journalists, and human rights advocates have been the primary targets of the insurgents,

8. A leader of the Islamic Courts, interview with the author, November 2008.
9. "Young Somali Men Missing from Minneapolis," *International Herald Tribune*, 27 November 2008.

TFG, and Ethiopian security forces. According to Amnesty International, "Rape, killings and looting have become widespread. Entire neighborhoods have been destroyed."[10] A number of Somali journalists covering the crisis in Somalia have been assassinated by insurgents and security forces since about mid-2007. Dozens of humanitarian and human rights advocates have been killed, injured, or imprisoned by TFG and Ethiopian security forces. Because of these targeted attacks, many human rights advocates and journalists have fled Somalia to neighboring countries for safety.[11] Somalis working for international NGOs and foreign media have also been attacked by insurgents and TFG/Ethiopian security forces.

## Somali Piracy in the Horn of Africa

### Overview

Somali pirates have intensified their attacks in the Gulf of Aden, carrying out attacks on more than ninety commercial ships, and successfully hijacked an estimated forty ships in 2008. As of late November 2008, an estimated fourteen to eighteen ships were under the control of the pirates, including a Saudi-owned supertanker, *Sirius Star*, and a Ukranian-owned ship, MV *Faina*, which was carrying thirty-three T-72 tanks and other weapons, according to press reports. MV *Faina* was released in mid-February 2009. The pirates have reportedly earned more than $120 million in ransom payments and have released a number of ships and crew members. The United States, Russia, India, and several other countries have deployed warships to tackle piracy in the Horn of Africa region, although the problem still persists. Some insurgent leaders have warned the pirates to end the piracy and to release crew members and ships currently controlled by the pirates. In December 2008, the Indian Navy reportedly arrested twenty-three Somali and Yemeni pirates. On 16 December 2008, the UN Security Council passed a resolution authorizing the use of "all necessary measures" by foreign military forces to stop piracy

10. "Routinely Targeted Attacks on Civilians in Somalia," Amnesty International, 1 June 2008, www.amnesty.org/en/library/info/AFR52/009/2008/en.

11. Journalists and human rights advocates, interviews with the author, Kenya, 2007 and 2008. In November 2008, the author met with a group of Somali human rights advocates who fled Somalia for safety.

in Somalia. The resolution authorizes military operations inside Somalia and in its airspace for one year, with the consent of the TFG.

## Who Are the Pirates?

The number of Somali pirates is unknown. While there are more pirates now than in previous years, the pirates do not seem to have a unified organization with a clear command structure. Many of these pirates are reportedly fishermen and former militia members of the Somali warlords. The pirates come primarily from the Puntland region of Somalia and are members of various clans. Some press reports have suggested that the pirates are being controlled and directed by the Islamic insurgents in south-central Somalia. There is no evidence, however, to support this assertion, and during the six months the ICU was in power, the leaders took measures to end piracy and other criminal activities. In November 2008, one of the top leaders of the insurgents, Sheik Hassan Aweys, called on the pirates to end their criminal activities, and other insurgent leaders threatened to take military action against the pirates. The pirates, however, are not operating alone, according to a number of Somali and regional sources. Some Somali businessmen and officials in Puntland are reportedly behind the piracy. The pirates are reportedly receiving valuable information about the types of ships, cargo, and timing from Somalis in the Persian Gulf.[12] They also possess sophisticated technology, including global position systems, automatic identification systems, and satellite phones.

## The Views from Somalia

Some Somalis view the piracy crisis as a foreign problem with little impact on their daily life. Some argue that the piracy problem will continue as long as the ship owners are willing to pay the pirates ransom. In the face of difficult economic conditions and a growing humanitarian crisis, many Somalis resent the fact that the piracy problem has received a great deal of international

12. Somali officials, opposition leaders, and regional officials, interviews with the author, Horn of Africa, 2007 and 2008.

attention. Some Somali community leaders contend that some Somalis get involved in criminal activities in order to survive, while many others have made these kinds of criminal activities a lifetime profession. Since the collapse of the Siad Barre government in 1991, Somalis have been the principal victims of criminals. Somalis had to pay "taxes" to warlords in order to pass from one neighborhood to another. Humanitarian assistance convoys are routinely targeted by criminal elements, forcing humanitarian agencies to hire gunmen for protection. Many Somalis contend that in the absence of a better alternative, they have come to accept life with all the difficulties they face daily.

Some Somalis argue that the fishermen have become pirates because their way of life was destroyed by illegal fishing and toxic waste dumping that has been ignored by foreign governments. In 2005, the UN Environment Program released a report documenting the damages done as a result of toxic waste dumping on Somalia's shores. According to a spokesman, "There's uranium radioactive waste, there's lead, there's heavy metals like cadmium and mercury, there's industrial waste, and there's hospital wastes, chemical wastes, you name it." According to the report, the primary reason for toxic dumping in Somalia is cost. The report states that it costs $2.50 per ton to dump toxic waste in Africa compared to $250 per ton to dump waste in Europe.[13] In July 2008, UN special envoy Ahmedou Ould-Abdallah stated that "because there is no [effective] government, there is so much irregular fishing from European and Asian countries." The special envoy argued that it is important to tackle these illegal activities by some countries, and not to focus solely on the problem of piracy.

### Policy Options in Dealing with Piracy

The international community has responded to the threat of piracy by deploying warships to the Gulf of Aden. The UN Security Council has passed resolutions on piracy in the Horn of Africa. Since the deployment of these warships to the region, however, the number of hijacked ships has increased. Moreover, there had been no rescue operation as of November 2008 to free

13. UN Environment Program, "Somalia," new.unep.org/tsunami/reports/TSUNAMI_SOMALIA_LAYOUT.pdf.

crew members and ships still under the control of the pirates. Somali community leaders and regional analysts argue that the groups most capable and best positioned to handle the piracy problem are the Islamic insurgents and the clan elders. The ICU dealt with this problem effectively when it was in power, according to senior leaders of the ICU/SCIC and independent observers. The Islamic insurgents claim that they are opposed to these kinds of criminal activities for religious reasons. The Islamic leadership sees the piracy problem as a source of concern, because they fear that they could erroneously or deliberately be linked to the piracy phenomenon and become targets of punitive action by the international community. One option is to provide quick and robust economic incentives to lure the unemployed away from piracy and other criminal activities.

### Policy Options in Dealing with Political and Security Problems

The international community might consider engagement with the Islamic insurgents and clan elders to deal with the political and security problems facing Somalia. According to some observers, it is essential to strengthen the moderate elements of the Islamic movements discretely. Most observers believe that al-Shabaab can be contained only by another Islamic movement supported by clan elders. Some of the most influential leaders in al-Shabaab are on the UN and US terrorism lists. Some observers argue that removing some of these individuals from the list in exchange for concessions, including an end to the insurgency and acceptance of a negotiated settlement, should be considered as an option. One of the key players in facilitating the Djibouti talks was a Somali man on a UN terrorism list. According to UN officials, that man is no longer on the list.

Some of the leaders in al-Shabaab are determined to continue their military campaign and are not inclined to participate in negotiations. According to some experts, targeted measures, including sanctions and assassination of the most extreme elements of al-Shabaab, could pave the way for other moderate leaders to emerge. However, others believe that this option is likely to backfire in the short term and increase anti-Western violence. Another option is to refer some of these individuals to the International Criminal Court for war crimes. The most effective way of containing the extremists, most observ-

ers contend, is to look for a Somali-led solution, both political and military. The TFG, Islamic courts, representatives from Somaliland and Puntland, and other moderate Somali forces could form a coalition to contain the advances of the most extreme elements of al-Shabaab politically and militarily. Such a coalition is likely to get more support from the Somali population than would a peacekeeping force. The coalition can be assisted by neighboring countries. A Somali-led initiative would take away one of the most powerful justifications used by al-Shabaab to wage war: the presence of foreign forces. A unified regional approach is essential, however. Most believe that Eritrea has leverage over some of the influential Islamic leaders, some of whom are in Eritrea. The ARS was founded in Eritrea, and some of its leaders are now engaged in the UN-led negotiation in Djibouti.

