UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MORRIS D. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:10-cv-00036-RBW |
| | ) | |
| JAMES BILLINGTON, in his official | ) | |
| capacity as the Librarian of Congress, and | ) | |
| DANIEL P. MULHOLLAN, in his | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE,
<u>A PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**PAGES**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      The Congressional Research Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     Library of Congress Regulations and CRS Policy Applicable to
        Outside Speaking and Writing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.      The Appointment of Plaintiff as Assistant Director for FDT.. . . . . . . . . . . . . . . . . 9

        B.      Plaintiff's Initial Performance as Assistant Director. . . . . . . . . . . . . . . . . . . . . . . 10

        C.      The Deterioration of Plaintiff's Professional Conduct.. . . . . . . . . . . . . . . . . . . . . 13

        D.      The Decision to Separate Plaintiff From the Service.. . . . . . . . . . . . . . . . . . . . . . 16

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.      Plaintiff Has Not Satisfied the Irreparable Harm Requirement. . . . . . . . . . . . . . . . . . . . 18

        A.      Plaintiff's Seven-Week Delay in Seeking "Emergency" Relief
                Undermines Any Suggestion of Irreparable Injury.. . . . . . . . . . . . . . . . . . . . . . . . 19

        B.      Plaintiff's Discharge Does Not Represent Irreparable Injury.. . . . . . . . . . . . . . . . 20

                1.      Loss of a Government Position Does Not Constitute
                        Irreparable Injury Absent a "Genuinely Extraordinary Situation.". . . . . . . . 19

       2.     Plaintiff's first Amendment Allegations Do Not Represent the "Genuinely Extraordinary Situation" Required to Establish Irreparable Injury in this Employee Discharge Case... . . . . . . . . . . . . . . . . . 24

II.    Plaintiff Has Not Established a Likelihood of Success on the Merits as to Any of His Three Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    A.    Plaintiff Has Failed to Demonstrate a Likelihood of Success on his First Amendment Retaliation Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        1.     Contrary to Plaintiff's Characterization, His Termination Was Based Upon a Serious and Sustained Failure of Professional Judgment Rather than the Content of his Opinion Pieces. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        2.     Plaintiff's Separation Withstands First Amendment Scrutiny Because his Failure of Judgment Violated the Greater "Burden of Caution" Governing his Speech as a Policy-Level CRS Official.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            a.     Under the <u>Pickering</u> Analysis, Policy-Level Employees Bear a Greater "Burden of Caution" as to Their Speech.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            b.     As a CRS Assistant Director, Plaintff Was a Policy-Level Employee Subject to a Higher Standard of Caution as to his Public Speech. . . . . . . . . . . . . . . . . 31

            c.     Plaintiff's Failure of Judgment Violated the Greater Burden of Care Attendant Upon his Public Speech as a CRS Assistant Director, and Thus Justified his Separation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    B.    CRS's Policy On Outside Speaking And Writing Is Not Unconstitutional On Its Face. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    C.    The Library And CRS' Policies Are Not Unconstitutionally Vague Under The First And Fifth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . 39

III.    The Balancing of Harms Favors the Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## **INTRODUCTION**

Plaintiff seeks emergency injunctive relief mandating that his employer, the Congressional Research Service ("CRS"), reinstate him to the policy-level Assistant Director position from which he was discharged during his probationary period on December 21, 2009 – three weeks before he brought suit – for a serious failure of professional judgment. Alternatively, he seeks an injunction mandating his indefinite continuation in the thirty-day temporary appointment to a separate position that CRS voluntarily provided him to facilitate his transition out of the Service. Neither is warranted: Plaintiff has shown neither that he will sustain irreparable injury absent relief nor that he has a likelihood of success on the merits.

Indeed, the only injury that Plaintiff alleges – the loss of his position – does not constitute the irreparable injury required for an injunction to issue. It is well established that the loss of employment simply does not rise to the level of irreparable injury; Plaintiff's efforts to set his case apart in that regard are unavailing. What is more, the "emergency" that Plaintiff alleges is entirely self-manufactured. By his own admission, he was informed orally on November 12, 2009, and in writing on November 20, 2009, of his impending discharge. Yet he offers no explanation as to why he waited more than seven weeks to file suit and seek emergency judicial relief on the virtual eve of the expiration of his thirty-day temporary appointment.

Further, Plaintiff cannot show that he is likely to succeed on the merits. His argument that he is entitled under the First Amendment to publicly opine on matters of policy related to his duties as a CRS Assistant Director fundamentally misconstrues the statutory role of CRS, his former role as one of its senior, policy-level leaders charged with providing objective research and analytical support to the United States Congress, and the reasons he was discharged. When viewed with an accurate understanding of the role of CRS, Plaintiff's former high-level position within CRS, and the circumstances of his discharge, Plaintiff simply is not likely to prevail on the merits. Rather, while Plaintiff was discharged for his poor judgment, even if his discharge was related to speech activities,

CRS' interest in preserving its statutory mission of non-partisan and objective service to Congress clearly outweighs the interests of Plaintiff in engaging in such speech.

CRS, a service unit of the United States Library of Congress, exists solely to provide objective, unbiased, and non-partisan research and analytical support to Congress. In turn, Congress relies heavily upon CRS to provide such support in a reliable, thorough, and responsive manner. In the context of federal legislative policy-making, this relationship is essentially unique. There is no shortage of politically partisan, ideologically driven, or financially motivated institutions ready and willing to provide Congress the same sort of substantive policy-making input that CRS provides. The critical distinction between those institutions and CRS is that CRS is statutorily required to remain free of any partisan, ideological, or subjective bias. In short, Congress must be able to trust that CRS will fill its role free of bias or subjectivity; otherwise, CRS has failed to measure up to its statutory mission.

The responsibility for ensuring that CRS is objective, unbiased, and non-partisan rests most heavily upon its senior leadership: approximately a dozen persons including the Director and Deputy Director, five Associate Directors, and five Assistant Directors. Contrary to Plaintiff's efforts now to minimize the significance of his role, he was an integral part of that close circle of senior, policy-level leadership until his discharge on December 21, 2009. As a senior level manager, he was charged with supervising and leading his subordinates, setting an example for them, serving as the Director's alter ego with Members of Congress and their staffs, and formulating, providing advice on, and enforcing CRS policy so that the mission of CRS could be accomplished.

This Circuit has made clear that the more senior an employee is in his organization, the more an agency can justifiably expect him to exercise great caution in his public speech activities so that the mission and management of his agency are not undermined. It is not at all hard to imagine how the speech of a senior official might easily be mistaken for the position of the organization itself, just as the public statements of a top advisor on a controversial issue are likely to be viewed as the position of a

2

political leader or the public remarks of a law clerk about a pending case could be viewed as the position of his or her judge.  Indeed, as a manager, Plaintiff himself reminded his staff collectively – and individually as needed – about the unique mission of CRS as a nonpartisan, objective organization and the importance of their adherence to its speech and writing policies to preserve the Service's core values of objectivity and nonpartisanship.  Early in his tenure at CRS, he himself had sought and received guidance under CRS' policies when asked to speak publicly about military detainee issues.

However, toward the end of Plaintiff's year as a probationary Senior Level employee, he chose to ignore the unique mission of CRS, his responsibilities as a senior manager, and the applicable regulations and policies governing outside writing, and published two opinion pieces on November 10, 2009 – one an op-ed in the Wall Street Journal and the other a letter to the editor in the Washington Post – regarding the criminal prosecution of military detainees.  The Wall Street Journal op-ed criticized current administration policies governing the prosecution of military detainees; the Washington Post letter responded to an op-ed on the same topic by former Attorney General Michael Mukasey, and accused Mukasey of "fear-mongering worthy of former vice president Dick Cheney."

Plaintiff now attempts to argue that his duties never involved military detainee issues.  That suggestion is unfounded.  In fact, in touting his own accomplishments for his self-drafted six-month performance evaluation, he himself highlighted to his supervisor his consultation within CRS on such issues.  And the simple fact is that he and his staff were involved in addressing military detainee issues for CRS reports.  As Assistant Director for the Foreign Affairs, Defense, and Trade Division ("FDT"), he bore responsibility over a range of issues including national security policy, military affairs, and international terrorism.  In addition, because of the intensely collaborative nature of CRS, he and members of his staff worked closely with analysts and supervisors from other divisions charged with providing analytical support to Congress as to military detainee issues, including issues relating to detainee prosecutions.  Thus, when he chose to write two pieces for major publications clearly taking

3

a position on these issues, he was definitely speaking about a matter within the scope of his duties, both substantively and as a senior manager charged with upholding the objective mission of CRS.

Plaintiff would also have this Court believe that his discharge was based upon the fact that he wrote those two opinion pieces. That is incorrect. The decision to discharge Plaintiff was based upon demonstrated failures of professional judgment on his part. Certainly, the most obvious was the failure to adhere to the CRS speech policy in a way that threatened to undermine CRS' core values of objectivity and non-partisanship, and to undermine his effectiveness as a senior manager. But, in the course of that, Plaintiff repeatedly demonstrated a lack of the judgment expected of a senior manager. Despite the fact that he had sought advice in previous instances of speaking on the same issue, he failed to seek any guidance from CRS in this instance. He ignored the policy about providing an express disclaimer when writing on controversial topics, choosing instead to rely on the advice of a newspaper editor about the value of express disclaimers. He failed to provide any heads up regarding the publication of those pieces to the Director of CRS until it was a fait accompli, later admitting to the Director that he did not consult beforehand precisely because he knew the Director would disapprove of his decision. And, when discussing the articles afterwards, Plaintiff refused to acknowledge any lapse in judgment regarding their publication, erroneously claimed that they had no connection to his duties at CRS, and demonstrated no awareness that his actions could harm the efforts of CRS to be perceived as an objective, nonpartisan organization, as it is charged with being. In light of that conduct, the Director felt compelled to reevaluate two previous actions by Plaintiff that also reflected a lack of professional judgment and disregard for agency policy – the first an intentional flouting of an internal CRS policy and the second an e-mail upbraiding of an Associate Director on the same topic – for which he had previously counseled Plaintiff. Considered cumulatively, all of those actions suggested that Plaintiff lacked the professional judgment to be converted from probationary to permanent status. Accordingly, he was discharged.

Given Plaintiff's actions and his role as a policy-level member of CRS' inner management circle, CRS was justified in reaching the decision to separate him for his failure of judgment precisely when it did.  As the Supreme Court has recognized, an agency is not required to let events unfold to the extent that disruption of the office and the destruction of working relationships is manifest before taking action.  Moreover, the probationary period is precisely the time to assess if a supervisor possesses the judgment, professionalism, discretion, and trustworthiness to fulfill the mission of the agency. Moreover, once Plaintiff accepted the position with CRS, his prior speech activities did not exempt him from meeting the standards applicable to senior CRS managers, as he seems to suggest.

