**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MORRIS D. DAVIS,

        Plaintiff,

        v.

JAMES H. BILLINGTON, in his official
capacity as the Librarian of Congress, and
DANIEL P. MULHOLLAN, in his individual
capacity,

        Defendants.

Case No. 1:10-cv-00036-RBW

---

**PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR A**
**TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A**
**PRELIMINARY INJUNCTION**

Aden J. Fine  (D.C. Bar No. 485703)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2693

Arthur B. Spitzer  (D.C. Bar No. 235960)
Frederick V. Mulhauser (D.C. Bar. No. 455377)
American Civil Liberties Union
  of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, D.C. 20036
(202) 457-0800

Jameel Jaffer
Alexander A. Abdo
National Security Project
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-7814

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... i

INTRODUCTION ................................................................................ 1

ARGUMENT ..................................................................................... 3

I.     COL. DAVIS IS LIKELY TO SUCCEED ON THE MERITS.................................. 3

   A. Col. Davis's Termination Is Unconstitutional Because the Library Has
      Not Shown Any Harm to CRS's Ability to Function. ...................... 3

      1. The Library Has Not Shown Any Harm to Its Interests. ................. 4

      2. The Declarations Submitted by Col. Davis Show that Col. Davis's
         Speech Would Not Have Harmed CRS's Interests.............................. 6

      3. The "Policy-Level Employee Exception" Does Not Apply. .......... 8

      4. CRS's Statutory Mandate Can Be Met Without Completely
         Silencing Its Employees.............................................. 10

      5. The Library Terminated Col. Davis for His Speech on a
         Matter of Significant Public Interest............................... 12

   B. CRS's Outside Speech Policy, as Interpreted, Violates the First
      Amendment............................................................. 13

   C. Col. Davis's Termination Violates Due Process. ........................... 14

      1. Col. Davis Did Not Have Fair Warning That His Speech Might
         Violate CRS's or the Library's Policies......................... 14

      2. CRS's Policy on Outside Speech Is Facially Vague.................... 18

II.    COL. DAVIS IS LIKELY TO SUFFER IRREPARABLE HARM ABSENT
       PRELIMINARY RELIEF.......................................................... 19

   A. Monetary Loss, When Likely Not Recoverable, Is Irreparable. .................. 20

   B. The Availability of Reinstatement Is Important Because of the
      Lack of Monetary Relief. .............................................. 21

   C. Col. Davis Did Not Delay in Seeking Relief for Irreparable Harm............... 22

D.  The Undisputed Evidence Establishes that Col. Davis's Speech
and the Speech of CRS Employees Are Presently Being Chilled. ................. 23

IV.     THE BALANCE OF HARDSHIPS WEIGHS IN COL. DAVIS'S FAVOR. ........... 24

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Adams v. Gunnell*, 729 F.2d 362 (5th Cir. 1984)...................................................................... 16, 17

*Am. Fed'n of Gov't Employees v. Loy*, 332 F. Supp. 2d 218 (D.D.C. 2004).................................. 5

*\*Am. Postal Workers Union v. U.S. Postal Serv.*, 830 F.2d 294 (D.C. Cir. 1987)......................... 4

*Bd. of Regents v. Roth*, 408 U.S. 564, 92 S. Ct. 2701 (1972) ...................................................... 16

*Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684 (1983)............................................................. 4

*Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165
  (D.C. Cir. 1969) ..................................................................................................... 3, 22

*Douglas T.V. Hi-Fi Stereo Ctr. v. U.S. Pioneer Elecs. Corp.*, Civ. No. 312-74, 1974 WL 860
  (D.D.C. Mar. 26, 1974).................................................................................................. 3

*Feinerman v. Bernardi*, 558 F. Supp. 2d 36 (D.D.C. 2008) ........................................................ 20

*Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006) ...................................................... 12

*Gately v. Massachusetts*, 2 F.3d 1221 (1st Cir. 1993) ................................................................ 20

*\*Grayned v. City of Rockford*, 408 U.S. 104, 92 S. Ct. 2294 (1972) ......................................... 18

*\*Hall v. Ford*, 856 F.2d 255 (D.C. Cir. 1988) .................................................................. 8, 9, 10

*Holt v. Continental Group, Inc.*, 708 F.2d 87 (2d Cir. 1983) .................................................... 24

*\*Keeffe v. Library of Cong.*, 777 F.2d 1573 (D.C. Cir. 1985) .............................................. passim

*Little v. Fenty*, Civil No. 09-2308, 2009 WL 4981535 (D.D.C. Dec. 15, 2009) ........................... 3

*Moore v. Consol. Edison Co.*, 409 F.3d 506 (2d Cir. 2005)........................................................ 24

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710 (1964).................................................. 11

*\*Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009)............ 4, 5, 10, 11

*Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005) ............................................................... 22

*\*O'Donnell v. Barry*, 148 F.3d 1126 (D.C. Cir. 1998)...................................................... 8, 9, 10

*\*Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 88 S. Ct. 1731 (1968)
  ............................................................................................................................ 8, 10, 24

*Rankin v. McPherson*, 483 U.S. 378, 107 S. Ct. 2891 (1987) ...................................................... 16

*Republican Party of Minn. v. White*, 536 U.S. 765, 122 S. Ct. 2528 (2002) ................................ 11

*Robinson v. Dist. of Columbia*, No. Civ. A. 97-787(GK), 1997 WL 607450 (D.D.C. July 17, 1997) ................................................................................................................................................ 25

*Roth v. United States*, 354 U.S. 476, 77 S. Ct. 1304 (1957), ...................................................... 11

*Sampson v. Murray*, 415 U.S. 61, 94 S. Ct. 937 (1974) ...................................................... 20, 24

*Taylor v. Resolution Trust Corp.*, 56 F.3d 1497 (D.C. Cir. 1995)................................................ 20

*\*Tygrett v. Barry*, 627 F.2d 1279 (D.C. Cir. 1980) ...................................................................... 13

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 93 S. Ct. 2880 (1973) .............................................................................................................................................. 12, 18

*\*United States v. Nat'l Treasury Employees Union* (*NTEU*), 513 U.S. 454, 115 S. Ct. 1003 (1995)................................................................................................................................................ 14

*Waters v. Churchill*, 511 U.S. 661, 114 S. Ct. 1878 (1994) ...................................................... 4, 8

*Waters v. Peterson*, 495 F.2d 91 (D.C. Cir. 1973)....................................................................... 17

*Watts v. Alfred*, 794 F. Supp. 431 (D.D.C. 1992) ........................................................................ 25

*Wolfel v. Morris*, 972 F.2d 712 (6th Cir. 1992) ........................................................................... 16

*Woody v. City of Dallas*, 809 F. Supp. 466 (N.D. Tex. 1992) ...................................................... 16

**Statutes and Regulations**

2 U.S.C. § 166(d) ............................................................................................................................ 11

LCR 2023-3, § 3(B) ........................................................................................................................ 19

**INTRODUCTION**

The Library's opposition is notable for what it does not do.  The Library does not dispute that plaintiff Colonel Morris Davis spoke on a matter of significant public interest.  It does not attempt to dispute the overwhelming evidence submitted by Col. Davis which establishes that there was no justification for terminating Col. Davis for writing the opinion pieces and that terminating him was completely contrary to the Library's past practice with respect to Col. Davis himself and other CRS employees.  Nor does it dispute that the public interest favors granting immediate relief.

