UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MORRIS D. DAVIS,<br><br>        Plaintiff,<br><br>        v.<br><br>JAMES H. BILLINGTON, in his official capacity as the Librarian of Congress, and DANIEL P. MULHOLLAN, in his individual capacity,<br><br>        Defendants. | Case No. 1:10-CV-36-RBW |

**DECLARATION OF ALEXANDER A. ABDO**

I, Alexander A. Abdo, hereby declare and state as follows:

1.  I am a member of the Bar of the State of New York, and I am co-counsel for the plaintiff in the above-captioned case. I am an attorney at the American Civil Liberties Union Foundation, 125 Broad St., 18th Floor, New York, NY 10004.

2.  I submit this declaration on behalf of the plaintiff's reply in support of his motion for a temporary restraining order or, in the alternative, a preliminary injunction against the defendants.

3.  Pursuant to paragraph 10 of this Court's "General Order and Guidelines for Civil Cases (ECF)," accompanying this declaration are true and correct copies of the following cases cited in the plaintiff's reply, for which only an on-line citation exists.

|  Document | Exhibit |
| --- | --- |

*Douglas T.V. Hi-Fi Stereo Ctr. v. U.S. Pioneer Elecs. Corp.*, Civ. No. 312-74, 1974 WL 860 (D.D.C. Mar. 26, 1974) ................................... A

*Little v. Fenty*, Civil No. 09-2308, 2009 WL 4981535 (D.D.C. Dec. 15, 2009) ................................................................................................ B

*Robinson v. Dist. of Columbia*, No. Civ. A. 97-787(GK), 1997 WL 607450 (D.D.C. July 17, 1997).................................................................. C

4. Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 17, 2010

_____
ALEXANDER A. ABDO

# EXHIBIT A

Not Reported in F.Supp., 1974 WL 860 (D.D.C.), 1974-1 Trade Cases P 74,995
**(Cite as: 1974 WL 860 (D.D.C.))**

United States District Court; District of Columbia.

**Douglas T. V. Hi-Fi Stereo Center**
v.
**U. S. Pioneer Electronics Corp.**, et al.
Civil Action No. 312-74

Filed March 26, 1974

GREEN, D. J.

**Memorandum**

***1** The granting of a preliminary injunction is governed in this circuit by the standards enunciated in *Virginia Petroleum Jobbers Association v. Fed. Power Com.,* 259 F. 2d 921, 925 (D. C. Circuit 1958). The four criteria laid down in that case and the specific findings in this case with respect to those criteria are as follows:

1. Has the petitioner made a strong showing that it is likely to prevail on the merits of its case? Plaintiff contends that the resale price maintenance agreement signed by plaintiff in the District of Columbia, which is a free trade "state", is a *per se* violation of Secs. 1 and 3 of the Sherman Act. *Bissell Carpet Sweeper Company v. Masters Mail Order Company of Washington, D. C., Inc.* [1956 TRADE CASES P 68,326], 140 F. Supp. 165 (D. C. Md. 1956).

In September or October 1973, plaintiff began to advertise in the *Washington Post* actual discount prices for Pioneer hi-fidelity equipment which it was offering for sale at its retail stores within the District of Columbia. By letter dated November 26, 1973, defendant, U. S. Pioneer Electronics Corp., terminated plaintiff as a franchised dealer in its hi-fidelity equipment. No reason for the termination was given. The effective date of this termination was December 13, 1973.

Plaintiff contends that this termination is part of an overall plan to drive discount hi-fi dealers out of business. While it is true that a mere refusal to deal without more is not violative of the antitrust laws, *United States v. Colgate & Company,* 250 U. S. 300, 307 (1919), that doctrine has been limited by subsequent Supreme Court decisions which have held that refusals to deal coupled with price-fixing or price maintenance agreements or some form of coercion to maintain prices are violative of the antitrust laws. *United States v. Arnold, Schwinn & Co.* [1967 TRADE CASES P 72,126], 388 U. S. 365 (1967); *F.*

*T. C. v. Beech-Nut Packing Co.,* 257 U. S. 441 (1922); *Wurzberg Brothers, Inc. v. Head Ski Company* [1967 TRADE CASES P 72,294], 276 F. Supp. 142 (D. N. J. 1967).

At a preliminary injunction hearing in a complex action such as antitrust litigation, a "strong showing of likelihood of success on the merits", *Virginia Petroleum Jobbers, supra,* is a very difficult standard to meet. There is ample precedent in antitrust litigation that if the questions in the complaint raise "a fair ground for litigation", *Semmes Motors, Inc. v. Ford Motor Co.* [1970 TRADE CASES P 73,263], 429 F. 2d 1197, 1205-6 (2d Cir. 1970), a preliminary injunction should issue. The Court feels that plaintiff has clearly met this test, and further as stated in *Milsen Company v. Southland Corporation* [1971 TRADE CASES P 73,774], 454 F. 2d 363, 366 (7th Cir. 1971):

"Many courts have held that defendants who are or may be guilty of anti-competitive practices should not be permitted to terminate franchises, leases or sales contracts when such terminations would effectuate those practices."

It is therefore the conclusion of the Court that a sufficient showing of likelihood of success on the merits has been met.

**\*2** 2. Has the petitioner shown that without such injunctive relief it will be irreparably injured? While plaintiff may currently have access to Pioneer products from other dealers, the Court feels that such access is not assured for the future and that plaintiff has the right to buy Pioneer products directly from U. S. Pioneer. Secondly, if plaintiff is forced to return deposits already accepted for Pioneer products and if plaintiff is no longer able to deliver products from an acknowledged leader in the hi-fi and stereo component field, the goodwill of its business will be irreparably harmed. Those who have already ordered such products will probably no longer deal with plaintiff and those who have contemplated dealing with plaintiff will probably be dissuaded when knowledge of the failure to deliver reaches the general consumer.

Accordingly, the plaintiff will be irreparably harmed if not accorded injunctive relief.

