UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MORRIS D. DAVIS,

Plaintiff,

v.

Civil Action No. 1:10-cv-00036-RBW

JAMES BILLINGTON, in his official
capacity as the Librarian of Congress, and
DANIEL P. MULHOLLAN, in his
individual capacity,

Defendants.

## REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
## ON BEHALF OF DEFENDANT DANIEL P. MULHOLLAN

Dated: April 26, 2010

Respectfully submitted,

TONY WEST
Assistant Attorney General

RONALD C. MACHEN, JR.
United States Attorney

JENNIFER R. RIVERA
Branch Director

SUSAN K. RUDY
Assistant Branch Director


 _/s/ Christopher R. Hall_
CHRISTOPHER R. HALL
DEANNA L. DURRETT
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C.  20530

(202) 514-4778

## TABLE OF CONTENTS

PAGES

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.     THE CSRA PRECLUDES THE CREATION OF A BIVENS REMEDY HERE. . . . . . . . . . . . . . . . 2

II.    PLAINTIFF FAILS TO STATE A CLAIM UNDER BIVENS. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       A.     PLAINTIFF FAILS TO STATE A FIRST AMENDMENT WRONGFUL
              DISCHARGE CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       B.     PLAINTIFF FAILS TO STATE A VAGUENESS CLAIM. . . . . . . . . . . . . . . . . . . . . . . . 14

III.   DIRECTOR MULHOLLAN IS ENTITLED TO QUALIFIED IMMUNITY AS TO
       ALL CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       A.     PLAINTIFF'S OPPOSITION IDENTIFIES NO VIOLATION OF A "CLEARLY
              ESTABLISHED" FIRST AMENDMENT RIGHT UNDER PICKERING . . . . . . . . . . . . . 17

       B.     PLAINTIFF IDENTIFIES NO ALLEGED VIOLATION OF ANY "CLEARLY
              ESTABLISHED" DUE PROCESS RIGHT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGES**

American Postal Workers Union, AFL-CIO v. United States Postal Service,
    830 F.2d 294 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Ashcroft v. Iqbal,
    129 S. Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

Bates v. Hunt,
    3 F.3d 374 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,
    403 U.S. 388 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Benson v. Allphin,
    786 F.2d 268 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Blankenship v. McDonald,
    176 F.3d 1192 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Bush v. Lucas,
    462 U.S. 367 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

Connick v. Myers,
    461 U.S. 138 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Davis v. Passman,
    442 U.S. 228 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Dotson v. Griesa,
    398 F.3d 156 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

Filebark v. Dep't of Transp.,
    555 F.3d 1009 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Grosdidier v. Chairman, Broad. Bd. Of Gov'rs,
    560 F.3d 495 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Hall v. Ford,
  856 F.2d 255 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hope v. Pelzer,
  536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hubbard v. U.S. E.P.A. Adm'r,
  809 F.2d 1 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Jones v. TVA,
  948 F.2d 258 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Keeffe v. Library of Congress,
  777 F.2d 1573 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 23, 24

Kinsey v. Salado Indep. Sch. Dist.,
  950 F.2d 988 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Kotarski v. Cooper,
  799 F.2d 1342 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Kotarski v. Cooper,
  866 F.2d 311 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Lee v. Hughes,
  145 F.3d 1272 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Lombardi v. Small Bus. Admin.,
  889 F.2d 959 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Malley v. Briggs,
  475 U.S. 335 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

McEvoy v. Spencer,
  124 F.3d 92 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

McGregor v. Greer,
  748 F. Supp. 881 (D.D.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

McIntosh v. Turner,
  861 F.2d 524 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

McKinney v. Pate,

20 F.3d 1550 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Melton v. City of Oklahoma City,
    879 F.2d 706 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Nicholas v. Penn. State Univ.,
    227 F.3d 133 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

O'Donnell v. Barry,
    148 F.3d 1126 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 20, 21

Pearson v. Callahan,
    129 S. Ct. 808 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Pickering v. Board of Education of Township High School District 205, Will County,
    391 U.S. 563 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Polsdorfer v. Gearan,
    1996 WL 451051 (D.D.C. Aug. 1, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rakovich v. Wade,
    850 F.2d 1180 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

Rankin v. McPherson,
    483 U.S. 378 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Regents of the Univ. of Mich. v. Ewing,
    474 U.S. 214 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Saucier v. Katz,
    533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21

Schweiker v. Chilicky,
    487 U.S. 412 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 6

Sculimbrene v. Reno,
    158 F. Supp. 2d 1 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Spagnola v. Mathis,
    809 F.2d 16 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Spagnola v. Mathis,
    859 F.2d 223 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 6, 8

Spiegla v. Hull,
    371 F.3d 928 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Stewart v. Evans,
    275 F.3d 1126 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Toms v. Office of the Architect of the Capitol,
    650 F. Supp. 2d 11 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Fausto,
    484 U.S. 439 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

United States v. Williams,
    128 S. Ct. 1830 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

U.S. Civil Sev. Comm'n v. Nat'l Ass'n of Letter Carriers,
    413 U.S. 548 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Waters v. Churchill,
    511 U.S. 661 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

Westfield High Sch. L.I.F.E. Club v. City of Westfield,
    249 F. Supp. 2d 98 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Winder v. Erste,
    511 F. Supp. 2d 160 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Zimbelman v. Savage,
    228 F.3d 367 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## INTRODUCTION

Director Mulhollan's Motion to Dismiss established that Plaintiff's Bivens claims against him are barred by "special factors" that prohibit the judicial creation of a Bivens remedy in this context – a textbook federal government employment case in which Plaintiff, a former Assistant Director at the Congressional Research Service ("CRS"), alleges that he was separated from his position in violation of the First and Fifth Amendments. The existence of the Civil Service Reform Act ("CSRA"), a comprehensive system enacted by Congress to govern the rights and remedies of federal employees, represents the paradigmatic example of such special factors, as the Supreme Court and the D.C. Circuit have both held unequivocally. In opposition, Plaintiff suggests, inter alia, that a ruling in Director Mulhollan's favor would be "unwarranted and unjust" and would be "chilling" in its implications for the rights of federal employees like himself. These pronouncements lack any factual basis. There would be no "unwarranted and unjust" or "chilling" outcomes should the Court follow controlling authority, as it must, and deny the creation of Plaintiff's requested Bivens remedy. The availability of remedies is irrelevant to whether a particular statutory scheme, like the CSRA, precludes the judicial creation of a Bivens remedy; what is relevant is whether the scheme is intended to be comprehensive. And in any event, the CSRA does not preclude Plaintiff's equitable claims against the Library as long as they are within the Court's subject-matter jurisdiction in the first instance. The Court should dismiss Plaintiff's Bivens claims on this basis alone.

That said, if the Court disagrees, Director Mulhollan has already shown that Plaintiff's own allegations compel the dismissal of his Bivens claims as a substantive matter, and that qualified immunity shields Director Mulhollan from such claims because the rights he is alleged to have violated were not "clearly established" at the time of Plaintiff's separation. As explained below, Plaintiff's arguments in opposition do not suggest otherwise, and should be rejected should the Court

even reach the substance of Plaintiff's allegations.

