# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
MORRIS S. DAVIS,             )
)
        Plaintiff,        )
)
       v.           )
)
JAMES H. BILLINGTON, *in his official*  )
*capacity as the Librarian of Congress,*  )
)     Civil Action No. 10-0036 (RBW)
and                )
)
DANIEL P. MULHOLLAN, *in his individual*  )
*capacity,*            )
)
        Defendants.     )
)
_____)

## MEMORANDUM OPINION

The plaintiff, Morris S. Davis, brings this action against James H. Billington, the

Librarian of Congress, in his official capacity, and Daniel P. Mulhollan, the director of the

Congressional Research Service ("CRS"), in his individual capacity, alleging that the defendants

violated his First and Fifth Amendment rights.  Complaint ("Compl.") ¶¶ 78-85.  On October 14,

2010, the Court denied the Defendants' Motion to Stay Litigation Except as to the Individual

Capacity Defenses of Daniel P. Mulhollan ("Defs.' Mot. to Stay"), and stated that the reasons for

its denial would be explained in a forthcoming memorandum opinion.[1]  Civil Action 10-0036

(RBW), October 14, 2010 Order.  This is that Memorandum Opinion.  This Memorandum

---

[1]      The October 14, 2010 Order also ordered defendant Billington to answer or otherwise respond to the plaintiff's Complaint within five days.  Defendant Billington satisfied that Order by filing his motion to dismiss on October 19, 2010.  Defendant Mulhollan had earlier filed his motion to dismiss on March 29, 2010.

Opinion also addresses the Motion to Dismiss on Behalf of Defendant Daniel P. Mulhollan ("Def. Mulhollan's Mot. to Dismiss"), and the Motion to Dismiss on Behalf of Defendant James Billington ("Def. Billington's Mot. to Dismiss"), both of which remain pending before the Court and are opposed by the plaintiff.[2]

In this Memorandum Opinion, the Court first further explains why it denied the motion for a partial stay, and then will address the motions to dismiss, which collectively raise three principal arguments in favor of dismissal: First, that the plaintiff cannot state a claim for damages against defendant Mulhollan in his individual capacity; second, that the plaintiff fails to state a claim under either the First or Fifth Amendments; and third, that defendant Mulhollan is entitled to qualified immunity as to the plaintiff's constitutional claims. The ensuing pages explain both the Court's earlier denial of the motion to stay and now its denial of both motions to dismiss.

---

[2] In addition to the record documents cited previously, the Court considered the following in deciding the motions: the Memorandum of Points and Authorities in Support of Motion to Dismiss on Behalf of Defendant Daniel P. Mulhollan ("Def. Mulhollan's Mem."); the Plaintiff's Opposition to Defendants' Motion to Stay Litigation Except as to the Individual Capacity Defenses of Daniel P. Mulhollan ("Pl.'s Opp'n. to Stay"); the Reply Memorandum in Support of Defendants' Motion to Stay Litigation Except as to the Individual Capacity Defenses of Daniel P. Mulhollan ("Defs.' Reply to Stay"); the Plaintiff's Memorandum of Points and Authorities in Opposition to Motion to Dismiss of Defendant Daniel P. Mulhollan ("Pl.'s Opp'n to Mulhollan Mot. to Dismiss"); the Reply Memorandum in Support of Motion to Dismiss on Behalf of Defendant Daniel P. Mulhollan ("Def. Mulhollan's Reply"); the Memorandum of Points and Authorities in Support of Motion to Dismiss on Behalf of Defendant James Billington ("Def. Billington's Mem."); the Plaintiff's Memorandum of Points and Authorities in Opposition to Motion to Dismiss of Defendant James Billington ("Pl.'s Opp'n to Billington Mot. to Dismss"); and the Reply Memorandum in Support of Motion to Dismiss on Behalf of James Billington ("Def. Billington's Reply").

# I.    <u>BACKGROUND</u>[3]

Between September 2005 and October 2007, the plaintiff, who at that point in his career had achieved the rank of Colonel in the United States Air Force, served as the Chief Prosecutor for the Department of Defense's Office of Military Commissions.  Compl. ¶ 2.  In this position, he oversaw the prosecution of suspected terrorists held at the Guantanamo Bay Naval Base ("Guantanamo Bay") in Cuba.  <u>Id.</u>  Believing that the military commissions system had become "fundamentally flawed," <u>id.</u>, the plaintiff resigned from his position as Chief Prosecutor in October 2007, <u>id.</u>, and retired from his position as a military officer at that same time, <u>id.</u> ¶ 12. He has since become a "vocal and highly public critic of the system, speaking, writing[,] and testifying to Congress about his personal views and firsthand experiences."  <u>Id.</u> ¶ 2.

## A.  <u>The Plaintiff's Hire by the Library of Congress</u>

In December of 2008, the Library of Congress (the "Library") hired the plaintiff as its Assistant Director of the Foreign Affairs, Defense and Trade Division (the "FADTD" or the "plaintiff's division") of the CRS.  <u>Id.</u> ¶¶ 3, 26.  The CRS is the public policy research arm of the United States Congress and a service unit of the Library.  <u>Id.</u> ¶ 14.  In his position as Assistant Director of the FADTD, the plaintiff represents that his "primary responsibilities were to lead, plan, direct, and evaluate the research and analytical activities in the policy areas assigned to his division, which included matters relating to foreign affairs, the Defense Department, and international trade and finance, but not issues related to military commissions."  <u>Id.</u> ¶ 29. According to the plaintiff, "sole responsibility for topics relating to the military commissions

---

[3]        The following description of events is based upon the factual allegations set forth in the plaintiff's Complaint.

system and the prosecution of the individuals held at Guantanamo [Bay] belongs to the American Law Division" and "[m]embers of Congress and their staffs know that [the American Law Division] is the division responsible for military-commission-related issues." Id. ¶¶ 31-32. The plaintiff also asserts that, within his division, he "had no authority to establish policy, and he had little opportunity for significant contact with the public." Id. ¶ 29. He therefore contends that he was "not expected to and did not author written reports or analyses on behalf of [the CRS,]" and that "[h]is name has not appeared on any reports distributed to Congress. Nor have any congressional inquiries or requests for information been directed to him." Id. ¶ 29.

### B. The Plaintiff's Opinion Articles

On November 11, 2009, both the Wall Street Journal and the Washington Post published articles written by the plaintiff that "reflect[ed] his personal views regarding Guantanamo [Bay] and the military commissions process." Id. ¶¶ 43-44, 50. These articles relied exclusively on the plaintiff's professional experiences prior to his employment with the CRS. Id. ¶ 50. According to the plaintiff, neither of these articles criticized Congress, any Member of Congress, any political party, or positions associated exclusively with one political party, nor did they criticize the CRS, the Library, or any of their employees or policies. Id. ¶¶ 47, 50. Rather, the plaintiff contends that the "opinion pieces relate[d] to subjects of immense public concern . . . for the foreseeable future," as they discussed the then-current policies of "President Obama and Attorney General Eric Holder . . . with respect to [future announcements concerning additional decisions about] the military-commission or federal-court trial of other Guantanamo [Bay] detainees." Id. ¶ 45. The plaintiff wrote the articles at his home, away from his workplace during non-working hours, and he did not receive any form of compensation for their authorship.

Id. ¶¶ 48-49.  The plaintiff also indicates that, although he previously engaged in speech similar to that at issue here, he was not reprimanded by either defendant in any way prior to the two articles being published on November 11, 2009.  Id. ¶¶ 33-42.

The plaintiff had informed defendant Mulhollan that his articles would be published prior to their publication, and after Mulhollan had the opportunity to review them, Mulhollan sent multiple emails to the plaintiff expressing his dissatisfaction with the plaintiff's actions.  Id. ¶¶ 53-54.  The day after the articles' publication, on November 12, 2009, Mulhollan told the plaintiff in a meeting that he would not be converted from probationary status to permanent status, as had been the planned development of the plaintiff's employment with the CRS prior to the November 11, 2009 publications.  Id. ¶ 55.  On November 13, 2009, Mulhollan again called the plaintiff into a meeting and served him with a Memorandum of Admonishment in response to the publication of the two November 11, 2009 articles.  Id. ¶¶ 56-57.  Mulhollan's last alleged act of retaliation occurred on November 20, 2009, when he informed the plaintiff that, because the plaintiff had written the opinion articles, he would be reassigned to work temporarily as Mulhollan's Special Advisor beginning on December 21, and that thirty days thereafter he would be separated entirely from the CRS.  Id. ¶¶ 58-59.  Although the plaintiff filed suit on January 8, 2010, Def. Mulhollan's Mem. at 5, which was prior to the expiration of his thirty days as Mulhollan's Special Advisor, subsequent filings with the Court indicate that the expected and allegedly retaliatory acts described in the plaintiff's complaint—namely the complete separation from the CRS—did in fact ultimately occur.  See Pl.'s Opp'n to Stay at 1-3.

