**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MORRIS D. DAVIS,

        Plaintiff,

           v.                      No. 1:10-CV-36-RBW

JAMES H. BILLINGTON, *et al.*,

        Defendants.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR SANCTIONS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

   A.  Procedural History. .................................................................................................2

   B.  Colonel Davis's Actions Prior to Leaving CRS. ....................................................4

   C.  Col. Davis's Actions After Being Notified of the Library's
      Allegations. ............................................................................................................9

ARGUMENT .....................................................................................................................14

   I.  NO SPOLIATION OCCURRED IN THIS CASE. .................................................14

      A.   Col. Davis Did Not Destroy Any Documents Or Emails. ............................14

      B.   Col. Davis Did Not Attempt To Conceal Evidence. ....................................18

      C.   Whether Col. Davis Misappropriated Government Property Or
          Improperly Shared Legislative Material With His Attorneys Has No
          Bearing On Spoliation And Is Not Properly Before This Court..................22

   II.  EVEN IF SPOLIATION HAD OCCURRED, SANCTIONS
       WOULD NOT BE MERITED IN THESE CIRCUMSTANCES. ........................25

      A.   Dismissal Is Not Justified. ...........................................................................26

          1.  The Library Has Not Identified Any Prejudice To Its Ability To
              Presents Its Case. ..............................................................................26

          2.  Col. Davis's Conduct Has Not Placed An Intolerable Burden On
              The Judicial System. .........................................................................27

          3.  Colonel Davis Did Not Engage In The Sort Of Egregious
              Misconduct That Could Justify Dismissal. ......................................28

      B.   Adverse Inference And Preclusion Sanctions Are Inappropriate. ...............29

      C.   Imposing Monetary Sanctions Would Work A Severe And
          Unwarranted Hardship On Col. Davis. ........................................................30

   III.  IT WOULD BE PREMATURE FOR THE COURT TO
        IMPOSE SANCTIONS. ....................................................................................31

CONCLUSION..................................................................................................................33

i

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Utley*, 129 F.R.D. 1 (D.D.C. 1990) ........................................................................ 31

*Bonds v. Dist. of Columbia*, 93 F.3d 801 (D.D.C. 2006) .................................................. 32

*Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir 1995) ............. 24

*Butera v. Dist. of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) ............................................ 29

*Chen v. Dist. of Columbia*, 839 F. Supp. 2d 7 (D.D.C. 2011) .......................................... 25

*Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Homeland Security*, 527 F. Supp. 2d 101 (D.D.C. 2007) ............................................................................... 23

*\*D'Onofrio v. SFX Sports Group, Inc.*, No. 06-687, 2010 WL 3324964 (D.D.C. Aug. 24, 2010) ............................................................................................................... passim

*Davis v. Billington*, 681 F.3d 377 (D.C. Cir. 2012) .......................................................... 3

*Davis v. Grant Park Nursing Home, LP*, No. 1:08-cv-01764 (PLF/JMF), 2010 WL 4642531 (D.D.C. Nov. 9, 2010) ................................................................................... 32

*\*In re Fort Totten Metrorail Cases Arising Out of the Events of June 22, 2009*, 279 F.R.D. 18 (D.D.C. 2011) ............................................................................................... 14

*Jacobs v. Schiffer*, 204 F.3d 259 (D.C. Cir. 2000) .......................................................... 24

*Mahaffey v. Marriott Int'l, Inc.*, No. 11-995, 2012 WL 4833370 (D.D.C. Oct. 11, 2012) 14

*Martin v. Lauer*, 686 F.2d 24 (D.C. Cir. 1982) ............................................................... 24

*Miller v. Time-Warner Commc'ns, Inc.*, No. 97 Civ. 7286, 1999 WL 739528 (S.D.N.Y. Sept. 22, 1999) .............................................................................................................. 28

*Retanan v. Cal. Dep't of Corr. & Rehabilitation*, No. 1:11-cv-01629-GBC (PC), 2012 WL 1833888 (E.D. Cal. May 18, 2012) ......................................................................... 23

*Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323 (2d Cir. 1999) ...................... 31

*Shea v. Donohoe Constr. Co.*, 795 F.2d 1071 (D.C. Cir. 1986) ................................. 26, 27

*\*Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469 (1995) ................................................ passim

*Summers v. Marin County Recorders Office*, No. C-09-1485 MMC, 2009 WL 1096274 (N.D. Cal. Apr. 22, 2009) ............................................................................................... 23

*United States v. Rayburn House Office Building, Room 2113*, 497 F.3d 654 (D.C. Cir. 2007) .......................................................................................................................... 24

*\*Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497 (D. Md. 2010) .................... 28

*Webb v. Dist. of Columbia*, 146 F.3d 964 (D.C. Cir. 1998) ............................ 25, 26, 27, 28

**Statutes**

18 U.S.C. § 2071 ............................................................................................................ 23

18 U.S.C. § 641 .............................................................................................................. 23

44 U.S.C. § 3106 ............................................................................................................ 23

5 C.F.R. § 2635.101 ........................................................................................................ 23

5 C.F.R. § 2635.106 ........................................................................................................ 23

**Other Authorities**

*Federal Electronic Records Management: A Status Report*, Hearing Before the Information, Policy, Census, and National Archives Subcommittee on Oversight and Government Reform, 111th Cong. 2 (2010) (statement of Anne Weismann, Chief Counsel, Citizens for Ethics and Responsibility in Washington), *available at* http://oversight.house.gov/wp-content/uploads/2012/01/20100617Weisman.pdf ....... 20

Lucosi Fuller, *10 Ways to Speed Up a PC*, Salon Tech Timps, http://techtips.salon.com/10-ways-speed-up-pc-10250.html (last visited Dec. 3, 2012) ...................................................................................................................... 20

Marc Saltzman, *Do a clean sweep: How to delete unwanted files and programs*, Microsoft at Home, http://www.microsoft.com/athome/setup/cleansweep.aspx#fbid=aXNPz9LWo16 (last visited Dec. 3, 2012) ................................................................................................ 20

Office of the Inspector General, Library of Congress, Report No. 2009-PA-104, *Integrated Support Services: The Library's Records Management Program Needs to be Overhauled* (2010) ............................................................................................ 8, 19

## **INTRODUCTION**

Three years after this case was filed, the Library is now dramatically alleging that Col. Davis intentionally spoliated evidence stored on his government computer.  But the Library utterly neglects the central and dispositive fact at issue: No evidence has been destroyed.

Prior to Col. Davis' departure from CRS, in accordance with his and his colleagues' past practice as government employees, he made a digital copy of the files stored locally on his work computer that he thought he should save for himself, including, to the best of his knowledge, every file related to this litigation; he then cleaned up the computer by deleting its contents, to prepare it for the next user.  Upon being notified of the Library's spoliation allegations and that the Library did not preserve its own copy of the files on its computer network, Col. Davis has voluntarily provided the Library with the non-privileged files copied from his work computer—as he inevitably would have done had the Library allowed this case to proceed to discovery.  Because all of these documents and emails still exist, spoliation has not occurred.  The Library knew these facts before it filed its motion.  Its continued pursuit of sanctions for spoliation is like trying to make chicken salad without the chicken.  Put another way, arguing that spoliation occurred without a loss of evidence "is to have Hamlet without the Dane." *D'Onofrio v. SFX Sports Group, Inc.*, No. 06-687, 2010 WL 3324964, at *9 (D.D.C. Aug. 24, 2010).

