UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MORRIS D. DAVIS,

Plaintiff,

v.

JAMES H. BILLINGTON, *et al.,*
Defendants.

No. 10-cv-0036 (RBW)

DECLARATION OF MORRIS D. DAVIS

I, Morris D. Davis, hereby declare and state as follows:

1.      I submit this declaration based on my personal knowledge in support of my
opposition to Defendant's motion for sanctions in the above-captioned case.

2.      I am the plaintiff in this case.  I was the Assistant Director of the Foreign Affairs,
Defense, and Trade ("FDT") Division of the Congressional Research Service ("CRS"), a branch
of the Library of Congress, until I was dismissed from my job because I wrote an op-ed in the
*Wall Street Journal* and a letter to the editor in the *Washington Post*.

3.      I am a twenty-five-year veteran of the United States Air Force.  Following my
graduation from law school in 1983, I was commissioned as an officer in the Judge Advocate
General's Corps of the United States Air Force, becoming Chief of Military Justice at Patrick Air
Force Base in Cocoa Beach, Florida.  Over the next twenty-five years of military service, I
served in a variety of important leadership and staff positions, including as a Staff Judge
Advocate at various levels of command, an Appellate Government Counsel, the Deputy
Commandant and Interim Commandant at the Air Force Judge Advocate General's School at

1

Maxwell Air Force Base in Montgomery, Alabama, the Director of Air Force Legal Information Services at Maxwell Air Force Base, and the Director of the United States Air Force Judiciary at Bolling Air Force Base in Washington, D.C. I retired from military service in October 2008, with the rank of Colonel.

4.      I received numerous awards and honors for my service over the years, including: the Legion of Merit; the Meritorious Service Medal (6 awards); the Air Force Commendation Medal (2 awards); the Air Force Achievement Medal (2 awards); the Air Force Outstanding Unit Award (2 awards); the Air Force Organizational Excellence Award (2 awards); the National Defense Service Medal (with service star); the Southwest Asia Service Medal; the Global War on Terrorism Expeditionary Medal; the Global War on Terrorism Service Medal; the Air Force Longevity Service Medal (6 awards); the Air Force Training Ribbon; and recognition as the 1990 Headquarters Air Force Outstanding Judge Advocate of the Year.

5.      I was never disciplined, sanctioned, or otherwise punished for any of the actions I took in my various positions over these twenty-five years of service.

6.      Because of my extensive and successful experience and expertise, I was selected in September 2005 to serve as the Chief Prosecutor for the Department of Defense's Office of Military Commissions. In that role, I was responsible for the prosecution of the suspected terrorists being held at Guantanamo Bay, Cuba, a position that carried enormous responsibilities and that was the subject of intense public scrutiny and attention. Nevertheless, I received praise for my performance from both the Air Force and the critics of the military commissions.

7.      My recollection is that computers arrived in Air Force JAG Corps legal offices for the first time in the mid-1980s. They had a limited amount of storage capacity, particularly in the early years, and were used in the course of performing official duties that routinely involved

attorney-client, attorney work-product, and Privacy Act information.  To ensure that client confidentiality was protected—and, separately, to give the next person assigned the same computer the storage space to accumulate his or her own data—my customary practice as I left a post was to copy information I believed I should keep and then to delete the files from the computer to clean it up and get it ready for the next employee, although there were a few times when I left certain files related to ongoing matters on the computer.  This practice was encouraged by Air Force personnel responsible for the administration and maintenance of the service's computers and computer networks.  When I arrived at new assignments it appeared that whoever had used the computers I inherited followed a similar practice, as typically there was little if any data saved on them.  It was my understanding that my colleagues followed practices similar to my own prior to leaving positions.

8.    The data I copied over the course of my career was saved on whatever the prevalent storage media was at the time, beginning with 5.25 inch floppy disks and ending with DVDs.  I rarely had a need to look back at data I saved and some of the storage technology became obsolete and inaccessible as technology evolved.

9.    I do not recall exactly when the Air Force first got email, but I believe it was in the latter part of the 1980s.  Each military installation had its own email system that was exclusive to that installation.  Individual users were given email accounts tied to the installation's system.  For example, when I was stationed at Columbus Air Force Base, Mississippi, I had an email account on @columbus.af.mil.  When I moved from there to Dyess Air Force Base, Texas, my email account at Columbus was terminated and I no longer had access to the emails on it, and I got a new email account at Dyess on @dyess.af.mil.  As with documents, it was my customary practice, as I had been advised to do, to copy and save my emails before departing for a new

assignment, and to then delete them from the computer that would be used by the next employee.

