**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MORRIS D. DAVIS,

        Plaintiff,

        v.

JAMES H. BILLINGTON,

        Defendant.

No. 1:10-CV-36-RBW

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

ARGUMENT ......................................................................................................................... 1

   I.   Introduction ................................................................................................................ 1

   II.   By its Express Language, *Elgin* Does Not Preclude This Court's Jurisdiction ............. 1

   III.   Equitable Remedies Remain Available to Colonel Davis .............................................. 3

      a.   Discovery is required to assess the availability of reinstatement .............................. 4

      b.   Col. Davis is entitled to back pay .......................................................................... 9

      c.   Injunctive relief remains available ........................................................................ 12

   IV.   Col. Davis is Entitled to Summary Judgment on His Free Speech Claim ................... 14

      a.   The Library faced no reasonable risk of harm from Col. Davis' speech ................. 14

      b.   Col. Davis has not waived his argument that he is not a "key deputy," but even a key deputy may speak on matters outside of his direct responsibilities ......................... 16

      c.   The balance of harms favors Col. Davis' free speech rights .................................... 18

      d.   The Library has not responded to Col. Davis' argument that the Library's outside speech policy is facially unconstitutional .............................................................. 21

   V.   Col. Davis is Entitled to Summary Judgment on His Due Process Claim Because the Library Failed to Provide Notice or Clarity Regarding Its Regulation of Speech ........ 21

   VI.   Conclusion ................................................................................................................ 24

# TABLE OF AUTHORITIES

## Cases

*Am. Fed. of Gov't Emps. Local 1 v. Stone*, 502 F.3d 1027 (9th Cir. 2007) ...............................9

*Auction Co. of Am. v. FDIC*, 132 F.3d 746 (D.C. Cir. 1997) ....................................................12

*\*Bowen v. Massachusetts,* 487 U.S. 879, 108 S. Ct. 2722 (1988)......................................11, 12

*\*Brown v. Sec'y of Army*, 918 F.2d 214 (D.C. Cir. 1990) (R.B. Ginsburg, J.).........................10

*Carpenter v. Fed. Nat'l Mortg. Ass'n*, 174 F.3d 231 (D.C. Cir. 1999) .....................................8

*Caudle v. District of Columbia*, 825 F. Supp. 2d 73 (D.D.C. 2011)........................................13

*Chen-Oster v. Goldman, Sachs & Co.,* 877 F. Supp. 2d 113 (S.D.N.Y. 2012) ..................12, 13

*\*Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684 (1983)..................................................14, 18

*Doe (P) v. Goss*, CIVA 04-2122 GK, 2007 WL 106523 (D.D.C. Jan. 12, 2007) ...................13

*Doe v. Dep't of Justice*, 753 F.2d 1092 (D.C. Cir. 1985) .........................................................11

*\*Elgin v. Dep't of Treasury*, 132 S. Ct. 2126 (2012)..............................................................2, 3

*Finley v. Nat'l Endowment for the Arts*, 100 F.3d 671 (9th Cir. 1996) ...................................22

*Garcetti v. Ceballos,* 547 U.S. 410, 126 S. Ct. 1951 (2006) ....................................................15

*Gray v. Office of Pers. Mgmt.,* 771 F.2d 1504 (D.C. Cir. 1985) ..............................................11

*\*Hall v. Ford*, 856 F.2d 255 (D.C. Cir. 1988) ....................................................................15, 17

*Hubbard v. EPA*, 949 F.2d 453 (D.C. Cir. 1992) .....................................................................10

*\*Keeffe v. Library of Cong.*, 777 F.2d 1573 (D.C. Cir. 1985).............................................22, 24

*\*Levin v. Madigan*, 697 F. Supp. 2d 958 (N.D. Ill. 2010).................................................12, 13

*Mack v. United States*, 653 F. Supp. 70 (S.D.N.Y. 1986) ........................................................11

*Miller v. Kerry*, --- F. Supp. 2d ---, No. 10-cv-0512 (ESH), 2013 WL 617021
    (D.D.C. Feb. 20, 2013)..........................................................................................................4

*Mitchell v. Hillsborough Cnty.,* 468 F.3d 1276 (11th Cir. 2006) ............................................20

*Morris v. Crow*, 117 F.3d 449 (11th Cir. 1997)........................................................................20

*Navab-Safavi v. Glassman,* 637 F.3d 311 (D.C. Cir. 2011) .....................................................17

*O'Donnell v. Barry*, 148 F.3d 1126 (D.C. Cir. 1998)...............................................................18

*Procunier v. Martinez*, 416 U.S. 396, 94 S. Ct. 1800 (1974) ..................................................22

*Reed v. Vill. of Shorewood*, 704 F.2d 943 (7th Cir. 1983)........................................................23

*Robinson v. Dist. of Columbia Gov't*, Civ. A. No. 97-787 (GK), 1997 WL 607450
   (D.D.C. July 17, 1997) ....................................................................................................20

*\*Suzal v. Dir., U.S. Info. Agency*, 32 F.3d 574 (D.C. Cir. 1994) ........................................2, 10

*Thornburgh v. Abbott*, 490 U.S. 401, 109 S. Ct. 1874 (1989) .................................................23

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 114 S. Ct. 771 (1994) ...................................3

*United States v. Connolly*, 716 F.2d 882 (Fed. Cir. 1983) (en banc) ......................................11

*\*United States v. Fausto*, 484 U.S. 439, 108 S. Ct. 668 (1988) ...........................................9, 10

*United States v. Nat'l Treasury Emps. Union,* 513 U.S. 454, 115 S. Ct. 1003 (1995) ........7, 21

*Waldau v. Coughlin*, Civil Action No. 95-1151 (LFO), 1997 WL 161958
   (D.D.C. Apr. 1, 1997) .....................................................................................................15

*Walsh v. Nevada Dep't of Human Res.,* 471 F.3d 1033 (9th Cir. 2006) ............................12, 13

*Waters v. Churchill*, 511 U.S. 661, 114 S. Ct. 1878 (1994) ....................................................15

*Webb v. District of Columbia*, 146 F.3d 964 (D.C. Cir. 1998) ..................................................4

*\*Webster v. Doe*, 486 U.S. 592, 108 S. Ct. 2047 (1988) ...........................................................2

**Statutes**

28 U.S.C. § 1331 .......................................................................................................................12

**Other Authorities**

Petition for Writ of Certiorari, *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126 (2012)
   (No. 11-45), 2011 WL 2689010 .......................................................................................3

**Rules**

Fed. R. Civ. P. 56(f) ....................................................................................................................8

**ARGUMENT**

## I.     Introduction

Col. Morris Davis' views on the military commissions at Guantánamo Bay were no secret when he was hired by the Library of Congress ("Library"). Before he was hired, Col. Davis had been invited to share his views with Congress and had maintained a high profile as a public voice on military commissions. When hired, he was not informed this speech was now forbidden, and his advocacy continued with the knowing acceptance of his supervisors. The Library argues that this same speech suddenly created an acute risk to its ability to provide non-partisan aid to Congress. The facts demonstrate this forecast of harm was unreasonable, speculative, and incorrect.

