**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                )
MORRIS D. DAVIS,                                )
                                                )
            Plaintiff,                          )
                                                )
      v.                                        )      Civil Action No. 10-00036 (RBW)
                                                )
JAMES H. BILLINGTON, in his official            )
capacity as the Librarian of Congress,          )
                                                )
            Defendant.                          )
_____)

**MEMORANDUM OPINION**

The plaintiff, Morris D. Davis, filed this action against James H. Billington, the Librarian

of Congress, in his official capacity, and Daniel P. Mulhollan, the former Director of the

Congressional Research Service ("CRS"), in his individual capacity, alleging that the defendants

violated his First and Fifth Amendment constitutional rights.  Complaint ("Compl.") ¶¶ 13-14,

78-85.  The only claims that now remain are those against defendant Billington.  Currently

before the Court are the Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction

or, in the Alternative, for Summary Judgment ("Def.'s Mot."), filed by defendant Billington, and

the Plaintiff's Motion for Summary Judgment ("Pl.'s Mot.").  After carefully considering the

parties' submissions[1] and their oral arguments presented to the Court on March 26, 2014, the

_____
[1] In addition to those already identified, the Court considered the following filings by the parties in reaching its decision: (1) the Memorandum in Support of Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction or, in the Alternative, for Summary Judgment ("Def.'s Mem."); (2) the defendant's Statement of Material Facts as to Which There is no Genuine Issue ("Def.'s Stmt."); (3) the Memorandum in Opposition to Defendant's Motion to Dismiss or for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem."); (4) the plaintiff's Statement of Material Facts as to Which There is no Genuine Issue ("Pl.'s Stmt."); (5) the plaintiff's Statement of Material Facts in Dispute ("Pl.'s Disputed Facts"); (6) the Reply in Support of Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction or, in the Alternative, for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Def.'s Reply"); (7) the Defendant's Response to Plaintiff's Statement of Material Facts to Which There is no Genuine Issue ("Def.'s Resp. Stmt."); and (8) the Reply Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Reply").

Court concludes for the following reasons that it must grant in part and deny in part the defendant's motion and deny the plaintiff's motion.

## I. BACKGROUND

The factual allegations that the plaintiff makes in this case are set forth in prior memorandum opinions issued by this Court and by this Circuit on appeal of this Court's opinion. See Davis v. Billington, 775 F. Supp. 2d 23, 27-29 (D.D.C. 2011), vacated and remanded, 681 F.3d 377, 379-80 (D.C. Cir. 2012). A divided panel of the District of Columbia Circuit reversed this Court's order denying defendant Mulhollan's motion to dismiss, see Davis, 681 F.3d at 379-80, and in accordance with the mandate issued following the Circuit's opinion, this Court thereafter dismissed the plaintiff's claim under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), against defendant Mulhollan. See Order at 1, ECF No. 53. Thus, because the plaintiff sued defendant Mulhollan only in his individual capacity, he is no longer a party in this case.

The plaintiff's factual allegations aside, the following facts are undisputed. The plaintiff "is a twenty-five year veteran of the U.S. Air Force" who was "appointed Chief Prosecutor for the Department of Defense's Office of Military Commissions in 2005." Pl.'s Stmt. ¶ 1; Def.'s Resp. Stmt. ¶ 1. In that capacity, "[h]e was responsible for overseeing the military commissions created to prosecute suspected terrorists held at Guantánamo Bay, Cuba." Pl.'s Stmt. ¶ 1; Def.'s Resp. Stmt. ¶ 1. The plaintiff resigned from his position as Chief Prosecutor in October 2007, and thereafter "became a vocal critic of the military commissions system." Pl.'s Stmt. ¶¶ 1-2; Def.'s Resp. Stmt. ¶¶ 1-2. He "wrote opinion pieces for major newspapers[,] . . . spoke about his experiences concerning the military commissions to various legal audiences," and "was asked to testify before Congress in July 2008." Pl.'s Stmt. ¶ 2; Def.'s Resp. Stmt. ¶ 2.

"In December 2008, [the plaintiff] began work at the . . . [CRS], a unit of the Library of Congress ('the Library'), as Assistant Director of its Foreign Affairs, Defense, and Trade Division," Pl.'s Stmt. ¶ 3; Def.'s Resp. Stmt. ¶ 3, in a probationary status, Def.'s Stmt. ¶ 1.  The Foreign Affairs, Defense, and Trade Division "has official responsibilities for matters including foreign affairs and the [United States] Defense Department."[2]  Pl.'s Stmt. ¶ 4; Def.'s Resp. Stmt. ¶ 4.  In his capacity as the Assistant Director, the plaintiff "reported directly to [then] CRS Director Daniel Mulhollan . . . and managed the substantive work of almost 100 analysts and support personnel within [the Foreign Affairs, Defense, and Trade Division]."  Def.'s Stmt. ¶ 2. The "[p]laintiff was [also] responsible for enforcing Library of Congress and CRS rules, regulations, and policies among the staff of [the Division]."  Id. ¶ 3.  Additionally, he "spoke about military commissions on certain occasions during his CRS tenure with knowledge of and approval by CRS management."  Def.'s Resp. Stmt. ¶ 5; Pl.'s Stmt. ¶ 5.

"On November 10, 2009, [the] [p]laintiff caused to be published an opinion-editorial piece in the Wall Street Journal and a letter-to-the-editor in the Washington Post, both written by him addressing military commission and detainee prosecution issues."  Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 8.  Neither submission "referenced [the] CRS or the Library," Pl.'s Stmt. ¶ 8; Def.'s Resp. Stmt. ¶ 8, and "[t]here was no explicit disclaimer" appended to either submission, Pl.'s Stmt. ¶ 11; Def.'s Resp. Stmt. ¶ 11.  "Director Mulhollan requested a meeting with [the] [p]laintiff for November 12, 2009, to continue the discussion about the opinion pieces that had begun the previous evening by e-mail," as well as "a subsequent meeting with [him] for November 13, 20[09]."  Def.'s Resp. Stmt. ¶ 14; Pl.'s Stmt. ¶ 14.  During the November 13,

---

[2] As the Court discusses below, the parties dispute whether the Foreign Affairs, Defense, and Trade Division additionally has responsibilities concerning military commissions and/or Guantánamo Bay.  Compare Pl.'s Stmt. ¶ 4 and Pl.'s Disputed Facts ¶ 1, with Def.'s Stmt. ¶ 4 and Def.'s Resp. Stmt. ¶ 4.

2009 meeting, "[Director] Mulhollan handed [the plaintiff] a formal letter of admonishment." Pl.'s Stmt. ¶ 14; Def.'s Resp. Stmt. ¶ 14.  Several days later, "[o]n November 20, [2009,] [Director] Mulhollan informed [the plaintiff] that he would be terminated as of December 21, 2009, and that [he] would thereafter be given a thirty-day temporary position as [Director] Mulhollan's Special Advisor.  [Director] Mulhollan's assistant then delivered a formal notice of termination to [the plaintiff]."  Pl.'s Stmt. ¶ 16; Def.'s Resp. Stmt. ¶ 16.

The defendant has now filed a motion to dismiss on jurisdictional grounds, or in the alternative, for summary judgment.  The plaintiff has opposed the defendant's motion with his own motion for summary judgment.

## II.  STANDARDS OF REVIEW

### A.    Rule 12(b)(1) Motion to Dismiss

Rule 12(b)(1) allows a party to move to dismiss for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1).  When a defendant moves to dismiss under Rule 12(b)(1), "the plaintiff[] bear[s] the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction."  Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 176 (D.D.C. 2004); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  A court considering a Rule 12(b)(1) motion must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [a] plaintiff the benefit of all inferences that can be derived from the facts alleged.'"  Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citation omitted).  "Although 'the District Court may in appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) on the complaint standing alone,' 'where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint

supplemented by undisputed facts plus the court's resolution of disputed facts.'" <u>Coal. for Underground Expansion v. Mineta</u>, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted).