## The Alliance for the Re-Liberation of Somalia

In September 2007, Somalis from the diaspora, civil society, opposition groups, and former members of parliament met in Eritrea and formed the ARS. More than four hundred people participated at the founding conference. Al-Shabaab did not participate, and later condemned the leadership of the ARS. The ARS significantly reduced the dominance of the ICU and brought into the leadership people from civil society, women's groups, and former members of the TFG. The ARS also brought into the coalition people from different regions and clans of Somalia. In addition, individuals, such as Hassan Aweys, considered by the West as extremists or terrorists, were not given leadership positions. The main objectives of the coalition are as follows:

- The liberation of Somalia from Ethiopia
- Somali solutions by Somali stakeholders through dialogue and peaceful means
- The establishment of a national government that would "completely devote its utmost care to the welfare of the people, protect its rights, properties and promote its spiritual and material development"[14]
- The fight against crimes and violence targeted against civilian population, such as killing, raping, pillaging, dislodging, and displacing

14  Political program of the Alliance for the Re-Liberation of Somalia, available at www.arssomalia .org.

- The resettlement of displaced people
- The holding of general elections once peace and security is established

In March 2008, the chairman of the ARS in a letter to the president of the Security Council wrote, "A peacekeeping mission would be possible only after the departure of the Ethiopian troops. Experience has shown that when peacekeepers are unilaterally imposed by the Security Council, they turn into peace enforcers. To avoid such a situation, the consent of the parties to the conflict is essential." The ARS leadership also has informed a congressional delegation that the ARS would accept a humanitarian cease-fire, zones of tranquility, and negotiations with the TFG and others once Ethiopian forces are replaced by a neutral force. This position led to a split of the ARS. Many of the top leaders of the ARS left Eritrea for Djibouti to participate in the UN-sponsored negotiations.

## Somalia: Safe Haven for Terrorist Groups?

The United States, Somalia's neighbors, and some Somali groups have expressed concern over the years about the spread of Islamic fundamentalism in Somalia. In the mid-1990s, Islamic courts began to emerge in parts of the country, especially in the capital of Mogadishu. These courts functioned as local governments and often enforced decisions by using their own Islamic militias. Members of the al-Ittihad militia reportedly provided the bulk of the security forces for these courts in the areas where al-Ittihad had a presence. The absence of central authority in Somalia created an environment conducive to the proliferation of armed factions throughout the country. Ethiopian security forces invaded Somalia on a number of occasions to disrupt the activities of al-Ittihad and its allies or in support of certain armed factions.

Somali factions, including the so-called Islamic groups, often go through realignments or simply disappear from the scene. Very little is known about the leadership or organizational structure of these groups, including al-Ittihad. There have been three known Islamic groups in Somalia whose prominence has alternately waxed and waned: al-Ittihad al-Islamiya, al-Islah (Reform), and al-Tabligh (Conveyers of God's Work). In 1995, a group called Jihad al-Islam, led by Sheikh Abbas bin Omar, emerged in Mogadishu and gave the two main warlords, General Mohamed Farah Aideed and Ali Mahdi,

an ultimatum to end their factional fighting. The group claimed at that time that it maintained offices in several countries, including Yemen, Pakistan, Kenya, and Sudan. Not much was heard subsequently from Jihad al-Islam, although a group of Somalis later formed the Sharia (Islamic law) Implementation Club (SIC) in 1996.

The SIC's principal objective was to establish sharia courts throughout the country. Some members of the Mogadishu-based former Transitional National Government reportedly were key players in the establishment of these courts. Very little is known about al-Islah, although it is perceived as a group dominated by Hawiye clan businessmen. According to the State Department's 2006 *Country Reports on Terrorism*,

> While numerous Islamist groups engaged in a broad range of activities operate inside Somalia, few of these organizations have any known links to terrorist activities. Movements such as Harakat al-Islah (al-Islah), Ahlu Sunna wal Jamaa, and Majma Ulimadda Islaamka ee Soomaaliya sought power by political rather than violent means and pursued political action via missionary or charity work. Missionary Islamists, such as followers of the Tablighi sect and the New Salafis, generally renounce explicit political activism. Other Islamist organizations became providers of basic health, education, and commercial services, and were perceived by some as pursuing a strategy to take political power.[15]

US officials have long expressed concern about the presence of known terrorist individuals in East Africa. Some observers contend that Somalia is being used as a transit and hiding place by some of these individuals, including Haroon Fazul, the leader of the 1998 and 2002 bombings, Saleh Nabhan, and Talha al-Sudani. But no Somali group has been directly linked to any terrorist attack against the United States or its allies.

## Al-Ittihad

Al-Ittihad was perhaps the most active and at one point most successful of all the Islamic groups. Its principal ideology was to establish an Islamic state and to bring law and order by utilizing the Islamic court system. Founded in

15. Available at www.state.gov/s/ct/rls/crt/2006/.

the late 1980s and early 1990s, al-Ittihad unsuccessfully sought to replace clan and warlord politics with an Islamic state. In the early 1990s, al-Ittihad had modest successes. For example, it administered territories under its control in the south. But al-Ittihad never emerged as a major military or political force in Somalia. The clan-based groups and factions led by warlords in Mogadishu are secular and have been at odds with al-Ittihad, even though some of these groups maintained tactical alliances from time to time with al-Ittihad. Its failure to maintain control over territories and spread its ideology led to a shift in strategy in the mid-1990s. Al-Ittihad abandoned its ambition to spread its ideology through military means and began to concentrate on providing social services to communities through Islamic schools and health care centers.

Al-Ittihad's social activities and religious objectives in Somalia seemed inconsistent with its activities in support of armed groups in the Somali-inhabited region of Ethiopia. In Ethiopia, al-Ittihad was reportedly engaged in military activities in support of ethnic Somalis. Several anti-Ethiopian groups are active in the Somali region and al-Ittihad cooperated with these groups in carrying out attacks against Ethiopian targets. They included the Ogaden Islamic Union under the leadership of Muhammad Muallem Omar Abdi, the Somali People's Liberation Front under the leadership of Ahmed Ali Ismail, and the Western Somali Liberation Front under the leadership of Muhammad Haji Ibrahim Hussein. These formed a coalition called the United Front for the Liberation of Western Somalia in 1999, their term for the Somali-inhabited region of Ethiopia.[16] The Ogaden National Liberation Front was engaged in military activities in the region and in the past formed alliances with other Ethiopian opposition groups.

Many Somali watchers believe that al-Ittihad's strength was highly exaggerated and that information about its alleged links with international terrorist organizations is unreliable. The State Department's *Country Reports on Terrorism* stated in 2006 that "in recent years the existence of a coherent entity operating as al-Ittihad has become difficult to prove." There is no reliable information or pattern of behavior to suggest that al-Ittihad had an international agenda, as was the case with the National Islamic Front (NIF)

---

16. Foreign Broadcast Information Services, "Islamists Regroup Their Forces after Ethiopian Pre-emptive Strike," 17–23 May 1999.

government of Sudan. Some observers note that if al-Ittihad had a clear internationally oriented agenda, its obvious ally in the region would be the NIF regime in Sudan or the Sudanese-backed Eritrean Islamic Jihad. The Sudanese regime did back regional extremist groups and international terrorist organizations, but there was no apparent relationship between the NIF and al-Ittihad. Many Somalis often refer to al-Ittihad's social services and the peace and stability that prevailed in the areas it controlled.

In late September 2001, the Bush administration added al-Ittihad to a list of terrorism-related entities whose assets were frozen by an executive order. Bush administration officials accused al-Ittihad of links with al Qaeda. The administration did not publicly offer evidence supporting its allegations, but some officials asserted that links between al-Ittihad and al Qaeda date back to the US presence in Somalia during Operation Restore Hope (1992–4). This assertion, however, seems inconsistent with the reality on the ground at that time, according to some observers. Then, the dominant players in Mogadishu were the warlords and not al-Ittihad. In early November 2001, federal authorities raided several Somali-owned money transfer businesses in the United States operated by al-Barakaat companies.

The Bush administration ordered the assets of al-Barakaat frozen because of its alleged links to al Qaeda. US officials, however, later seemed to back off from their earlier assertion that al-Barakaat and individuals associated with the money transfer business sector are directly linked to al Qaeda. In September 2002, US officials cleared three Somalis and three al-Barakaat branches accused of ties with al Qaeda. The three individuals and businesses were removed from the US Treasury Department list of terrorist supporters and their assets were unfrozen. Nonetheless, the Bush administration remained concerned about terrorist activities in Somalia, although no attacks against US interests have been carried out by any known Somali groups. The United States has had no presence in Somalia since Washington pulled out of the peacekeeping operation in 1994. In September 2008, the European Court of Justice annulled the decision taken by the EU Council to freeze the assets of two Somalis and al-Barakaat International Foundation of Sweden.

# Exhibit AP



# Humanitarian Crises in Ethiopia and Eritrea

## Theodros Dagne

An estimated 14 million to 16 million people are in need of humanitarian assistance in Ethiopia and Eritrea. Ethiopia is by far the more affected country, with an estimated 14.3 million people at risk. Relief organizations and United Nations officials have described the situation in Ethiopia as a famine. Beginning in late 2002, people began to die of starvation and disease in parts of Ethiopia. Reliable statistics are lacking as to how many people have perished already, but the massive international response to the crisis seems to have contained the situation in some areas. In Eritrea, an estimated 1.4 million people out of a population of 4.5 million are at risk, according to World Food Program (WFP) officials.