Finally, Plaintiff also fails to show a likelihood of success on his more generalized challenges. While in the first instance, he claims he adhered to the CRS speech policy, in the alternative, he claims the policy itself is an unconstitutional constraint on speech as well as unconstitutionally vague.  Yet, once again, he misstates the facts about the policy.  The CRS policy does not prohibit employees from speaking on any matter of public policy or even on certain subject matters, as Plaintiff claims.  The policy does not contain any ban on outside speech on any subjects and has never been interpreted to contain such a ban.  In fact, CRS' policy actually encourages employees to speak but includes precautionary measures such as disclaimers when employees are speaking or writing on "controversial" matters and encourages review by the CRS Review Office when any outside speech may create an appearance of a conflict of interest.  These measures act as an alternative to any blanket ban, affording employees greater freedom to speak on issues of public concern without crippling CRS' ability to provide balanced, objective, unbiased support to Congress.  The encouragement to seek review provides the opportunity for additional guidance that would address any uncertainties or confusion.

The problem here was not the CRS policy at all.  Rather, the problem was a probationary, policy-level Assistant Director who wilfully decided to ignore CRS policies and instead set an example for subordinates that they do not have to be mindful of CRS' unique mission when they speak publicly,

ought not to seek guidance from the Service if the topic might create an appearance of a conflict of interest, and do not need to provide express disclaimers if they are speaking on a controversial issue. Likewise, instead of setting an example of professional judgment and discretion, Plaintiff suggested that subordinates can be disrespectful and dismissive of their supervisors when their adherence to policies is called into question.  The Court should not require CRS to abide such a managerial example in its ranks either as a permanent matter or on a temporary basis, and should reject Plaintiff's request for emergency relief.  At the same time, Plaintiff simply fails to meet the heightened standard necessary to obtain a mandatory injunction altering the status quo, either through reinstatement to a position from which he has already been discharged or through an indefinite extension of a temporary appointment to an entirely different position that expires by its own terms.[1]

## BACKGROUND

### I.    THE CONGRESSIONAL RESEARCH SERVICE.

CRS, a department of the Library of Congress, exists to "advise and assist" Congress through the provision of research and analytical support, all "without partisan bias." 2 U.S.C. § 166(d).  CRS' mandate includes, among other services, the evaluation of legislative proposals pending before Congress or any committee of either chamber; this function includes determining the advisability of enacting such proposals, estimating the probable results of such proposals and alternatives thereto, and evaluating alternative methods of accomplishing the results sought.  Id. § 166(d)(1).  In addition, CRS is charged with collecting, classifying, and analyzing data having a bearing on legislation and making such data "available and serviceable" to committees, Members, and staff of both chambers.  Id. §

---

[1]  Plaintiff makes clear that his motion is premised solely upon his claims against the Librarian in his official capacity. Pl.'s Mem. at 1, n.1.  Thus, this opposition is submitted solely on behalf of the Librarian in that capacity.

166(d)(4).  CRS must be both responsive and proactive in carrying out this mandate.  See, e.g., id. §§ 166(d)(4), (5).

The chief hallmark of CRS is the requirement that it provide its services to Congress in an objective, unbiased, and nonpartisan manner.  See generally Keeffe v. Library of Congress, 777 F.2d 1573, 1580-81 (D.C. Cir. 1985) ("Nonpartisanship on the part of CRS Analysts enables them to serve all Members of Congress effectively and to carry out Congress' mandate that the Service render advice 'without partisan bias.'"); Declaration of Daniel Mulhollan, Jan. 15, 2010 ("Mulhollan Decl.") ¶¶ 2-3.  CRS is essentially unique in this regard.  The majority of sources that provide information and analysis to Congress have particular points of view or interests at stake; the Members and staff of Congress understand that the analyses they receive from those sources will generally reflect – and in fact are motivated by – such interests.  Mulhollan Decl. ¶ 3.  By contrast, Congress expects and depends upon CRS to provide expert analysis that is "neither overtly nor subtly tainted by ideological bias or policy preferences."  Id.  Thus, CRS' continued value to Congress depends entirely upon its ability to execute its duties free of subjectivity, bias, and partisanship – and upon its ability to avoid any appearance of such taints.  Id. ¶¶ 3, 6.

Subject to and guided by those core principles, CRS employs more than 450 policy analysts and experts (among almost 700 total personnel) divided into five substantive research divisions: (1) American Law ("ALD"); (2) Domestic Social Policy; (3) Foreign Affairs, Defense and Trade ("FDT"); (4) Government and Finance; and (5) Resources, Science and Industry.  Id. ¶¶ 7-8.  Analysts from separate divisions often work together, and the relationship among the five divisions is "intensely collaborative."  Id. ¶ 10.  This is particularly so in the context of detainee treatment and military commission issues.  Id. ¶ 11.  The policy elements of those issues generally fall within the ambit of FDT, which focuses on a range of issues including terrorism, national security policy, and military affairs, id., while the legal elements generally fall within that of ALD, id.  However, the policy and legal

aspects of those issues are essentially inextricable from each other, thus requiring particularly frequent collaboration between FDT and ALD.  Id.  For example, FDT and ALD analysts are currently collaborating on reports on detainee treatment.  Id. ¶ 13.

Each of CRS' five research divisions is lead by its own Assistant Director, a senior, policy-level officer that reports to the Director and represents part of the senior management team of CRS.  Id. ¶¶ 14-15.  Among other responsibilities, the Assistant Directors must set the professional standard for the analysts and experts of their divisions, including ensuring that their public and professional conduct is free of subjectivity, bias, or partisanship or any appearance thereof.  Id. ¶ 18.  At the same time, each Assistant Director counsels the Director, influences and determines matters of policy affecting the entire Service, and interfaces with Senators and Representatives, their congressional staff, and the public.  Id. ¶¶ 14-16.  These policy-level responsibilities are not limited to matters officially within each Assistant Director's portfolio.  Instead, because CRS is designed to provide integrated analyses of complex issues, often under expedited time frames, collaboration among divisions is not only encouraged, but often mandated.  For that reason, each Assistant Director is required to perform substantively and be free of bias even on matters not officially within his or her bailiwick.  Id. ¶¶ 7, 14.

**II.    LIBRARY OF CONGRESS REGULATIONS AND CRS POLICY APPLICABLE TO OUTSIDE SPEAKING AND WRITING.**

Library of Congress personnel are expected to comply with applicable Library of Congress Regulations regarding their professional and public conduct, including outside speaking and writing. Library of Congress Regulation ("LCR") 2023-1, titled "Personal Conduct and Personal Activities of the Staff of the Library of Congress: Purpose, Policy, and General Standards of Conduct," provides that "maintenance of high standards of honesty, integrity, impartiality, and conduct by staff members is essential to assure the proper performance of the Library's business and the maintenance of confidence by citizens in their Government."  LCR 2023-1.

LCR 2023-3, titled "Outside Employment and Activities," provides that "staff members shall not engage in outside employment or other outside activities not compatible with the full and proper discharge of the duties and responsibilities of their Library employment," and that "[i]n speaking and writing on controversial matters, staff members are expected to disassociate themselves explicitly from the Library and from their official positions." LCR 2023-3. LCR 2023-3 further provides that "[w]here . . . the subject matter of [personal writings as well as prepared or extemporaneous speeches by staff members] relates to . . . a field of a staff member's official specialization or the special clientele which a staff member serves, staff members shall . . . avoid sources of potential damage to their ability to perform official Library duties in an objective and non-partisan manner . . . ." Id.

In addition to the Library Regulations, CRS policies govern outside speaking and writing for CRS employees. Pursuant to the CRS Policy titled "Outside Speaking and Writing," employees are obligated when speaking or writing outside of CRS "to present a formal disclaimer regarding any personal views," and "should strive to avoid even the appearance of a conflict of interest or engaging in an activity that would compromise one's ability to perform their responsibilities for CRS." Mulhollan Decl. ¶ 20. The policy also "strongly encourages all staff to submit draft outside writings to the Review Office," and to "err on the side of caution, especially when addressing issues for which the individual has responsibility for the Service." Id. The Policy further explains that "[w]hile CRS staff, like all citizens, are entitled to hold their own views on all matters of public policy, when CRS staff speak or write in their private capacities they continue to carry with them related responsibilities." Id.

## III.   FACTUAL BACKGROUND.

### A.   THE APPOINTMENT OF PLAINTIFF AS ASSISTANT DIRECTOR FOR FDT.

In late 2008, the position of Assistant Director for FDT became vacant. Id. ¶ 21. Among the applicants for the position was Plaintiff. Id. The selection committee, including CRS Director Daniel

Mulhollan, interviewed Plaintiff on November 19, 2008.  Id. ¶ 22.  During the interview, Plaintiff and the committee members discussed Plaintiff's prior career as a military attorney in the Air Force, including his tenure as the chief prosecutor for the military at Guantanamo Bay.  Id.  In that context, Director Mulhollan explained the mission of CRS, in particular emphasizing the importance of objectivity and non-partisanship.  Id.

In particular, Director Mulhollan emphasized to Plaintiff that public "issue advocacy" would not be acceptable for the new Assistant Director.  Id. ¶ 23.  Director Mulhollan emphasized this point in part because compliance with Library and CRS standards on objectivity and non-partisanship had recently become a particular problem within FDT, including the failure of some FDT analysts to comply with regulations and policies governing outside speaking and writing and media interactions.  Id.  In that regard, Director Mulhollan emphasized that the new Assistant Director would be required to set the standard for compliance with applicable regulations and policy within FDT, and would likewise be required enforce regulations and policy with staff members who failed to comport themselves accordingly.  Id.  Plaintiff responded that he understood that public "issue advocacy" would be problematic given the mission of CRS, and emphasized that if selected he would be able to comply with CRS' core values of objective, non-partisan, and balanced research and analysis.  Id.

The committee ultimately selected Plaintiff for the position, with Director Mulhollan's concurrence as the selecting official, id. ¶ 24, and Plaintiff began his tenure as Assistant Director for FDT on December 22, 2008.  Id. ¶ 25.  Consistent with Library of Congress regulations applicable to all new Senior Level appointees, Plaintiff was required to serve a one-year probationary period before possible conversion to permanent status.  Id.  That period would end on December 21, 2009.  Id.

B.  **PLAINTIFF'S INITIAL PERFORMANCE AS ASSISTANT DIRECTOR.**

Plaintiff's duties as Assistant Director during his probationary period were broad and varied; they included planning, directing, and evaluating the research and analyses conducted by FDT analysts

and working with managers and analysts from other divisions on issues requiring collaborative efforts, including personnel from ALD.  Id. ¶¶ 26, 49.  The substantive issues on which Plaintiff worked included issues relating to military detainees and Guantanamo Bay.  Id. ¶ 49.  Plaintiff also served as one of Director Mulhollan's closest policy-level advisors despite his probationary status, providing substantial input into the creation of CRS policies and procedures.  Id. ¶ 27.  Along with the other Assistant Directors, Plaintiff was a formal member of Director Mulhollan's senior management team, and advised the Director on all aspects of CRS' operations.  Id.  In addition, Plaintiff represented both Director Mulhollan and CRS as a whole before Congress; in that sense, he frequently served as Director Mulhollan's "alter ego" when speaking with Members, committees, officers, and staff.  Id. ¶ 28.  In that capacity, statements made by Plaintiff were imputed to both Director Mulhollan and the Service as a whole.  Id.