Instead, the Library simply claims that:  (1) Col. Davis was not fired for his speech; (2) even if his speech played a part in the termination, his opinion pieces were grounds for termination because he allegedly is a high-level employee with virtually no free speech rights; and (3) there is no irreparable injury.  There is no factual or legal support for the Library's claims.

First, as the detailed discussion of the facts in Col. Davis's opening memorandum and Complaint make clear, the only reason Col. Davis was fired was because he wrote the opinion pieces.  It is undisputed that on November 10, 2009—the day before the pieces were published in the papers—Mr. Mulhollan told Col. Davis that he was doing a very good job and that others at CRS also liked him.  To now claim that Col. Davis's performance "deteriorated" well before the opinion pieces were published and that the opinion pieces were simply a small part of the decision to terminate him is disingenuous, at best, and contrary to the undisputed evidence.

Second, the Library's broad assertions about CRS's objectivity and non-partisan nature and Col. Davis's purportedly policy-level position betray a fundamental misunderstanding of circuit precedent.  High-level employees have fewer First Amendment rights only when their

public speech is critical of their employer or superiors, or contrary to their superior's policy choices, not, as here, where the speech does not mention the employer, their superiors, or the superior's policy choices.  Moreover, even if Col. Davis's speech had been about CRS, the Library, or Mr. Mulhollan, the Court still must weigh the balance between harm to the government's interest and the plaintiff and public's right to make and receive the speech at issue. Because of the public interest in hearing Col. Davis's view on this subject of immense public concern, and all of Col. Davis's evidence that his speech did not cause a disruption, Col. Davis would win this balance even if he were deemed to fall within this exception.

Finally, Col. Davis has demonstrated a likelihood of irreparable injury in the absence of immediate relief.  Where, as here, there is a significant possibility that Col. Davis will not be able to recover monetary relief even if he prevails on his claims, that loss of money constitutes irreparable injury.  In addition, Defendants' actions in attempting to deprive Col. Davis of his right to reinstatement by immediately hiring a permanent replacement for his position also demonstrate the requisite irreparable injury.  Moreover, contrary to the Library's claim, where, as here, Col. Davis has in fact shown that his and other CRS employees' First Amendment rights are presently being violated, irreparable injury is present.

Because the evidence establishes that Col. Davis is likely to prevail on his claims, that the public interest overwhelmingly favors the granting of immediate relief, and that Col. Davis will otherwise suffer irreparable injury whereas the Library will not experience any harm, the Court should grant the requested relief and issue an Order reinstating Col. Davis to his Assistant Director position or, in the alternative, prohibiting the Library from terminating his employment and hiring a permanent replacement for his position.

**ARGUMENT**

Immediate injunctive relief should be granted because Col. Davis satisfies each of the four factors favoring the grant of preliminary relief, and the Library has made no showing that such relief would harm it.  The Library does not even address one of the factors—the public interest—because the public interest in upholding the First Amendment overwhelmingly favors granting a preliminary injunction here.[1]  The Court should thus issue a preliminary injunction that maintains the status quo ante—"the last uncontested status which preceded the pending controversy."  *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969) (internal quotation marks omitted).  Here, the "last uncontested status" before Col. Davis's unconstitutional termination is that Col. Davis was an Assistant Director at CRS.  *See, e.g.*, *Douglas T.V. Hi-Fi Stereo Ctr. v. U.S. Pioneer Elecs. Corp.*, Civ. No. 312-74, 1974 WL 860, at *2-3 (D.D.C. Mar. 26, 1974) (reinstating plaintiff's status as a franchised dealer—the last peaceable status quo—in challenge to the termination of franchise agreement).[2]

**I.     COL. DAVIS IS LIKELY TO SUCCEED ON THE MERITS.**

> **A.     Col. Davis's Termination Is Unconstitutional Because the Library Has Not Shown Any Harm to CRS's Ability to Function.**

The Library concedes in its brief that (1) Col. Davis spoke as a private citizen on a matter of immense public concern, (2) the speech was the motivating or substantial factor for his dismissal, and (3) it would not have terminated him in the absence of the protected speech.  *See*

---

[1] That is significant because, under the sliding scale test employed by the D.C. Circuit, a particularly strong showing of one factor, combined with a showing of likelihood of irreparable harm, can warrant injunctive relief on its own. *See Little v. Fenty*, Civil No. 09-2308, 2009 WL 4981535, at *1 (D.D.C. Dec. 15, 2009).

[2] Col. Davis seeks, in the alternative, an injunction that maintains the current status quo by prohibiting the Library from discharging him after his 30-day temporary employment period and from permanently filling the Assistant Director position.

Opp. at 29 n.6.  Instead of challenging these prongs of the *Pickering* balancing test, the Library relies exclusively on its claim that his speech should be suppressed because Col. Davis was allegedly a policymaking employee.  The Library fails, however, to offer any evidence of actual or likely harm that warrants its actions.

The Library justifies its lack of evidence by citing to *Connick v. Myers*, yet ignores that *Connick* expressly warns that "a stronger showing" of harm is necessary where, as here, the employee's speech "substantially involved matters of public concern," 461 U.S. 138, 152, 103 S. Ct. 1684, 1692-93 (1983); *see also Waters v. Churchill*, 511 U.S. 661, 674, 114 S. Ct. 1878, 1887 (1994) (where a government employee has a "strong, legitimate interest in speaking out on public matters," the government "may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished").  Moreover, "[w]hat makes this case noteworthy is that plaintiff's speech was 'made outside the workplace[] and involved content . . . unrelated to [his] government employment.'"  *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 55 (D.D.C. 2009).  Neither the Supreme Court nor the D.C. Circuit has ever upheld a termination of a governmental employee based on speech on a matter of substantial public concern, made outside the office, and having nothing to do with the workplace.  *See id.*  This Court should not do so either—especially where the Library does not offer any evidence of harm and Col. Davis has provided overwhelming evidence to the contrary.

**1.     The Library Has Not Shown Any Harm to Its Interests.**

Because the Library has made no attempt to provide any evidence that Col. Davis's speech harmed CRS's interests, his termination cannot be justified under controlling precedent. *See* Pl.'s Br. at 15-16; *Am. Postal Workers Union v. U.S. Postal Serv.*, 830 F.2d 294, 304 (D.C. Cir. 1987) (rejecting claims of harm where there was "no evidence whatsoever, apart from a[n]

[employer's] opinion, that [the employee's] speech interfered with a legitimate government

interest").  Indeed, this Court has previously rejected similar claims of harm where the

government "speculatively assert[ed] that [its] interest . . . [is] endangered" without "com[ing]

forth with any affirmative evidence" that the speech interfered with the efficient functioning of

the office or discredited the employer.  *Am. Fed'n of Gov't Employees v. Loy*, 332 F. Supp. 2d

218, 230-31 (D.D.C. 2004) (Walton, J.).