3. Would the issuance of a stay substantially harm other parties interested in the proceedings? Defendants' main contention is that Pioneer

Not Reported in F.Supp., 1974 WL 860 (D.D.C.), 1974-1 Trade Cases P 74,995
**(Cite as: 1974 WL 860 (D.D.C.))**

Electronics seeks to market its products only through "high-class" dealers. It was Pioneer's business judgment that Douglas T-V was not a dealer who possessed experienced and well-trained salesmen or the type of showroom and demonstration facilities necessary to sell high-priced and high-quality hi-fi equipment.

However, plaintiff has been a Pioneer dealer for almost three years and yet the record reflects no past warnings or complaints as to the plaintiff's marketing qualities. Therefore, the Court finds no reason to believe that either Pioneer Electronics or others directly involved in this law suit will suffer any material injury from an order to continue to deal with Douglas T-V as a franchised dealer.

4. Where lies the public interest? It is the opinion of the Court that the Court in *Milsen Company, supra,* has succinctly stated the equities to be balanced in an antitrust action of this nature:

"Courts which have entered injunctions against terminations have weighed the equities and found the plaintiffs' side more substantial, even though in each case the plaintiff had violated the terms of the franchise or sales agreement and had given defendant a contractual basis for termination. The public interest in encouraging antitrust prosecutions by private parties and the need for such parties to continue in their businesses while the legal claims are tried have persuaded courts to restrain terminations pendente lite."

[*Status Quo*]

The plaintiff's franchise was terminated on December 13, 1973, but the complaint and Motion for Preliminary Injunction were not filed until February 19, 1974. The question that has thus arisen is what status between plaintiff and defendants is to be frozen by a preliminary injunction.

The purpose of a preliminary injunction is to maintain the status quo between the litigants pending final determination of the case. *Hamilton Watch Co. v. Benrus Watch Co.* [1953 TRADE CASES P 67,517], 206 F. 2d 738, 742 (C. A. 2, 1953). The status quo which is to be preserved by the issuance of a preliminary injunction is the last peaceable, uncontested status between the parties which preceded the controversy about which suit is brought. *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F. 2d 804, 809 (C. A. 9, 1963), cert. den. 375 U. S. 821, 84 S. Ct. 59 (1963); *Washington Capitols Basketball Club, Inc. v. Barry,* 419 F. 2d 472, 476 (C. A. 9, 1969); *District 50, United Mine Workers v. International Union, U. M. W.,* 412 F. 2d 165, 168 (C. A. D. C., 1969).

**\*3** Pursuant to the holdings in the foregoing cases, the relevant status to be preserved in the instant case is the status that plaintiff occupied as franchisee of defendant U. S. Pioneer up to November 25, 1973. It is plaintiff's status as a franchised dealer which was indeed the last peaceable and uncontested status between plaintiff and U. S. Pioneer which preceded this controversy.

The four criteria of *Virginia Petroleum Jobbers Assn., supra,* having been met, a preliminary injunction as set out in the Court's Order, is granted.

**Preliminary Injunction Order**

This cause, having come on to be heard on plaintiff's Motion for Preliminary Injunction, and the Court having considered the arguments of counsel as well as the allegations of the verified complaint, together with the various affidavits filed by the parties herein, and after careful examination and consideration of the evidence presented at the hearing and of the legal memoranda submitted by the parties, and it appearing to the Court that plaintiff has no adequate remedy at law and will be irreparably harmed if this injunction does not issue; the balance of hardships tilts towards plaintiff in that defendants will risk little in continuing to deal with the plaintiff; plaintiff has a reasonable likelihood of success on the merits; and for the reasons given by the Court in its accompanying Memorandum, it is, this 25th day of March 1974,

Ordered that U. S. Pioneer Electronics Corp., its officers, directors, agents, servants, employees and all persons and corporations in active concert and participation with it or them, be and they hereby are enjoined from: refusing to sell and ship Pioneer high fidelity components ordered by plaintiff upon the same delivery and payment terms as existed between plaintiff and defendants pursuant to their franchise agreement on November 25, 1973, which date the Court finds to be the last uncontested status between the parties.

Provided, however, the plaintiff first gives security in the amount of One Thousand ($1,000.00) Dollars for the payment of such cost or damages which may be

Not Reported in F.Supp., 1974 WL 860 (D.D.C.), 1974-1 Trade Cases P 74,995
**(Cite as: 1974 WL 860 (D.D.C.))**
incurred or suffered by any party who has been found to be wrongfully enjoined, such bond to be approved by the Court or by the Clerk of the Court.

D.D.C. 1974.
Douglas T. v. Hi-Fi Stereo Center
Not Reported in F.Supp., 1974 WL 860 (D.D.C.), 1974-1 Trade Cases P 74,995

END OF DOCUMENT

# EXHIBIT B

Slip Copy, 2009 WL 4981535 (D.D.C.)
**(Cite as: 2009 WL 4981535 (D.D.C.))**
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
District of Columbia.
Joyce A. **LITTLE**, Plaintiff,
v.
Adrian **FENTY**, DC Mayor, et al., Defendants.
**Civil No. 09-2308 (CKK).**

Dec. 15, 2009.

Joyce A. Little, Washington, DC, pro se.

### MEMORANDUM OPINION

COLLEEN KOLLAR-KOTELLY, District Judge.