## ARGUMENT

As set forth in Director Mulhollan's opening brief, Plaintiff's claims for damages under

Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), must

be dismissed for three reasons. First, the existence of a comprehensive remedial scheme in the

CSRA bars the judicial creation of a Bivens remedy here. Second, Plaintiff fails to state a claim

against Director Mulhollan under Fed. R. Civ. P. 12(b)(6). Finally, even if Plaintiff's allegations

could be construed to state a claim that would survive dismissal on the pleadings, they do not allege

a violation of a "clearly established" right as required to overcome qualified immunity. As explained

below, Plaintiff's arguments in opposition are not persuasive.

## I.    THE CSRA PRECLUDES THE CREATION OF A BIVENS REMEDY HERE.

This case is a classic federal employment dispute in which Plaintiff, a federal civil servant,

claims he was unconstitutionally separated from his employment at CRS in violation of his First and

Fifth Amendment rights. Plaintiff seeks to vindicate the alleged constitutional violation in part by

suing Director Mulhollan in his individual capacity for compensatory and punitive damages. Yet,

because Plaintiff's Bivens claim centers on an adverse personnel action, it is precisely the type of

claim governed by the CSRA – a comprehensive remedial scheme that has been held by the Supreme

Court to preclude Bivens remedies in cases such as this. Consequently, the Court should dismiss

Plaintiff's Bivens claims against Director Mulhollan.

In Plaintiff's Opposition to Director Mulhollan's Motion to Dismiss, he argues against

dismissal of his Bivens claims because, according to Plaintiff, the CSRA does not preclude the

Bivens claims of plaintiffs to whom it offers no administrative remedies. Plaintiff's remedy-centric

argument, however, suffers from one fatal flaw: both the Supreme Court and the D.C. Circuit have

instructed that, in determining if "special factors" counsel against the creation of a <u>Bivens</u> remedy, a "case-by-case examination of the particular administrative remedies available to a given plaintiff [is] unnecessary." <u>Spagnola v. Mathis</u>, 859 F.2d 223, 228 (D.C. Cir. 1988) (en banc); <u>see also Bush v. Lucas</u>, 462 U.S. 367, 388 (1983).   Instead, a court must focus on whether there is a congressionally created, comprehensive scheme that speaks to the plaintiff's claim and, if that scheme does not provide a remedy for the claim, whether the omission of a remedy was "inadvertent." <u>See Schweiker v. Chilicky</u>, 487 U.S. 412 (1988); <u>see also Jones v. TVA</u>, 948 F.2d 258, 264 (6th Cir. 1991) ("[T]he 'special factors' analysis does not require a foray into the meaningfulness of federal employees' remedies under the CSRA. The focus is on the comprehensive nature of the administrative system protecting the rights of the plaintiff, as well as Congress' expertise and authority in the field in question.") (internal citation omitted). As explained in Director Mulhollan's Motion to Dismiss, because it is clear that the CSRA covers Plaintiff's claims, and because Plaintiff's lack of an administrative remedy under the CSRA was not "inadvertent," a <u>Bivens</u> remedy is precluded.[1]

---

[1] Plaintiff does not appear to contest the CSRA's application to his claims, <u>see</u> Pl.'s Opp. Mem. at 9-17; <u>but see id.</u> at 13 (The "CSRA does not even 'technically accommodate' Col. Davis' constitutional challenges."). And nor can he, for Plaintiff's First Amendment retaliation claims resemble the plaintiff's First Amendment claim in <u>Bush</u>, which the Supreme Court recognized as covered by the CSRA. <u>See Bush</u>, 462 U.S. at 385 (The CSRA "appl[ies] to a multitude of personnel decisions that are made daily by federal agencies. Constitutional challenges to agency action, such as the First Amendment claims raised by petitioner, are fully cognizable within this system."); <u>see also</u> <u>Spagnola</u>, 859 F.2d at 229-30 ("<u>Bivens</u> remedies [do not] exist for civil service employees and applicants who advance constitutional challenges to federal personnel actions" because the CSRA "affirmatively speaks" to such claims "by condemning the underlying actions as 'prohibited personnel practices.'"); <u>Polsdorfer v. Gearan</u>, 1996 WL 451051, *12 n.8 (D.D.C. Aug. 1, 1996) ("Termination as a result of First Amendment speech is a 'prohibited personnel practice' within the CSRA system."). Indeed, despite mischaracterizing Director Mulhollan's position by describing it as "conced[ing] that [Plaintiff's] termination is not covered by the CSRA," <u>see id.</u> at 9, Plaintiff only argues that the CSRA should not preclude a <u>Bivens</u> remedy in this case because Plaintiff, as a probationary, excepted service employee, cannot avail himself of the statute's administrative procedures and remedies for

In its 1983 decision in Bush, the Supreme Court addressed the plaintiff's Bivens claim for an allegedly unlawful demotion in violation of the First Amendment and held that:

> [t]he question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue.

462 U.S. at 388. The Court stated that the plaintiff's claim arose "out of an employment relationship that is governed by" the CSRA and that the CSRA, as a comprehensive remedial system, embodied Congress' judgment on federal employment disputes and precluded the judicial imposition of a damages remedy, notwithstanding the fact that the plaintiff's constitutional claims were not "fully cognizable" under the statute. Id. at 386.

Nonetheless, Plaintiff argues that because the plaintiff in Bush was afforded access to the CSRA's remedial provisions and because the Court specifically noted that certain federal employees are denied these same rights, the Court "explicitly left open the question whether 'the Constitution itself requires a judicially-fashioned damages remedy in the absence of any other remedy to vindicate the underlying right.'" Pl.'s Opp. Mem. at 11 (quoting Bush, 462 U.S. at 378 n.14). Yet Plaintiff ignores the fact that whatever question may have been left open by Bush was certainly closed by the Supreme Court's subsequent decision in Schweiker v. Chilicky, 487 U.S. 412 (1988), in which the Court explained that the decision in Bush was not based on what remedies were available to the plaintiff, but instead on the fact that "the case involved policy questions in an area that had received careful attention from Congress." Chilicky, 487 U.S. at 423. As the D.C. Circuit subsequently announced in Spagnola, it is now clear under Chilicky that a "case-specific analysis" of the

_____

adverse personnel action claims. See id. at 9 n.2, 9-10. Thus, there appears to be no valid dispute from Plaintiff that with the enactment of the CSRA, Congress indeed has legislated as to his claims.