## C. **The Library's Regulations**

The Library's internal personnel regulations generally encourage employees to speak and write publicly and they do not restrict employees from engaging in public discourse when discussing issues not within an employee's area(s) of specialty. Compl. ¶¶ 65-67 (citing Library of Congress Regulation ("LCR") 2023-3 § 3(A) - (B)). However, when speaking on "controversial matters," the regulations dictate that Library employees should "explicitly disassociate" themselves from the Library and "their official positions," but such statements made by employees are not subject to prior review.[4] Id. ¶¶ 66-67 (citing LCR-2023-3 § 3(A) - (B)). Additionally, the Library's regulations state that "where an employee's writing relates to library science, the administration or policies of the Library, matters relating to an employee's official duties or responsibilities, or matters specifically addressing Members of Congress, the employee is expected to, among other things, "'assure, when appropriate, that staff members' opinions clearly differentiate from Library policy.'" Id. ¶ 67 (quoting LCR-2023-3 § 3(B)).

---

[4]       Section 3 of LCR 2023 reads in its entirety:

"Section 3. Teaching, Writing, and Lecturing

A. Staff members are encouraged to engage in teaching, lecturing, or writing that is not prohibited by law. Generally, personal writings and prepared or extemporaneous speeches that are on subjects unrelated to the Library and to staff members' official duties are not subject to review.
B. In speaking and writing on controversial matters, staff members are expected to disassociate themselves explicitly from the Library and from their official positions. Personal writings as well as prepared or extemporaneous speeches by staff members shall not be subject to prior review. Where, however, the subject matter of such writing relates to library science or the history, organization, administration, practices, policies, collections, buildings, or staff of the Library as well as matters relating to a field of a staff member's official specialization or the special clientele which a staff member serves, and where some association may be made with a staff member's official status, staff members shall: (1) assure accurate presentation of facts about the Library and Library-related matters; (2) avoid the misrepresentation of Library policies; (3) avoid sources of potential damage to their ability to perform official Library duties in an objective and nonpartisan manner; and (4) assure, when appropriate, that staff members' opinions dearly differentiate from Library policy."

In 2004, defendant Mulhollan issued a statement clarifying the Library's regulations as applied to the CRS, which has since been adopted as policy and is implemented and enforced by defendant Mulhollan.  Id. ¶ 68.  This clarification, entitled Outside Speaking and Writing, encourages Library employees to submit their authored works for prior review and provides that employees are responsible for using "sound judgment in deciding when engagement in an outside activity may place the reputation of [the CRS] at risk."  Id. ¶¶ 69-71.  However, the term "sound judgment" is neither defined nor discussed, which the plaintiff alleges affords "the Library and [the CRS] unfettered discretion to determine which speech to punish."  Id. ¶¶ 71, 76.

## II.     THE DEFENDANTS' MOTION TO STAY THIS LITIGATION

The defendants requested that this Court issue "an order staying [this] action except as to [the] litigation of Director Mulhollan's individual capacity defenses, including both qualified immunity and statutory bars to [the plaintiff's] Bivens claims for damages against Director Mulhollan."  Defs.' Mot to Stay at 2.  As noted above, however, this Court denied that request on October 14, 2010.  Davis v. Billington, et al., No. 10-0036 (RBW) (D.D.C. Oct. 14, 2010).

### A.  Standard of Review

Upon balancing the competing interests of the parties, a court has inherent power to stay proceedings on its docket.  Feld Entm't v. Am. Soc'y for the Prevention of Cruelty to Animals, 523 F. Supp. 2d 1, 2-3 (D.D.C. 2007).  "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 879 n.6 (1998) (quoting Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)).  In determining whether to grant a stay, "the [C]ourt, in its sound discretion, must assess and balance the nature

and substantiality of the injustices claimed on either side." <u>Gordon v. FDIC</u>, 427 F.2d 578, 580 (D.C. Cir. 1980). The party requesting a stay must make out a "clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." <u>Feld Entm't</u>, 523 F. Supp. 2d at 3 (quoting <u>Landis</u>, 299 U.S. at 255).

**B. <u>Legal Analysis</u>**

As noted above, the defendants sought "an order staying [this] action except as to [the] litigation of Director Mulhollan's individual capacity defenses." Defs.' Mot. to Stay at 2. As grounds for this request, defendant Mulhollan argued that he is shielded "from both liability and the burdens of litigation" by the doctrine of qualified immunity, <u>id.</u> at 4, and he asserted that "were [the] plaintiff permitted to embark upon discovery as to Dr. Billington and the Library, it would have an immediate and direct effect on [him], his qualified immunity defense, and his right not to participate in discovery until the Court has ruled on his motion to dismiss." <u>Id.</u> at 6. In other words, defendant Mulhollan maintains that "for the protections of [qualified immunity] to be meaningful to [him], litigation should be stayed as to the Library pending the outcome of [his motion to dismiss]." Defs.' Reply to Stay at 4.

The plaintiff opposed the motion to stay, asserting that the defendants were "attempt[ing] to expand the qualified immunity doctrine to stay all litigation of all claims against all defendants, including defendants for whom qualified immunity is not available." Pl.'s Opp'n to Stay at 3. And the plaintiff argued that because defendant Billington has been sued in his official capacity as the Librarian of Congress he is not protected by qualified immunity, and he must therefore respond to the plaintiff's Complaint. <u>Id.</u> The plaintiff further objected to the timing of

the motion to stay, noting that "the Supreme Court . . . has focused on the individual-capacity defendant's right to avoid peculiarly disruptive proceedings like 'unnecessary and burdensome discovery or trial proceedings,' which necessarily occur only after the defendant has filed a response to the plaintiff's complaint."  Id. at 4 (quoting Crawford-El v. Britton, 523 U.S. 574, 598 (1998)).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callhan, 555 U.S. 223, __, 129 S.Ct. 808, 815 (2009).  Qualified immunity is "an immunity from suit rather than a mere defense to liability."  Saucier v. Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  A district court "must exercise its discretion in a way that protects the substance of the qualified immunity defense . . . so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings."  Crawford-El, 523 U.S. at 597-98.  The Supreme Court has "repeatedly stressed . . . the importance of resolving immunity questions at the earliest possible stage in litigation."  Pearson, 555 U.S. at __, 129 S.Ct. at 815 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).   It must be remembered, however, that qualified immunity is not a right to immunity "from litigation in general."  Behrens v. Pelletier, 516 U.S. 299, 312 (1996).

Here, the defendants' motion to stay was premature, overly encompassing, and did not demonstrate a clear case of hardship.  First, although defendant Mulhollan had filed a pre-answer motion to dismiss, defendant Billington had not yet responded to the plaintiff's Complaint with an answer or any other form of responsive pleading or motion permissible under the Federal

Rules of Civil Procedure. Pl.'s Oppn' to Stay at 3; see Fed. R. Civ. P. 8(b)-(c), 12 (b). While the defendants cited ample case authority supporting the issuance of a stay of discovery pending resolution of the qualified immunity issue, see Defs.' Mot to Stay at 5 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) ("[u]ntil this threshold immunity question is resolved, discovery should not be allowed,") and Behrens, 516 U.S. at 308 (1996) (qualified immunity "is meant to give government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery")) (emphasis added), as the plaintiff aptly noted, the defendant did not cite any authority to support the extension of qualified immunity to the pleading stage. Pl.'s Opp'n to Stay at 8. The Court was similarly unable to find authority supporting a pre-answer or dispositive motion stay of litigation.[5] Because this litigation was only in the infancy of the pleading stage when the stay was requested, and consequently had not, and still has not, yet reached the discovery stage, granting the defendants' motion to stay would have freed the Library from participating in the "litigation in general," Behrens, 516 U.S. at 312, rather than protecting defendant Mulhollan's asserted right to qualified immunity.