Even if there were some basis for believing that spoliation had occurred, the sanctions requested by the Library are not justified.  No documents or emails have been destroyed, and the Library has conspicuously failed to identify any prejudice to its ability

to litigate this case on the merits as the result of Col. Davis's actions.  Instead, the Library

hangs its entire motion on the need to punish Col. Davis and to deter future litigants.

Contrary to the Library's submission, that rationale cannot justify the severe sanctions

requested, particularly given both the absence of nefarious intent on the part of Col.

Davis—who never received any contrary instructions regarding the Library's records

management practices—and the Library's failure to take steps to ensure the preservation

of these files and emails stored on its own computer system.

Finally, even if sanctionable spoliation had occurred, it would be inappropriate to

impose sanctions at this early stage of the litigation.  Spoliation sanctions are measured

by the harm caused by the destruction of evidence.  That measurement cannot be made

where, as here, discovery has not even begun and the factual contours of the case remain

unclear.

In short, the Library's motion for sanctions has no foundation in law or fact.  By

filing this motion, the Library has further delayed resolution of a case that is already

nearing its third anniversary, forced Col. Davis to spend considerable time and resources

responding to baseless allegations, and wasted the Court's time.  It has done all this in yet

another attempt to avoid litigation on the merits and to tarnish Col. Davis in the eyes of

the Court.   Its motion should be denied, and the case should finally move forward to

discovery.

## **FACTUAL BACKGROUND**

### A.      **Procedural History.**

This case arises out of the Library of Congress's termination of Col. Morris Davis

from his position as an Assistant Director of the Congressional Research Service for

writing an Op-Ed in the *Wall Street Journal* and a Letter to the Editor in the *Washington Post* concerning the Obama Administration's decision to prosecute some Guantanamo detainees in federal court and some in military commissions—a topic of immense public concern related solely to Col. Davis's former career as the Chief Prosecutor of the military commissions at Guantanamo.

Colonel Davis filed this lawsuit on January 8, 2010, alleging that the Library's actions violated his First Amendment and due process rights.  The Court denied Col. Davis's motion for a temporary restraining order and/or a preliminary injunction, holding that Col. Davis had a substantial likelihood of success on the merits of his First Amendment and due process claims, but that he had not adequately demonstrated that he would suffer irreparable injury absent injunctive relief.  Dkt. 11.

Defendant James Billington, sued in his official capacity as the Librarian of Congress (the "Library"), and defendant Daniel Mulhollan, sued in his individual capacity, then filed motions to dismiss the action.  The Court denied both motions to dismiss, holding that Col. Davis had stated claims against Defendants, that Col. Davis could bring a *Bivens* claim against Mulhollan, and that Mulhollan was not entitled to qualified immunity.  Dkt. 35.

Mulhollan appealed the Court's decision to the D.C. Circuit, which issued its opinion on June 1, 2012.  *Davis v. Billington*, 681 F.3d 377 (D.C. Cir. 2012).  In a 2-1 decision, the D.C. Circuit held that Col. Davis could not bring a *Bivens* claim against Mulhollan.  Because of that decision, the panel majority (Sentelle, J. and Henderson, J.) did not reach the merits of Col. Davis's claims.  The dissent (Rogers, J.) did address the

merits, concluding, as had this Court, that Col. Davis has alleged valid First Amendment and due process claims.

Although Col. Davis ultimately found a new job in August 2010, seven months after his termination by the Library, that job paid him less than half of his prior salary at the Library.  The funding for that job ended less than a year later, and for the past sixteen months, he has been working as an Assistant Professor of Lawyering Skills at Howard Law School, earning less than forty-five percent of his prior salary at the Library.  He continues to desire reinstatement to his position at CRS.  *See* Declaration of Morris D. Davis, dated August 10, 2011 (Dkt. 47-1) (detailing the ongoing harm he had suffered from his termination, as of August 2011).

Discovery has still not begun in this case.  Instead, almost three years after the case was filed, the Library persists in its attempts to avoid litigating the merits of this case, now by alleging that Col. Davis intentionally spoliated evidence and that the lawsuit should be dismissed.  The Library first informed Col. Davis of these allegations in a letter dated September 24, 2012, asserting that Col. Davis improperly deleted files and emails from his CRS work computer prior to his departure from CRS.  Upon learning about these surprising allegations, Col. Davis and his attorneys promptly conducted an investigation in an attempt to understand, and respond to, the Library's concerns.  That process has taken a significant amount of time, energy, and money, and resulted in the conclusion that no documents or emails were destroyed.

## B.    Colonel Davis's Actions Prior to Leaving CRS.

Plaintiff's investigation, conducted by his attorneys and their retained forensic experts, indicates that no files or emails related to this lawsuit were destroyed by Col.

Davis.  Instead, Col. Davis preserved a copy of the allegedly spoliated documents, as he explained to the Library before it filed its motion, and subsequently provided those documents to the Library when he learned that the Library did not have its own copies.

Colonel Davis's actions prior to his departure from CRS, with respect to the treatment of the documents and emails on his work computer, were consistent with his past practice throughout his lengthy career as a government employee.  Declaration of Col. Morris Davis, December 17, 2012 ("Davis Decl.") at ¶ 20.  When leaving a place of employment, Col. Davis's practice was to clean up his computer and to preserve an electronic copy of those files and emails that he thought he should keep.  *Id.* ¶¶ 7, 9.  His departure from CRS was no different:  Before leaving, he made a digital copy of his documents and emails—except for those that had nothing to do with him or this lawsuit, such as evaluation forms for his subordinates—and cleaned up his computer by deleting the items on it, so that the next employee could use it.  Col. Davis did not undertake these actions to destroy, alter, or conceal evidence relevant to this lawsuit.  *Id.* ¶¶ 20-21.  To the best of his knowledge, Col. Davis has not destroyed any documents or emails related to this litigation, and he has subsequently provided all such non-privileged documents and emails to the Library.

Colonel Davis's conduct here was consistent with the regular and common practice of his colleagues throughout his more than twenty-five years of service as a government employee.  As the former Chief of the Air Force's Office of Professional Responsibility explains:  "The regular and common practice was for the person leaving a post to delete everything on his or her work computer and hard drive, including files and emails, to clean it up and make it ready for the next person who would be using that

computer station.  Employees were given the option of making copies of all or certain items from their computer work station and hard drive by downloading them onto a personal hard drive or similar storage device.  Whether that was done was up to each individual, depending on whether he or she wanted to keep any of them."  Declaration of Col. Daniel E. Rogers ("Rogers Decl.") at ¶ 8.

There was, accordingly, no prohibition against creating these personal storage files or subsequently deleting the files on an employee's work computer and accompanying hard drive.  Rogers Decl. ¶¶ 9-10.  To the contrary, that is the advice that Col. Davis and his colleagues received.  Davis Decl. ¶ 7; Rogers Decl. ¶ 11 ("[T]he systems administrators—the individuals responsible for the administration and maintenance of the computers and computer networks—specifically advised individuals leaving their positions to store anything they wanted from the work computer and hard drive by copying it onto a personal hard drive or similar storage device, and then to delete the originals from the computer and hard drive to clean it up for the next employee.").