Much of the information that would have been in my email accounts was attorney work-product,

attorney-client or Privacy Act information.  I do not recall the exact date, but it was near the end

of my career, that the Air Force began implementation of an "email for life" program that assigns

service members official  email accounts on @us.af.mil that stay with them for the duration of

their careers.

        10.     I recall one specific occasion when I needed to access old email that I had saved

to disk.  I was a witness in the military commission prosecution of Mohammed Jawad at

Guantanamo Bay, Cuba, in the summer of 2008, and I needed to review some of my old emails

related to the topic of the hearing in order to prepare for my testimony.  As was my customary

practice, I had copied the unclassified emails for the period I served as chief prosecutor for the

military commissions onto disks before I left the office in October 2007.  I was unable to open

the emails on the disks, however, so I requested assistance from the Office of Military

Commissions to help open them.  I delivered the disks to them and, in turn, they gave the disks to

the Office of the General Counsel of the Department of Defense for help in opening the emails.

Staff at the General Counsel's Office were able to open the emails, and I was notified that I

could come and pick up the disks.  I went to the DOD General Counsel's Office in the Pentagon,

and a member of the General Counsel's staff handed me the disks and instructed me on how to

open the data.  No one raised any questions or expressed any concerns about me copying my

emails and taking them with me on disks.

        11.     No one before, during or after my involvement in the Jawad case, or at any other

time in the two decades that I had military email accounts, ever questioned the propriety of me

copying, taking, or deleting my emails when I left a post.

12.     I began work as an employee of the Library, in my position at CRS, in December

2008.  I do not recall ever being provided with any instructions, memorandum, policy, handbook,

training, or guidance of any sort concerning the Library's policies or procedures with respect to

the treatment of documents or emails on an employee's work computer.  No one ever told me,

either before I began working for the Library or during my time there, that the copies of the

documents and emails on my computer were the Library's only copies, that they were to be

treated as official copies, that I was not permitted to make a copy of them, that I was not

permitted ever to delete any of them, or anything similar to that effect.  Had anyone told me

anything like that, I would definitely remember it, because such a policy would have been so

different from my and former colleagues' prior practice over my twenty-five-year career at the

Air Force.

13.     The lack of training and guidance with respect to the Library's records

management policies and procedures that I just described was not unique to me.  I have read the

Inspector General for the Library's March 2010 report concerning the Library's records

management program, which is highly critical of the Library and its records management

program, including its policies concerning the treatment of electronic records.  The findings

made by the Inspector General, which were apparently based on interviews from the time when I

was a Library employee, are entirely consistent with my own experience.

14.     Because of my position as an Assistant Director at CRS, I did not personally

create or draft very many documents during my time at CRS, other than emails.  For example,

like other Assistant Directors, I was not expected to and did not author any substantive reports or

analyses on behalf of CRS.  As a result, I did not have very many documents on my CRS

computer, other than emails.  Many of the documents I did have were copies of documents

created by others, such as CRS reports written by other CRS employees.  Of the few that I

created myself, many related to my filling out of official forms, such as personnel evaluations

and award recommendations for subordinates.  After completing these forms, to the best of my

knowledge, I always submitted them to the appropriate offices or individuals at CRS (e.g., the

Personnel Office), and I believed that those offices or individuals would file and retain those

documents in the appropriate manner.  As with the copies of documents authored by others, I

believed that these documents on my computer that I had created were merely my local copies,

not the Library's official copy—which was exactly how the system worked in my prior positions

as a government employee.  I therefore had no reason to believe that the Library needed to retain

or store these particular documents.

     15.    Similarly, with respect to emails, I assumed that the Library archived the data on

its network and that it had a back-up system in place in case of a loss of data on desktop

computers as a result of fire, flood, power surges, or other unexpected events at the Library.  In

other words, I assumed that every email I sent or received on my Library account would be

preserved by the Library.  When I deleted the emails stored locally on my computer, I had no

reason to believe that I was deleting the Library's only copy.  Instead, I thought I was merely

deleting the local copy.

     16.    In November 2009, on my personal time and from my personal, non-work

computer, I wrote two opinion pieces criticizing the Obama administration's decision to try some

of the individuals held at Guantanamo Bay in federal court and others in military commissions.

As soon as I learned that the pieces would be published, I notified Mr. Mulhollan.  Mr.

Mulhollan thereafter sent several emails to me questioning my ability to continue serving as an

Assistant Director.  Prior to that time, Mr. Mulhollan had never once questioned my ability to

serve as an Assistant Director or my compliance with my ethical and professional responsibilities.  In fact, the day all of this began, Mr. Mulhollan had personally told me that I was doing a good job and that everyone liked me, which was consistent with his prior statements to me, including his representations that I would successfully pass my probationary period.