What changed over the course of Col. Davis' employment was not the nature of his speech, but the amount of employee speech the Library sought to censor. The written policies that bound Col. Davis specify that speech unrelated to an employee's area of specialization is "encouraged." But over the course of Col. Davis' employment, the Library claimed the authority to regulate all employee speech relevant to any topic *on the congressional agenda*. That is a difference of significant constitutional proportions. The Library's claimed scope of censorship is not permissible, and no authority suggests otherwise. Col. Davis is entitled to summary judgment on his free speech claims, because the Library's expansive restrictions on speech reach beyond an employee's matters of responsibility, both facially and as applied to Col. Davis. He is also entitled to summary judgment on his due process claim, because the Library's speech-based restrictions were applied without notice and were at odds with prior practice.

Furthermore, this Court retains jurisdiction to hear this case, and Col. Davis has the right to conduct discovery on the Library's after-acquired evidence claims under clearly-established law.

## II.     By its Express Language, *Elgin* Does Not Preclude This Court's Jurisdiction

1

As Col. Davis explained in his motion for summary judgment, Congress must clearly express its intent to preclude all judicial review of constitutional claims. *Webster v. Doe*, 486 U.S. 592, 603, 108 S. Ct. 2047, 2053 (1988); *see also Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2132 (2012). Because the Civil Service Reform Act ("CSRA") does not clearly express Congress's intent to prevent federal employees from obtaining review of their constitutional claims, the D.C. Circuit has long held "that district courts are open to challenges seeking equitable relief on *constitutional* grounds, at least when the CSRA does not provide an adequate alternative to judicial review." *Suzal v. Dir., U.S. Info. Agency*, 32 F.3d 574, 586 (D.C. Cir. 1994) (emphasis in original) (collecting cases). The Library persists in arguing that this rule was rejected by the Supreme Court in *Elgin*. *See* Def.'s Mot. to Dismiss and Mot. for Summ. J. ("MTD") at 8–9 & n.1; Def.'s Opp'n to Pl.'s Mot. for Summ. J. and Reply in Supp. of Mot. to Dismiss, July 26, 2013, ECF No. 96 ("Opp'n") at 5–6. As Col. Davis explained in his previous memorandum, Pl.'s Mot. For Summ. J. and Opp'n to Def.'s Mot. to Dismiss, June 30, 2013, ECF No. 92 ("PMSJ") at 9–11, *Elgin* held only that public employees entitled to administrative and judicial review under CSRA may not seek "an *additional* avenue of review in district court," even with respect to constitutional claims. 132 S. Ct. at 2134 (emphasis added). Nothing in *Elgin* abrogates the well-established rule that courts have jurisdiction to hear constitutional claims where CSRA provides no review.

According to the Library, *Elgin* precludes all federal jurisdiction over public employees' constitutional claims, even where CSRA provides no route of review. Opp'n at 4–6. The Library identifies no language from *Elgin* to support this strained interpretation. Instead, it argues that the Court's holding can be inferred from its grant of certiorari, which asked the Court to resolve a circuit split over whether CSRA precludes district court jurisdiction over constitutional claims

for equitable relief. Opp'n at 5 (citing Petition for Writ of Certiorari, *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126 (2012) (No. 11-45), 2011 WL 2689010, at *i). Because *Elgin* held that CSRA's "statutory review scheme is exclusive," the Library reasons, it must have rejected the Circuit cases holding that CSRA does not preclude review of public employees' constitutional claims for equitable relief. Opp'n at 5–6 (citing *Elgin*, 132 S. Ct. at 2135). The Library's interpretation of *Elgin* is squarely at odds with the decision's text. As Col. Davis explained in his previous memorandum, PMSJ at 9–10, the Court expressly declined to apply *Webster*'s heightened congressional intent requirement in *Elgin*, because "CSRA [did] not foreclose all judicial review of petitioners' constitutional claims." 132 S. Ct. at 2132. Because the statute "merely direct[ed] that judicial review shall occur in the Federal Circuit," the case "did not present the serious constitutional question that would arise if an agency statute were construed to preclude all judicial review of a constitutional claim." *Id.* (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215, 114 S. Ct. 771, 781 & n.20 (1994)). *Elgin* ultimately concluded that CSRA evinces congressional intent to *funnel* covered employees' constitutional claims through the administrative process and into the Federal Circuit. *Id.* at 2140. But that conclusion has no bearing on whether the statute demonstrates clear congressional intent to preclude all judicial review of constitutional claims.

### III.    Equitable Remedies Remain Available to Colonel Davis

The Library again asserts that its unilateral conclusions about *remedies* prevent this Court from exercising *jurisdiction* over Col. Davis' constitutional claims. It is mistaken; the availability of comparable positions and the applicability of the after-acquired evidence rule are fact-intensive inquiries properly before the Court. Currently, the Library retains sole control over the evidence it cites in support of summarily depriving this Court of jurisdiction. Col. Davis is

entitled to challenge this evidence, and believes that further discovery will support his claims, as set forth in his Rule 56(f) Declaration.  Decl. of Lee Rowland Pursuant to Fed. R. Civ. P. 56(f), June 28, 2013, ECF No. 91-5 ("56(f) Decl."), ¶6. Further, back pay and injunctive relief are available to remedy the violations of Col. Davis' speech and due process rights.

### a.  Discovery is required to assess the availability of reinstatement.

As the cases cited by the Library confirm, reinstatement "may be determined only after careful consideration of the circumstances of a particular case." Opp'n at 8 (citing *Webb v. District of Columbia*, 146 F.3d 964, 976 (D.C. Cir. 1998)). That is currently not possible in this case, because no factual record has been developed regarding reinstatement.

The Library avers that reinstatement is off the table due to after-acquired evidence of Col. Davis' "misconduct." Opp'n at 11. Col. Davis denies that any of his actions constitute misconduct that would prevent his reinstatement. The Library misconstrues the after-acquired evidence defense: the burden is on defendant to demonstrate by clear and convincing evidence that plaintiff's actions were legitimate grounds for discharge, and plaintiff must be given a full opportunity to challenge that evidence. *See Miller v. Kerry*, --- F. Supp. 2d ---, No. 10-cv-0512 (ESH), 2013 WL 617021, at *7 (D.D.C. Feb. 20, 2013); *see also Webb v. District of Columbia*, 146 F.3d 964, 976–78 (D.C. Cir. 1998) (holding that district court abused its discretion by refusing to allow plaintiff to contest after-acquired evidence suggesting impropriety of reinstatement). Disposition of an after-acquired evidence defense is inappropriate at this stage; the Library's mere invocation provides no support whatsoever for defeating court jurisdiction.