**B.      Rule 56 Motion for Summary Judgment**

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based upon the depositions, affidavits, and other factual materials in the record.  Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it "might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  And "[a] dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Arrington v. United States</u>, 473 F.3d 329, 333 (D.C. Cir. 2006) (quoting <u>Anderson</u>, 477 U.S. at 248).  The moving party bears the initial burden of showing the absence of a disputed material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party to "'set forth specific facts showing that there is a genuine issue for trial.'" <u>Anderson</u>, 477 U.S. at 248 (citation omitted).  "Although summary judgment is not the occasion for the court to weigh credibility or evidence, summary judgment is appropriate 'if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" <u>Talavera v. Shah</u>, 638 F.3d 303, 308 (D.C. Cir. 2011) (citations omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249.  In making this assessment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." <u>Talavera</u>, 638 F.3d at 308 (citing <u>Anderson</u>, 477 U.S. at 255).

### III.  LEGAL ANALYSIS

**A.      Whether the Civil Service Reform Act of 1978 Precludes Judicial Review of the Plaintiff's Constitutional Claims**

The defendant argues that the holding of a recent Supreme Court case, <u>Elgin v. Dep't of Treasury</u>, __ U.S. __, 132 S. Ct. 2126 (2012), mandates the conclusion that claims like the plaintiff's are unreviewable by district courts.  Def.'s Mem. at 6.

In <u>Elgin</u>, the Supreme Court held that the review scheme set forth in the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.), was intended to preclude district court jurisdiction over certain claims, regardless of the constitutional implications of those claims.  <u>See</u> __ U.S. at __, 132 S. Ct. at 2140.  In that case, the petitioners were "former federal competitive service employees" who failed to comply with the Military Selective Service Act's requirement that "male citizens and permanent-resident aliens of the United States between the ages of 18 and 26 . . . register for the Selective Service."  <u>Id.</u> at __, 132 S. Ct. at 2131.  The petitioners were thus discharged by their federal agency employers pursuant to 5 U.S.C. § 3328, which "bars from employment by an Executive agency anyone who has knowingly and willfully failed to register" under the Military Selective Service Act.  <u>Id.</u>  One of the petitioners, Michael Elgin, appealed to the Merit Systems Protection Board ("MSPB"), arguing "that Section 3328 is an unconstitutional bill of attainder and unconstitutionally discriminates on the basis of sex when combined with the registration requirement of the Military Selective Service Act."  <u>Id.</u>  An administrative law judge held that the MSPB lacked the authority to consider the constitutionality of a federal statute and thus dismissed the case for lack of jurisdiction.  <u>Id.</u>  Rather than appeal the ruling to the full MSPB or the United States Court of Appeals for the Federal Circuit, Elgin and the other petitioners filed a

civil lawsuit challenging their dismissal in the United States District Court for the District of

Massachusetts.  Id.

The case eventually made its way to the Supreme Court.  In reaching its conclusion that

the CSRA precluded federal district courts from entertaining the petitioners' claims, the Supreme

Court looked to the standard it had announced in Thunder Basin Coal Co. v. Reich, 510 U.S. 200

(1994).  See id. at __, 132 S. Ct. at 2133.  In Thunder Basin, the Court stated that

> [i]n cases involving delayed judicial review of final agency actions, we shall find
> that Congress has allocated initial review to an administrative body where such
> intent is "fairly discernible in the statutory scheme."  Whether a statute is intended
> to preclude initial judicial review is determined from the statute's language,
> structure, and purpose, its legislative history, and whether the claims can be
> afforded meaningful review.

510 U.S. at 207 (footnote and citations omitted).  The Thunder Basin Court noted further in a

footnote that, because the statute at issue in that case provided for judicial review in another

forum, "'the strong presumption that Congress did not mean to prohibit all judicial review'" was

not implicated.  Id. at 207 n.8 (citations omitted).  The Elgin Court, in turn, observed that "[l]ike

the statute in Thunder Basin, the CSRA does not foreclose all judicial review of petitioners'

constitutional claims, but merely directs that judicial review shall occur in the Federal Circuit,"

which "is fully capable of providing meaningful review of [the] petitioners' claims."  Elgin, __

U.S. at __, 132 S. Ct. at 2132.  Thus, the Elgin Court asked "whether it is 'fairly discernible'

from the CSRA that Congress intended covered employees appealing covered agency actions to

proceed exclusively through the statutory review scheme, even in cases in which the employees

raise constitutional challenges to federal statutes," id. at __, 132 S. Ct. at 2132-33, a question that

it answered in the affirmative, id. at __, 132 S. Ct. at 2134, 2140.

The case currently before this Court concerns constitutional claims raised by a federal

probationary employee in the excepted service, and is therefore somewhat distinct from Elgin,

which addressed constitutional claims raised by federal non-probationary competitive service

employees.  See __ U.S. at __, 132 S. Ct. at 2131.  So while the analysis in Elgin is potentially

instructive, this Court must first determine whether the CSRA provides for meaningful judicial

review of constitutional claims brought by federal probationary employees in another forum.

See Thunder Basin, 510 U.S. at 207 & n.8.  To be sure, certain CSRA remedies, including the

individual right to directly petition the MSPB with respect to allegations of prohibited

employment practices, are available only to employees who, unlike the plaintiff here, "meet

certain requirements regarding probationary periods and years of service."  Elgin, __ U.S. at __,

132 S. Ct. at 2130.  The other, indirect methods for challenging prohibited employment practices

are limited to allegations that an "agency" has engaged in "a prohibited personnel practice."  See

5 U.S.C. § 1214 (a)(1)(A).  And the Federal Circuit has held that, "[a]ccording to section 2302, a

'personnel action' may be considered a 'prohibited personnel practice' only if it occurs within an

'agency' as that word is defined."  Booker v. Merit Sys. Prot. Bd., 982 F.2d 517, 519 (Fed. Cir.

1992).  Section 2302, in turn, excludes the Library of Congress from the definition of "agency."

See § 2302(a)(2)(C) (defining "agency" as an "Executive agency and the Government Printing

Office" (emphasis added)); see also Davis, 681 F.3d at 384 (observing that the Library of

Congress is a non-Executive agency).  Thus, even the limited protections provided by chapter 12

are unavailable to the plaintiff.

The case before this Court thus presents the following quandary: does the CSRA's

complex remedial scheme completely deprive individuals in the plaintiff's position—

probationary employees in non-Executive agencies—from challenging in this Court the

constitutionality of agency policies that lead to the termination of their employment?  The

Supreme Court has emphasized repeatedly that "where Congress intends to preclude judicial

review of constitutional claims its intent to do so must be clear." Webster v. Doe, 486 U.S. 592, 603 (1988) (citing Johnson v. Robison, 415 U.S. 361, 373-74 (1974)).  Courts "require this heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." Id. (citing Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 681 n.12 (1986)); cf. Elgin, __ U.S. at __, 132 S. Ct. at 2132 ("Webster's standard does not apply where Congress simply channels judicial review of a constitutional claim to a particular court.").

As this Circuit has recognized and "[a]s the Supreme Court has made clear, in most instances the judgment has been that Congress, not the judicial branch, is in the best position to prescribe the scope of relief available for the violation of a constitutional right." Davis, 681 F.3d at 381.  But "time and again this [Circuit] has affirmed the right of civil servants to seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights," Spagnola v. Mathis, 859 F.2d 223, 229-30 (D.C. Cir. 1988) (citing cases); see also id. at 230 n.13 (limiting judicial review to constitutional claims), and has "held that the district courts are open to challenges seeking equitable relief on constitutional grounds, at least where the CSRA does not provide an adequate alternative route to judicial review," Suzal v. Dir., U.S. Info. Agency, 32 F.3d 574, 586 (D.C. Cir. 1994) (citing cases).  Indeed, the Supreme Court, in analyzing whether the CSRA's comprehensive remedial scheme could accommodate the constitutional claims of the Elgin petitioners, was careful to limit its discussion of the exclusivity of the CSRA's scheme for constitutional claims to "covered employees appealing covered agency actions . . . , even in cases in which the employees raise constitutional challenges to federal statutes." Elgin, __ U.S. at __, 123 S. Ct. at 2133.  The Court emphasized that "the

CSRA does not foreclose all judicial review of petitioners' constitutional claims, but merely directs that judicial review shall occur in the Federal Circuit."  Id. at __, 132 S. Ct. at 2132.