The primary cause of the current humanitarian crisis is drought due to poor rains over the past several years. In Eritrea, according to WFP, "rainfall has been poor since October 2001, with the almost total failure of the March through June Azmera rains, and the late onset of the June through September Kremti rains." The most affected regions in Ethiopia are the Somali and Afar regions, the populations of which are largely pastoralist or nomadic. High population growth, inefficient agricultural policies, misplaced budgetary priorities, abject poverty, poor infrastructure, lack of access to fertilizers and pesticides, the HIV/AIDS pandemic, bad governance, and internal conflicts are major contributing factors in recurring humanitarian crises in the Horn of Africa. The absence of commercial farming and dependence on rains instead of irrigation are also contributing factors. Moreover, ethnic and religious conflicts continue to drain meager resources away from development.

The two-year (1998 to 2000) war between Ethiopia and Eritrea diverted

Theodros Dagne is a specialist in African affairs with the Congressional Research Service.

meager resources to military purposes and reversed the limited gains made since the two governments took power in 1991. According to observers, the warring factions spent over a billion dollars between 1998 and 2000.[1] An estimated 75,000 people were killed and more than 100,000 displaced. Because of the prevailing poor state of relations between the two countries, donor countries are forced to use primarily the port of Djibouti instead of the ports of Assab and Massawa in Eritrea, which are closer to the affected regions. Eritrean authorities offered the use of their ports in 2002, but Ethiopia argued that was not necessary. Relief officials have stated that the cost of delivering humanitarian assistance through Djibouti is higher than the costs of using ports in Eritrea and that shipments are delayed because of increasing congestion around the port of Djibouti. But donor governments have been reluctant to press Ethiopian authorities on this matter.

The response by the international community to the current crisis was slow initially, but it accelerated as the crisis grew and the threat of massive starvation loomed large, especially in Ethiopia. In June 2003, former Finnish president Martti Ahtisaari was appointed to be the United Nations special envoy for the humanitarian crisis in the Horn of Africa. The government of Ethiopia is credited with sounding the alarm about the humanitarian crisis early. Describing the magnitude of the problem in a BBC interview in November 2002, Prime Minister Meles Zenawi of Ethiopia stated that "if the 1984 famine was a nightmare, this is too ghastly to contemplate." The Ethiopian government has put in place a famine-warning system and maintains an emergency food reserve in order to respond quickly to emergencies. But many say the humanitarian crisis is too widespread and serious for the two governments to handle on their own. Ethiopia's history of drought is depicted in table 1.

## Ethiopia

In September 2002, the government of Ethiopia and the UN's Emergency Unit for Ethiopia issued a formal appeal for emergency humanitarian assistance for an estimated 6.3 million people. In late December 2002, a WFP

1. CNN. "Ethiopia, Eritrea Sign Pledge to Stop Fighting," 18 June 2000, at www.cnn.com/2000/WORLD/africa/06/18/ethiopia.eritrea.02/index.html.

### Table 1
### Drought History in Ethiopia

| Country | Year | Number Affected (in millions) |
|---|---|---|
| Ethiopia | 1965 | 1.5 |
| (Eritrea was part of | 1969 | 1.7 |
| Ethiopia until 1993) | 1973 | 3.0 |
| | 1977 | 0.3 |
| | 1978 | 1.4 |
| | 1979 | 0.02 |
| | 1983 | 2.0 |
| | 1984 | 5.0 |
| | 1985 | 7.75 |
| | 1987 | 7.0 |
| | 1989 | 2.3 |
| | 1990 | 6.5 |
| | 1991 | 6.2 |
| | 1992 | 0.5 |

Source: World Food Program, available at www.wfp.org.

assessment mission concluded that crop production had dropped 25 percent below 2001 levels. Officials from the government of Ethiopia and relief organizations increased their estimates of the number of people affected by the crisis from 6.3 million to 11.3 million people, with an additional 3 million people requiring close monitoring. Ethiopia's food requirements for 2003 has been estimated at 1.4 million metric tons (mt).

Ethiopia has two crop seasons, the Meher and the Belg. During the Meher season, Ethiopia's main harvesting period, farmers plant seeds in November through January and harvest in March through August. During the Belg season, Ethiopia's secondary and low-yielding period, farmers sow in February through March and harvest in May through June. In 1999–2000, Ethiopia suffered another drought, resulting in over 10 million people requiring emergency food assistance. In 2001, Ethiopia had a good season with higher crop production than previous years, in part due to good Belg and Meher rains. But insufficient and erratic rainfall led to poor harvest and loss of live-

stock in 2002. The Belg rains failed to come in April and May 2002, leading to a significant shortfall in short-season crops. Long-season crops, maize and sorghum, also suffered when rainfall stopped early. The mostly pastoral Afar and Somali regions were significantly affected because of depleted water resources, resulting in high livestock mortality. The Belg rains in spring 2003 were "favorable" in comparison to the previous four years, though it is estimated that long-term precipitation rates will continue in the current drying trend.

The Ethiopian government has appealed for an estimated 1.4 million mt of food aid, and the United States, the largest donor country, has pledged 508,000 mt. In August 2002, after the U.S. embassy in Ethiopia declared a humanitarian disaster, the U.S. Agency for International Development contributed $71 million in humanitarian assistance and the U.S. Department of Agriculture contributed an additional $34.4 million in emergency food assistance. An additional $7.2 million was provided to assist refugees, bringing the total U.S. humanitarian assistance to $112.6 million for fiscal year 2002. In fiscal year 2003, the United States provided an estimated $516 million in humanitarian assistance to Ethiopia.

### Eritrea

According to UN and U.S. officials, an estimated 1.4 million people are in need of emergency assistance in Eritrea. According to relief-organization and Eritrean officials, poor rainfall beginning in October 2001 and absence of the Azmera rains (March through June) led to crop failure, impacting almost half of the population. Moreover, returning refugees and internally displaced people (IDPs) further exacerbated the humanitarian crisis. In 2002, an estimated 15,569 IDPs returned to Eritrea, bringing the total returned number of IDPs to over 185,000. Tens of thousands of Eritreans of Ethiopian origin, who were expelled from Ethiopia during the war, are being assisted by authorities. An additional 20,000 Eritrean refugees also returned from Sudan in 2002. Since July 2000, an estimated 100,000 Eritrean refugees have returned, the majority still requiring government assistance. According to UN officials, an estimated 15 to 20 percent of children are malnourished, with over 10,000 children requiring immediate nutritional support.

In early December 2002, the U.S. embassy in Eritrea declared a humanitarian disaster, three months after the Eritrean government issued an appeal to the international community. In fiscal year 2002, the U.S. government provided 13,400 mt ($5.8 million) of food to Eritrea. In fiscal year 2003, the United States provided an estimated $71 million in humanitarian assistance to Eritrea. The WFP estimates a shortfall of 350,000 mt, while the Eritrean government appealed for 300,000 mt in August 2002. Relief officials are concerned that the international community has been slow in responding to the Eritrean crisis. The U.S. contribution to Eritrea is estimated to be 10 percent of that country's requirement, compared to U.S. aid covering over 30 percent of Ethiopia's need. While the number of people affected by the crisis in Ethiopia is significantly more than that in Eritrea, the percentage of people affected in Eritrea is close to 50 percent of that country's population.

### Contributing Factors to Recurring Humanitarian Crises

Since the late 1900s, Ethiopia has been afflicted intermittently by drought and famine. The famine of 1973–74 killed hundreds of thousands of Ethiopians; critics attributed many of the deaths to Emperor Haile Selassie's alleged indifference to the suffering of the people and his attempt to hide the humanitarian crisis from the international community. In 1974, Selassie was ousted from power, and the military junta that replaced him justified its action saying the emperor had spent millions of dollars on his birthday party while hundreds of thousands of Ethiopians died of starvation. The junta subsequently mimicked him, spending millions of dollars on its tenth anniversary of ascension to power, while over a million people died of starvation and disease in the 1984 famine. Nonetheless, the military junta survived for another seven years before it was ousted by the current regime. The regime now in power has been more open and transparent in confronting the humanitarian crisis, but it spent hundreds of millions of dollars for armaments in the late 1990s while over 10 million people faced a severe humanitarian crisis. The generous and swift response by the international community averted the looming humanitarian disaster.