As Assistant Director for FDT, Plaintiff's other key duties also included working to  foster compliance with CRS' outside speaking and writing policies within FDT.  Id. ¶ 32.  In that respect, he was also required to enforce those policies.  Id. ¶ 23.  For example, on February 18, 2009, after verbally counseling an FDT analyst about the need to adhere to the policies, Plaintiff composed and sent a division-wide e-mail to all FDT personnel emphasizing that point:

> Title 2, Section 166(d) of the U.S. Code states, "It shall be the duty of the Congressional Research Service, without partisan bias, upon request, to advise and assist . . ."  Objectivity is a fundamental precept at the heart of the CRS mission and it is reflected in CRS policies on outside writing, speaking and engagement with the news media.  Each of us has areas of expertise and personal views, and the two commingle on some level.  In some instances a person's personal views may be so strong that he or she is compelled to publicly advocate a particular viewpoint, which could raise a question of partisan bias in the advice and assistance rendered to Congress on the same or related subject-matter.  I ask everyone to review and adhere to the policies, and if in doubt ask.

Id. ¶ 32 (emphasis in original).  Later, in a June 2009 memorandum of admonishment to an FDT analyst, Plaintiff informed the employee that while he "did not forfeit [his] First Amendment rights as

a CRS employee," he could not conduct himself in "a manner that impairs, in fact or in perception, the high professional standards for objectivity which are essential to CRS." Id. ¶ 33.

Early in his probationary tenure, Plaintiff also demonstrated that he appeared to understand and accept the core values of CRS, in particular his obligation to uphold the principles of objectivity and non-partisanship both personally and as a senior manager within CRS. Id. ¶¶ 31, 34. For example, on February 11, 2009, Plaintiff contacted the CRS Communications Office to report that he had been contacted by the Virginia State Bar and asked to speak at the Bar's annual meeting. Id. ¶ 31. He said that he responded that he was "working for a non-partisan government organization and needed to avoid expressing public opinions on issues likely to come before Congress." Id.

Plaintiff's compliance with CRS' outside speaking and writing policy apparently continued through much of his probationary period. For example, in July 2009, Plaintiff was invited to do a BBC radio interview regarding his experience as the chief prosecutor at Guantanamo Bay. Id. ¶ 35. Plaintiff brought the request to Director Mulhollan's attention on July 21, 2009, explaining in an e-mail that a BBC producer had asked for an interview, that he had informed the producer that "because of our non-partisan status we tend not to do on-the-record interviews," and that the producer had clarified that the BBC was interested in a retrospective view. Id. The producer had provided Plaintiff an advance copy of the interview questions, which Plaintiff provided to Director Mulhollan and to the head of the CRS Communications Office. Id. Plaintiff even asked for Director Mulhollan's thoughts as to how he should respond to the interview request; in response, Director Mulhollan stated that Plaintiff could participate in the interview, but should decline to answer questions that called for opinions regarding current policy issues. Id.[2]

---

[2] Of note, Plaintiff informed Director Mulhollan during this period that he had received other requests for interviews and comments on Guantanamo but that aside from the BBC request, the others wanted to discuss "the current debate" and his "views on what the current policy should be." Id. ¶ 36. Plaintiff informed Director Mulhollan that he had declined all other requests. Id.

On September 11, 2009, Plaintiff participated in a panel discussion about the military commissions as part of a conference at Case Western Reserve University School of Law.  Id. ¶ 37. Plaintiff had first brought the matter to Director Mulhollan's attention on April 13, 2009, explaining that he had been asked to serve on a panel titled "A Look Back at the Military Commissions."  Id.  As Plaintiff explained to Director Mulhollan, the focus of that panel would be an entirely retrospective discussion of the commissions.  Id.  Plaintiff asked Director Mulhollan if his participation constituted permissible outside activity, and voluntarily submitted his planned remarks to both the Communications Office and the Review Office – the latter the CRS office that reviews written work submitted for Congress to ensure compliance with CRS policies – for review.  Id.  The Review Office offered only minor, non-substantive suggested edits.  Id.

## C.   THE DETERIORATION OF PLAINTIFF'S PROFESSIONAL CONDUCT.

Ultimately, however, Plaintiff's professional conduct began to deteriorate.  In October 2009, Plaintiff intentionally subverted a CRS policy governing authorship attribution of non-CRS employees by allowing the publication of an FDT report with an intern listed as co-author, which was against the then-policy.  Id. ¶ 39.  Upon learning of that, Director Mulhollan orally counseled Plaintiff.  Id. Plaintiff explained that he had allowed the intern to be named as co-author of the report because he believed the intern deserved credit, but admitted that he disagreed with the co-authorship policy and wanted to see if he could get such a co-authored report through the review system.  Id.  Director Mulhollan informed Plaintiff that his actions were not an appropriate means of initiating policy changes. Id.  In Director Mulhollan's view, Plaintiff's willingness to circumvent existing CRS policy raised concerns about his judgment, discretion, and forthrightness.  Id.

That same month, Plaintiff also upbraided CRS's Associate Director for Research in an e-mail disseminated to other senior managers, using language Director Mulhollan viewed as inappropriate and disrespectful toward an Associate Director of long tenure.  Id. ¶ 40.  Plaintiff, the other Assistant

Directors, and the Associate Director of Research had been asked to develop options for acknowledging the work of non-CRS employees on reports and to discuss the future policy on the authorship of CRS reports.  Id.  In an e-mail to the entire team, Plaintiff referred to the Associate Director as being "dictatorial" and "intractable in his views that interns are unworthy and [Assistant Directors] are unreliable," suggesting that the Associate Director lacked respect for the Assistant Directors.  Id.  In Director Mulhollan's view, the tone and substance of the e-mail, coupled with its dissemination to others, raised further concerns about Plaintiff's judgment and discretion.  Id.  Thus, as with the previous incident, Director Mulhollan orally counseled Plaintiff on this matter.  Id.

Subsequently, at a November 2009 award luncheon in Kansas City, Plaintiff gave a speech in which he articulated several criticisms of current and former Administration policies, including his view that few military detainees were actually prosecuted at Guantanamo because "prosecution was a distant thought at best" during many of the detainee interrogations.  Id. ¶ 41.  Plaintiff had previously informed Director Mulhollan of the award luncheon by e-mail on August 24, 2009, explaining that he was being honored by the Lawyers Association of Kansas City for the stance he had taken as military prosecutor at Guantanamo Bay and requesting permission to attend the luncheon.  Id.  Based on Plaintiff's representations, Director Mulhollan approved the request.  Id.  This time, unlike Plaintiff's previous participation in the Case Western conference, Plaintiff did not submit prepared remarks to the Review Office, id., and Director Mulhollan did not learn of Plaintiff's remarks at the luncheon until after he had made the decision to separate Plaintiff.  Id.

On November 10, 2009, well after the conclusion of an in-person meeting between Plaintiff and Director Mulhollan that afternoon, Plaintiff informed Director Mulhollan via e-mail sent at 7:34 p.m. that he had submitted two opinion pieces related to military commissions to national newspapers: the first an op-ed for the Wall Street Journal, and the second a letter to the editor in the Washington Post. Id. ¶ 43.  Both had been selected for publication, Plaintiff explained, and could "run as early as

14

tomorrow" (November 11).  Id.  In fact, the Wall Street Journal op-ed had already appeared online at the time of Plaintiff's e-mail.  Id.  Plaintiff closed his e-mail by saying that "neither has any connection to CRS."  Id.  Plaintiff's e-mail was the first indication he gave Director Mulhollan of the pieces; he had failed to mention them during their earlier meeting.  Id.

Plaintiff's Wall Street Journal op-ed criticized Attorney General Eric Holder and the Obama Administration for the decision to employ both military commission trials and civilian trials for the Guantanamo detainees.  Id. ¶ 44.  Inter alia, the op-ed posited that that decision "will only perpetuate the perception that Guantanamo and justice are mutually exclusive."  Id.  Plaintiff's Washington Post letter, which ran on November 11, 2009, responded to a previous Post op-ed written by former Attorney General Michael Mukasey on the same issue.  Id.  Inter alia, it described Mukasey's arguments as "fear-mongering worthy of former vice president Dick Cheney."  Id.

After reading Plaintiff's opinion pieces that night (Plaintiff had belatedly provided a copy of each piece) Director Mulhollan sent Plaintiff an e-mail expressing concerns about their potential consequences for CRS.  Id. ¶ 45.  Plaintiff responded in turn to Director Mulhollan's e-mail, stating that he had "no desire to get into a back and forth e-mail debate," but that he believed that Director Mulhollan would like for the outside writing policy to be that "no one from CRS expresses an opinion in public."  Id.  Director Mulhollan replied that he found Plaintiff's response unprofessional and that he would not tolerate such conduct by senior managers.  Id.

In a brief meeting between Plaintiff, Director Mulhollan, and Acting Deputy Director Richard Ehlke on Thursday, November 12, 2009, Plaintiff expressed no remorse for his actions, or awareness that his poor judgment could do serious harm to the trust and confidence Congress reposes in CRS.  Id. ¶ 51.  In Director Mulhollan's view, Plaintiff's "credibility and leadership were seriously eroded with the publication of these pieces."  Id. ¶ 53.

On November 13, 2009, Director Mulhollan, along with Acting Deputy Director Richard Ehlke, met again with Plaintiff, delivered a written memorandum of admonishment, and informed him that he would not be recommending that he be made permanent (and, therefore, that he would be separated from employment at the Library at the end of his probationary period). Id. ¶ 52. Director Mulhollan has characterized Colonel Davis' reaction to the admonishment as "indifferent, defensive, and dismissive." Id. ¶ 53. When handed the memorandum of admonishment, Plaintiff placed it in a folder without looking at it. Id.

### D.   THE DECISION TO SEPARATE PLAINTIFF FROM THE SERVICE.

Because probationary employees are to be given thirty calendar days' written notice of separation, Director Mulhollan determined that he needed to make a decision as to Plaintiff's status around mid-November. Although Director Mulhollan had initially held "high hopes" for Plaintiff's service as an Assistant Director, id. ¶ 54, he believed he could not convert Plaintiff to permanent status given that in his view Plaintiff had not shown sufficient ownership of the issues covered by FDT – for example, Plaintiff had been remiss in ensuring that CRS Reports for Congress were promptly updated following key events – and had not shown the necessary judgment, discretion, and trustworthiness for Senior Level performance, id. "[B]ased on an overall assessment of Colonel Davis' actions and conduct, including, but not limited to, the outside writings and the circumstances surrounding them," Director Mulhollan determined that separation was appropriate. Id. ¶ 55.

After the separation decision was made, Director Mulhollan offered Plaintiff a thirty-day temporary appointment as his special assistant to help facilitate his transition, complete any outstanding administrative duties, and seek other job opportunities. Id. ¶ 59. During the temporary appointment, Plaintiff's duties have involved matters unrelated to research. Id.

## STANDARD OF REVIEW

Temporary restraining orders and preliminary injunctions constitute "extraordinary remed[ies] that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation and citation omitted); see also Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (power to issue injunctive relief "should be 'sparingly exercised.'").  To obtain emergency injunctive relief, the moving party must establish: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. Chaplaincy of Full Gospel Churches, 454 F.3d at 297; Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1505 (D.C. Cir. 1995); Nat'l Treasury Employees Union v. United States, 927 F.2d 1253, 1254 (D.C. Cir. 1991) ("A party is entitled to a preliminary injunction only if [he] proves that [the four factors are met.]") (emphasis supplied).