 Although the Library argues that the Court may draw "reasonable inferences of harm,"

Opp. at 29, there are no such inferences to be drawn from Col. Davis's opinion pieces, which do

not mention CRS, the Library, or its employees or policies.  *See Navab-Safavi*, 650 F. Supp. 2d

at 59 (rejecting speculation that a Voice of America translator's neutrality and objectivity was

compromised by her music video criticizing the U.S. involvement in the Iraq War).  Nor were

the pieces directly related to Col. Davis's responsibilities for CRS.  Although the Library claims

that "Plaintiff himself was closely involved in CRS' work on ['detainee legal'] issues," Opp. at

27, the cited paragraphs in Mr. Mulhollan's declaration—¶ 43 and ¶ 44—say no such thing.

Regardless of whether CRS generally has a "collaborative" nature, the objective evidence shows

that Col. Davis and his FDT division did not have CRS responsibilities for military commissions

issues and that a separate division, the American Law Division, handled every single

Congressional inquiry, report, analysis and outreach to Congress on military commissions.  Pl.'s

Br. at 4-5; Dumbaugh Decl. ¶ 6; Davis Decl. ¶¶ 19-25, Exs. C-D.[3]

 Even if the Library were correct that Col. Davis's job involved matters related to military

commissions—which it did not—the Library has failed to explain why his clearly private speech

compromised CRS's ability to function.  Notably, the Library fails to refute Col. Davis's

---

[3] Col. Davis's peer review of ALD products was informal and was based purely on his experience as the Chief
Prosecutor.  *See* Pl.'s Br. at 5; Davis Decl. ¶ 25.

arguments that no harm could be said to result from his speech because:  (1) the Library rules

allow the speech; (2) past practice confirms that outside speech does not harm CRS; (3) previous

approval of Col. Davis's speech confirms that there is no harm; (4) the speech was non-partisan

and objective; and (5) CRS has continued to receive inquiries from Members of Congress from

both sides of the aisle regarding military commissions after Col. Davis's opinion pieces.  Pl.'s

Br. at 14-26.  These unrebutted reasons establish that there can be no reasonable inference of

harm to CRS from the opinion pieces.[4]

## 2. The Declarations Submitted by Col. Davis Show that Col. Davis's Speech Would Not Have Harmed CRS's Interests.

As against zero evidence offered from the Library, Col. Davis has submitted declarations

from five current and former well-respected and prominent CRS employees—with a collective

tenure of over 165 years at CRS—establishing that CRS would not be harmed by the opinion

pieces.  Four of these declarations describe similar experiences with outside speaking and writing

while employed at CRS:  all engaged in extensive outside speaking and writing in which they

took positions on policy questions, all benefited professionally from that writing, all viewed their

writing as compatible with their CRS obligations, all occasionally omitted express disclaimers,

but none were terminated for their speech.  The fifth confirms through his observations of over

thirty-three years that the experiences of these four seasoned CRS employees are representative

of the experiences of all CRS employees.  Thus:

- Louis Fisher worked at CRS from 1970 to 2006 as a specialist focusing on constitutional law.  Fisher Decl. ¶¶ 1, 4.  He authored numerous books and articles during his time there, routinely offered his opinion to Congress on controversial questions, and frequently submitted amicus briefs to federal courts, including the Supreme Court, on some of the most controversial issues of the day, including the military commissions.  *Id.*

---

[4] The Library also fails to respond to Col. Davis's arguments that: (1) there is no value to Congress of employing experts with no views or concealing their views, and (2) CRS employees should not be held to a higher standard than judges.

¶¶ 4, 6, 12-23, 25-32. That outside speech propelled Mr. Fisher to the rank of senior specialist in 1988, and it fostered trust in and reliance on his expert opinions and views by Congress. *Id.* ¶¶ 4, 10, 12-22, 25-32.

- Harold C. Relyea worked for CRS from 1971 until January 2009 as an analyst and a senior analyst in American National Government. Relyea Decl. ¶¶ 1, 3. During his tenure, he served as a supervisor of a staff section in his CRS division and as the Acting Assistant Chief of his division. *Id.* ¶ 5. He received numerous awards for his distinguished service, including, in 2008, the CRS Director's Award for "outstanding contributions in support of the United States Congress and to the mission of the Congressional Research Service." *Id.* ¶ 6. While at CRS, Mr. Relyea authored in excess of 300 books, articles, speeches and other texts, expressing publicly his stance on policy questions. *Id.* ¶ 17-18, 22. CRS never criticized his frequent outside speaking and writing, and it never argued that his speech compromised his ability to serve as an objective CRS employee. *Id.* ¶ 18. Although he often used disclaimers in his outside writing, Mr. Relyea did not always do so, and he was never disciplined in any manner for failing to do so. *Id.* ¶ 19.

- Kerry Dumbaugh was a specialist in Asian Affairs within the FDT Division from 1985 to December 31, 2009. Dumbaugh Decl. ¶ 1. She "was among the many analysts and employees of CRS who took part in outside speaking, and [her] career at CRS undoubtedly benefited from it." *Id.* ¶ 4. In her outside speech, she "often associated herself with CRS" without using a disclaimer to establish the source of her expertise. *Id.* ¶ 7. She was never admonished or disciplined for her outside speaking and writing, and she is not aware of any CRS employee who was terminated either for the content of his or her speech or for failure to use a disclaimer. *Id.* ¶¶ 5, 7.

- Morton Rosenberg was an attorney and a senior attorney in ALD from 1972 until August 2008. Rosenberg Decl. ¶ 1. He assisted individual members of Congress and congressional committees on legal issues of major importance. *Id.* ¶¶ 1, 3-4. In his close workings with Congress, Mr. Rosenberg was often critical of the House, of particular pieces of legislation, of congressional committees, and of the Executive itself. *Id.* ¶ 10. Mr. Rosenberg "often criticized public officials by name in the context of expressing [his] opinions on policy matters." *Id.* ¶ 15 (giving examples). He did all of this publicly, "with the full awareness and support" of CRS. *Id.* ¶ 10. Mr. Rosenberg received awards and commendations, not admonishments, for his work. *Id.* ¶ 9.

- Dennis Roth has been a specialist in Labor Economics at CRS since 1976, and he is the president of the Congressional Research Employees Association ("CREA"). Roth Decl. ¶ 1, 3. Based on his thirty-three years at CRS, Mr. Roth states that (1) CRS employees routinely engage in outside speaking and writing and express their opinions on matters of public policy, including controversial matters, *id.* ¶ 5-8; (2) this engagement is compatible with the duties of CRS employees, *id.*; and (3) CRS employees do not always include formal, express disclaimers in their outside speaking and writing, which, as a matter of practice, is "only necessary if employees are writing or speaking about matters directly related to their official CRS area of expertise *and* an association is made in the

writing or speech with CRS and their role at CRS," *id.* ¶ 17 (emphasis added).  Mr. Roth is not aware of any other CRS employee who has been terminated either for engaging in outside speaking or writing, or for doing so without an express disclaimer.  *Id.* ¶¶ 17-18.