\*1 Plaintiff, Joyce A. Little, representing herself *pro se,* filed the above-captioned civil action on December 7, 2009. Along with the [1] Complaint, Plaintiff filed a [2] Motion for Preliminary Injunction Staying the Final Vote on DC Bill 19-482 "Religious Freedom of Marriage Equality Act of 2009." Plaintiff's motion principally focuses on the pending final vote by the DC Council ("Council") on the Religious Freedom and Marriage Equality Act of 2009 ("DC Bill 19-482"), and requests the Court issue an emergency order enjoining the Council from voting on DC Bill 19-482. Pursuant to Court order, Defendants filed expedited oppositions to Plaintiff's motion on Monday, December 14, 2009. In response, at the Court's request, Plaintiff filed a [23] Reply to Defendants' oppositions on Tuesday, December 15, 2009, regarding standing. The Court became aware this morning for the first time that Plaintiff, at her own initiative, also filed a [22] Motion to Amend her Complaint on Monday, December 14, 2009, in response to Defendants' oppositions (although the motion to amend was not docketed by the Clerk nor did Chambers receive a copy of the pleading until Tuesday, December 15, 2009). In so responding, Plaintiff raised certain issues for the first time, particularly as regards her standing to bring this lawsuit. The Court has ordered counsel for Defendants to file a response addressing these newly-raised issues by no later that 4 PM today. Nonetheless, the Court has just been advised by counsel for Defendants that the final vote on DC Bill 19-482 is currently scheduled to occur on or around 11:30 AM this morning. In an effort to timely address Plaintiff's request for an emergency injunction, given the imminence of the final vote, the Court therefore issues this Memorandum Opinion briefly addressing Plaintiff's motion.[FN1] As the Court has not yet had an opportunity to fully consider the issues regarding Plaintiff's standing, the Court shall assume for the purposes of this Memorandum Opinion only that Plaintiff has standing to bring this motion. Upon consideration of the parties' filings, the relevant case law and statutory provisions as well as the record of this case as a whole, the Court shall DENY Plaintiff's [2] Motion for Preliminary Injunction Staying the Final Vote on DC Bill 19-482 "Religious Freedom of Marriage Equality Act of 2009."

> FN1. The Court shall supplement its reasoning for its decision later today as may be appropriate. The Court also notes that it attempted to reach Plaintiff by telephone prior to issuing this Memorandum Opinion and Order in order to hold a conference call on the record with all parties, but was unable to reach Plaintiff; Chambers left a voicemail message for Plaintiff advising her of the imminent final vote and requesting she contact Chambers immediately. The Court has not yet heard back from Plaintiff as of the filing of this Memorandum Opinion.

### LEGAL STANDARD AND DISCUSSION

The standard for obtaining injunctive relief through either a temporary restraining order or a preliminary injunction is well established. A moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C.Cir.2006); *Hall v. Daschle,* 599 F.Supp.2d 1, 6 n. 2 (D.D.C.2009) ( "[t]he same standard applies to both temporary restraining orders and to preliminary injunctions"). In applying this four-factored standard, district courts may employ a sliding scale as to which a particularly strong showing in one area can compensate for weakness in another. *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995)). Nevertheless, both the United States Supreme Court and the Court of Appeals for the D.C. Circuit have emphasized that a plaintiff must show at least *some* likelihood of irreparable harm in the absence of an injunction. *See Winter v. Nat. Res. Def.*

Slip Copy, 2009 WL 4981535 (D.D.C.)
**(Cite as: 2009 WL 4981535 (D.D.C.))**

*Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 375, 172 L.Ed.2d 249 (2008) (holding that a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction," and not a mere "possibility"); *CityFed,* 58 F.3d at 747 (holding that a plaintiff must demonstrate " 'at least some injury' for a preliminary injunction to issue ... [because] 'the basis of injunctive relief in federal courts has always been irreparable harm ....' " (quoting *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)).

**\*2** In this case, Plaintiff has failed to show any likelihood of irreparable harm in the absence of an injunction. As the Council explained in its opposition,

> The Council's vote and presentment of a bill to the Mayor is not the end of the District's legislative process. District laws are subject to a 30 or 60-day Congressional review period, and are further subject to the referendum process. Unless and until legislation becomes effective, judicial resources should not be spent on speculative activity.

Council's Opp'n, Docket No. [8], at 7. Accordingly, even assuming the bill at issue is passed by the DC Council, it must still be signed by the Mayor and must then be subject to Congressional review. Defendants indicate that even assuming the bill is signed by the Mayor and that Congress takes no action on it, "the challenged legislation will not become effective until late January, 2010, at the earliest." DC's Opp'n, Docket No. [9] at 4 (citing D.C. Official Code § 1-206.02(c)(1) (2005 Supp.). Plaintiff therefore has shown no threat of "imminent" irreparable harm warranting the requested emergency relief. Similarly, with respect to Plaintiff's challenge to the Jury and Marriage Amendment Act of 2007, the law is already in effect, as Plaintiff concedes, and Plaintiff has proffered no threat of "imminent" irreparable harm as to her request for emergency relief on this issue either.

The Court also notes briefly that Plaintiff has failed to show a likelihood of success on the merits. In particular, with respect to Plaintiff's request to enjoin the pending final vote on DC Bill 18-482, "the individual council members and the Council itself are absolutely immune from suit for injunctive relief" as to all actions taken in the sphere of legitimate legislative activity. *State of Maryland v. Barry,* 6045 F.Supp. 495, 497 n. 1 (D.C.Cir. (1985) (citing *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980)); *see also Bogan v. Scott-Harris,* 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998).

For these reasons, as may be supplemented by the Court at a later date, the Court shall DENY Plaintiff's [2] Motion for Preliminary Injunction Staying the Final Vote on DC Bill 19-482 "Religious Freedom of Marriage Equality Act of 2009." An appropriate Order accompanies this Memorandum Opinion.

D.D.C.,2009.
Little v. Fenty
Slip Copy, 2009 WL 4981535 (D.D.C.)

END OF DOCUMENT

# EXHIBIT C

Not Reported in F.Supp., 1997 WL 607450 (D.D.C.), 13 IER Cases 210
**(Cite as: 1997 WL 607450 (D.D.C.))**

United States District Court, District of Columbia.
Jeffrey V. **ROBINSON**, Plaintiff,
v.
The **DISTRICT OF COLUMBIA GOVERNMENT**, et al., Defendants.
No. Civ.A. 97-787(GK).

July 17, 1997.

Diane Allison Seltzer, Eric L. Siegel, Washington, DC, Guy Zuzovsky, Siegal Law Firm, Washington, DC, for Jeffrey V. Robinson, plaintiff.
Wayne C. Beyer, Washington, DC, for District of Columbia, defendant.
Wayne C. Beyer, (See above), for Larry Soulsby, Chief of Police, defendant.
Wayne C. Beyer, (See above), for John Daniels, Inspector, In His Official and Individual Capacity, defendant.
Wayne C. Beyer, (See above), for Joshua Ederheimer, Captain, In His Official and Individual Capacity, defendant.
Wayne C. Beyer, (See above), for Glenn Shearod, Captain, In His Official and Individual Capacity, defendant.