4

"particular statutory remedies available to a claimant" is inappropriate. Id. at 227-28.[2] Courts must "withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights" and has not "'inadvertently'" denied a particular claimant remedies under that scheme. Id. at 228 (quoting Chilicky, 487 U.S. at 423).[3]

In light of the holdings in Chilicky and Spagnola, Plaintiff's Opposition is most notable for what it conspicuously fails to argue: that the lack of administrative protections for a federal employee like Plaintiff is anything but advertent. Plaintiff decries the prospect of dismissal of his

---

[2] Since Chilicky's clarification of the Court's holding in Bush, courts have uniformly emphasized the existence of the CSRA over the remedies provided thereunder. See, e.g., Grosdidier v. Broad. Bd. of Governors, 560 F.3d 495, 498 (D.C. Cir. 2009) ("We have emphasized [] that the CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA"); Dotson v. Griesa, 398 F.3d 156, 163 (2d Cir. 2005) ("The CSRA represents Congress's comprehensive identification of the employment rights and remedies available to federal civil service personnel."); Kotarski v. Cooper, 866 F.2d 311, 312 (9th Cir. 1989) (noting that the court originally did not "bar [the plaintiff's] Bivens claim because the administrative remedies available to him, as a probationary employee, under the [CSRA] were inadequate," but subsequently denying Bivens claim after original judgment was vacated by Supreme Court for reconsideration in light of Chilicky); McIntosh v. Turner, 861 F.2d 524, 526 (8th Cir. 1988) (same).

[3] Plaintiff's suggestion that a Bivens remedy ought to be available here because of Davis v. Passman, 442 U.S. 228 (1979) – a decision predating both Bush and Chilicky – is unavailing. As an initial matter, "the Davis Court did not consider the effect of the CSRA on Davis' Bivens claim because the CSRA had been enacted immediately prior to the ruling and the preemptive effect of the Act was not an issue before the Court." Lee v. Hughes, 145 F.3d 1272, 1275 (11th Cir. 1998) (finding the plaintiff's reliance on Davis "misplaced," and denying a Bivens remedy despite fact that federal employee was not afforded any administrative or judicial remedies under the CSRA), cert. denied, 525 U.S. 1138 (1999). More importantly, however, "the more recent Supreme Court cases do not reflect the Davis Court's willingness to recognize a Bivens claim in instances where there is a clear congressional intent to exclude certain classes of employees from a statute's comprehensive remedial scheme, as is the case with the CSRA." Id. (citing Bush, 462 U.S. 367). Finally, even if Davis' holding was not called into question by the Court's subsequent decisions, it nonetheless differs from this case. In sanctioning a Bivens remedy, the Court recognized that, for Davis, it was "damages or nothing" because the defendant, a former Congressman, no longer held office; consequently, equitable relief was unavailable. See Davis, 442 U.S. at 245. In this case, however, equitable relief would be available if Plaintiff were to succeed ultimately. See Spagnola, 859 F.2d at 230.

5

Bivens claims as "unwarranted and unjust," but, lacking any suggestion that the omission of procedural protections for Plaintiff was inadvertent, this statement is little more than rhetoric that cannot withstand the weight of case law finding that, with the CSRA, Congress created a preferential scheme, deliberately giving some aggrieved federal employees more rights and remedies than others. See United States v. Fausto, 484 U.S. 439, 448 (1988) (exclusion of certain employees is a "manifestation of a considered congressional judgment that they should not have statutory entitlement to review for adverse action of the type governed by" the CSRA); Grosdidier v. Broad. Bd. of Governors, 560 F.3d 495, 498 (D.C. Cir. 2009) ("Congress designed the CSRA's remedial scheme with care, 'intentionally providing-and intentionally not providing-particular forums and procedures for particular kinds of claims.'") (quoting Filebark v. Dep't of Transp., 555 F.3d 1009, 1010 (D.C. Cir. 2009)); see also Blankenship v. McDonald, 176 F.3d 1192, 1194-95 (9th Cir. 1999) (recognizing that federal court reporter "has no effective remedies" under the CSRA, but denying Bivens claims under the First and Fifth Amendments because "congressional action has not been inadvertent in providing certain remedies and denying others to judicial employees"), cert. denied, 528 U.S. 1153 (2000).

The fact that Plaintiff has no administrative remedies under the CSRA or at the Library of Congress simply does not change the court's analysis or justify circumvention of the CSRA with the judicial imposition of a damages remedy. See Zimbelman v. Savage, 228 F.3d 367, 371 (4th Cir. 2000) ("[t]o view the exemption of [these] employees from the CSRA as an invitation for the judicial creation of new employee remedies would . . . afford [them] more safeguards than ordinary civil servants receive under the CSRA"); Spagnola, 859 F.2d at 228 ("[T]he preclusive effect of Bush extends even to those claimants within the system for whom the CSRA provides 'no remedy whatsoever'") (citing Chilicky, 487 U.S. at 423). And contrary to Plaintiff's intimations, the denial

of a <u>Bivens</u> claim here would not be novel. In <u>McGregor v. Greer</u>, 748 F. Supp. 881 (D.D.C. 1990),

the court rejected the plaintiff's argument that her wrongful discharge claim was outside the purview

of the CSRA because, as an employee in a confidential and policy-making position, she had no

administrative remedies under the statute. <u>Id</u>. at 884. Denying a <u>Bivens</u> remedy, the court held that:

> Congress's explicit denial of a remedy to Schedule C employees shows an intention
> to deny them court access to challenge dismissals. . . . To disturb this specific
> provision would impermissibly upset the balance Congress strove to achieve between
> federal employees' rights and an efficient government. Allowing plaintiff access to
> prior avenues of relief would bypass the scheme Congress developed and return to
> the largely incoherent patchwork they sought to remedy. . . . In light of these
> principles, the CSRA defines plaintiff's exclusive rights as a public employee,
> <u>regardless of her lack of remedies</u>.

<u>Id</u>. (emphasis added) (internal citations omitted). And in <u>Sculimbrene v. Reno</u>, 158 F. Supp. 2d 1

(D.D.C. 2001), the court again denied a <u>Bivens</u> remedy to the plaintiff despite the fact that the

plaintiff's claims were not addressable under the CSRA. <u>Id</u>. at 6-7. The court noted that "[t]he

comprehensive nature of the CSRA indicates that congressional silence on . . . actions taken by

non-supervisory employees, was not inadvertent[,]" and that "[t]o allow either of these claims to

proceed would permit Plaintiff to impermissibly circumvent the CSRA." <u>Id</u>. at 7.[4]

Plaintiff's reliance on <u>Stewart v. Evans</u>, 275 F.3d 1126 (D.C. Cir. 2002), misses the mark,

for <u>Stewart</u> differs from the case at hand on a critical, dispositive point. In <u>Stewart</u>, the plaintiff

brought a <u>Bivens</u> action based on allegations that two federal employees illegally searched her

private documents in violation of her Fourth Amendment rights. The court held that, unlike "a

<u>Bivens</u> action based upon a violation of an employee's First Amendment rights," which is covered

by the CSRA "regardless [of] whether [the statute] provides a remedy for it," warrantless searches

---

[4] <u>See also, e.g.</u>, <u>Fausto</u>, 484 U.S. at 450-51; <u>Lombardi v. Small Bus. Admin.</u>, 889 F.2d
959, 960-61 (10th Cir. 1989); <u>Dotson v. Griesa</u>, 398 F.3d at 168-69 – all holding that the CSRA
precludes any alternate remedies, even when it provides none.

are not personnel actions and do not fall within the statutory scheme. Id. at 1130; see also McGregor, 748 F. Supp. at 889 (recognizing that unlike the plaintiff's unlawful termination claim, the CSRA does not speak to claims of unlawful searches in violation of the Fourth Amendment). Unlike Stewart, this case does not involve allegations of a warrantless search. Stewart thus offers Plaintiff no support.