Second, and similarly, the defendants' motion cut too broad a swath in its attempt to stay litigation as to the Library based solely on Mulhollan's alleged right to qualified immunity. "A stay of discovery pending determination of a motion to dismiss is rarely appropriate when the

---

[5]   Although the Feld Court apparently granted a pre-answer and responsive motion stay of "all proceedings," 523 F. Supp. 2d at 5, that case is inapplicable here. The court in Feld granted a temporary stay of all proceedings pending resolution of an earlier-filed, related case. Id. at 2. Further, the Feld court determined that the second matter was filed only after the court denied a counterclaim Feld attempted to assert in the first matter because it would have resulted in "additional expenses to the plaintiffs, would likely create a need for new counsel to pursue [the claim] where no need . . . exist[ed], and that the claim was being used as a tool by [Feld] to indefinitely prolong the . . . litigation." Id. at 3. These factual and procedural differences make Feld inapposite to the situation in this case.

pending motion will not dispose of the entire case." Chavous v. D.C. Fin. Responsibility &
Mgmt. Assistance Auth., 201 F.R.D. 1, 3 (D.D.C. 2001) (citation and internal quotation marks
omitted); see Pearson, __ U.S. at __, 129 S. Ct. at 815 (2009) (noting only that qualified
immunity should "be resolved prior to discovery . . . at the earliest possible stage in litigation")
(citations and internal quotation marks omitted). Because only defendant Mulhollan's motion to
dismiss was before the Court when the stay was requested and it only addressed the claims
against him, it was impossible for the Court, at that time, to dispose of the entire case based on
the motion to dismiss the claims against Mulhollan.

Finally, there was no indication that defendant Mulhollan would be "peculiarly
disrupt[ed]," Crawford-El, 523 U.S. at 605, by the Court requiring the Library to file an answer
or other responsive pleading. In fact, Mulhollan had likely already expended substantial efforts
in responding to the plaintiff's Complaint by raising and analyzing not only his qualified
immunity challenge, but also multiple defenses on other grounds. The Court therefore
determined that requiring the Library to similarly respond to the plaintiff's Complaint would not
further significantly burden defendant Mulhollan. This was especially so given that, as the
defendants in fact conceded, the legal assertions and alleged factual underpinnings of each set of
the plaintiff's claims are "substantively identical," Defs.' Reply to Stay at 4-5, and that both
defendants are represented by the same counsel. Conversely, there was a fair possibility that
granting the stay would prolong the injury the plaintiff asserted he was enduring due to his
termination. See Pl.'s Opp'n to Stay at 10 & n.4 (asserting that the plaintiff remains unemployed
despite his best efforts to acquire employment).

For all of these reasons on October 14, 2010, the Court denied the defendants' motion to stay.  Davis v. Billington, et al., No. 10-0036 (RBW) (D.D.C. Oct. 14, 2010).

### III.  THE DEFENDANTS' MOTIONS TO DISMISS

A motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) tests whether the complaint has properly stated a claim upon which relief can be granted.  Wells v. United States, 851 F.2d 1471, 1473 (D.C. Cir. 1988).  For a complaint to survive a Rule 12(b)(6) motion, Federal Rule of Civil Procedure 8(a) requires only that it provide a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although Rule 8(a) does not require "detailed factual allegations," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), a plaintiff is required to provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," Ashcroft v. Iqbal, __ U.S. __, __, 129 S. Ct. 1937, 1949 (2009), in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests," Twombly, 550 U.S. at 555 (internal citation, quotation marks, and alteration omitted).  Thus, while "detailed factual allegations are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the grounds of entitlement to relief, a plaintiff must furnish more than labels and conclusions or a formulaic recitation of the elements of a cause of action."  Hinson ex rel. N.H. v. Merritt Educ. Ctr., 521 F. Supp. 2d 22, 27 (D.D.C. 2007) (quoting Twombly, 550 U.S. at 555) (internal quotation marks and alterations omitted).  Or, as the Supreme Court more recently stated, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, __ U.S. at __, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570).

A claim is facially plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556). A complaint alleging facts that are "'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

Finally, in evaluating a Rule 12(b)(6) motion, "[t]he complaint must be liberally construed in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotation marks and citations omitted), and the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice," EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997) (footnote omitted); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) (noting that courts may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"). On the other hand, although the Court must accept the plaintiffs' factual allegations as true, any conclusory allegations are not entitled to an assumption of truth and even those allegations pleaded with factual support need only be accepted to the extent that "they plausibly give rise to an entitlement to relief." Iqbal, __ U.S. at __, 129 S. Ct. at 1950. In the final analysis, dismissal for failure to state a claim is "proper when . . . the court finds that [a] plaintiff[] [has] failed to allege all the material elements of [that claim]." Taylor v. FDIC, 132 F.3d 753, 761 (D.C. Cir. 1997).

## A. __The Plaintiff's Bivens Claims__

"Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 395 (1971). Bivens "established that a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district courts to obtain an award of money damages against the responsible federal official." Davis v. Passman, 442 U.S. 228, 234 (1979). "[W]hether to recognize a Bivens remedy may require two steps." Wilkie v. Robbins, 551 U.S. 537, 550 (2007). First, "there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." Id. (citing Bush v. Lucas, 462 U.S. 367, 378 (1983)). Second, "even in the absence of an alternative, a Bivens remedy is a subject of judgment: 'the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation.'" Wilkie, 551 U.S. at 550 (quoting Bush, 462 U.S. at 378). Where special factors counsel hesitation, "the judiciary should decline to exercise its discretion in favor of creating damages remedies against federal officials." Spagnola v. Mathis, 859 F.2d 223, 226 (D.C. Cir. 1988).

As initially employed by the Supreme Court in Bivens, the phrase "special factors counseling hesitation" had nothing to do with the merits of the particular remedy sought by a plaintiff, but rather concerned the question of who—Congress or the courts—should decide whether such a remedy should be provided. Bush, 462 U.S. at 379-80. A statutory system of

"comprehensive procedural and substantive provisions giving meaningful remedies against the United States," Spagnola, 859 F.2d at 226, for example, constitutes a "special factor counseling hesitation," id., because such a system indicates Congress's intent to establish and regulate the remedies provided for claims brought in accordance with that system. Indeed, it is the "comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention," in deference to the existence of this special factor. Id. at 227 (citing Schweiker v. Chilicky, 487 U.S. 412 (1988)); see Chilicky, 487 U.S. at 421-22 ("The absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation.").

Despite exercising caution in the face of special factors, courts have nonetheless also been mindful of whether there exists meaningful relief for alleged constitutional violations. See Spagnola, 859 F.2d at 227 n.6 (observing that, at two separate points in Bush, the majority "appeared to suggest that the specific remedies extended under the [Civil Service Reform Act] were 'meaningful'"). The Supreme Court has declined to answer the question "whether the Constitution itself requires a judicially fashioned damages remedy in the absence of any other remedy to vindicate the underlying right, unless there is an express textual command to the contrary." Bush, 462 U.S. at 379 n.14; see id. at 388 ("The question is not what remedy the court should provide for a wrong that would otherwise go unredressed."); id. at 391 (Marshall, J., concurring) (declaring that there is nothing foreclosing a federal employee from pursuing a Bivens remedy when his injury is not attributable to personnel actions that may be remedied under a federal statutory scheme). When the question is one of augmenting or supplementing

statutory relief, courts have not been hesitant to deny a <u>Bivens</u> action. <u>See</u> <u>Bush</u>, 462 U.S. at 372

(assuming, as petitioner asserted, that "civil service remedies were not as effective as an

individual damages remedy and did not <u>fully compensate</u> him for the harm he suffered," but

nonetheless declining to accord a <u>Bivens</u> remedy) (emphasis added); <u>Chilicky</u>, 487 U.S. at 425

(declining to provide a <u>Bivens</u> remedy even though "Congress ha[d] failed to provide for

<u>complete relief</u>") (emphasis added); <u>Spagnola</u>, 859 F.2d at 229 (noting that, "[a]fter <u>Chilicky</u>, it

is quite clear that if Congress has 'not inadvertently' omitted damages against officials in the

statute at issue, then courts must abstain from <u>supplementing</u> Congress' otherwise comprehensive

statutory relief scheme with <u>Bivens</u> remedies") (emphasis added); <u>Navab-Safavi v. Broad. Bd.</u>

<u>of Governors</u>, 650 F. Supp. 2d 40, 71 (D.D.C. 2009), <u>aff'd on other grounds</u>, __ F.3d __, 2011

WL 691363 (D.C. Cir. Mar. 1, 2011) (explaining that "Congress's provision of substantive rights

<u>and</u> procedural remedies has been a defining feature of the other regulatory schemes that the

District of Columbia Circuit has held to preclude <u>Bivens</u> recovery") (emphasis in original).