One example from Col. Davis's past vividly illustrates that this practice was condoned by everyone, including those in a position to say otherwise.  When Col. Davis left his position as the Chief Prosecutor for Guantanamo, he made a personal copy of his unclassified emails from his two years in that position by copying them onto disks.  Davis Decl. ¶10.  When preparing to testify in the subsequent prosecution of one of the Guantanamo detainees, Col. Davis asked the Office of Military Commissions for help opening his personal copy of those emails, because they might be relevant to the case.  The Office of Military Commissions forwarded Col. Davis's

disks to the General Counsel's Office of the Department of Defense for help in opening the emails. The General Counsel's Office did so, and handed the disks back to Col. Davis with instructions on how to open the email files contained on the disks. At no point did anyone indicate that Col. Davis had inappropriately made copies of his emails or that there was anything wrong with him having taken copies of them or maintaining those files after his departure from his prior position. *Id.* ¶¶ 10-11.

Colonel Davis received no guidance or instruction from the Library that contradicted his prior training and practice. *Id.*¶¶ 12, 19. In fact, to the best of his recollection, the Library did not provide him with *any* training or instructions concerning how to handle documents on electronic media or what he was supposed to do with respect to such documents prior to his departure. Nor did the Library have any policies or procedures in place to instruct Col. Davis as to how to treat electronic documents.

Colonel Davis was not alone in his lack training or knowledge concerning the Library's policies and procedures for handling electronic documents. The Library's own Inspector General issued an official report in March 2010—shortly after this lawsuit was filed—that was highly critical of the Library's records management procedures and policies. That report found, among other things: (1) "The Library's Records Management Program is [d]eficient"; (2) "The Library lacks records management directives that establish record keeping requirements, including records created or received using electronic mail and distinguishing records from non-records"; and (3) "The Library lacks an employee records management training program designed to inform Library employees of required recordkeeping policies, responsibilities, and techniques." *See* Declaration of Aden Fine ("Fine Decl."), Exh. A (Office of the

Inspector General, Library of Congress, Report No. 2009-PA-104, *Integrated Support Services: The Library's Records Management Program Needs to be Overhauled*, at i-ii (2010)).[1]  The Library's records management practices and procedures were so deficient that the Inspector General felt compelled to state that:  "NARA [the National Archives and Records Administration] regulations require that each federal agency perform periodic evaluations of its records management program to obtain reasonable assurance that the agency is in compliance with federal recordkeeping requirements.  Notwithstanding this regulatory requirement, the Records Management Section is not providing any oversight for the Library organizations' recordkeeping activities."  *Id*. at 9 (footnote omitted).  This report is particularly relevant to the instant dispute because the Inspector General conducted its investigation in October and November 2009, while Col. Davis was employed at the Library.

Colonel Davis's actions were also consistent with his limited understanding of the Library's document filing system.  Because Col. Davis did not personally need to create many substantive documents in his position as an Assistant Director at CRS, the vast majority of the documents he had on his computer were copies of documents created by others, such as CRS reports written by other CRS employees.  Davis Decl. ¶ 14.  The few that he created himself primarily related to his filling out of official forms, such as

---

[1] As the report explains in more detail:  "It is the Library's policy that e-mail records are to be printed and filed in a paper recordkeeping system.  Yet, this policy is neither published in an LCR nor posted on the Records Management Section's website.  ISS informed us that its standard practice is to issue a yearly memo intended to remind Library employees of the Library's recordkeeping policy.  However, service units we contacted stated that they had not received any information about recordkeeping from ISS for a long time.  ISS acknowledged that its last memo on the subject was issued in April 2008."  *Id*. at 8.  Col. Davis's first day at CRS was in December 2008, well after the last issuance of such a memorandum.

personnel evaluations and award recommendations for his subordinates.  *Id*.  After

completing these forms, Col. Davis submitted them to the appropriate offices or

individuals (e.g., the Personnel Office), and he believed that those offices or individuals

would file and retain those documents in the appropriate manner.[2]  As with the copies of

documents authored by others, Col. Davis believed that these documents were merely his

personal copies, not the Library's official copy.  That belief was consistent with the

practice in his prior government positions, and he still has no reason to believe otherwise.

*Id*.  As a result, Col. Davis had (and has) no reason to believe that the Library needed to

retain his personal copies.  *Id.* at ¶¶ 14, 22; Rogers Decl. ¶ 7.

Similarly, with respect to emails, Col. Davis assumed that the Library archived

the data on its network and that it had a back-up system in place in case of a loss of data

on desktop computers as a result of fire, flood, power surges, or other unexpected events

at the Library.  In other words, he thought that every email he sent or received on his

Library account would be preserved by the Library.  When he deleted the emails stored

locally on his computer, he had no reason to believe that he was deleting the Library's

only copy—he thought he was merely deleting his personal copy.

**C.**     **Col. Davis's Actions After Being Notified of the Library's Allegations.**

Upon being notified of the Library's accusations, Col. Davis promptly provided

his attorneys with a copy of CRS-related files on the thumb drive onto which he had

copied his emails and documents.  Davis Decl. ¶¶ 25-26.  The vast majority of those

files—approximately 3,600—were emails.  Because the emails were in a format that

neither Col. Davis nor his attorneys could open on their computers, his attorneys retained

---

[2] Because documents such as personnel evaluations and recommendations for employee
awards for CRS employees had nothing to do with him personally or with this litigation,
Col. Davis did not copy those types of documents onto his personal thumb drive.

a computer forensic corporation, Kroll OnTrack Inc. (a subsidiary of the largest

commercial provider of background investigations for the United States government, *see*

http://www.krollontrack.com/company/overview/), on his behalf to convert those emails

to a readable format.  Fine Decl. ¶ 4.  Kroll successfully converted those files, and

following a privilege review by his attorneys, Col. Davis provided copies of those emails,

along with non-email documents from his hard drive, to the Library on October 19, 2012,

save for the few files that contained privileged information.[3]  Fine Decl. ¶ 4, Exh. B.

Despite receiving these files, the Library filed its motion for sanctions, arguing

that Col. Davis had committed spoliation and that this case should be dismissed.  Along

with its motion, the Library submitted a report from its Information Technology

department and a declaration from a forensic analyst at Kroll, the same company that

Plaintiff had previously retained.  That declaration states that 3,894 total files appear to

have been deleted from Col. Davis's CRS computer, that 3,405 of them appear to have

been deleted on Col. Davis's last day at CRS (January 20, 2010), and that 134 of them

were likely deleted at some point between December 1, 2009 and January 19, 2010.  No

information is provided about when the other 355 files appear to have been deleted.  The

Library's declaration further states that the 3,405 files deleted on Col. Davis's last day

appear to have come from a location on the computer with the identifying information,

"C:\archive\ofsv1arc\."  That location on the computer is virtually identical to the

location information for the 3,600 email files previously provided by Col. Davis to the

Library ("C:\ofsv1arc\."), indicating that the files deleted by Col. Davis on his last day at

work were likely his emails, which is consistent with Col. Davis's recollection.

---

[3] A privilege log detailing the specific privileged items was provided to the Library along
with the non-privileged documents.