17.     From the time that I received Mr. Mulhollan's emails criticizing me and threatening my employment, I have not, to the best of my knowledge and belief, destroyed any documents or emails, or other evidence related to this litigation.

18.     For the final month of my employment at the Library, I was moved to an office on the second floor of the Madison Building near Mr. Mulhollan's office.  It was a small office that, during my tenure, was not used as an office for a full-time employee and was usually unoccupied.  It appeared to be an office that might be made available to a summer intern or someone who needed an office while working on a temporary assignment.  I had no idea how long it might remain empty after I left or who might use it, or the computer in it, in the future.

19.     I do not recall anyone giving me any direction or guidance on what I was supposed to do or not to do with the information on my CRS computer prior to my departure.  I therefore saw no reason to discontinue my prior practice or to do anything contrary to what I had previously been advised to do in my years of public service.

20.     I do not recall copying or deleting files stored on my CRS work computer; however, based on the contents of my thumb drive and the forensic analysis, I must have continued my past practice and performed the following actions:  After the Library notified me that I would be terminated, I saved files and emails that I thought I should keep to a USB drive (my "thumb drive").  The thumb drive that I used was my personal thumb drive, which I have used over the years to save numerous files, from a multitude of different places and contexts

besides CRS, including documents relating to my representation of past clients. To the best of

my knowledge and belief, I saved a copy of all files and emails on my CRS computer related to

this litigation, in addition to other files and emails. After saving these files and emails, I cleaned

up the computer by deleting the items on the hard drive to render it suitable for use by another

employee, as I had previously done when leaving other positions.

21.     Although I do not have a specific recollection of copying or deleting these files

from my CRS computer, I know that I did not copy or delete any files with the intent to alter or

destroy evidence relevant to this lawsuit. Indeed, to the best of my knowledge, I have not

destroyed any documents or emails related to this litigation, and I have provided all such

documents and emails from my CRS computer to the Library. As a lawyer, I would have

understood that any relevant emails and files transferred from my government computer to my

thumb drive would inevitably need to be produced in discovery.

22.     Because documents such as past personnel evaluations and recommendations for

employee awards for CRS employees had nothing to do with me personally or with this

litigation, and because I believed that the copies on my computer were merely my personal

copies, not the Library's official copy, I did not copy those types of documents onto my thumb

drive.

23.     With respect to my emails, I do not recall copying or deleting them from my

computer, but as discussed earlier, I now know that I must have, and based on my past practice, I

believe that what I must have done, as I had done previously, would have been to make a copy of

all my emails that were on my computer prior to my departure, including all emails related to this

litigation, and to clean up the computer at the end of my stay by deleting all of those locally

stored emails at once by selecting the entire email account and deleting its contents. From time

to time, I probably deleted some emails in the ordinary course of business because they were

junk, non-substantive, personal, duplicates, or the like.  Those emails would, of course, not have

been copied onto my thumb drive.  Nor, to the best of my knowledge, would they have been

related to this lawsuit.

      24.     I backed up files from the CRS hard drive by later copying them onto my portable

hard drive.  To the best of my knowledge, I have never deleted any of these files from my

portable hard drive, including any of the litigation-related files.  I use this portable hard drive to

back up a lot of different files, from a multitude of different sources and contexts.  Many of the

files are personal documents; for example, I have years' worth of family photographs stored on

that hard drive.  Documents related to my representation of clients are also stored on that drive.

      25.     I had no reason to try to access the CRS emails I copied and saved until this issue

arose.  Upon learning of the Library's allegations, I found my thumb drive and reviewed its

contents.  My emails were stored on the thumb drive, but I was not able to read any of them

because they were in a format that my computer was not able to open.

      26.     I subsequently provided my thumb drive and my portable hard drive to my

attorneys.  They are still in the possession of my attorneys.

      27.     From time to time, over the years, I have removed files on my thumb drive.  I do

not recall deleting any of the files that I had copied from my CRS computer from the thumb

drive.  I now understand that 86 of these documents were removed from the thumb drive at some

point in time.  I do not recall when or how that occurred, and I have no recollection of having

done so.  I do know that I did not intentionally remove those files from the thumb drive in order

to destroy or alter any evidence related to this litigation.  A copy of those same files was always

present, and remains present, on my portable hard drive backup.

28.    To the best of my knowledge and belief, all of the documents and emails that I copied from my CRS computer to my thumb drive, except for a few privileged ones, have now been provided to the Library.

Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on December 17, 2012

MORRIS D. DAVIS