The Library cites a "litany of serious misconduct," by Col. Davis, consisting of the forwarding and deletion of work emails, use of a redacted Mercury database page in support of his request for an injunction, his certification that he had no government property upon departing

from the Library, and the brief editing of an opinion piece from his work computer. Opp'n at 11–12. The Library dramatically overstates the severity of these actions, which were undertaken in good faith and violated no written Library policy. Nor does the Court have to take Col. Davis' word for it. Substantial evidence on the record undercuts the Library's claims that these actions constituted "serious misconduct"—they are far from "unquestioned," as the Library claims. Opp'n at 8.  The evidence before the Court, *before* any discovery, underscores why Col. Davis is entitled to challenge the after-acquired evidence Defendant claims prevents his reinstatement.

First, with respect to the Congressional Research Service's ("CRS") Mercury database, Col. Davis took pains to conceal information that could identify the congressional office requesting assistance.  Decl. of Morris D. Davis, June 28, 2013, ECF No. 91-6 ("Davis Decl."), ¶¶ 24–25. Additional evidence confirms Col. Davis' belief that his anonymized print-out of the database did not compromise CRS' confidentiality policies:

> The rules and directives, as I have understood them, throughout my decades of service at CRS, have been intended to protect from disclosure the name and office from which any request originated or any information that would link them with any specific request subject they place with CRS. I do not understand how it would be feasible for someone to identify a congressional requester solely from knowing the date and subject of a request.

Decl. of Richard F. Grimmett ("Grimmett Decl.") ¶ 24. *See also* Davis Decl. ¶ 24 (detailing provision of Mercury print-out to CRS General Counsel Karl Schornagel). It is undisputed that the information in the Mercury database is not classified. Confirming that the publicity of this nameless data was not a "reckless breach of the highly sensitive Mercury database," Opp'n at 8, the Library never (until now) made an issue of the fact that this print-out was attached as a public exhibit to Col. Davis' motion for an injunction at the beginning of this case, and has still not moved to seal or redact it. *See* Decl. of Morris Davis, Jan. 8, 2010, ECF No. 2-2, Ex. D.

Second, the parties have thoroughly briefed and litigated Col. Davis' good faith deletion of email files on his work computer, which he believed to be both backed up by the Library's servers and a routine part of government transition. Davis Decl. ¶¶ 59–60. Col. Davis' belief that his actions were standard procedure is ratified by other declarants in this case. *See* Grimmett Decl. ¶ 25 ("I also routinely deleted quantities of emails from my CRS email account"); Decl. of Colonel Daniel E. Rogers, Dec. 17, 2012, ECF No. 68-4, ¶¶ 8–11 (confirming government practice of email transfer and deletion at end of employment).

Furthermore, in March 2010, the Library's Inspector General issued a report—based on an investigation conducted in October and November 2009, during Col. Davis' employment— that sternly criticized the Library's records management procedures, including its handling of electronic documents.   The report found, in relevant part:   (1) "The Library's Records Management Program is [d]efficient;" (2) "The Library lacks records management directives that establish recordkeeping requirements, including records created or received using electronic mail and distinguishing records from non-records;" and (3) "The Library lacks an employee records management training program designed to inform Library employees of required recordkeeping policies, responsibilities, and techniques."  *See* Decl. of Aden Fine, Dec. 17, 2012, ECF No. 68-5, Ex. A (Office of the Inspector Gen., Library of Cong., Report No. 2009-PA-104, *Integrated Support Services: The Library's Records Management Program Needs to be Overhauled* (2010)) ("*Inspector General Report*"), at i–ii.  Col. Davis reasonably believed that his computer files were backed-up and accessible to the Library. It is unseemly for the Library to now claim that Col. Davis' good faith transfer of these files was a clear dischargeable offense, given its documented lack of attention to records management.

For the same reasons, Col. Davis' certification that he retained no "Government property, correspondence, or records" was not sworn "falsely." Opp'n at 8. As noted in his Declaration, Col. Davis believed he was copying these files as a standard practice, believed the Library to have full access to all files he copied, and thus did not consider them Government property as described by the certification. Davis Decl. ¶ 59–61. In light of Col. Davis' past practice, consistent with fellow government and CRS employees, his immediate transfer of all files once notified that the Library lacked copies, and the Library's documented lack of email policies, it is not credible that Col. Davis' good faith certification constituted a dischargeable offense.

Third, the Library claims that Col. Davis *lied* to this Court in attesting that he authored and submitted the opinion pieces from his home computer. Opp'n at 11. But Col. Davis' claim was and is true: the pieces were both accepted for publication based entirely on work he did at his home. He then briefly edited one of the pieces from his work computer; he has never denied this fact. Once reminded by the Library of the four-year-old evidence demonstrating these final additional edits came from his CRS email—evidence to which Col. Davis has no access and imperfect recollection—he offered as much detail as he was able about those brief edits.[1] Davis Decl. ¶¶ 34–35. Consistent with all of his actions in this case, Col. Davis believed the few minutes he spent finalizing one of the pieces in response to an editor's request was fully consistent with workplace protocol. *Id.* The Library appears to dispute this. Col. Davis requires discovery to assess whether this widely-accepted practice has ever actually been treated as a dischargeable offense.

---

[1] As set forth in his prior brief, Col. Davis' minor edits to his piece do not alter the *Pickering* inquiry. *See* PMSJ at 31 (citing *United States v. Nat'l Treasury Emps. Union,* 513 U.S. 454, 466, 115 S. Ct. 1003, 1013 (1995) (speech "addressed to a public audience . . . made outside the workplace, and involv[ing] content largely unrelated to . . . government employment" weighs in employee's favor)).

Finally, the Library claims that persistent hostility between the parties prevents reinstatement. But again, these unilateral assertions, untested by discovery, do not provide a legitimate basis for dismissal or summary judgment. The record already reflects Col. Davis clearly does not agree that his non-existent relationship with Director Mazanec prevents his reestablishing a productive career at the Library. Davis Decl. ¶ 58 (noting Col. Davis has "maintained positive relationships with my colleagues and former subordinates"); *see also* Grimmett Decl. ¶14 (Col. Davis "enjoyed the respect of his colleagues and supervisees").