Here, the plaintiff does not have access to the Federal Circuit through an appeal of a decision resulting from the CSRA administrative process, because he is not entitled to administrative review under the CSRA in the first place.  See Davis, 681 F.3d at 388.  Nor can he obtain damages under Bivens, as no such remedy exists for probationary non-Executive agency employees.  Id.  However, unless it is clear that Congress intended to preclude all judicial review of colorable constitutional claims, see Webster, 486 U.S. at 603, the Court cannot find that it does not have jurisdiction over the plaintiff's claim for two reasons.  First, the Supreme Court has indicated that "when Congress intends to bar judicial review altogether, it typically employs . . . unambiguous and comprehensive" language.  Lindahl v. Office of Personnel Mgmt., 470 U.S. 768, 779-80 (1985).  In a footnote illustrating this point, the Lindahl Court referenced the language of 5 U.S.C. § 8128(b), which addresses compensation for work injuries and states:

> The action of the Secretary [of Labor] or his designee in allowing or denying a payment under this subchapter is—(1) final and conclusive for all purposes and with respect to all questions of law and fact; and (2) not subject to review by another official of the United States or by a court by mandamus or otherwise.

Id. at 780 & n.13 (quoting 5 U.S.C. § 8128(b)).  The Court provided as a further example the statutory language of 38 U.S.C. § 211(a), which addresses benefits for veterans and provides that

> [t]he decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans and their dependents or survivors shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise.

Id. (quoting 38 U.S.C. § 211(a)).  There is no similar language in the CSRA definitively barring the plaintiff's constitutional claims from review by a district court.  Moreover, this Circuit has explicitly stated that "the district courts are open to challenges seeking equitable relief on

constitutional grounds, at least when the CSRA does not provide an adequate alternative route to judicial review." Suzal, 32 F.3d at 586. And in this case, the Circuit stated that the plaintiff "can . . . file[] a claim for injunctive relief for the alleged constitutional violations." Davis, 681 F.3d at 388 n.1.

At bottom, the Court is unconvinced that the Supreme Court's Elgin decision has any effect other than to route the constitutional claims of civil servants who already have an administrative remedy to the Federal Circuit. That Congress intentionally barred probationary non-Executive agency employees from the CSRA's administrative remedial scheme does not thereby indicate that Congress intended to completely bar from judicial review colorable constitutional claims filed by those same employees. Rather, in order "to avoid the 'serious constitutional question' that would arise if . . . [the] statute were construed to deny any judicial forum for a colorable constitutional claim," Webster, 486 U.S. at 603, and in keeping with the longstanding law of this Circuit that favors permitting plaintiffs the opportunity to bring constitutional claims for injunctive relief in the district court, the Court finds that the CSRA does not bar this Court's jurisdiction to address the plaintiff's constitutional claims. The Court therefore denies the defendant's motion to dismiss the plaintiff's claims for lack of subject matter jurisdiction.

**B.      Whether the Court has Jurisdiction to Award any of the Requested Relief**

The defendant argues that the Court must dismiss this case because "reinstatement is not an available remedy" and because the "[p]laintiff's requests for front pay, back pay, and any other form of money damages are barred by" sovereign immunity. Def.'s Mem. at 9. As the defendant correctly notes, "[i]f the Court 'cannot grant any of the relief sought by [the plaintiff], a decision of this court would be an advisory opinion barred by Article III of the Constitution.'"

Id. at 10 (citing James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085, 1092 (D.C. Cir. 1996)).

The Court must therefore assess whether it can award any of the requested relief.

1. **The Plaintiff's Request for Front Pay**

As to the plaintiff's request for front pay, see Compl., Prayer for Relief, the defendant

correctly notes that the plaintiff "never even address[es] the topic" in his opposition to the

defendant's motion to dismiss.  Def.'s Reply at 1.  The Court therefore deems this argument

conceded and need not address it.  See Lewis v. District of Columbia, No. 10-5275, 2011 WL

321711, at *1 (D.C. Cir. Feb. 2, 2011) (per curiam) ("'It is well understood in this Circuit that

when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments

raised by the defendant, a court may treat those arguments that the plaintiff failed to address as

conceded.'") (quoting Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 284 F. Supp. 2d

15, 25 (D.D.C. 2003), aff'd, 98 F. App'x. 8 (D.C. Cir. 2004)).

2. **The Plaintiff's Request for Back Pay**

The defendant argues that back pay is not available to the plaintiff because the United

States has not waived its sovereign immunity for claims like those advanced in this case.  Def.'s

Mem. at 18.  The plaintiff counters that the Court may award him damages under the Back Pay

Act, 5 U.S.C. § 5596(b)(1) (2006).  Pl.'s Mem. at 13.

The Back Pay Act provides that certain federal employees who successfully challenge

"unjustified or unwarranted personnel action[s] which . . . resulted in the withdrawal or reduction

of all or part of the pay . . . of the employee[s] . . . [are] entitled, on correction of the personnel

action" to some or all of the back pay to which the employees are entitled, as well as reasonable

attorney fees.  See § 5596(b)(1).  However, as the Sixth Circuit explained,

> [u]nder [United States v.] Fausto, [484 U.S. 439, 455 (1988),] where a
> comprehensive remedial scheme exists to address agency adverse actions, and

Congress has clearly indicated that no judicial review is available, an individual may not choose other federal statutory avenues to obtain review. The CSRA established a comprehensive system for reviewing personnel action taken against federal employees. Its deliberate exclusion of employees in respondent's service category from the provisions establishing administrative and judicial review for personnel action of the sort at issue here prevents respondent from seeking review in the Claims Court under the Back Pay Act.

Fligiel v. Samson, 440 F.3d 747, 752 (6th Cir. 2006) (citations and quotation marks omitted); see also Weber v. Dep't of Veterans Affairs, 521 F.3d 1061, 1067 (9th Cir. 2008) (same). And in Elgin, the Supreme Court reiterated that "the CSRA's integrated scheme of administrative and judicial review for aggrieved federal employees was designed to replace an outdated patchwork of statutes and rules that afforded employees the right to challenge employing agency actions in district courts across the country." Elgin, __ U.S. at __, 132 S. Ct. at 2135 (citing and quoting Fausto, 484 U.S. at 444-45) (internal quotation marks omitted). Moreover, as this Circuit has stated with respect to the plaintiff in this case, "the CSRA includes a comprehensive remedial scheme evincing a considered judgment of Congress that certain remedies are not warranted, including the damages remedy Davis seeks for alleged constitutional violations." Davis, 681 F.3d at 388 (internal citations and quotation marks omitted).

"The doctrine of sovereign immunity shields the government from liability for . . . [back pay] payments, except when waived by statute" and "any waiver of sovereign immunity must be strictly construed in favor of the government." Trout v. Sec'y of Navy, 540 F.3d 442, 443 (D.C. Cir. 2008) (citations omitted). Here, although the plaintiff's claims appear to fit the bill of the Back Pay Act, it is clear that his claims are excluded from the comprehensive remedial scheme of the CSRA. In other words, "Congress consciously, 'not inadvertently' omitted remedies for civil-service members employed in or under the Library of Congress." Davis, 681 F.3d at 386. And where Congress has, in one comprehensive, specific statute, namely the CSRA, chosen not

to waive sovereign immunity for the plaintiff's claims, it would be illogical for the Court to find that another, more general statute, like the Back Pay Act, constitutes a waiver of sovereign immunity for the very same claims.  Cf. Brown v. Sec'y of Army, 918 F.2d 214, 218 (D.C. Cir. 1990) ("[A] remedial framework inconsistent with the structure of Title VII is preempted by that Title.").

The Court's conclusion that the Back Pay Act is inapplicable here does not conflict with its earlier holding that Congress did not intend to completely foreclose civil servants in the plaintiff's position from seeking injunctive relief in district courts for colorable constitutional claims.  As this Circuit has stated, "back pay or lost wages traditionally have been viewed as money damages and not specific relief."  Hubbard v. EPA, 949 F.2d 453, 470 (D.C. Cir. 1991).  Thus, although the plaintiff may seek and, if ultimately successful in this lawsuit, receive injunctive relief, he is not entitled to money damages.  See Davis, 681 F.3d at 388 & n.1.