Recurring humanitarian crises in the Horn of Africa region have con-

tributed to what some observers refer to as *donor fatigue*. Indeed, drought
can be predicted and famine prevented if appropriate measures are taken by
governments. Climatic change that contributes to drought is just one of many
contributing factors to humanitarian crises. High population growth, heavy
debt burdens, lack of resources, economic mismanagement, bad governance,
misplaced budgetary priorities, poor agricultural policies, abject poverty,
poor infrastructure, lack of access to fertilizers and pesticides, and armed
conflicts are major contributing factors to recurring humanitarian crises.
There tends to be a linkage, observers argue, between recurring humanitar-
ian crises and authoritarian regimes. In the case of Ethiopia, the regime has
apparently failed to cope with the crisis. The dominant issue in the region
over the past several years has been the two-year war and continued political
tensions between the two governments and internal political upheaval. Both
governments are reportedly spending millions of dollars in the United States
on lobbyists to win political support against the other.[2]

The government of Ethiopia has undertaken a number of initiatives and
reforms to deal with recurring humanitarian crises. Since 1991, Ethiopia
has implemented a number of important economic reforms resulting in mod-
erate gross domestic product (GDP) growth. Through deregulation and
privatization, the government has transformed the once highly centralized
economy to a relatively market-based economy. The government also over-
hauled the tax system, devalued the birr, relaxed rules and regulations to
attract foreign investment, and undertook extensive reform in the financial
sector. According to the International Monetary Fund (IMF), the "Poverty
Reduction Strategy of the Government of Ethiopia continues the broad thrust
of policies that have been debated and developed internally in Ethiopia over
the past decade to reduce poverty."[3] The IMF acknowledges that this is work
in progress and that a lot of challenges are ahead. The goal of Ethiopia's
Poverty Reduction Strategy appears to be ambitious. It seeks, according to
the government, a "reduction of income poverty by about half by 2015."

2. *Washington Business Forward*, 24 February 2003. See also Africa Online, "African Governments
Spend Millions," May 2001, available at www.africaonline.com.
3. International Development Association and International Monetary Fund, "Joint Staff Assessment
of the Poverty Reduction Strategy," 27 August 2002, available at www.IMF.org.

Ethiopia also aims to achieve a GDP growth rate of at least 7 percent, an inflation rate of less than 5 percent, and a foreign exchange reserve of four to five months.[4]

Despite the government's serious efforts to improve conditions, millions of Ethiopians continue to face hardship, and Ethiopia remains one of the poorest countries in Africa. A number of factors are contributing to these problems. High population growth is a major factor. The population of Ethiopia is expected to nearly double from 67 million to over 115 million by 2025. Even in good harvest years, Ethiopia is incapable of feeding all its people. Per capita income is less than one hundred dollars per year and is one-fourth the average for sub-Saharan Africa, placing Ethiopia as one of the poorest countries in the world. According to the UN Development Program's Human Development Index for 2002, Ethiopia is ranked 168 of the 173 countries surveyed, one of the world's most impoverished countries. According to the 2002 *Human Development Report* on progress toward the UN's Millennium Development goals, Ethiopia is far behind in meeting the target in universal primary education, is slipping back in achieving gender equality and empowering women, and is far behind in reducing the infant mortality rate.[5] (Eritrea is also far behind in achieving universal primary education, but is on track in reducing the child mortality rate.) Poverty is widespread in Ethiopia. More than 50 percent of the population lives below the poverty line, and economic conditions are more dire in rural areas, where more than 80 percent of the population live. The AIDS epidemic is also devastating the country, taking a drastic toll on Ethiopians between the ages of twenty and fifty-four.[6] More than 300,000 people have died of AIDS in the past several years, and more than 3 million people are believed HIV positive.

Analysts attribute recurring humanitarian crises partly to bad governance, which often leads to political instability and conflict. According to the 2002 *Human Development Report*, Ethiopia and Eritrea were at the bottom of the 15 worst performers out of 173 countries surveyed. Both Ethiopia and

4. Federal Democratic Republic of Ethiopia, Ministry of Finance and Economic Development, "Sustainable Development and Poverty Reduction Program," July 2002, available at www.IMF.org.
5. UN Development Program, *Human Development Report: 2002* (New York: United Nations, 2002), available at www.UNDP.org.
6. See http://asia.reuters.com/newsArticle.jhtml?type=healthNews&storyID=3011971.

Eritrea scored way below average on democracy, respect for the rule of law, and government effectiveness. Both Ethiopia and Eritrea, according to a Freedom House survey, were deemed as having a press that is not free.[7] In Eritrea, there is virtually no private press, while in Ethiopia there is a small private press, but with limited circulation. Both governments control television and radio. Eritrea has had no elections since it became independent in 1993, and political parties are not allowed. Ethiopia has held two national and local elections since 1991; the elections were not considered by international observers to be free and fair. The ruling Ethiopian People's Revolutionary Democratic Front dominates the local, national, and federal offices. Human rights conditions are poor in both Ethiopia and Eritrea, according to human rights organizations and the U.S. State Department.

Poor agricultural policies are also impeding self-sufficiency and food security, according to experts. Reforms in agriculture have been slow and are hampered by bureaucratic red tape. The Ethiopian and Eritrean governments have been somewhat forthcoming in assisting farmers with fertilizers, seeds, and credit. Commercial farming, while permitted, has not flourished due to bureaucratic problems. The limited use of irrigation as a method of farming and nonutilization of abundant water resources (rivers) for farming purposes, observers assert, are contributing factors to food shortages. Only 4 percent of arable land is irrigated. The slow pace of privatization of government-owned farms also has contributed to this problem. Most importantly, government ownership of land has discouraged and will likely continue to discourage large foreign and domestic investment in this sector. According to the Ethiopian constitution, "The right of ownership of rural and urban land, as well as of all natural resources, is exclusively vested in the State and the peoples of Ethiopia."

Analysts also regard misplaced budget priorities as contributing factors to recurring humanitarian crises. In 1997, Ethiopia spent $139 million (2.1 percent of GDP) on defense, compared to $670 million (10.3 percent of GDP) in 2000. Eritrea spent $65 million in 1997, 8.3 percent of its GDP,

compared to $196 million in 2000, 30 percent of its GDP.[8] Meanwhile, life expectancy is 43.9 years in Ethiopia and 52.0 years in Eritrea; adult literacy for age 15 and above is 39.1 percent for Ethiopia and 55.7 percent for Eritrea; and primary and secondary school enrollment is 26 percent for Eritrea and 27 percent for Ethiopia. Moreover, while economic indicators for both Ethiopia and Eritrea seem to suggest some improvement over the past decade, the reality on the ground is quite different. According to the World Bank, the prevalence of child malnutrition (percentage of children under five) was 47.7 percent in 1990 compared to 47.2 percent in 2000. Gross national income (GNI) per capita in 1990 for Ethiopia was $160 compared to $100 in 2000.[9] In Eritrea, the GNI shrank from $841.5 million in 1997 to $792.3 million in 2001. GNI per capita was also down from $220 in 1997 to $190 in 2001.

Both Ethiopia and Eritrea face serious challenges. Many regional observers note that it will take decades to bring political stability, economic prosperity, and generally improved social conditions to their populations. Without sustained political and economic reforms, Ethiopia and Eritrea could face the fate of Somalia—that of being a failed state.

8. International Institute for Strategic Studies (IISS), *Military Balance, 1998/1999–2002/2003* (London: IISS, 2003).

9. World Bank Group, April 2002, available at www.worldbank.org.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COLONEL MORRIS D. DAVIS, <br><br>      Plaintiff, <br><br>      v. <br><br> JAMES H. BILLINGTON, in his official capacity as the Librarian of Congress, and DANIEL P. MULHOLLAN, in his individual capacity, <br><br>      Defendants. | Case No. _____ <br><br> **DECLARATION OF** <br> **BENJAMIN WITTES** |

## DECLARATION OF BENJAMIN WITTES

I, Benjamin Wittes, hereby declare and state as follows:

1.      I am a Senior Fellow in Governance Studies at the Brookings Institution. My research at the Brookings Institution focuses on the Supreme Court, federal courts, the Department of Justice, federal law, and judicial nominations and confirmations. In particular, in recent years, it has focused on the legal architecture of American counterterrorism policy. I have written extensively on detention policy in the War on Terror and the handling of detainees at the Guantánamo Bay detention facility in particular.

2.      I submit this declaration based on my personal knowledge in the above-captioned case.

3.      In this declaration, however, I express no opinion whatsoever about the merits of the plaintiff's motion for a preliminary injunction or of his lawsuit generally. As discussed below, I write only to discuss the value of the plaintiff's speech to the ongoing, national debate about the use of military commissions to try Guantánamo detainees.

4.      As I make clear below, although I believe the plaintiff's speech to be an important part of the debate, I disagree with his position on the use of military commissions (as expressed in the two articles referenced below) as well as with the position of his counsel, the American Civil Liberties Union Foundation ("ACLU"), on the issue of the commissions and of Guantánamo detainees more generally.