In deciding a motion for preliminary injunctive relief, the Court must "balance the strengths of the requesting party's arguments in each of the four required areas." Chaplaincy of Full Gospel Churches, 454 F.3d at 297.  While a particularly strong showing in one area might warrant injunctive relief despite weak showings in other areas, a movant must "demonstrate that irreparable injury is likely in the absence of an injunction," not just a "possibility." Winter v. Nat. Res. Def. Council, — U.S. —, 129 S. Ct. 365, 375 (2008) (emphasis in original).  A movant's failure to show irreparable harm thus represents grounds for refusing to issue a preliminary injunction, even if the other three factors favor him. Id.; Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (citing Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1210-11 (D.C. Cir.1989)).

Moreover, a plaintiff seeking a mandatory injunction faces a greater hurdle than one seeking a prohibitive injunction. Mylan Pharm., Inc. v. Shalala, 81 F. Supp. 2d 30, 36 (D.D.C. 2000).  In this

Circuit, "the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised." Dorfmann, 414 F.2d at 1173; see also Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1319 (9th Cir. 1994) (where movant seeks mandatory injunction "well beyond maintaining the status quo pendente lite, courts should be extremely cautious about issuing a preliminary injunction.").   "[W]here an injunction is mandatory – that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act – the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." Phillip v. Fairfield Univ., 118 F.3d 131, 133 (2d Cir. 1997); see also Columbia Children's Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 15 F. Supp. 2d 1, 4 (D.D.C. 1997), aff'd, 159 F.3d 636 (D.C. Cir. 1998).

## ARGUMENT

Plaintiff has failed to meet his burden for obtaining the extraordinary interim relief he seeks – reinstatement into the position from which he was separated three weeks before he filed suit or, alternatively, indefinite continuation of his temporary appointment in a different position.

## I.   PLAINTIFF HAS NOT SATISFIED THE IRREPARABLE HARM REQUIREMENT.

Plaintiff has not shown that he faces the threat of irreparable harm in the absence of a preliminary injunction.  First, his seven-week delay in seeking relief from the date he was informed in writing that he would be discharged underscores that any alleged "exigency" is entirely self-manufactured. Second, his only alleged injury is the loss of his position; courts are virtually unanimous in holding that the loss of a job is not irreparable, and thus does not support the entry of injunctive relief, even where free speech violations are alleged.

A.   **PLAINTIFF'S SEVEN-WEEK DELAY IN SEEKING "EMERGENCY" RELIEF UNDERMINES ANY SUGGESTION OF IRREPARABLE INJURY.**

As a basic matter, Plaintiff's delay in seeking "emergency" injunctive relief undermines any credible suggestion of irreparable injury. Delay constitutes a relevant factor when considering whether a plaintiff has met his burden to show irreparable injury. Citybank, N.A. v. Citytrust & Citytrust Bancorp, 756 F.2d 273, 276 (2d Cir. 1985). Delays of as little as thirty to forty-five days before bringing suit have been deemed fatal to the irreparable injury requirement. See, e.g., Newdow v. Bush, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (one-month delay); see also Fund for Animals v. Frizzell, 530 F.2d 982, 987 (D.C. Cir. 1975) (forty-four day delay from issuance of challenged regulations). Here, Plaintiff received his termination letter on Friday, November 20, 2009, informing him that his discharge as Assistant Director would be effective on December 21, 2009. That date came and went, and he was officially discharged. In the interim, he accepted CRS' offer of a thirty-day temporary appointment in a different position – special assistant to the Director – to facilitate his transition out of government service. Only on January 8, 2010, did he finally bring suit.

Whatever Plaintiff's reasons for waiting seven weeks to seek relief – until three weeks after his separation – his actions belie any suggestion of urgency or irreparable harm. Newdow, 355 F. Supp. 2d at 292 ("delay implies a lack of urgency and irreparable harm."). To the contrary, they underscore that any alleged "exigency" is entirely self-manufactured. If Plaintiff truly believed he was facing irreparable injury in the absence of injunctive relief, he should not have waited seven weeks to seek such relief. Nor should he have waited until less than two weeks before the end of his temporary appointment as special assistant to the CRS Director to seek judicially mandated continuance of that appointment. That fact that he now seeks such interim relief on an "emergency" basis suggests nothing more than litigation gamesmanship, and undermines any argument of irreparable injury.

**B.     PLAINTIFF'S DISCHARGE DOES NOT REPRESENT IRREPARABLE INJURY.**

Plaintiff's seven-week delay aside, his termination does not constitute irreparable injury as a substantive matter.  The loss of his position would be reparable through reinstatement and back pay, if warranted at judgment.  His allegations of constitutional injury do not change that basic principle.

**1.     LOSS OF A GOVERNMENT POSITION DOES NOT CONSTITUTE IRREPARABLE INJURY ABSENT A "GENUINELY EXTRAORDINARY SITUATION."**

In government personnel cases, a plaintiff must satisfy a particularly stringent standard for making that showing.  Sampson v. Murray, 415 U.S. 61, 91-92 (1974) (citing Va. Petroleum Jobbers Assn. v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958)); Am. Postal Workers Union v. U.S. Postal Serv., 766 F.2d 715, 721 (2d Cir. 1985); Farris v. Rice, 453 F. Supp. 2d 76, 79-80 (D.D.C. 2006) ("cases are legion holding that loss of employment does not constitute irreparable injury").  In Sampson, much as here, a probationary status government employee sought to enjoin her pending discharge, alleging that it represented irreparable injury.  Sampson, 415 U.S. at 92 n.68.  The Supreme Court rejected that argument, holding that absent a "genuinely extraordinary situation," a showing of financial distress or difficulty in obtaining other employment does not constitute irreparable harm.  Id.

Plaintiff's efforts to preemptively escape the overwhelming weight of controlling authority on this point by arguing that this "is not a typical employment case like Sampson []," see Pl.'s Mem. at 39, 40-41, are unavailing.  The distinctions that Plaintiff attempts to draw between this case and the purportedly more typical Sampson scenario are threefold: (1) Here, there is no administrative review process that requires exhaustion prior to judicial review, and which might be disrupted by his interim reinstatement; (2) his former position is unique, thus apparently requiring that he be reinstated pending judgment; and (3) he may or may not be entitled to back pay in the event of a judgment in his favor.  None of these putative differences amounts to anything of substance.

Plaintiff's first purported distinction – his suggestion that there is no administrative review process here that would be disrupted by the emergency injunction he seeks – is logically misplaced, and has nothing to do with what does or does not constitute a showing of irreparable injury. The courts in this Circuit follow a straightforward calculus in determining what constitutes an irreparable injury:

> The key word in this consideration is <u>irreparable</u>. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

<u>Nichols v. Agency for Int'l Dev.</u>, 18 F. Supp. 2d 1, 4 (D.D.C. 1998) (quoting <u>Va. Petroleum Jobbers</u>, 259 F.2d at 925) (emphasis in original). There simply is no room in that calculus to shoehorn the question of whether or not Plaintiff is required to pursue administrative remedies before heading to court. All that said, of course, the reason that Plaintiff lacks a panoply of administrative remedies to pursue is that he was still in his probationary period as Assistant Director when he was discharged. If that lack of administrative remedies is in any way relevant to whether the loss of Plaintiff's position constitutes irreparable injury, it cuts against him. As courts have emphasized, "probationary federal employees must demonstrate an even greater showing of irreparable injury when seeking to enjoin the government: '[Plaintiff] at the very least must make a showing of irreparable injury sufficient in kind and degree to override' the many factors that militate against enjoining the federal government." <u>Id.</u>

The second of Plaintiff's three purported distinctions – the notion that interim reinstatement is required to preserve his hold on his "unique" former position, unlike the apparently fungible employee in <u>Sampson</u> – is simply flattened under the weight of case law from numerous circuits. Plaintiff's argument seems to be that the loss of any position other than one that is essentially interchangeable within the discharging organization constitutes irreparable injury because it might be filled prior to final judgment. <u>See</u> Pl.'s Mem. at 39, 41. That cannot be the case, as the circuit courts have overwhelmingly held that the mere loss of a position does not represent irreparable injury in cases where the positions

lost were singular within the discharging organization.  See, e.g., Hetreed v. Allstate Ins. Co., 135 F.3d 1155, 1158 (7th Cir. 1998) (loss of position as senior manager leading audit department not irreparable injury); Marxe v. Jackson, 833 F.2d 1121 (3d Cir. 1987) (division manager); Rubino v. City of Mount Vernon, 707 F.2d 53 (2d Cir. 1983) (mayoral-appointed City Assessor); Franks v. Nimmo, 683 F.2d 1290 (10th Cir. 1982) (Associate Chief of Staff for Research and Development position at VA Medical Center); EEOC v. City of Janesville, 630 F.2d 1254 (7th Cir. 1980) (Chief of Police); Levesque v. State of Me., 587 F.2d 78 (1st Cir. 1978) (Maine Commissioner of Manpower).  District courts in this Circuit have reached the same conclusion.  See, e.g., Nichols, 18 F. Supp. 2d at 2, 4 (Chief of Information Management Systems, Office of Inspector General); Burns v. GAO Empl. Fed. Credit Union, Civ. No. 88-3424, 1988 WL 134925, at **1, 2  (D.D.C. Dec. 2, 1988) (President of Credit Union Board of Directors).  Where the overwhelming weight of judicial authority has measured the loss of singular positions like state Commissioner of Manpower or Chief of Police and found their loss not to be irreparable, there is no reason why Plaintiff's position should be any different.[3]

Turning to Plaintiff's third purported distinction, his apparent suggestion that he is "likely" to suffer irreparable injury absent interim reinstatement or continuation because "the Library will likely argue that sovereign immunity bars Col. Davis' right to obtain back pay and other monetary relief from the Library for lost pay during the period of the lawsuit," Pl.'s Mem. at 39, falls far short of the mark required to establish irreparable harm.  To begin with, Plaintiff ignores the plain language of the Back

---

[3]  Insofar as Plaintiff cites Johnson v. Bergland, 586 F.2d 993 (4th Cir. 1978), to suggest otherwise, he is incorrect.  The result reached in Johnson – that the loss of the plaintiff's position as state director for the federal Farmers Home Administration was irreparable absent interim reinstatement, 586 F.2d at 995 – is an obvious outlier in light of the results discussed supra.  It is also wrong.  For obvious reasons, vacancies in positions like Chief of Police ought to be timely filled, either on an acting or official basis.  Yet the discharged incumbent cannot show irreparable injury absent interim reinstatement for that reason alone.  That is because no judicial remedy must be perfect; for example, reinstatement into a comparable position represents an adequate equitable remedy in the employment context.  See, e.g., Ohal v. Bd. of Trustees of the Univ. of the Dist. of Columbia, 100 Fed. App'x 833, 835 (D.C. Cir. 2004) (placement of high-level senior administrator in "comparable" position following trial court reinstatement order proper).