These declarations "weaken[]" the Library's already unsupported claim that Col. Davis's speech harmed CRS's interests, as they show that outside speaking and writing by CRS employees on a variety of controversial topics of public interest, including in areas of official expertise, often without express disclaimers, have not harmed CRS's mission or ability to operate for nearly forty years.  *O'Donnell v. Barry*, 148 F.3d 1126, 1136 (D.C. Cir. 1998) (holding that the fact that two other employees who spoke on similar issues were not punished weakens the government's claim of harm).  Given this overwhelming evidence, the Library can claim no injury to its interest stemming from Col. Davis's speech, let alone the "substantial showing" necessary to outweigh Col. Davis and the public's First Amendment rights to express and hear his speech.  *Waters*, 511 U.S. at 674, 114 S. Ct. at 1887.

### 3.    The "Policy-Level Employee Exception" Does Not Apply.

Circuit precedent forecloses the Library's reliance on the "greater burden of caution" borne by policy-level employees to justify Col. Davis's termination.  Opp. at 28-36.  First, the policy-level employee principle does not apply to speech that is not critical of the employer. *Hall v. Ford*, the seminal circuit case on this point, held that the employee could be dismissed under the policy-level exception for speech that "reflect[s] a policy disagreement with his superiors such that they could not expect him to carry out their policy choices vigorously."  856 F.2d 255, 265 (D.C. Cir. 1988); *see also Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 570 n.3, 88 S. Ct. 1731, 1735 n.3 (1968) (contemplating situations in which "the relationship between superior and subordinate is of such a personal and intimate nature that *certain forms of public criticism* of the superior by the subordinate would seriously undermine

the effectiveness of the working relationship between them" (emphasis added)); *O'Donnell*, 148 F.3d at 1135 (holding that "it is especially disruptive for the high-level employees of a governmental agency to express public disagreement with the agency's policies"). Col. Davis did not criticize CRS's policy on military commissions, or its policy on any issue.

Second, under *Hall*, one of the inquiries before this exception applies is "whether the government interest in accomplishing its organizational objectives through compatible policy level deputies is implicated by the employee's speech," and for that, "[a]t a minimum, the employee's speech must relate to policy areas for which he is responsible." 856 F.2d at 264. Col. Davis's opinion pieces on military commissions did not relate to any "policy" areas for which he was responsible because CRS does not have a policy direction with respect to military commissions, and Col. Davis was not responsible for setting such non-existent policy. The Library claims that Col. Davis's position encompassed "policy areas" like deciding how to "plan, direct, and evaluate the research and analysis produced by CRS" or how to set "priorities, goals and policies of CRS." Opp. at 31. Col. Davis's opinion pieces did not relate to those purported policy matters. They did not criticize, or even comment on, CRS priorities, the direction of CRS research, or any other policy areas.

Third, the exception does not apply to policy-neutral agencies like CRS. The policy-level exception grew out of political patronage dismissal cases that reflected "the importance of allowing officials at the top of the organizational hierarchy to implement their policies through politically compatible deputies." *Hall*, 856 F.2d at 263. The *Hall* court found that the same concern applies in employee speech cases, adopting the reasoning that if the President is allowed to terminate a Deputy Secretary of Defense for being a member of the opposition party, he should also be able to terminate him for a public expression of policy contrary to his own. *Id.*

Having urged its interest in the political and policy neutrality of CRS, the Library cannot now turn around and argue that this exception should nonetheless apply.

Finally, although the policy-level employee doctrine "gives employers considerable leeway to ensure that high-level officials toe the party line, . . . it does not give them unchecked power to silence them." *O'Donnell*, 148 F.3d at 1137. "In some cases, the public interest in a high-level official's speech will outweigh any interest in that official's bureaucratic loyalty." *Id.* Although the Library insists that no balancing need even be done and that harm should simply be presumed to occur to it because of the high-level nature of Col. Davis's position, that is not the law. Where, as here, there is a significant First Amendment interest at stake and the government offers little more than conclusory assertions about why the content of Col. Davis's speech injures CRS and why his position as an Assistant Director would matter in the calculus of its interests, the balance overwhelmingly weighs in favor of Col. Davis's speech. *See Navab-Safivi*, 650 F. Supp. 2d at 58 (holding that the exception did not apply because, regardless of whether the employee was policy-level or not, there was no allegation that her speech had a detrimental impact on confidential relationships).[5]

> **4.    CRS's Statutory Mandate Can Be Met Without Completely Silencing Its Employees.**

The Library's assertions boil down to Mr. Mulhollan's view that Assistant Directors at CRS should never publicly take a policy position or criticize a public official on any issue "on the congressional agenda," Davis Decl. Ex. J, because "each Assistant Director is required to

---

[5] Moreover, Col. Davis does not even fall into the "narrow band of fragile relationships requiring for job security loyalty at the expense of unfettered speech," *Hall*, 856 F.2d at 264. Col. Davis never had "broad responsibilities with respect to policy formulation, implementation, or enunciation." *Id.* His job did not require formulation of policy direction for CRS, much less the Library. Davis Decl. ¶¶ 17-18. That he had "some policy responsibilities" is not enough to rank him as part of the "narrow band" of policymakers. *O'Donnell*, 148 F.3d at 1136 (holding that plaintiff was not a policymaker for *Pickering* purposes even though he was in charge of a number of Police Department facilities and instituted several reforms in their operations).

perform substantively and be free of bias even on matters not officially within his or her bailiwick." Opp. at 8. [6]  This position turns the First Amendment on its head.

It is well-established that the First Amendment was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth v. United States*, 354 U.S. 476, 484, 77 S. Ct. 1304, 1308 (1957), and that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 721 (1964).  The Library, in other words, seeks to suppress the very types of speech most protected under the First Amendment.

Although the Library seeks to portray CRS's status in the government as unique, it bears highlighting that CRS's statutory mandate is limited to rendering service "without partisan bias," 2 U.S.C. § 166(d).  The Library has not argued that Col. Davis's speech was "partisan" —a term limited to political parties, political management, and campaigns.  Pl.'s Br. at 22-23.  Instead, the Library attempts to stretch CRS's statutory mandate to a strict standard of hyper-neutrality that would prohibit every supervisor from ever publicly expressing a policy opinion on any issue. That position is not permitted by the First Amendment.

CRS is not unique in claiming an interest in non-partisanship and impartiality.  Many government units have an interest in having their employees execute their work with impartiality —the judiciary,[7] the Voice of America,[8] and, in fact, all executive branch agencies.[9]  The

---

[6] This assertion in the brief is not supported by Mr. Mulhollan's declaration.  *See* Mulhollan Decl. ¶¶ 7, 14.

[7] *Republican Party of Minn. v. White*, 536 U.S. 765, 775-80, 122 S. Ct. 2528, 2534-38 (2002) (holding that Minnesota's canon of judicial conduct prohibiting candidates for judicial election from announcing their views on disputed legal or political issues is not narrowly tailored to the judiciary's interest in "impartiality" in any sense of the word).

[8] *Navab-Safavi*, 650 F. Supp. 2d at 58-59  (holding that there is no evidence of harm to the Voice of America's purported interest in the neutrality and objectivity of its translators).