**MEMORANDUM ORDER**

KESSLER, J.

**\*1** This matter is before the Court on Plaintiff's Motion for Preliminary Injunction [# 2]. Plaintiff brings this action under 42 U.S.C. §§ 1981, 1983, and 1985.[FN1] He alleges: (1) that he has been discriminated against because of his religion and race; and, (2) that he was retaliated against for exercising his First Amendment rights by filing internal complaints and speaking to the press about his employer's alleged discrimination.

> FN1. Plaintiff also asserted claims under the Religious Freedom Restoration Act of 1993 ("RFRA"), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.* However, the Supreme Court's decision in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624, 1997 WL 345322 (June 25, 1997), declared that act unconstitutional. Thus, Plaintiff's RFRA claims are dismissed.

Plaintiff filed a twenty-one count Amended Complaint on May 29, 1997. In that Complaint, he seeks declaratory, injunctive, and monetary relief against the District of Columbia Metropolitan Police Department ("MPD" or the "Department")[FN2] and individual MPD supervisors. In addition, MPD has initiated termination proceedings against Plaintiff and he has filed complaints with the MPD, the District of Columbia Office of Human Rights ("OHR") and the Equal Employment Opportunity Commission ("EEOC").

> FN2. The Complaint names the District of Columbia Government and Larry Soulsby, Chief of Police.

In his request for injunctive relief, Plaintiff asks: (1) that Defendants be enjoined from terminating his employment or taking any adverse action, including placing him on unpaid leave, pending the resolution of his administrative claims and his claims before this Court; and (2) that Defendants reinstate him to active duty status pending the resolution of his claims. The Court held oral argument on Plaintiff's motion on June 17, 1997. Based on Plaintiff's Motion, Defendants' Opposition, the many supplemental pleadings and affidavits filed by the parties, the representation and arguments made by counsel, the Court's own observations, and the entire record herein, the Court makes the following findings of fact and conclusions of law and grants Plaintiff's motion.

**I.** *Findings of Fact*

Plaintiff Jeffrey Robinson is an MPD Officer. He has been employed by MPD for approximately six years-three as a Police Cadet and three as a Police Officer. He has been assigned to the Sixth District in Southeast Washington, D.C. throughout his tenure with MPD. In his second sworn Affidavit, Plaintiff explains that his long term career goal is to become an MPD detective. Accordingly, he applied for a job as a station clerk in the spring of 1996. He believed that this would give him the opportunity to learn the station's operations, acquire computer experience and improve his writing skills, all of which would increase his potential for advancement within the Department.[FN3] Plaintiff's assignment immediately prior to being placed on administrative leave was as a desk clerk in the station house. However, when the station was short on manpower, he did request to be placed in a scout car or on a foot beat.[FN4] Plaintiff worked the night shift. During his tenure with MPD, Plaintiff received several letters of commendation, both from citizens and fellow officers.

Case 1:10-cv-00036-RBW   Document 8-1   Filed 01/17/10   Page 13 of 19

Page 2

Not Reported in F.Supp., 1997 WL 607450 (D.D.C.), 13 IER Cases 210
**(Cite as: 1997 WL 607450 (D.D.C.))**

> FN3. Plaintiff did apply for a Detective position in July 1996, but was not selected.

> FN4. This is corroborated to some degree by Defendant Ederheimer's order that the Plaintiff wear his hat while in the scout car.

Plaintiff began wearing short "twist" dreadlocks in September 1996. They are a manifestation of his Nazarite religious beliefs and his African-American culture. Plaintiff's dreadlocks are, from the Court's own observation, no longer than two to three inches and are neat and well groomed.[FN5]

> FN5. Defendants have repeatedly characterized Plaintiff's dreadlocks as "long, rope-like locks." The Court's own observation is that Plaintiff's locks are neither "long" nor "rope-like."

**\*2** Plaintiff wore his dreadlocks from September 1996 until December 1996 without incident. In December 1996, Defendant Joshua A. Ederheimer, a Captain in the Sixth District and Plaintiff's direct supervisor, received complaints about Plaintiff's hair from Defendant John Daniels, the Commander of the Sixth District, and Defendant Glenn Shearod, another Captain in the Sixth District. Defendants Daniels and Shearod complained that Plaintiff's hair was unprofessional. Defendant Daniels states that he received complaints that "officers and members of the public were making jokes and negative comments about [Plaintiff's] appearance." However, there are no documented complaints in the record and Plaintiff states that, prior to December 1996, Defendants never told him of any specific complaints. Defendant Daniels also states that, in his opinion, Plaintiff's hairstyle did not conform with MPD General Order 1101.1.

MPD General Order 1101.1 sets forth the standards for an officer's personal appearance. Part I.E.1, effective February 24, 1991, sets forth the standards for a male officer's hair and reads as follows:

a. Hair shall be neat, clean, and trimmed to present a groomed appearance.

b. It shall be worn at a length that will permit the uniform hat to fit securely on the head and in conformity with this order.

c. Hair on the sides of the head may touch the top of the ears, but shall not cover any portion of the outside surface of the ear.

d. Hair on the back of the head may touch, but shall not extend below, the mid-point of the shirt collar in the rear.

e. Hair shall be groomed so that, when the member is covered, the hair does not fall below the eyebrows or bunch out to the front, side, or rear of the headgear.

f. Extreme or fad style haircuts, such as the following, are prohibited:

(1) Mohawks,

(2) Tracks, designs, or sculptures cut into the hair,

(3) Decorations, or

(4) Ducktails, ponytails, or pigtails.

g. Hair color shall consist of only natural hair colors. Extreme or fad type artificial hair colors (e.g., purple, pink, green, etc.) are prohibited.

The order does not specifically prohibit dreadlocks.

Several other members of the MPD, who are not assigned to the Sixth District, wear their hair in dreadlocks, including Captain Ethel Jones, who has consented to being named on the record, and Officer Kevin Johnson,[FN6] who appeared at the hearing on Plaintiff's Motion.[FN7] Prior to the adverse actions taken against Plaintiff, only two other Officers have been subject to any disciplinary action for noncompliance with the grooming standards because they wore dreadlocks.