Finally, Plaintiff argues that "Mr. Mulhollan's view of the law would leave individuals who are not covered by the CSRA with no remedy for even the clearest constitutional violations[.]" See Pl.'s Opp. Mem. at 15. Yet, with this argument, Plaintiff neglects the holding in Spagnola – that civil servants have the right to seek equitable relief against their supervisors and their employing agency "in vindication of their constitutional rights." 859 F.2d at 230. This was the remedy afforded the plaintiffs in Spagnola, and so it is for Plaintiff.[5] Thus, the result in this case is not "chilling," as

---

[5] Plaintiff argues that Spagnola is distinguishable from this case because the plaintiffs in Spagnola at least had some remedy under the CSRA since they could petition to the Office of Special Counsel ("OSC") for review of an alleged "prohibited personnel practice." Pl.'s Opp. Mem. at 12-13; see also Spagnola, 859 F.2d at 225. Plaintiff's argument here, however, holds no water for two reasons. First, as previously noted, the holding of Spagnola is not based on the fact that the plaintiffs could petition OSC, but instead, on the existence of the CSRA, with which Congress did not inadvertently omit a damages remedy as redress for the plaintiffs' claims. See Spagnola, 859 F.2d at 228-229. Ironically, Plaintiff overlooks the fact that the Spagnola court rejected the practice of distinguishing cases based on the administrative remedies available to different plaintiffs. Id. at 228 n.7 ("It is thus possible to distinguish Chilicky on the basis that the Court was not presented with claimants whose remedies under the congressional scheme were merely discretionary. We nevertheless believe [] that undertaking that effort runs counter to the clear direction of the Supreme Court's 'special factors' reasoning."). Second, Plaintiff's argument overstates the "remedy" that is OSC. At the time of the D.C. Circuit's en banc decision in Spagnola, OSC had the discretion to institute an investigatory proceeding, and if it decided not to, that decision was entirely unreviewable. See Spagnola v. Mathis, 809 F.2d 16, 21 (D.C. Cir. 1987); Hubbard v. U.S. E.P.A. Adm'r, 809 F.2d 1, 5 (D.C. Cir. 1986). And, even if OSC did investigate and conclude that a prohibited personnel practice occurred, OSC could not award affirmative relief to the aggrieved employee – but could only discipline the offending employer. See McIntosh v. Turner, 861 F.2d at 526; see also Kotarski v. Cooper, 799 F.2d 1342, 1348 (9th Cir. 1986) (noting that petition to OSC gave plaintiff "no enforceable right, and no judicial review, even if he or she demonstrates a constitutional violation"). Thus, the plaintiffs in Spagnola and like cases from other circuits essentially had no more of a remedy than Plaintiff.

Plaintiff suggests, Pl.'s Opp. Mem. at 15, but instead the product of both a deliberate choice made by Congress as part of a carefully crafted federal employment scheme and an unwavering judicial deference to that choice. In light of Congress' scheme, this court should also withhold its power to create a new remedy and should dismiss Plaintiff's <u>Bivens</u> claims against Director Mulhollan.

## II.     PLAINTIFF FAILS TO STATE A CLAIM UNDER BIVENS.

As explained above and in Director Mulhollan's opening brief, the CSRA precludes the judicial creation of a <u>Bivens</u> remedy in this context. Should the Court disagree, however, Plaintiff's first and third causes of action should nonetheless be dismissed for failure to state a claim, notwithstanding the arguments raised in his opposition to the motion to dismiss.

### A.     PLAINTIFF FAILS TO STATE A FIRST AMENDMENT WRONGFUL DISCHARGE CLAIM.

Director Mulhollan's opening brief established that Plaintiff's wrongful discharge claim under the First Amendment fails to meet the threshold for withstanding a Rule 12(b)(6) motion to dismiss under <u>Ashcroft v. Iqbal</u>, — U.S. —, 129 S. Ct. 1937 (2009), and <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544 (2007). Plaintiff's arguments in opposition do not suggest otherwise.

This claim is largely controlled by <u>Hall v. Ford</u>, 856 F.2d 255 (D.C. Cir. 1988), in which the D.C. Circuit affirmed the district court's Rule 12(b)(6) dismissal of the plaintiff's First Amendment wrongful termination claim under <u>Pickering v. Board of Education of Township High School District 205, Will County</u>, 391 U.S. 563 (1968). The plaintiff, the erstwhile athletic director for the University of the District of Columbia ("UDC"), had publicly asserted views in tension with those of his superiors – the school's president and board of trustees. <u>Hall</u>, 856 F.2d at 257-58. Because the plaintiff occupied a policy-level position at the time of his discharge, the court held, UDC was justified in separating him even though his public speech had addressed matters of public concern. <u>Id.</u> at 259-60, 265. By virtue of the plaintiff's high level, the government-as-employer's interest in

9

promoting the efficiency of its public services outweighed his interest in making the speech at issue under the Pickering balancing test. Id. at 264-65. In so holding, the court undertook no analysis of any actual, manifest harm asserted as a consequence of the plaintiff's speech. Id. Instead, what justified the plaintiff's separation under Pickering was that he had "express[ed] views on matters within the core of his responsibilities that reflected a policy disagreement with his superiors such that they could not expect him to carry out their policy choices vigorously." Id. at 265.

The facts of this case are not substantively distinguishable from those of Hall, even on the basis of Plaintiff's own pleadings. According to his complaint, Plaintiff managed and supervised approximately ninety-five experts, analysts, and support staff, and his "primary responsibilities were to lead, plan, direct, and evaluate the research activities in the policy areas assigned to his division." Pl.'s Compl. ¶¶ 29-30. Thus, it would be implausible to suggest (as Plaintiff nonetheless attempts to do without any support) that he did not occupy both a policy "area" and "level" at CRS. See Hall, 856 F.2d at 264-65. At the same time, Plaintiff alleges in conclusory fashion that he had no responsibility for military detainee issues, but that suggestion defies plausibility when the division he led was the Foreign Affairs, Defense, and Trade Division, or "FDT" Division. See Pl.'s Compl. ¶ 29. Accordingly, it is similarly implausible to suggest (as Plaintiff nonetheless does, again with no support) that his speech had nothing to do with CRS or with his duties there. See Hall, 856 F.2d at 264-65. On the other hand, Plaintiff does not even try to assert that the two November 2009 opinion pieces that allegedly triggered his separation – one of which accused former Attorney General Michael Mukasey of "fear-mongering worthy of former Vice President Dick Cheney" – were in any way objective. Of course, objectivity, both at work and in public, is one of the key "policy choices" animating virtually every aspect of the public service that CRS performs. See, e.g., Keeffe v. Library of Congress, 777 F.2d 1573, 1579-80 (D.C. Cir. 1985). In light of those alleged facts,

10

Plaintiff's First Amendment claim closely mirrors that asserted by the plaintiff in Hall, and this Court should reach the same result as the D.C. Circuit in Hall.