When, however, "there are available no other alternative forms of judicial relief," <u>Davis</u>, 442

U.S. at 245, and the consequence becomes one of "damages or nothing," <u>id.</u>, courts have not

been hesitant to recognize a <u>Bivens</u> remedy. <u>See</u> <u>id.</u> at 248-49 (finding the plaintiff had no other

alternative forms of judicial relief and allowing him to seek redress for alleged Fifth Amendment

violations in the form of damages); <u>Navab-Safavi</u>, 650 F. Supp. 2d at 73 ("The strongest reason

for recognizing a <u>Bivens</u> action in this instance is that the only 'meaningful remedies' available to

[a] plaintiff are monetary damages.") (quoting <u>Bush</u>, 462 U.S. at 368).

   Defendant Mulhollan asserts that the plaintiff's individual capacity claims against him

cannot "survive in light of resounding pronouncements by the Supreme Court and the [District of

Columbia] Circuit that <u>Bivens</u> claims arising from federal employment disputes are precluded by the Civil Service Reform Act ("CSRA")."  Def. Mulhollan's Mem. at 7.  Accordingly, the defendant argues that the CSRA is a special factor that precludes the plaintiff from pursuing relief under <u>Bivens</u>.  <u>Id.</u>  Citing <u>Chilicky</u> as the "linchpin decision" for denying a <u>Bivens</u> remedy in this case, the defendant maintains that although the plaintiff "enjoys <u>no</u> avenue for review under [the CSRA]," <u>id.</u> at 11, the omission of relief for individuals in the plaintiff's position from the CSRA was not inadvertent and recognition of a <u>Bivens</u> remedy would therefore "turn Congress's deliberate and carefully crafted federal employee scheme 'upside down,'" <u>id.</u> at 14.  The plaintiff, on the other hand, maintains that he is "precisely the type of plaintiff who should be entitled to a [<u>Bivens</u>] damages remedy for the violation of his constitutional rights."  Pl.'s Opp'n to Mot. to Dismiss at 9.  He contends that because the Library of Congress is not an Executive Agency, it is excluded from the definition of agencies covered by the CSRA.  <u>Id.</u> at 9 n.2.  The plaintiff therefore notes that he is not subject to the "detailed procedural protections of Chapters 23 or 43" of the CSRA.  <u>Id.</u>  Moreover, he points out that as a probationary employee serving less than one year as Assistant Director, he is likewise not covered by the procedural protections in Chapter 75 of the CSRA.  <u>Id.</u>  Defendant Mulhollan does not contest the plaintiff's assertion that his termination falls outside the ambit of the CSRA; instead, he argues that no distinctions need be drawn between adequacy of remedy and availability of review in light of <u>Chilicky</u>.  Defs.' Reply in Support of Mot. to Dismiss at 2-9.  As explained below, the Court does not agree with defendant Mullhollan.

The Court agrees with the parties that the plaintiff's termination falls outside the reach of the CSRA.  <u>See</u> Pl.'s Opp'n to Mot. to Dismiss at 9 n.2; Def. Mulhollan's Mem. at 11.  Thus,

much like in Navab-Safavi, the strongest reason for recognizing the plaintiff's Bivens claim is

that the only meaningful remedies available to him are monetary damages. See Navab-Safavi,

650 F. Supp. 2d at 73. Another, similar reason for recognizing the plaintiff's Bivens claims is the

fact that, unlike the plaintiffs in Bush, Chilicky, and Spagnola, the plaintiff here faces a

"complete unavailability of review." Pl.'s Opp'n to Mot. to Dismiss at 10. Because the issue here

is not simply one of remedy, but also of meaningful review, this case is distinguishable from

Spagnola and this Circuit's application of Chilicky to Spagnola.

 Although Spagnola stands for the proposition that a limited remedy under the CSRA

may nonetheless be considered a meaningful remedy, the plaintiff here faces both an absence of

review and lacks the possibility for relief under the CSRA. While the circumstances surrounding

the plaintiffs' First Amendment claims in Spagnola "differ[ed] markedly" from one another, the

District of Columbia Circuit noted that "the CSRA accord[ed] claimants in their respective

positions substantially the same relief," as

> each could petition the Office of Special Counsel ("OSC") of the Merit Systems
> Protection Board ("MSPB") alleging a "prohibited personnel practice." If the
> OSC believed the allegations meritorious, it was required to report findings and
> recommendations of corrective action to the agency involved. If the agency failed
> to take action, the OSC could have requested that the MSPB order corrective
> action.

859 F.2d at 225 (internal citations omitted). Moreover, neither of the Spagnola plaintiffs could

assert one of the prohibited "major personnel actions" (e.g., removal, reduction in grade or pay,

or suspension of more than fourteen days), as defined by the CSRA. Id. (citing 5 U.S.C. §§

7511-14, 7701-03 (1982)); see Spagnola, 859 F.2d 228 n.9 (explaining that Spagnola challenged

a series of minor personnel actions). For this reason, they could not avail themselves of the more

elaborate administrative protections reserved by Congress under the CSRA for employees

alleging unconstitutional "major personnel actions." Spagnola, 859 F.2d at 225. Nonetheless,

the Spagnola plaintiffs could still petition the OSC, make allegations, and ensure that the OSC

conducted the requisite "adequate inquiry" into the allegations. Id.; see id. at 228 n.9 (observing

that the CSRA entitled claimants "to the remedy (albeit a limited one) of an OSC petition"). The

plaintiff here alleges a significantly greater employment action—complete termination from his

position at the CRS—and yet, under the CSRA he has no remedy at all, not even a limited one.

See Pl.'s Opp'n to Mot. to Dismiss at 9. It seems strange, then, that Congress would accord relief

under the CSRA for the minor personnel actions challenged in Spagnola, but intentionally

omitted relief for those in the plaintiff's position who had experienced major personnel actions as

a result of alleged constitutional violations.

 In analyzing the claims before it, the Spagnola Court found "Chilicky . . . significant not

only for its holding, but for its analysis of Bush." 859 F.2d at 227. As the Circuit noted, "in

applying the Bush 'special factors' doctrine to the [statutory claims] before it, the Chilicky Court

made clear that it is the comprehensiveness of the statutory scheme involved, not the 'adequacy'

of specific remedies extended thereunder, that counsels judicial abstention." Id.; see Navab-

Safavi, 650 F. Supp. 2d at 74-75 (observing that "no matter how the existence of [] review [under

the statutory scheme at issue] might factor into a determination as to whether a Bivens remedy is

available, its relevance is minimal in a case involving a claimant who is ineligible under [that

statute]") (internal quotation marks and alterations omitted). But, while discussing the

significance of a meaningful remedy, which it deemed the "principal lesson of Bush," Spagnola,

859 F.2d at 228, the Spagnola Court observed that Chilicky never explicitly determined the

extent of Bush's preclusive effect, and noted that Chillicky only dealt with the issue by

implication, see id. ("the Chillicky Court included a citation implicitly suggesting that the preclusive effect of Bush extends even to those claimants within the system for whom the CSRA provides 'no remedy whatsoever.'" (emphasis added)). There can be no doubt then that the existence of a meaningful remedy is indeed the principal lesson of Bush. And the District of Columbia Circuit observed that the CSRA does provide meaningful, although sometimes incomplete, remedies to those federal employees who fall within its protections and they may thus avail themselves of its procedural and substantive protections. See Spagnola, 859 F.2d at 228 (explaining that the statutory scheme before the court "at least technically accommodates appellants' constitutional challenges") (emphasis added). This Court, however, finds it needs more than just an "implicit[] suggesti[on]," Spagnola, 859 F.2d at 228, before it can agree with defendant Mulhollan that Congress's provision of no review whatsoever is a special factor counseling hesitation. In other words, the Court cannot accept the proposition that a system affording absolutely no review for the plaintiff's alleged constitutional violations can fairly or accurately be deemed "comprehensive." Cf. Navab-Safavi, 650 F. Supp. 2d 40, 71 (examining Bush, Chilicky, and Spagnola, and concluding that their "discussions of specific entitlement programs suggest that for purposes of the special factors analysis, a statutory scheme is a comprehensive congressional system to administer public rights when it provides both substantive rights and administrative procedures for adjudicating those rights") (internal quotation omitted); id. at 73 (noting that the "remedial regimes at issue in Bush and [Chilicky], which were deemed to provide meaningful remedies against the United States, offered the prospect of monetary compensation for the claimed economic harms") (internal quotation omitted).