The Library's papers are vague about whether it had a back-up system in place that kept a copy of these documents and emails, as would be expected.  The Library does not indicate whether it deleted or failed to preserve those back-up tapes, to the extent they once existed.  And the Library is opaque about how many of these allegedly spoliated documents it had in its possession prior to notifying Col. Davis or the Court about its accusations.  Indeed, although it is conspicuously absent from either the Library's IT Department report or the Kroll declaration, the Library's brief concedes, without including any details, that prior to the *Library* becoming aware of this situation, "the information technology staff for *CRS* (which is separate from the Library's IT staff) had *previously* determined that the contents of Plaintiff's CRS e-mail account had been entirely deleted by Plaintiff," and that CRS "had been able to restore a portion of the deleted e-mails using CRS back-up tapes."  Mot. at 11 (emphases added).  In other words, it appears that in addition to the Library being provided a copy of these documents by Plaintiff, the Library—via CRS—itself previously had many of them before it filed its motion.  The Library's papers are silent as to when CRS first learned about this situation; it is possible that CRS was aware of this situation a long time ago and simply failed to notify the Library in a timely manner, or, just as likely, that no one from the Library, including CRS, ever took any steps to preserve the potentially litigation-related material on Col. Davis's computer, despite its litigation obligation to do so.  It is similarly unclear how many emails (the "portion" referenced in the Library's brief) could not be recovered automatically from CRS's back-up tapes, or whether those unrecovered emails had been deleted in the regular course of business, long before the Library decided to terminate Col. Davis.  Nor is there any explanation for why those emails were not present on the

back-up tapes.  These missing facts are significant, because it is quite possible that the

only reason the Library did not have these files prior to Plaintiff providing them to the

Library is because the Library failed to retrieve them from its own back-up system before

its back-up tapes were themselves deleted or overwritten.

Far from revealing any surprising or disturbing information, the Library's

declaration and IT Department report are consistent with what Col. Davis previously told

the Library about what he did prior to his departure from CRS:  He made a copy of

emails and documents on his computer and then cleaned up the computer by deleting its

contents.  Nevertheless, in an attempt to provide additional corroborating evidence, Col.

Davis retained a second set of forensic consultants to avoid a conflict on the part of Kroll,

now that he knew the Library was using its services.  The analysis conducted by those

experts, HLP Integration, is consistent with Col. Davis's recollection, outlined above.

Specifically, their analysis confirms that Col. Davis placed 3,935 files from his CRS

computer onto his personal thumb drive between November 10, 2009 and January

20,2010.  Declaration of Kevin Albert ("Albert Decl.") at ¶ 9.[4]  Of those, 3,622 are Col.

Davis's emails; the remaining 313 files were documents from his hard drive.  The

identifying path location ("C:\ofsv1arc\.") for the emails is virtually identical to that

identified by the Library's forensic report.  *See* Venema Decl. ¶ 11.  All but eighty-six of

the 3,935 CRS files copied onto the thumb drive are still on the thumb drive.  Albert

---

[4] The thumb drive on which these documents were placed is the same thumb drive that
Col. Davis used for years, to save a variety of different documents, from different
contexts.  As a result, there are many non-CRS files on the thumb drive, including
documents relating to his past representation of clients.  Col. Davis did not provide those
documents to the Library, as they are not relevant to this lawsuit, and there is no reason
for believing them to be so.

Decl. ¶ 9.  These eighty-six other documents are on a backup copy made by Col. Davis.[5]

All of these documents, including the eighty-six other documents, except for the

privileged items, have been provided to the Library.  Fine. Decl. ¶¶ 4-5.  The HLP

Integration report confirms Col. Davis's recollection that he did not delete any documents

from his backup copy, *see* Davis Decl. ¶¶ 24, 27; Albert Decl. ¶ 11,[6] meaning that, to the

best of his knowledge and belief, the documents that have now been provided to the

Library constitute all of the documents and emails that Col. Davis copied from his CRS

computer, and that he allegedly spoliated.  Davis Decl. ¶ 28.

---

[5] The thumb-drive and portable hard drive containing Col. Davis's backup copy are now in the possession of his attorneys.

[6] One file appears to have been deleted from the backup drive, but that file is a systems file that would not have come from Col. Davis's CRS computer.  *Id.* ¶ 9.

**ARGUMENT**

## I.   NO SPOLIATION OCCURRED IN THIS CASE.

Spoliation is "the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Mahaffey v. Marriott Int'l, Inc.*, No. 11-995, 2012 WL 4833370, at \*2 (D.D.C. Oct. 11, 2012) (internal quotation marks omitted).  In other words, spoliation occurs when evidence becomes unavailable as a result of a party's intentional or negligent violation of its duty to preserve that evidence.  Conversely, where there is "no evidence of any loss of data, the complicated principles pertaining to preservation and spoliation do not . . . have to be considered." *In re Fort Totten Metrorail Cases Arising Out of the Events of June 22, 2009*, 279 F.R.D. 18, 22 (D.D.C. 2011).

There is no spoliation here, because there is no indication that any documents or emails have been destroyed, lost, or materially altered.  To distract from this fatal deficiency in its argument, the Library instead argues that Col. Davis "misappropriated" government property when he transferred files from his government computer to his personal thumb drive.  That argument is misplaced:  Whether Col. Davis mistakenly misappropriated government property by doing what he had been advised to do in his earlier government jobs has no relevance to the Library's motion for spoliation sanctions and is not properly before this Court.

### A.   Col. Davis Did Not Destroy Any Documents Or Emails.

To argue that spoliation occurred without the loss of evidence "is to have Hamlet without the Dane." *D'Onofrio*, 2010 WL 3324964, at \*9  (refusing to impose spoliation sanctions where it was not yet clear "what may still be missing and its relevance to plaintiff's claims").  Nevertheless, that is precisely what the Library argues in this case.

Not once in its entire motion does the Library affirmatively allege that Col. Davis destroyed evidence.  In fact, it cannot make this assertion, because there is no indication that Col. Davis destroyed anything.  Rather, as part of his routine work station clean up procedure, he copied files from his government computer to his personal thumb drive and later deleted them.  In doing so, he did not destroy the files; he simply moved them from one storage location to another.  Regardless of whether this transfer was technically inappropriate, it does not constitute the spoliation of evidence related to this lawsuit.

Colonel Davis's transfer of the files to a thumb drive was consistent with his past practice and instruction, and it was not done with the intent of destroying evidence related to this lawsuit.  Col. Davis served in the United States Air Force for over twenty-five years.  As described above, Col. Davis was advised by the military's information technology personnel that individuals who wished to retain certain information upon leaving their positions should copy those files onto their personal hard drives or similar devices and then delete the files from their work computers.  Davis Decl. at ¶¶ 7,9; Rogers Decl. at ¶ 11. These actions were a regular and common practice among Air Force personnel, including Col. Davis.  Davis Decl. at ¶¶ 7, 9; Rogers Decl. at ¶ 8.

The Declaration of Col. Rogers substantiates this practice, *id*. at  ¶¶ 7-12, and is especially significant because of his computer science background and training and the various supervisory roles that he served in over his lengthy and distinguished career, including his direct involvement with issues concerning the storage of documents on electronic media, *id*. at ¶¶ 1-5, 12.  As Col. Rogers explained, throughout his twenty-seven year career in the Air Force, "there was never a clear official policy or procedure in place to explain or provide guidance concerning how documents on electronic media

15

within legal offices were to be stored or retained," *id*. at ¶ 6, and "if anyone would have

been familiar with any policies or procedures prohibiting individuals from creating

personal storage files or deleting items on a government computer or hard drive, that

person would have been me," *id*. at ¶ 12.  As mentioned previously, Col. Rogers also

served as the Chief of the Air Force's Office of Professional Responsibility.  His

Declaration makes clear that what Col. Davis did in the Air Force and upon his departure

from CRS would have been well within the norms of his professional responsibilities as

an Air Force attorney and what employees, including lawyers, did at the Air Force.  *Id*. at

¶¶ 8-14.