In sum, the entirety of the Library's after-acquired evidence claim turns on its lawyers' sinister view of actions that were not clearly improper. Extrinsic evidence, including an official report on the Library's own policy failures, supports Col. Davis' claims that his actions were workplace standard and undertaken in good faith. The Library's mischaracterizations of Col. Davis' actions are *precisely* what the discovery process is designed to unfurl. Col. Davis is entitled to discovery to enable him to challenge unwarranted characterizations of his actions and character, establish his credibility, assess treatment of current and former Library employees, and thus challenge the Library's after-acquired evidence claims.[2]

---

[2] As noted in Col. Davis' 56(f) Declaration, he is entitled to challenge the factual claims underpinning the Library's after-acquired evidence defense:

> With respect to reinstatement…Plaintiff is entitled to discovery regarding Defendant's after-acquired evidence of misconduct argument, the degree to which his relationship with other CRS employees has been fractured, and the availability of equivalent positions.

56(f) Decl. ¶6. The Library suggests this is "discovery for the sake of discovery," Opp'n at 11, but one party is not entitled to preclude discovery by the other simply by characterizing its own assessment of its own evidence as conclusive. *See, e.g., Carpenter v. Fed. Nat'l Mortg. Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999) (allowing pre-summary judgment discovery if a party opposing the motion cannot "present by affidavit facts essential to justify the party's opposition") (citing Fed. R. Civ. P. 56(f)).

Col. Davis is entitled to discovery that may contradict the Library's unilateral claims that no positions are available, Opp'n at 2,[3] or that any of Col. Davis' actions were actually dischargeable offenses, as well as demonstrate that the Library's claim of bad blood—which flows directly from Col. Davis' vindication of his constitutional rights—should not be given the force of a jurisdictional bar. Discovery is therefore required on the availability of reinstatement.

### b.   Col. Davis is entitled to back pay.

As noted in Col. Davis' previous memorandum, the Court may award back pay to remedy his unconstitutional termination because the Back Pay Act waives the government's sovereign immunity. PMSJ at 13–14. To dispute this point, the Library argues that the Supreme Court's decision in *United States v. Fausto*, 484 U.S. 439, 108 S. Ct. 668 (1988), precludes application of the Back Pay Act to public employees, like Col. Davis, who have not been provided a statutory right to challenge a personnel action under CSRA. Opp'n at 14. The Library is incorrect.

In *Fausto*, the Supreme Court held that CSRA's comprehensive administrative scheme precludes excepted service employees from obtaining parallel judicial review over statutory or regulatory claims related to adverse employment actions otherwise covered by the Act—including claims for relief under the Back Pay Act. *See* 484 U.S. at 448–49, 454–55, 108 S. Ct. at 674, 677; *see also Am. Fed. of Gov't Emps. Local 1 v. Stone*, 502 F.3d 1027, 1036 (9th Cir. 2007) ("When Congress decides to exclude an employee from the protections of the CSRA or an analogous scheme  . . . *Fausto* precludes the employee from obtaining judicial review of statutory or regulatory claims."). In reaching this result, the Court reasoned that CSRA evinces a considered congressional judgment that public employees should be forced to raise adverse personnel action claims through the Act's unitary administrative scheme or, if the Act provides

---

[3] Even if it is true that no suitable positions are available now, positions may be available by the time this Court is ready to issue an order on remedy, which may be many months from now.

no right to review, not at all. *See Fausto* at 448–51, 108 S. Ct. at 674–76. However, in light of

the significant constitutional questions raised by any congressional attempt to preclude *all*

judicial review of an employee's constitutional claims, this Circuit has held that *Fausto* does not

prevent employees from raising constitutional claims in federal court if CSRA provides them no

alternative mechanism for review. *See Suzal*, 32 F.3d at 586. *Fausto* therefore does not apply

here, because Col. Davis is asserting a constitutional claim for relief under the First and Fifth

Amendments, rather than a statutory claim for relief under the Back Pay Act.[4]

The Library argues that even if CSRA does not preclude Col. Davis' constitutional

claims, *Fausto* prevents application of the Back Pay Act's sovereign immunity waiver. But

*Fausto* is simply not a sovereign immunity case; nothing in the opinion suggests that a court

properly adjudicating an action may not award monetary relief pursuant to the Back Pay Act's

sovereign immunity waiver. Indeed, the opinion explicitly states that the Back Pay Act applies

"if any employee is found by an 'appropriate authority' to have undergone an unwarranted

personnel action." 484 U.S. at 454, 108 S. Ct. at 677. As this Court is an appropriate authority to

review the constitutionality of the Library's personnel decision, PMSJ at 14–15, *Fausto* does not

prevent application of the Back Pay Act's sovereign immunity waiver. *See Brown*, 918 F.2d at

217–18 (holding that the Back Pay Act waives sovereign immunity with respect to prejudgment

interest in Title VII cases).[5]

---

[4] To be clear, Col. Davis' request for back pay relief derives from his First Amendment claim,
not from a statutory cause of action under the Back Pay Act. *See Hubbard v. EPA*, 949 F.2d 453,
469 (D.C. Cir. 1992) [*Hubbard* II], *rev'd en banc in part on other grounds*, 982 F.2d 531 (D.C.
Cir. 1992). The Back Pay Act here functions only as a waiver of sovereign immunity. *See Brown
v. Sec'y of Army*, 918 F.2d 214, 217–18 (D.C. Cir. 1990) (R.B. Ginsburg, J.).

[5] The Library attempts to distinguish *Brown* by arguing that the case involved a *statutory* cause
of action. Opp'n at 17. But it does not explain why a court with proper authority to hear a
statutory cause of action should have any more authority to award money damages pursuant to
the Back Pay Act than a court with proper authority to hear a constitutional cause of action.

The Library finds significance in the lack of post-*Fausto* cases holding that the Back Pay Act waives sovereign immunity against federal constitutional claims. The dearth of reported precedent is, however, easily explained by the fact that most such claims are raised through CSRA's comprehensive administrative scheme. Moreover, although the Library maintains that the Back Pay Act does not waive sovereign immunity with respect to constitutional claims, all of the cases cited to support that contention are inapposite. *See Gray v. Office of Pers. Mgmt.,* 771 F.2d 1504, 1514 (D.C. Cir. 1985) (holding that the Back Pay Act did not provide a basis for jurisdiction, because the plaintiffs' Back Pay Act claims were premature); *Doe v. Dep't of Justice*, 753 F.2d 1092, 1101–02 (D.C. Cir. 1985) (holding, in relevant part, that the district court lacked jurisdiction over plaintiff's Back Pay Act claim for wrongful termination in violation of internal Department of Justice regulations, because the Tucker Act vested jurisdiction in the Claims Court); *United States v. Connolly*, 716 F.2d 882, 887–88 (Fed. Cir. 1983) (en banc) (holding that the Back Pay Act did not itself confer jurisdiction on the Claims Court to hear plaintiff's First Amendment claim); *Mack v. United States*, 653 F. Supp. 70, 72 n.1 (S.D.N.Y. 1986) (holding that the Tucker Act vested the Claims Court with exclusive jurisdiction over the plaintiff's back pay claim). None of these cases engages in a sovereign immunity analysis that is relevant to this case.