### 3.     The Plaintiff's Request for Reinstatement

In arguing that reinstatement would be an unavailable remedy in this case, the defendant relies principally on the after-acquired evidence rule.  Def.'s Mem. at 10.  Under this rule, reinstatement is generally an inappropriate remedy "if the employer has after-acquired evidence of wrongdoing 'of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.'"  Kapche v. Holder, 677 F.3d 454, 464-65 (D.C. Cir. 2012) (quoting McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 362-63 (1995)).  This is because "[i]t would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds."  McKennon, 513 U.S. at 362.  In order to establish the defense, an employer must show that it "would have discharged the employee because of the misconduct,

not simply that it <u>could have</u> done so." <u>Frazier Indus. Co. v. NLRB</u>, 213 F.3d 750, 760 (D.C. Cir. 2000); <u>see also</u> <u>Kapche</u>, 677 F.3d at 466.  And "[t]o do so, [the defendant] must establish 'that [the employer's] practice has been to dismiss employees for similar [conduct].'" <u>Kapche</u>, 677 F.3d at 466 (quoting <u>Frazier Indus.</u>, 213 F.3d at 760) (some alterations in original).  The Circuit has indicated that affidavits or testimony, together with "company policy" and "common sense," are sufficient to establish that an employer would have terminated an employee for the conduct at issue.  <u>See</u> <u>id.</u> at 467 (citing <u>O'Day v. McDonnell Douglas Helicopter Co.</u>, 79 F.3d 756, 762 (9th Cir. 1996)).

Here, the defendant advances his after-acquired evidence argument with respect to the following three courses of conduct by the plaintiff:  (1) failure to maintain the confidentiality of certain records; (2) mishandling of federal records; and (3) "demonstrated [] lack of honesty and candor."  Def.'s Mem. at 11-15.  He contends that the "[p]laintiff's wholesale destruction of records, removal and use of confidential CRS information, and false statements would have led to his discharge even had he never published the opinion pieces."  <u>Id.</u> at 15.  In particular, the defendant asserts that the "[p]laintiff forwarded three batches of dozens of e-mails and other documents from his CRS e-mail to his personal e-mail account."  <u>Id.</u> at 14 (citing Def.'s Mem., Ex. E (Emails from "Morris Davis" to "col.morris.davis@gmail.com") at 2-4.  The defendant further asserts that the plaintiff "converted thousands of [g]overnment files from the Library into his private possession" on the same day that he submitted a certification attesting that "he had no '[g]overnment property, correspondence, or records.'"  <u>Id.</u> (citing Def.'s Mem., Ex. K (Davis Library of Congress Separation Clearance Form)).

However, the nature of the documents that the plaintiff took with him when he departed from the Library is less clear than the Library contends, and the plaintiff asserts that the deletion

of the emails and documents was not intentional.  The defendant cites to a declaration previously

submitted by the plaintiff, see Def.'s Mem. at 12 (citing ECF 68-2 (Declaration of Morris D.

Davis ("2012 Davis Decl.") ¶¶ 20-24)), in which the plaintiff acknowledges that he copied some

documents and emails onto a "thumb drive," and deleted others.  But what the defendant

characterizes as "deleting thousands of electronic files from their proper repository on a

government computer, and moving sensitive and potentially privileged files into his private

possession," id., overstates the plaintiff's admissions.  First, the plaintiff stated that, "[b]ecause

of [his] position as an Assistant Director at CRS, [he] did not personally create or draft very

many documents during [his] time at CRS, other than emails."  ECF 68-2 (2012 Davis Decl.) ¶

14.  He further states that, "[a]s a result, [he] did not have very many documents on [his] CRS

computer, other than emails."  Id.  Moreover, the plaintiff asserted that his copying and deletion

of emails and other documents was consistent with his past practices in prior government

employment, id. ¶¶ 7-9, and that he received no instructions to the contrary upon beginning his

employment with the Library, id. ¶ 12.  Finally, while the plaintiff admits to taking the emails

and documents, he does not characterize any of the information that he took with him as

confidential.  See generally ECF 68-2 (2012 Morris Decl.).

    To support his contention that the plaintiff's actions would nonetheless have led to his

discharge, the defendant proffers affidavits from four current and former CRS employees.  See

generally Def.'s Mem., Exhibits ("Exs.") A (Declaration of Daniel Mulhollan ("Mulhollan

Decl.")), B (Declaration of Mary Mazanec ("Mazanec Decl.")), C (Declaration of Karen Lewis

("Lewis Decl.")), D (Declaration of Richard Ehlke ("Ehlke Decl.")).  But while each of these

affidavits describes serious misconduct and provides some support for the notion that, on the

basis of the after-acquired evidence, the Library "would have discharged the [plaintiff]," Frazier

Indus., 213 F.3d at 760 (emphasis removed), there is no other indication in the record currently before the Court regarding how the Library would have treated an employee who behaved in the same manner as the plaintiff.  For example, the defendant has presented no proof of an agency policy indicating that the plaintiff's conduct "would have," as opposed to "could have," resulted in dismissal from the Library.  See Frazier Indus., 213 F.3d at 760-61 (finding that employment application which stated that "false information, omissions, or misrepresentations may result in a discharge of the employee" was insufficient to establish that the plaintiff would have been discharged for conduct at issue, and that company policy manual specifying that falsification of records would warrant immediate dismissal was immaterial where manual had not been distributed to employee prior to employee's termination (emphasis added)); Kapche, 677 F.3d at 466 (finding that employer appropriately invoked after-acquired evidence defense where employer presented evidence of its "policy and practice"); Moore v. Gilead Scis., Inc., No. C 07-03850 SI, 2012 WL 1192075, at *8 (N.D. Cal. Apr. 10, 2012) (granting employer's motion to preclude reinstatement based on after-acquired evidence where employee admitted to deleting documents from his hard drive related to pending lawsuit and employer "produced numerous policies prohibiting destruction of [its] documents" as well as "human resource documents relat[ing] to other employees who ha[d] been disciplined for behavior ranging from downloading copyrighted materials to swapping hard drives [to] demonstrate that [the employer] [took] computer misconduct seriously").  Nor has the defendant presented evidence concerning how the Library has treated similarly situated employees who engaged in similar misconduct in the past.  See, e.g., Kapche, 677 F.3d at 466-68 (reviewing testimony of employer's "usual practice" when making hiring decisions); O'Day, 79 F.3d at 762 ("We could hardly require employers in these cases to come forward with proof that they discharged other employees for the precise

misconduct at issue . . . , as often the only proof an employer will have is that adduced in this case—a company policy forbidding the conduct and the testimony of a company official that the conduct would have resulted in immediate discharge.  This does not mean that employers can prevail based only on bald assertions that an employee would have been discharged for the later-discovered misconduct.  In this regard, we find it significant that [the employer's] testimony is corroborated both by the company policy, which plausibly could be read to require discharge for the conduct at issue here, and by common sense." (citations omitted)); Moore, 2012 WL 1192075, at *8 (reviewing evidence of past termination for misconduct similar to that of employee).  The single case cited by the defendant, see Def.'s Mem. at 13, concerned a former Library employee who "was removed from his position as a GS-12 Librarian (Cataloger) at the Library of Congress for intentionally altering and destroying library catalog records," Powitz v. Office of Pers. Mgmt., 82 M.S.P.R. 56, 57 (1999) (emphasis added).  Here, however, it is not clear from the current record whether the plaintiff was aware of which documents were to be treated as Library records.  ECF No. 68-2 (2012 Davis Decl.) ¶ 12.  And the plaintiff contends that he did not intend to destroy the only copy of documents, because he "assumed that the Library archived the data on its network."  Id. ¶ 15.  As a result of the factual disputes concerning the nature of the documents and emails, the plaintiff's intentions, and the lack of evidence concerning Library policy, the Court cannot find on the current record and prior to discovery that the after-acquired evidence rule precludes the possibility of reinstatement as a matter of law.