5.      The following is a brief summary of my career as relevant to this declaration. I graduated from Oberlin College in 1990. In the subsequent sixteen years, I served as a reporter and news editor at *Legal Times*, covering the Justice Department and federal regulatory agencies, and I served for nine years as an editorial writer for *The Washington Post*, specializing in legal

2

affairs. In the last few years, my research, writing, and expertise have focused on the legal architecture of the War on Terror. I have published extensively on the topic, including articles such as: Benjamin Wittes & Jack Goldsmith, *No Place to Write Detention Policy*, Wash. Post (Dec. 22, 2009); Benjamin Wittes, *President Obama's Decision on Closing Guantánamo*, Wash. Post (Sept. 29, 2009); Benjamin Wittes, *Congress's Guantánamo Burden*, Wash. Post (June 13, 2008). In 2008, I released a book entitled *Law and the Long War: The Future of Justice in the Age of Terror*, and earlier this year, I edited a book, entitled *Legislating the War on Terror: An Agenda for Reform*, comprising articles written by leading legal experts in the War on Terror. I also recently co-authored a Brookings Institution report, entitled *Designing Detention: A Model Law for Terrorist Incapacitation*. I have testified before Congress on the subject of Guantánamo Bay detainees, military commissions, and detention. *See* Testimony of Benjamin Wittes, Hearing Before the S. Comm. on the Judiciary (June 4, 2008), *available at* http://judiciary.senate.gov/hearings/testimony.cfm?id=3390&wit_id=7214. I have also discussed Guantánamo Bay and the military commissions in various forms of video and internet media. *See* http://www.brookings.edu/experts/w/wittesb.aspx.

6.      In short, I am intimately acquainted with the high-profile debate surrounding Guantánamo Bay and the use of military commissions to try suspected terrorists. I am a frequent participant in that debate, and I closely follow most issues related it. It is a historic debate with daily news coverage and extensive disagreement about the appropriate resolution. I am well versed in the various positions expressed by those involved, and I have made my positions publicly known through the publications noted above and through regular interaction both with the press and with governmental and non-governmental experts on the subject.

7.     Over the last several years, I have become particularly familiar with the views of Colonel Morris Davis, the former chief prosecutor of the military commissions. Since his days in government, we have consulted periodically, and I have followed with interest his evolving views on the use of military commissions, which he once defended whole-heartedly and about which he has more recently developed reservations. In particular, I am familiar with the views he expressed in two recently published articles cited by the Congressional Research Service as justification for his termination. These two articles focus on the recent decision of Attorney General Eric Holder to try some of the Guantánamo detainees in the commissions and others in federal court.

8.     Although I disagree with Colonel Davis's conclusion—that the government should use either federal courts or military commissions to try suspected terrorists, but not both—I highly value his contributions to the debate. He has offered a fresh and unorthodox perspective on an extremely important debate at a critical moment. His views are constructive and refreshing and reflective of his unique former position as a chief prosecutor in the military commissions.

9.     I stress that although I disagree with Colonel Davis's conclusions, I have found them valuable enough to cite in discussion concerning the military commissions. Indeed, after I read his Op-Ed and Letter to the Editor, and before I knew that they led to his dismissal from the Congressional Research Service, I specifically discussed the articles with at least one of my colleagues.

10.     His views are a significant contribution to that debate, and they will continue to have importance in that debate as additional decisions are made with respect to the use of the military commissions or of federal courts to try other Guantánamo detainees and as the military

commission process continues to be refined. The debate is not yet over, and the public has much to gain from hearing Colonel Davis's voice in it.

11.     The views expressed by Colonel Davis in his recently published articles are consistent with the unorthodox approach he has taken since leaving his post with the military commissions. While he and I have somewhat different approaches to the problem, he advocates, as I do, a middle-of-the-road position that fully embraces the views of neither side of an increasingly contentious debate—neither those who most enthusiastically support the use of the commissions, nor those, like the ACLU, who are against use of the commissions altogether.

12.     In sum, although I disagree with Colonel Davis's conclusions, I greatly respect his insight into and critical analysis of issues surrounding the military commissions. His voice is a valuable part of the ongoing and fundamental debate about the prosecution of Guantánamo detainees. While I have no opinion on the merits of his motion for a preliminary injunction or of his lawsuit generally, to silence his voice would deprive the public of a fully informed debate of historic significance.

13.     Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 5, 2010

BENJAMIN WITTES

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MORRIS D. DAVIS,<br><br>   Plaintiff,<br><br>     v.<br><br>JAMES H. BILLINGTON, in his official capacity as the Librarian of Congress, and DANIEL P. MULHOLLAN, in his individual capacity,<br><br>   Defendants. | Case No. _____<br><br>**DECLARATION OF LOUIS FISHER** |

I, Louis Fisher, hereby declare:

1.      I am a Specialist in Constitutional Law at the Law Library of the Library of Congress, after serving with the Congressional Research Service (CRS) of the Library of Congress from September 1970 to March 2006.  I received my doctorate from the New School for Social Research in 1967 and have written twenty books and more than 400 articles in law reviews, political science journals, encyclopedias, and other publications. A biosketch is attached at the end of this declaration as Exhibit A.  The views expressed in this declaration are my own and are not attributable to the Law Library, the Library of Congress, or any other organization.

2.      I submit this declaration based on my personal knowledge.  This declaration focuses on my experience publishing and expressing my expert views on the outside without undermining my ability to provide professional, credible and reliable analysis to Congress.

3.      In the course of my career at the Library of Congress I have worked closely with Members of Congress, their committees, and their staff and understand their need for expert opinions.  I can say categorically that I know of no instance in the past four decades where my expression of expert opinions — both within the Library of Congress and in my outside writings and speeches — ever prompted any lawmaker or legislative staffer to decline my analytical assistance.  Lawmakers and staff are accustomed to hearing a variety of viewpoints.  They expect reasoned and informed analysis, even when those studies differ or conflict with their own positions.  I will provide numerous examples where my expression of expert opinions on controversial

issues (including in outside publications) created a close, constructive, and professional working relationship with Members of Congress and their staff.

4.    My outside writing helped promote my advancement within the Library of Congress, entering at the level of GS-12 in 1970 and moving to the grade of GS-17 as senior specialist in 1988.  I was the first analyst in the Library of Congress to jump two grades at once, from GS-13 to GS-15, and it was in large part because my outside writing and professional reputation led to high-level work with congressional committees.

5.    In my career at the Library of Congress I never consciously justified my professional activities by interpreting the First Amendment.  I took it for granted that as an expert I had not only a right but a duty to express expert opinions, both within the institution and outside.  My basic orientation was not the First Amendment but as someone who participates actively as part of the constitutional system of checks and balances.  That was my impulse when I entered the Library of Congress and remains so now.

6.    Everything I say in this declaration draws from a deep sense of gratitude for having the opportunity to work at the Library of Congress and serve the interests of Congress.  It has been my good fortune to use its unrivaled resources and reputation to assist Congress.  I know of no other position where I could have had constantly applied and tested my analytical work.  My book *Nazi Saboteurs on Trial* (2003) is dedicated to the Library of Congress, "for more than three decades my home in so many ways."  My textbook on *American Constitutional Law*, now in its eighth edition, is dedicated to the Law Library.  Throughout my service at CRS and the Law Library I did what Congress

by statute in 1970 wanted done: I offered expert views on controversial issues of public

policy.

### Legislative Reorganization Act of 1970

7.     When I first began working at CRS, Congress was in the process of

converting the 300-employee Legislative Reference Service (LRS) to the Congressional

Research Service (CRS), expecting it to triple in size and greatly sharpen and deepen its

analytical mission.  In the decades following World War II, Congress had seen increasing

evidence that it was becoming a second-rate, second-class political institution, far too

subordinate to presidential power.  Years of congressional hearings led to passage of the

Legislative Reorganization Act (LRA) on October 26, 1970.

8.     As part of that statute, Congress purposefully shifted LRS from reference

work to the high-level research expected of CRS.  The Librarian of Congress was

directed to "grant and accord to the Congressional Research Service complete research

independence."  84 Stat. 1182.  The statute authorized a number of senior specialists

within CRS to be compensated at "the highest grade in the executive branch of the

Government to which research analysts and consultants, without supervisory

responsibility, are currently assigned."  Id.  Congress specified broad fields for these

senior specialists, including American government and public administration, American

public law, international affairs, national defense, and taxation and fiscal policy.  Id. at

1184.  The clear intent was to create a congressional staff agency with the capacity to

deliver to the legislative branch nonpartisan, professional and expert analysis, especially

for those assigned to the top level of senior specialist.

9.    A Senate report explained that "sound congressional decisionmaking is rooted in the availability of accurate information and expert analysis." S. Rept. No. 91-202, 91st Cong., 1st Sess. 18 (1969). Congress expected the work of CRS to involve "more creative effort than the mere acquisition, storage and retrieval of data and information produced elsewhere." Id. at 19. Obtaining and compensating "high caliber specialists and senior specialists" would provide research services to Congress "of the highest possible quality." Id. at 42. A similar objective is found elsewhere in the legislative history: H. Rept. No. 91-1215, 91st Cong., 2d Sess. 100 (1970).