Pay Act, which makes clear that back pay is available where an "appropriate authority" determines that an employee was affected by an "unjustified or unwarranted personnel action" that resulted in "the withdrawal or reduction of his pay." 5 U.S.C. § 5596. To the extent Plaintiff suggests that the Act would not apply here if he were to prevail at judgment, he appears to be conflating the government's waiver of sovereign immunity for back pay with the broader issue of subject matter jurisdiction. As to the waiver of sovereign immunity for back pay, the Supreme Court in United States v. Testan, made clear that the Back Pay Act waives sovereign immunity for back pay under limited circumstances. 424 U.S. 392, 405-06, 407 (1976). And the Back Pay Act itself plainly applies to employees of the Library of Congress. 5 U.S.C. § 5596(a)(3).[4]

Almost as importantly, Plaintiff's back pay argument on its face represents an odd example of naked conjecture, equating "irreparable injury" with not just one but two speculative leaps: (1) that we will assert that particular argument; and (2) that we would prevail if we in fact do so. For that reason alone, the argument fails. As explained most recently by the Supreme Court in Winter, a plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction," and not simply a mere "possibility." 129 S. Ct. at 375 (emphasis in original). If the most Plaintiff can offer in this respect is conjecture that we might oppose a request for back pay on sovereign immunity grounds, such speculation is far closer to "possibility" than it is to "likelihood," and thus fails under Winter. In that regard, it is telling that Plaintiff apparently is unwilling to state outright that back pay would be unavailable to him if he is ultimately reinstated. If Plaintiff lacks the conviction to unequivocally make an argument that might suggest some irreparable injury – choosing instead to simply speculate as to what the government might argue – the Court should not make it for him.

---

[4] On the other hand, this waiver would not apply where applicants had merely sought jobs or promotions, since in such a case their pay would not have been subjected to "withdrawal or reduction." See Clark v. Library of Congress, 750 F.2d 89 (D.C. Cir. 1984) (no waiver of sovereign immunity where Plaintiff challenged failure to promote and sought damages).

As to the broader question of subject matter jurisdiction, the relevant inquiry is not whether the Court would have jurisdiction over Plaintiff's request for back pay, but whether there is a basis for jurisdiction over Plaintiff's case at all. If Plaintiff had administrative remedies available to him under the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 111 (codified in scattered sections of 5 U.S.C.), this Court would not possess subject matter jurisdiction to consider his constitutional claim until he had exhausted those remedies. See, e.g., Steadman v. Governor, United States Soldiers' and Airmen's Home, 918 F.2d 963, 967, 968 (D.C. Cir. 1990). Moreover, the Supreme Court made clear in United States v. Fausto that the comprehensive scheme created by the CSRA precludes bringing a cause of action based on other statutes such as the Back Pay Act and the Tucker Act, 28 U.S.C. § 1491. Fausto, 484 U.S. 439, 454-55 (1988). The unavailability of remedies under the CSRA, however, is unrelated to the issue of the government's waiver of sovereign immunity for back pay. Rather, what is relevant is whether there is a basis for jurisdiction here in the first place. Indeed, perhaps that is the most important concern for Plaintiff – that he has not provided a basis for subject-matter jurisdiction.

2.    **PLAINTIFF'S FIRST AMENDMENT ALLEGATIONS DO NOT REPRESENT THE "GENUINELY EXTRAORDINARY SITUATION" REQUIRED TO ESTABLISH IRREPARABLE INJURY IN THIS EMPLOYEE DISCHARGE CASE.**

Moving beyond Plaintiff's unsuccessful efforts to escape the binding authority of Sampson, his allegations of First Amendment violations likewise fail to transform his discharge – or the impending end of his temporary appointment – into the hypothetical "genuinely extraordinary situation" that might suggest irreparable injury. Plaintiff attempts to effect such a transformation chiefly by invoking Elrod v. Burns, 427 U.S. 347 (1976), to suggest that "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" Pl.'s Mem. at 41 (quoting Elrod, 427 U.S. at 373). But as the D.C. Circuit has held, that notion is no longer applicable in the context of employee free speech claims, to the extent it ever was. Nat'l Treasury Employees Union v.

United States, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991) (no irreparable injury where speech is not curtailed). As the D.C. and other circuits have emphasized, the mere claim of a First Amendment violation does not satisfy the irreparable harm requirement in an employee speech case. See id.; see also, e.g., Bennett v. Lucier, 239 Fed. App'x 639, 640-41 (2d Cir. 2007); Schrier v. Univ. of Colo., 427 F.3d 1253, 1266-67 (10th Cir. 2005); Hohe v. Casey, 868 F.2d 69, 72-73 (3d Cir. 1989); Savage v. Gorski, 850 F.2d 64, 67-68 (2d Cir. 1988); Am. Postal Workers, 766 F.2d at 721. Rather, to satisfy the requirement in a case such as this, Plaintiff must establish that a discharge "pending the outcome of the case would have a chilling effect on [his] First Amendment rights," Am. Postal Workers, 766 F.2d at 721, or, put differently, that the injunction he seeks "'will prevent the feared deprivation of free speech rights.'" Chaplaincy of Full Gospel Churches, 454 F.3d at 301 (quoting Bronx Household of Faith v. Bd. of Educ., 331 F.3d 342, 349-50 (2d Cir. 2003)). That Plaintiff cannot do.

As a matter of logic, an injunction temporarily reinstating Plaintiff pending the outcome of this suit would have no preventive or ameliorative effect at all on any alleged chilling of his or any other person's right to speak. As the Second Circuit explained in American Postal Workers:

> [W]e fail to understand how a chilling of the right to speak or associate could logically be thawed by the entry of an interim injunction, since the theoretical chilling of protected speech . . . stems not from the interim discharge but from the threat of permanent discharge, which is not vitiated by an interim injunction.

766 F.2d at 721. That is precisely the case here. As to Plaintiff, he has already been disciplined for his demonstrated failure of professional judgment through the decision to discharge him; no speech he makes now or in the future can change what has already happened, so he has nothing to fear in that regard. Thus, there is no pending action "chilling" his speech, and nothing that can be done to "thaw" a chilling effect that does not exist. Id. Likewise, if anyone else's speech has been chilled – and there is no admissible evidence suggesting that it has – the source of such chill is the permanent loss of Plaintiff's position. Id. For that reason, reinstating (or continuing) Plaintiff pending resolution of the

case would do nothing to abate such an effect; the only relief that conceivably might accomplish that objective would be that provided pursuant to a final judgment.  Savage, 850 F.2d at 67-68.

As a final matter, Plaintiff's apparent suggestion that CRS employees' speech is being "separately" chilled by CRS' allegedly vague and unconstitutional policy on outside speech, Pl.'s Mem. at 41, is irrelevant to the disposition of his motion for injunctive relief.  While Plaintiff's complaint includes a claim challenging CRS' policy, his motion does not seek an injunction enjoining or otherwise affecting the policy or its enforcement.  See Pl.'s Mot. at 1-2.

**II.     PLAINTIFF HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS AS TO ANY OF HIS THREE CLAIMS.**

To obtain temporary injunctive relief, a movant must also establish that he is likely to succeed on the merits of his suit.  Plaintiff has failed to make this showing as to any of his three claims.

**A.     PLAINTIFF HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON HIS FIRST AMENDMENT RETALIATION CLAIM.**

Plaintiff's first claim is that he was terminated in retaliation for his opinion pieces, in violation of the First Amendment.  The reason he is likely to succeed on the merits of this claim, he contends, is that under the balancing test originally set forth in Pickering v. Board of Education of Township High School District 205, Will County, 391 U.S. 563 (1968), his interest as a citizen in articulating such speech outweighs CRS' interest as his employer in promoting the efficiency of the public services it provides through its decision to remove him.  As we explain below, he is wrong on both counts.

**1.     CONTRARY TO PLAINTIFF'S CHARACTERIZATION, HIS TERMINATION WAS BASED UPON A SERIOUS AND SUSTAINED FAILURE OF PROFESSIONAL JUDGMENT RATHER THAN THE CONTENT OF HIS OPINION PIECES.**

As a factual matter, Plaintiff is incorrect:  He was not terminated because he wrote publicly on a matter of public concern, or because of the content of his writings.  To the contrary, the decision to separate Plaintiff prior to the end of his probationary period was based on a compressed sequence of

events that demonstrated a sustained failure of professional judgment – a failure particularly critical in

a policy-level member of CRS' senior leadership team.   In chronological order:

- Plaintiff intentionally subverted an internal CRS policy governing authorship attribution for interns on official publications to see if he could get away with it, for which he was verbally counseled in October 2009.  Mulhollan Decl. ¶ 39.

- Plaintiff upbraided a highly tenured Associate Director by e-mail disseminated among other CRS senior managers on October 20, 2009, accusing him of trying to confer "dictatorial authority" upon himself and suggesting that he was "intractable in [his] view" regarding the policy under discussion, for which Plaintiff was also verbally counseled in October 2009.  Id. ¶ 40.

- Plaintiff published the afore-mentioned Wall Street Journal and Washington Post opinion pieces, a pair of actions in which he intentionally flouted CRS policy and as to which he failed to provide Director Mulhollan a "heads up" until a 7:34 p.m. e-mail on November 10 – several hours after an in-person meeting with Director Mulhollan and after the Wall Street Journal op-ed had already appeared on-line.  Id. ¶ 43.

- Plaintiff asserted in his 7:34 p.m. November 10 e-mail to Director Mulhollan that neither opinion piece "has any connection to CRS," ignoring that detainee legal issues in general and military commissions in particular are a significant part of the Congressional agenda, and thus a significant part of CRS' public mission, and that Plaintiff himself was closely involved in CRS' work on such issues.  Id. ¶¶ 43-44.

- Plaintiff asserted in a November 11 e-mail to Director Mulhollan that he had "no desire to get into a back and forth e-mail debate" regarding CRS' speech policy, but that he believed Director Mulhollan's ideal policy is one in which "no one from CRS expresses an opinion in public."   Director Mulhollan counseled Plaintiff for the tenor of this response, emphasizing that he could not tolerate unprofessional conduct by his senior managers.  Id. ¶ 45.

- In a meeting on November 12, 2009, between Plaintiff, Director Mulhollan, and Acting Deputy Director Richard Ehlke, Plaintiff refused to acknowledge Director Mulhollan's view that his actions in publishing the opinion pieces and ignoring CRS policy on outside writing could impair CRS' reputation for objectivity and reiterated the views expressed in his November 10 e-mail to Director Mulhollan.  Id. ¶ 51.

As indicated by that chronology, the publication of Plaintiff's two opinion pieces did not trigger

the decision to separate him; it was Plaintiff's entire course of conduct that prompted that decision.

Plaintiff flatly refused to even consider that his conduct might have represented a failure of professional

judgment.  Id. ¶ 52.  Plaintiff reacted to his subsequent formal admonishment with disrespect – even

outright contempt – toward Director Mulhollan, and the latter concluded that Plaintiff's judgment was clearly lacking.   Id.   Taken cumulatively, Director Mulhollan determined that Plaintiff should be separated based on the failure of judgment his escalating actions had demonstrated.   Id.