Library's view, logically extended, would mean that any supervisory employee in any of these government units must never engage in speech that lies at the core of the First Amendment. That assertion must be held to be unconstitutional if there is any meaning to the well-settled principle that "public employees do not surrender all their First Amendment rights by reason of their employment," *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 1957 (2006).

### 5. The Library Terminated Col. Davis for His Speech on a Matter of Significant Public Interest.

In an effort to evade constitutional scrutiny, the Library attempts to characterize Col. Davis's termination as based on a "failure of professional judgment," not on his speech. Opp. at 26-28. A cursory examination of the six "events" that the Library now asserts showed a "failure of judgment," however, reveals that four of them are directly related to his exercise of First Amendment rights in writing the opinion pieces: one is the publication of the opinion pieces and three are Col. Davis's subsequent assertions that the opinion pieces are protected by the First Amendment.[10] Opp. at 27. Surely, the First Amendment protects not only the employee's right to speak on matters of public interest, but also his subsequent speech defending his right to speak, and the Library has not presented any argument to the contrary.

---

[9] *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 564-65, 93 S. Ct. 2880, 2890 (1973) ("It seems fundamental in the first place that employees in the Executive Branch of the Government, or those working for any of its agencies, should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party. They are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof. A major thesis of the Hatch Act is that to serve this great end of Government—the impartial execution of the laws—it is essential that federal employees, for example, not take formal positions in political parties.").

[10] The Library accuses Col. Davis of "intentionally flout[ing] CRS policy" by publishing the opinion pieces and not giving Mr. Mulhollan a "heads up." Opp. at 27. The Library never clarifies, however, what CRS policy Col. Davis "flouted." As the Library itself states, "CRS's policy does not require pre-approval of an employee's speech." Opp. at 38. To the extent that the Library is referring to the express disclaimer policy, the Library does not refute that CRS previously gave Col. Davis permission not to use an explicit disclaimer when discussing his views on Guantánamo and the military commissions where, as here, the outside speech made no association between CRS and Col. Davis.

The other two "events" on the Library's list occurred well before the uncontested glowing review that Mr. Mulhollan gave Col. Davis on November 10, 2009—the day before the opinion pieces were published.  Davis Decl. ¶ 38.  Indeed, the Library's account of the "compressed sequence of events" since October showing the alleged failure of judgment, Opp. at 26-27, is undermined by the facts:  the publication of the report with the intern's name occurred on August 13, even before Col. Davis's favorable six-month review.  Davis Decl. ¶ 59; Davis Supp. Decl. Ex. A (E-mail from Cliff Cohen to Morris Davis (Aug. 20, 2009, 16:37 EST)).[11]

Contrary to the Library's claimed pattern of deterioration, the letters of admonishment and termination, as well as the events surrounding the termination, make clear that Col. Davis's exercise of First Amendment rights, not some pattern of deterioration, was the cause of his dismissal.  *See* Pl.'s Br. at 26-29; *Tygrett v. Barry*, 627 F.2d 1279, 1286 (D.C. Cir. 1980) ("Judicial review for the discharge must be addressed solely to contemporaneous considerations," not the employer's *post hoc* justifications.).

### B.    CRS's Outside Speech Policy, as Interpreted, Violates the First Amendment.

The Library does not offer any specific rebuttal to Col. Davis's legal argument that a policy that would (1) prohibit every CRS employee from commenting on any current public policy matter or (2) require prior approval for such speech violates the First Amendment.  *See* Pl.'s Br. at 29-31.  The Library simply denies that such a policy exists.  Opp. at 37-38.  At the same time, the Library's memorandum betrays that the CRS policy, as interpreted by Mr. Mulhollan, has these very effects.  *See* Opp. at 3 (criticizing Col. Davis for "fail[ing] to provide any heads up regarding the publication of those pieces to the Director of CRS until it was a <u>fait accompli</u>"); *id.* at 38 ("Director Mulhollan's comments [that opinions cannot be issued on

---

[11] Mr. Mulhollan's declaration mischaracterizes the facts in a number of additional ways.  This brief will not discuss every objection to his recitation of the events because the mischaracterizations are largely irrelevant for the legal issues presented.

matters 'on the congressional agenda'] and the language of the letter of admonishment merely paraphrase of CRS' longstanding policy").  The Library cannot have it both ways:  the policy either prohibits speech on policy issues or it does not, and the policy either requires prior approval or it does not.  If it does not, the Library cannot claim that Col. Davis used poor judgment in expressing his views on such policy issues without receiving Mr. Mulhollan's permission.[12]

The Library argues in a footnote that such policy would still be constitutional because a policy-level employee bears a greater burden of caution with respect to speech.  Opp. at 39 n.9. This argument makes no sense given that CRS's policy does not differentiate between any type of employees.  Col. Davis is, thus, likely to prevail on this claim because the Library has not offered any sufficient reason to justify a "wholesale deterrent to a broad category of expression by a massive number of potential speakers," *NTEU*, 513 U.S. at 467, 115 S. Ct. at 1013.

**C.      Col. Davis's Termination Violates Due Process.**

The Library ignores the majority of Col. Davis's arguments that Col. Davis's termination violated his right to due process under the First and Fifth Amendments, Pl.'s Br. at 31-38, focusing instead on a few largely irrelevant contentions.

**1.      Col. Davis Did Not Have Fair Warning That His Speech Might Violate CRS's or the Library's Policies.**

CRS's termination of Col. Davis violated his right to fair notice because, as in *Keeffe v. Library of Congress*, 777 F.2d 1573 (D.C. Cir. 1985), neither CRS's policies nor its past practice provided fair warning that it might terminate Col. Davis on the basis of the opinion pieces.  Here,

---

[12]  Mr. Mulhollan also claims to have told Col. Davis during his interview that public "issue advocacy" would not be acceptable.  Opp. at 10; Mulhollan Decl. ¶ 23.  While this conversation did not take place, Davis Decl. ¶¶ 14-15, it is a clear indication that Mr. Mulhollan apparently interprets the policy to prohibit any "issue advocacy."  Such a blanket ban on speech of CRS employees is an unconstitutional prior restraint.  *See United States v. Nat'l Treasury Employees Union* (*NTEU*), 513 U.S. 454, 477, 115 S. Ct. 1003, 1018 (1995).

as in *Keeffe*, CRS's general policy on outside writing and speaking—which uses vague language like "sound judgment" and "objectivity" —provides no notice that the opinion pieces would be prohibited. *See Keeffe*, 777 F.2d at 1575-82; Davis Decl. Ex. P. Here, also as in *Keeffe*, past practice directly contradicts Mr. Mulhollan's personal interpretation of the policy on outside writing and speaking to apply to Col. Davis's speech. *See id.* at 1582 (holding that Library failed to provide fair notice based on its past "permissiveness toward employee political activities, including [similar activities of the plaintiff]"). CRS has expressly approved of similar speech by Col. Davis on at least six prior occasions. Pl.'s Br. at 32-33. And, as each of the five veteran CRS employees has declared, CRS has never terminated an employee for outside writing and speaking, even when that speech concerns controversial matters, opines on issues before Congress, expresses a policy preference, or overlaps with the CRS duties of the employee speaking. *See* Pl.'s Br. at 33-34; *see also supra* Part I.A.2. CRS also entirely ignores the forty-two articles cited in Col. Davis's opening brief as examples of such outside speech, which was often on controversial matters and often on topics related to CRS obligations, without express disclaimers. *See* Pl.'s Br. at 33-34 (citing Mulhauser Decl. Exs. A-AP). CRS cannot now argue, without even attempting to explain the differences between its past practice and this case, that Col. Davis had fair warning that the publication of the opinion pieces would result in his termination.