> FN6. The Court notes that Officer Jones' dreadlocks were also neat and well-groomed.

> FN7. Plaintiff has been reluctant to identify other members of the MPD who wear dreadlocks because of his fear that they may be subjected to disciplinary action. This reluctance seems well-founded.
>
> Just five days after the hearing on Plaintiff's Motion, Officer Johnson, who appeared at the hearing, was placed on

Not Reported in F.Supp., 1997 WL 607450 (D.D.C.), 13 IER Cases 210
**(Cite as: 1997 WL 607450 (D.D.C.))**

administrative leave and had his police powers revoked. In April 1997, Detective Stalling investigated an incident involving Officer Jones. An arrestee alleged that Officer Johnson and another officer had taken his property. Detective Stalling discovered that one of the arrestee's relatives had the funds. The matter was closed. However, Captain Grossman spoke with Officer Johnson on June 18 or 19, 1997, indicating that the investigation was being reopened.

In December 1996, Defendant Ederheimer informally contacted Plaintiff and said that, if Plaintiff did not cut his hair, he would have to wear his hat in the station and in his patrol car. Plaintiff indicated that he did not believe that his hair violated the regulations and that, based on his discussions with his union representative, he was not required to cut his hair. Throughout December, Plaintiff and Defendant Ederheimer had confrontations about Plaintiff's hair. On December 24, 1996, Defendant Ederheimer ordered Plaintiff to cut his hair by January 2, 1997, or face suspension on a charge of insubordination. On December 26, 1997, after meeting with Plaintiff's union representative, Defendant Daniels told Plaintiff that he did not want Plaintiff to wear his hat in the station instead of cutting his hair. There is nothing in the record regarding what happened between January 2, 1997, and February 1997.[FN8]

> FN8. The Court notes that D.C.Code § 1-617.1(b-1)(1) requires that any corrective or adverse action must be taken within 45 days of the date "that the agency knew or should have known of the act or occurrence allegedly constituting cause ..." Plaintiff was first put on notice that he was facing suspension in December 1996, but no adverse action was taken until April 11, 1997, more than 90 days after his first alleged act of insubordination.

**\*3** In February 1997, Plaintiff and his counsel met with the MPD's Office of Labor Relations to discuss his concerns about the discrimination and harassment he had been experiencing. He explained that his hairstyle had a religious aspect.

On at least three occasions in February, Defendant Ederheimer directed Plaintiff to cut his hair. On February 20, 1997, Defendant Ederheimer informed Plaintiff that MPD would not allow him to work and that it would charge him with annual leave until he cut his hair. Plaintiff worked on February 23, 1997.

On February 26, 1997, Plaintiff filed a discrimination complaint with the MPD. Just two hours after he gave the notarized complaint to Lieutenant Yvette Tate, Plaintiff was ordered by Defendant Ederheimer to cut his hair or be sent home on his own leave. Further, Defendant Ederheimer told Plaintiff that he was designating Plaintiff's dreadlocks a "fad" hairstyle, prohibited by General Order 1101.1.

On twenty-two separate occasions from February 26, 1997, to April 11, 1997, Plaintiff reported to work but was sent home as "unfit for duty" because of his failure to cut his hair.

In March 1997, MPD investigated Plaintiff for his failure to obey the order to cut his hair. Defendant Ederheimer conducted the investigation, although Plaintiff had named him in his MPD discrimination complaint. On March 31, 1997, Defendant Ederheimer requested that Plaintiff write a statement explaining why he would not cut his hair. Plaintiff stated that he was "growing [his] hair in the form of locks because it is an expression of [his] religion and [his] culture."

On April 3, 1997, an article appeared in *The City Paper* describing Plaintiff's situation. The article quoted Plaintiff expressing his concerns about the treatment he was receiving because of his hair.

A Commander's resolution hearing was held on April 7, 1997, via telephone. Plaintiff was advised that, because of the seriousness of his alleged misconduct, a resolution could not be reached within the Sixth District and that the matter would be referred to MPD's Disciplinary Review Office.

On April 11, 1997, MPD issued a notice of proposed adverse action, seeking Plaintiff's removal from MPD. The grounds cited for the action were failure to comply with General Order 1101.1 and several incidents of insubordination for failure to comply with the orders of his superiors to cut his hair. Plaintiff was given 21 days to respond to the notice and was placed on administrative leave with pay. On the same day, April 11, 1997, MPD served Plaintiff with a notice revoking his police duties. That notice, signed by Defendant Shearod, prohibited Plaintiff from: (1) leaving the Washington metropolitan area without permission; (2) leaving his home between the hours of 8:00 a.m. through 4:00 p.m. from Monday

Not Reported in F.Supp., 1997 WL 607450 (D.D.C.), 13 IER Cases 210
**(Cite as: 1997 WL 607450 (D.D.C.))**

through Friday without notifying MPD; and (3) engaging in outside employment.[FN9] A hearing before a three-member panel was scheduled for May 21, 1997. That hearing has been postponed pending the disposition of the instant motion. Plaintiff would have a right to appeal any determination by that panel. However, the body that hears such appeals has been unable to obtain a quorum for some time.

> FN9. There is evidence that the notice is a standard form used by MPD and that the provisions are in effect for all MPD officers who are on administrative leave. *See* Decl. of Assistant Chief Sonya T. Proctor ¶ 5.

**\*4** Plaintiff has a wife and four children, including an infant. His wife recently became ill and cannot work full time. While on administrative leave, Plaintiff is not eligible to obtain a night shift salary differential, overtime wages, or court appearance fees. As a result of being on leave, Plaintiff is experiencing financial hardship. The fact that his suspension is based on charges of insubordination has affected his professional reputation. In addition, he has been emotionally affected by these events and has been seeking help from MPD's Employee Assistance Program weekly since December 30, 1996. His relationship with his wife has suffered-they argue, have trouble communicating, and have come close to separating. They did not have such problems prior to December 1996.