Plaintiff's first argument in opposition – that Hall is not controlling here because it is factually distinguishable from this case – is unpersuasive for at least two reasons. First, it simply mischaracterizes the facts and holding of Hall. Plaintiff suggests that the key fact in Hall was that the public speech at issue involved explicit criticism by the plaintiff of his superiors and their policies, thus justifying his discharge under the Pickering balance. Pl.'s Opp. Mem. at 25. In purported contrast here, Plaintiff asserts that his public speech was not explicitly critical of any CRS policy or of his supervisor, Director Mulhollan. Id. But Plaintiff is wrong. Contrary to his suggestion, the decision in Hall did not turn on whether the plaintiff explicitly criticized his superiors or their policies. Rather, the decision turned on whether the plaintiff's speech created or suggested a dissonance between his views and those of his superiors that would reasonably undermine their confidence that he would "vigorously" carry out their policy choices. Hall, 856 F.2d at 265. That dissonance constituted the harm that justified the plaintiff's separation in Hall; the same dissonance justified Plaintiff's separation here.

Second, Plaintiff's argument relies upon an overly narrow view of what it means to be "critical" of a policy or policy choice. In Plaintiff's view, his public speech was not critical of any CRS policy because it did not mention any such policy by name; that is, it did not criticize it explicitly. Pl.'s Opp. Mem. at 25. Under that reasoning, Plaintiff could permissibly be separated under Hall for publicly criticizing CRS' guiding policy of objectivity, but would be protected by the First Amendment if he simply disregarded that policy entirely and publicly aired views that revealed his personal biases, even if doing so frustrated the purposes the policy is designed to serve. In other words, Plaintiff could implicitly disagree with the policy by publicly and actively disregarding it,

11

without facing the sanction that would have been permissible under Hall if he had explicitly criticized the policy. But Plaintiff cannot sidestep Hall that easily. Among the flaws in his argument is that implicit criticism of the policy of objectivity can be more harmful than explicit criticism. In either case, though, Hall governs the legal analysis: Plaintiff's public speech has revealed a policy disagreement between him and Director Mulhollan, and the institution of CRS itself, that is so extensive and fundamental that Director Mulhollan "cannot expect him to carry out [his] policy choices vigorously." Hall, 856 F.2d at 265. And in one concrete sense, at least, Plaintiff's infraction here is much greater than that of the plaintiff in Hall. There is no indication in Hall that the "policy choices" at issue there ran any deeper than the personal preferences of the UDC president or board of trustees. See id. Here, the policy of objectivity is statutory in origin, see 2 U.S.C. § 166(d), and has been recognized in this Circuit as the embodiment of the values underlying CRS' statutory mission for decades. See, e.g., Keeffe, 777 F.2d at 1579-80.

Plaintiff's next argument – that there are not sufficient indicia of harm apparent from his own pleadings to support Director Mulhollan's decision to separate him under Pickering – is likewise misplaced. In articulating this argument, Plaintiff suggests that Director Mulhollan argues that Plaintiff's former policy-level position is virtually dispositive as to his claim because of an inability "to show actual harm from [his] speech." Pl.'s Opp. Mem. at 24. That is incorrect. Plaintiff's former status as an Assistant Director, and thus a policy-level employee, is virtually dispositive because controlling authority makes it so. As to any employee, a government employer is not required to wait until harm is manifest before taking disciplinary action; rather, it is entitled to consider the "potential disruptiveness of the [employee's] speech" in reaching its decision. Waters v. Churchill, 511 U.S. 661, 681 (1994). In doing so here, CRS was entitled "to infer these untoward consequences from the content, manner, time, and place of [Plaintiff's] speech." Hall, 856 F.3d at

12

261. The Court itself may rely on the same inferences of potential disruptiveness. Id. That is even more the case here, where Plaintiff occupied a policy-level position at the time of his public speech, than it is in the case of lower level employees. Id.; see also McEvoy v. Spencer, 124 F.3d 92, 103 (2d Cir. 1997); Bates v. Hunt, 3 F.3d 374, 378 (11th Cir. 1993); Kinsey v. Salado Indep. Sch. Dist., 950 F.2d 988, 994 (5th Cir. 1992).

Plaintiff's final argument – that his opinion pieces had nothing to do with his work at CRS, at least on the basis of his own allegations – fails the "plausibility" test of Iqbal. Plaintiff alleges in his complaint that his job had nothing to do with military detainee issues, but that allegation does not help him for at least two reasons. First, it is conclusory – a "bare assertion" attempting a formulaic recitation of the elements of a claim under Pickering – and thus is entitled to no deference under Rule 12(b)(6). Iqbal, 129 S. Ct. at 1949. Second, it is implausible against the context of Plaintiff's own allegations elsewhere. As noted supra, Plaintiff served as Assistant Director for FDT at CRS, in which capacity he managed and supervised almost 100 experts, analysts, and support personnel in substantive areas under the umbrellas of foreign affairs and defense (as well as international trade). Pl.'s Compl. ¶ 29. Even on the basis of Plaintiff's own complaint, it is difficult to credit his conclusory assertion that his opinion pieces on the subject of military detainee issues had nothing to do with his duties managing and supervising expert analysis and research on issues of foreign affairs and defense.

For those reasons, in addition to those set forth in greater detail in Director Mulhollan's opening brief, Plaintiff fails to state a claim of wrongful discharge under the First Amendment. Plaintiff's first cause of action should be dismissed on that basis.

### B.   PLAINTIFF FAILS TO STATE A VAGUENESS CLAIM.

Director Mulhollan's opening brief established that Plaintiff's Due Process claim must fail

on the pleadings. Plaintiff's opposition is more confusing than substantive, particularly as to what Plaintiff intends to challenge, what remedy he seeks and from whom, and what Constitutional provision or provisions he seeks to have applied. That said, his basic strategy as to this claim appears to be to muddy the waters by conflating the First and Fifth Amendments. The Court should reject that strategy.

On the substance, Plaintiff's argument is troubling aside from its lack of doctrinal and factual clarity. It reads almost as if Plaintiff wishes the Court to momentarily forget that he is by his own allegations an experienced attorney and a retired Colonel with twenty-five years' service in the Air Force Judge Advocate General's Corps, and was for a period one of the senior leaders of CRS. Instead, Plaintiff appears to suggest that for the purpose of this claim he ought to be regarded as a professional naif, someone who needed to be taken by hand and guided through what it means to exercise "sound judgment," "caution," and "objectivity." See Pl.'s Opp. Mem. at 33.[6] Bare assertions to such effect in Plaintiff's complaint should be afforded no weight under Iqbal, and such characterizations in his opposition are essentially reiterative of the arguments already anticipated and addressed in Director Mulhollan's opening brief. See Indiv. Def.'s Mem. at 33-37.

---

[6] Plaintiff's reliance on Westfield High Sch. L.I.F.E. Club v. City of Westfield, 249 F. Supp. 2d 98, 127 (D. Mass. 2003), seems to corroborate this. City of Westfield involved a high school bible club's challenge to school speech policies under which members of the student bible club had been disciplined for engaging in proselytizing activities at school. 249 F. Supp. 2d at 104-07. Inter alia, the student plaintiffs argued that they were unable to understand what the undefined concept of "responsible speech" referenced in the school's Free Speech Policy allowed them to do without facing discipline. Addressing the student plaintiffs' motion for preliminary injunction, the district court agreed that "it is unlikely that the reasonable Westfield High School student understands what 'responsible speech' is." Id. at 127.