20

Based on the above analysis of the current legal landscape, the Court finds that the absence of an "alternative, existing process for protecting the [plaintiff's] interest amounts to a convincing reason for the Judicial Branch," <u>Wilkie</u>, 551 U.S. at 550, to provide the plaintiff a remedy in damages. Further, the Court, in making "the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed . . . to any special factors counseling hesitation," <u>id.</u>, has not found persuasive the defendant's arguments against recognizing the plaintiff's <u>Bivens</u> claims based on the CSRA being a "special factor counseling hesitation before authorizing" the plaintiff to pursue his claim for damages. Accordingly, the Court concludes that the plaintiff has properly stated claims under <u>Bivens</u> against defendant Mulhollan in his individual capacity.

**B.  <u>The Plaintiff's First Amendment Claim</u>**

It is beyond question that a public employee does not relinquish his First Amendment rights to comment on matters of public interest by virtue of his government employment. <u>Connick v. Myers</u>, 461 U.S. 138, 140 (1983) (citing <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968)). A public employee's claim of First Amendment violations by his government employer is evaluated under the four elements set forth in <u>Pickering v. Board of Education of Township High,</u> 391 U.S. 563 (1968), and clarified by subsequent cases that have construed <u>Pickering</u>. <u>Hall v. Ford</u>, 856 F.2d 255, 258 (D.C. Cir. 1988). First, the public employee must have been speaking on a matter of public concern. <u>Id.</u> (citing <u>Connick</u>, 461 U.S. at 138). Second, the court must balance the interests of the employee, "'as a citizen, in commenting upon matters of public interest, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" <u>Hall</u>, 856 F.2d at 258 (quoting <u>Pickering</u>, 391 U.S.

at 568).  Third, the employee must prove that the speech was a substantial or motivating factor in the adverse employment action.  Hall, 856 F.2d at 258 (citing Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  Finally, the government employer must be given an opportunity to prove that it would have reached the same decision even absent the protected conduct.  Hall, 856 F.2d at 258.  The first two inquiries are questions of law for the court to resolve.  Id.  The latter two elements are questions of fact usually left for the jury to decide.  Id.

The state interest factor of the Pickering balancing test "focuses on the effective functioning of the public employer's enterprise."  Rankin v. McPherson, 483 U.S. 378, 388 (1987).  Whether the speech at issue "impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties," id., thus become pertinent factors in assessing the "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities," Connick, 461 U.S. at 150; see Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) ("A government entity has broader discretion to restrict speech when it acts in its role as an employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.").  The "manner, time, and place" in which the speech occurred are also factors relevant to the balancing exercise undertaken by the court.  Connick, 461 U.S. at 152.  Additionally, while "unadorned speculation as to the impact of the speech" will not suffice in the Pickering balance, a court may draw "reasonable inferences of harm from the employee's speech, his position, and his working relationship with his superior."  Hall, 856 F.2d at 261.

In weighing the state's interest in having taken the challenged employment action, "some attention must be paid to the responsibilities of the [aggrieved] employee within the agency." Rankin, 483 U.S. 390. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." Id. In the attempt to discern whether an employee is a "key deputy [who must be] loyal, cooperative, willing to carry out [his] superiors' policies, and perceived by the public as sharing [his] superiors' aims," Hall, 856 F.2d at 263, a court should ask three, successive questions, id. at 264. Hall instructs a court to "[a]sk first whether the employee's position relates to an area as to which there is room for principled disagreement on goals or their implementation . . . [i.e.,] is it a policy area?" Id. at 264 (emphasis in original). If the answer to this first question is yes, then the court must "ask whether the office gives the employee broad responsibilities with respect to policy formulation, implementation, or enunciation . . . [i.e.,] was the individual a policy level employee?" Id. (emphasis in original). If the answer to this question is also yes, then the court must finally "ask whether the government interest in accomplishing its organizational objectives through compatible policy level deputies is implicated by the employee's speech." Id. "At a minimum," for the "key deputy" heighted burden of caution to apply, "the employee's speech must relate to the policy areas for which he is responsible." Id.

As explained above, to withstand the defendants' motion to dismiss under Rule 12(b)(6), the plaintiff's claim of retaliation based on the First Amendment "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, __ U.S. at __, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 570). Here, because the defendants seemingly concede that the plaintiff's opinion articles addressed matters of public concern, see

Def. Mulhollan's Mem. at 18 (stating that "in this motion we address only the second <u>Pickering</u> element"); Def. Billington's Mem. at 7 (same), the only First Amendment inquiry for the Court to make at this time is whether the plaintiff's Complaint states a plausible claim that his speech interests as a citizen outweighed the Library's need to terminate him in order to allow it to effectively and efficiently perform its responsibilities to the public. And in making this assessment, the Court must find only that the plaintiff asserts facts sufficiently specific to plausibly tip the <u>Pickering</u> balance in his favor. <u>Iqbal</u>, __ U.S. at __, 129 S. Ct. at 1949.

It is no surprise that both defendants Mulhollan and Billington argue that the plaintiff's allegations "do not contain factual material that would plausibly suggest . . . that his interests in speaking outweighed [the] CRS's interests in promoting the efficiency of its public service." Def. Mulhollan's Mem. at 18; <u>see also</u> Def. Billington's Mem. at 7. The defendants place great weight on <u>Hall's</u> conclusion that "the higher the level the employee occupies, the less stringent [is] the government's burden of proving interference with its interest," Def. Mulhollan's Mem. at 18 (quoting <u>Hall</u>, 856 F.2d at 261), and argue that the plaintiff was a policy-level employee subject to a greater burden of caution in the exercise of his speech, Def. Mulhollan's Mem. at 19-21.[6] Although the defendants may disagree with them, the Court is nonetheless confined to the factual allegations of the plaintiff's Complaint, and must, moreover, accept those allegations as true at this stage of the proceedings. For the reasons explained below, the Court finds that the

---

[6]     As defendant Billington acknowledges early on in his memorandum in support of his motion to dismiss, "certain of the arguments asserted herein are substantively identical to the arguments" asserted in the memorandum in support of defendant Mulhollan's motion to dismiss. Def. Billington's Mem. at 2 n.1. Given the similarity of the arguments and the near identity of the language with which those arguments are presented, the Court will not always cite the memoranda of both defendants throughout the remainder of this Memorandum Opinion.

plaintiff's allegations adequately state a claim of unconstitutional termination in violation of the First Amendment.

First, the plaintiff's allegations indicate that he was not a policy-level employee as defined by Hall, and thus was not required to exercise any special degree of caution in the exercise of his speech.  See Hall, 856 F.2d at 264 (clarifying that an employee's policy-level status matters only to the extent that "the government interest in accomplishing its organizational objectives through compatible policy level deputies is implicated by the employee's speech"). According to the plaintiff, his "primary responsibilities were to lead, plan, direct and evaluate the research and analytical activities in the policy areas assigned to his division."  Compl. ¶ 29. While the plaintiff uses the phrase "policy areas," the Court distinguishes this use of the phrase from the significance given to the term "policy" in Hall, 856 F.2d at 264-65, based on the fact that the CRS is the actual "public policy research arm," compl. ¶ 14, of the Library.  In other words, because public policy is one of the primary responsibilities of the CRS, the entire organization could be considered as one collective "policy" operation if the language of Hall were applied literally.  Moreover, because the CRS is divided into discrete areas of varying specialties, it would seem to only make sense that the individual units of the CRS would be referred to by Library employees as "policy areas."  The Court therefore interprets paragraph 29 of the plaintiff's Complaint, in which he uses the term "policy areas," as simply a generalized indication that he managed the individual unit of the CRS tasked with Foreign Affairs, Defense and Trade, and not as the plaintiff's acknowledgment that he was a "key deputy" within the CRS and accordingly answers the first Hall inquiry—whether the plaintiff's position had a relationship to policy concerns—in the negative.  In any event, the plaintiff contends that he "had no

authority to establish policy, and he had little opportunity for significant contact with the public." Id. ¶ 29.  The second Hall inquiry—whether the plaintiff was a policy level employee—must therefore similarly be answered in the negative.  Lastly, the plaintiff unequivocally asserts that the speech for which he was fired was not related to his official work at the CRS.  Compl. ¶¶ 30-32; see id. ¶ 3 (the plaintiff "did not have any official responsibilities or duties over issues relating to the military commissions"); id. ¶ 35 (describing how defendant Mulhollan required the plaintiff to attend a conference on personal time using a vacation day because "the subject of the conference—Guantanamo and the military commissions system—had nothing to do with [the plaintiff's] CRS job responsibilities or duties").  Consequently, even if the plaintiff could be classified as a policy-level employee, it is clear that his speech did not "at a minimum, . . . relate to [the] policy areas for which he [wa]s responsible."  Hall, 856 F.2d at 264.