　　　　Colonel Davis simply continued these practices after he left the military.  Davis

Decl. at ¶¶ 19-20.  While preparing to leave his job at the Library, Col. Davis followed

his routine work station cleanup practice:  He copied files that he thought he should

preserve from his government computer to his personal thumb drive and then deleted the

files from the computer to render it suitable for use by the next employee.  *Id*. at ¶ 20.  As

soon as the Library notified Col. Davis that files were missing from his government

computer, he reviewed his thumb drive and turned it over to his counsel, who conducted

a privilege review, and provided non-privileged files to the Library.  Davis Decl. at ¶¶

25-26; Fine Decl. ¶ 4, Exh. B at 2.  Col. Davis's retained experts then conducted a

forensic analysis to ensure that he had identified and produced all the files copied from

his CRS work computer.  When that analysis revealed that eighty-six documents were

missing from the thumb drive, Col. Davis located copies of those files on his backup

drive and voluntarily produced them to the Library.  Davis Decl. ¶¶ 27-28; Fine Decl. ¶ 5.

Similarly, when it was discovered that there were additional files on the thumb drive not

yet produced to the Library, he provided those to the Library as well.  *Id.* ¶ 5, Ex. C.  The forensic analysis confirms that, to the best of Plaintiff's knowledge, he has now turned over to the Library every non-privileged file transferred to his personal thumb drive from his CRS computer.  Davis Decl. at ¶ 28; Fine Decl. at ¶¶ 4-5.

The Library does not assert, and has provided no evidence to suggest, that Col. Davis destroyed any evidence material to this case.  First, the Library nowhere affirmatively contends that Col. Davis actually destroyed relevant documents or emails.  Second, it barely mentions Col. Davis's voluntary production of the non-privileged files copied from his government computer to his personal thumb drive.  Finally, the Library explicitly concedes that it might be able to retrieve all of the information stored on his computer and that it has already been able to recover the majority of these files. *See* Mot. at 24 n.5; Venema Decl. at ¶ 11 (stating that, of the 3,894 files that appear to have been removed from Col. Davis's CRS computer, 3,089 files have been retrieved).  Indeed, prior to even retaining its forensic consultants, the Library—via CRS—apparently already had recovered some of the files.  Mot. at 11.

The Library nevertheless contends that spoliation occurred because Col. Davis "[v]iolated [h]is [o]bligation to [p]reserve [e]vidence."  Mot. at 15.  But—as the Library knew before it filed its motion—he did preserve all of the documents and emails at issue.  The argument that a party violated his obligation to preserve evidence only applies when there is some indication that evidence has actually been lost.  *See Fort Totten*, 279 F.R.D. at 22.  "There being no evidence of any loss of data, the . . . principles pertaining to preservation and spoliation do not . . . have to be considered."  *Id*.  Thus, because the

Library does not even argue, let alone demonstrate, that any documents or emails related to this lawsuit were destroyed, it fails to establish that spoliation has occurred.

### B.      Col. Davis Did Not Attempt To Conceal Evidence.

Unable to prove that Col. Davis spoliated evidence, the Library instead insinuates that Col. Davis transferred the files from his government computer as part of a calculated effort to *conceal* evidence.  Mot. at 22.  That assertion also has no factual support.  There is nothing to suggest that Col. Davis transferred the files from his government computer with the intent of concealing them from the Library and the Court.  To the contrary, Col. Davis has made clear that his actions were entirely consistent with his and his colleagues' past practice and training as to what to do with respect to files on electronic media, and that they were not motivated by a desire to destroy or to conceal evidence relevant to this lawsuit.  Davis Decl. ¶¶ 19-21, 23.  Moreover, Col. Davis has voluntarily produced all of the non-privileged files contained on his thumb drive, including all of his emails.  Contrary to the Library's suggestions, there is nothing damaging to Col. Davis's lawsuit in those documents.  If anything, the vast majority are either irrelevant to this lawsuit or helpful to Col. Davis.  Far from hand-picking harmful documents to "conceal" from the Library, Col. Davis copied almost everything to the thumb drive, including, to the best of his knowledge, all of his emails; he did not pick and choose amongst them.[7]

Moreover, the Library cannot now complain that Col. Davis failed to adhere to its recordkeeping requirements when the Library itself—as recently reported by its own Inspector General—failed to inform its employees about those alleged requirements.

---

[7] As discussed above (at n.2), Col. Davis did not copy a small number of files from his hard drive to his thumb drive, such as personnel evaluations of employees he supervised, that had nothing to do with this lawsuit.  Davis Decl. at ¶ 22.

Because of the glaring deficiencies in the Library's own recordkeeping system—

including the lack of directives outlining the Library's records management requirements,

nonexistent oversight by the Library's Records Management Section, and the absence of

a statutorily mandated agency training program for federal recordkeeping requirements—

Library employees, including Col. Davis, never received formal instruction on either

federal recordkeeping requirements or the Library's recordkeeping policies and

capabilities.  *See* Fine Dec. Exh. A (Office of the Inspector General, Library of Congress,

Report No. 2009-PA-104, *Integrated Support Services: The Library's Records*

*Management Program Needs to be Overhauled* (2010)).  Indeed, in its March 2010 report

based on a field audit conducted from October through November 2009—shortly before

Col. Davis's departure—the Inspector General of the Library found that "[t]he lack of a

training program along with the lack of other controls to ensure that employees are

knowledgeable of their recordkeeping responsibilities, results in the Library having little

assurance that records are being properly identified, stored, and preserved."  *Id.* at 11.

Col. Davis, in particular, assumed, perhaps incorrectly, that the Library archived agency

records and employee emails, and so did not realize that deleting such files from his

computer, as he had previously done without consequence or admonishment throughout

his twenty-five years as a government employee, might prevent the Library from having

its own copy of those files.  Davis Decl. at ¶¶ 11-15.[8]  In any event, whether Col. Davis

---

[8] Other federal agencies also routinely neglect their federal records management
responsibilities.  "Agencies routinely and systematically ignore their clear obligations to
preserve electronic records, particularly email.  Agency personnel do not even understand
what those obligations encompass, and their agencies have done little to educate them.
Most agencies have no effective way to manage their email records beyond asking
individual employees to print them to paper and save them in paper files."  *Federal*
*Electronic Records Management: A Status Report*, Hearing Before the Information,

did or did not comply with the Library's supposed recordkeeping rules is not relevant to the Library's motion seeking sanctions for spoliation of evidence.  The Library's recordkeeping rules and the obligations of a party to preserve relevant evidence are independent matters.