Finally, the Library contends that the Tucker Act deprives this Court of jurisdiction, because Col. Davis' claim for back pay likely involves an amount over $10,000. But the Supreme Court clarified in *Bowen v. Massachusetts,* 487 U.S. 879, 108 S. Ct. 2722 (1988) that while "it is often assumed that the Claims Court has exclusive jurisdiction of Tucker Act claims for an amount more than $10,000," in fact the Claims Court's "jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims that may be

11

decided by the Claims Court." *Id.* at 910, 2740 n.48. Thus, "if a separate waiver of sovereign immunity and grant of jurisdiction exist, district courts may hear cases over which, under the Tucker Act alone, the Court of Federal Claims would have exclusive jurisdiction." *Auction Co. of Am. v. FDIC*, 132 F.3d 746, 752 n.4 (D.C. Cir. 1997). In this case, the Court has jurisdiction over Col. Davis' constitutional claims pursuant the general grant of federal question jurisdiction, 28 U.S.C. § 1331, and the Back Pay Act provides the requisite waiver of sovereign immunity.

### c.  Injunctive relief remains available.

The Library is correct that as a general rule, former employees lack standing to pursue injunctive relief against their previous employers. *See* Opp'n at 7 n.2. However, courts have explicitly held that this general rule does not apply where an employee seeks reinstatement. *See Walsh v. Nevada Dep't of Human Res.,* 471 F.3d 1033, 1037 (9th Cir. 2006) (collecting cases) (former employees have standing to seek injunctions when they are "in the process of seeking reinstatement to their former positions, or seeking work from that employer"); *Chen-Oster v. Goldman, Sachs & Co.,* 877 F. Supp. 2d 113, 122 (S.D.N.Y. 2012) ("should plaintiffs prevail, and should a court grant them reinstatement, they have a very real interest in a court-issued injunction preventing their employer from engaging in the same or substantially identical discriminatory behavior"); *Levin v. Madigan*, 697 F. Supp. 2d 958, 975 (N.D. Ill. 2010) ("If Plaintiff's employment is reinstated, he may indeed be subject to the same allegedly discriminatory policy that he challenges in this lawsuit.").

While the D.C. Circuit has not been as explicit about this rule, cases suggest an employee seeking reinstatement faces a risk of injury concrete enough to support injunctive relief:

> [P]laintiffs aver that such an injunction is warranted because of the ongoing possibility of further retaliation. They point out that four of the five plaintiffs still work for the MPD, and the fifth (Miller) is seeking reinstatement. …Plaintiffs' arguments are persuasive. This dynamic—where both the plaintiffs and the parties responsible for the unlawful

action they experienced continue to work for the defendant—frequently justifies the issuance of an injunction, especially where the defendant has "taken no affirmative steps to prevent recurrence" of the misconduct in question.

*Caudle v. District of Columbia*, 825 F. Supp. 2d 73, 81 (D.D.C. 2011); *see also Doe (P) v. Goss*, CIVA 04-2122 GK, 2007 WL 106523, at *3 (D.D.C. Jan. 12, 2007) (entertaining ex-employee's claim for injunction to promulgate rules; injunction denied on grounds unrelated to standing).

The Library also argues that Col. Davis' standing requires "double speculation" because a repeated likelihood of injury would only be present if the Library's policies were facially unconstitutional. That is not so. While Col. Davis maintains that the Library's policies governing employee speech *are* facially unconstitutional, standing to pursue injunctive relief still lies even should the Court disagree. None of the cases cited above involved a facial challenge; yet the opinions all cited concerns over possible recurrence of the same unlawful actions alleged in each case. *Walsh,* 471 F.3d at 1035 (alleging specific actions constituted disability discrimination); *Chen-Oster,* 877 F. Supp. 2d at 121-22 (employment discrimination claims too disparate to seek class certification, but injunctive relief would be appropriate for ex-employees); *Levin*, 697 F. Supp. 2d at 975 (sex and age discrimination) ("To the extent that Plaintiff seeks an injunction requiring Defendants to cease engaging in sex or age discrimination, such relief *would* remedy a harm that Plaintiff is likely to suffer again."); *Caudle,* 825 F. Supp. 2d at 74-75 (race discrimination); *Doe (P),* 2007 WL 106523 at *1 (statutory claims of unlawful termination).

Future harm is even less speculative in this case, because far from taking 'affirmative steps' to narrow the unlawful breadth of its speech rules, the Library continues to insist on its ability to regulate all speech "on matters of legislative importance to Congress." Opp'n at 23. The sweeping scope of this claimed right to censor employee speech on matters of public concern no matter how far removed from an employee's job responsibilities lies in direct tension

13

with the Library's written policy on outside speech, which applies only to "the very issues for which [employees] have responsibility at CRS." Decl. of Lee Rowland, June 28, 2013, ECF No. 91-8 ("Rowland Decl."), Ex. E (CRS Policy on Outside Speaking and Writing). It also obviously violates the First Amendment. Col. Davis has been a consistent public speaker on military detainee policy and will continue to be in the future. There is no speculation in concluding that should Col. Davis be reinstated, an injunction would be warranted to require the Library to remain within the bounds of the Constitution—and Col. Davis certainly has standing to pursue such relief.

## IV.    Col. Davis is Entitled to Summary Judgment on His Free Speech Claim

### a.    The Library faced no reasonable risk of harm from Col. Davis' speech.

The Library begins its opposition to Col. Davis' motion for summary judgment with the puzzling allegation that Col. Davis has "misstated the applicable standards" by "fail[ing] to acknowledge the substantially greater latitude afforded to the Government-as-employer in regulating the speech of its employees than to the Government in other capacities." Opp'n at 19. But this is the axiom that underpins every case of employee speech the parties have cited; it is beyond debate that had the government *not* employed Col. Davis and reached out to penalize his citizen speech about Guantánamo Bay, such action would blatantly violate the First Amendment. Simply stating this axiom does not assist this Court in identifying the standards that govern the government's ability to censor speech in *this* case.