The defendant's other arguments against reinstatement are that there is continuing hostility between the plaintiff, the Library, and senior CRS leadership, Def.'s Mem. at 16-17, and that there is no comparable position to which the plaintiff may be reinstated, id. at 17-18.  But, as

the plaintiff notes, there has been no discovery in this case.  See Pl.'s Mem. at 11-12.  Rather, the

defendant relies solely on two affidavits stating that it would be "very difficult at best to restore a

collaborative atmosphere among senior management."  Def.'s Mem. at 17 (citing Def.'s Mem.,

Ex. C (Lewis Decl.) ¶ 33); see also Def.'s Mem., Ex. D (Ehlke Decl.) ¶ 40 (stating that, as a

result of his conduct, the plaintiff has "lost the ability to be a collaborator with others on detainee

issues, which should have been one of his greatest assets as an Assistant Director").  This does

not suffice.  Moreover, the cases cited by the defendant as support for his summary judgment

request involve markedly different factual contexts than this case, see Def.'s Mem. at 16-17

(citing Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 845 (2001) (hostile work

environment based on sexual harassment); Navab-Safavi v. Broad. Bd. of Governors, 650 F.

Supp. 2d 40, 74 (D.D.C. 2009) (suggesting, without deciding, that reinstatement is inappropriate

in the context of personal service contracts), aff'd sub nom., Navab-Safavi v. Glassman, 637

F.3d 311 (D.C. Cir. 2011); Thomas v. Nat'l Football League Players Ass'n, 941 F. Supp. 156,

164 (D.D.C. 1996) (finding reinstatement inappropriate where plaintiffs alleged retaliatory

discharge based on racially discriminatory employment practices and where "the economic harm

to the plaintiff [who sought reinstatement] that resulted from defendant's wrongful conduct had

subsided more than six years before the date of judgment"), rev'd in part, 131 F.3d 198 (D.C.

Cir. 1997), vacated in part, No. 96-7242, 1998 WL 1988451 (D.C. Cir. Feb. 25, 1998) (striking

language relating to costs); Castle v. Bentsen, 867 F. Supp. 4, 7 (D.D.C. 1994) (finding

reinstatement and front pay inappropriate after applying the after-acquired evidence rule and

considering evidence that the plaintiff had plagiarized large portions of her work), aff'd sub

nom., Castle v. Rubin, 78 F.3d 654 (D.C. Cir. 1996)), or are actually helpful to the plaintiff's

arguments, see id. at 17 (citing Katz v. Georgetown Univ., No. 00-CV-2412, 2000 WL

33539394, at *7 (D.D.C. Nov. 6, 2000) ("[I]n an action for breach of contract, specific performance is generally only available if monetary damages are deemed to be either inadequate or impractical.")).  Without discovery concerning the nature of the documents and without providing the plaintiff the opportunity to test the defendant's statements about the hostility that would result if the Court were to order reinstatement, the Court cannot find at this juncture that reinstatement is inappropriate as a matter of law.  Because the Court has not yet foreclosed the possibility of reinstatement, there is no cause to address the current lack of a comparable position, as that reality might change when a final judgment is ultimately issued in this case.

Because the CSRA does not bar the plaintiff's colorable constitutional claims, and because the Court cannot find on the current record as a matter of law that ordering reinstatement will be inappropriate, the Court must deny in part the defendant's motion to dismiss. Specifically, the Court grants the defendant's motion as to the plaintiff's claims for front and back pay, and denies the motion in all other respects.

**C.      Whether Summary Judgment Is Warranted**

**1.      The Plaintiff's First Amendment Claims**

Both the defendant and the plaintiff seek summary judgment on the plaintiff's First Amendment claims.  <u>See</u> Pl.'s Mem. at 15; Def.'s Mem. at 21-22.  Under <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968), courts must seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  391 U.S. at 568.  In accordance with the test developed in <u>Pickering</u> and its progeny, this Circuit "has described the public employee's First Amendment cause of action as

having four elements." <u>Tao v. Freeh</u>, 27 F.3d 635, 638 (D.C. Cir. 1994) (citing <u>Hall v. Ford</u>, 856

F.2d 255, 258 (D.C. Cir. 1988)).

> First, the public employee must have been speaking on a matter of public concern.
> . . . Second, the court must balance the interest of the employee as a citizen, in
> commenting upon matters of public concern and the interest of the employer in
> promoting the efficiency of the public services it performs through its employees.
> Thus, only where the employee's speech touches on a matter of public concern,
> and only where the employee's First Amendment interest is not outweighed by
> any disruption that the speech may cause to the efficiency of the public enterprise,
> is that speech constitutionally protected. Third, the employee must prove that
> h[is] speech was a substantial or motivating factor in the denial of the benefit that
> []he sought. Finally, the government employer must be given an opportunity to
> prove that it would have reached the same decision even absent the protected
> conduct. The first two factors under the <u>Pickering</u> test are questions of law for the
> court to resolve, while the latter are questions of fact ordinarily for the jury.

<u>Id.</u> (citations and internal quotation marks omitted).

The defendant focuses on the second element of the <u>Pickering</u> test, arguing that "the

Library 'reasonbl[y] predict[ed]' that [the] [p]laintiff's actions had 'some potential to affect the

[Library's] operations.'" Def.'s Mem. at 21 (quoting <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418

(2006)). In assessing whether a government employer's predictions of harm were reasonable,

courts consider whether "the statement impairs discipline by superiors or harmony among

coworkers, has a detrimental impact on close working relationships for which personal loyalty

and confidence are necessary, or impedes the performance of the speaker's duties or interferes

with the regular operation of the enterprise." <u>Hall</u>, 856 F.2d at 260 (citing and quoting <u>Rankin v.

McPherson</u>, 483 U.S. 378, 388 (1987)). While it is not necessary "for an employer to allow

events to unfold to the extent that the disruption of the office and the of destruction working

relationships is manifest before taking action," <u>Connick v. Myers</u>, 461 U.S. 138, 152 (1983), the

government must present more than "unadorned speculation as to the impact of [the] speech,"

<u>Hall</u>, 856 F.2d at 261. Moreover, the Supreme Court has "caution[ed] that a stronger showing

may be necessary if the employee's speech more substantially involve[s] matters of public concern." Connick, 461 U.S. at 152.  Courts must also consider "the content, manner, time[,] and place of the speech in . . . weighing the governmental interest in regulating the speech." O'Donnell v. Barry, 148 F.3d 1126, 1135 (D.C. Cir. 1998).

The defendant argues that the plaintiff was a "key deput[y]" who "carr[ied] a higher burden of care as to [his] public speech."  Def.'s Mem. at 39 (citing Hall and O'Donnell).  To determine whether a public employee is a high-level employee, the Circuit directs district courts to

> ask first whether the employee's position relates to an area as to which there is room for principled disagreement on goals or their implementation.  In other words, is it a policy area?  If so, we then ask whether the office gives the employee broad responsibilities with respect to policy formulation, implementation, or enunciation.  Put differently, was the individual a policy level employee?  If both criteria are met, we ask whether the government interest in accomplishing its organizational objectives through compatible policy level deputies is implicated by the employee's speech.[3]

Hall, 856 F.2d at 264 (citations omitted); see also O'Donnell, 148 F.3d at 1136.  The First Amendment rights of key deputies and high-level public employees are constrained to a higher degree than other employees.  Hall, 856 F.2d at 263 ("High-level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims.").  Moreover, "[a]n employee may be dismissed who 'expresses views on matters within the core of his responsibilities that reflect[] a policy disagreement with his superiors such that they could not expect him to carry out their policy choices vigorously.'"

---

[3] The defendant points to additional factors set forth elsewhere in Hall.  See Def.'s Mem. at 40 (citing Hall, 856 F.2d at 262).  However, these factors, while related to the test that the Circuit has fashioned for employee speech cases, are factors for consideration in political affiliation cases.  See Hall, 856 F.2d at 261-62.