10.    When I became a senior specialist in 1988, the number of these positions stood at 18. We had to compete for the position. A basic requirement was to be a "nationally recognized expert." One cannot gain that stature by being neutral and descriptive. The last senior specialist selected through this competitive process was in 1989. Since that time CRS management has chosen to let the number of research senior specialists drift down, by attrition, toward zero. There are currently four research senior specialists who gained that position by the competitive process.

11.    Moreover, the title of "senior specialist" has been given to a number of individuals in CRS management who did not compete for the position, are not nationally recognized experts, and lack the education, experience, and academic skills to function as research senior specialists in the substantive areas statutorily designated by Congress. I have brought this issue to the attention of CRS management on many occasions, but CRS management has chosen to implement not what Congress specifically authorized by statute (research senior specialists recognized as national experts) but rather a regime of "senior specialists" that Congress never authorized and never wanted. The LRA of 1970

4

asked for high-level analytical support by experts.  CRS management opted for a large

number of non-research senior specialists.

### Impoundment of Funds Dispute

12.    After I joined the Library of Congress in September 1970, some of my

outside professional writing quickly propelled me to a senior staff position with a Senate

committee, leading to enactment of legislation designed to curb the President's capacity

to refuse to spend ("impound") appropriated funds.  This experience taught me how much

Congress appreciates the expression of expert opinions by CRS staff on controversial

matters.  Two of my published articles caught the attention of Senator Sam Ervin,

chairman of the Subcommittee on Separation of Powers of the Senate Judiciary

Committee.  The articles were "Funds Impounded by the President: The Constitutional

Issues," 38 G.W. L. Rev. 124 (1969), and "The Politics of Impounded Funds," 15 Admin.

Sci. Q. 361 (1970).

13.    For several years I worked closely with Senator Ervin and his staff on

remedial legislation.  Everyone understood that I believed that President Nixon had

abused his constitutional powers by impounding funds in the manner he did.  In an article

I did for the [Washington] *Sunday Star and Daily News* on February 25, 1973, entitled

"Impoundment Relies on Weak Arguments," I examined each of the legal and

constitutional assertions by the Nixon administration and found them wholly deficient.

Senators Edmund Muskie and Hubert Humphrey on separate days put my article in the

*Congressional Record*.  CRS management, of course, was aware of the article and fully

supportive of my expressing expert views on a controversial matter, including a subject

area within my CRS portfolio.  The article identified me solely as author of *President and*

*Congress*. There was no disclaimer and CRS did not object to the lack of one. The article specifically critiqued statements by President Nixon and such administration officials as Roy Ash, Casper Weinberger, Kenneth R. Cole, Jr., and James Lynn.

14. Although the committee's general counsel or staff director usually sit directly behind the chairman at a hearing, Senator Ervin asked that I occupy that chair to offer expert advice. During committee markup on the impoundment bill, Senators were recognized by Senator Ervin and submitted their handwritten or typed amendments to him. He would read them, make no comment, and hand them to me sitting to his right. I offered my expert views as to whether the amendment helped the legislation or could be modified to serve its overall objectives. I wasn't expected to provide "neutral" or "balanced" responses. I was asked, as a specialist, to provide professional guidance on legislation that would protect the constitutional rights of Congress.

15. After the impoundment bill was added as Title X to the Budget Act of 1974, the committee asked me to write language on that title of the conference report. My language explained the constitutional issues at stake. It was not "descriptive" or "even-handed." No one in the committee (Democrat or Republican) wanted that. The purpose of the bill was to restore constitutional power to Congress and to exercise checks and balances.

16. When the bill was debated in the Senate, I was asked to prepare a dialogue between Senators Ervin and Hubert Humphrey to explain the bill's legislative intent. President Nixon signed the bill and sent me a signing pen and a personal letter, underscoring my level of assistance. This type of professional involvement helped me move quickly from GS-12 to GS-15. I came to understand the close connection between

6

my published work and assistance to Members and committees. I learned also the value

that CRS placed on my outside writing.

17. As explained later in this declaration, CRS management in 2004 began

directing analysts to adhere to a strict policy of "neutrality" when publicly speaking or

writing in one's area of expertise. Nothing in the 1970 statute implied or required that

policy. On the contrary, Congress understood then and understands now that it is

appropriate for experts to speak and write publicly about their discipline. I did that in

1973 with my newspaper article on impoundment, with full CRS knowledge and support.

For the next three decades I continued to conduct myself in that manner, with full CRS

knowledge and support. Whatever the meaning of "neutrality," it does not preclude

expert opinions or reasoned analysis. Congress sought competent opinion in 1970 from

CRS specialists and continues to seek it.

### Outside Writing and Supporting Congress

18. On April 23, 1973, *U.S. News & World Report* published a six-page

interview with me called "Power Struggle in Washington." The invitation came because

of my first book, *President and Congress* (1972). When I showed the transcript of the

interview to CRS management, the first page said "Louis Fisher, author of President and

Congress." CRS reviewers asked that it be altered to reflect that I was also an analyst at

the agency, in order to bring renown to CRS. Senators Ervin and Humphrey placed the

interview in the *Congressional Record*. During this period other articles of mine were

placed in the *Record* by such lawmakers as Rep. William F. Ryan and Senators Thomas

Eagleton, J. William Fulbright, and James Abourezk. I brought these developments to

the attention of CRS managers and learned that they were very pleased with both my output and public visibility.

19.     Senator Ervin had asked me to testify on presidential impoundment but CRS replied that it was not its policy to permit analysts to testify.  Soon it was.  I began appearing before a number of committees on such issues as legislative control of executive spending discretion, committee prior-approval of agency shifts in spending, presidential reorganization authority, the legislative veto, the item veto, biennial budgeting, the pocket veto, the balanced budget amendment, recess appointments, executive lobbying, and war powers.  Opportunities to testify on the latter issue expanded after publication of my book, *Presidential War Power* (1995; 2d edition, 2004).  I think it is accurate to say that I have testified before more committees on matters of constitutional law and public policy than any other analyst in the Library of Congress.  Many of the invitations flowed from my outside publications, including *Presidential Spending Power* (1975), which won a book award the following year, and *Constitutional Conflicts between Congress and the President*, first published in 1985 and now in its fifth edition.

20.     In 1985 I was invited by the House Committee on Government Operations to testify on the constitutionality of the Gramm-Rudman deficit control bill.  There were three other witnesses: Comptroller General Charles Bowsher, OMB Director James Miller, and CBO Director Rudolph Penner.  I was the only one prepared to testify on the constitutionality of the bill.  I concluded that it was unconstitutional because it attempted to give executive duties to a legislative officer: the Comptroller General.  At that stage of the legislation it also involved CBO in executive duties, which I also found unconstitutional.  Rep. Mike Synar remarked to me: "you sit there as the only person

8

whom I can find in this city or anywhere in this country who has done the type of

constitutional scrutiny and analysis which is necessary to give any of us assurances that

we are not going down a path that may be dangerous." In *Bowsher* v. *Synar*, 478 U.S.

714 (1986), the Supreme Court held that Gramm-Rudman was unconstitutional because it

gave executive duties to legislative officers.

21.     In 1987 I was asked to serve as research director of the House Iran-Contra

Committee, where I wrote major sections of the final report dealing with constitutional

and institutional issues.  Several analysts in CRS were highly knowledgeable about

covert operations and national security.  I was invited to join the committee because of

my outside writing and national reputation.  During my interview for the position I

noticed behind the person asking me questions a shelf with a number of my books.  The

committee was looking for someone with a track record of writing and analyzing issues

of presidential power and national security law.  They knew I had established views on

the subject and found that desirable.  My work on Iran-Contra was a major factor in being

promoted to Senior Specialist on Separation of Powers in 1988.

22.     In 1994 I was invited to testify before the House Intelligence Committee

on whether the aggregate budget of the Intelligence Community should be made public.

Again, other analysts in CRS were exceptionally knowledgeable about covert spending,

but the committee reached out to me because in 1979 I had published "Confidential

Spending and Governmental Accountability" in the *George Washington Law Review*.  On

the basis of constitutional analysis and the congressional budget process, I testified that

the aggregate amount should be publicly disclosed.

23.     During my first 33 years at CRS no one in management counseled me not to express expert opinions, either within the organization or in my outside writings and talks.  Instead, I was encouraged and promoted.  CRS Director Daniel Mulhollan often told me to my face that I was an ideal senior specialist because of my analytical reports to Congress, my testimony before congressional committees, and my outside writing and talks.  It was clearly understood that what I did on the outside benefited what I did on the inside.