**2.   PLAINTIFF'S SEPARATION WITHSTANDS FIRST AMENDMENT SCRUTINY BECAUSE HIS FAILURE OF JUDGMENT VIOLATED THE GREATER "BURDEN OF CAUTION" GOVERNING HIS SPEECH AS A POLICY-LEVEL CRS OFFICIAL.**

As a legal matter, Plaintiff is likewise unlikely to succeed on the merits.   As explained above, Plaintiff was separated not for his speech but for his failure of professional judgment.   That said, the First Amendment aspect of the foregoing sequence is not inconsiderable:  Defying both CRS policy and the common sense expected of a senior, policy-level official – a lawyer, no less – Plaintiff published two opinion pieces that, inter alia, criticized current and former public officials by name and in one instance accused the former Attorney General of "fear-mongering worthy of former Vice President Richard B. Cheney."   Accordingly, we must resort to the Pickering balancing test to explain why the interests of CRS in preserving its objectivity outweigh the interests of Plaintiff in making such speech, although the Pickering test is not a perfect fit in a factual sense.[5]

**a.   UNDER THE PICKERING ANALYSIS, POLICY-LEVEL EMPLOYEES BEAR A GREATER "BURDEN OF CAUTION" AS TO THEIR SPEECH.**

As subsequently elaborated by the Supreme Court, the Pickering balancing test has four elements.   First, the public employee must have been speaking on a matter of public concern.   If the speech is not of public concern, "it is unnecessary . . . to scrutinize the reasons for [the] discharge," at least "absent the most unusual circumstances."   Connick v. Myers, 461 U.S. 138, 146-47 (1983).

---

[5]  Plaintiff would have the Court believe that his separation was based solely upon the publication of his opinion pieces.   But as the sequence of events demonstrates, it was instead a sustained pattern of poor judgment that precipitated his separation.   The First Amendment is only implicated by a portion of those constituent incidents.   Some did not constitute speech at all; some constituted speech on personnel matters specific to Plaintiff or internal to CRS.   In those instances, the speech at issue is not subject to the heightened protections set forth in Pickering and its progeny, but rather scaled-back protections applicable to such speech.

Second, the Court must balance the interests of the employee, "as a citizen, in commenting upon matters of public interest and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.  Third, the employee must prove that his speech was a substantial or motivating factor in his discharge.  Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  Finally, the government employer must be afforded an opportunity to prove that it would have reached the same decision even absent the protected conduct. Id.  The first and second inquiries are questions of law for the Court to resolve.  Connick, 461 U.S. at 148.  The third and fourth are questions of fact ordinarily left to the finder of fact to resolve.  Hall v. Ford, 856 F.2d 255, 258 (D.C. Cir. 1988).

The critical Pickering element here is the second, the strength of the government's interest weighed against Plaintiff's interest in making the speech at issue.[6]  Here, courts must consider "'whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" Hall, 856 F.2d at 260 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)).  In short, this element "'focuses on the effective functioning of the public employer's enterprise.'" Id. (quoting Rankin, 483 U.S. at 388).  Importantly, "[a]lthough unadorned speculation as to the impact of speech, whether public or private, on the government's enterprise will not suffice under Rankin and [Am. Postal Workers Union v. U.S.P.S., 830 F.2d 294, 303-04 & n.12 (D.C. Cir. 1987)], neither case forbids us from drawing reasonable inferences of harm from the employee's speech, his position, and his working relationship with his superior." Id. at 261.[7]  "Connick, for example, recognized that the employer need

_____

[6]  In responding to Plaintiff's motion, we do not address the first, third, or fourth Pickering elements; we reserve the right to address these factors at a later stage of this litigation.

[7]  Plaintiff's single citation to Hall v. Ford, see Pl.'s Mem. at 15, is frankly misleading. According to Plaintiff, that decision supports the proposition that "'[U]nadorned speculation as

not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" Id. (quoting Connick, 461 U.S. at 152). "Just as the employer may be permitted to infer these untoward consequences from the content, manner, time, and place of the employee's speech, so may we." Id.

Of particular significance here, "the higher the level the employee occupies, the less stringent the government's burden of proving interference with its interest." Id. (citing Rankin, 483 U.S. at 390). A higher level employee bears a greater "'burden of caution'" as to his or her speech, depending upon "'the extent of authority and public accountability the employee's role entails.'" Id. (quoting Rankin, 483 U.S. at 390). That stands in sharp contrast to the relative burdens in the case of lower level employees: "'Where [] an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful function from that employee's private speech is minimal.'" Id. (quoting Rankin, 483 U.S. at 390) (emphasis added in original). The basis for this distinction between high- and low-level governmental employees is self-evident: "High-level officials must be permitted to accomplish their key organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims; this is true whether or not those officials are elected." Id. at 263. Put differently, "[f]or this narrow band of relationships" between high-level employees and their superiors, "refusing to grant First Amendment found tenure would seem to take away little freedom not already lost in accepting the appointment itself. . . ." Id. (quoting Gonzales v. Benavides, 712 F.2d 142, 148 (5th Cir. 1983)).

―――――――――――――――

to the impact of speech,' however, is not enough to justify suppressing Col. Davis's speech." Id. (citing Hall, 856 F.2d at 261). Plaintiff's selective parsing omits the main thrust of that passage – that courts are permitted to "draw[] reasonable inferences of harm from the employee's speech, his position, and his working relationship with his superior." Hall, 856 F.2d at 261; see also supra text accompanying this Note (quoting entire sentence).

      **b.**    **AS A CRS ASSISTANT DIRECTOR, PLAINTIFF WAS A POLICY-LEVEL EMPLOYEE SUBJECT TO A HIGHER STANDARD OF CAUTION AS TO HIS PUBLIC SPEECH.**

In his erstwhile capacity as Assistant Director, Plaintiff fell squarely within the "narrow band" of relationships described in <u>Hall</u> that is subject to a "greater burden of caution" as to outside speech. <u>See id.</u> at 262. Three main inquiries guide the Court in determining whether an employee resides within that category. First, the Court must ask "whether the employee's position relates to an area as to which there is room for principled disagreement on goals or their implementation. . . . In other words, is it a <u>policy</u> area?" <u>Id.</u> at 264 (citing <u>Nekolny v. Painter</u>, 653 F.2d 1164, 1170 (7th Cir. 1981)) (emphasis in original). If so, the Court must next ask "whether the office gives the employee broad responsibilities with respect to policy formulation, implementation, or enunciation. Put differently, was the individual a <u>policy</u> <u>level</u> employee?" <u>Id.</u> (emphasis in original). Finally, if both those criteria are met, the Court must ask "whether the government interest in accomplishing its organizational objectives through compatible policy level deputies is implicated by the employee's speech. At a minimum, the employee's speech must relate to policy areas for which he is responsible." <u>Id.</u> (citing <u>Gonzales v. Benavides</u>, 774 F.2d 1295, 1302 (5th Cir. 1985)). Importantly, the Court must not restrict its analysis to the particular employee, but rather must also "focus on the powers inherent in the office, even if a particular incumbent has not exercised all of his authority." <u>Id.</u> (citing <u>Jimenez Fuentes v. Torres Gaztambide</u>, 807 F.2d 236, 241-42 (1st Cir. 1986) (<u>en banc</u>)). In light of those factors, Plaintiff clearly occupied a policy-level position subject to a greater burden of caution regarding public speech.

First, Plaintiff's former position plainly relates to areas in which there is substantial "room for principled disagreement on goals or their implementation." Assistant Directors might disagree with one another on how to plan, direct, and evaluate the research and analysis produced by CRS to best ensure that they meet the legislative needs of Congress. Mulhollan Decl. ¶ 14. Likewise, they might disagree as to the priorities, goals, and policies of CRS itself. <u>Id.</u> In fact, this quality is built into the senior

management structure, as each Assistant Director serves as a formal member of CRS' Research Policy Council, which focuses on research and administrative policy within CRS. Id. The Director depends upon this quality as well, relying on each Assistant Director to serve as one of his chief advisors, counseling him on "all aspects of the research management and operations of their respective divisions of CRS, and recommending specific policies and procedures for improving the Service's overall quality, efficiency, and effectiveness." Id. The inter-management debate on CRS' policy of authorship attribution for interns and Assistant Directors is one example of this. See id. ¶ 15. That there was substantial room for principled disagreement on that discrete topic was obvious from the debate that it produced – and, unfortunately, from the tone that Plaintiff took when he accused the Associate Director of Research of trying to confer "dictatorial authority" upon himself and suggested that he was "intractable in [his] view" regarding the policy under discussion. Id. Thus, as with the plaintiff in Hall, 856 F.2d at 264, Plaintiff's position relates to a policy area.

Second, Plaintiff's duties as Assistant Director were sufficiently extensive to qualify him as a policy-level employee. The "relevant indicia" of policy-making authority include: "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." Id. (citing Jimenez Fuentes, 807 F.2d at 241-42). Virtually all are present here. Because of their varied responsibilities within CRS, "it is difficult to concisely summarize [Assistant Directors'] duties." Mulhollan Decl. ¶ 14. However, they include serving as CRS' direct liaison to Congress, Davis Decl. ¶ 17; Mulhollan Decl. ¶ 28, including speaking on behalf of the Director where warranted, Mulhollan Decl. ¶ 28; providing firsthand counsel to the Director and "substantial input into the creation of CRS policies and procedures," id. ¶ 27; supervising and reviewing the work product of analysts and experts within their divisions, id. ¶ 14; and collaborating in and providing peer review for the substantive work of other divisions, id. ¶¶ 10-13;

32

Davis Decl. ¶ 25.  Plaintiff, like the other Assistant Directors, was responsible for explaining and enforcing CRS's policies within the ranks of his division, including Library regulations and CRS policy governing outside speaking and writing.  Mulhollan Decl. ¶ 18.  And, like the other Assistant Directors, Plaintiff was paid at a Senior Level salary.  Id. ¶ 25.

Finally, CRS' interest in ensuring continued adherence to its core values of objectivity and non-partisanship – and in protecting its reputation in that regard – was directly threatened by Plaintiff's conduct, including his public actions contravening its outside speech policy.  Setting aside Plaintiff's conduct toward Director Mulhollan after the publication of his opinion pieces, his public speech directly implicated CRS' "interest in accomplishing its organizational objectives through compatible policy level deputies."  Id. at 264.  Plaintiff's own primary argument here – that his statements had nothing to do with his "official" duties at CRS – illustrates the degree to which his speech and his demonstrated views regarding its propriety implicated the Service's interests.  Contrary to Plaintiff's suggestion, the work of CRS is not divided among subject matter areas having little or nothing to do with one another.  Rather, CRS is "intensely collaborative," a quality required by the nature of its work:

> Constant inter-divisional interaction on legislative issues pending before Congress is critical to comply with CRS' statutory mandate.  Indeed, it would be negligent on the part of our analysts and attorneys were they not to collaborate with one another on these issues in all aspects of their work, including written analyses and oral briefings for Members and staff [of Congress].