The Library ignores *Keeffe* and this evidence of past practice and makes four arguments instead. None has any merit. First, the Library argues that Col. Davis has no protected liberty interest in his continued employment with CRS. That is irrelevant. Probationary and non-probationary employees alike may not be terminated in violation of the Constitution, especially when First Amendment freedoms are involved. *See Rankin v. McPherson*, 483 U.S. 378, 383-

15

84, 107 S. Ct. 2891, 2896 (1987).  The cases relied upon by the Library deal only with

*procedural* due process challenges, which rest upon "the deprivation of interests encompassed by

the Fourteenth Amendment's protection of liberty and property."  *Bd. of Regents v. Roth*, 408

U.S. 564, 569, 92 S. Ct. 2701, 2705 (1972).  Vagueness claims like Col. Davis's are different.

*See, e.g.*, *Woody v. City of Dallas*, 809 F. Supp. 466, 472-74 (N.D. Tex. 1992) (dismissing the

procedural claims of a probationary employee for lack of a property interest, but considering the

merits of the employee's Fifth Amendment vagueness challenge).

Second, the Library argues that Col. Davis was "aware of the contours of the policy" and

that he "was also charged with clarifying and enforcing the policy."  Opp. at 41.  This argument

ignores the evidence of past practice permitting similar speech.  To the extent Col. Davis was

aware of the contours of the policy, he was aware that the opinion pieces would be in line with

past practice and, accordingly, acceptable.  *See* Davis Decl. ¶¶ 56, 58.[13]  Mr. Mulhollan's

application of the outside speaking and writing policy to Col. Davis's speech was, by contrast,

unconstitutionally novel.  *See Keeffe*, 777 F.2d at 1582 (holding that Library failed to provide

fair notice based on its past "permissiveness toward employee political activities, including

[similar activities of the plaintiff]"); *Adams v. Gunnell*, 729 F.2d 362, 369 (5th Cir. 1984) (no

fair notice where "[t]here is no evidence that any inmate had ever before been punished in

connection with a petition; quite to the contrary, Dancy testified that he had signed two petitions

before at Texarkana without sanction or other adverse consequence"); *Wolfel v. Morris*, 972 F.2d

712, 717 (6th Cir. 1992) (no fair notice where plaintiffs were punished for circulating petitions

even though they had previously been allowed to do so, as the conduct was 'virtually identical to

---

[13] Mr. Mulhollan incorrectly states that Col. Davis submitted his planned remarks at the Case Western conference for review.  Opp. at 13; Mulhollan Decl. ¶ 37.  Col. Davis submitted only the paper he wrote in connection with the conference.  *See* Davis Decl. ¶ 29, Ex. G.  Moreover, Mr. Mulhollan does not dispute that CRS subsequently became aware of Col. Davis's remarks at this conference—which expressed exactly the same view as that in his opinion pieces—but that nobody counseled Col. Davis that his comments were inappropriate.  *See* Davis Decl. ¶ 30.

conduct previously tolerated.'" (quoting *Waters v. Peterson*, 495 F.2d 91, 100 (D.C. Cir. 1973))).[14]

Third, the Library argues that the disclaimer requirement clarifies the CRS policy.  Opp. at 41.  This too ignores past practice, as established by the CRS declarants and the forty-two examples of outside speaking and writing cited in Col. Davis's opening brief, which unequivocally demonstrate that the disclaimer requirement was not categorically required, even for speech on controversial matters.  The Library also ignores that CRS's own attorney expressly approved of Col. Davis's speech *without* an express disclaimer on at least two occasions, including speaking and writing on the very same subject of military commissions.  Davis Decl. ¶ 29, Ex. G (email from Kent Ronhovde approving non-use of express disclaimer for Case Western conference because there was no association between Col. Davis and CRS).  Col. Davis's opinion pieces were consistent with that past practice; CRS cannot reverse its policy as enforced now without even attempting to explain the basis for its reversal or how Col. Davis would have had notice of it.  *Keeffe*, 777 F.2d at 1582.

Finally, the Library argues that the availability of pre-publication approval by CRS cures the vagueness of its policy.  Opp. at 41.  This argument is dangerous in its implications and

---

[14] In other portions of its brief, the Library claims that Col. Davis was aware of an unwritten policy against "issue advocacy," "prospective" speech, and speech about issues on the congressional agenda.  Opp. at 10-13.  Col. Davis specifically disputes Mr. Mulhollan's assertion that he was instructed not to engage in any "issue advocacy."  Davis Decl. ¶ 13-15.  In any event, these purported unwritten policies directly contradict the past practice extensively documented by Col. Davis and wholly ignored by the Library.  CRS employees—including other Assistant Directors—have always publicly taken prospective positions on issues before or likely to appear before Congress.  Davis Decl. ¶¶ 28, 30, 33; Pl.'s Br. at 17-19 & n.6, 33-34 (citing declarations and articles); Davis Supp. Decl. Ex. C (recent article by an Assistant Director at CRS on the highly politicized concept of "empathy" and its importance to current and future politics).  And Mr. Mulhollan personally approved of at least one instance in which Col. Davis publicly took a stand on an issue confronting the Library.  Davis Decl. ¶ 28 (exchange regarding Col. Davis's public opposition to the Library's event hosting Lynndie England).  At best, therefore, the correspondence documents the personal preference of Mr. Mulhollan that employees be "careful" when "look[ing] forward," Mulhollan Decl. Ex. 14, but it does not establish the existence of a policy—much less a constitutionally clear policy—against certain speaking or writing, the violation of which could result in termination.  *See Adams*, 729 F.2d at 369 ("Perhaps these inmates could have anticipated that the prison administration might disagree with the contents of the petition or resent its dissemination outside the institution.  They could not have known, however, that serious disciplinary sanctions would be imposed for their conduct.").

misguided in its application of the caselaw.  No court has ever suggested that pre-publication

approval on its own is sufficient to cure an otherwise vague policy on speech by public

employees.  The reason is simple:  the fundamental vice of a vague law is that it encourages

subjective and discriminatory enforcement by failing to provide clear standards that guide its

application.  *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S. Ct. 2294, 2298-99 (1972).

A pre-publication approval process cannot, on its own, guard against that vice; in fact, it

exacerbates it by allowing entirely ad hoc application of vague and general principles.  In *Letter

Carriers* and *Keeffe*, the availability of administrative clarification was only supplemental to

what the courts already determined was a concrete and precise policy.  *See U.S. Civil Serv.

Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 575-80 & n.21, 93 S. Ct. 2880, 2895-98

& n.21 (1973) (noting availability of such review only after detailing the exhaustive statutory,

regulatory, and interpretive clarifications already available under the Hatch Act); *Keeffe*, 777

F.2d at 1581 ("The Gude memorandum is similarly precise—it states unequivocally that such

conduct presents an actual or apparent conflict of interest with Library duties and accordingly is

proscribed.  There is no ambiguity.").  That is not the case here:  Given the inherently vague

nature of the text of CRS's policy and the lack of any clarifying policies or interpretation, the

availability of CRS review does not cure the vagueness in its policy, particularly in light of the

prior practice that contradicts the Library's new application of CRS's policy.

### 2.    CRS's Policy on Outside Speech Is Facially Vague.

The Library does not even attempt to address Col. Davis's argument that CRS's policy on

outside speaking and writing is unconstitutionally vague on its face because the terms it uses—

like "sound judgment," "discretion," and "objectivity"—are inherently vague and because it

lacks any clarifying guidance to narrow its reach.  Pl.'s Br. at 35-38.  Though the Library

characterizes the policy as "flexible," it otherwise fails to address the precedent cited by Col.

Davis explaining that terms like those used in CRS's policy are not just "flexible," they are

inherently vague.  *Id.* at 36-37.[15]  The Library similarly fails to address the declarations of four

CRS employees—each with over thirty years of experience at CRS—who confirm that CRS's

policy on outside speaking and writing is incoherent and vague and has fostered confusion

among CRS employees.  *Id.* at 37 (citing Roth Decl. ¶¶ 9-14; Rosenberg Decl. ¶ 16; Relyea Decl.

¶ 23; Fisher Decl. ¶ 44).

Far from addressing these arguments, the Library proves them in its failure throughout its

entire brief to articulate what CRS's policy on outside speaking actually is.  The brief fails to

provide any clarification of the criteria or standards used to determine when speech is or is not

appropriate—when "sound judgment" and "discretion" are lacking, and when speech sacrifices

"objectivity."  The Library instead cedes unfettered authority to Mr. Mulhollan to determine,

through the recommended (though not mandatory, LCR 2023-3, § 3(B)) review process, whether

an employee has demonstrated "sound judgment" and "discretion" in outside writing and

speaking.  But, as discussed above, the government may not "cure" inherently vague terms by

delegating unfettered discretion to an executive agent to determine when speech violates the

vague terms of a policy and when it does not.

## II.    COL. DAVIS IS LIKELY TO SUFFER IRREPARABLE HARM ABSENT
##        PRELIMINARY RELIEF.

Unlike many discharged employees, Col. Davis will suffer irreparable harm absent

preliminary relief for two reasons: (1) his loss in salary and benefits after January 20, 2010, will

likely not be recoverable, and (2) he has specific evidence showing that the Library is quickly

---

[15] Alternatively, the Library argues that the use of express disclaimers somehow clarifies its policy.  As explained above, this simply ignores past practice and the multitude of examples of CRS employees speaking and writing on controversial matters without using express prior disclaimers, including CRS's express approval of Col. Davis's speech without an express disclaimer.

hiring for his Assistant Director position so that it can deprive him of his remedy of reinstatement. In addition, he has presented evidence that CRS's vague and overbroad policy and its application to him are presently chilling the speech of his colleagues. Col. Davis has moved for relief based on such harms with all diligence.

### A.    Monetary Loss, When Likely Not Recoverable, Is Irreparable.

The Library misses the mark in arguing that *Sampson v. Murray* controls this case and that the likelihood that Col. Davis will not be able to recover monetary relief does not constitute irreparable injury. *Sampson* was based on the proposition that "*temporary* loss of income" that can "*ultimately . . . be recovered*" is not irreparable injury. *Sampson v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 937, 952-53 (1974) (emphasis added).[16]  Thus, as this Court has previously found, "[W]here, as here, the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity, any loss of income suffered by a plaintiff is irreparable *per se*." *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (Walton, J.) (internal citations omitted); *see also* Pl.'s Br. at 40 (citing additional cases, including cases involving irrecoverable loss of back pay and benefits).

Notably, the Library does not argue that Col. Davis will be able to recover the monetary loss he will suffer if he is not given preliminary relief, and it does not offer to waive sovereign immunity.[17]  Although the Library contends that the Back Pay Act waives sovereign immunity,

---

[16] In addition, the D.C. Circuit "has not resolved the applicability" of *Sampson* outside of "a plaintiff's attempt to short-circuit an administrative scheme explicitly designed to resolve the exact type of personnel dispute at issue." *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1506 n.1 (D.C. Cir. 1995). The Library's suggestion that the *Sampson* heightened standard applies to a case where there is no administrative scheme is "predicated . . . upon an overly broad, and faulty, interpretation of *Sampson*'s holding." *Gately v. Massachusetts*, 2 F.3d 1221, 1233 (1st Cir. 1993). As explained in detail by the First Circuit, *Sampson* "reiterated throughout the opinion that the district court should not have weighed the irreparable harm allegations without taking into account . . . multiple factors," including the availability of the administrative appeals process. *Id.* at 1233-34.

[17] Courts have found irreparable injury when monetary relief is precluded by sovereign immunity, although in any of those cases the government could later have waived immunity. *See* Pl.'s Br. at 40. The Library's argument that Col.

it ultimately agrees with Col. Davis that he would likely be precluded from recovering monetary relief under that Act.  *See* Opp. at 24.  Col. Davis will thus likely suffer irreparable harm in the form of irrecoverable pay and benefits starting Wednesday, January 21, 2010.

**B.     The Availability of Reinstatement Is Important Because of the Lack of Monetary Relief.**

Because of the lack of monetary relief, as well as the uniqueness of Col. Davis's position as the Assistant Director, it is imperative that the Court preserve reinstatement as a remedy.  In all of the cases cited by the Library for the proposition that a loss of position does not represent irreparable injury, *see* Opp. at 22, the discharged employee (1) had monetary relief available, (2) did not claim that reinstatement would not be available later, and (3) did not present evidence that the employer is rushing to eviscerate the reinstatement remedy.  By contrast, the cases cited by Col. Davis directly address, and find, that there is irreparable harm where reinstatement is unlikely.  *See* Pl.'s Br. at 39 (discussing cases).

On January 8, 2010, after receiving notice the day before that Col. Davis was about to file this case, the Library posted a vacancy for Col. Davis's position as Assistant Director.  The application period closes on February 5, 2010.  Davis Supp. Decl. Ex. B.  This is an unusually short application period, *see id.* ¶ 4, and was undoubtedly motivated by this lawsuit.  Indeed, the Library has acted similarly in the past to fill a position quickly when there is a threat of a lawsuit.  When Col. Davis had to terminate an employee this year, a CRS attorney expressly advised him to fill the post quickly so that the employee would have no remedy if he were to sue.  *Id.* ¶ 5.  The same strategy appears to be at work here, and the Court should not permit the Library to

---

Davis has not shown a likelihood of irreparable injury because of the theoretical chance that it will waive sovereign immunity is disingenuous.

deprive Col. Davis of the very remedy to which he is entitled.[18]  Although the Library states in a footnote that Col. Davis could later be reinstated in a comparable position, by its own admission CRS has only five Assistant Directors.  Fashioning an effective remedy for the constitutional violation will be extremely difficult for this Court if the Library is permitted to fill Col. Davis's position now.