## II. *Conclusions of Law*

Plaintiff filed this motion for preliminary injunction seeking to enjoin Defendants from terminating him and seeking reinstatement to active status pending resolution of his administrative and judicial claims. To determine whether preliminary injunctive relief should be granted, the Court must consider: (1) whether the party seeking the relief can establish a substantial likelihood of success on the merits; (2) whether that party will suffer irreparable harm if the injunctive relief is not granted; (3) whether the party opposing the relief will be harmed by the granting of the injunction; and (4) whether granting the injunction is in the public interest. *CityFed Fin. Corp. v. office of Thrift Supervision,* 58 F.3d 738 (D.C.Cir.1995); *Randolph-Sheppard Vendors of Am. v. Weinberger,* 795 F.2d 90, 110 (D.C.Cir.1986). Preliminary injunctive relief is appropriate to maintain the status quo when "a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C.Cir.1977). For the reasons set forth below, the Court concludes that this case is an appropriate one for granting such relief.

### A. Likelihood of Success on the Merits

Although Plaintiff has asserted many claims against Defendants, he need only show a likelihood of success on the merits of any one of those claims in order to establish entitlement to injunctive relief. Plaintiff has successfully shown a strong likelihood of success with respect to his claims that Defendants retaliated against him for exercising his First Amendment rights.[FN10]

> FN10. The Court is expressing no opinion with respect to Plaintiff's other claims.

Several of Plaintiff's First Amendment claims rest on the premise that the government may not treat him adversely in retaliation for engaging in protected speech. Our Court of Appeals has described a public employee's [FN11] First Amendment cause of action as having four elements:

> FN11. It cannot be disputed that Plaintiff, a police officer, is a public employee.

First, the public employee must have been speaking on a matter of public concern.... Second, the court must balance the interest of the employee as a citizen, in commenting upon matters of public concern and the interest of the employer in promoting the efficiency of the public services it performs through its employees. Thus, only where the employee's speech touches on a matter of public concern, and only where the employee's First Amendment interest is not outweighed by any disruption that the speech may cause to the efficiency of the public enterprise is that speech constitutionally protected. Third, the employee must prove that [his] speech was a substantial or motivating factor in the denial of the benefit that she sought. Finally, the government employer must be given an opportunity to prove that it would have reached the same decision even absent the protected conduct.

**\*5** *Tao v. Freeh,* 27 F.3d 635, 638-639 (D.C.Cir.1994) (citing *Hall v. Ford,* 856 F.2d 255, (D.C.Cir.1988); *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878,

Not Reported in F.Supp., 1997 WL 607450 (D.D.C.), 13 IER Cases 210
**(Cite as: 1997 WL 607450 (D.D.C.))**

128 L.Ed.2d 686 (1994); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)) (internal quotations omitted). Based on the record before the Court, Plaintiff is likely to carry his burden of proof on all four elements.

First, Plaintiff has met his burden of showing that his complaints of racial and religious discrimination, made in his internal discrimination complaint in March 1997 and to the *City Paper* in April 1997, were protected speech. "Whether an employee's speech is one of public concern depends on its content, form, and context, as revealed by the whole record." *Tao,* 27 F.3d at 639 (citing *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708, (1983)).

The *City Paper* article focused on MPD's treatment of Plaintiff and another unnamed officer who wore dreadlocks and were subject to discipline as a result. In particular, the article criticized the MPD for using its limited resources to coerce Plaintiff into cutting his hair and enforcing the grooming standards in a selective and discriminatory way. "A statement concerning racial discrimination on the part of a public agency is a matter of public concern because it involves information that enables members of society to make informed decisions about the operation of their government." *Id.* at 640 (citations and internal quotations omitted). Plaintiff's allegations of racial and religious discrimination fall squarely within this rubric. The fact that the media covered Plaintiff's allegations of discrimination is further evidence that they were, indeed, a matter of public concern. *Id.* (citing with approval *Rode v. Dellarciprete,* 845 F.2d at 1201-02 (3d Cir.1988)).

Defendants claim that because Defendant Ederheimer had finished his investigation and had written a report recommending termination by March 28, 1997, prior to the publication of the *City Paper* article, any adverse action taken on April 11, 1997, could not have been retaliatory. However, the City Paper had contacted Defendant Ederheimer about the article in March 1997 and therefore he was aware that it was focusing on MPD's treatment of officers wearing dreadlocks.

Further, Plaintiff's internal complaints of harassment were also protected speech. As the Court in *Tao* stated, even speech that is not made public can be speech on a matter of public concern because the "First Amendment is not 'lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.' " 27 F.3d at 640-41 (quoting *Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 415-16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)).

With respect to the second *Tao* criteria, there is no evidence that Plaintiff's speech disrupted in any way MPD operations or his own efficiency as a police officer. Our Court of Appeals addressed these issues in *Tygrett v. Barry,* 627 F.2d 1279, 1283 (D.C.Cir.1980), emphasizing the need "for a meticulous application of the *Pickering* test" to ensure that a police officer is not wrongly deprived of his rights. In *Tygrett,* MPD discharged a probationary officer after he became active in efforts by fellow police officers to lobby Congress for a pay raise and supported a "sick-in" as a way of pressing for their demands. *Id.* at 1281. In rejecting MPD's argument that "there was, in fact, an interference with the efficiency of the public services performed," *id.* at 1282 (quoting *Jannetta v. Cole,* 493 F.2d 1334, 1336 (4th Cir.1974)), the Court examined the testimony of members of the Department about the reasons for Tygrett's dismissal [FN12] and concluded that "the Department's firing ... was motivated by a concern for how others would react to what Tygrett had said" rather than any actual disruption caused by Tygrett. *Id.* at 1285.

> FN12. The letter dismissing Tygrett cited a concern for the image of the Department and its capacity for carrying out its obligations to the community. However, the Chief of Police testified that he had fired Tygrett because he wanted to "avoid a blue flu strike" and because Tygrett might lead others to participate in such a strike. *Id.* at 1285.