Plaintiff might be willing to compare his professional acumen to that of a group of high school students for the purpose of this argument, but that seems unconvincing. On the contrary, inherent in any sort of reasonableness standard is ample flexibility to account for age, education, and experience, all of which Plaintiff should possess in abundance in comparison to the student plaintiffs in City of Westfield. Plaintiff thus should be held to a slightly higher standard here.

In the same regard, Plaintiff also seems to forget what this case actually is, even as he himself has pleaded it: a fairly textbook employment dispute centered on whether his employer's decision to separate him was warranted or not. Based on Plaintiff's own allegations, he accepted a position as a senior leader at CRS, performed his duties for a time, wrote two national opinion pieces on a matter of public concern, and was separated. The third act of Plaintiff's story – his separation – was by his allegations the result of his decision to write those two opinion pieces. See Compl. ¶ 1. At the Rule 12(b)(6) stage, the issue raised by that narrative is whether his employer's decision to separate him was legally justified based on the substance of his pieces, as measured through the prism of Plaintiff's own carefully selected allegations. None of Plaintiff's arguments about "fair notice," in particular whether he received adequate guidance from CRS as to what "sound judgment" and "objectivity" mean in a professional setting, alters the essence of this case as he has framed it through his complaint allegations.

Turning to the lack of doctrinal clarity in Plaintiff's arguments, it is unclear whether Plaintiff seeks to challenge his separation under the First Amendment, the Fifth Amendment, or some conflation of the two. Ultimately, what Plaintiff identifies as the Constitutional basis for his claim may not matter much, as the one thing that does seem relatively clear from Plaintiff's opposition is that he now apparently intends to focus on what he characterizes as vagueness in the interplay among the Library regulation on outside speech, the CRS policy on the same subject, and CRS' past enforcement of the two. In United States v. Williams, 128 S. Ct. 1830 (2008), the Supreme Court recently emphasized that vagueness is a Due Process rather than First Amendment doctrine. Id. at 1845. Thus, Plaintiff's claim requires that he demonstrate the existence of a property or liberty interest in the benefit he has lost – his position. And that Plaintiff cannot do.

Insofar as Plaintiff now appears to be asserting a substantive Due Process claim, such a claim

15

must fail because he lacks any property or liberty interest in his former position. As this Court itself recently pointed out, "for a plaintiff to allege a substantive due process violation, he must allegedly have been arbitrarily deprived of a fundamental right or liberty or property interest that is based in the United States Constitution." Toms v. Office of the Architect of the Capitol, 650 F. Supp. 2d 11, 25 n.11 (D.D.C. 2009) (citing Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 229 (1985) (Powell, J., concurring)). And at a minimum, "'there is substantial doubt as to whether one's interests in public employment is protected by substantive due process.'" Id. (quoting Winder v. Erste, 511 F. Supp. 2d 160, 183 (D.D.C. 2007)). Other courts have gone farther, reaching the conclusion that substantive due process does not apply in the employment context as a matter of law. See id. (citing cases); see also McKinney v. Pate, 20 F.3d 1550, 1560 (11th Cir. 1994); Nicholas v. Penn. State Univ., 227 F.3d 133, 143 (3d Cir. 2000). In either event, Plaintiff has no such interest here as a former probationary employee.[7]

## III.   DIRECTOR MULHOLLAN IS ENTITLED TO QUALIFIED IMMUNITY AS TO ALL CLAIMS.

As explained in Part II, supra, and in Director Mulhollan's opening brief, Plaintiff has failed to state a claim under either the First or Fifth Amendments. But even if the Court were to conclude otherwise, Plaintiff has failed to show that Director Mulhollan violated a "clearly established" right under either provision, and thus cannot overcome qualified immunity. See Pearson v. Callahan, — U.S. —, 129 S. Ct. 808, 815-18 (2009); Saucier v. Katz, 533 U.S. 194, 201 (2001).

### A.   PLAINTIFF'S OPPOSITION IDENTIFIES NO VIOLATION OF A "CLEARLY ESTABLISHED" FIRST AMENDMENT RIGHT UNDER PICKERING.

Even if the Court were to conclude that Plaintiff has stated a claim of wrongful discharge under the First Amendment, Director Mulhollan is entitled to qualified immunity because any

---

[7] Plaintiff has previously disclaimed any intent to argue procedural due process as the legal basis for this claim. See Pl.'s Reply in Supp. of Mot. for TRO at 16.

alleged First Amendment right was not "clearly established" at the time of Plaintiff's separation. Plaintiff raises a handful of arguments in opposition, but none is persuasive.

Plaintiff's first argument – that the existence of "general statements of the law" as to the First Amendment reasonably should have put Director Mulhollan on notice that his decision to separate Plaintiff would violate a clearly established First Amendment right, Pl.'s Opp. Mem. at 28 – is simply incorrect. As a threshold matter, this amounts to a concession that there is no D.C. Circuit authority on factually similar circumstances. In fact, as shown in Director Mulhollan's opening brief, see Indiv. Def.'s Mem. at 17-21, 37-43, the only factually similar decisions from the D.C. Circuit reached precisely the opposite conclusion:  that a high-level government employee can lawfully be separated for public speech in tension with the policy choices of his superiors even without manifest evidence of actual harm resulting from such speech. O'Donnell v. Barry, 148 F.3d 1126 (D.C. Cir. 1998); Hall v. Ford, 856 F.2d 255. Significantly, in neither O'Donnell nor Hall did the D.C. Circuit undertake any particular analysis of harm; in each, the court recognized that the dissonance created or simply suggested by the public airing of views at odds with those of the plaintiff's superiors represented more than sufficient potential harm to justify sanctions up to and including separation. O'Donnell, 148 F.3d at 1136-37; Hall, 856 F.2d at 265.[8]

Just as importantly, Plaintiff's argument makes no sense logically, because "general statements of the law" have little if any real world value in terms of guidance, especially here. It is less than clear what decisions Plaintiff believes represent such "general statements of the law" in the context of First Amendment claims asserted and assessed under Pickering; it may be that Plaintiff means to refer to Pickering itself, but Plaintiff never spells that out. In any event, that does not

---

[8] The D.C. Circuit in O'Donnell remanded one factual element of the plaintiff's claim for factual development as to the merits – his letter to the editor and his subsequent demotion – but determined on the pleadings that the individual defendant was protected by qualified immunity as to that allegation. O'Donnell, 148 F.3d at 1139, 1142.