Satisfied that the plaintiff was not, under Hall, required to use any extra degree of caution in the exercise of his speech, the Court now turns to the alleged harm the plaintiff's speech caused or could have caused Director Mulhollan, the CRS, or the Library at large.  The Supreme Court cautioned in Connick "that a stronger showing [of harm to the government-employer] may be necessary if the employee's speech more substantially involve[s] matters of public concern." Connick, 461 U.S. at 152-53 (observing that only one question out of fourteen on a questionnaire the plaintiff distributed within her office "touched upon matters of public concern in only a most limited sense").  As noted above, the plaintiff here engaged in speech pertaining to matters of immense public concern, namely, "the military commissions process [at Guantánamo Bay], and the decision to try certain detainees in federal court in the United States."  Compl. ¶ 45.  Given the public's substantial interest in receiving "the personal views or experiences . . . [the plaintiff]

acquired as the former Chief Prosecutor [for the Department of Defense's Office of Military Commissions]," compl. ¶ 50, the Court must require a relatively stronger showing of harm to the government-employer to tip the <u>Pickering</u> balance in the defendants' favor.  <u>See</u> <u>Am. Fed'n of Gov't Emps. v. Loy</u>, 332 F. Supp. 2d 218, 230-31 (D.D.C. 2004) (Walton, J.) (rejecting the government's speculative assertions as to how the plaintiff's speech harmed it and noting that the government must instead come forth with "affirmative evidence" of this harm).

The defendants indicate that, above and beyond any potential harm the plaintiff's speech might reasonably have been expected to cause, his speech did in fact produce a "disruption" because defendant Mulhollan believed it "undermined [the plaintiff's] ability" to fulfill his duties and lead the FADTD as its Assistant Director.  Def. Mulhollan's Mem. at 30 (arguing that this disruption is evidenced in the plaintiff's Complaint through its incorporation of the November 13, 2009 Memorandum of Admonishment and the November 20, 2009 letter of separation); <u>see also</u> Def. Billington's Mem. at 20 (same).

It bears repeating that even though the defendants disagree with the plaintiff's allegations, in deciding the defendants' motions to dismiss under Rule 12(b)(6), the Court is limited to the factual allegations in the plaintiff's Complaint and any documents it incorporates by reference. The Complaint sets forth only a handful of instances when the plaintiff's writings could be construed as having created a disruption—after he reviewed the opinion pieces, defendant Mulhollan sent several emails to the plaintiff, compl. ¶ 54; on November 12, 2009, the day after the writings were published, defendant Mulhollan called the plaintiff into a meeting during which the acting Deputy Director of CRS was also present, <u>id.</u> ¶ 55; the letter of admonishment from defendant Mulhollan to the plaintiff, <u>id.</u> ¶ 56; the November 20, 2009 phone call from

defendant Mulhollan to the plaintiff informing him of his removal from the CRS, which was immediately followed by a letter stating the same, id. ¶ 58; and an email sent to all CRS employees from Mulhollan on November 24, 2009, informing them of the plaintiff's removal from the CRS and that he would be replaced, id. ¶ 60.  However, these events—the meetings, emails, telephone calls, and letters, all initiated by defendant Mulhollan himself—strike the Court as examples of typical, everyday employer/employee interactions, rather than examples of harm to a government-employer.  Furthermore, there is nothing in the Complaint suggesting that the subject of these events was harmful to the effective and efficient functioning of the Library. In their attempt to convince the Court otherwise, the defendants remind the Court that it is entitled to draw "reasonable inferences" of harm from the employee's speech, his position, and his working relationship with his superior, Def. Billington's Mem. at 19 (quoting Hall, 856 F. 26 at 261) & 22, and ask the Court to infer that the plaintiff's actions created "dissonance," id. at 21, between himself and defendant Mulhollan and undermined his ability to lead the FADTD.  The Court, however, is unable to draw that inference given that the record currently before it indicates that the plaintiff had previously engaged in similar speech without any detrimental impact on his working relationship with defendant Mulhollan or anyone else.  See compl. ¶¶ 33-40, 46.  Perhaps more damaging to this claim of an impaired working relationship, however, is the fact that defendant Mulhollan reassigned the plaintiff to work as his special advisor, id. ¶ 58, which seemingly indicates that the plaintiff still had a good "working relationship with his superior," Hall, 856 F.2d at 261.  Indeed, it seems that the greatest disruption to the CRS and the Library was the loss of an employee, the plaintiff, who, one day prior to the publication of his articles, was told by defendant Mulhollan that "he was very pleased with [the plaintiff's] job

performance, and that others at [the] CRS had stated that they respected and appreciated [the plaintiff] and thought that he was doing a very good job."  Compl. ¶ 42.

The plaintiff's interest in speaking, on the other hand, is significant.  He alleges that "[n]either of his opinion pieces singled out or criticized Congress, any Member of Congress, any political party, or positions associated with one party but not another," id. ¶ 47, and that they were written on and submitted from "his home computer, during non-work[ing] hours," id. ¶ 48; see Navab-Safavi, 650 F. Supp. 2d at 55 (concluding that the plaintiff's speech did not interfere substantially with her job because it was engaged in away from her workplace, not during her work hours, without the use of any work-related materials, and did not implicate or criticize her employers).  Moreover, the only information in the articles from which it could be inferred that the plaintiff might have had some association with the government was his identification as the former Chief Prosecutor for the Department of Defense's Office of Military Commissions; however, nothing in either piece suggested any current association the plaintiff had with the federal government, or indicated any relationship he had the Library.  See Def. Mulhollan's Mem., Exhibits ("Exs.") 2 (The plaintiff's Wall Street Journal piece) & 3 (The plaintiff's Washington Post piece).  In addition, nothing in the content of the plaintiff's speech concerning "the military commissions process [at Guantanamo Bay], and the decision to try certain detainees in [the] federal court[s] in the United States," compl. ¶ 45, was derived from his employment at the CRS, where, according to the plaintiff, his work was "not related to the military commissions system," id. ¶ 30.  Instead, the plaintiff contends that "sole responsibility for [matters] relating to the military commissions system . . . belongs to the American Law Division" of the Library, id. ¶ 31, of which he was not a member.

The defendants argue that the plaintiff's duties were actually greater than alleged in the Complaint, Def. Mulhollan's Mem. at 21-22, that "the Library's interest is in guaranteeing the impartiality and the appearance of impartiality projected by the signed work and the professional conduct" of its employees, id. at 26 (quoting Keeffe v. Library of Cong., 777 F.2d 1573, 1579-80 (D.C. Cir. 1985)), and that the plaintiff directly threatened the CRS's "interest in ensuring continued adherence to its core values of objectivity and non-partisanship," Def. Mulhollan's Mem. at 27. Keeffe, a case relied upon by the defendants, however, is distinguishable. In that case, the Library's Office of General Counsel opined that an analyst's actual and apparent impartiality might be compromised by her participation in a political party convention because "a delegate has an interest in the success of the convention's candidate or party platform." Keeffe, 777 F.2d at 1576. Here, the plaintiff alleges that his articles did not side with one party or the other and, instead, simply expressed his personal and private opinions as a citizen and former Department of Defense employee. Compl. ¶¶ 47-50. Moreover, the plaintiff in Keeffe was an analyst for the Library whose "work for [the] CRS identifie[d] . . . [her] by name." Keeffe, 777 F.2d at 1576. On the contrary, the plaintiff was not an analyst; rather, he was an Assistant Director who, he represents, "was not expected to and did not author written reports or analyses on behalf of the CRS. His name had not appeared on any reports distributed to Congress. Nor ha[d] any congressional inquiries or requests for information been directed to him." Compl. ¶ 29. Thus, as represented in the Complaint, the facts depict a private citizen engaging in speech, on his own time, on a matter of public concern unrelated to his job at the CRS.