Despite the widespread ignorance and neglect of electronic recordkeeping practices throughout the Library, and regardless of the fact that it was Col. Davis's consistent practice to clean up his work computer when changing jobs, the Library contends that Col. Davis's deletion of files here must have been part of some calculated plan to hide adverse evidence from the Library.  To support this position, the Library makes several specious insinuations:

First, the Library attributes special significance to the fact that Col. Davis deleted the files and then emptied his desktop's "Recycling Bin."  Mot. at 15.  Contrary to the Library's submission, it is a common—and recommended—practice to empty a recycling bin after files have been moved—that is simply how one removes files from a computer's hard drive.  *See, e.g.*, Marc Saltzman, *Do a clean sweep: How to delete unwanted files and programs*, Microsoft at Home, http://www.microsoft.com/athome/setup/cleansweep.aspx#fbid=aXNPz9LWo16 (last visited Dec. 3, 2012) ("To free space on your computer, you'll need to empty the Recycle Bin periodically."); Lucosi Fuller, *10 Ways to Speed Up a PC*, Salon Tech Timps, http://techtips.salon.com/10-ways-speed-up-pc-10250.html (last visited Dec. 3, 2012) ("Take Out the Trash: Some people think that they have permanently deleted files when

_____

Policy, Census, and National Archives Subcommittee on Oversight and Government Reform, 111th Cong. 2 (2010) (statement of Anne Weismann, Chief Counsel, Citizens for Ethics and Responsibility in Washington), *available at* http://oversight.house.gov/wp-content/uploads/2012/01/20100617Weisman.pdf.

they send them to the Recycle Bin or the Trash.  That is not the case.  The initial deletion of a file only moves it to a different location.  The file size is the same and it still takes up the same amount of space on the computer, which can slow it down.  Take out the garbage to get rid of the files you delete permanently and get your computer back up to speed.").  Thus, there is nothing remarkable about the fact that Col. Davis emptied his computer's Recycling Bin after deleting the files on his computer's hard drive.  His failure to do that would have left his successor's computer cluttered with old files.

Second, the Library asserts that Col. Davis removed the files from his computer after he brought this lawsuit and on the same day that this Court denied his motion for a temporary restraining order.  Mot. at 22.  But there is nothing remarkable about that either, because Col. Davis's last day at CRS was the same day that this Court issued its decision on the requested temporary restraining order, and, as described above, Col. Davis's customary practice in leaving a job was to transfer the computer's files to his personal thumb drive and then to clear the computer's hard drive to render it suitable for the next user.  Thus, there is nothing especially significant about the fact that Col. Davis removed the files on the same day that the Court issued its decision.

Finally, the Library argues that Col. Davis's deletion of potentially material evidence itself evinces the intent to hide this evidence from the Library.  But, as described above, Col. Davis transferred almost all of the files on his government computer, including, to the best of his knowledge, all of his emails, and he made no effort to target evidence of potential usefulness to the Library.  Of course, some of the nearly 4,000 files that were on Col. Davis's computer may prove helpful to the Library, just as some will prove useful to Col. Davis, but there is nothing to suggest that Col. Davis

transferred the files with the intention of concealing information helpful to the Library.

Had that been his objective, he would likely have removed *only* those files helpful to the

Library, to give the impression that no evidence existed that might be helpful to the

Library.[9]  Moreover, as a lawyer, Col. Davis would have realized that any relevant emails

and files transferred from his government computer to his thumb drive would inevitably

need to be produced in discovery, Davis Decl. at ¶ 21, and so his decision to transfer

those files does not itself suggest any intent to conceal them.

      Thus, the Library utterly fails to support its assertion that Col. Davis intended to

conceal evidence when he transferred files from his government computer to his personal

thumb drive.  Given that Col. Davis's actions were consistent with his prior practice and

the practice of his colleagues—and because deficiencies in the Library's own records-

management program led Col. Davis to presume that the Library archived files stored on

its employees' computers— there is no basis for attributing nefarious intent to Col.

Davis's actions.

    **C.**    **Whether Col. Davis Misappropriated Government Property Or Improperly Shared Legislative Material With His Attorneys Has No Bearing On Spoliation And Is Not Properly Before This Court.**

      The Library also raises the irrelevant contention that Col. Davis violated certain

federal statutory and regulatory provisions by misappropriating government files.  *See*

---

[9] The government spends several pages discussing certain emails that it has recovered and believes to be helpful to its case.  Col. Davis disagrees with those assertions.  As Col. Davis previously attested, and as a plethora of corroborating evidence supports, he had no official responsibility for military commissions issues, regardless of how the Library wants to characterize his statements.  *See* Dkt. 2-2 at ¶¶ 19-25; Dkt. 2-3 at 7-21.  Regardless, these emails are not relevant to the issues raised by the Library's motion for sanctions, and so there is no need to explore them or the merits of this lawsuit further here.

Mot. at 20-21 (citing 18 U.S.C. §§ 641, 2071; 44 U.S.C. § 3106; 5 C.F.R. § 2635.101(b)(9)).  But whether Col. Davis violated these provisions has nothing to do with this case or this motion, and it is not properly before this Court.  Sections 641 and 2071 of Title 18 are criminal statutes that can only be enforced by the appropriate prosecutorial authorities.  *See, e.g.*, *Retanan v. Cal. Dep't of Corr. & Rehabilitation*, No. 1:11-cv-01629-GBC (PC), 2012 WL 1833888, at *5 (E.D. Cal. May 18, 2012) ("Whether to prosecute and what criminal charges to file or bring [under 18 U.S.C. § 641] are decisions that generally rest in the discretion of the prosecutor, not the court."); *Summers v. Marin County Recorders Office*, No. C-09-1485 MMC, 2009 WL 1096274, at *1 n.3 (N.D. Cal. Apr. 22, 2009) (holding, in the context of a prisoner's civil suit, that "[18 U.S.C.] Section 2071 is a criminal statute and, consequently, is inapplicable herein").  Section 3106 of Title 44 and 5 C.F.R. § 2635.101(b)(9), on the other hand, authorize only administrative remedies.  *See Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Homeland Security*, 527 F. Supp. 2d 101, 110-11 (D.D.C. 2007); 5 C.F.R. § 2635.106.  Thus, whether Col. Davis violated these provisions is not at issue in these proceedings.[10]

The Library also suggests that Col. Davis's disclosure of the contents of his thumb drive to his counsel in this lawsuit for the purpose of responding to the Library's accusations may somehow have violated the non-disclosure privilege afforded by the Federal Constitution's Speech or Debate Clause.  Mot. at 20-21.  The Speech or Debate Clause's non-disclosure privilege, however, acts as a shield against "compelled disclosure," enforced through executive or judicial process.  *See United States v. Rayburn*

---

[10] Moreover, as discussed above, documented deficiencies in the Library's records management system resulted in the total absence of agency guidance regarding Library employees' federal recordkeeping obligations.

*House Office Building, Room 2113*, 497 F.3d 654, 660 (D.C. Cir. 2007) (holding that the

FBI's search of a Congressman's office, pursuant to a search warrant, violated the Speech

or Debate Clause) ("The bar on *compelled* disclosure is absolute . . . ." (emphasis

added)); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421 (D.C. Cir

1995) (holding that the Speech or Debate clause barred enforcement of a subpoena in a

civil case) ("A party is no more entitled to compel congressional testimony—or

production of documents—than it is to sue congressmen.").  The Library cites no

authority suggesting that the Speech or Debate Clause itself prohibits private individuals

from disclosing legislative materials.

 Even if it did, individuals have a well-established right to disclose even

confidential documents to counsel, absent a strong governmental interest in limiting the

communication—such as counsel's refusal to enter into a protective order.  *See, e.g.*,

*Jacobs v. Schiffer*, 204 F.3d 259, 266-67 (D.C. Cir. 2000) (holding that "the Department

[of Justice] could not reasonably insist that its interests could be protected only by

preclearing document-by-document the information Jacobs sought to share with his

attorney"); *Martin v. Lauer*, 686 F.2d 24, 33 n.41 (D.C. Cir. 1982) (stating, in the

government whistleblower context, that a federal employee "must be allowed to consult

his attorney for an answer to [the question of whether a contemplated disclosure would be

prohibited by law] absent some strong governmental interest in limiting such

communications").