Those standards are as follows: the government as employer has an interest in the "effective and efficient fulfillment of its responsibilities," Mem. Op., March 30, 2011, ECF No. 35, at 22 (citing *Connick v. Myers*, 461 U.S. 138, 150, 103 S. Ct. 1684, 1692 (1983)). Restrictions on speech "must be directed at speech that has some potential to affect the entity's

operations," *Id.* (citing *Garcetti v. Ceballos,* 547 U.S. 410, 411, 126 S. Ct. 1951, 1953 (2006)), and any inferences of potential harm must be "reasonable" and avoid "unadorned speculation." *Id.* (citing *Hall v. Ford,* 856 F.2d 255, 261 (D.C. Cir. 1988)). While employers have more leeway to discipline 'key deputies,' that power is not absolute and "'[a]t a minimum,' for the 'key deputy' heightened burden of caution to apply, 'the employee's speech must relate to the policy areas for which he is responsible.'" *Id* at 23. (citing *Hall,* 856 F.2d at 264).

The cases relied upon by the Library for greater deference to its claims of harm focus on such claims' reasonableness. *See* Opp'n at 20 (citing *Waldau v. Coughlin*, Civil Action No. 95-1151 (LFO), 1997 WL 161958 (D.D.C. Apr. 1, 1997); *Waters v. Churchill*, 511 U.S. 661, 114 S. Ct. 1878, 1887-89 (1994)). In *Waters* the plurality opinion states:

> And a government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters. In many such situations the government may have to make a *substantial showing that the speech is, in fact, likely to be disruptive* before it may be punished.

*Id*. at 674, 114 S. Ct. at 1887 (emphasis added). The Library has not and cannot make such a showing, let alone one that is substantial.

The fundamental reason the Library's claims of potential harm fail is that Col. Davis' opinionated advocacy regarding Guantánamo Bay was the proverbial cat out of the bag—long before his opinion pieces were published. It is clear from the record that both the Library and members of Congress were fully aware of Col. Davis' policy advocacy. *See* Davis Decl. ¶ 10; Declaration of Richard Ehlke, May 10, 2013, ECF No. 89-12, ¶ 17; Rowland Decl. Ex. C (Email from Daniel Mulhollan to Morris Davis (Aug. 24, 2009)) (requesting that Col. Davis take a personal day to accept and award for his Military Commissions advocacy and stating: "your choice of principle was not without cost"); *Id.* Ex. J (Letter from Lindsey O. Graham, U.S. Senator, to Dr. James Billington, Librarian of Congress (Dec. 15, 2009) ("Graham Letter")).

The Library's litigation position that this same advocacy suddenly created a serious threat of harm to its operations is just not reasonable. Col. Davis resigned his previous position as Chief Prosecutor in a high-profile repudiation of Guantánamo Bay procedures; he repeated his beliefs to the national media, Congress, and the Organization of American States; he was publicly thanked by a Republican Member of Congress—the very audience the Library claims would be alienated by his speech, Opp'n at 24—for his indispensable testimony on Guantánamo. Davis Decl. ¶¶ 6, 9, 11; Graham Letter. This is consistent with the fact that immediately after Col. Davis published his opinion pieces, a bipartisan string of Members of Congress requested CRS' assistance on military commissions issues. Davis Decl. ¶ 23; Rowland Decl. Ex. P (Mercury Database Search Results for "Military Commissions"). Indeed, Senator Graham's letter included a pointed request to the Library *not to terminate* Col. Davis for writing the opinion pieces. That request, combined with the continuing bipartisan outreach from Congress to CRS on detainee issues, constitute the *only* factual evidence on the record about Congress' actual reaction to the opinion pieces. It contradicts the Library's contention that its claims of possible harm resulting from Col. Davis public speech are reasonable. Far from it: the only harm perceived by one Republican Senator was the Library's censorship of a critical voice in the national debate over military commissions.

### b. Col. Davis has not waived his argument that he is not a "key deputy," but even a key deputy may speak on matters outside of his direct responsibilities.

Col. Davis has consistently maintained that his role as CRS was not that of a "key deputy" as defined in the caselaw. *See, e.g.,* Mem. Op., March 30, 2011, ECF No. 35 at 25 (citing Compl. ¶ 29). Col. Davis has not waived this argument; it was straightforwardly preserved in his motion for summary judgment, PMSJ at 22 ("This argument is incorrect as a factual matter. But even taking the Library's claim as true, it does not tip the *Pickering* balance

in its favor."). Accepting a defendant's claim as true, *arguendo*, for the purposes of summary judgment is not a waiver; it is the appropriate standard under the federal rules.

Hewing to that standard, the Library's theory that it is entitled to increased deference because Col. Davis is a key deputy still fails to account for the limiting principle on this deference. "It is clear that his speech did not, 'at a minimum, … relate to [the] policy areas for which he [wa]s responsible.'" Mem. Op., March 30, 2011, ECF No. 35 at 26 (citing *Hall*, 856 F.2d at 264). After further development of the record, more testimony now supports Col. Davis' claim that neither he nor his Division at CRS had responsibility for the policy areas encompassing Guantánamo Bay or military commissions. Grimmett Decl. ¶¶ 5, 6, 17; Davis Decl. ¶¶ 10, 29, 41. Rather than engage in the specifics of his responsibilities, the Library cites *Hall* for the proposition that any speech "in tension with agency policies or interests" supports a finding of presumed harm. Opp'n at 22; *see also id.* at 23 (Col. Davis had "highest burden of caution as to his public speech on matters of legislative importance to Congress"). But *Hall* cautions that a key deputy's speech leads to a presumption of harm only when it relates to the *employee's* area of responsibility—not his employer's. 856 F.2d at 264. The Library's reliance on *Navab-Safavi v. Glassman,* 637 F.3d 311 (D.C. Cir. 2011), Opp'n at 23, does not support its argument; the opinion never discussed deputy liability, and the court held that the value of an employee's commentary was *not* outweighed by her employer's general interest in integrity. *Id.* at 317.

The Library again points to select emails in its sole possession that it claims support an inference that Col. Davis had responsibility for military detainee issues. But nothing in these emails undermines Col. Davis' claims, supported by numerous other declarants, that his Division at CRS has no public responsibility for these issues. In fact, the language the Library most relies

17

on—that Col. Davis notified a colleague that he could "help focus the debate" on Guantánamo, Opp'n at 38—does not compel the conclusion that the opinion pieces fell within his areas of responsibility. However, even if this Court should find that the opinion pieces touched on areas of Col. Davis' employment responsibilities, that conclusion is not a blank check for the Library to censor speech. The case law requires that any forecast of harm be reasonable, which, as explained *supra* at 14–16, the Library's was demonstrably not. Col. Davis' emails also do nothing to contradict the facially unconstitutional scope of the Library's outside speech policies, *see infra* at 20, or the manner in which they were inconsistently applied to Col. Davis.