O'Donnell, 148 F.3d at 1136 (quoting Hall, 856 F.2d at 265).  This Circuit and other members of

this Court have generally limited the high-level employee exception to situations where the

public employee disagrees with either his employer's internal policy or the manner in which the

employer has chosen to respond to a policy issue within the employee's official responsibilities.[4]

See, e.g., Hall, 856 F.2d at 265 (University of the District of Columbia athletic director disagreed

with manner in which the University responded to violations of University and National College

Athletic Association rules); Pearson v. District of Columbia, 644 F. Supp. 2d 23, 43 (D.D.C.

2009) (disagreement over office policy); see also Tao, 27 F.3d at 640 n.4 (finding appellee's

reliance on Hall "misplaced because . . . [the appellant] [was] not a high level employee whose

expression reflected a policy disagreement with her superiors").

 However, the Circuit suggested in a recent decision that the high-level employee

exception applies in an additional context.  In Navab-Safavi, the plaintiff was a contractor for a

federal news service charged with, among other things, providing "accurate, objective, and

comprehensive" news.  637 F.3d at 313, 316.  While still employed by the federal news service,

the plaintiff appeared in a music video that her employer "judged . . . to be anti-American."  Id.

at 314.  The employer argued that the plaintiff's actions "raised two potential threats to [its]

journalistic credibility:  first, that she would cause [the agency] to produce biased work[,] and

second, that, even if she did not, the public could perceive [the agency]'s broadcasting to be

---

[4] Other circuits similarly limit the application of the high-level employee exception.  See Lewis v. Cowen, 165 F.3d 154, 165 (2d Cir. 1999) ("This is not to say that a high-level policymaking employee may never claim the protection of the First Amendment under Pickering, [but] only that a public employer's interests in running an effective and efficient office are given the utmost weight where a high-level subordinate insists on vocally and public criticizing the policies of his employer."); Moran v. Washington, 147 F.3d 839, 850 (9th Cir. 1998) (finding against high-level employee who publicly criticized outreach program that she had been specifically hired to implement, and stating that the court was "most doubtful that the Constitution ever protects the right of a public employee in a policymaking position to criticize her employer's policies or programs simply because she does not share her employer's legislative or administrative vision"); Warzon v. Drew, 60 F.3d 1234, 1239 (7th Cir. 1995) (recognizing that an official's "concern is . . . acute when a[n] [employee] openly disagrees with an official's policy stance in a certain area").

biased because of her editorial role in the agency." Id. at 316.  The employer further argued that "[i]f [its] credibility were compromised in this way . . . this could hinder [its] ability to advance foreign policy."  Id.  The Circuit concluded that it was "inarguable that the government has presented a weighty interest in support of its authority to take action against [the plaintiff's] exercise" of her First Amendment right to free speech.  Id.  The Circuit then observed that the employer would "not likely . . . argue that, for example, a janitor or messenger could be discharged for making an anti-American video[,] . . . . [while on the other hand] it might well be that an on-the-air editorialist for [the news service] or a top executive could be discharged for the same conduct."  Id. at 317.  In other words, the Circuit left room for the possibility that a high-level employee who engages in speech detrimental to his employer but unrelated to his official responsibilities might nonetheless be subject to termination if the public perception of his employer's credibility is based on the employee's non-partisanship and objectivity.

Here, as in Navab-Safavi, the plaintiff worked for an agency that places a premium on the appearance of non-partisanship and objectivity.  See Keeffe v. Library of Congress, 777 F.2d 1573, 1577-78 (D.C. Cir. 1985).  And in both cases, the plaintiffs engaged in speech that neither criticized an internal policy nor the employer's chosen response to a public policy issue.  But it is not clear from the existing record whether the plaintiff here is a high-level employee.  Compare Pl.'s Mem. at 22 (disputing whether the plaintiff held a high-level position within the CRS); Pl.'s Mot., Attachment ("Attach.") 6 (Declaration of Morris D. Davis ("2013 Davis Decl.")) ¶ 13 ("My main day-to-day duties as an Assistant Director were to lead, plan, direct, and evaluate the research and analytical activities in the policy areas assigned to the [Foreign Affairs, Defense, and Trade] Division: foreign affairs, the [United States] Department of Defense, and international trade and finance."), and Pl.'s Reply at 16 ("Col. Davis has consistently maintained

that his role a[t] CRS was not that of a 'key deputy' as defined in the caselaw."), <u>with</u> Def.'s Mem. at 39-41 (characterizing the plaintiff's position as "a key role within the Service's small senior leadership core"), <u>and id.</u>, Ex. A (Mulhollan Decl.) ¶¶ 14-18.  The defendant relies in part on the position description of a CRS Assistant Director, <u>see</u> Def.'s Mem., Ex. A (Mulhollan Decl.) ¶ 14; <u>see also</u> Def.'s Mem. at 40, but this description is not dispositive, <u>see</u> <u>Garcetti</u>, 547 U.S. at 424 ("We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.").  Because the parties dispute whether the nature of the plaintiff's role within the CRS afforded him "broad responsibilities with respect to policy formulation, implementation, or enunciation," <u>Hall</u>, 856 F.2d at 264, the Court finds that there is a genuine issue of material fact as to whether the plaintiff was a high-level employee within the meaning of <u>Hall</u>.  Thus, while the Circuit's ruling in <u>Navab-Safavi</u> possibly lends support to the defendant's argument that the Library was justified in dismissing the plaintiff from the Assistant Director position regardless of whether his speech related to his official responsibilities, the Court cannot on the current record find that the plaintiff had a higher burden of care or was obligated to exercise special caution in the exercise of his speech.  Rather, because there are issues of fact concerning the plaintiff's responsibilities, the Court must consider whether either party is entitled to summary judgment without employing the high-level employee analysis.

The Court therefore turns to the alleged harm that the plaintiff's speech caused the defendant.  The defendant contends first that the "[p]laintiff was not separated because [the] CRS disagreed with the content of his publication," but rather because of "his sustained failure of professional judgment."  Def.'s Mem. at 25.  In advancing his argument, the defendant attempts to separate the plaintiff's publication of the opinion pieces from his conduct concerning how and when he notified his superiors about the publication of the opinion pieces and also his conduct

during and after meetings concerning the opinion pieces.  See id. at 25-27.  The Court finds this

approach illogical.  To separate the plaintiff's speech from his interactions with the Library

before and after the opinion pieces were published—interactions that concerned the opinion

pieces—would ignore the Court's obligation to consider not only the speech, but also the

government's interest in regulating that speech, as well as the impact that the speech could or did

have in the workplace.  Additionally, the "[p]laintiff maintains that each of the reasons claimed

by [the] [d]efendant" for terminating his employment "was pretextual, based on the

misapplication of Library policies, or was not conduct that had been treated as a disciplinary

matter by the Library in the past."  Pl.'s Disputed Facts ¶ 2.  Because there is a dispute as to

whether it was the plaintiff's alleged "sustained failure of professional judgment" or his

publication of the opinion pieces that resulted in his dismissal, the Court cannot grant either

party's motion for summary judgment on these grounds.

The defendant argues next that the "CRS could have reasonably concluded that [the]

[p]laintiff's publication of the November 2009 opinion pieces cast substantial doubt on his

commitment to fundamental CRS policies designed to further the Service's mandated

commitment to objectivity and non-partisanship."  Def.'s Mem. at 27; see also id. at 27-30.  The

plaintiff repeats the response he made in opposition to the previous argument.  Pl.'s Disputed

Facts ¶ 2.  Moreover, the plaintiff cites opinion pieces published by other Library employees in

the New York Times, the Legal Times, and the Washington Times, and contends that none of

these employees were disciplined.  Id. ¶ 3 (citing Declaration of Lee Rowland ("Rowland

Decl."), Exs. L, M, N).  The plaintiff submitted with his motion for summary judgment the

declaration of one of his former colleagues, who states that he "wrote a sharply-worded opinion

piece on land use policy in Washington, D.C., which was prominently published in the Sunday

<u>Washington Post</u>'s 'Outlook' section in January 1996." Pl.'s Mot., Attach. 7 (Declaration of

Richard F. Grimmett ("Grimmett Decl.")) ¶ 22. Grimmett represents that although "[t]he piece

criticized" certain government recommendations, "urged readers to take specific action," and

"contained no disclaimer," <u>id.</u>, he remained employed by the CRS, <u>see id.</u> ¶¶ 2, 4 (stating that

Grimmett was hired by the CRS in 1974 and remained employed there for 38 years, which was

more than 15 years after his opinion piece was published). That Grimmett remained employed

despite engaging in seemingly similar conduct, <u>id.</u> ¶¶ 2, 4, 22, and possibly other employees, as

well, Pl.'s Disputed Facts ¶ 3 (citing Rowland Decl., Exs. L, M, N (Letters to the Editor

published in the <u>New York Times</u>, <u>Legal Times</u>, and <u>Washington Times</u>)), calls into question the

defendant's assertions regarding its concern about the plaintiff's "commitment to fundamental

CRS policies." Def.'s Mem. at 27. Accordingly, the Court finds that summary judgment for

either party on these grounds is also inappropriate.