### Can Expert Opinions Demonstrate "Bias"?

24.     On January 23, 2004 I was admonished by Director Mulhollan for my article on the Iraq War that was published in *Political Science Quarterly*.  He listed two objections: (1) the article failed to include a disclaimer, and (2) its point of view damaged my "reliability as an unbiased analyst" and "undermine[d] not only your but CRS' credibility."  Had the article not been on a controversial topic or had it not drawn attention (as it did by being the subject of an op-ed by David Broder in the *Washington Post*) the presence or absence of a disclaimer would not have been significant, as I am not aware of any CRS employee who was ever formally admonished or terminated merely for failing to include a disclaimer.  Many of my published articles had lacked a disclaimer, without any objection or warning by CRS.  The crucial objection to my Iraq article related to content.

25.     On every occasion in the past when I testified — always with CRS review and approval — my analysis reached a conclusion about constitutionality and public policy.  I testified in favor of committee controls over agency reprogramming of funds and in favor of congressional powers over war.  I testified against the item veto, biennial

budgeting, and the balanced budget amendment.  On those occasions and others it could

have been argued by CRS management (but was not) that my reputation as an unbiased

analyst had been damaged and that Members of Congress and their staff who had a

contrary point of view would not seek my assistance.

26.     It has been my experience that lawmakers and their staff evaluate me not

on whether I support their positions but whether my analysis is of professional quality

and well reasoned.  I have never heard a Member or a staff person in my nearly four

decades at the Library of Congress object that my analysis lacked rigor or was in any

sense slanted, unprofessional, or "biased."  Reaching a conclusion does not mean bias

unless the analysis fails to rely on available evidence and persuasive reasoning.

27.     From 2004 to the present, covering my time with CRS and the Law

Library, I have filed a number of amicus and amici briefs with federal district courts, the

D.C. Circuit, and the U.S. Supreme Court, expressing my expert views on such

constitutional issues as military commissions, NSA surveillance, the state secrets

privilege, the al-Marri detention case, and the pocket veto.  Some of these briefs were

done entirely under my own name, such as the *Hamdan* military commission case (a brief

in D.C. Circuit, a second brief seeking to gain cert, and a third brief after the Supreme

Court accepted the case).  Those briefs were done with the knowledge and support of the

Office of the General Counsel at the Library of Congress, CRS, and the Law Library.

The only condition was that I make clear that the views were my own.  I have never

heard of any negative reaction by Members of Congress or legislative staff to this

professional activity.  No one in the Library of Congress advised me that taking these

public positions on controversial issues lessened my value to Members of Congress, their staff, or the Library.

## Bipartisan Assistance

28.     In 1994, Republicans won control over each chamber of Congress.  In the House of Representatives they adopted a "Contract with America," including a commitment to enact a presidential item veto.  Republican counsel in the House knew of my consistent record in opposing an item veto, including many times in congressional testimony, but asked, because of my expertise, if I would write the committee report.  I agreed to do so.

29.     Appreciating the quality of my assistance, House Republican counsel called the general counsel of the Senate committee and suggested it might want me to write the Senate report.  The general counsel called and I agreed to write their report. Democrats on the Senate committee, learning that a report was being written to authorize an item veto, insisted that hearings be held.  The Republican chairman consented to their request.

30.     The Democrats then asked me to testify.  In public testimony I explained why the bill was unconstitutional and would weaken not only legislative power but judicial independence.  At the end of the hearing, after everyone had left the hearing room, the committee chairman asked the general counsel if, based on what I had testified, I could write the report.  She said I could.  I did.  I was willing to help committees if the product was theirs alone.  If asked to testify I would express my expert opinions.  Both political parties and chambers appreciated my professional assistance.

## Achieving Unanimity

31.     In 1998 I was asked by the Senate Intelligence Committee to evaluate a

memo from the Office of Legal Counsel (OLC) in the Justice Department.  It had

concluded that the committee's bill giving whistleblower rights to employees in the

Intelligence Community violated the President's constitutional control over the executive

branch.  My analysis for the committee rejected almost everything that OLC had said.

The committee asked me to testify on February 4 and I set forth my objections to the

OLC memo and argued in favor of the bill's constitutionality.  At that point I did not

know the committee's position on the constitutional issue.

32.     The committee asked me to return a week later, this time to sit down next

to an OLC deputy.  We went back and forth with our competing analyses.  I recall every

Senator being present.  At the end of the hearing I returned to my office and received a

call from the committee, two hours later, telling me the committee has reported out the

"unconstitutional" bill.  The committee vote: 19 to zero.  I testified before the House

Intelligence Committee, worked on the bill language, and it was signed into law by

President Clinton.  112 Stat. 2413 (1998).

## Admonishment

33.     As mentioned above, the CRS Director admonished me on January 23,

2004 for my *Political Science Quarterly* article on the Iraq War.  Before receiving that

letter I had two lengthy meetings with CRS management.  At the first, one of the CRS

managers turned to me and said that I had violated the CRS policy of "neutrality."  I

responded that I had never been neutral and had never in my 33 years at CRS even heard

the word.  I looked at Director Mulhollan and reminded him that CRS had approved all of

my congressional testimony and that I had repeatedly taken positions for and against

legislation.  Nothing in my nearly 40 appearances before committees could be called

"neutral."  I told the Director that I gave him copies of all of my books and articles,

including a book called *Congressional Abdication on War and Spending* (2000), pointing

out that the book was not neutral even in its title.

34.      In my written response to the letter of admonishment I noted: "On all the

occasions where I have testified, inevitably I pleased some Members of the committee

and displeased others.  Any of the disaffected could have called the [CRS] front office to

complain."  I am not aware of any such complaints about my testimony.  Had such

objections been raised it would not have mattered, as it is not uncommon for Members to

complain when they disapprove with policy opinions made by CRS employees.

35.      My memo to Director Mulhollan on the letter of admonishment reviewed

the mandate of the LRA of 1970, which requires CRS to provide nonpartisan and

objective analysis.  In the process of assembling evidence, I explained that "an analyst

may come down on one side or another of an issue.  You have admitted that to my face."

I said that an analyst proceeds on the basis of evidence "*and* the values and framework

that shape the analysis."  My value framework, consistently supported by CRS

management in the past, was the constitutional system of separation of powers and

checks and balances.

36.      With regard to my article on the Iraq War, CRS management was reacting

to a letter to the editor sent by Rep. Henry Hyde to the *Washington Post*, objecting to the

Broder op-ed called "Congress's Cop-Out On War."  Broder summarized my article in

*Political Science Quarterly*.  This eye-catching headline was bound to attract the

14

attention of Rep. Hyde, chairman of the committee that had reported the Iraq Resolution. I talked to the person in Rep. Hyde's office who prepared his letter to the editor. He told me he could not believe that Mr. Hyde would communicate to CRS or the Library of Congress that he would not request my services in the future. "We just don't work that way." He told me that Rep. Hyde encourages "competitive analysis" and "diversity of opinion" and warned CRS management not to try to "read the minds" of Members of Congress as to who they will and will not call for assistance. CRS, he said, "shouldn't go down that road." Members will decide by themselves who to call, and why. He advised CRS not to be in the business of making assumptions about lawmakers and their staffs.

37.     After receiving this letter of admonishment, I took the issue to the Office of the General Counsel and was informed that I had a constitutional, statutory, and Library of Congress right to express my professional views on the outside. The Office had read my article on the Iraq War and found that it did not violate Library policy and that any effort by CRS to punish me for writing in that manner would not be successful. My sole obligation was to indicate that the views are personal and not those of CRS or the Library.

38.     During this period, a CRS attorney who specializes in ethics and federal personnel policy prepared a legal analysis of the CRS Director's Statement of January 23, 2004 called "Outside Activities: Preserving Objectivity and Non-Partisanship." The Statement directed CRS analysts to "err on the side of caution" when speaking or writing on "controversial matters," especially when discussing issues "for which we have primary responsibility for the Service." For analysts who acquire much of their information about a subject matter during their official duties, "this is also the danger

15

area for presenting the appearance that your neutrality cannot be relied upon as you undertake your work in your official CRS capacity." The Director's Statement asked "everyone to think carefully before taking a public position on matters for which you are responsible in your work. When addressing the issues for which you speak for CRS, please do so in full observance of the neutrality required of your work here."

39.     The analysis prepared by the CRS attorney was published in *CREAgram*, dated May 12, 2004. He concluded that the Director's Statement had no support in the Constitution, federal statutes, or Library of Congress regulations. He expressed concern that the Statement "is having the unfortunate, but perhaps the intended effect of chilling and intimidating staff who want or had planned to engage in professionally-related writing or lecturing activities outside of their CRS employment." He believed "this result is detrimental not only to the individual employee, but to the professionalism, reputation and mission of the agency as a whole." Moreover, it was "inconsistent and self-defeating for the agency to require, as a factor for promotion, recognition as an expert in one's field by the professional community outside of Congress, and then to discourage and intimidate employees from engaging in precisely those kinds of outside writing and scholarship activities which may garner such recognition."