Mulhollan Decl. ¶ 10.  This is particularly the case with issues of detainee treatment and prosecution: policy aspects usually handled by FDT and legal aspects usually handled by ALD are "so intertwined as to be inseparable."  Id. ¶ 11. This fact is reflected in formal working groups that involve members of both divisions.  Id. ¶¶ 12-13.  Indeed, Plaintiff regularly consulted with ALD on detainee issues throughout his tenure, including providing pre-publication review for ALD reports. Id. ¶¶ 49.  Plaintiff even cited some of his efforts in that regard in the self-assessed performance rating that he prepared for Director Mulhollan's review and signature prior to his six-month evaluation, noting as one of his

achievements that had "peer reviewed several ALD products and assisted them in making contact with relevant outside parties." Id. From all of this, it is clear that Plaintiff's views as to how CRS, in particular its senior managers, should operate in public were at odds with those of Director Mulhollan.

c.     PLAINTIFF'S FAILURE OF JUDGMENT VIOLATED THE GREATER
BURDEN OF CARE ATTENDANT UPON HIS PUBLIC SPEECH AS A CRS
ASSISTANT DIRECTOR, AND THUS JUSTIFIED HIS SEPARATION.

Given Plaintiff's actions and his role as a policy-level member of CRS' inner management circle, CRS was justified in reaching the decision to separate him for his failure of judgment precisely when it did. As the Supreme Court recognized in Connick, CRS was not required to "allow events to unfold to the extent that disruption of the office and the destruction of working relationships is manifest before taking action." Connick, 461 U.S. at 152; Hall, 856 F.2d at 260. That is especially so because of Plaintiff's role as one of the approximately dozen highest level officials in the Service. As a member of that circle, Plaintiff bore a greater "burden of caution" in his public speech, Hall, 856 F.2d at 261, and was required to be loyal, cooperative, and willing to carry out Director Mulhollan's policy choices as Director, id. Thus, CRS did not have to wait until it was waist-deep in evidence that its reputation for objectivity was broken, or that its analysis and research were no longer reliable. Id. Given a clear indication that Plaintiff lacked the judgment to understand and fulfill his role as one of CRS' senior leaders, and that his willingness to execute Director Mulhollan's policies was in serious doubt, CRS was entitled to act before the situation became a full-blown internal crisis. Id.

The district court decision in Nabav-Safavi v. Broadcasting Board of Governors, 650 F. Supp. 2d 40 (D.D.C. 2009), does not undermine that conclusion. In Nabav-Safavi, the Broadcasting Board of Governors ("BBG") for the Voice of America ("VOA") network terminated the contract it had with the plaintiff, an Iranian-born U.S. citizen who had contracted to provide translation services for Persian language VOA affiliates, on the basis of her participation outside of work in an internet music video protesting the Iraq War. Id. at 46. Ruling on a motion to dismiss brought by several individual

34

defendants, the court held that the plaintiff's complaint as pleaded stated a claim under the First Amendment and ruled that the individual defendants were not shielded by qualified immunity. Id. Plaintiff here cites the court's decision for the proposition that CRS has a "high burden of justifying its interest in suppressing [Plaintiff's] speech" because his speech ostensibly involved "a matter of immense public concern . . . unrelated to his work." Pl.'s Mem. at 25. But there are at least two distinctions between Nabav-Safavi and this case that render the former decision inapposite.

First, it is apparent that the court in Nabav-Safavi found the plaintiff's speech there, at least as pleaded, to be completely unrelated to her work, a position the defendants did not dispute in their Rule 12(b)(6) motion. Nabav-Safavi, 650 F. Supp. 2d 47. Here, by contrast, Plaintiff's two opinion pieces concerned detainee policy, a subject within his personal expertise and one within his former duties as Assistant Director as well. Mulhollan Decl. ¶ 49. Indeed, his continued insistence that his "official" duties as the Assistant Director for FDT had nothing to do with detainee policy – thus rendering him in his view free to opine publicly on such issues with no concern for CRS policy – was part of the reason that Director Mulhollan lost confidence in his professional judgment. Id. ¶¶ 47-51. Plaintiff's overly narrow focus on what matters fell within his "official" duties fundamentally misconstrues the nature of his former position, in particular the breadth of his duties and the collaborative mandate under which he, like all Assistant Directors, was required to operate. Id. ¶ 49.

Second, Plaintiff's reliance on Nabav-Safavi ignores the crucial distinction between his role at CRS and hers at VOA: that of a non-policy, low-level contractor whose sole duty was the provision of translation services. 2009 WL 2849069. That difference is critical to the First Amendment calculus. As explained previously, "'[w]here [] an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful function from that employee's private speech is minimal.'" Hall , 856 F.2d at 261 (quoting Rankin, 483 U.S. at 390) (emphasis added in original). Thus, through the limited prism of the pleadings in Nabav-Safavi, it was apparent that the plaintiff's

employers had a significantly lower interest in regulating her outside speech. By contrast, Plaintiff here, as a higher level employee, bears a much greater "burden of caution" as to his speech. Hall , 856 F.2d at 261. By virtue of his senior role at CRS, Plaintiff's speech presented a much more significant danger to the successful function of his employer than did that of the plaintiff in Nabav-Safavi.

One last point. Plaintiff points to his previous public outspokenness on military detainee and related issues and argues that, in light of that fact, CRS's organizational interests could not possibly be threatened by similar outspokenness after he came on board as an Assistant Director. He seems to suggest that either: (1) CRS should not have hired him to begin with based on his previous outspokenness on matters within CRS' purview; or (2) once CRS did hire him, he was entitled to remain just as free as he had been before to speak on those matters notwithstanding CRS' statutory role, its core principles, or its policies. He is wrong. In an analogous context, that notion is like suggesting that outspoken trial lawyers should never be made judges because of their outspokenness or, if they are, that they must remain perfectly free to speak out on any matter of importance when not on the bench, whether it is pending before them or not. That is simply incorrect. When people accept new positions, they assume new responsibilities, must adhere to new standards of conduct, and must take their new organization's interests into account in their public conduct. Here, CRS did not at all shrink from hiring Plaintiff because of his prior speech and, in fact, believed that his prior experience made him well-qualified for the position. But once Plaintiff chose to join CRS, he accepted the responsibility of upholding its nonpartisan, objective mission both internally and publicly. And as a policy-level Assistant Director, that responsibility was only magnified. Hall, 856 F.2d at 260.

For all of those reasons, Plaintiff cannot demonstrate a substantial likelihood of success on the merits as to his First Amendment retaliation claim.

**B.**    **CRS'S POLICY ON OUTSIDE SPEAKING AND WRITING IS NOT UNCONSTITUTIONAL ON ITS FACE.**[8]

Not only is Plaintiff not likely to succeed on the merits of his unconstitutional-termination claim, but Plaintiff likewise cannot effectively argue that CRS' policy on outside speaking and writing, as a general matter, violates the First Amendment.  Plaintiff challenges CRS's policy by arguing that the policy:  (1) "prohibit[s] every CRS employee from commenting on any current public policy matter;" and (2) operates as an unconstitutional prior restraint on speech by requiring employees to receive prior approval.  See Pl.'s Mem. at 29.  These assertions, however, are factually incorrect.

First, CRS' policy does not "prohibit all CRS employees from engaging in future outside speaking or writing on certain subject matters."  Id.   To the contrary, CRS' policy is a nuanced and flexible instrument that attempts to strike the optimal balance between employees' First Amendment right to speak as citizens and the need to "promot[e] the efficiency of the public services" CRS performs with the help its citizen employees.  See Pickering, 391 U.S. at 568.  The policy does not contain any ban on outside speech on any subjects and has never been interpreted to contain such a ban.  In fact, CRS's policy includes precautionary measures such as disclaimers when employees are speaking or writing on "controversial" matters and encourages review by the CRS Review Office when outside speech may create an appearance of a conflict of interest.  These measures act as an alternative to any blanket ban, affording employees greater freedom to speak on issues of public concern without crippling CRS' ability to "provid[e] balanced, objective, unbiased support to Congress."  See CRS Policy p.2.

In addition, Plaintiff's argument that Director Mulhollan's comments and letter of admonishment to Plaintiff are an attempt to create a "new rule" banning "'any opinion'" on an issue

---

[8]  We note that because Plaintiff's request for a TRO or preliminary injunction does not involve seeking relief for any alleged action or policy other than his separation, his broader First and Fifth Amendment challenges, addressed here and in Part II.C, infra, are unnecessary to resolve for purposes of this motion.

"'on the congressional agenda'" is baseless.  See Pl.'s Mem. at 29-30.  Director Mulhollan's comments and the language of the letter of admonishment merely paraphrase of CRS' long-standing policy.

Second, Plaintiff argues that "[t]o the extent that CRS also insists that there is a policy requiring prior approval of all speech, or of certain speech, such as speech on high profile or controversial matters, that policy would be unconstitutional."  Id. at 30.  Although a rule that "forces a person to ask permission to speak bears a heavier presumption against constitutionality than one that merely penalizes people who have already spoken," U.S. v. Nat'l Treasury Employees Union, 513 U.S. 454, 468 (1995) ("NTEU"), CRS' policy does not require pre-approval of an employee's speech.  Again, the opposite is true.  CRS' policy clearly states that although it is "not a formal requirement," CRS "encourages all staff to submit draft outside writings to the Review Office[.]"  See CRS Policy p.1.  Thus, Plaintiff's argument that "if prior approval is required, the CRS leadership would have unfettered discretion," is entirely hypothetical, and need not be addressed by this Court.  Pl.'s Mem. at 30 (emphasis added).

Finally, Plaintiff's attempted application of the NTEU standard must fall along with their two factually incorrect assertions.  In NTEU, the Supreme Court addressed the constitutionality of a law that "broadly prohibit[ed] federal employees from accepting any compensation for making speeches or writing articles . . . even when neither the subject of the speech or article nor the person or group paying for it has any connection with the employee's official duties."  513 U.S. at 457 (emphasis added). There, in light of the "the sweep of [the law]" and the fact that the ban "chills potential speech before it happens," the Government burden was greater.  Id. at 466, 468.  This heightened burden has also been applied in cases where there is a prior restraint on speech.  See, e.g., Weaver v. U.S. Info. Agency, 87 F.3d 1429, 1440 (D.C. Cir. 1996).  But here, unlike the honoraria ban at issue in NTEU or the prior restraint in Weaver, CRS' policy does not contain any kind of blanket prohibition on speech or pre-approval process, and thus, it does not "chill[] potential speech before it happens" or act as a "wholesale

deterrent to a broad category of expression by a massive number of potential speakers." Id. at 467.

Thus, the heightened NTEU standard does not apply.[9]

### C. THE LIBRARY AND CRS' POLICIES ARE NOT UNCONSTITUTIONALLY VAGUE UNDER THE FIRST AND FIFTH AMENDMENTS.

Plaintiff argues that "[e]ven assuming CRS's termination of [Plaintiff] did not violate [his] free speech rights, it violated [his] entitlement to due process under the First and Fifth Amendments." Pl.'s Mem. at 31.  Plaintiff, however, cannot prevail under either Amendment.

The first issue in any due process analysis is whether the plaintiff even has a property or liberty interest protected by the Constitution.  Bd. of Regents v. Roth, 408 U.S. 564, 571 (1972).  The Constitution does not create property interests.  Rather, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law[.]"  Id. at 577.  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Id.  Only in such case must the Court determine whether the process afforded was sufficient.  See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001).