### C.    Col. Davis Did Not Delay in Seeking Relief for Irreparable Harm.

The Library's argument that the timing of Col. Davis's suit undermines his irreparable injury is misplaced.  Col. Davis's irreparable monetary injury begins on January 21, 2010.  It did not begin "seven weeks" ago.  Thus, this case is unlike those cited by the Library, Opp. at 19, in which the plaintiff delays filing the case although injury had been occurring for some period of time, or waits until the very day the harm will occur before moving for relief.[19]

In any event, the timing of the lawsuit is understandable.  Col. Davis received the notice of termination on November 20, 2009.  Davis Decl. Ex. M.  He immediately attempted to resolve the matter informally by going to the Library's Inspector General's office.  He thereafter obtained counsel and sent the Library a detailed, seven–page letter explaining his legal arguments on December 4, 2009.  The Library responded by letter dated December 14, 2009.  The parties then entered into settlement discussions, which ultimately proved unsuccessful several days later.  Simultaneously, congressional committees who oversee the Library were

---

[18] Although Mr. Mulhollan claims that he authorized the posting of a vacancy announcement on January 8, 2010, because of the attempted terrorist bombing of an airliner on Christmas Day, Mulhollan Decl. ¶ 60, Col. Davis was informed by a CRS employee in the end of November that Mr. Mulhollan told the employee that he intended to post the vacancy on December 27.  Davis Supp. Decl. ¶ 6.

[19] *Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005), on which the Library relies, is also inapposite.  There, plaintiff sought to change the status quo by enjoining the inclusion of prayers at the Presidential Inauguration— "a practice that . . . arguably can be traced back to the Inauguration of President George Washington in 1789."  *Id.* at 268.  The court was unwilling to rule quickly on issues that raise "serious separation of powers concerns," *id.* at 280, and overturn a practice that has arguably existed since this country's founding.  What Col. Davis seeks is a much more limited remedy that preserves the *status quo ante*—his position as an Assistant Director at CRS, *see District 50*, 412 F.2d at 168—and that will not harm the functioning of the Library.

looking into resolving the matter.  When it became clear a lawsuit would be necessary, on

December 23, the day after Col. Davis's temporary position began, and on December 24, Col.

Davis proposed that the parties reach agreement on a briefing and hearing schedule to eliminate a

need for him to request a temporary restraining order.  On December 31, the Library informed

Col. Davis that it would not agree to such a schedule.  The following week, Col. Davis filed his

Complaint, this motion, and the accompanying declarations.

       In short, this is not a case where a party waits until the last moment to prejudice the other

side.  The Library has had notice of Col. Davis's detailed legal claims since December 4, 2009.

It was then given seven days to file a response to the motion for a temporary restraining order—

the same amount of time permitted under the local rules for a preliminary injunction, *see* Local

Civ. Rule 65.1(c).  In these circumstances, there is no reason to find that the timing of this

request undermines Col. Davis's irreparable injury.

   **D.   The Undisputed Evidence Establishes that Col. Davis's Speech and the
          Speech of CRS Employees Are Presently Being Chilled.**

       The Library is correct that "the mere claim of a First Amendment violation" does not

constitute irreparable injury.  Here, however, Col. Davis has presented undisputed evidence that

both his speech and the speech of other CRS employees are presently being chilled as a result of

the Library's unconstitutional policy and Col. Davis's termination under it.  *See* Roth Decl. ¶ 9,

13; Pl.'s Br. at 41-42.  It is difficult to imagine what better evidence Col. Davis might gather at

this stage, given that current CRS employees are afraid to speak for fear of being retaliated

against by the Library.  An order reinstating Col. Davis because he was terminated based on the

unconstitutionality of CRS's policy or enjoining enforcement of CRS's unconstitutional policy,

as requested in the Proposed Order lodged with the Court, will have the effect of easing the

chilling of valuable speech from CRS employees.[20]

## IV.    THE BALANCE OF HARDSHIPS WEIGHS IN COL. DAVIS'S FAVOR.

Given that the Library has failed to show any harm to its interests from Col. Davis's

speech, *see supra* Part II.A, and thus has no justification for terminating Col. Davis, there is also

no harm to retaining Col. Davis as an employee while this litigation is pending.  This is

particularly true given the overwhelmingly positive reviews of Col. Davis's work before the

protected speech.  Pl.'s Br. at 42.

The Library's assertion that the hardship question is controlled by *Sampson* is incorrect:

at issue in *Sampson* were whether the court had authority to grant interim injunctive relief to an

employee who was challenging his dismissal through an administrative procedure, and whether

that authority was properly exercised.  *See* 415 U.S. at 68, 94 S. Ct. at 942.  Although *Sampson*

recognized the government's interest in avoiding interference in employment decisions, such

interference is warranted where the government acts unconstitutionally.  *See, e.g.*, *Pickering*, 391

U.S. at 568, 88 S. Ct. at 1734 (affirming First Amendment rights of employees while recognizing

government employer's interest in the efficiency of public services).  Courts in this district have

thus not hesitated to award preliminary reinstatement where, as here, a plaintiff makes a showing

that the employee's termination likely violated the First Amendment, particularly when the

individual is still employed at the workplace in a different position.  *See, e.g.*, *Robinson v. Dist.*

---

[20] "A retaliatory discharge carries with it the distinct risk that other employees may be deterred from protecting their rights," and such a risk can constitute irreparable injury.  *Holt v. Continental Group, Inc.*, 708 F.2d 87, 91 (2d Cir. 1983).  The Second Circuit has narrowly interpreted the cases cited by the Library, Opp. 25-26, and affirmed that preliminary relief may be appropriate in some circumstances to extinguish the chilling effects of a retaliatory discharge.  *See Moore v. Consol. Edison Co.*, 409 F.3d 506, 512 n.6 (2d Cir. 2005).  This is such a case, as Col. Davis's termination has had an immediate adverse effect on the speech of CRS employees, Roth Decl. ¶¶ 12-13, and "[j]udicial intervention is necessary to stop this from occurring and to assure CRS employees that management cannot overrun employees' First Amendment rights," *id.* ¶ 18.

*of Columbia*, No. Civ. A. 97-787(GK), 1997 WL 607450, at *8-9 (D.D.C. July 17, 1997)

(granting preliminary reinstatement to active status); *Watts v. Alfred*, 794 F. Supp. 431, 434

(D.D.C. 1992) (granting reinstatement *pendente lite* to regular duty station).  This Court should

similarly grant preliminary reinstatement to Col. Davis.

## CONCLUSION

For the foregoing reasons, Col. Davis's motion for immediate relief should be granted.

Respectfully submitted,

_____/s/_____
Arthur B. Spitzer  (D.C. Bar No. 235960)
Frederick V. Mulhauser (D.C. Bar. No. 455377)
American Civil Liberties Union
  of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, D.C. 20036
(202) 457-0800

Aden J. Fine (D.C. Bar No. 485703)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2693

Jameel Jaffer
Alexander A. Abdo
National Security Project
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-7814

January 17, 2010                    ATTORNEYS FOR PLAINTIFF