**\*6** Similarly, there is insufficient evidence of disruption on this record. First, the declarations submitted by Defendants citing the need for uniformity and esprit de corps are unconvincing, given that other officers with similar hair styles have not been treated in the same manner as Plaintiff. Most unconvincing is the declaration of a police officer who has not even seen Plaintiff, but states that he "understand(s) that Officer Robinson was starting to grow long, rope-like locks", and feels that they would "raise questions in the mind of citizens as to whether an individual is really a police officer." Defendants have simply, at this point, failed to submit any concrete evidence that residents of the

Not Reported in F.Supp., 1997 WL 607450 (D.D.C.), 13 IER Cases 210
**(Cite as: 1997 WL 607450 (D.D.C.))**

District of Columbia would fail to recognize Plaintiff as a police officer, or would fail to respond to him appropriately simply because of his dreadlocks.

As to whether Plaintiff's protected speech was a motivating factor in the decision to discipline him, the Court can only conclude, at this stage, that it was. Plaintiff began growing his dreadlocks in September of 1996. Despite the fact that he was told to cut them throughout December 1996, January, February, and March 1997, MPD took no adverse action against Plaintiff until *after* he filed an internal discrimination complaint and the *City Paper* profiled and quoted him. The obvious inference to be drawn from the timing of Plaintiff's suspension pending termination proceedings is that there was some causal nexus between Plaintiff's protected speech and that suspension.

Finally, with respect to whether the employer would have taken the same action absent the protected speech, there is no evidence on the record. Defendants may well be able to produce such evidence at a later date, but, on this record, Plaintiff has shown more than a colorable probability of succeeding on his First Amendment retaliation claims.

**B. Irreparable Harm**

A party moving for preliminary injunctive relief must carry the burden of showing irreparable injury. *Sampson v. Murray,* 415 U.S. 61, 88-92, 94 S.Ct. 937, 39 L.Ed.2d 166 (1973). As our Court of Appeals has noted, "mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958).

In *Sampson,* a probationary employee who was terminated filed an action in federal court seeking reinstatement pending administrative appeal of her dismissal. In her complaint, she alleged that the dismissal would deprive her of income and cause her to suffer the embarrassment of being wrongfully discharged. *Sampson,* 415 U.S. at 66-67. Although both the District Court and the Court of Appeals found that the plaintiff might suffer irreparable harm, the Supreme Court reversed, finding that economic loss and damage to reputation resulting from her termination were inadequate to establish irreparable injury. 415 U.S. at 91-92.

*7 Despite this holding, the Court specifically left open the possibility that there may be circumstances in which injunctive relief would be proper. *Id.* at 92 n. 68. In other words, *Sampson* did not establish a *per se* rule that injunctive relief is never proper in an employee suspension/termination case and, therefore, it is the duty of the court to scrutinize and weigh the facts in each particular case. *Accord, Gonzalez v. Chasen,* 506 F.Supp. 990, 998 (D.P.R.1980).

Many courts applying *Sampson* have found that injunctive relief should issue. *See Gately v. Massachusetts,* 2 F.3d 1221 (1st Cir.1993) (upholding grant of injunctive relief), *cert. denied,* 511 U.S. 1082, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994); *Gonzalez, supra,* 506 F.Supp. 990; *Schrank v. Bliss,* 412 F.Supp. 28 (M.D.Fla.1976); *Keyer v. Civil Serv. Comm'n of the City of New York,* 397 F.Supp. 1362 (E.D.N.Y.1975); *Assaf v. University of Tex. Sys.,* 399 F.Supp. 1245 (S.D.Tex.1975); *American Fed. of Gov't Employees, Local 1858 v. Callaway,* 398 F.Supp. 176 (N.D.Ala.1975).

A survey of cases involving law enforcement employees is instructive. In *Keyer,* the District Court enjoined dismissal of non-probationary, permanent law enforcement employees with unmarred records of at least satisfactory performance. The plaintiffs' discharge from non-probationary job status, in a highly restricted job market for persons with their experience, combined with the handicapping stigma of dismissal in the profession and attendant loss of job benefits, were sufficient to constitute irreparable injury. *Keyer,* 397 F.Supp. at 1370-72.

The *Gonzalez* court also enjoined the dismissal of a law enforcement employee. In that case, the plaintiff's qualifications in the "limited and specialized field" of law enforcement, the limited opportunities for employment in the field, and the stigma of dismissal, combined with the fact that he was the sole breadwinner in his family, and the potential loss of health insurance for his seriously ill son, sufficiently demonstrated that the plaintiff would be irreparably harmed if an injunction did not issue. The court distinguished *Sampson* because the plaintiff was "a non-probationary, permanent employee, whose good behavior and above satisfactory performance justifie[d] a reasonable expectation of continued employment in the circumstances of this case." *Gonzalez,* 506 F.Supp. at 999.

In *Gately,* the First Circuit affirmed the District

Not Reported in F.Supp., 1997 WL 607450 (D.D.C.), 13 IER Cases 210
**(Cite as: 1997 WL 607450 (D.D.C.))**

Court's issuance of an injunction prohibiting the enforcement of statutorily mandated retirement for police officers over the age of 55. 2 F.3d at 1224. The court below found that reinstatement after a successful trial would not compensate any plaintiffs who had, in the interim, reached a higher retirement age and would lose their later years of employment and that "time spent away from the force would impair the plaintiffs' ability to stay in touch with new developments ... impairing their effectiveness and that of the State Police as a whole, if and when they are ultimately reinstated." *Id.* at 1234 (internal quotations omitted). [FN13]

> FN13. The court further distinguished *Sampson* because the plaintiffs were not circumventing an administrative appeal process and the plaintiffs' allegations of irreparable harm went beyond temporary loss of pay or reputational injury. Further, plaintiffs were not claiming that they were entitled to additional procedural safeguards in effectuating the discharge, as the *Sampson* plaintiff had claimed, but rather that the discharge itself would violate their civil rights. *Id.*

**\*8** Finally, in *Schrank,* the District Court ordered the reinstatement of a deputy sheriff pending decision on his due process claim. Like the *Keyer* and *Gonzalez* courts, the court cited the stigma of dismissal of a law enforcement agent with the charge of insubordination as one factor that weighed in favor of an injunction. Further, the court found that *Sampson* was distinguishable. The plaintiff in *Schrank* was also a non-probationary employee, with an above satisfactory employment record, with no reasonable hope to vindicate himself in the future. *Schrank,* 412 F.Supp. at 37.