matter. Whatever unspecified "general statements of the law" Plaintiff means to rely on, they are counterbalanced by other general statements of law that would suggest the opposite conclusion to a reasonable official in this context. For example, as noted supra, both the Supreme Court and the D.C. Circuit have emphasized that a government employer need not wait until harm is actual or manifest before removing an employee on the basis of potentially disruptive speech. Waters, 511 U.S. at 681; Connick v. Myers, 461 U.S. 138, 152 (1983); Hall, 856 F.2d at 261. Likewise, "the higher the level the employee occupies, the less stringent the government's burden of proving interference with its interest" to justify a particular sanction under Pickering. Hall, 856 F.2d at 261. The latter two general statements of First Amendment law should inform a reasonable government official's thinking at least as much as whatever unspecified general statement Plaintiff apparently has in mind. Indeed, because Hall represents a particularized application of the "general statements" of First Amendment law that preceded it chronologically – among others Pickering, Connick, and Rankin v. McPherson, 483 U.S. 378 (1987) – it stands to reason that it is of relatively greater utility in allowing reasonable officials to recognize what rights are "clearly established." The bottom line is that it would be difficult if not impossible for any reasonable government official to be on fair notice that he or she is poised to violate a "clearly established" First Amendment right under Pickering equipped only with the knowledge that Plaintiff's unspecified "general statements of the law" might provide.[9]

---

[9] Plaintiff's citation to Hope v. Pelzer, 536 U.S. 730 (2002), an Eighth Amendment decision, does not suggest otherwise, as it is plainly distinguishable from the circumstances alleged here. At issue in Hope was the availability of qualified immunity for several prison guards allegedly responsible for handcuffing a prison inmate to an outdoor hitching post on two separate occasions – on the latter occasion leaving him cuffed to the post for approximately seven hours during which time he was forced to remain shirtless "while the sun burned his skin," was given water "only once or twice," and was allowed no bathroom breaks. 536 U.S. at 734-35. In holding that this treatment represented a clear violation of the Eighth Amendment, the Court rejected the individual defendants' argument that the plaintiff's right to be free of such treatment was not "clearly established" simply because there were no previously decided Eleventh Circuit

Plaintiff's next argument – the suggestion that there is in fact controlling D.C. Circuit authority that should have put Director Mulhollan on notice of a "clearly established" right under Pickering – fares no better. To represent "controlling authority" under the facts alleged here, a D.C. Circuit decision would among other things need to involve public speech by a policy-level or at least supervisory employee. In that respect, Plaintiff is half correct – there are at least two such decisions in Hall and O'Donnell. The problem from Plaintiff's perspective is the other half of the equation. In both Hall and O'Donnell the D.C. Circuit reached conclusions contrary to that urged by Plaintiff here, finding that the separation or other sanction of each plaintiff withstood review under Pickering because in each instance the plaintiff's interest in the speech at issue was outweighed by the interest of the government-as-employer. O'Donnell, 148 F.3d at 1136-37; Hall, 856 F.2d at 265. A couple of points stand out amid the Circuit's analysis in both cases. First, as noted supra, in neither case did the court undertake any particular harm analysis. See O'Donnell, 148 F.3d at 1136-37; Hall, 856 F.2d at 265. Instead, as the court in Hall emphasized, the dissonance created by the plaintiff's airing of views at odds with those of his superiors represented sufficient potential harm to warrant his discharge. Hall, 856 F.2d at 265. Second, in O'Donnell, the court found that the plaintiff was not even a policy-level employee at the time of much of his speech, yet determined that his interests in speaking nonetheless did not outweigh the government-as-employer's interest in promoting the efficiency of its public service. O'Donnell, 148 F.3d at 1136-37.

In that regard, Plaintiff's effort to characterize the D.C. Circuit's 1987 decision in American

decisions finding liability where other defendants had handcuffed inmates to hitching posts. Id. at 742. Instead, in light of previous Eleventh Circuit authority holding that multiple forms of corporal punishment violated the Eighth Amendment – including, inter alia, handcuffing inmates to fences – the Court concluded that there was no reason to distinguish between handcuffing inmates to fences and other objects and handcuffing inmates to hitching posts. Id. This case is not analogous to Hope in any way, not least for the reasons discussed extensively in the text, including the highly fact-specific – and thus highly outcome-variable – Pickering balance that is determinative in cases focusing on speech of public concern.

Postal Workers Union, AFL-CIO v. United States Postal Service, 830 F.2d 294 (D.C. Cir. 1987), as controlling authority here is wide of the mark in several respects. First, the court's decision in American Postal Workers Union predates both Hall and O'Donnell. Second, it did not involve claims by an employee with any supervisory or confidential responsibilities, Am. Postal Workers Union, 830 F.2d at 297, a distinction that became determinative one year later when the D.C. Circuit decided Hall. Indeed, Hall expressly noted that American Postal Workers Union did not forbid the court from "drawing reasonable inferences of harm from the employee's speech, his position, and his working relationship with his superior." Hall, 856 F.2d at 265 (citing Am. Postal Workers Union, 830 F.2d at 303-04 & n. 12). Thus, even if American Postal Workers Union could somehow be considered controlling in the wake of the much more analogous decisions in Hall and O'Donnell, it would not compel the sort of outcome Plaintiff urges on the Court.

Plaintiff's argument is also unavailing for another somewhat related reason: given the fact-bound nature of the Pickering balancing inquiry, it is categorically difficult if not impossible for a reasonable government official to anticipate prior to making a personnel decision that he risks violating a clearly established First Amendment right. That is particularly so here. The "right" at issue in this case cannot be clearly defined without measuring Plaintiff's interest in speaking against the government's interest in promoting the efficiency of the services it provides through its employees, including Plaintiff. That is the essence of Pickering as it applies in the qualified immunity context. In turn, the Pickering balance cannot be assessed here without measuring the nature and level of Plaintiff's position at CRS. See Hall, 856 F.2d at 264-65. Thus, simply asserting that Plaintiff possesses a First Amendment right to speak publicly on a particular topic – no matter its alleged importance – has little if any bearing on determining whether such a right was "clearly established" when he spoke. If it were otherwise – if "clearly established" was determined

independently of any balancing of interests that accounted for Plaintiff's level of responsibility or authority – then no individual defendant would ever be able to establish qualified immunity unless no violation was found at all, a result clearly at odds with Supreme Court authority. See, e.g., Saucier, 533 U.S. at 201.

Of course, the weight of authority from the D.C. Circuit and elsewhere confirms the fundamental principle articulated in Saucier, but just as importantly suggests a categorical reality in this context: as a general rule, individual defendants possess qualified immunity as to claims asserted under Pickering far more often than not. See, e.g., O'Donnell, 148 F.3d at 1142; Melton v. City of Oklahoma City, 879 F.2d 706, 729-30 (10th Cir. 1989); Rakovich v. Wade, 850 F.2d 1180, 1213-14 (7th Cir. 1988) (en banc), abrogated on other grounds, Spiegla v. Hull, 371 F.3d 928 (7th Cir. 2004). Indeed, as emphasized in Director Mulhollan's opening brief, at least two circuits elsewhere have concluded that the Pickering inquiry is so fact-dependent that a plaintiff's right can rarely be considered "clearly established," even where the plaintiff is not a policy-level or even supervisory employee. Melton, 879 F.2d at 729-30 ("[B]ecause a rule of law determined by a balancing of interests is inevitably difficult to clearly anticipate, it follows that where Pickering balancing is required, the law is less likely to be well established than in other cases."); Rakovich, 850 F.2d at 1213-14 (application of Pickering is "so fact dependent that the 'law' can rarely be considered 'clearly established'") (quoting Benson v. Allphin, 786 F.2d 268, 276 & n.18 (7th Cir. 1986)). Plaintiff fails to even acknowledge those decisions, much less attempt to refute their conclusions. That failure is particularly conspicuous given Plaintiff's argument here. If Plaintiff cannot even acknowledge two circuit court decisions explaining that rights measured under Pickering's balancing test are seldom "clearly established" as a categorical matter, the Court should ascribe little credibility to Plaintiff's argument to the contrary.