While it is not inconceivable that at some stage later in the proceedings the defendants may be able to present evidence of how the plaintiff's speech impaired the effective and efficient

functioning of the CRS or the Library, such evidence is not currently before the Court in the plaintiff's Complaint or any of its attachments. Accordingly, because as pleaded the plaintiff's speech "substantially involved matters of public concern," <u>Connick</u>, 461 U.S. at 152, and did not in any significant way cause harm to his government-employer, the <u>Pickering</u> balance tips decidedly in the plaintiff's favor. The plaintiff has therefore stated a plausible First Amendment claim.

## C. **The Plaintiff's Fifth Amendment Due Process Claim**

The vagueness doctrine is an outgrowth not of the First Amendment, but of the Fifth Amendment. <u>United States v. Williams</u>, 553 U.S. 285, 304 (2008). A statute or ordinance is vague if either: one, it does not give fair warning of the proscribed conduct, or, two, if it is an unrestricted delegation of power that enables enforcement to occur with arbitrary and unchecked discretion. <u>Keeffe</u>, 777 F.2d at 1581. Observing that vague laws "offend several important values," <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972), the Supreme Court has concluded that

> [l]aws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. . . . [I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

<u>Id.</u> "What renders a statute vague . . . is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." <u>Williams</u>, 553 U.S. at 306.

The plaintiff's third cause of action alleges that, in violation of the Fifth Amendment, the Library regulation and the CRS policy regulating outside speech by Library and CRS employees

are unconstitutionally vague on their face and as applied to the plaintiff.[7]  Compl. ¶ 83.  The

defendants dispute the plaintiff's characterization of the regulation and policy as vague, arguing

that, at best, the plaintiff alleges arbitrary enforcement by citing examples of occasions when he

previously spoke publicly about the military commissions without reprimand.  Def. Mulhollan's

Mem. at 34 ("The plaintiff's allegations of arbitrary enforcement do not amount to a valid

vagueness claim."); Def. Billington's Mem. at 32 (same).  The defendants further assert that both

the Library regulation and the CRS policy are facially sound under the Fifth Amendment because

they make clear and concise statements about what outside speech and writing is permitted.  Def.

Mulhollan's Mem.at 36.  For the reasons outlined below, the Court finds that the regulation and

the policy are not void as facially vague, but that they were unconstitutionally applied to the

plaintiff.

        1.  <u>The Plaintiff's Facial Challenge to the Regulation and the CRS Policy</u>

The Library regulation and the CRS policy adopted to supplement that regulation provide

reasonably clear notice that, while outside speaking is encouraged, <u>see</u> Pl.'s Opp'n. to Mot. to

Dismiss at Ex. A (LCR 2023-3) (stating "staff members are encouraged to engage in teaching,

lecturing, or <u>writing</u> that is not prohibited by law" (emphasis added)), employees must take

efforts to ensure that the views expressed in outside speech concerning controversial matters are

_____

[7]        The Complaint actually asserts a vagueness claim under both the First and the Fifth Amendments.  Compl.
¶¶ 83-85.  Although the Supreme Court recently clarified that the vagueness doctrine is located squarely within the
Fifth Amendment's due process language, <u>Williams</u>, 553 U.S. at 304, vagueness concerns are "elevated when the
law regulates speech." <u>Bryant v. Gates</u>, 532 F.3d 888, 893 (2008); <u>see</u> <u>Grayned</u>, 408 U.S. at 109 (observing that
"where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the
exercise of those freedoms.  Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than
if the boundaries of the forbidden areas were clearly marked") (internal quotations omitted).  Accordingly, the Court
will construe the plaintiff's third cause of action as solely an alleged Fifth Amendment violation, but with the
"elevated concern" accorded alleged First Amendment violations.

solely the employee's personal views, see id., Ex. A (LCR 2023-3) (providing that "in speaking on and writing on controversial matters, staff members are expected to disassociate themselves explicitly from the Library and from their official positions"); id., Ex. B (The CRS policy) at 2 ("For [the] CRS, almost everything that staff say or write has the potential to be 'controversial.'"). The Court is somewhat troubled by Director Mulhollan's admonition that "almost everything" has the potential to be controversial, id., Ex. B (The CRS Policy) at 2, but is unsure whether this statement was made simply due to the legitimate concern for the all-too-pervasive practice of statements being distorted or taken out of context for partisan or political purposes, or is rather a comment on the nature of the work performed at the CRS. In other words, the Court does not understand how "almost everything" a CRS employee states could be potentially controversial. Nonetheless, an employee with the same question could seek guidance from the Review Office. See id. ("While it is not a formal requirement, the [CRS] strongly encourages all staff to submit draft outside writings to the Review Office, which welcomes the opportunity to provide input and advice."). And the existence and encouraged use of the Review Office counsels against a finding that either the regulation or the policy is void on its face for vagueness reasons. See U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 580 (1973) (finding "it . . . important . . . that the Commission has established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the" regulation). Thus, although the regulation and the policy are themselves reasonably clear, to the extent that

an employee desires further clarity, he or she may seek guidance from the Review Office.[8] See

Keeffe, 777 F.2d at 1581 (observing that "whether self-initiated or initiated by others, this review

procedure enables the employee to resolve any ambiguity about the reach of the regulation and to

decide whether it will be applied to her proposed conduct").

　　　　Further, the regulation and the policy satisfactorily alert employees of the need to

"avoid sources of potential damage to their ability to perform" their duties at the Library in an

objective and nonpartisan manner.  Pl.'s Opp'n to Mot. to Dismiss, Ex. A (LCR 2023-3) § 3

("[W]here some association may be made with a staff member's official status, staff members

shall . . . avoid sources of potential damage to their ability to perform official Library duties in an

objective and nonpartisan manner[,] and . . . assure, when appropriate, that staff members'

opinions clearly differentiate from Library policy.").  While there is no doubt that the LCR and

the policy "are marked by flexibility and reasonable breadth," Grayned, 408 U.S. at 110 (internal

quotation marks omitted), the Court finds that it is clear what the regulation, clarified by the

policy, "as a whole prohibits," id.—an employee from conveying the impression to an outside

audience that the employee is engaging in speech on behalf of or espousing the view of the

Library.

　　　　As was noted in Keeffe, it is again here "worth emphasizing that the Library's regulation

restricts only the exercise of [F]irst [A]mendment rights in ways that impinge on employees'

official duties."  Keeffe, 777 F.2d at 1580.  It is significant that the sections of the regulation at

---

[8]　　　　It should be noted, however, that while the Review Office can constitutionally seek to clarify regulations, it cannot evaluate proposed speech on the basis of its content or act as a prior restraint on such speech.  See Grayned, 408 U.S. at 113 (observing that the ordinance at issue "does not permit punishment for the expression of an unpopular point of view, and it contains no broad invitation to subjective or discriminatory enforcement").

issue here, LCR 2023-3 § 3(A)-(B), and the supplemental CRS policy do not explicitly prohibit any speech, although they do implicitly prohibit speech that will damage the perceived objectivity and nonpartisanship of the employee or the CRS.  See Keeffe 777 F.2d at 1583 (leaving "the Library free to adopt those interpretations that permit and even encourage the widest possible participation of its employees in public life").  Moreover, the only explicit limitation is a formal disclaimer clarifying that the views expressed in the speech are not those of the CRS or the Library, and this is required only when "some association may be made with a staff member's official status" as a Library employee.  Pl.'s Opp'n to Mot. to Dismiss, Ex. A (LCR 2023-3) § 3.  This minimal limitation on an employee's outside speech reflects the Library's measured calculation that "it is inescapable that some off-duty activities of a public servant are incompatible with the undivided loyalty and integrity the person must show on behalf of [his] client or constituency."  Keeffe, 777 F.2d at 1580.  The regulation and the policy "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," Grayned, 408 U.S. at 108, and are thus not impermissibly vague under the Fifth Amendment.  As the court in Keeffe observed, the "CRS'[s] regulations are not a triumph of careful drafting, but the [CRS] need not discard them."  777 F.2d at 1583.