 At bottom, the Library argues that the files stored on Col. Davis's computer were

government property and should never have been removed from the Library's possession.

Whatever the merits of that argument may be, they have nothing to do with spoliation,

which is concerned solely with the destruction or material alteration of evidence. Because there is no indication that any documents or emails in this case were lost or destroyed, the Library has failed to establish that spoliation occurred.

Furthermore, if the information stored on Col. Davis's computer was indeed government property—as the Library maintains, Mot. at 19-20—then the Library had both the right and the duty to ensure that the information in its control, possession, and custody was preserved as soon as litigation become reasonably foreseeable.[11]  *See, e.g.*, *Webb v. Dist. of Columbia*, 146 F.3d 964, 975-76 (D.C. Cir. 1998); *Chen v. Dist. of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011).  The Library, however, apparently did not do so, failing to place a litigation hold on Col. Davis's files prior to his departure, even after this lawsuit had been filed, and having failed to instruct its employees on the agency's federal records management practices and capabilities.  Had the Library fulfilled its own evidence preservation and records management duties, it would not now have to rely on Col. Davis's own preservation of the files at issue.

## II.   EVEN IF SPOLIATION HAD OCCURRED, SANCTIONS WOULD NOT BE MERITED IN THESE CIRCUMSTANCES.

Even if some spoliation had occurred, the sanctions requested by the Library are not justified.  Sanctions for spoliation are measured by the litigation harm caused by the destruction of evidence, and no litigation harm has been (or, for the reasons given above, will be) shown.  Additionally, the imposition of monetary sanctions would impose a severe and unwarranted hardship on Col. Davis, who has already expended significant time and resources responding to the Library's unjustified sanctions motion, and would

---

[11] To be clear, Col. Davis does not concede that all of the files on his computer were government property.

inequitably reward the Library despite its own failure to preserve evidence in its possession.

### A.     Dismissal Is Not Justified.

Dispositive sanctions, such as dismissal, are "fundamentally penal in nature," and so cannot be imposed absent a finding, supported by clear and convincing evidence, that the spoliating party acted in bad faith—"i.e., with a purposeful intent to destroy evidence." *D'Onofrio*, 2010 WL 3324964, at *5, 9 (citing *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1477-78 (1995)).  No such finding can be made in this case, because Col. Davis neither destroyed nor attempted to destroy any of the documents or emails at issue.

The D.C. Circuit has identified three basic justifications that support the use of dispositive sanctions in response to litigation misconduct:  (1) prejudice to the movant's ability to present its case that is so severe as to prevent fair adjudication of the case; (2) "intolerable" prejudice to a court's ability to manage its docket and operations; and (3) the need to punish and deter misconduct.  *See Webb*, 146 F.3d at 971 (citing and quoting *Shea v. Donohoe Constr. Co.*, 795 F.2d 1071, 1074-77 (D.C. Cir. 1986)) (internal quotation marks omitted).  None of these rationales justifies the imposition of dispositive sanctions in this case.

### 1.     The Library Has Not Identified Any Prejudice To Its Ability To Presents Its Case.

"Because disposition of cases on the merits is generally favored," dispositive sanctions are "sanction[s] of last resort," to be used only where the innocent party has suffered such overwhelming prejudice that the case cannot be legitimately resolved on the merits.  *Webb*, 146 F.3d at 971 (internal quotation marks omitted).  "[C]ourts generally respond to document destruction or alteration with the ultimate sanction of

dismissal or default in two types of cases: where the destroyed document is dispositive of

the case, so that an issue-related sanction [such as an adverse inference] effectively

disposes of the merits anyway; and where the guilty party has engaged in such wholesale

destruction of primary evidence regarding a number of issues that the district court

cannot fashion an effective issue-related sanction." *Shepherd*, 62 F.3d at 1479 (citations

omitted); *see also Webb*, 146 F.3d at 972.  It is obvious that neither circumstance is

present in this case.  As discussed above, Col. Davis has already turned over the non-

privileged information transferred from his government computer, and this Court can rule

on any dispute regarding the documents that have been withheld as privileged.

### 2. Col. Davis's Conduct Has Not Placed An Intolerable Burden On The Judicial System.

In determining whether to impose dispositive sanctions, courts may also take into

account the degree to which the errant party's misconduct places an intolerable burden on

the judicial system.  *See id.*  at 971, 974.  Such intolerable burdens include, for example,

a party's repeated failure to comply with a court order or unreasonable, last-minute

withdrawal from a scheduled trial.  *See, e.g.*, *Shea*, 795 F.2d at 1076.

Here, Col. Davis has not ignored any Court orders, nor has he forced the Court to

alter significantly its docket or procedures.  The Court's involvement in the present

dispute—a dispute engendered entirely by the Library's recalcitrant refusal to accept Col.

Davis's cooperation—is not likely to "call on far more [judicial] resources into the future

than the system should be required to allocate to the case."  *See Webb*, 146 F.3d at 975.

Any delay in reaching the merits is attributable to the Library's unjustified motion, and

had the Library raised these allegations sooner than three years into the case, they could

have been addressed while Defendant Mulhollan's appeal to the D.C. Circuit was

pending.  In short, Col. Davis's conduct has not placed any significant burden on the judicial system.

**3.     Colonel Davis Did Not Engage In The Sort Of Egregious Misconduct That Could Justify Dismissal.**

Implicitly recognizing that no aspect of this case has been prejudiced by Col. Davis's actions, the Library hangs its request for dismissal on the purported need to punish Col. Davis and to deter future litigants from engaging in misconduct.  *See* Mot. at 23-25.  Contrary to the Library's submission, however, the twin values of punishment and deterrence do not justify dispositive sanctions absent "a showing of extreme prejudice."  *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 535 n.36 (D. Md. 2010); *cf. Shepherd*, 62 F.3d at 1478-80 (holding that a court may not justify dispositive sanctions merely by citing the spoliating party's misconduct, but must also explain why lesser sanctions would prove ineffective).  In *Victor Stanley,* for instance, the court's exhaustive review of federal case law revealed only one case, decided by a district court in another circuit, that was terminated based solely on a party's bad faith spoliation of evidence.  269 F.R.D. at 535 n.36 (citing *Miller v. Time-Warner Commc'ns, Inc.*, No. 97 Civ. 7286, 1999 WL 739528, at *2 (S.D.N.Y. Sept. 22, 1999)).

Even if spoliation had occurred, Col. Davis's conduct was not sufficiently "flagrant or egregious" to justify dismissal solely on the basis of the need to punish and deter misconduct.  *Webb*, 146 F.3d at 975 (alteration in original) (internal quotation marks omitted) (holding that dismissal on punitive grounds was not justified where the record did not, for example, indicate that the spoliating party "deliberately discarded documents relating to [the] case in an attempt to destroy key evidence"); *see also, e.g.*, *Miller*, 1999 WL 739528, at *2 (suggesting that the plaintiff's unsuccessful attempt to

28

erase handwritten notes on documents would not likely have merited dismissal of the action, had the plaintiff not also committed multiple perjuries).