While the Library seeks to increase the deference to which it is entitled, it fails to respond to Col. Davis' arguments that given the importance of his advocacy, including to Congress and the legal world, its entitlement to such deference is actually diminished. *See Connick*, 461 U.S. at 152, 103 S. Ct. at 1692–93 ("a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern"); *O'Donnell v. Barry*, 148 F.3d 1126, 1137 (D.C. Cir. 1998) ("In some cases, the public interest in a high-level official's speech will outweigh any interest in that official's bureaucratic loyalty."). Col. Davis was not a key deputy at CRS; but even if he were, this fact alone does not support the Library's claims for extraordinary deference in this case.

### c. The balance of harms favors Col. Davis' free speech rights.

Beyond its reliance on the "key deputy" argument, the Library repeats its claims that Col. Davis' opinion pieces undermined his colleagues' confidence in him, Opp'n at 28–29, failed to uphold the Library's policies requiring "objectivity" by using "rhetorically charged language," *id.* at 31, and impaired his effectiveness at CRS, *id.* at 32–33. These arguments all collapse into one argument: that by writing the pieces, Col. Davis committed the unspeakable sin of using

18

opinionated language. *See, e.g.* Rowland Decl. Ex. K (Email from Dan Mulhollan to Morris Davis (Nov. 10, 2009)) ("I am worried by what our CRS colleagues will now feel they can model after you in asserting their personal policy preferences to the world"); Rowland Decl. Ex. I (Termination Letter from Daniel P. Mulhollan to Morris Davis (Nov. 20, 2009) (criticizing Col. Davis' "poor judgment and lack of discretion with respect to the letter to the editor and an opinion piece you authored"); Decl. of Daniel Mulhollan, Jan. 15, 2010, ECF No. 6-1, ¶ 53 ("potential harm to the Service on account of his public issue advocacy"); Decl. of Karen Lewis, May 10, 2013, ECF No. 89-11, ¶ 29 ("The articles raised my concern for the integrity of the organization").

The record makes plain that there was no source of displeasure with Col. Davis at the time he was fired other than the opinion pieces; his speech was the entirety of the alleged harm by the Library—now twisted to sound like independent misconduct. Indeed, if the culture of the Library is one that permits coworkers to ostracize a colleague for engaging in constitutionally-protected activity, that adds to Col. Davis' side of the scales, not the Library's.

The Library's own policies and practices belie any claim that Col. Davis' advocacy caused harm to the Library's interests. First, the Library's written policy on outside writing states that publications like Col. Davis' opinion pieces are to be "encouraged," not penalized. Rowland Decl. Ex. D (Library of Congress Regulation 2023-3) (staff members are "encouraged to engage in . . . writing that is not prohibited by law"). Even the Library does not suggest that any criticisms Col. Davis may have penned were unlawful. Furthermore, while the Library attempts to minimize its past lack of institutional concern over the sharp tone of other employees' advocative speech, Opp'n at 28–29, its differential reaction is directly relevant to assessing the reasonableness of its claims of harm. *See Robinson v. Dist. of Columbia Gov't*, Civ.

A. No. 97-787 (GK), 1997 WL 607450, at *6 (D.D.C. July 17, 1997) (finding employer's unilateral claims of harm "unconvincing" where other employees engaged in similar activity were not disciplined).

The Library next suggests that Col. Davis' "ad hominem" attacks caused it *per se* harm. Opp'n at 35. But Col. Davis' words were core political speech, not offensive screeds like those in both cases cited by the Library, where employees went on lengthy vulgar rants with coworkers present. *Mitchell v. Hillsborough Cnty.,* 468 F.3d 1276, 1288 (11th Cir. 2006) ("continuing to employ Mitchell after his insulting comments would impede the County's ability to perform its public duties" and the vulgarity stripped employee's speech of any public concern); *Morris v. Crow*, 117 F.3d 449, 458 (11th Cir. 1997) ("profane chewing out of one of her superiors—in full view of her co-workers" was harmful speech). Those facts are not remotely present here, where the "content and tone" of Col. Davis' pieces about core public policy "were consistent with letters written by private citizens to the editors of newspapers on significant matters of public policy on which they have strong personal views." Grimmett Decl. ¶ 17. Col. Davis' speech displayed none of the vituperation to coworkers that courts have taken as presumed harm to an employer's interest.

Finally, the Library suggests that because Col. Davis had disciplined previous employees for falling afoul of the Library's written outside speech policies, he is hypocritical for speaking out himself. This argument holds no water. Col. Davis relied on the written policies of the Library and CRS—which, as the Library acknowledges, required employees to exercise caution in their outside speech only when it might conflict with "assistance rendered to Congress on the same or related subject-matter." Opp'n at 31 (citing MTD, Ex. L, May 10, 2013, ECF No. 89-20 (Email from M. Davis (Feb. 18, 2009))). There is nothing inconsistent in Col. Davis' application

of the written policies to his subordinates when their speech involved their areas of responsibility. He held himself to the same standard.  Davis Decl. ¶¶ 26–30.

Given the ongoing and public nature of Col. Davis' speech, the Library simply does not get a free pass on its summary claims that his speech created potential harm for the Library. Actual evidence undisputedly shows that CRS business as usual continued after their publication, with the exception of the Director's exaggerated response to Col. Davis' protected speech.

### d.  The Library has not responded to Col. Davis' argument that the Library's outside speech policy is facially unconstitutional.

Nowhere in its brief does the Library respond to Col. Davis' claim that the Library's outside speech policies are facially unconstitutional and cover significant swaths of protected speech. In its own words, the Library seeks to prohibit employees for speaking on "matters of legislative importance to Congress." Opp'n at 23.  Nothing in the First Amendment, the *Pickering* line of cases, or anything cited by the Library comes close to justifying such a massive imposition on employees' citizen speech. "As the magnitude of intrusion on employees' interests rises, so does the Government's burden of justification." *Nat'l Treasury Emps. Union,* 513 U.S. at 483, 115 S. Ct. at 1021. The Library cannot meet this heightened burden, and has made no attempt to do so.