     The defendant argues also that the "[p]laintiff's decision to publish his two pieces deeply

undermined his relationship with then-Director Mulhollan and other colleagues." Def.'s Mem. at

32. The Supreme Court

> ha[s] previously recognized as pertinent considerations whether the statement
> impairs discipline by superiors or harmony among co-workers, has a detrimental
> impact on close working relationships for which personal loyalty and confidence
> are necessary, or impedes the performance of the speaker's duties or interferes
> with the regular operation of the enterprise.

<u>Rankin</u>, 483 U.S. at 388 (citing <u>Pickering</u>, 391 U.S. at 570-73); <u>see also</u> <u>O'Donnell</u>, 148 F.3d at

1135. Indeed, "[i]nterference with work, personnel relationships, or the speaker's job

performance can detract from the public employer's function; avoiding such interference can be

a strong state interest." <u>Rankin</u>, 483 U.S. at 388. And as noted earlier, "the employer need not

'allow events to unfold to the extent that the disruption of the office and the destruction of

working relationships is manifest before taking action.'"  <u>Hall</u>, 856 F.3d at 261 (quoting

<u>Connick</u>, 461 U.S. at 152).

Here, the defendants have presented evidence that the publication of the plaintiff's

opinion pieces "impair[ed] discipline by superiors [and] harmony among co-workers."  <u>Rankin</u>,

483 U.S. at 388.  As noted in the Lewis Declaration, "[t]o effectively fulfill [the CRS's] duties to

provide balanced and authoritative advice, collaboration between and among divisions is

encouraged and often mandated in both formal and informal ways."  Def.'s Mem., Ex. C (Lewis

Decl.) ¶ 12.  Lewis further contends that attorneys in the CRS's American Law Division "have

collaborated with analysts in [the Foreign Affairs, Defense, and Trade Division] on issues related

to Guantanamo and detainee treatment, military commissions, and national security, to name just

a few," <u>id.</u> ¶ 15, and that the attorneys collaborated specifically with the plaintiff on these issues,

<u>id.</u> ¶¶ 17-19.  However, "[a]fter the publication of [the] [p]laintiff's opinion pieces, [Lewis]

discussed the pieces with the attorneys who work on these issues and advised them not to seek

[the] [p]laintiff's assistance in their future research and writing" because she was "concerned that

their work would be tainted."  <u>Id.</u> ¶ 31.  Lewis also states in her declaration that the "[p]laintiff's

decision to write these opinion pieces negatively impacted [her] professional working

relationship with him because [she] was disappointed in the example he set."  <u>Id.</u> ¶ 32.  She

contends that she and the plaintiff "never talked much after their publication," and that "it

seemed clear to [her] that he was unable to separate himself from the issues that he cared deeply

about and also carry out his responsibilities as an [Assistant Director] in [the] CRS."  <u>Id.</u>  Finally,

she states that

> [i]f [the] [p]laintiff were 'reinstated' to [the] CRS in a senior leadership position,
> whether as [Assistant Director] for [the Foreign Affairs, Defense, and Trade
> Division] or in an arguably comparable senior position, [she] would have deep
> reservations based on his prior conduct as to whether he could meet effectively

the professional obligations that come with such a position, [and that she would] have similar reservations about whether [she] could ever effectively work with [the] [p]laintiff again in the unique context of CRS' senior leadership team given his prior conduct.

Id. ¶ 33.  The Ehlke Declaration expresses similar concerns.  See Def.'s Mem., Ex. D (Ehlke Decl.) ¶ 40 ("[The] [p]laintiff's conduct impaired the necessary sense of harmony and collaboration among him and his co-workers, particularly at the Assistant Director level.  [His] behavior was uniformly condemned by his fellow [Assistant Directors]; it shattered their collaborative relationship and undermined his credibility in the eyes of his fellow [Assistant Directors].  In particular, he lost the ability to be a collaborator with others on detainee issues, which should have been one of his greatest assets as an Assistant Director.").

But the plaintiff has submitted his own declaration that contradicts the assertions set forth in the Lewis and Ehlke Declarations.  Unsurprisingly, the plaintiff contends that "[his] colleagues at [the] CRS never expressed outrage or concern over the content of [his] opinion pieces during [his] time there.  To the contrary, business continued as usual after the articles' publication."  Pl.'s Mot., Attach. 6, (2013 Davis Decl.) ¶ 52.  He further states that the "Assistant Directors got together each month to catch up and compare notes over wine and cheese, and to the best of [his] recollection [he] attended one of those get-togethers after the publication of the articles."  Id.  He states that he "never detected any change in how [the other Assistant Directors] interacted with [him]."  Id.  As to the representations in the Lewis Declaration, the plaintiff responds that he "continued working with [her] for more than two months after the articles came out, and [he] cannot recall her ever saying anything even remotely similar to what she says in her declaration."  Id. ¶ 55.  He states that "[they] did not stop speaking and continued to go to the same meetings."  Id.  Further, the plaintiff states that he "ha[s] maintained positive relationships

with [his] [former] colleagues and former subordinates, who have been extremely supportive of [him] throughout this process." Id. ¶ 58.

Even if the defendant's declarations comprise more than "unadorned speculation as to the impact of the speech," Hall, 856 F.2d at 261, the plaintiff has challenged the defendant's characterization of that impact through his own declaration. It is well-established that on a motion for summary judgment, "[c]redibility determinations . . . are jury functions, not those of a judge." Anderson, 477 U.S. at 255. Where, as here, the parties have presented directly contradictory, written statements about the level of discord, if any, between the plaintiff and his colleagues following the publication of the plaintiff's opinion pieces, it is not only impossible, but also inappropriate for the Court to determine which party's depiction of the facts is accurate. Accordingly, the Court cannot conclude that the plaintiff's speech "impair[ed] discipline by superiors or harmony among co-workers, [or] ha[d] a detrimental impact on close working relationships," Rankin, 483 U.S. at 388, and therefore cannot grant summary judgment on such grounds.

The defendant further argues that the plaintiff's "conduct was even more damaging to [the] CRS in light of the role that he was expected to play as Assistant Director for [the Foreign Affairs, Defense, and Trade Division] . . . on detainee and military commission issues." Def.'s Mem. at 34. In asserting that the plaintiff's official responsibilities included detainee and military commission issues, the defendant argues that the plaintiff has "admitted significant responsibility for" those issues. Id. at 35-37 (citing Def.'s Mem., Ex. R (email correspondence attaching Mid-Term Assessment); Pl.'s Mot., Attach. 6 (2013 Davis Decl.) ¶ 25; Def.'s Mem., Exs. M, S, T, U (email correspondence)). But what the defendant characterizes as admissions of "significant responsibility" are references to discussions in which the plaintiff took part rather

than admissions or assertions of his official responsibilities.  Indeed, the statements in the emails

could be read as puffery designed to make the plaintiff appear more involved in detainee issues

than he actually was.  Furthermore, the statements do not speak to the role that the Library

expected the plaintiff to play but rather, if anything, to his own subjective understanding of his

role—an understanding which he asserts changed at some point prior to the publications of the

opinion pieces.[5]  See Pl.'s Mot., Attach. 6 (2013 Davis Decl.) ¶ 29.