40.     A second letter of admonishment came to me on January 13, 2006, in response to my statement in the magazine *Government Executive* that employees in executive agencies can be unfairly punished for expressing their views without agency supervisors paying any price. I had written a lengthy CRS report on national security whistleblowers and had testified three times on the intelligence whistleblower bill in 1998. I knew from available studies that agency whistleblowers rarely prevailed in court

and that conditions after the terrorist attacks of 9/11 created even greater deference to agency managers, including abusive conduct. The letter of admonishment warned me that such public statements can damage my credibility "in the future as an unbiased resource" and that readers of my CRS report after reading the interview in *Government Executive* "can conclude that your work cannot be presumed to be balanced. . . . Such behavior must not be repeated." On May 14, 2009, after I had transferred to the Law Library, the House Committee on Oversight and Government Reform invited me to testify on a bill concerning national security whistleblowers.

### Transfer to the Law Library of Congress

41.     On March 6, 2006, I was transferred from CRS to the Law Library, where I continue to work with Members of Congress, committees, and legislative staff. Over the past nearly four years I have testified eleven times on a range of controversial issues, including the presidential item veto, war powers, NSA surveillance, the state secrets privilege, restoring the rule of law, national security whistleblowers, and criminal penalties for Presidents and executive officials who mislead Congress and the public about the need to initiate military operations. My testimony on the latter topic covered misleading claims from President James Polk in the 1840s with the Mexican War up to July 2009, including criticism of statements regarding Iraq by President George W. Bush, CIA Director George Tenet, and Secretary of State Colin Powell.

42.     On my first day at the Law Library an email circulated to the staff stating that it was an "honor" to have me join them. I was greatly touched by that kindness and thoughtfulness. The Law Library has been extremely supportive, setting aside a section of its newsletter called "outreach by Louis Fisher," highlighting my congressional

testimony, articles, outside speeches, and books. Such materials are also available on the Law Library's website, within reach of congressional offices and the general public, both in this country and abroad. Several times the Law Library has asked me to make presentations about constitutional matters, as have the Government and Foreign Affairs divisions of CRS and I remain in close touch with attorneys in CRS's American Law Division. I am very happy to be back doing what I always wanted to do: helping Congress receive the analytical assistance it mandated in 1970.

43.     Several months after leaving CRS, the Library of Congress in 2006 invited me to give a public talk in the Madison Library of Congress building on my book on the state secrets privilege: *In the Name of National Security: Unchecked Presidential Power and the* Reynolds *Case* (2006). Two years later I again gave a public talk at the Library of Congress, this time on my book *The Constitution and 9/11: Recurring Threats to America's Freedoms* (2008). I remain grateful for the opportunity to share scholarly interests with colleagues and the general public.

## Summary

44.     There is widespread uncertainty within CRS concerning the rules for outside writing and speaking. Because of this, some CRS employees have urged that the current ad hoc CRS policy be replaced by clear standards to direct what analysts may and may not say and write. However, it is not merely a lack of understandable guidelines. I am concerned about the legacy of CRS. Were CRS to prohibit analysts from expressing their expert views, both within the organization and outside, CRS employees would be prevented from doing the analytical work that Congress requested, authorized, and mandated in the LRA of 1970. The action by CRS against Col. Davis greatly chills the

capacity of agency employees to develop and apply the expertise that Congress needs to perform its constitutional duties.  Sanctions by CRS against experts who publish their views on the outside damages the ability of CRS to recruit and hire skilled analysts intent on furthering their professional careers.

Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 7th day of January 2010.

LOUIS FISHER

# EXHIBIT A

## BIOSKETCH FOR LOUIS FISHER

Louis Fisher is Specialist in Constitutional Law with the Law Library of the Library of Congress, after working for the Congressional Research Service from 1970 to 2006. During his service with CRS he was research director of the House Iran-Contra Committee in 1987, writing major sections of the final report.

His books include *President and Congress* (1972), *Presidential Spending Power* (1975), *The Constitution Between Friends* (1978), *The Politics of Shared Power* (4th ed. 1998), *Constitutional Conflicts Between Congress and the President* (5th ed. 2007), *Constitutional Dialogues* (1988), *American Constitutional Law* (with Katy J. Harriger, 8th ed. 2009), *Presidential War Power* (2d ed. 2004), *Political Dynamics of Constitutional Law* (with Neal Devins, 4th ed. 2006), *Congressional Abdication on War and Spending* (2000), *Religious Liberty in America: Political Safeguards* (2002), *Nazi Saboteurs on Trial: A Military Tribunal & American Law* (2003; 2d ed. 2005), *The Politics of Executive Privilege* (2004), *The Democratic Constitution* (with Neal Devins, 2004), *Military Tribunals and Presidential Power: American Revolution to the War on Terrorism* (2005), In the *Name of National Security: Unchecked Presidential Power and the* Reynolds *Case* (2006), *The Constitution and 9/11: Recurring Threats to America's Freedoms* (2008), *The Supreme Court and Congress: Rival Interpretations* (2009), and *On Appreciating Congress: The People's Branch* (2010). His textbook in constitutional law is available in two paperbacks: *Constitutional Structures: Separation of Powers and Federalism* and *Constitutional Rights: Civil Rights and Civil Liberties*. With Leonard W. Levy he edited the four-volume *Encyclopedia of the American Presidency* (1994). He has twice won the Louis Brownlow Book Award (for *Presidential Spending Power* and *Constitutional Dialogues*). The encyclopedia he co-edited was awarded the Dartmouth Medal. In 1995 he received the Aaron B. Wildavsky Award "For Lifetime Scholarly Achievement in Public Budgeting" from the Association for Budgeting and Financial Management. In 2006 he received the Neustadt Book Award for *Military Tribunals and Presidential Power*.

He received his doctorate in political science from the New School for Social Research (1967) and has taught at Queens College, Georgetown University, American University, Catholic University, Indiana University, Johns Hopkins University, the College of William and Mary law school, and the Catholic University law school.

Dr. Fisher has been invited to testify before Congress on such issues as war powers, state secrets, NSA surveillance, executive spending discretion, presidential reorganization authority, Congress and the Constitution, the legislative veto, the item veto, the Gramm-Rudman-Hollings Act, executive privilege, executive lobbying, CIA whistleblowing, covert spending, the pocket veto, recess appointments, the budget process, the balanced budget amendment, biennial budgeting, and presidential impoundment powers.

He has been active with CEELI (Central and East European Law Initiative) of the American Bar Association, traveling to Bulgaria, Albania, and Hungary to assist

constitution-writers, participating in CEELI conferences in Washington, D.C. with delegations from Bosnia-Herzegovina, Lithuania, Romania, and Russia, serving on CEELI "working groups" on Armenia and Belarus, and assisting in constitutional amendments for the Kyrgyz Republic.  As part of CRS delegations he traveled to Russia and Ukraine to assist on constitutional questions.  For the International Bar Association he helped analyze the draft Swaziland Constitution.

Dr. Fisher's specialties include constitutional law, war powers, budget policy, executive-legislative relations, and judicial-congressional relations.  He is the author of more than 400 articles in law reviews, political science journals, encyclopedias, books, magazines, and newspapers.  He has been invited to speak in Albania, Australia, Belgium, Bulgaria, Canada, China, the Czech Republic, England, France, Germany, Greece, Israel, Japan, Macedonia, Malaysia, Mexico, the Netherlands, Oman, the Philippines, Poland, Romania, Russia, Slovenia, South Korea, Taiwan, Ukraine, and the United Arab Emirates.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MORRIS D. DAVIS,

       Plaintiff,

          v.

JAMES H. BILLINGTON, in his official
capacity as the Librarian of Congress, and
DANIEL P. MULHOLLAN, in his individual
capacity,

       Defendants.

Case No. _____

## RULE 65.1 CERTIFICATE

Pursuant to Local Rule 65.1, Plaintiff's counsel affirms that at approximately 3:40 p.m. on January 7, 2010, counsel notified Defendants' counsel by telephone and, at approximately 3:50 p.m., by confirmation email, of Plaintiff's intention to file a motion for a temporary restraining order or, in the alternative, an expedited preliminary injunction in this Court on January 8, 2010, at approximately 3:00 p.m.

On January 8, 2010, and prior to the filing of these papers with the Court, counsel furnished to Defendants' counsel, by email, true and correct copies of all pleadings and papers subsequently filed in this action with the Court.

       Respectfully submitted,

       Arthur B. Spitzer (D.C. Bar No. 235960)
       Frederick V. Mulhauser (D.C. Bar No. 455377)
       American Civil Liberties Union
         of the Nation's Capital

1400 20th Street, N.W. #119
Washington, D.C. 20036
(202) 457-0800

Aden J. Fine  (D.C. Bar No. 485703)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2693

Jameel Jaffer
Alexander A. Abdo
National Security Project
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-7814

ATTORNEYS FOR PLAINTIFF

January 8, 2010