Plaintiff does not argue – nor can he – that he had a property interest in his former position.  As Assistant Director, Plaintiff was a probationary employee with no legitimate claim of entitlement to continued employment.  Thus, he cannot succeed on his Fifth Amendment due process claim.  See Perry v. Sinderman, 408 U.S. 593, 598 (1972) ("[Plaintiff] has yet to show that he has been deprived of an interest that could invoke procedural due process protection.  As in Roth, the mere showing that he was not rehired in one particular job, without more, did not amount to a showing of a loss of liberty.  Nor did it amount to a showing of a loss of property."); see also Gemmell v. FAA, 558 F. Supp. 918, 921

---

[9] Even if the Court disagrees, CRS' policy would still be constitutional.  See Part II.A.2.c, supra; see also Sanjour v. EPA, 56 F.3d 85, 91 (D.C. Cir. 1995) (difference between "facial" and "as-applied" challenge under Pickering /NTEU "largely irrelevant").

(D.D.C. 1982) (probationary employees "that may be dismissed for less than just cause do not have a property interest in continued employment that rises to a Constitutional level.").

That said, we recognize that "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons the government may not rely.  It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – especially, his interest in freedom of speech." Perry, 408 U.S. at 597.  Thus, even though Plaintiff may not have a property right in his job at CRS, Plaintiff's dismissal, "if carried out in retaliation for the exercise of his First Amendment rights," would violate the First Amendment.  Egger v. Phillips, 669 F.2d 497, 502 (7th Cir. 1982).

Yet, as we have already explained, that is not the case here.  The thrust of Plaintiff's argument is that Plaintiff was not "on notice" that he could be terminated for writing his opinion pieces because other employees who had engaged in outside writing and speaking on controversial matters were not discharged.  But this argument ignores a critical point in this case: Plaintiff was not separated for the opinion pieces.  Instead, he was terminated for a host of reasons, including his lack of judgment and ability to effectively carry out the duties of the Assistant Directorship.  See Part II.A.1, supra.[10]

Further, as the Supreme Court has held, "[t]he root of the vagueness doctrine is a rough idea of fairness.  It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing [policies] both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." Colten v. Ky., 407 U.S. 104, 100 (1957).  Plaintiff is not likely to succeed on the merits of any vagueness claim

---

[10] Even if the Court disagreed, CRS' actions did not violate the Constitution.  The point made in Perry v. Sinderman, that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests," is limited by Pickering's recognizing that "government has a legitimate interest in efficient operations." Hall, 856 F.2d at 262-63 (recognizing this limitation).  Accordingly, an employee may be discharged for speech where the decision to discharge was constitutionally sound under Pickering and its progeny.

because Plaintiff cannot show that CRS' policy failed to give him "'fair warning' that he could not express a public opinion on a controversial or political matter." Pl.'s Mem. at 31. Although CRS' policy is purposefully flexible to account for "a variety of human conduct," it is not so vague as to be "unfair," particularly for someone such as Plaintiff who was not only aware of the contours of the policy, but was also charged with clarifying and enforcing the policy for those in his division. Indeed, even though he was a policy-level senior manager, Plaintiff makes no showing that he ever suggested any revisions to this policy, a sharp contrast to his efforts to change other CRS policies such as that governing attribution of authorship on CRS reports. See Mulhollan Decl. ¶ 39.

With a clarity similar to the regulations at issue in Keefe v. Library of Congress, LCR 2023-3 unequivocally states that "[i]n speaking and writing on controversial matters, staff members are expected to disassociate themselves explicitly from the Library and from their official positions." LCR 2023-3, p.3; see also Keefe, 777 F.2d at 1573. CRS' policy provides additional clarification by: (1) stating that "[e]mployees must make it clear that the views expressed are theirs and do not represent the views of the Service," and by (2) providing a "sample disclaimer." The policy thus "give[s] fair warning of [any] proscribed conduct," – for example, speaking on a controversial issue related to an employee's work at CRS without a disclaimer. See Keefe, 777 F.2d at 1581. In addition, CRS' policy has a built-in mechanism for the provision of "fair notice:" the Review Office. Like the review process discussed in Keefe, "[w]hether self-initiated or initiated by others, this review procedure enables the employee to resolve any ambiguity about the reach of the regulation and to decide whether it will be applied to her proposed conduct." Id. For his part, Plaintiff did not add any disclaimer to his writings on an unarguably controversial topic, and his self-identification as the "former chief prosecutor for the military commissions" and "Morris Davis, Gainesville" clearly do not suffice under the policy. See Mulhollan Decl. ¶ 47. Nor did Plaintiff take advantage of the available review procedure prior to submitting his opinion pieces for publication. Indeed, Plaintiff concedes that he discussed whether to

provide an express disclaimer to his letter to the editor not with Director Mulhollan but with the opinion page editor of the Washington Post.  Davis Decl. ¶ 43.  Thus, Plaintiff should not now be permitted to challenge the alleged vagueness of a policy that he neither followed nor used to his benefit.

**III.**   **THE BALANCING OF HARMS FAVORS THE GOVERNMENT.**

As we have shown, Plaintiff has failed to demonstrate either irreparable injury or a substantial likelihood of success on the merits, making either form of injunctive relief he seeks here unwarranted. Irrespective of Plaintiff's showing as to those two factors, though, the injunctive relief he seeks – either interim reinstatement as Assistant Director or the indefinite continuation of his temporary appointment coupled with an order proscribing CRS from filling the vacant FDT position – would substantially harm CRS through the disruption of its internal personnel affairs, particularly in light of Plaintiff's former policy-level, managerial role.  Such harm would outweigh any countervailing harm to Plaintiff from a lack of interim relief.  Thus, Plaintiff's motion should be denied on the basis of this factor as well.

In an employee discharge case such as this, the Court "is bound to give serious weight" to the potentially disruptive effect of interim relief like that sought by Plaintiff.  Sampson, 415 U.S. at 83.  As Sampson emphasized, the government "has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'"  Id. (quoting Cafeteria and Restaurant Workers Union, Local 473, A.F.L.-C.I.O. v. McElroy, 367 U.S. 886, 896 (1961)).  By the same token, another district court within this Circuit has noted that it views as "compelling and insurmountable the institutional harm attendant to judicial interference with federal personnel actions," Farris, 453 F. Supp. 2d at 81 (citing Sampson, 415 U.S. at 83-84), while another has emphasized that granting interim injunctive relief to a plaintiff who "believed that his termination or involuntary separation was animated by discriminatory or retaliatory animus" would "paralyze[] [the federal government] from taking necessary personnel action."  Nichols, 18 F. Supp. 2d at 6.  Thus, the provision of interim injunctive relief "is appropriate

in the federal employment realm only when circumstances 'so far depart from the normal case.'" <u>Farris</u>, 453 F. Supp. 2d at 81 (citing <u>Sampson</u>, 415 U.S. at 92).

This is not such a case.  As we explained in Part I, <u>supra</u>, Plaintiff does not face a likelihood of irreparable injury absent either of the alternative injunctions he seeks.  More to the point here, the relative severity of any injury to Plaintiff is far less than that faced by CRS if he is ordered reinstated as Assistant Director or continued in his temporary appointment indefinitely.  The Seventh Circuit's decision in <u>Hetreed v. Allstate Insurance Co.</u>, though not a government employee discharge case, explained exactly why that is so in denying the plaintiff's motion for interim reinstatement to her former position as an audit manager:  "When deciding whether to grant interlocutory relief, a judge must compare the costs of false negatives (the injury caused by wrongly denying relief to someone who ultimately prevails on the merits) against the costs of false positives (the injury caused by wrongly granting relief to a plaintiff who ultimately loses the case)." 135 F.3d at 1158 (citing <u>American Hospital Supply Corps. v. Hospital Products Ltd.</u>, 780 F.2d 589 (7th Cir. 1986)).  In discharge cases, "false negatives" are not particularly costly given that damages and prejudgment interest compensate plaintiffs for what they have lost by being unemployed in the meantime.  <u>Id.</u>

By contrast, "false positives" can impose "substantial and irreversible" costs on the employer: "A reinstated employee who lacks the firm's confidence may draw a salary while contributing little work of value; the reinstated employee, especially one in a managerial capacity, actually may reduce the productivity of other employees." <u>Id.</u>  As in <u>Hetreed</u>, the balance of harms here weighs in favor of CRS.  We have previously documented the serious failure of professional judgment and the lack of respect for CRS policies and officials demonstrated by Plaintiff, a failure particularly problematic given his high-level role at CRS.  <u>See</u> Part II.A.2, <u>supra</u>.  On the other hand, Plaintiff has made no showing whatever that he faces any harm any greater that faced by any plaintiff in a federal employment

discharge case, much less that his circumstances 'so far depart from the normal case,'" <u>Farris</u>, 453 F. Supp. 2d at 81 (citing <u>Sampson</u>, 415 U.S. at 92), that interim relief might conceivably be proper.

At the end of the day, all Plaintiff has pointed to in arguing that the balance of harms favors him rather than CRS is that he has alleged claims under the First Amendment.  <u>See</u> Pl.'s Mem. at 43-44.[11] But neither of the two decisions Plaintiff cites to support that notion – <u>Watts v. Alfred</u>, 794 F. Supp. 431, 434 (D.D.C. 1992), or <u>Allen v. Autauga County Board of Education</u>, 685 F.2d 1302, 1305-06 (11th Cir. 1982) – suggests any principled reason why a plaintiff's allegations of conduct violating the First Amendment warrant a departure from the controlling authority of <u>Sampson</u>.  Plaintiff has failed to satisfy his burden as to this important question.

---

[11]  Plaintiff does suggest that CRS' decision to provide him a thirty-day temporary appointment as a special assistant to Director Mulhollan after his discharge as Assistant Director implies that any "friction" created by a potential interim reinstatement would be "minimal."  Pl.'s Mem. at 43.  That is incorrect.  There is no reasonable basis to infer from CRS' decision to provide Plaintiff a temporary appointment in a different position – an accommodation intended by CRS to assist Plaintiff and to ease his transition out of the Service – that his continued presence at CRS for an indefinite period would not impose "substantial and irreversible costs" upon the Service.  <u>See</u> <u>Hetreed</u>, 135 F.3d at 1158.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion for injunctive relief should be denied.

Dated: January 15, 2010                         Respectfully submitted,

                                                   TONY WEST
Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

JENNIFER R. RIVERA
Branch Director

SUSAN K. RUDY
OF COUNSEL:                            Assistant Branch Director

ELIZABETH A. PUGH
General Counsel                            _/s/ Christopher R. Hall_
EVELIO RUBELLIA                    CHRISTOPHER R. HALL
Associate General Counsel            DEANNA L. DURRETT
MEREDITH SKOWRONSKI         Trial Attorneys
Assistant General Counsel           U.S. Department of Justice
Office of the General Counsel        Civil Division
United States Library of Congress   Federal Programs Branch
101 Independence Ave, SE        P.O. Box 883
Washington, DC 20540           Washington, D.C.  20530

                                             (202) 514-4778