Similar factors are present in this case. With respect to Plaintiff's administrative leave status, he is being irreparably harmed. Even if the Court were ultimately to rule in Plaintiff's favor, he could not recoup the night shift differential, or the court appearance fees, or the overtime pay that he could be earning. The financial losses have placed significant strain on his personal relations with his wife. Further, with each day that Plaintiff is out of the station house or off the streets, he loses the opportunity to gain valuable experience and training to help him achieve his career goal of becoming a police detective.

Further, with respect to Plaintiff's potential termination, he will be irreparably harmed if MPD is allowed to terminate him pending the outcome of this case. Plaintiff is a non-probationary MPD employee. Until the events underlying this case occurred, he had, at a minimum, a satisfactory record and had received several commendations that were placed in his file.[FN14] Thus, he had a reasonable expectation of continued employment. He works in a field where opportunities are limited to public employers. Therefore, he will likely have trouble finding employment with a record of discharge for insubordination. Although Plaintiff is not his family's sole breadwinner, his wife is ill. If he were to lose his job, his wife and four children would be without the health insurance that they need. Further, Plaintiff is not claiming that MPD must give him additional procedural protections before it can discharge him, but rather that any discharge at all would violate his First Amendment rights. Finally, because the Board to which Plaintiff may appeal an adverse decision has been unable to obtain a quorum for some time, Plaintiff may not have a realistic opportunity for vindication.

> FN14. Defendants introduced no evidence in the record contradicting Plaintiff's assertions that he was a skilled and dedicated police officer.

For these reasons, the Court finds that Plaintiff is being irreparably harmed by his inability to serve as an active duty police officer and would be irreparably harmed if terminated from the force.

**C. Harm to Defendants**

To determine whether to issue an injunction, the Court must also balance the interests of the parties whom the injunction would affect. An injunction can issue only if the threatened injury to the movant, here Plaintiff, outweighs the threatened harm to the party opposing the relief, here Defendants. Defendants have made no showing that they would be harmed if the requested relief is granted.

**\*9** Plaintiff is currently on administrative leave and is receiving his base pay from MPD. Plaintiff's return to active duty status will not financially harm defendants. Defendants have submitted the Declaration of MPD Assistant Chief Sonya T. Proctor stating that MPD "[m]anagement would not want an officer who faces termination for insubordination to be working the officer's regular duties while the charges are pending. The fact that

Not Reported in F.Supp., 1997 WL 607450 (D.D.C.), 13 IER Cases 210
**(Cite as: 1997 WL 607450 (D.D.C.))**

the officer faces discipline puts a strain on the officer's relationship with supervisors and the officer's ability to follow orders is in question if the pending discipline relates to insubordination."

The statements of Assistant Chief Proctor are not persuasive in this context, where Plaintiff has an otherwise unblemished record and there is not one shred of evidence to suggest that he would disobey other orders of his superiors. If an employer could rely on speculation about future insubordination in order to balance the equities in its favor, it would have a powerful weapon for defeating a wronged employee's request for injunctive relief. An employer could always assert that a pretextual and speculative insubordination charge renders the employee incapable of working successfully for his superiors and with his peers. This would allow an employer to wrong the employee twice-once when it initially charged the employee with insubordination in violation of his First Amendment rights and again when the employee challenged that charge. If an employee's "right not to be fired for reasons that infringe on First Amendment rights", *see Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), is to have any meaning at all, it must protect Plaintiff's right to work where his record is otherwise unblemished.[FN15]

> FN15. Defendants have concerns about Plaintiff's ability to work with the superior officers who are Defendants in this case, they can certainly assign Plaintiff to one of the six other MPD divisions not involved in this action.

Because the only insubordination that Defendants can point to in Plaintiff's record is that which Plaintiff alleges was an exercise of his First Amendment rights, the Court finds that the harm to Plaintiff if the injunction is not granted outweighs the harm to Defendants if the injunction is granted.

**D. The Public Interest**

Issuing a preliminary injunction in this case will not disserve the public interest. First, with respect to the specific disserve the public interest. First, with respect to the specific facts at hand, the evidence establishes that Plaintiff was a capable and conscientious police officer. Thus, it affirmatively serves the public interest to continue to employ an officer who does his job well. *Accord, Gonzalez,* 506 F.Supp. 990. Given the District of Columbia's high crime rate and stretched financial coffers, the city can only benefit if a police officer whom it is paying actually is doing the work of a police officer.

Second, there are serious allegations of retaliation for the exercise of First Amendment rights. Failure to grant preliminary injunctive relief may well deter others from filing charges of discrimination or speaking out on matters of public interest. The avoidance of such a chilling effect will always serve the public interest.

**III.** *Conclusion*

*\*10* The Court concludes that Plaintiff has carried his burden and is entitled to preliminary injunctive relief. First, there is a substantial likelihood that Plaintiff will succeed on the merits of his retaliation claims. Second, Plaintiff is experiencing irreparable harm from not being able to work as an active duty police officer. Finally, issuing this injunction will not harm Defendants and is clearly in the public interest.

Thus, it is this 17th day of July, 1997, hereby:
ORDERED, that Defendants, their agents, servants, employees, and those individuals acting at their direction are enjoined from ordering Plaintiff to change or cut his dreadlocks, from terminating his employment, from placing Plaintiff on administrative leave, or from taking other adverse employment action against him pending a final judgment in the action pending before this court and in the pending proceedings before the District of Columbia Office of Human Rights and the United States Equal Employment Opportunity Commission; and it is further
ORDERED, that Defendants immediately reinstate Plaintiff to active duty as a police officer with full pay, rights and benefits; and it is further
ORDERED, that this Order shall remain in effect unless otherwise ordered by this Court; and it is further

ORDERED, that a Status Conference is set for **July 24, 1997, at 2:00 p.m.** in Courtroom 19.
D.D.C.,1997.
Robinson v. District of Columbia Government
Not Reported in F.Supp., 1997 WL 607450 (D.D.C.), 13 IER Cases 210
END OF DOCUMENT