Plaintiff's final argument – that the Library's own regulation governing outside speech encourages such speech, and thus should have provided Director Mulhollan fair notice that he was about to violate Plaintiff's "clearly established" right under the First Amendment – makes no sense. For one thing, Plaintiff misrepresents the regulation itself and ignores the CRS policy that implements it as to CRS. The Library regulation requires employees to, inter alia, "avoid sources of potential damage to their ability to perform official Library duties in an objective and non-partisan manner." LCR 2023-3, Section 3.B. CRS' own policy amplifies that requirement by emphasizing that where CRS employees "contemplate engaging in . . . activities potentially compromising the appearance of independence or impartiality, they should strive to avoid even the appearance of a conflict of interest or engaging in an activity that would compromise one's ability to perform their responsibilities for CRS." CRS Policy at 2. Much more could be said in response to Plaintiff's mischaracterization of the Library's regulation – as well as his disregard of CRS' amplifying policy – but the essential point is that while public speech is encouraged as a general matter, public speech on controversial issues that could suggest a lack of objectivity is in fact discouraged. Just as importantly, CRS' policies encourage employees "to make an inquiry before embarking on conduct that may present these issues" with the goal of preventing avoidable problems. See, e.g., Keeffe, 777 F.2d at 1579-80.

## B. PLAINTIFF IDENTIFIES NO ALLEGED VIOLATION OF ANY "CLEARLY ESTABLISHED" DUE PROCESS RIGHT.

In arguing against Director Mulhollan's immunity from liability as to Plaintiff's third cause of action, Plaintiff again attempts to conflate arguments under the First and Fifth Amendments and any as-applied and facial claims. See Pl.'s Opp. Mem. at 40 ("Qualified Immunity is not appropriate here because any reasonable government official would have been aware of [Plaintiff's] clearly

established rights not to be terminated <u>without fair warning or pursuant to a facially vague policy</u>[.]")
(emphasis added). If Plaintiff cannot clearly state the contours of his own claim, then such rights
were certainly not "clearly established" from Director Mulhollan's perspective.   Nonetheless, to
determine that any alleged vagueness of the Library's regulation and CRS' policy was not "clearly
established," and that Director Mulhollan is thus entitled to qualified immunity on Plaintiff's third
cause of action, the Court need look no further than the D.C. Circuit's decision in <u>Keeffe</u>, 777 F.2d
1573. Here, too, though, Plaintiff's discussion of <u>Keeffe</u> attempts to add confusion to the resolution
of this issue.

 Plaintiff argues that, in <u>Keeffe</u>, the D.C. Circuit held that the Library's general policy on
conflict of interests "to be unconstitutionally vague." Pl.'s Opp. Mem. at 36. In fact, the opposite
is true. Only <u>as applied to Keeffe</u> did the Court find the regulations unconstitutional. <u>See id.</u> But
against the plaintiff's facial attack, the Court of Appeals upheld the regulations: "We think that the
Library's regulations, on their face, are clear enough to provide fair warning to a CRS Analyst
considering participation at a political convention that such activity may result in disciplinary
action." <u>Keeffe</u>, 777 F.2d at 1581. Likewise, the court held that "[t]he Gude Memorandum[,
clarifying the Library's regulations,] is similarly precise[.]" <u>Id.</u> Thus, the court reversed the
judgment of the district court vacating the Library's regulations and upheld the regulations despite
the fact that they were not "a triumph of careful drafting." <u>Id.</u> at 1583.

 In light of this Circuit's affirmation of the regulations in <u>Keeffe</u>, which proscribed
participation in activities that created the "appearance of a conflict of interest," Defendant Mulhollan
must be immune from Plaintiff's vagueness claim, as the unlawfulness of his conduct was not
apparent. <u>See Malley v. Briggs</u>, 475 U.S. 335, 341 (1986). Like the <u>Keeffe</u> regulation, the Library's
regulation and CRS' implementing policy both speak to "the obligation to avoid 'the appearance of

23

conflict of interest,' especially when speaking or writing on controversial matters." CRS Policy at 1 (quoting LCR 2023-3). Furthermore, and as Defendant Mulhollan pointed out in the Motion to Dismiss, to the extent that there is any ambiguity as to what speech falls within the regulation and policy, CRS invites employees to consult with the Review Office – a procedural safeguard identical to the one the court lauded in Keeffe. See Keeffe, 777 F.2d at 1581 ("[T]he existence of an administrative procedure within the Library is a significant safeguard.") (citing LCR 2023-8 that "provides a means by which an employee or his supervisor may obtain an opinion in advance from the Library's General Counsel's Office as to whether a particular activity would create a conflict of interest under LCR 2023-7).

Furthermore, Plaintiff admits that "limitations on governmental speech that have been upheld have either been sufficiently precise or have been informed by (1) statutory or regulatory clarification; (2) past practice and interpretive guidance; and (3) availability of administrative clarification." Pl.'s Opp. Mem. at 37 (citing U.S. Civil Sev. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 550, 575-76, 580 (1973)). And this is exactly Director Mulhollan's point: because CRS' policy statement clarifies any uncertainty in the Library's regulation, and because there is the "availability of administrative clarification" in the Review Office – something Plaintiff did not avail himself of in this case – Plaintiff cannot successfully argue that it was "clearly established" that separating Plaintiff for the publication of the opinion piece (taking Plaintiff's allegation as true) was a violation of any provision of the Constitution. And because Plaintiff only alleges the involvement of Director Mulhollan with Plaintiff's last instance of outside speaking, any vagueness "as applied" to Plaintiff was not so clearly established as to overcome Director Mulhollan's qualified immunity.

One final point: Plaintiff's Due Process argument also seeks to improperly bootstrap his

damages claim against Director Mulhollan onto his equitable claim against the Library. Whether it is characterized as a facial or an as-applied challenge, Plaintiff's Due Process claim attacks something that should be attributed not to Director Mulhollan but rather to the Library and/or CRS – the creation and implementation of a regulatory and policy framework. The only proper remedy for any alleged Constitutional flaw in the creation or implementation of that regulation-policy interplay would be declaratory or injunctive relief against the Library, at most remanding or setting aside one or both. Plaintiff's efforts to hold Director Mulhollan personally liable for that interplay, by contrast, simply are not proper and should be rejected by the Court.

## CONCLUSION

For the foregoing reasons, as well as those set forth in Director Mulhollan's opening brief, Plaintiff's individual capacity claims against Director Mulhollan should be dismissed.