### 2.  The Regulation and the Policy as Applied to the Plaintiff

Because the regulation and policy are facially constitutional, the constitutionality of the Library's action turns on the application of the regulation and policy to the plaintiff.  As such, the Court must examine whether the plaintiff had "fair warning," Grayned, 408 U.S. at 108, that he would be punished for the publication of his opinion articles.  In conducting this analysis, the District of Columbia Circuit's disposition of Keeffe provides direct guidance.  See Keeffe, 777

F.2d at 1582 (inquiring "whether Keeffe had fair notice, at the time she left for the Democratic Convention in New York, that her service as a delegate was legitimately proscribed because it conflicted with her professional duty").  As did the Circuit in <u>Keeffe</u>, this Court now similarly concludes that the plaintiff was not given reasonable warning that he would be punished under the regulation or the policy.

The plaintiff alleges that he had, prior to the November 11, 2009, publication of his two opinion articles, engaged in similar speech regarding the military commissions, not only without punishment, but with the blessing of his superiors at the CRS.  <u>See</u> compl. ¶ 33 ("[I]n February 2009, [the plaintiff] gave . . . [a] dinner speech at a Human Rights Watch dinner that reflected his oft-stated criticism of the Bush administration's policies relating to military commissions.  The CRS Deputy Director had given him approval to attend the dinner, and [the plaintiff] reported to her what happened the next day.  He was not told by anyone that his speech had threatened [the] CRS or the Library's work, or that it had compromised his objectivity or non-partisanship."); <u>id.</u> ¶ 46 ("The views expressed by [the plaintiff] in the opinion pieces were similar to those he had already expressed publicly both before and after the commencement of his employment with [the] CRS."); <u>see also</u> <u>id.</u> ¶¶ 34-40 (detailing other outside speech engaged in by the plaintiff in which he criticized the military commissions system, and asserting that the plaintiff "was not disciplined in any manner before publication of the opinion pieces on November 11, 2009[,] for writing or speaking publicly about Guantanamo [Bay] or the military commissions").  Based on these allegations, it is plain that the discipline following the publication of the opinion pieces was a departure from what had previously been the norm.  This history of the Library's acceptance of the plaintiff's prior outside speech commands a finding that the plaintiff never "received the

constitutionally mandated 'reasonable opportunity to know what [was] prohibited' that was necessary in order for [him] to conform [his] conduct." Keefee, 777 F.2d at 1582 (quoting Grayned, 408 U.S. at 108).

Although the defendants contend that the Library's lax enforcement of an otherwise clear regulation cannot sustain a vagueness challenge, Def. Mulhollan's Mem. at 34; Def. Billington's Mem. at 32, both the Supreme Court and the District of Columbia Circuit have held otherwise by ruling that fair warning is required, and where fair warning is absent due to prior interpretation or enforcement, a person cannot reasonably conform his or her conduct to what is expected. See Grayned, 408 U.S. at 114 (concluding that the Rockford City Council had "made the basic policy choices, and [had] given fair warning as to what [was] prohibited"). This is so because "the Library must . . . give loud and clear advance notice when it [decides] to interpret a particular regulation as a prohibition or limitation on an employee's outside activity. Without this notice, an employee is entitled to read the Library's overly long silence as assent." Keeffe, 777 F.2d at 1583 (emphasis added). Here, where the plaintiff's earlier outside activity was met with not only an "overly long silence," id., but express approval of prior speaking engagements at which he commented about the military commissions, the plaintiff was not provided fair warning of the adverse consequences of his November 11, 2009 publications in the Wall Street Journal and the Washington Post. Accordingly, the plaintiff has adequately stated a claim for relief under the Fifth Amendment.

**D.  Qualified Immunity**

As noted previously in this Memorandum Opinion, the doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known. Pearson, 555 U.S. at __, 129 S.Ct. at 815. Qualified immunity balances two important interests—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. In Saucier v. Katz, 533 U.S. 194 (2001) the Supreme Court mandated a two-step process for resolving government officials' claims of qualified immunity. Pearson, 555 U.S. at __, 129 S.Ct. at 815. Under Saucier, a court must first decide whether the facts alleged by the plaintiff make out a violation of a constitutional right. Id. at 816. Then, the court must decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct. Id. In more recent years, however, the Supreme Court has clarified that

> while [the Saucier] sequence . . . is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.

Id. at 818.

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness of the action must have been apparent. Hope, 536 U.S. at 739. Thus, public officials can be on notice that their conduct violates established law even in novel factual circumstances. Id. at 741. "[G]eneral statements of the law are not inherently incapable of

giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." Id.

Because the preceding pages of this Memorandum Opinion conclude that the plaintiff does indeed allege facts establishing two distinct constitutional violations, the Court's qualified immunity analysis will focus on whether those First and Fifth Amendment rights were clearly established when defendant Mulhollan allegedly violated them by terminating the plaintiff.

1.   The Plaintiff's First Amendment Claim

On November 12, 2009, when defendant Mulhollan first commenced what amounted to a series of reprimands that ultimately resulted in the plaintiff's separation from the CRS, it had been established both by the Supreme Court and the District of Columbia Circuit that a public employer could not punish an employee for lawful speech in the absence of harm to the effective functioning of the employer's operations.  See Pickering, 391 U.S. at 568 (concluding that a balance must be struck between the interests of the employee "as a citizen, in commenting upon matters of public interest and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees"); Rankin, 483 U.S. at 388 (holding that the state interest element of the Pickering balance focuses on the effective functioning of the public employer); Hall, 856 F.2d at 264 (determining that an employee's speech must, at a minimum, relate to the policy areas for which  he is responsible before a policy-level employee can be reprimanded for outside speech).  Further, the Supreme Court had already suggested that when an employee's speech involved matters of heightened public concern, an enhanced showing of harm to the government is required.  Connick, 461 U.S. at 152.

Although the Court's inquiry is objective, rather than subjective, <u>see</u> <u>Hope</u>, 536 U.S. at 739 (observing that a right is clearly established when a <u>reasonable</u> official would understand his conduct was in violation of that right), the plaintiff asserts that defendant Mulhollan's own behavior suggests that the First Amendment right in question was "sufficiently clear" to him and that defendant Mulhollan understood its applicability to the actions he took in response to the plaintiff's articles. According to the Complaint, defendant Mulhollan twice asked the plaintiff to "acknowledge that . . . First Amendment protections did not apply" to the publication of the two articles. Compl. ¶¶ 55-56. These alleged exchanges between the plaintiff and defendant Mulhollan regarding the plaintiff's articles and the First Amendment shows that Mulhollan was at least aware of "a general constitutional rule already identified in the decisional law," <u>Hope</u>, 536 U.S. at 741, and that this constitutional rule might have applicability to the plaintiff's articles. Therefore, because the plaintiff alleges in his Complaint the violation of a clearly established constitutional right, defendant Mulhollan's motion to dismiss on qualified immunity grounds must be denied.

        2.   <u>The Plaintiff's Fifth Amendment Claim</u>

The District of Columbia Circuit held in <u>Keeffe</u>, a case with strikingly similar factual circumstances to those under examination here, that the Fifth Amendment requires a public employer give "loud and clear advance notice when it [decides] to interpret a particular regulation as a prohibition or limitation on an employee's outside activity." 777 F.2d at 1583. Accordingly, the Fifth Amendment right to fair notice of prohibited conduct was clearly established when defendant Mulhollan reassigned and later terminated the plaintiff's employment following the publication of his two opinion pieces. Because the Complaint adequately states a

violation of a clearly established right under the Fifth Amendment, the Court must deny

defendant Mulhollan's motion to dismiss the claim on qualified immunity grounds.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Stay Litigation was earlier denied

by this Court. The Motion to Dismiss on Behalf of Defendant Daniel P. Mulhollan and the

Motion to Dismiss on Behalf of James Billington are now both also denied.[9]

_____/s/_____
REGGIE B. WALTON
United States District Judge

---

[9]    The Court will contemporaneously issue an order consistent with this Memorandum Opinion.