### B.      Adverse Inference And Preclusion Sanctions Are Inappropriate.

The Library alternatively argues that the Court should:  1) impose adverse inferences with respect to the relationship between Col. Davis's November 2009 opinion pieces and his official duties at CRS; and 2) preclude Col. Davis from relying for any purpose on evidence removed from his work computer's hard drive, even if that information has not been destroyed.  Mot. at 25-27.  These "fundamentally remedial" sanctions may not be imposed here, because Col. Davis's conduct has not "tainted the evidentiary resolution of [any] issue" in this case.  *Shepherd*, 62 F.3d at 1478.

Indeed, because the Library has failed to identify any gap in the evidentiary record caused by Col. Davis's actions, imposing adverse inference or preclusion sanctions here would needlessly and impermissibly "add a fictitious weight to one side or another of the case," *D'Onofrio*, 2010 WL 3324964, at *6 (internal quotation marks omitted) (refusing to impose adverse inferences and preclusive sanctions where the extent of information loss had not yet been determined) (quoting *Burgess v. United States*, 440 F.2d 226, 234 (D.C. Cir. 1970)).  Adverse inference sanctions are based on the presumption that a party who destroyed evidence did so to keep it from being used against him, *D'Onofrio*, 2010 WL 3324964, at *10, but that presumption makes no sense where, as here, the evidence itself is actually available.  Preclusion sanctions, on the other hand, are used primarily to prevent a party from profiting off of its own failure to comply with discovery rules or other rules set forth by the Court, *see Butera v. Dist. of Columbia*, 235 F.3d 637, 661 (D.C. Cir. 2001), but that rationale is inapplicable here—Col. Davis

has provided the Library with the files transferred from his computer to his thumb drive

even before discovery in this case has begun, and he has therefore not engaged in any

discovery-related misconduct from which he might profit.  The use of issue-related

sanctions in this case would thus contradict the D.C. Circuit's strong presumption in

favor of resolving cases on their evidentiary merits.  *See, e.g.*, *Shepherd*, 62 F.3d at 1475

("[B]ecause the overriding purpose of the inherent power is to achieve the orderly and

expeditious disposition of cases, the use of this power should reflect our judicial system's

strong presumption in favor of adjudications on the merits.") (citation omitted) (internal

quotation marks omitted); *D'Onofrio*, 2010 WL 3324964, at *6.

> C.   **Imposing Monetary Sanctions Would Work A Severe And
>       Unwarranted Hardship On Col. Davis.**

Finally, the Library asks the Court to impose monetary sanctions, including: 1)

punitive fines paid to the Court's registry; and 2) attorneys' fees and costs incurred in

bringing this motion and in attempting to reconstruct the government hard drive.  Mot. at

28.  Such sanctions would be inappropriate here for at least two reasons.  First, because

monetary sanctions are fundamentally penal in nature, they cannot be imposed unless the

Court finds clear and convincing evidence of litigation-related misconduct.  *Shepherd*, 62

F.3d at 1477.  No such finding can be made on the present record, and as shown above,

Col. Davis has not engaged in litigation-related misconduct at all.  Second, such sanctions

would be inappropriate because they would work an extraordinary and unjustified

hardship on Col. Davis, an individual who has already expended considerable time and

resources preparing his opposition to the Library's sanctions motion, retaining and

consulting with experts, and conducting forensic data analysis.  Davis Decl. at ¶¶ 25-28.

*See, e.g.*, *D'Onofrio*, 2010 WL 3324964, at *9 ("Given what defendant has already

expended, adding attorneys' fees under the Court's inherent power to sanction crosses the line from fairness to disproportional punishment.  That, put simply, is to place Pelion upon Ossa, and I will not do it."); *see also Allen v. Utley*, 129 F.R.D. 1, 8 (D.D.C. 1990) (stating, in the Rule 11 context, that "[i]t is . . . appropriate for a court to consider the ability to pay of the person being sanctioned").

Moreover, awarding attorneys' fees and costs would inequitably reward the Library, which is itself largely responsible for many of the costs it has incurred in connection with its sanctions motion and any data recovery process.  *See, e.g.*, *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 341 (2d Cir. 1999) ("a court considering sanctions can and should consider the equities involved before rendering a decision"). Had the Library properly preserved the files and emails stored on its own system after it became aware of the likelihood of this litigation, or simply asked Col. Davis (either before or as part of the discovery that the Library has assiduously prevented for the past three years) if he had a copy of the files previously on his work computer before conducting any forensic analysis and investigation, all of this could have been avoided. Instead, the Library has attempted to seize upon this situation in yet another attempt to avoid litigating the merits of its unconstitutional termination of Col. Davis.

## III.    IT WOULD BE PREMATURE FOR THE COURT TO IMPOSE SANCTIONS.

Even if the Library could prove that sanctionable spoliation had occurred, any imposition of sanctions at this point would be premature.  *See D'Onofrio*, 2010 WL 3324964, at *11.  Any determination as to whether sanctions are warranted hinges on whether the parties and the Court have been prejudiced by the loss of information.  *See id.* at *9 ("The heart and soul of any sanction is its proportion to the harm done and the

prejudice sustained.") (citing *Bonds v. Dist. of Columbia*, 93 F.3d 801, 808 (D.D.C. 2006)).  The prejudice determination, in turn, hinges on the relationship between the information lost and the information that remains available.  *See, e.g.*, *Davis v. Grant Park Nursing Home, LP*, No. 1:08-cv-01764 (PLF/JMF), 2010 WL 4642531, at *1 (D.D.C. Nov. 9, 2010).

As already discussed at great length, Col. Davis has not spoliated any evidence. Even if any documents or emails had been spoliated, however, the resulting prejudice could not be accurately determined at this time.  First, the Library itself takes the position that it does not know how much, if any, information has been irretrievably lost.  Mot. at 24 n.5 ("[I]t might be possible (through the expense of using a forensic recovery expert) to restore some or all of the deleted files.").  Second, the total amount of available evidence is not yet known, because discovery has not even begun.  *See Davis*, 2010 WL 4642531, at *1 ("[I]t is premature to consider the question of sanctions until discovery ends and the Court can assess accurately what prejudice, if any, the loss of the electronically stored information has caused.").  Thus, even if the Library could somehow demonstrate at some future time that sanctionable spoliation had occurred, the proper course would be for the Court to deny the sanctions motion at this time and for the Library to file a new motion after discovery has concluded.  *See id.*

## CONCLUSION

For the foregoing reasons, the Court should deny the Library's motion to impose sanctions, and should move ahead to set a schedule for discovery.


Dated:  December 17, 2012                    Respectfully submitted,


                                      /s/ Aden J. Fine
                                     Aden J. Fine (D.C. Bar No. 485703)
                                     Brian M. Hauss
                                     Alex A. Abdo (*pro hac vice*)
                                     American Civil Liberties Union Foundation
                                     125 Broad Street, 18th Floor
                                     New York, NY 10004
                                     (212) 549-2500


                                      /s/ Arthur B. Spitzer
                                     Arthur B. Spitzer (D.C. Bar No. 235960)
                                     Frederick V. Mulhauser (D.C. Bar. No.
                                     455377)
                                     American Civil Liberties Union
                                       of the Nation's Capital
                                     1400 20th Street, N.W., Suite 119
                                     Washington, DC 20036
                                     (202) 457-0800

                                     *Counsel for Plaintiff*

33