### V.  Col. Davis is Entitled to Summary Judgment on His Due Process Claim Because the Library Failed to Provide Notice or Clarity Regarding Its Regulation of Speech

As Col. Davis' opening brief showed, the Library violated his entitlement to due process by terminating him on the basis of a novel interpretation of CRS' policy on outside speaking. On its face, that policy *encourages* speech and, at most, requires employees to "preserv[e] the appearance of objectivity when addressing the *very issues for which [the employees] have responsibility* at CRS." Rowland Decl. Ex. E (emphasis added). Yet the Library has manufactured multiple and divergent rules that it now pretends flow unambiguously from that

abstract guidance: that employees may not express "any opinion" on an issue "on the congressional agenda," Rowland Decl. Ex. R (Email from Daniel Mulhollan to Morris Davis (Nov. 10, 2009)); that they may not engage in speech on controversial or political matters, *id.*, and, more recently, that they may not "publicly advocate positions on Guantánamo." MTD at 44; *see also* Opp'n at 23 ("matters of legislative importance to Congress"). These fabrications not only contradict the plain text of the Library's policy on outside speaking, but they fly in the face of the Library's past practice with respect to both Col. Davis and other CRS employees who frequently express controversial yet valuable public opinions. PMSJ at 29, 39–40. Indeed, while at CRS, Col. Davis often articulated the same views reflected in the public writings for which he was fired and for which he had become well known. *See id.* at 38–39.

In other words, the only change that occurred with Col. Davis' opinion pieces was Director Mulhollan's interpretation of the Library's policy on outside speaking. The Library is free to alter that policy, of course, but before terminating employees based on new rules, it must "give loud and clear advance notice." *Keeffe v. Library of Cong.*, 777 F.2d 1573, 1583 (D.C. Cir. 1985).

The Library's latest brief responds by arguing that Col. Davis is not entitled to due process because, as a probationary employee, he possessed no property interest in his continued employment. Opp'n at 42–43. What the Library refuses to recognize is that the Fifth Amendment right to due process protects not only interests in property, but interests in liberty as well, and that "the right to engage in free speech is a liberty interest protected by due process." *Finley v. Nat'l Endowment for the Arts*, 100 F.3d 671, 675 n.4 (9th Cir. 1996), *rev'd on other grounds*, 524 U.S. 569, 118 S. Ct. 2168 (1998); *see also Procunier v. Martinez*, 416 U.S. 396, 417–18, 94 S. Ct. 1800, 1814 (1974) ("We also agree with the District Court that the decision to censor or

withhold delivery of a particular letter must be accompanied by minimum procedural safeguards. The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment."), *overruled on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401, 109 S. Ct. 1874 (1989); *Reed v. Vill. of Shorewood*, 704 F.2d 943, 949 (7th Cir. 1983) ("Freedom of speech is one of the liberties the due process clause has been held to protect."). Accordingly, when the government seeks to regulate speech, the right to due process requires it to act precisely and clearly. *See* PMSJ at 42–43 (citing cases). Because it has not done so here, it has violated Col. Davis' basic entitlement to fair notice.

Next, the Library argues once again that a handful of emails sent by Col. Davis early in his employment evidence his familiarity with the vagaries of the Library's policy on outside speaking. *See* Opp'n at 43–44. This is not true. Virtually all of Col. Davis' public commentary on Guantánamo and the military commissions post-dated the emails relied upon by the government. Davis Decl. ¶¶ 26–34. And CRS consistently and repeatedly approved of or failed to object to that speech. What Col. Davis understood prior to the publication of his opinion pieces was that neither the Library's policy on outside speaking nor CRS's implementation of that policy prevented him from continuing to publicly share his expertise on the military commissions. In any event, Col. Davis' emails refer primarily to the "objective" and "non-partisan" mission of CRS, and his speech contradicted neither. *Cf.* Grimmett Decl. ¶ 11 ("CRS is charged in the Legislative Reorganization Act of 1970 with being a 'nonpartisan' resource for the U.S. Congress. That act does not stipulate that CRS work products be neutral, but it does stipulate that CRS carry out its work 'without partisan bias.'"). It expressed a non-partisan and

23

objective view based upon his prior experience with the military commissions. *See id.* ¶ 18 ("It is absolutely clear to me that nothing in either of Col. Davis' two opinion pieces was partisan in nature. He criticized equally policies and actions taken by both the Bush and Obama administrations, and noted the implications of the policy approach being taken. I submit that what Col. Davis wrote fairly characterized the actions and positions of U.S. public officials he mentioned, and his views were based upon facts."). Grimmett Decl. ¶ 18.

Finally, the Library complains that CRS employees should intuitively understand where their entitlement to free expression ends and the "principles of professional judgment" begin. *See* Opp'n at 44. In other words, it seeks to shift to Col. Davis the burden of defining its policy on outside speech. As the D.C. Circuit made clear when the Library attempted the same tactic, "What the Library *must* do is give loud and clear advance notice when it does decide to interpret a particular regulation as a prohibition or limitation on an employee's outside activity." *Keeffe*, 777 F.2d at 1583 (emphasis in original). Here, the Library has a history of interpreting its permissive policy on outside speaking to permit speech by its employees on controversial matters, on current affairs, on sensitive political topics, and, with respect to Col. Davis in particular, on the proper handling of the detainees held at Guantánamo Bay. The Library may not now penalize Col. Davis for what it previously permitted him to do. That game of bait and switch with Col. Davis' entitlement to free speech violates his right to fair notice.

For these reasons, the Court should enter summary judgment for Col. Davis on his Due Process claim or, at the very least, deny the Library's motions with respect to that claim.

## VI.    Conclusion

Before and after he was hired by the Library, Col. Davis spoke publicly as a citizen with expertise about the use of military commissions at Guantánamo Bay, to the gratitude of

Congress. The Library now claims that this public speech, repeated on the editorial pages of the Washington Post and the Wall Street Journal, suddenly created a risk to its relations with Congress. The facts demonstrate that this risk was nonexistent and claimed in unreasonable haste by the Library. This expansion of the Library's speech restrictions was both unreasonable and improperly retroactive, and  the resulting termination of Col. Davis violated both his free speech and due process rights.

For the reasons stated above and in Col. Davis' earlier briefs, the Court should deny the Library's motions for summary judgment and dismissal, and grant Col. Davis summary judgment on his constitutional claims followed by discovery limited to ascertaining the proper remedies.

Dated: August 14, 2013                                Respectfully submitted,


                                        /s/ *Arthur B. Spitzer*
                                        Arthur B. Spitzer (D.C. Bar No. 235960)
                                        American Civil Liberties Union
                                         of the Nation's Capital
                                        4301 Connecticut Avenue, N.W., Suite 434
                                        Washington, DC 20008
                                        Phone: (202) 457-0800
                                        Fax: (202) 457-0805


                                        /s/ *Lee Rowland*
                                        Lee Rowland (*pro hac vice*)
                                        Brian M. Hauss (*pro hac vice*)
                                        Alex A. Abdo (*pro hac vice*)
                                        American Civil Liberties Union Foundation
                                        125 Broad Street, 18th Floor
                                        New York, NY 10004
                                        (212) 549-2500

                                        *Attorneys for Plaintiff*