Additionally, the plaintiff has submitted the Grimmett Declaration, which states that "no

one at [the Foreign Affairs, Defense, and Trade Division] had any formal or public responsibility

for anything involving Guantánamo Bay or the related military commissions," and that "[i]f

anyone within [the Division] had been tapped to work on military commissions issues . . . it

would likely have been [him, i.e., Grimmett], as [he] was an expert on war powers.  However,

[he] was never asked to work on military commissions issues broadly or Guantánamo

---

[5] The defendant now urges the Court to impose an "argument-preclusion sanction" to "preclude [the] [p]laintiff from denying," among other things, "his involvement with military commission or detainee issues."  Def.'s Mem. at 24-25.  The parties previously briefed and presented oral argument on the merits of the Defendant's Material Evidence and Misappropriation of Government Information.  See ECF No. 63.  The Court denied the motion, but "reserve[d] for consideration the issue of whether an adverse inference instruction is warranted."  See ECF No. 86 at 1.  An issue-related sanction in the form of an adverse inference instruction or something similar is warranted where:

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind"; and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defense of the party that sought it.

Mazloum v. D.C. Metro. Police Dep't, 530 F. Supp. 2d 282, 291 (D.D.C. 2008) (citation omitted).  "[A] district court may impose issue-related sanctions whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue."  Shepherd v. Am. Broad. Cos., 62 F.3d 1469, 1478 (D.C. Cir. 1995).  Here, the defendant argues that a large number of relevant emails from the period of time giving rise to this litigation are missing, Def.'s Mem. at 24, and the plaintiff responds that he "absolutely did not intentionally delete any e-mails because of their timing or relation to the events giving rise to this litigation," Pl.'s Mot., Attach. 6 (2013 Davis Decl.) ¶ 59.  The posture of this case today is thus no different than it was when the parties briefed and argued the merits of the defendant's motion for sanctions:  discovery has not begun, and the Court has no basis upon which to conclude that the plaintiff's deletion of the emails in question "was accompanied by a culpable state of mind."  Mazloum, 530 F. Supp. 2d at 291 (citation and internal quotation marks omitted).  The Court therefore declines to impose an argument preclusion sanction at this time.

specifically."  Pl.'s Mot., Attach. 7 (Grimmett Decl.) ¶ 6.  In light of the factual disputes surrounding the scope of the plaintiff's responsibilities, the Court cannot grant summary judgment to either party on these grounds.

Finally, the defendant argues that the plaintiff's use of his CRS computer during work hours to edit and submit edits to the opinion piece that he published in the <u>Wall Street Journal</u> weigh in favor of the government's interest in regulating the plaintiff's speech.  <u>See</u> Def.'s Mem. at 41.  The defendant is correct that "content, manner, time[,] and place of speech" are relevant factors that the Court must consider.  <u>See</u> <u>O'Donnell</u>, 148 F.3d at 1135.  And a former member of this Court held in another case that a "[p]laintiff's liberty interest in speaking on matters of public concern is diminished by the fact that [he] used government property to do so."  <u>Waldau v. Coughlin</u>, Civ. Ac. No. 95-1151, 1997 WL 161958, at *6 (D.D.C. Apr. 1, 1997), <u>aff'd</u>, No. 97-5162, 1997 WL 634539, at *1 (D.C. Cir. Sept. 25, 1997).  Here, the plaintiff concedes that he used at least some CRS time and resources in order to finalize his <u>Wall Street Journal</u> opinion piece.  <u>See</u> Pl.'s Mem. at 31.  The Court therefore finds that the plaintiff's interest in speaking is diminished with respect to that particular opinion piece.

However, it is not apparent from the current record how much CRS time the plaintiff spent in order to finalize the <u>Wall Street Journal</u> opinion piece.  In light of that uncertainty, as well as the myriad of other factual disputes raised by the parties' motions and other submissions, the Court cannot find that the government's interest in regulating the plaintiff's speech outweighed the plaintiff's speech interest.  Accordingly, the Court must deny without prejudice both parties' motions for summary judgment on the plaintiff's First Amendment claims.

2.        **The Plaintiff's Fifth Amendment Due Process Claim**

The plaintiff argues that "the application of the Library rules to [him] was unconstitutionally vague because nothing in the policies or their past enforcement gave [him] 'fair warning' that [the] CRS might interpret them to apply to his outside speech about the military commissions system—on which he had previously been permitted to speak."  Pl.'s Mem. at 38.  The defendant argues that the plaintiff "fails to establish any of the legal or factual prerequisites for . . . [a Fifth Amendment due process] claim."  Def.'s Mem. at 43.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).  To be sure, when a statute "interferes with the right of free speech or of association, a more stringent test of vagueness should apply."  Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982).  But "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989).

As an initial matter, the Court notes that it previously held that the Library's speech policy is not void as facially vague, see Davis, 775 F. Supp. 2d at 43, and on appeal the Circuit did not disturb that holding, see Davis, 681 F.3d at 388.  The plaintiff's sole claim, therefore, is whether the speech policy, as applied to him, violated his due process rights.

The Court also previously held that the plaintiff had stated a claim under the Fifth Amendment.  See Davis, 755 F. Supp. 2d at 46.  As the Court noted, this Circuit has directly addressed the Library's regulations, stating that "'the Library must . . . give loud and clear advance notice when it [decides] to interpret a particular regulation as a prohibition of the limitation on an employee's outside activity.  Without this notice, an employee is entitled to read

the Library's overly long silence as assent.'"  <u>Id.</u> (quoting <u>Keeffe</u>, 777 F.2d at 1583).  In so

holding, this Court found that the plaintiff had stated a claim because he "was not provided fair

warning of the adverse consequences of" publishing his opinion pieces, <u>Davis</u>, 755 F. Supp. 2d

at 46, that is, fair notice that his employment would be terminated.

 The defendant now argues that the plaintiff's Fifth Amendment claim can survive

summary judgment only if he has stated a constitutionally protected <u>property</u> interest in his

employment with the Library of Congress.  Def.'s Mem. at 43-44.  The plaintiff appears to

concede that he has no property interest in his employment, and instead argues that his "claim is

grounded in his liberty interest in free speech."  Pl.'s Mem. at 42.  As a result, the plaintiff's

claim fails.  The Supreme Court has long held that, "[w]here a particular Amendment 'provides

an explicit textual source of constitutional protection' against a particular sort of government

behavior, 'that Amendment . . . must be the guide for analyzing these claims.'"  <u>Albright v.</u>

<u>Oliver</u>, 510 U.S. 266, 273 (1994) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989)).

Indeed, the cases that the plaintiff cites as supporting his liberty interest in free speech are First

Amendment cases, or cases addressing whether the statutes at issue were unconstitutionally

vague.  <u>See</u> Pl.'s Mem. at 42 (citing <u>Rankin</u>, 483 U.S. at 383-84; <u>Keyishian v. Bd. of Regents</u>,

385 U.S. 589, 664 (1967); <u>Cramp v. Bd. of Pub. Instruction</u>, 368 U.S. 278, 288 (1961)).  While a

<u>property</u> interest in employment might be protected under the Fifth Amendment, <u>Keeffe</u>, 777

F.2d at 1583, a <u>liberty</u> interest in free speech cannot be.  Rather, a particular Amendment—the

First Amendment—explicitly provides for the protection of the plaintiff's liberty interest in free

speech.  Accordingly, regardless of the ultimate conclusion of this case, the plaintiff cannot state

a Fifth Amendment liberty interest in free speech.  <u>See</u> <u>Albright</u>, 510 U.S. at 273; <u>Graham</u>, 490

U.S. at 395.  The Court therefore grants summary judgment to the defendant on the plaintiff's

Fifth Amendment claim.

### IV.  CONCLUSION

For the foregoing reasons, the Court will deny in part and grant in part the defendant's

motions to dismiss and for summary judgment, and will deny the plaintiff's motion for summary

judgment in its entirety.[6]

**SO ORDERED** this 25th day of June, 2014.

REGGIE B. WALTON
United States District Judge

---

[6] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.